## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**DARRYL PELICHET**, and
**BONN WASHINGTON**,

        Plaintiffs,

v.

**NICK LYON**, individually,
**LISA MEDOFF**, individually,
**MARY CLAIRE SOLKY**, individually,
**LAURIE ALBERT**, individually,
**HANUMAIAH BANDLA**, individually,
**CHARLES STERN**, individually,
**ARUNA BAVINENI**, individually,
**SHARON DODD-KIMMEY**, individually,
**CRAIG LEMMEN**, individually,
**KIMBERLY KULP-OSTERLAND**,
individually,
**LISA MARQUIS**, individually,
**MARTHA SMITH**, individually,
**DAVE BARRY**, individually,
**KELLI SCHAEFER**, individually,
**JOE CORSO**, individually,
**DIANE HEISEL**, individually,
**HEGIRA PROGRAMS, INC.,**
**CARELINK NETWORK, INC.,** and
**MICHIGAN DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES**
(Count II and injunctive relief only),

        Defendants.

_____ /

Case No.:

Hon.:

JURY DEMAND

Laurence H. Margolis (P69635)
*Margolis Law, PC*
Attorneys for Plaintiffs
214 S. Main St., Suite 202
Ann Arbor, MI 48104

James M. Gallagher (P73038)
*James Gallagher PLLC*
Attorneys for Plaintiffs
214 S. Main St., Suite 202
Ann Arbor, MI 48104

(734) 994-9590                          (734) 274-5090
Email: larry@lawinannarbor.com          Email:jgallagher@jamesgallagherlaw.com

_____ /

# COMPLAINT

Plaintiffs Darryl Pelichet and Bonn Washington—stable and nonviolent individuals suffering from mental illness and subjected to repeated unlawful involuntary civil commitment—bring this action for legal and equitable relief against Defendants for deprivation of Plaintiffs' federally protected civil rights pursuant to Section 1983 and the American's with Disabilities Act. For their cause of action against the Defendants, Plaintiffs respectfully state as follows:

## JURISDICTION AND VENUE

1.      This action is brought against Defendants pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 12132 for deprivation of civil rights secured by the Fourth and Fourteenth Amendments to the United States Constitution and for violation of the integration mandate under Title II of the Americans with Disabilities Act.

2.      Jurisdiction is founded upon 28 U.S.C. § 1331, § 1343(a)(3)(4), and § 1367(a). This Court has jurisdiction over the Plaintiffs' claims of violation of civil rights under 42 U.S.C. § 1983. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that the factual acts and omissions which give rise to this cause of action occurred within this judicial district.

## THE DEFENDANTS

3.     Janet Olszewski (not named as a Defendant) was the Director of the Michigan Department of Community Health, now known as the Michigan Department of Health and Human Services ("MDHHS,") from January 2003 to December 2010.

4.     During her tenure as Director, Ms. Olszewski issued Administrative Directive 10-C-1050-AD (Exhibit A.) Through her Administrative Directive, Ms. Olszewski ordered Michigan's regional psychiatric hospitals and community mental health service providers to automatically file a petition in Probate Court for one year of involuntary hospitalization for every "Not Guilty by Reason of Insanity" ("NGRI") patient, every year, regardless of whether the patient's treating physicians believed that the patient continued to satisfy the statutory or constitutional requirements for involuntary civil commitment.

5.     The MDHH policy promulgated by former Director Olszewski caused an unknown number of Michigan residents, including the Plaintiffs, to spend years of their lives unnecessarily and unconstitutionally confined in state-operated psychiatric hospitals.

6.     Defendant Nick Lyon is the present Director of MDHHS and was the Director of the Michigan Department of Community Health from September of 2014 until April of 2015, when that agency was merged into MDHHS.

7.     As Director of the Michigan Department of Community Health and later as Director of MDHHS, Defendant Lyon continued to enforce the policy promulgated by former Director Olszewski.

8.     Defendant Lisa Medoff is the Director of Psychology at Walter P. Reuther Psychiatric Hospital.

9.     Defendant Laurie Albert is the Director of Social Work at Walter P. Reuther Psychiatric Hospital.

10.     Defendant Hanumaiah Bandla is the Chief of Clinical Affairs at Walter P. Reuther Psychiatric Hospital**.**

11.     Defendant Mary Clare Solky is the Hospital Director at Walter P. Reuther Psychiatric Hospital.

12.     Defendants Medoff, Albert, Bandla, and Solky (collectively, the "Hospital Management Defendants,")  directed less-senior staff members at the Hospital to file petitions for one-year hospitalization treatment orders for every NGRI patient, every year as a matter of course, regardless of whether the individual patient continued to meet the statutory and constitutional criteria for involuntary civil commitment and regardless of whether an institutional setting continued to be the least restrictive treatment environment suitable to the patient's needs.

13.     The Hospital Management Defendants continued to enforce this policy even after they were informed by the MDHHS Office of Recipient Rights, in October 2017, that the policy violated the statutory and constitutional rights of the patients in their care.

14.     Defendant Charles Stern is a psychologist who, on an independent-contractor basis, conducts cursory examinations of patients at Walter P. Reuther Psychiatric Hospital and testifies for the hospital in Probate Court proceedings.

15.     Defendant Stern invariably concludes, after a cursory exam of each patient for less than twenty minutes, that the patient continues to meet the statutory criteria for involuntary civil commitment and that a no less restrictive treatment setting than a closed psychiatric hospital is appropriate.

16.     Multiple investigations conducted by the MDHHS Office of Recipient Rights have found Defendant Stern responsible for proffering false or misleading testimony in Probate Court hearings, including at a hearing held in November of 2016 regarding a petition to impose an additional year of involuntary hospitalization on Mr. Pelichet. *See Ex. B:* Report of Investigative Findings from Office of Recipient Rights, dated 2/8/17; *Ex. C:* Report of Investigative Findings from Office of Recipient Rights, Amended, 6/12/17; *Ex. D:* Report of Investigative Findings from Office of Recipient Rights, dated 9/8/17; *Ex. E:* Summary Report of Recipient Rights Complaint Amended Report – 4th revision.

17.     Defendant Aruna Bavineni is a psychiatrist employed by Walter P. Reuther Psychiatric Hospital and was Mr. Pelichet's treating psychiatrist in 2016.

18.     At the express or implicit direction of the Hospital Management Defendants, Defendant Bavineni completed a Clinical Certificate on October 30, 2016 for submission to the Wayne County Probate Court. In that certificate, she alleged Plaintiff Darryl Pelichet was a "Person Requiring Treatment," as defined in Section 401 of the Michigan Mental Health Code, while indicating that Mr. Pelichet did not meet any of the four statutory bases for classification as a "Person Requiring Treatment."

19.     In the "Likelihood of injury to self" space on the October 30, 2016 Clinical Certificate form, Defendant Bavineni wrote only, "He denied." In the "Likelihood of injury to others" space, she wrote, "He denied." In the "Inability to attend to basic physical needs" space, she wrote only: "He is taking care of his personal hygiene." And in the "Inability to understand the need for treatment" space, she wrote only: "He was provided with IM medications." *See Ex. F: Clinical Certificate Completed by Defendant Bavineni on 10-30-2016.*

20.     On April 17, 2017, Defendant Bavineni completed a Six-Month Review Report for Darryl Pelichet, which is a form submitted by the hospital to the Probate Court when a patient exercises his right, after six months of a one-year involuntary commitment order, to file a Petition for Discharge.

21.    In the Six-Month Review Report, Defendant Bavineni indicated, "I believe that the individual has a mental illness and as a result of that mental illness, the individual can reasonably be expected in the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in an act or acts or made significant threats that are substantially supportive of this expectation." *Ex. G*: Six-Month Review Report by Defendant  Bavineni, 4/17/17.

22.    In the next section of the form, Defendant Bavineni indicated that "This conclusion is based on the following facts of which I have personal knowledge: *Seen and evaluated the patient. Reviewed the medical records and discussed with different treatment team members."* (Italicized portion handwritten). Defendant Bavineni did not provide any further indications of what "act or acts" or "significant threats" Mr. Pelichet had made which caused her to believe that he would seriously physically injure someone in the near future.

23.    On May 3rd, 2017, only sixteen days after completing the Six-Month Review Report, Defendant Bavineni conducted a psychiatric evaluation of Darryl Pelichet. In her psychiatric evaluation, Defendant Bavineni indicated that Mr. Pelichet had *no risk* of violence to himself over the past six months, *no risk* of violence to others over the past six months, *no current or past risk* of suicide/violence to self, and *no current or past risk* of violence to others. *See Ex. H*: Psychiatric Evaluation of Darryl Pelichet by Aruna Bavineni on 05/03/17.

24.     When interviewed by internal investigators about the Six-Month Review Report she completed in April of 2017, Defendant Bavineni apparently "did not understand that facts were required to support the assertion" that Mr. Pelichet required an additional year of involuntary hospitalization. *See Ex. D:* Report of Investigative Findings from Office of Recipient Rights, dated 9/8/17.

25.     Defendants Sharon Dodd-Kimmey, Craig Lemmen, Kimberly Kulp-Osterland, Lisa Marquis, Martha Smith, Dave Barry, Kelli Schaefer, Joe Corso, and Diane Heisel are the members of the "NGRI Committee" at the Center for Forensic Psychiatry (hereafter the "NGRI Committee Defendants.")

26.     The NGRI Committee Defendants, acting under color of state law, used and continue to use the authority granted to them by Administrative Directive 10-C-1050-AD to exercise control over what recommendations psychiatrists, psychologists, and other treating professionals can make to the Probate Court regarding the NGRI patients in their care.

27.     The NGRI Committee Defendants compelled and continue to compel Community Mental Health Service Providers, including Defendants Hegira Programs, Inc., and CareLink Network, Inc., to file petitions for involuntary civil commitment against NGRI patients living in the community solely for the purpose of maintaining those patients' NGRI status, and not because they continued to meet the statutory and constitutional criteria for involuntary civil commitment.

28.     Defendants Hegira Programs, Inc., and CareLink Network, Inc., (hereafter Community Mental Health Service Providers or "CMHSP Defendants,") are Michigan nonprofit corporations that contract with the Michigan Department of Health and Human Services to provide mental health and substance abuse treatment programs to Michigan residents.

29.     The CMHSP Defendants, in their contractual agreements with the NGRI Committee Defendants, agreed to petition the Probate Court for a one-year continuing Hospitalization Treatment Order for every NGRI patient placed in their care, every year for five years, and to never make a recommendation to the Probate Court for discharge or for alternative/assisted outpatient treatment, regardless of the opinions of their own treating professionals about the patient's present condition and treatment needs.

30.     All NGRI patients that are in the care of the CMHSP Defendants are living in community settings, such as adult foster care homes, with family, or independently, and receiving outpatient treatment. Paradoxically, the CMHSP Defendants never recommend alternative/assisted outpatient treatment to the Probate Court, even though this is precisely what their patients are receiving and will continue to receive.

31.     The CMHSP Defendants do not recommend alternative/assisted outpatient treatment because a patient on an "Alternative Treatment Order" ceases

to be "inpatient" at a regional psychiatric hospital under Michigan law. When a patient is not an "inpatient," the NGRI Committee Defendants lose their ability to summarily compel the patient to return to the psychiatric hospital without filing a new petition for involuntary civil commitment. The CMHSP Defendants, at the behest of the NGRI Committee Defendants, therefore routinely seek a court order for one year of hospitalization, and the patient is considered an inpatient on an authorized leave of absence from the hospital for the entire year. This process is repeated annually for a five-year period.

32.     The CMHSP Defendants made facially invalid petitions for one-year Hospitalization Treatment Orders for Plaintiffs Darryl Pelichet and Bonn Washington and so caused the Plaintiffs to be subject to restrictions on their liberty which were not based on meaningful, individualized assessments of their present treatment needs.

## THE PLAINTIFFS

### A. Darryl Pelichet

33.     Plaintiff Darryl Pelichet is a thirty-eight-year-old man who suffers from schizoaffective disorder. Like many patients with schizoaffective disorder, Mr. Pelichet first began experiencing the symptoms of his disease in his 20's.

34.     In 2005, at the age of twenty-four, Mr. Pelichet punched a City of Farmington police officer during an acute psychotic episode.

35.    At the time of the incident, Mr. Pelichet had not yet been diagnosed with schizoaffective disorder and had not started taking antipsychotic medication.

36.    Mr. Pelichet was charged with assaulting a police officer and subsequently found Not Guilty by Reason of Insanity ("NGRI").

37.    Immediately following his acquittal, Mr. Pelichet was civilly committed to the Center for Forensic Psychiatry for inpatient psychiatric treatment. He began receiving treatment and antipsychotic medication for the first time.

38.    Mr. Pelichet responded well to medication and treatment.    He understood and accepted the reality of his mental illness, was voluntarily compliant with his medication, and his symptoms went into remission.

39.    Mr. Pelichet has not experienced any acute psychotic episodes or engaged in any violent behavior in the thirteen years since he began taking medication to treat his condition.

40.    After approximately five months in the Center for Forensic Psychiatry, Mr. Pelichet was transferred to the Kalamazoo Psychiatric Hospital, a less restrictive facility.

41.    In February of 2007, Mr. Pelichet was placed on "Authorized Leave Status" ("ALS") from the Kalamazoo Psychiatric Hospital pursuant to an "ALS contract." Mr. Pelichet was required to sign the contract in order to be released from otherwise indefinite confinement.

42.     Mr. Pelichet's ALS contract laid out a series of parole-like conditions of release that he was required to comply with for a period of five years. The penalty for violating a condition of the ALS contract was an immediate return to custody at a closed psychiatric facility.

43.     Mr. Pelichet was returned to custody in January of 2008, this time at the Walter P. Reuther Psychiatric Hospital, when he tested positive for marijuana on a random drug screen. Unlike a probationer or parolee charged with a violation, Mr. Pelichet had no opportunity to contest his return to custody in court and no access to court-appointed legal counsel.

44.     Mr. Pelichet was released pursuant to ALS contracts on seven occasions between 2005 and 2017. When not in custody, Mr. Pelichet worked as a delivery truck driver and as a taxi driver. His stretches of conditional liberty ranged from three months to approximately one and a half years.

45.     On each occasion except the last, Mr. Pelichet was returned to the hospital for violating the ALS contract by testing positive for marijuana. Each subsequent release was pursuant to a new ALS contract that required a renewed five-year, violation-free period before Mr. Pelichet could be discharged.

46.     Mr. Pelichet also suffers from multiple sclerosis, a progressive nerve disease that often leads to partial or complete paralysis and death. Multiple sclerosis is among the "debilitating medical conditions" which may qualify a person to use

medical marijuana per the Michigan Medical Marijuana Act ("MMMA"). Mich. Comp. Laws § 333.26423(b)(2) (2018). Mr. Pelichet applied for and was issued a patient registration card in accordance with the MMMA. He used marijuana to alleviate the pain and muscle spasms associated with multiple sclerosis.

47.     After each positive drug test, Mr. Pelichet was confined in the Walter P. Reuther Psychiatric Hospital under restrictive conditions for approximately one year.

48.     Mr. Pelichet received little-to-no substance abuse treatment during his periods of confinement at Walter P. Reuther Psychiatric Hospital.

49.     Both Michigan law and the United States Constitution prohibit the involuntary civil commitment in a psychiatric hospital of a person who is not both mentally ill *and* dangerous. Mich. Comp. Laws § 330.1401 (2018); *Foucha v. Louisiana*, 504 U.S. 71, 77-78 (1992) ("[It is] unconstitutional for a State to continue to confine a harmless, mentally ill person."); *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975) ("a finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement.")

50.     Michigan law limits the duration of a Hospitalization Treatment Order for involuntary commitment to a psychiatric hospital to one year.

51.     Michigan law further requires that a Petition for a one-year continuing Hospitalization Treatment Order be accompanied by a Clinical Certificate executed by a psychiatrist who has personally examined the patient, certifying that the patient continues to meet the statutory criteria for involuntary hospitalization.

52.     To secure court orders for continuing hospitalization when Mr. Pelichet's condition failed to satisfy the statutory or constitutional requirements for involuntary civil commitment, MDHHS employees and contractors filed petitions for continuing treatment orders that were facially invalid and presented false or misleading testimony to the Probate Court.

53.     On November 9, 2016, Charles Stern testified at a Wayne County Probate Court hearing on a Petition for a Continuing Treatment Order for Mr. Pelichet.

54.     Defendant Stern had previously examined Mr. Pelichet on one occasion for between ten and twenty minutes.

55.     Defendant Stern testified at the hearing that Mr. Pelichet refused to take his medications and that "they've had to increase his regular medications, because of his behavior."

56.     Mr. Pelichet's treatment records did not indicate that he had refused to take psychiatric medication, that his psychiatric medications had been increased, or

that he had engaged in any disruptive or violent behavior during his present admission at the hospital.

57.    Mr. Pelichet objected to this testimony during the hearing. The Court apparently credited Defendant Stern's testimony over Mr. Pelichet's, as it granted the Petition for an additional year of involuntary hospitalization.

58.    The following day, Mr. Pelichet filed a grievance against Defendant Stern with the MDHHS Office of Recipient Rights.

59.    The Office of Recipient Rights ("ORR") conducted an investigation and substantiated Mr. Pelichet's complaint, finding that, "[r]eview of the court transcript confirmed that Defendant Stern made statements regarding Mr. Pelichet's treatment, medication and behavior while at Walter Reuther as well as during his time in the community that were both incorrect and misleading." *See Ex. B:* Report of Investigative Findings from Office of Recipient Rights, dated 2/8/17.

60.    The findings stemming from Mr. Pelichet's complaint led ORR to conduct two additional, full investigations into Walter Reuther's practices with respect to filing petitions for Continuing Treatment Orders for NGRI patients.

61.    The Amended ORR Report substantiated the findings of the initial report with respect to Defendant Stern proffering false testimony, and further concluded that:

> "*The evidence indicates that incorrect or misleading information may have also been presented to the court by other treating professionals at*

*[Walter P. Reuther Psychiatric Hospital] in what appears to be an attempt to ensure that Mr. Pelichet remains on a one-year continuing treatment order due to his NGRI status.* The record and staff interviews indicated that Mr. Pelichet did not meet the criteria for continued hospitalization as required by section 330.1401 of the Mental Health Code. Based upon the new information gathered, ORR will be opening a new complaint on behalf of recipient Darryl Pelichet to determine if his rights were violated by the actions of these other treating professionals at [Walter P. Reuther Psychiatric Hospital]."

*Ex. C:* Office of Recipient Rights Report of Investigative Findings, Amended, June 12, 2017 (emphasis added).

62.     The second Office of Recipient Rights investigation was completed in September of 2017 and covered not only Defendant Stern's testimony at the 09/11/2016 hearing, but also the testimony and actions of other treating professionals relating to the May 3, 2017 hearing regarding a Petition for Discharge filed by Mr. Pelichet.

63.     The second investigation concluded that Walter Reuther staff filed Petitions for Continuing Treatment Orders and prepared Clinical Certificates as a matter of course, without actually considering whether the patient's clinical data supported the allegations recited in the Petition and the Clinical Certificate that the patient met the Section 401 criteria. With respect to Mr. Pelichet in particular, the second ORR investigation found that he *did not* meet the Section 401 criteria for continued involuntary hospitalization in April of 2017, when he filed a Petition for Discharge, but that incorrect or misleading testimony by Walter Reuther treating

professionals improperly influenced the Court to deny Mr. Pelichet's petition. *See Ex. E:* Office of Recipient Rights Report of Investigative Findings, Sept. 8, 2017 (Second Investigation).

64. Mr. Pelichet was again placed on "Authorized Leave Status" in July of 2017.

65. The Defendants filed yet another petition for a one-year hospitalization treatment order for Darryl Pelichet on October 25, 2017.

66. For the first time since 2005, Mr. Pelichet exercised his right to a jury trial with respect to the petition. He was represented by undersigned counsel.

67. The jury took less than 30 minutes to return a verdict in Mr. Pelichet's favor. The Defendant's Petition for involuntary hospitalization was denied.

68. In the two months since his release from the ALS contract, Mr. Pelichet has begun working for Freight Angels Transportation LLP as a truck driver. He is saving up money to go to Alabama to visit his six-year-old daughter. He had never been able to see her in person, because the ALS contracts prohibited him from leaving the State of Michigan.

**B. Bonn Washington**

69. Bonn Washington is a forty-three-year-old man who grew up in Michigan's foster care system. Like Mr. Pelichet, he suffers from schizoaffective disorder, but unlike Mr. Pelichet, he lacks a family support network.

70.     In 2005, Mr. Washington assaulted a Washtenaw County Sheriff's Deputy during a psychotic episode. He had recently switched healthcare providers, and the new provider changed his antipsychotic medication from Olanzapine (Zyprexa) to Quetiapine (Seroquel). The new medication exacerbated his symptoms rather than controlling them.

71.     Mr. Washington was found Not Guilty by Reason of Insanity (NGRI) on the resulting criminal charges.

72.     Immediately following his acquittal, Mr. Washington was civilly committed to the Center for Forensic Psychiatry for evaluation and inpatient psychiatric treatment. His antipsychotic medication was changed back to Zyprexa, which he continues to take daily.

73.     Mr. Washington responded well to Zyprexa, as he had before, and his symptoms were brought back under control.

74.     Mr. Washington has not experienced an acute psychotic episode since 2005. He has been voluntarily compliant with his medication and understands and accepts that he has a mental illness.

75.     Mr. Washington has been released pursuant to ALS contracts on five occasions between 2005 and 2018. His stretches of conditional liberty ranged from one month to over two years.

76.     Mr. Washington's most recent release was in January of 2018. He is presently living in the community, compliant with medication and treatment, and passing his random drug screens.

77.     When not in custody, Mr. Washington worked in the S.T.E.P. program, a work-therapy program affiliated with his treatment provider, at an automotive-component manufacturing facility. He made repeated requests to the NGRI Committee for permission to get a job outside the S.T.E.P. program but has not yet been granted permission to seek private-sector employment. *See Ex. I:* Letter from Bonn Washington to the NGRI Committee.

78.     Every time he was released prior to his current stint in the community, Mr. Washington was returned to the hospital for violating the ALS contract by testing positive for marijuana. Each subsequent release was pursuant to a new ALS contract that required a renewed five-year, violation-free period before Mr. Washington could be discharged.

79.     After each positive drug test, Mr. Washington was confined in the Walter P. Reuther Psychiatric Hospital under restrictive conditions for approximately one year.

80.     Mr. Washington received little-to-no substance abuse treatment during his periods of confinement at Walter P. Reuther Psychiatric Hospital.

**COUNT I:**

**DEPRIVATION OF RIGHTS GUARANTEED BY THE CONSTITUTIONS AND LAWS OF THE UNITED STATES AND THE STATE OF MICHIGAN**

### A. Procedural Due Process

81.     Plaintiffs incorporate by reference all allegations contained in Paragraphs 1 through 80.

82.     All Defendants were acting under color of state law at all relevant times.

83.     The federal and state constitutional deprivations outlined herein were caused by the exercise of State created rights and privileges, by a rule of conduct imposed by the State, or by a person for whom the State is responsible. All Defendants may fairly be said to be state actors.

84.     Plaintiffs Darryl Pelichet and Bonn Washington experienced a deprivation of liberty each and every time they were returned to confinement at Walter P. Reuther Psychiatric Hospital as punishment for allegedly violating of the rules of their ALS contracts, sometimes after years of living successfully in the community.

85.     The right to be free from physical detention is at the very core of the liberty interest protected by the Due Process Clause of the Fourteenth Amendment. *Hamdi v. Rumsfeld*, 452 U.S. 507, 529 (2004).

86.     The Michigan Mental Health Code requires that "an opportunity for appeal, and notice of that opportunity, shall be provided to an individual who objects to being returned from any authorized leave in excess of 10 days," MCL §

330.1408(3). The Michigan Constitution also provides that "[n]o person shall be . . . deprived of life, liberty or property, without due process of law." Mich. Const. 1963, Art. I, § 17.

87.     The Michigan State Court Administrative Office, the administrative agency of the Michigan Supreme Court, developed and published a court form entitled, "Notice of Right to Appeal Return and Appeal of Return from Authorized Leave," to facilitate compliance with MCL § 330.1408(3). *See Ex. J:* SCAO Form PCM 233.

88.     Mr. Pelichet was forced to return to confinement on six occasions since 2005, most recently on May 4, 2016. Mr. Washington was similarly forced to return to confinement on four occasions since 2005.

89.     Neither plaintiff was ever served with SCAO Form PCM 233 or otherwise notified that he had a right to contest his involuntary return to the hospital.

90.     Neither plaintiff ever had an opportunity to contest any of the forced returns to the hospital before a neutral decisionmaker.

91.     Defendants knew or should have known that they had a statutory and constitutional duty to Plaintiffs to provide some modicum of procedural due process either before or shortly after depriving the Plaintiffs of their liberty interests in being free of physical detention. *See Zinermon v. Burch*, 494 U.S. 113 (1990); M.C.L. § 330.1408(3).

92.     Defendants repeatedly deprived Plaintiffs of their liberty interests in being free of physical detention without due process of law in violation of the Fourteenth Amendment to the Constitution of the United States.

93.     On information and belief, the NGRI Defendants regularly exercise their seemingly absolute discretion to compel persons living in the community who have been adjudicated NGRI to return to confinement in a psychiatric hospital without any adversarial hearings or other judicial oversight.

94.     Unless Defendants are enjoined, Plaintiff Bonn Washington will suffer irreparable injury because of Defendants' conduct. Defendants have a practice of failing to provide NGRI patients with the notifications and opportunities to be heard required by the Michigan and United States Constitutions. Plaintiff Bonn Washington's, and other NGRI patients', constitutional rights remain in jeopardy until Defendants can no longer engage in their unlawful practices.

**B. Substantive Due Process**

95.     "The Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Foucha*, 504 U.S. at 80.

96.     Among the arbitrary, wrongful government actions that are absolutely barred by the Due Process Clause is the involuntary confinement of a mentally-ill

person who is "dangerous to no one and can live safely in freedom." *Donaldson*, 422 U.S. at 575.

97.     Defendants acted in concert to establish, maintain, and enforce a policy of continuing the involuntary civil commitment of all persons adjudicated NGRI, including Plaintiffs, unless and until the patient completes a five-year period in the community without violating a set of strict conditions of release.

98.     Defendant Lisa Medoff, the Director of Psychology at Walter P. Reuther Hospital, hired outside psychiatrists and psychologists on an independent-contractor basis to complete Clinical Certificates for NGRI patients and testify at their Probate Court hearings.

99.     These independent contractors, who had little-to-no previous contact with the subject patient, typically examined the patient for less than twenty minutes before invariably concluding that the patient continues to meet the statutory criteria for involuntary hospitalization.

100.    On information and belief, every clinical examination of an NGRI patient commissioned by Walter P. Reuther Psychiatric Hospital for the purpose of completing a Petition for a Continuing Treatment Order in the past five years has resulted in the following findings:

a) The patient continues to be a "person requiring treatment" as defined in M.C.L. § 330.1401;

b) Alternative/assisted outpatient treatment is insufficient to meet the patient's needs;

c) A combination of hospitalization and alternative/assisted outpatient treatment is insufficient to meet the patient's needs;

d) The patient requires continuing involuntary hospitalization for the maximum period of time permitted by law (typically one year).

101.    All releases of NGRI patients on ALS contracts presently require approval from the "NGRI Committee," a committee composed of state employees who do not work at the Walter P. Reuther Psychiatric Hospital.

102.    NGRI patients who have been released on ALS contracts also must gain permission from the NGRI Committee before they may engage in a variety of common, lawful activities, such as driving a car, obtaining private-sector employment, or enrolling in community college.

103.    Plaintiffs Bonn Washington and Darryl Pelichet both unsuccessfully sought permission from the NGRI Committee to participate in private-sector employment during their most recent releases.

104.    Typically, the members of the NGRI Committee do not personally examine or meet with the NGRI patients confined in Walter P. Reuther Psychiatric Hospital when deciding whether to release them, and do not

personally examine or meet with NGRI patients in the community when deciding whether they can work, go to school, or drive a car.

105.    The members of the NGRI Committee do not typically have a face-to-face meeting with any of the social workers, psychologists, or other professionals at Walter P. Reuther Psychiatric Hospital who regularly treat and interact with the subject NGRI patient before making their decisions.

106.    The policies and procedures established, maintained, and carried out by the Defendants collectively amount to an informal, parole-like system for NGRI patients, which lacks the procedural protections, judicial oversight, and statutory maximum sentences afforded to similarly-situated criminal defendants who are adjudicated "Guilty But Mentally Ill" (GBMI) pursuant to Mich. Comp. Laws § 768.36 (2018).

107.    The parole-like system operated by the Defendants prolongs the confinement of persons adjudicated NGRI after said persons cease to be both mentally-ill and dangerous, in violation of their "constitutional right to freedom." *Donaldson*, 422 U.S. at 576.

108.    The Defendants' internal policies require the patient's treatment providers to determine "within the bounds of reasonable clinical certainty, [that] the patient is not likely to repeat the type of behavior that led to the adjudication as NGRI or commit other dangerous acts," *before* the patient can be released from

the hospital on an ALS contract. *See Ex. K:* Walter P. Reuther Psychiatric Hospital Standard Operating Procedure #254.

109.    Shortly after making internal determinations that Plaintiffs Darryl Pelichet and Bonn Washington were "not likely to repeat the type of behavior that led to the adjudication as NGRI or commit other dangerous acts," Defendants filed petitions for Continuing Treatment Orders in which they alleged that Plaintiffs "can reasonably be expected, in the near future, to intentionally or unintentionally seriously physically injure" themselves or others. *See Ex. L:* Petition filed by Defendant Hegira Programs, Inc. on October 24, 2017.

110.    The CMHSP Defendants filed Petitions for Continuing Treatment Orders alleging that Plaintiffs Darryl Pelichet and Bonn Washington could reasonably be expected "in the near future" to "seriously physically injure" themselves or others while the Plaintiffs were living in the community, complying with their treatment, and passing their random drug screens.

111.    Plaintiffs have not seriously injured anyone in the thirteen years since their original NGRI adjudications.

112.    The ALS contracts employed by Walter P. Reuther Psychiatric Hospital are agreements not only between the patient and the hospital, but also between the hospital, the NGRI Committee, and the private contractors engaged to provide treatment to the patient in the community.

113.    The CMHSP Defendants agree, in their standard NGRI outpatient treatment contracts with Walter P. Reuther Psychiatric Hospital and the NGRI Committee Defendants, to petition for a one-year continuing Hospitalization Treatment Order for the relevant patient every year for five years, and never to make a recommendation to the Probate Court for alternative/assisted outpatient treatment. *See Ex. M:* Darryl Pelichet and Bonn Washington ALS Contracts.

114.    The "Community Mental Health Provider Responsibilities" section of Mr. Pelichet's most recent ALS contract refers to the act of filing a Petition for Continuing Treatment Order with the Probate Court as a mere "reporting requirement." *See Id.*

115.    The contract purports to obligate Defendant Hegira Programs, Inc. to file with the Probate Court "at least 14 days prior to the expiration of the current court order, a Petition for a Second or Continuing Treatment Order and a Clinical Certificate," and "these should reflect a request for a 90 day or one-year hospitalization with Walter P. Reuther Psychiatric Hospital named as the hospital." *Id.*

116.    The contract further provides that "the patient must be kept on a Hospitalization Treatment Order and should not be placed on an Alternative Treatment Order . . ." *Id.*

117.    The contract does not allow for the possibility that the examining psychiatrist for the relevant CMGSP Defendant could conclude that outpatient treatment is sufficient for the patient's needs or that the patient no longer meets the M.C.L. § 330.1401 criteria for continuing involuntary hospitalization.

118.    Each petition for a continuing one-year Hospitalization Treatment Order is filed on a standard SCAO form, PCM 218. Paragraph 13 of the form provides four options for recommendations to the court if the petitioner believes that the respondent meets the Section 401 criteria for involuntary hospitalization:

a) "hospitalization for not more than 90 days."

b) "continuing hospitalization for not more than one year."

c) "combined hospitalization and alternative/assisted outpatient treatment for not more than one year."

d) "alternative/assisted outpatient treatment for not more than one year."

SCAO Form, PCM 18.

119.    A check-box is provided next to each option. The CMHSP Defendants' employees always check the second box, "continuing hospitalization for not more than one year," for every NGRI patient because the CMHSP Defendants' ALS contracts with the NGRI Committee Defendants preclude them from making any other recommendation to the Court.

120. When completing the SCAO form, Defendant Hegira Programs' employees type, "To Maintain NGRI Status," next to the second option. Walter P. Reuther Psychiatric Hospital adds the same text to the petitions it files using what appears to be a stamp. *See Ex. L:* Petition filed by Defendant Hegira Programs, Inc. on October 24, 2017; *Ex. M:* Petition filed by Walter P. Reuther Psychiatric Hospital on October 31, 2016.

121. Walter P. Reuther Psychiatric Hospital possesses a literal rubber stamp that reads "To maintain NGRI Status" and uses it to amend the text of the standard SCAO form after, "I REQUEST the court to order the individual to receive continuing hospitalization for not more than one year."

122. The use of the rubber stamp gives rise to a strong inference that Walter P. Reuther Psychiatric Hospital regularly recommends one-year Hospitalization Treatment Orders for NGRI patients not because, in its professional clinical judgment, the patient continues to meet the constitutional and statutory criteria for involuntary civil commitment and a one year of continued involuntary hospitalization is the least restrictive treatment setting appropriate for the patient, but rather *for the sole purpose of maintaining the patient's NGRI status*.

123. During the course of its second investigation, the MDHHS Office of Recipient Rights "determined that the process of using court orders for continued hospitalization to maintain NGRI Committee oversight has become standard

practice that is placing the due process rights of individuals who have been found NGRI and placed in the care of the Michigan Department of Health and Human Services (MDHHS) in jeopardy." *Ex. D*: Report of Investigative Findings from Office of Recipient Rights, dated 9/8/17.

124.  Defendants knew or should have known that "[t]o maintain NGRI Status" is not among the statutorily or constitutionally permissible bases for subjecting a person to involuntary civil commitment. See M.C.L. § 330.1401(1), *Bell v. Wayne County General Hospital*, 384 F.Supp. 1085, 1096 (E.D. Mich. 1974).

125.  Defendant Lisa Medoff, the Director of Psychology at Walter P. Reuther Psychiatric Hospital, testified at the May 3, 2017 hearing on Mr. Pelichet's Petition for Discharge which demonstrates that she, too, either does not understand or recklessly disregards the Section 401 criteria and the due process rights of patients in her care. Counsel for Mr. Pelichet asked Defendant Medoff on cross-examination if "there was ever a point in time that [Mr. Pelichet] has ever injured himself or others during this entire period from 2005 to now that we – that we're now looking at?" to which she responded, "Well from my perspective, I consider taking a drug which can be contradictory to your health something that is dangerous. So I consider that harm to self."

126.  She further testified that although she had known Mr. Pelichet and overseen his treatment for several years, to her knowledge he had never actually

physically done harm to himself or others except for "harming himself" by smoking marijuana. *Ex. N:* Cross-Examination of Defendant  Lisa Medoff at May 3, 2017 Hearing.

127.   Neither Plaintiff has ever "seriously physically injured" himself or anyone else while under the influence of marijuana.

128.   Defendant Lisa Medoff knew or should have known that the risk of self-harm via substance abuse is specifically excluded by statute as a permissible basis for involuntary civil commitment in a psychiatric hospital. M.C.L. § 330.1401(2).

129.   As a consequence of the Defendants' violations of their constitutional rights, the Plaintiffs have suffered damages. Such damages include, but are not limited to, lost wages, reduced future earnings potential, loss of their freedom from physical confinement, suffering and mental anguish during the years they were unnecessarily institutionalized, lost opportunities to spend time with their children and other family members, and loss of enjoyment of life.

130.   Unless Defendants are enjoined, Plaintiff Bonn Washington will continue to suffer irreparable injury because of Defendants conduct. Defendants have a practice of automatically filing petitions for continued hospitalization in bad faith, in order to keep persons who have been adjudicated NGRI institutionalized when there is no longer a statutory or constitutional basis to confine them. Because Plaintiff Bonn Washington has been released subject to an ALS contract with

Defendants, Plaintiffs could be returned to Walter P. Reuther Psychiatric Hospital at any time. Plaintiffs are further required to obtain permission from the NGRI Committee to participate in lawful activities such as seeking employment. Plaintiff Bonn Washington's, and other NGRI patients', constitutional rights remain in jeopardy until Defendants can no longer engage in their unlawful practices.

131. The public has an interest in ensuring Defendants (government entities and their affiliates) abide by state and federal law, especially where it involves unconstitutional deprivations of liberty.

**COUNT II:**
**DEPRIVATION OF RIGHTS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND TITLE II OF THE AMERICANS WITH DISABILITIES ACT**

132. Plaintiffs incorporate by reference all allegations contained in Paragraphs 1 through 132.

133. This Count is brought pursuant to Title II of the Americans with Disabilities Act ("ADA.") The ADA prohibits discrimination in all "services, programs, or activities of a public entity." 42 U.S.C. § 12132 (2010).

134. The "unjustified isolation" of persons with disabilities in psychiatric facilities by state and local governments constitutes unlawful disability discrimination under Title II. *Olmstead v. L. C. by Zimring*, 527 U.S. 581, 597 (1999).

135.   Plaintiffs are "qualified individuals with a disability" as defined in the ADA.

136.   The "integration mandate" of Title II of the ADA, codified in 28 C.F.R. § 35.130(d), requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."

137.   Defendants discriminated and continue to discriminate against "qualified individuals with disabilities," in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations, by administering Michigan's mental health system in a manner that has denied and continues to deny hundreds of persons with mental illness and/or addictive diseases, including the Plaintiffs, the opportunity to receive services in the most integrated setting appropriate to their needs. These individuals are qualified to receive services in a setting that is more integrated than a closed psychiatric hospital, and they do not oppose receiving the services they require, such as substance abuse treatment, on an outpatient basis in the community.

138.   Providing treatment to the Plaintiffs on an outpatient basis would not constitute a "fundamental alteration" of the State's behavioral health service system, as that term is defined in *Olmstead*, because the State of Michigan already provides the services that the Plaintiffs require to live in a more integrated setting through its

community mental health programs, and providing the necessary treatment in an integrated community setting is significantly less costly on a per-patient basis than institutionalization in a regional psychiatric hospital.

139.   Although the Plaintiffs' numerous readmissions to Walter P. Reuther Psychiatric Hospital were due primarily to their use of marijuana, Walter P. Reuther Psychiatric Hospital is not a substance abuse treatment facility and neither Plaintiff received meaningful substance abuse treatment during any of their lengthy hospitalizations.

140.   Because the Defendants repeatedly subjected the Plaintiffs to long periods of institutionalization, rather than providing treatment to them in the most integrated setting appropriate to their needs, the Plaintiffs have suffered damages. As the United States Supreme Court recognized in *Olmstead*, "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Olmstead*, 527 U.S. at 601.

141.   Unless Defendants are enjoined, Plaintiff Bonn Washington will suffer irreparable injury because of Defendants failure to comply with the ADA.

## REQUEST FOR RELIEF

Accordingly, Plaintiffs respectfully request the following relief from the Court:

1. Legal Relief

   a.  An Order for an award of full compensatory damages for injuries and damages sustained by Plaintiffs due to the many years they were illegally and unconstitutionally confined, against their will, by Defendants;

   b.  An Order for actual reasonable attorney fees and litigation expenses.

2. Equitable Relief

   a.  An Order permanently enjoining Defendants, their officers, agents, employees, subordinates, successors in office, and all those acting in concert or participating with them (hereafter "All Defendants") from continuing the acts, omissions, and practices set forth in Counts I-II,

   b.  An Order permanently enjoining the NGRI Defendants, Hospital Management Defendants, and CMHSP Defendants from entering into any contractual arrangement(s) that place limits or conditions on the recommendations that a psychiatrist, psychologist, or other treatment professional can make to a Probate Court regarding a patient;

   c.  An Order permanently enjoining All Defendants from involuntarily returning patients living in community on authorized leave status to custody in a psychiatric hospital without first providing notice and an adversarial hearing, at which the patient may be represented by counsel;

d.  An Order permanently enjoining All Defendants from administering

behavioral health services in a setting that unnecessarily isolates and

segregates individuals with disabilities from the community, and

requiring Defendants to administer behavioral health services in the most

integrated setting appropriate to the needs of the individuals with

disabilities;

3.  An Order for all such other relief as this Court deems reasonable, just,

and equitable under the circumstances.

## JURY DEMAND

Plaintiffs, by and through their attorneys, demands a jury trial in this case.

This the 2nd day of May, 2018

/s/ Laurence H. Margolis
Laurence H. Margolis (P69635)
*Margolis Law, PC*
Attorneys for Plaintiffs
214 S. Main St., Suite 202
Ann Arbor, MI 48104
(734) 994-9590

/s/ James M. Gallagher
James M. Gallagher (P73038)
*James Gallagher PLLC*
Attorneys for Plaintiffs
214 S. Main St., Suite 202
Ann Arbor, MI 48104
(734) 274-5090