# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**DARRYL PELICHET**,
**BONN WASHINGTON**,
**JOSHUA RAGLAND**,
**DARIUS BICKERSTAFF**,
**through his guardian**
**MARY BICKERSTAFF, and**
**MICHIGAN PROTECTION AND**
**ADVOCACY SERVICE, INC.**,

Case No.: 2:18-cv-11385
Hon.: PAUL D. BORMAN

JURY DEMAND

Plaintiffs,

v.

**NICK LYON**, in his official capacity,
**LISA MEDOFF**, individually and in her
official capacity,
**MARY CLAIRE SOLKY**, individually
and in her official capacity,
**LAURIE ALBERT**, individually and in
her official capacity,
**HANUMAIAH BANDLA**, individually
and in his official capacity,
**CHARLES STERN**, individually,
**ARUNA BAVINENI**, individually and in
her official capacity,
**SHARON DODD-KIMMEY**, individually
and in her official capacity,
**CRAIG LEMMEN**, individually and in his
official capacity,
**KIMBERLY KULP-OSTERLAND**,
individually and in her official capacity,
**LISA MARQUIS**, individually and in her
official capacity,
**MARTHA SMITH**, individually and in her
official capacity,

**DAVE BARRY**, individually and in his
official capacity,
**KELLI SCHAEFER**, individually and in
her official capacity,
**JOE CORSO**, individually and in his
official capacity,
**DIANE HEISEL**, individually and in her
official capacity,
**HEGIRA PROGRAMS, INC.,
NEW CENTER COMMUNITY
SERVICES, INC.,
CARELINK NETWORK, INC.,
BEHAVIORAL HEALTH
PROFESSIONALS, INC.,** and
**MICHIGAN DEPARTMENT OF
HEALTH AND HUMAN SERVICES**
            Defendants.

---

Laurence H. Margolis (P69635)
*Margolis Law, PC*
Attorney for Plaintiffs
214 S. Main St., Suite 202
Ann Arbor, MI 48104
Phone: (734) 994-9590
Email: larry@lawinannarbor.com

James M. Gallagher (P73038)
*James Gallagher PLLC*
Attorney for Plaintiffs
214 S. Main St., Suite 202
Ann Arbor, MI 48104
Phone: (734) 274-5090
Email:jgallagher@jamesgallagherlaw.com

Andrea L. Rizor (P78382)
Chris E. Davis (P52159)
*Michigan Protection & Advocacy Service, Inc.*
Attorneys for Plaintiff MPAS
4095 Legacy Parkway, Suite 500

Scott L. Feuer (P38185)
*Law Offices of Scott L. Feuer, P.C.*
Attorney for Defendant Stern
888 W. Big Beaver Rd., Ste. 850 Troy,
MI 48084
Phone: (248) 723-7828
Email: sefuer@fklawyers.com

Paul J. Dwaihy (P66074)
*Plunkett Cooney*
Attorney for Defendant, Lisa Medoff
10 S. Main St., Ste. 400
Mt. Clemens, MI 48043
Phone: (586) 783-7621
Email:pdwaihy@plunkettcooney.com

Katherine J. Bennett (P75913)
Darrin F. Fowler (P53464)
*Michigan Dep't of Attorney General*
Attorneys for MDHHS Defendants
P.O. Box 30755

Lansing, MI 48911
Phone: (517) 487-1755
Email: arizor@mpas.org
Email: cdavis@mpas.org

Scott S. Holmes (P66580)
*Foley & Mansfield, PLLP*
Attorney for Defendant,
Carelink Network, Inc.
130 E. Nine Mile Rd.
Ferndale, MI 48220-3728
Phone: (248) 721-4200
Email:sholmes@foleymansfield.com

Lansing, MI 48909
Phone: (517) 373-1160
Email: Bennettk1@michigan.gov
Email: Fowlerd1@michigan.gov

Loren D. Blum (P38557)
Elia & Ponto, PLLC
Attorney for Defendant, Hegira
Programs, Inc.
25800 Northwestern Hwy, Ste. 850
Southfield, MI 48075
Phone: (248) 595-8579
Email: loren.blum@libertymutual.com

## FIRST AMENDED COMPLAINT

Plaintiffs Darryl Pelichet, Joshua Ragland, Bonn Washington, and Darius Bickerstaff—individuals who have been adjudicated "not guilty by reason of insanity" ("NGRI") and subjected to repeated unlawful involuntary civil commitment—bring this action for legal and equitable relief against Defendants for deprivation of Plaintiffs' federally protected civil rights pursuant to Section 1983, the American's with Disabilities Act, and Section 504 of the Rehabilitation Act. Michigan Protection and Advocacy Service, Inc., brings this action on its own behalf and on behalf of its constituents who have been directly affected by Defendants' unlawful policies and practices. For their cause of action against the Defendants, Plaintiffs respectfully state as follows:

## JURISDICTION AND VENUE

1.      This action is brought against Defendants pursuant to 42 U.S.C. § 1983 for deprivation of civil rights secured by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution and for violations of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*

2.      Jurisdiction is founded upon 28 U.S.C. § 1331, § 1343(a)(3)(4), and § 1367(a). This Court has jurisdiction over the Plaintiffs' claims of violation of civil rights under 42 U.S.C. § 1983. Relief is authorized pursuant to 28 U.S.C. §§ 2201, 2202; 29 U.S.C. § 794a; 42 U.S.C. § 1983; and 42 U.S.C. § 12133. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that the factual acts and omissions which give rise to this cause of action occurred within this judicial district.

## INTRODUCTION

3.      Individuals treated for mental illness, including those deemed not guilty by reason of insanity, in Michigan's state psychiatric hospitals are patients, not prisoners. They are thus entitled to therapeutic, rather than punitive treatment.

4.      Yet, because of stigma deeply rooted in our society and culture, people with mental illness often suffer far greater deprivations of liberty, respect, and dignity than those convicted of crimes. This stigma often expresses itself in the

creation of unconstitutional and discriminatory policies and practices designed to segregate those with disabilities from the rest of society.

5.      For example, in 2003, Janet Olszewski, former director of the Michigan Department of Community Health, now known as the Michigan Department of Health and Human Services ("MDHHS"), issued Administrative Directive 10-C-1050-AD (Ex. A.) Administrative Directive 10-C-1050-AD mandates that all recommendations to the probate court for release from hospitalization, transfer between facilities, or alternative treatment for patients "under the legal status of 'not guilty by reason of insanity'" be reviewed by the NGRI Committee prior to filing or court appearance. Administrative Directive 10-C-1050-AD further warns that "[a]ny delay in referring or filing necessary papers in a timely manner that would result in not renewing the order, will be considered a violation of this policy."

6.      Since a civil commitment order will not be renewed if a petition is not filed to renew it, a treatment provider that determines that a person adjudicated NGRI does not currently satisfy the statutory or constitutional requirements for involuntary civil commitment would violate the Policy by declining to petition the Probate Court for an additional year of involuntary hospitalization.

7.      Through her Administrative Directive, Ms. Olszewski effectively ordered that all patients at Michigan's regional psychiatric hospitals and

community mental health service providers to automatically file a petition in Probate Court for one year of involuntary hospitalization for every "Not Guilty by Reason of Insanity" ("NGRI") patient, every year, regardless of whether the patient's treating physicians believed that the patient continued to satisfy the statutory or constitutional requirements for involuntary civil commitment.

8.     The MDHHS policy promulgated by former Director Olszewski, which is still in effect today, caused and continues to cause an unknown number of Michigan residents, including the Plaintiffs, to spend years of their lives unnecessarily and unconstitutionally confined in state-operated psychiatric hospitals.

9.     Individuals deemed NGRI are not being served in the most integrated setting or receiving individualized therapeutic treatment to give them a realistic chance to be successful in the community. Instead they are merely warehoused in state hospitals, their rights and freedoms forfeited in the name of public safety.

10.    The effect has been devastating to the Plaintiffs and to other forensic patients. The intentional isolation and segregation of mental health patients deprives them of critical treatment modality and significantly harms their quality of life. And it deprives them of their sense of dignity, respect, and self-worth as their lives are micromanaged and they are subject to long-term, involuntary, and unnecessary confinement.

**DEFENDANTS**

11.    Defendant Nick Lyon is the present Director of MDHHS and was the Director of the Michigan Department of Community Health from September of 2014 until April of 2015, when that agency was merged into MDHHS.

12.    As Director of the Michigan Department of Community Health and later as Director of MDHHS, Defendant Lyon continued to enforce the policy promulgated by former Director Olszewski as referenced above.

13.    As Director, Defendant Nick Lyon is responsible for administering and overseeing Michigan's public Mental Health system pursuant to M.C.L. § 330.1104.

14.    MDHHS' establishment, authority, and powers stem from Michigan's Constitution, which states "the health of the people of the state is a matter of primary public concern, and as required by section 8 of article VIII of the state constitution of 1963, which declares that services for the care, treatment, education, or rehabilitation of those who are seriously mentally disabled shall always be fostered and supported, the department shall continually and diligently endeavor to ensure that adequate and appropriate mental health services are available to all citizens throughout the state." M.C.L. § 330.1116.

15.    MDHHS is also the agency designated as the single state agency responsible for administering and implementing Michigan's Medicaid program under Title XIX of the Social Security Act. *See* 42 U.S.C. § 1396, *et seq.* As Director,

Defendant Nick Lyon is responsible for ensuring Michigan's Medicaid program is administered and implemented consistent with the requirements of federal law. Most forensic patients receive outpatient mental health services funded by Medicaid. Nick Lyon is sued in his official capacity.

16.     Defendant Lisa Medoff is the Director of Psychology at Walter P. Reuther Psychiatric Hospital. She is sued in her individual and official capacity.

17.     Defendant Laurie Albert is the Director of Social Work at Walter P. Reuther Psychiatric Hospital. She is sued in her individual and official capacity.

18.     Defendant Hanumaiah Bandla is the Chief of Clinical Affairs at Walter P. Reuther Psychiatric Hospital. He is sued in his individual and official capacity.

19.     Defendant Mary Clare Solky is the Hospital Director at Walter P. Reuther Psychiatric Hospital. She is sued in her individual and official capacity.

20.     Defendants Medoff, Albert, Bandla, and Solky (collectively, the "Hospital Management Defendants,") directed, encouraged, supported, and allowed less-senior staff members at the Hospital to file petitions for one-year hospitalization treatment orders for every NGRI patient, every year as a matter of course, regardless of whether the individual patient continued to meet the statutory and constitutional criteria for involuntary civil commitment and regardless of whether an institutional setting continued to be the least restrictive treatment environment suitable to the patient's needs.

21.     The Hospital Management Defendants continued to enforce this policy, allowed the practice and custom, even after they were informed by the MDHHS Office of Recipient Rights, in October 2017, that the policy violated the statutory and constitutional rights of the patients in their care.

22.     Defendant Aruna Bavineni is a psychiatrist employed by Walter P. Reuther Psychiatric Hospital. She is sued in her official and individual capacity.

23.     Defendant Charles Stern is a psychologist who, on an independent-contractor basis, conducts psychological evaluations of NGRI patients at Walter Reuther Psychiatric Hospital prior to their probate court hearings. He is sued in his individual capacity.

24.     Defendants Sharon Dodd-Kimmey, Craig Lemmen, Kimberly Kulp-Osterland, Lisa Marquis, Martha Smith, Dave Barry, Kelli Schaefer, Joe Corso, and Diane Heisel are the members of the "NGRI Committee" at the Center for Forensic Psychiatry (hereafter the "NGRI Committee Defendants.") Each are sued in their official and individual capacity.

25.     The NGRI Committee Defendants, acting under color of state law, used and continue to use the authority granted to them by Administrative Directive 10-C-1050-AD to exercise control over what recommendations psychiatrists, psychologists, and other treating professionals can make to the Probate Court

regarding the NGRI patients in their care. *See Ex. B:* NGRI Committee Procedure Manual.

26.     The NGRI Committee Defendants compelled and continue to attempt to compel Community Mental Health Contractual Agencies, including Defendants Hegira Programs, Inc., and New Center Community Services, Inc., to file petitions for involuntary civil commitment against NGRI patients living in the community solely for the purpose of maintaining those patients' NGRI status, and not because they continued to meet the statutory and constitutional criteria for involuntary civil commitment.

27.     The NGRI Committee's Procedures Manual states, in a section entitled, "Alternative Treatment and Combined Hospitalization/Alternative Treatment Orders;"

> "IN ORDER TO MAINTAIN NGRI STATUS, NGRI PATIENTS SHOULD NOT BE PLACED ON ANY TYPE OF ALTERNATIVE TREATMENT ORDER OR COMBINED HOSPITALIZATION/ ALTERNATIVE TREATMENT ORDER. Placement on such orders results in loss of NGRI status, once the patient is discharged from inpatient hospitalization."

*See Ex. B*: NGRI Committee Procedures Manual pg. 11.

28.     Defendants Hegira Programs, Inc., and New Center Community Services, Inc., (hereafter "Community Mental Health Contractual Agencies" or "CMH Subcontractor Defendants,") are Michigan nonprofit corporations that contract with Defendant CareLink Network, Inc. and with the Michigan Department

of Health and Human Services to provide mental health and substance abuse treatment programs to Michigan residents.

29.    The CMH Subcontractor Defendants, in their contractual agreements with Defendant CareLink Network and the NGRI Committee Defendants, agreed to petition the Probate Court for a one-year continuing Hospitalization Treatment Order for every NGRI patient placed in their care, every year for five years, and to never make a recommendation to the Probate Court for discharge or for alternative/assisted outpatient treatment, regardless of the opinions of their own treating professionals about the patient's present condition and treatment needs.

30.    All NGRI patients that are in the care of the CMH Subcontractor Defendants are living in community settings, such as adult foster care homes, with family, or independently, and receiving outpatient treatment. Paradoxically, the CMH Subcontractor Defendants do not recommend alternative/assisted outpatient treatment to the Probate Court, even though this is precisely what their patients are receiving and will continue to receive.

31.    The CMH Subcontractor Defendants do not recommend alternative/assisted outpatient treatment because a patient on an "Alternative Treatment Order" ceases to be "inpatient" at a regional psychiatric hospital under Michigan law. When a patient is not an "inpatient," the NGRI Committee Defendants lose their ability to summarily compel the patient to return to the

psychiatric hospital without filing a new petition for involuntary civil commitment. The CMH Subcontractor Defendants, at the behest of the NGRI Committee Defendants, therefore routinely seek a court order for one year of hospitalization, and the patient is considered an inpatient on an authorized leave of absence from the hospital for the entire year. This process is repeated annually for a five-year period.

32.     The CMH Subcontractor Defendants made facially invalid petitions for one-year Hospitalization Treatment Orders for Plaintiffs Darryl Pelichet, Bonn Washington, Darius Bickerstaff, and other forensic patients and so caused them to be subject to restrictions on their liberty which were not based on meaningful, individualized assessments of their present treatment needs.

33.     The CMH Subcontractor Defendants filed petitions for one-year Hospitalization Treatment Orders and/or failed to recommend NGRI patients for discharge when their own assessments of the patients' condition indicated that the patients did not meet the statutory or constitutional requirements for subjecting a person to involuntary civil commitment.

34.     Defendant Carelink Network, Inc. is a Michigan non-profit corporation. According to its website:

> The mission of CareLink Network, Inc. is to provide a comprehensive community-based supports to youth and adults with serious emotional and behavioral health issues in the manner that promotes member choice. CareLink will manage and deliver an innovative array of supports and services that address core member needs in the context of person-centered planning, maximized member choice, self-

determination, high quality clinical and psychiatric services and fiscal efficiency. Furthermore, CareLink will continually seek to create, sustain and enhance a network of culturally competent providers.

35.    Defendant CareLink Network, Inc. receives approximately $170 million in annual revenue, but it has no employees, and it reports that it has zero volunteers. *See Ex. C*: Form 990 for Carelink.

36.    Defendant CareLink Nework, Inc.is managed on a day-to-day basis by employees of Defendant Behavioral Health Professionals, Inc. The two entities have the same office address, the same managers, and the same publicly-listed phone number.

37.    Defendant CareLink Network, Inc. is functionally a holding company maintained by Defendant Behavioral Health Professionals, Inc.

38.    Defendant Behavioral Health Professionals, Inc. is a Michigan nonprofit corporation and a "Manager of Comprehensive Provider Networks" (MCPN).

39.    Defendants CareLink Network, Inc. and Behavioral Health Professionals Partnership, Inc, (collectively, the "CMH Contractor Defendants") contract with, screen, and supervise individual community mental health treatment providers, including the CMH Subcontractor Defendants, to provide mental health services to residents of Wayne County.

40. The CMH Contractor Defendants derive substantially all of their operating revenue, directly or indirectly, from government grants. The CMH Contractor Defendants are responsible for managing the provision of mental-health-related care to certain categories of Medicaid beneficiaries in Wayne County.

41. The CMH Contractor Defendants agreed to the terms of Plaintiffs and other forensic patients' NGRI contracts. The CMH Contractor Defendants hired the CMH Subcontractor Defendants to perform the acts in the "Community Mental Health Service Provider Responsibilities" section of the Plaintiff's NGRI contracts, including the mandatory filing of petitions and the mandatory recommendation of "hospitalization for one year" to the probate court.

## THE PLAINTIFFS

### A. Michigan Protection and Advocacy Service, Inc.

42. Plaintiff Michigan Protection and Advocacy Service, Inc. (MPAS), is a nonprofit organization incorporated in Michigan. MPAS maintains its offices at 4095 Legacy Parkway, Suite 500, Lansing, MI 48911-4263 and 129 W Baraga Ave., Suite A, Marquette, MI 49855-4644.

43. MPAS brings this action on its own behalf and on behalf of its constituents who have been directly affected by Defendants' unlawful policies and practices.

44.     MPAS is a nonprofit organization designated by the governor as the protection and advocacy organization for individuals who have physical, mental, and developmental disabilities in the state of Michigan.

45.     Every state and territory in the United States has a designated protection and advocacy organization.

46.     Under the Federal Developmental Disabilities Assistance and Bill of Rights Act of 1975 (DD Act), each state is required to have a statewide Protection & Advocacy network in place by October 1, 1977. This bill provided funding for Protection & Advocacy organizations (P&As) to represent individuals with developmental disabilities, including intellectual disabilities, cerebral palsy, muscular dystrophy, autism and related disabilities, and other lifelong conditions.

47.     Congress also enacted the Protection and Advocacy for Individuals with Mental Illness Act (PAIMI) to assist states in establishing advocacy systems to protect and advocate the rights of individuals with mental illness through activities to ensure the enforcement of the Constitution and Federal and State statutes. 42 U.S.C. § 10801(b)(1) - (2).

48.     In the Act, Congress expressed the following: "individuals with mental illness are vulnerable to abuse and serious injury; individuals with mental illness are subject to neglect, including lack of treatment, adequate nutrition, clothing, health care, and adequate discharge planning; and state systems for monitoring compliance

with respect to the rights of individuals with mental illness vary widely and are frequently inadequate." 42 U.S.C. § 10801(a)(1) - (4).

49.     Under PAIMI, MPAS has a federal mandate to pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness. 42 U.S.C. § 10805(a)(1).

50.     MPAS' mission is to advocate and protect the legal rights of people with disabilities. MPAS works to fulfill its mission by working toward systemic changes that advance the rights of all people with disabilities and advocating for individual rights when a case meets MPAS' board adopted priorities and case selection criteria.

51.     MPAS is governed by a Board of Directors whose membership includes a majority of individuals with disabilities, including individuals with mental health conditions or family members of individuals with disabilities.

52.     MPAS is also advised by a statutorily required Mental Health Advisory Council that is composed predominantly of individuals with mental health conditions.

53.     This advisory council meets quarterly. The council also completes a yearly report and submits it to the federal government.

54.     The Board of Directors, with input from the Advisory Council, staff, and public, sets MPAS' service priorities yearly and evaluates its progress in reaching positive outcomes for individuals with mental illness.

55.     Every individual that calls for information, referral, advocacy, or representation receives a priority survey in the mail asking for his or her input as to what they think MPAS should focus its efforts on in the following year. Additionally, MPAS posts its priority survey online and distributes it electronically and in person, seeking input.

56.     MPAS' constituents include the named individual plaintiffs, as well as all other forensic patients.

57.     Through access authority granted to it by federal law, MPAS regularly monitors (weekly) the five state operated psychiatric hospitals located in Kalamazoo County, Washtenaw County, Wayne County, and Tuscola County by visiting the units and cottages, disseminating and posting rights-based information in the units, discussing rights violations concerns with patients, advocating for individuals, representing individuals, training newly hired staff on MPAS' federal mandates, and meeting with hospital administrators to advocate for remedies to individual and systemic rights violations.

58.     MPAS spends significant resources in monitoring, investigating, and representing individuals in disputes with state psychiatric hospital staff and

community mental health service providers with regard to abuse and neglect, treatment, discharge planning, and placement.

59.     MPAS operates a toll-free telephone line. It also accepts letters and emails from people across Michigan in order to provide information and assistance to individuals with mental illness and their family members/guardians regarding their rights. MPAS' information is provided by MDHHS to every person filing an ORR complaint in a state psychiatric hospital.

60.     Only declaratory and injunctive relief is sought by MPAS as it pertains to the state's policies, practices, supervision, training, and customs as a whole and does not require the participation of individual members to resolve.

61.     As a result of the illegal policies and practices of violating the liberty interests of MPAS' constituents, imposing parole-like conditions on MPAS' constituents, and requiring that they be confined to a state mental institution longer than allowed by law, MPAS has not only had to increase resources spent on NGRI clients, but on individuals unable to receive emergency psychiatric hospitalization (due to the shortage of psychiatric beds and a well-documented waiting list).

62.     Over the past six months MPAS has been investigating a number of complaints from NGRI patients regarding their confinement, including two individuals currently residing at Caro Psychiatric Hospital, four individuals at

Walter Reuther Psychiatric Hospital (including Plaintiff Darius Bickerstaff), and one currently on an ALS contract in the community.

**B. Darryl Pelichet**

63.    Plaintiff Darryl Pelichet is a thirty-eight-year-old man who suffers from schizoaffective disorder. Like many patients with schizoaffective disorder, Mr. Pelichet first began experiencing the symptoms of his disease in his 20's.

64.    In 2005, at the age of twenty-four, Mr. Pelichet punched a City of Farmington police officer during an acute psychotic episode.

65.    At the time of the incident, Mr. Pelichet had not yet been diagnosed with schizoaffective disorder and had not started taking antipsychotic medication.

66.    Mr. Pelichet was charged with assaulting a police officer and subsequently found Not Guilty by Reason of Insanity ("NGRI").

67.    Immediately following his acquittal, Mr. Pelichet was civilly committed to the Center for Forensic Psychiatry for inpatient psychiatric treatment. He began receiving treatment and antipsychotic medication for the first time.

68.    Mr. Pelichet responded well to medication and treatment.    He understood and accepted the reality of his mental illness, was voluntarily compliant with his medication, and his symptoms went into remission.

69.     Mr. Pelichet has not experienced any acute psychotic episodes or engaged in any violent behavior in the thirteen years since he began taking medication to treat his condition.

70.     After approximately five months in the Center for Forensic Psychiatry, Mr. Pelichet was transferred to the Kalamazoo Psychiatric Hospital, a less restrictive facility.

71.     In February of 2007, Mr. Pelichet was placed on "Authorized Leave Status" ("ALS") from the Kalamazoo Psychiatric Hospital pursuant to an "ALS contract." Mr. Pelichet was required to sign the contract in order to be released from otherwise indefinite confinement.

72.     Mr. Pelichet's ALS contract laid out a series of parole-like conditions of release that he was required to comply with for a period of five years. The penalty for violating a condition of the ALS contract was an immediate return to custody at a closed psychiatric facility.

73.     Mr. Pelichet was returned to custody in January of 2008, this time at the Walter P. Reuther Psychiatric Hospital, when he tested positive for marijuana on a random drug screen. Unlike a probationer or parolee charged with a violation, Mr. Pelichet had no opportunity to contest his return to custody in court and no access to court-appointed legal counsel.

74.     Mr. Pelichet was released pursuant to ALS contracts on seven occasions between 2005 and 2017. When not in custody, Mr. Pelichet worked as a delivery truck driver and as a taxi driver. His stretches of conditional liberty ranged from three months to approximately one and a half years.

75.     On each occasion except the last, Mr. Pelichet was returned to the hospital for violating the ALS contract, typically by testing positive for marijuana. Each subsequent release was pursuant to a new ALS contract that required a renewed five-year, violation-free period before Mr. Pelichet could be discharged.

76.     Mr. Pelichet also suffers from multiple sclerosis, a progressive nerve disease that often leads to partial or complete paralysis and death. Multiple sclerosis is among the "debilitating medical conditions" which may qualify a person to use medical marijuana per the Michigan Medical Marijuana Act ("MMMA"). Mich. Comp. Laws § 333.26423(b)(2) (2018). Mr. Pelichet applied for and was issued a patient registration card in accordance with the MMMA. He used marijuana to alleviate the pain and muscle spasms associated with multiple sclerosis.

77.     After each positive drug test, Mr. Pelichet was confined in the Walter P. Reuther Psychiatric Hospital under restrictive conditions for approximately one year.

78.     Mr. Pelichet received little-to-no substance abuse treatment during his periods of confinement at Walter P. Reuther Psychiatric Hospital.

79.   Both Michigan law and the United States Constitution prohibit the involuntary civil commitment in a psychiatric hospital of a person who is not both mentally ill *and* dangerous. Mich. Comp. Laws § 330.1401 (2018); *Foucha v. Louisiana*, 504 U.S. 71, 77-78 (1992) ("[It is] unconstitutional for a State to continue to confine a harmless, mentally ill person."); *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975) ("a finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement.")

80.   Michigan law limits the duration of a Hospitalization Treatment Order for involuntary commitment to a psychiatric hospital to one year.

81.   Michigan law further requires that a Petition for a one-year continuing Hospitalization Treatment Order be accompanied by a Clinical Certificate executed by a psychiatrist who has personally examined the patient, certifying that the patient continues to meet the statutory criteria for involuntary hospitalization.

82.   To secure court orders for continuing hospitalization when Mr. Pelichet's condition failed to satisfy the statutory or constitutional requirements for involuntary civil commitment, MDHHS employees, contractors, and subcontractors filed petitions for continuing treatment orders that were facially invalid and presented false or misleading testimony to the Probate Court.

83.     Defendant Charles Stern is a psychologist who, on an independent-contractor basis, conducts examinations of patients at Walter P. Reuther Psychiatric Hospital and testifies for the hospital in Probate Court proceedings.

84.     Defendant Stern invariably concludes, after a cursory exam of each patient, including Mr. Pelichet, for less than twenty minutes, that the patient continues to meet the statutory criteria for involuntary civil commitment and that a no less restrictive treatment setting than a closed psychiatric hospital is appropriate.

85.     Multiple investigations conducted by the MDHHS Office of Recipient Rights have found Defendant Stern responsible for proffering false or misleading testimony in Probate Court hearings, including at a hearing held in November of 2016 regarding a petition to impose an additional year of involuntary hospitalization on Mr. Pelichet. *See Ex. D:* Report of Investigative Findings from Office of Recipient Rights, dated 2/8/17; *Ex. E:* Report of Investigative Findings from Office of Recipient Rights, Amended, 6/12/17; *Ex. F:* Report of Investigative Findings from Office of Recipient Rights, dated 9/8/17; *Ex. G:* Summary Report of Recipient Rights Complaint Amended Report – 4th revision.

86.     On information and belief, Defendant Stern has performed hundreds of evaluations of NGRI patients at Walter Reuther Psychiatric Hospital in the past five years, but none of his evaluations has ever resulted in a determination that an NGRI

patient no longer met the statutory criteria for continued involuntary civil commitment.

87.     On November 9, 2016, Charles Stern testified at a Wayne County Probate Court hearing on a Petition for a Continuing Treatment Order for Mr. Pelichet.

88.     Defendant Stern had previously examined Mr. Pelichet on one occasion for between ten and twenty minutes.

89.     Defendant Stern testified at the hearing that Mr. Pelichet refused to take his medications and that "they've had to increase his regular medications, because of his behavior."

90.     Mr. Pelichet's treatment records did not indicate that he had refused to take psychiatric medication, that his psychiatric medications had been increased, or that he had engaged in any disruptive or violent behavior during his present admission at the hospital.

91.     Mr. Pelichet objected to this testimony during the hearing. The Court apparently credited Defendant Stern's testimony over Mr. Pelichet's, as it granted the Petition for an additional year of involuntary hospitalization.

92.     The following day, Mr. Pelichet filed a grievance against Defendant Stern with the MDHHS Office of Recipient Rights.

93.    The Office of Recipient Rights ("ORR") conducted an investigation and substantiated Mr. Pelichet's complaint, finding that, "[r]eview of the court transcript confirmed that Defendant Stern made statements regarding Mr. Pelichet's treatment, medication and behavior while at Walter Reuther as well as during his time in the community that were both incorrect and misleading." *See Ex. D:* Report of Investigative Findings from Office of Recipient Rights, dated 2/8/17.

94.    The findings stemming from Mr. Pelichet's complaint led ORR to conduct two additional, full investigations into Walter Reuther's practices with respect to filing petitions for Continuing Treatment Orders for NGRI patients.

95.    The Amended ORR Report substantiated the findings of the initial report with respect to Defendant Stern proffering false testimony, and further concluded that:

> *The evidence indicates that incorrect or misleading information may have also been presented to the court by other treating professionals at [Walter P. Reuther Psychiatric Hospital] in what appears to be an attempt to ensure that Mr. Pelichet remains on a one-year continuing treatment order due to his NGRI status.* The record and staff interviews indicated that Mr. Pelichet did not meet the criteria for continued hospitalization as required by section 330.1401 of the Mental Health Code. Based upon the new information gathered, ORR will be opening a new complaint on behalf of recipient Darryl Pelichet to determine if his rights were violated by the actions of these other treating professionals at [Walter P. Reuther Psychiatric Hospital].

*Ex. E:* Office of Recipient Rights Report of Investigative Findings, Amended, June 12, 2017 (emphasis added).

96.    The second Office of Recipient Rights investigation was completed in September of 2017 and covered not only Defendant Stern's testimony at the 09/11/2016 hearing, but also the testimony and actions of other treating professionals relating to the May 3, 2017 hearing regarding a Petition for Discharge filed by Mr. Pelichet.

97.    The second investigation concluded that Walter Reuther staff filed Petitions for Continuing Treatment Orders and prepared Clinical Certificates as a matter of course, without actually considering whether the patient's clinical data supported the allegations recited in the Petition and the Clinical Certificate that the patient met the Section 401 criteria. With respect to Mr. Pelichet in particular, the second ORR investigation found that he *did not* meet the Section 401 criteria for continued involuntary hospitalization in April of 2017, when he filed a Petition for Discharge, but that incorrect or misleading testimony by Walter Reuther treating professionals improperly influenced the Court to deny Mr. Pelichet's petition. *See Ex. F:* Office of Recipient Rights Report of Investigative Findings, Sept. 8, 2017 (Second Investigation).

98.    Defendant Aruna Bavineni is a psychiatrist employed by Walter P. Reuther Psychiatric Hospital and was Mr. Pelichet's treating psychiatrist in 2016.

99.    At the express or implicit direction of the Hospital Management Defendants, Defendant Bavineni completed a Clinical Certificate on October 30,

2016 for submission to the Wayne County Probate Court. In that certificate, she alleged Plaintiff Darryl Pelichet was a "Person Requiring Treatment," as defined in Section 401 of the Michigan Mental Health Code, while indicating that Mr. Pelichet did not meet any of the four statutory bases for classification as a "Person Requiring Treatment."

100.   In the "Likelihood of injury to self" space on the October 30, 2016 Clinical Certificate form, Defendant Bavineni wrote only, "He denied." In the "Likelihood of injury to others" space, she wrote, "He denied." In the "Inability to attend to basic physical needs" space, she wrote only: "He is taking care of his personal hygiene." And in the "Inability to understand the need for treatment" space, she wrote only: "He was provided with IM medications." *See Ex. H:* Clinical Certificate Completed by Defendant Bavineni on 10-30-2016.

101.   On April 17, 2017, Defendant Bavineni completed a Six-Month Review Report for Darryl Pelichet, which is a form submitted by the hospital to the Probate Court when a patient exercises his right, after six months of a one-year involuntary commitment order, to file a Petition for Discharge.

102.   In the Six-Month Review Report, Defendant Bavineni indicated, "I believe that the individual has a mental illness and as a result of that mental illness, the individual can reasonably be expected in the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in an act

or acts or made significant threats that are substantially supportive of this expectation." *Ex. I*: Six-Month Review Report by Defendant Bavineni, 4/17/17.

103. In the next section of the form, Defendant Bavineni indicated that "This conclusion is based on the following facts of which I have personal knowledge: *Seen and evaluated the patient. Reviewed the medical records and discussed with different treatment team members.*" (Italicized portion handwritten). Defendant Bavineni did not provide any further indications of what "act or acts" or "significant threats" Mr. Pelichet had made which caused her to believe that he would seriously physically injure someone in the near future.

104. On the morning of May 3rd, 2017, Defendant Bavineni testified in Mr. Pelichet's probate court hearing. She recommended that Mr. Pelichet remain subject to a hospitalization treatment order for an additional year.

105. In the afternoon of May 3rd, 2017, only sixteen days after completing the Six-Month Review Report and only hours after testifying in favor of a continuing 1-year hospitalization order probate court, Defendant Bavineni conducted a psychiatric evaluation of Darryl Pelichet. In her psychiatric evaluation, Defendant Bavineni indicated that Mr. Pelichet had *no risk* of violence to himself over the past six months, *no risk* of violence to others over the past six months, *no current or past risk* of suicide/violence to self, and *no current or past risk* of violence to others. *See Ex. J*: Psychiatric Evaluation of Darryl Pelichet by Aruna Bavineni on 05/03/17.

106. When interviewed by internal investigators about the Six-Month Review Report she completed in April of 2017, Defendant Bavineni apparently "did not understand that facts were required to support the assertion" that Mr. Pelichet required an additional year of involuntary hospitalization. *See Ex. F:* Report of Investigative Findings from Office of Recipient Rights, dated 9/8/17.

107. Mr. Pelichet was again placed on "Authorized Leave Status" in July of 2017.

108. The Defendants filed yet another petition for a one-year hospitalization treatment order for Darryl Pelichet on October 25, 2017.

109. For the first time since 2005, Mr. Pelichet exercised his right to a jury trial with respect to the petition. He was represented by undersigned counsel.

110. The jury took less than 30 minutes to return a verdict in Mr. Pelichet's favor. The Defendant's Petition for involuntary hospitalization was denied.

111. In the months since his release from the ALS contract, Mr. Pelichet has begun working for Freight Angels Transportation LLP as a truck driver. He is saving up money to go to Alabama to visit his six-year-old daughter. He had never been able to see her in person, because the ALS contracts prohibited him from leaving the State of Michigan.

**C. Joshua Ragland**

112.    Joshua Ragland is a 28-year-old man who has, at times, struggled with depression.

113.    On February 8, 2014, Mr. Ragland was sitting on the guardrail at the edge of the Telegraph Bridge in Monroe, Michigan. He was contemplating suicide.

114.    Police were called to the scene. Officers pulled Mr. Ragland away from the edge of the bridge, tackled, and restrained him.

115.    Mr. Ragland was transported to a local emergency room and from there to Henry Ford Kingswood Psychiatric Hospital for treatment for his suicide attempt.

116.    Henry Ford Kingswood Psychiatric Hospital discharged Mr. Ragland after approximately three weeks of treatment, and he returned home.

117.    In June of 2014, four months after his suicide attempt, Mr. Ragland was arrested and charged with resisting/obstructing an officer and felonious assault. He was accused of resisting and assaulting the officers who pulled him off of the bridge.

118.    In October of 2014, Mr. Ragland accepted an offer from the prosecutor to resolve the charges with a plea of Not Guilty by Reason of Insanity.

119.    Although Henry Ford Kingswood Psychiatric Hospital had already treated Mr. Ragland for his suicide attempt and discharged him after a three-week stay, Mr. Ragland was involuntarily confined in the Center for Forensic Psychiatry

for approximately five months following his NGRI plea. When he was finally released, it was pursuant to a five-year ALS contract, with a series of strict, parole-like conditions he was required to comply with, under penalty of re-confinement in a psychiatric hospital.

120.    For most of 2015, Mr. Ragland lived with and cared for his mother, who had breast and bone cancer. He was generally complaint with the terms of his ALS contract.

121.    On January 14, 2016, with no prior warning, police officers took Mr. Ragland into custody at his residence and transported him to Walter Reuther Psychiatric Hospital.

122.    Mr. Ragland was taken into custody because the NGRI Committee had revoked Mr. Ragland's authorized leave status after reading a report from his treatment team. The report supposedly mentioned that Mr. Ragland had told his therapist that "he occasionally has a beer" and that he had once smoked marijuana. *See Ex.K*: Monroe Community Mental Health Authority Progress Notes for Joshua Ragland, pgs  372, 350.

123.    Mr. Ragland denied drinking beer or smoking marijuana during the term of his release on the ALS contract. He claimed that those statements to his therapist had been misinterpreted, and that the statements were referring to his past history of substance use before his arrest and NGRI adjudication. He also asked why

he was never drug tested before being sent to Walter Reuther for allegedly using drugs. *See Ex.* K: Monroe Community Mental Health Authority Progress Notes for Joshua Ragland, pg. 346.

124.    On January 20, 2016, six days after he was admitted, Mr. Ragland was informed by his treatment team that he "would have a minimum stay of six months at Walter Reuther."

125.    Unlike a probationer or parolee charged with a violation, Mr. Ragland had no opportunity to contest his return to custody in court and no access to court-appointed legal counsel.

126.    Despite being "the model patient" at Walter Reuther, *See Ex. K:* Monroe Community Mental Health Authority Progress Notes for Joshua Ragland pg. 320, Mr. Ragland remained in custody for nearly a year. He was released on December 16, 2016.

127.    Mr. Ragland's release was conditioned on signing another five-year ALS contract, with the same set of strict, parole-like conditions that he had allegedly violated in 2015 by drinking a beer.

128.    During his confinement at Walter Reuther, Mr. Ragland's social worker submitted a "petition for respite," which, "if approved, would mean the 10 months he spent in the community would be credited towards his five-year NGRI

contract." *See Ex. K* Monroe Community Mental Health Authority Progress Notes for Joshua Ragland pg. 344. However, the "petition for respite" was not approved.

129.     In March of 2017, a few months after his release from Walter Reuther, Mr. Ragland's outpatient treatment team at Monroe Community Mental Health Authority refused to submit a petition for a continuing hospitalization treatment order and clinical certificate for him, notwithstanding their supposed contractual responsibility for completing this "reporting requirement."

130.     Members of Mr. Ragland's treatment team met with a representative from the NGRI Committee regarding their position. It was determined that because the ALS contract states that "ultimate responsibility for petitioning remains with the hospital," Walter Reuther staff would complete the petition and clinical certificate in light of the treatment team's refusal to do so.

131.     Mr. Ragland was ordered to report to Walter Reuther to be examined by Defendant Dr. Aruna Bavineni. Defendant Bavineni completed a clinical certificate indicating that Mr. Ragland was mentally ill, and as a result of that mental illness could reasonably be expected "in the near future" to "seriously physically injure" himself or another person.

132.     On April 21, 2017, a bench trial was held on Walter Reuther's petition for a continuing hospitalization treatment order. The Court denied the petition.

133.     During his ordeal as an NGRI acquittee, Mr. Ragland was confined in secure psychiatric facilities for approximately 16 months. He was subject to strict, parole-like supervision in the community for an additional 12 months. Outside of the forensic system and immediately following his suicide attempt, Henry Ford Kingswood Psychiatric Hospital considered Mr. Ragland ready for unconditional discharge after only three weeks of inpatient treatment. Mr. Ragland had not reattempted suicide or engaged in any other dangerous or violent behavior in the approximately seven months between his discharge from Henry Ford Kingswood Psychiatric Hospital and his admission to the Center for Forensic Psychiatry, which occurred automatically as a consequence of his NGRI plea.

**D. Bonn Washington**

134.     Bonn Washington is a forty-three-year-old man who grew up in Michigan's foster care system. Like Mr. Pelichet, he suffers from schizoaffective disorder, but unlike Mr. Pelichet, he lacks a family support network.

135.     In 2005, Mr. Washington assaulted a Washtenaw County Sheriff's Deputy during a psychotic episode. He had recently switched healthcare providers, and the new provider changed his antipsychotic medication from Olanzapine (Zyprexa) to Quetiapine (Seroquel). The new medication exacerbated his symptoms rather than controlling them.

136.     Mr. Washington was found Not Guilty by Reason of Insanity (NGRI) on the resulting criminal charges.

137.     Immediately following his acquittal, Mr. Washington was civilly committed to the Center for Forensic Psychiatry for evaluation and inpatient psychiatric treatment. His antipsychotic medication was changed back to Zyprexa, which he continues to take daily.

138.     Mr. Washington responded well to Zyprexa, as he had before, and his symptoms were brought back under control.

139.     Mr. Washington has not experienced an acute psychotic episode since 2005. He has been voluntarily compliant with his medication and understands and accepts that he has a mental illness.

140.     Mr. Washington has been released pursuant to ALS contracts on five occasions between 2005 and 2018. His stretches of conditional liberty ranged from one month to over two years.

141.     Mr. Washington's most recent release was in January of 2018. He is presently living in the community, compliant with medication and treatment, and passing his random drug screens.

142.     When not in custody, Mr. Washington worked in the S.T.E.P. program, a work-therapy program affiliated with his treatment provider, at an automotive-component manufacturing facility. He made repeated requests to the

NGRI Committee for permission to get a job outside the S.T.E.P. program but has not yet been granted permission to seek private-sector employment. *See Ex. L:* Letter from Bonn Washington to the NGRI Committee.

143.     Every time he was released prior to his current stint in the community, Mr. Washington was returned to the hospital for violating the ALS contract by testing positive for marijuana. Each subsequent release was pursuant to a new ALS contract that required a renewed five-year, violation-free period before Mr. Washington could be discharged.

144.     After each positive drug test, Mr. Washington was confined in the Walter P. Reuther Psychiatric Hospital under restrictive conditions for approximately one year.

145.     Mr. Washington received little-to-no substance abuse treatment during his periods of confinement at Walter P. Reuther Psychiatric Hospital.

**E. Darius Bickerstaff**

146.     Mr. Bickerstaff is 28 years old. His mother died when he was 10 years old and he was then raised by his grandmother. Until the age of 26, Mr. Bickerstaff lived in the family home.

147.     Mr. Bickerstaff is diagnosed with schizoaffective bipolar disorder.

148.      In March, 2014, at the age of 26, Mr. Bickerstaff stopped taking medication for his illness. As a result, Mr. Bickerstaff had a psychotic episode and

entered into a physical altercation with his grandmother's friend while in the home. He was charged with felonious assault with intent to do great bodily harm.

149.    Mr. Bickerstaff was found Not Guilty by Reason of Insanity and was treated at the Forensic Center for Psychiatry in Washtenaw County. Mr. Bickerstaff was transferred to Walter P. Reuther Psychiatric Hospital in March 2016.

150.    Within two months of this transfer, Walter P. Reuther Psychiatric Hospital's treatment team deemed him a minimal risk of escape or violence and continued to assess him as low-risk until his release to the community in 2017.

151.    Mr. Bickerstaff was approved in October 2016 for release to the community only if he agreed to sign a 5-year ALS contract with parole-like conditions as imposed by the NGRI Committee.

152.    Defendant NGRI Committee's policy holds that Mr. Bickerstaff is not eligible for alternative leave unless the hospital team determines "within the bounds of reasonable clinical certainty," he is not likely to repeat the type of behavior which led to the adjudication of NGRI or to commit other dangerous acts.

153.    Despite this determination by the NGRI Committee and Mr. Bickerstaff treatment team that he was no longer dangerous, Walter P. Reuther's psychiatrist wrongfully and as a matter of course declared Mr. Bickerstaff instead continued to meet hospitalization criteria (danger to self or others) and required treatment for another year in the hospital.

154.    Eventually Mr. Bickerstaff was released to the community on an ALS contract, four months after being approved for discharge. He was released to an Adult Foster Care Home (AFC) in February 2017.

155.    Despite being deemed no longer a danger or self to others as of February 2017, three months later in May, a six-month review report was submitted to the probate court by Defendant New Center Community Services declaring he continued to require treatment in a hospital and that he can reasonably be expected, within the near future, to intentionally or unintentionally seriously physically injure himself or others (and has engaged in an act or acts that support this expectation).

156.    Mr. Bickerstaff had not engaged in any threatening or violent acts between his release in February 2017 and the time Defendant New Center Community Services submitted the six-month report in May.

157.    Mr. Bickerstaff  filed recipient rights complaints against several staff members at his AFC home mid July 2017, alleging, among other things, verbal abuse and HIPPA violations. Three of Mr. Bickerstaff's complaints were substantiated by Office of Recipient Rights investigators, who relied in part on recordings of the abuse that Mr. Bickerstaff made on his phone. One AFC home employee was terminated and another suspended as a result of the investigations.

158.    A few days prior to these complaints being filed, the AFC home contacted Walter Reuther Hospital's NGRI liaison.

159.    The AFC home manager made verbal allegations against Mr. Bickerstaff to Walter Reuther which resulted in him being immediately placed on restrictions by the NGRI Committee - in that he could no longer leave the AFC home without direct supervision from staff.

160.    A meeting was held on July 20, 2017 at the hospital. Mr. Bickerstaff's guardian and his grandmother were not allowed to participate and were told to sit in the waiting room.

161.    According to emails between the Defendants NGRI Committee and CMH Subcontractor employees, it was noted Mr. Bickerstaff's case worker felt he was being wrongfully targeted by the Adult Foster Care Home staff. According to the CMH Subcontractor's case manager, the NGRI Committee approved the move to another AFC home. The AFC home issued a 30-day discharge notice.

162.    Defendant CareLink was responsible for finding alternative placement for Mr. Bickerstaff by no later than August 19, 2017. CareLink never found alternative placement, leaving Mr. Bickerstaff homeless, which upon information and belief, led to his re-hospitalization (given no records obtained reflect any ALS contract violation or other triggering event leading to re-hospitalization).

163.    On August 7, 2017, Mr. Bickerstaff's therapist's notes indicate Mr. Bickerstaff was compliant with medication, doing well in the community, and had been following his ALS contract since the July 20, 2017 meeting. His drug screens

had been negative, and he continued to follow his treatment plan. On August 9, 2017, the therapist's notes report he remained compliant with medication. But on or around August 13, 2017, Mr. Bickerstaff's AFC home manager received a call from the hospital or Defendant NGRI Committee to bring him back. She was advised not to tell Mr. Bickerstaff why he was going to the hospital as they were afraid he would run.

164. While Mr. Bickerstaff thought he was attending a treatment team meeting, he was actually brought back to the hospital for re-admission. He was readmitted to the hospital that day with no prior notice against his will, August 14, 2017. Mr. Bickerstaff was physically restrained in order to maintain his detention.

165. Neither Mr. Bickerstaff nor his guardian were provided with any information as to his right to appeal or challenge the re-hospitalization. This is despite several calls from his guardian addressing concerns with the readmission.

166. According to the admission records, the reasons for re-admission provided include only the allegations made by the AFC home staff prior to the July 20, 2017 meeting.

167. Mr. Bickerstaff is once again up for discharge back to the community. The treatment team has deemed him no longer a danger or self to others as of April 9, 2018. Walter Reuther Psychiatric Hospital staff have determined the most

therapeutic setting for him to return to is his grandmother's home with significant home and community-based services.

168. The NGRI Committee Defendants have agreed upon release, but approved release only to the community in another AFC home pursuant to an ALS contract as of April 12, 2018.

169. And despite the determination he no longer meets hospitalization criteria, Defendants NGRI Committee and Walter Reuther Staff filed documents with the probate court again May 2018, wrongfully declaring he still requires hospitalization as a danger to self or others.

170. Mr. Bickerstaff, despite no longer meeting hospitalization criteria as deemed by NGRI Committee, has not yet been released from confinement in a closed psychiatric hospital as of this writing, almost four months after he was approved for release.

## COUNT I:
## DEPRIVATION OF RIGHTS GUARANTEED BY THE CONSTITUTIONS AND LAWS OF THE UNITED STATES AND THE STATE OF MICHIGAN
### (All Defendants)

### A. Procedural Due Process Violations under the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983.

171. Plaintiffs incorporate by reference all allegations contained in Paragraphs 1 through 168.

172.   All Defendants were acting under color of state law at all relevant times.

173.   The federal and state constitutional deprivations outlined herein were caused by the exercise of State created rights and privileges, by a rule of conduct imposed by the State, or by a person for whom the State is responsible. All Defendants are state actors or private parties engaging in state action.

174.   Plaintiffs' constitutionally protected rights under 42 U.S.C. § 1983 that Defendants violated involve Plaintiffs' Fourteenth Amendment right to liberty under the Due Process Clause.

175.   Plaintiffs Darryl Pelichet, Bonn Washington, Joshua Ragland, Darius Bickerstaff, and other forensic patients experienced a deprivation of liberty each and every time they were returned to confinement at Walter P. Reuther Psychiatric Hospital as punishment for allegedly violating of the rules of their ALS contracts, sometimes after years of living successfully in the community.

176.   Plaintiffs signed their ALS contracts under duress, because the NGRI Committee Defendants and Hospital Management Defendants sought to keep each NGRI patient confined in a hospital indefinitely unless the patient signed the ALS contract.

177.   The right to be free from physical detention is at the very core of the liberty interest protected by the Due Process Clause of the Fourteenth Amendment. *Hamdi v. Rumsfeld*, 452 U.S. 507, 529 (2004).

178.   The Due Process Clause protects even conditional liberty interest that a state body has broad discretion to grant or deny, such as parole. A parolee facing revocation of his conditional liberty interest must receive, at a minimum, "(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972).

179.   The specific procedural due process protections mandated in *Morrissey* apply to the revocation of other conditional liberty interests besides parole. *See Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973). These specific protections are applicable to programs that resemble parole, even if the state claims that the program is not parole, and even if the state classifies the program participants as technically "in custody." *See Young v. Harper*, 520 U.S. 143 (1997).

180.   Persons in state custody also have liberty interests protected by the due process clause that do not even implicate release from confinement. *See Washington v. Harper*, 494 U.S. 210 (1990) (holding that convicted felon confined in a

psychiatric facility has protected liberty interest in avoiding involuntary administration of antipsychotic medication); *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982) (recognizing inherent protected liberty interest in freedom from bodily restraint for the involuntarily civilly committed: "[t]his interest survives criminal conviction and incarceration. Similarly, it must also survive involuntary commitment.")

181. Confinement in a psychiatric hospital has long been recognized as among the most grievous deprivations of liberty that a state can impose upon its citizens. Even currently incarcerated persons are entitled to due process protections before they can be transferred to a psychiatric hospital from a state prison. *See Vitek v. Jones*, 445 U.S. 480, 492-93 (1980).

182. Additional protected liberty entitlements, outside the scope of the inherent protections of the Due Process Clause, can be created by operation of state law. *Bills v. Henderson,* 631 F.2d 1287, 1291 (6th Cir. 1980). "When a liberty interest has been created, the due process clause acts to ensure that the state-created right is not arbitrarily abrogated." *Id*.

183. The Michigan Mental Health Code requires that "an opportunity for appeal, and notice of that opportunity, shall be provided to an individual who objects to being returned from any authorized leave in excess of 10 days," MCL § 330.1408(3). The Michigan Constitution also provides that "[n]o person shall be . .

. deprived of life, liberty or property, without due process of law." Mich. Const. 1963, Art. I, § 17.

184.    The Michigan State Court Administrative Office, the administrative agency of the Michigan Supreme Court, developed and published a court form entitled, "Notice of Right to Appeal Return and Appeal of Return from Authorized Leave," to facilitate compliance with MCL § 330.1408(3). *See Ex. M:* SCAO Form PCM 233.

185.    Mr. Pelichet was forced to return to confinement on six occasions since 2005, most recently on May 4, 2016. Mr. Washington was similarly forced to return to confinement on four occasions since 2005. Mr. Ragland was forced to return to confinement on one occasion, in January of 2016. And Mr. Bickertaff was forced to return to confinement on one occasion, on August 14, 2017. Other forensic patients have suffered the same.

186.    None of the Plaintiffs (and it is believed the same for other forensic patients) were ever served with SCAO Form PCM 233 or otherwise notified that they had a right to contest their involuntary return to the hospital.

187.    None of the Plaintiffs ever had an opportunity to contest any of the forced returns to the hospital before a neutral decisionmaker.

188.    All of the Plaintiffs have had their ALS status summarily revoked, resulting in additional extended periods of confinement in Walter Reuther

Psychiatric Hospital and loss of credit for the ALS time they served in the community, with no procedural due process protections at all.

189. Defendants knew or should have known that they had a statutory and constitutional duty to Plaintiffs to provide some modicum of procedural due process either before or shortly after depriving the Plaintiffs of their liberty interests in being free of physical detention. *See Zinermon v. Burch*, 494 U.S. 113 (1990); *Vitek v. Jones*, 445 U.S. 480, 492-93 (1980); *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973); *Young v. Harper*, 520 U.S. 143 (1997); *Bills v. Henderson,* 631 F.2d 1287, 1291 (6th Cir. 1980); M.C.L. § 330.1408(3).

190. Defendants repeatedly deprived Plaintiffs and other forensic patients of their protected liberty interests in being free of physical detention without due process of law in violation of the Fourteenth Amendment to the Constitution of the United States.

191. On information and belief, the NGRI Defendants regularly exercise their seemingly absolute discretion to compel persons living in the community who have been adjudicated NGRI to return to confinement in a psychiatric hospital for allegedly violating the rules of their ALS contracts, without any adversarial hearings or other judicial oversight. Forensic patients on ALS contracts are living the reality

that at any moment in time, based on any unsubstantiated allegation made by anyone, they could be forced back to the hospital and held there for approximately one year.

192.   Unless Defendants are enjoined, Plaintiffs Bonn Washington, Darius Bickerstaff, and other forensic patients will suffer irreparable injury because of Defendants' conduct. The NGRI Committee Defendants, Hospital Management Defendants, and CMH Contractor and Subcontractor Defendants have a practice of failing to provide NGRI patients with the notifications and opportunities to be heard required by Michigan law and by the Michigan and United States Constitutions. Plaintiff Bonn Washington's, Plaintiff Darius Bickerstaff's, and other NGRI patients' constitutional rights remain in jeopardy until Defendants can no longer engage in their unlawful practices.

193.   As a proximate result of the Defendants' violations of Plaintiffs' rights, Plaintiffs have suffered damages. Such damages include, but are not limited to, lost wages, reduced future earnings potential, loss of their freedom from physical confinement, suffering and mental anguish during the years they were unnecessarily institutionalized, lost opportunities to spend time with their children and other family members, and loss of enjoyment of life.

**B. Substantive Due Process Violations under the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983.**

194. "The Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Foucha*, 504 U.S. at 80.

195. Among the arbitrary, wrongful government actions that are absolutely barred by the Due Process Clause is the involuntary confinement of a mentally-ill person who is "dangerous to no one and can live safely in freedom." *Donaldson*, 422 U.S. at 575.

196. All Defendants acted in concert to establish, maintain, and enforce a policy of continuing the involuntary civil commitment of all persons adjudicated NGRI, including Plaintiffs and other forensic patients, unless and until the patient completes a five-year period in the community without violating a set of strict conditions of release.

197. Defendant Lisa Medoff, the Director of Psychology at Walter P. Reuther Hospital, hired outside psychologists on an independent-contractor basis to complete Clinical Certificates for NGRI patients and testify at their Probate Court hearings.

198. These independent contractors, who had little-to-no previous contact with the subject patient, typically examined the patient for less than twenty minutes before invariably concluding that the patient continues to meet the statutory criteria for involuntary hospitalization.

199.   On information and belief, it was intended by Defendant Lisa Medoff, and as a result, every clinical examination of an NGRI patient commissioned by Walter P. Reuther Psychiatric Hospital for the purpose of completing a Petition for a Continuing Treatment Order in the past five years has resulted in the following findings:

a) The patient continues to be a "person requiring treatment" as defined in M.C.L. § 330.1401;

b) Alternative/assisted outpatient treatment is insufficient to meet the patient's needs;

c) A combination of hospitalization and alternative/assisted outpatient treatment is insufficient to meet the patient's needs;

d) The patient requires continuing involuntary hospitalization for the maximum period of time permitted by law (typically one year).

200.   Determinations made by the Office of Recipient Rights support the allegation there is a practice, policy, or custom of employing excessive and illegal treatment for punitive purposes for NGRI patients.

201.   According to an ORR report, on February 22nd, 2018, Marway Johnson, LLMSW, an employee of Walter Reuther Psychiatric Hospital, told a group of hospitalized NGRI patients that, "I will never have anything good to say about you or anyone here [in probate court] and I will always say something bad

about you when I go to court because my job is to keep you here." *See Ex. N:* Office of Recipient Rights Investigation Re: Marway Johnson, May 15, 2018.

202.    When asked by an Office of Recipient Rights investigator if she really believed that it was her job to say whatever was necessary in court to secure another hospitalization treatment order, she responded, "yes, that is my job. **I was told, that is my job.** Is it not my job?" Ms. Johnson also stated in the interview: "that we go to court, so we can renew your treatment order even if you are stable. **That is our job to say what is needed for them to stay.**" *See Ex. N*: Office of Recipient Rights Investigation Re: Marway Johnson, May 15, 2018.

203.    On information and belief, the Hospital Management Defendants directed both independent-contractor psychologists, such as Defendant Stern, and hospital employees, such as Marway Johnson, LLMSW, and Defendant Bavineni, to "say what is needed" in probate court to keep every patient on a hospitalization treatment order, regardless of that patient's treatment progress or present mental health condition.

204.    On information and belief, the Hospital Management Defendants directed both independent-contractor psychologists, such as Defendant Stern, and hospital employees, such as Marway Johnson, LLMSW, and Defendant Bavineni, to produce treatment documentation, petitions for civil commitment, and clinical certificates that exaggerated each NGRI patient's present level of

dangerousness in order to increase the probability that each NGRI patient's hospitalization treatment order would be renewed.

205.    Indigent, mentally-ill persons institutionalized at Walter Reuther Psychiatric Hospital are poorly-equipped to detect and credibly respond to false or misleading testimony proffered by their treatment professionals. The court-appointed attorneys provided to Mr. Pelichet and Mr. Washington received only a "one-time payment" of $130 to handle their entire civil commitment cases, including the trial. *See Ex. O*: Appointed Attorney Fee Schedule for Wayne County Probate Court. The appointed attorneys for indigent NGRI patients typically do not interview witnesses, conduct little, if any, investigation into their client's present condition and treatment history, and spend minimal time preparing for trial.

206.    NGRI patients report that their court-appointed attorneys consistently pressure them to waive their right to trial and stipulate to an additional 1-year hospitalization treatment order. Securing a waiver and stipulation from his mentally-ill client allows an appointed attorney to avoid conducting a trial, while still receiving the $130 payment. ORR staff have also observed appointed attorneys, who are typically assigned several NGRI clients at a time, moving from patient to patient in hospital common areas and attempting

to convince all of their appointed clients to sign waivers and stipulations in a single hospital visit.

207. All releases of NGRI patients on ALS contracts presently require approval from the "NGRI Committee," a committee composed of state employees who do not work at Walter P. Reuther Psychiatric Hospital.

208. NGRI patients who have been released on ALS contracts also must gain permission from the NGRI Committee before they may engage in a variety of common, lawful activities, such as driving a car, obtaining private-sector employment, working the night shift, visiting local relatives, enrolling in community college, or getting a GED.

209. Plaintiffs Bonn Washington and Darryl Pelichet both unsuccessfully sought permission from the NGRI Committee to participate in private-sector employment during their most recent releases.

210. Typically, the members of the NGRI Committee do not personally examine or meet with the NGRI patients confined in Walter P. Reuther Psychiatric Hospital when deciding whether to release them, and do not personally examine or meet with NGRI patients in the community when deciding whether they can work, go to school, or drive a car.

211. The members of the NGRI Committee do not typically have a face-to-face meeting with any of the social workers, psychologists, or other

professionals at Walter P. Reuther Psychiatric Hospital who regularly treat and interact with the subject NGRI patient before making their decisions.

212.   The parole-like system operated by the Defendants prolongs the confinement of persons adjudicated NGRI after said persons cease to be both mentally-ill and dangerous, in violation of their "constitutional right to freedom." *Donaldson*, 422 U.S. at 576.

213.   The Defendants' internal policies require the patient's treatment providers to determine "within the bounds of reasonable clinical certainty, [that] the patient is not likely to repeat the type of behavior that led to the adjudication as NGRI or commit other dangerous acts," *before* the patient can be released from the hospital on an ALS contract. *See Ex. P:* Walter P. Reuther Psychiatric Hospital Standard Operating Procedure #254.

214.   Shortly after making internal determinations that Plaintiffs Darryl Pelichet, Bonn Washington, Joshua Ragland, Darius Bickerstaff, and other forensic patients, were "not likely to repeat the type of behavior that led to the adjudication as NGRI or commit other dangerous acts," the CMH Contractor and Subcontractor Defendants, NGRI Committee Defendants, and Hospital Management Defendants filed or directed subordinates to file petitions for Continuing Treatment Orders in which they alleged that Plaintiffs "can reasonably be expected, in the near future, to intentionally or unintentionally

seriously physically injure" themselves or others. *See Ex. Q:* Petition filed by Defendant Hegira Programs, Inc. on October 24, 2017.

215.    The CMH Subcontractor Defendants filed Petitions for Continuing Treatment Orders alleging that Plaintiffs Darryl Pelichet, Joshua Ragland, Bonn Washington, Darius Bickerstaff, and other forensic pateients, could reasonably be expected "in the near future" to "seriously physically injure" themselves or others while the Plaintiffs were living in the community, complying with their treatment, and passing their random drug screens.

216.    Plaintiffs Darryl Pelichet and Bonn Washington have not seriously injured anyone in the thirteen years since their original NGRI adjudications. Plaintiff Joshua Ragland has not reattempted suicide or engaged in any other dangerous or violent behavior since his suicide attempt in February 2014. And Darius Bickerstaff has not seriously injured anyone since his original NGRI adjudication in 2014.

217.    The ALS contracts employed by Walter P. Reuther Psychiatric Hospital are agreements not only between the patient and the hospital, but also between the hospital, the NGRI Committee, and the private contractors and subcontractors engaged to provide treatment to the patient in the community.

218.    The CMH Contractor Defendants and Subcontractor Defendants agree, in their standard NGRI outpatient treatment contracts with Walter P.

Reuther Psychiatric Hospital and the NGRI Committee Defendants, to petition for a one-year continuing Hospitalization Treatment Order for the relevant patient every year for five years, and never to make a recommendation to the Probate Court for alternative/assisted outpatient treatment. *See Ex. R:* Darryl Pelichet and Bonn Washington ALS Contracts.

219.    The "Community Mental Health Provider Responsibilities" section of Mr. Pelichet's most recent ALS contract refers to the act of filing a Petition for Continuing Treatment Order with the Probate Court as a mere "reporting requirement." *See Id.*

220.    For example, Mr. Pelichet's contract purports to obligate Defendant Hegira Programs, Inc. to file with the Probate Court "at least 14 days prior to the expiration of the current court order, a Petition for a Second or Continuing Treatment Order and a Clinical Certificate," and "these should reflect a request for a 90 day or one-year hospitalization with Walter P. Reuther Psychiatric Hospital named as the hospital." *Id.*

221.    The contract further provides that "the patient must be kept on a Hospitalization Treatment Order and should not be placed on an Alternative Treatment Order . . ." *Id.*

222.    The contract does not allow for the possibility that the examining psychiatrist for the relevant CMH Defendant could conclude that outpatient

treatment is sufficient for the patient's needs or that the patient no longer meets the M.C.L. § 330.1401 criteria for continuing involuntary hospitalization.

223.     Dr. P. G. Vijayakumaran completed the clinical certificate for the most recent Petition for a Continuing Treatment Order for Mr. Pelichet. Dr. Vijayakumaran checked the box to recommend "hospitalization" rather than the box for "alternative treatment" and wrote below, "to maintain NGRI status."

224.     Dr. Vijayakumaran testified at Mr. Pelichet's jury trial on January 29th, 2018. He said that he had examined Mr. Pelichet on one occasion for twenty minutes. When asked what the purpose of the single twenty-minute appointment was, Dr. Vijayakumaran said the purpose was **"[t]o create documents substantiating his continuation of the ALS status."** *See Ex. S*: Pelichet transcript pg 22.

225.   Each petition for a continuing one-year Hospitalization Treatment Order is filed on a standard SCAO form, PCM 218. Paragraph 13 of the form provides four options for recommendations to the court if the petitioner believes that the respondent meets the Section 401 criteria for involuntary hospitalization:

a) "hospitalization for not more than 90 days."

b) "continuing hospitalization for not more than one year."

c) "combined hospitalization and alternative/assisted outpatient treatment for not more than one year."

d) "alternative/assisted outpatient treatment for not more than one year."

SCAO Form, PCM 18.

226. A check-box is provided next to each option. Upon information and belief, the CMH Subcontractor Defendants' employees are advised to always check the second box, "continuing hospitalization for not more than one year," for every NGRI patient because the CMH Contractor and Subcontractor Defendants' ALS contracts with the NGRI Committee Defendants proport to preclude them from making any other recommendation to the Court.

227. Mary Scott, the employee of Hegira Programs, Inc., who completed Mr. Pelichet's most recent Petition for a Continuing Treatment Order, testified in his jury trial on January 29, 2018. She testified that she had worked for Hegira in her present position for thirty years. She testified that throughout her entire career, when completing the "Petition for a Continuing Treatment Order" form for an NGRI patient, she had never checked a box in the "I recommend" section other than the box for one additional year of hospitalization. *See Ex. S*, Pelichet Transcript pgs 19-20.

228. The SCAO form used by Defendant Hegira Programs' employees includes the words "To Maintain NGRI Status" appended next to the second option, although this text does not appear in the standard version of the form approved by

the SCAO. Walter P. Reuther Psychiatric Hospital adds the same text to the petitions it files using what appears to be a stamp. *See Ex. Q:* Petition filed by Defendant Hegira Programs, Inc. on October 24, 2017; *Ex. T:* Petition filed by Walter P. Reuther Psychiatric Hospital.

229.   Walter P. Reuther Psychiatric Hospital possesses a literal rubber stamp that reads "To maintain NGRI Status" and uses it to amend the text of the standard SCAO form after, "I REQUEST the court to order the individual to receive continuing hospitalization for not more than one year."

230.   The use of the rubber stamp gives rise to a strong inference that Walter P. Reuther Psychiatric Hospital regularly recommends one-year Hospitalization Treatment Orders for NGRI patients not because, in its professional clinical judgment, the patient continues to meet the constitutional and statutory criteria for involuntary civil commitment and a one year of continued involuntary hospitalization is the least restrictive treatment setting appropriate for the patient, but rather *for the sole purpose of maintaining the patient's NGRI status*.

231.   During the course of its second investigation, the MDHHS Office of Recipient Rights "determined that the process of using court orders for continued hospitalization to maintain NGRI Committee oversight has become standard practice that is placing the due process rights of individuals who have been found NGRI and placed in the care of the Michigan Department of Health and Human

Services (MDHHS) in jeopardy." *Ex. F*: Report of Investigative Findings from Office of Recipient Rights, dated 9/8/17.

232.   All Defendants knew or should have known that "[t]o maintain NGRI Status" is not among the statutorily or constitutionally permissible bases for subjecting a person to involuntary civil commitment. See M.C.L. § 330.1401(1), *Bell v. Wayne County General Hospital*, 384 F.Supp. 1085, 1096 (E.D. Mich. 1974); *Foucha v. Louisiana*, 504 U.S. 71 (1992); *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975).

233.   Defendant Lisa Medoff, the Director of Psychology at Walter P. Reuther Psychiatric Hospital, testified at the May 3, 2017 hearing on Mr. Pelichet's Petition for Discharge which demonstrates that she recklessly disregards the Section 401 criteria and the due process rights of patients in her care. Counsel for Mr. Pelichet asked Defendant Medoff on cross-examination if "there was ever a point in time that [Mr. Pelichet] has ever injured himself or others during this entire period from 2005 to now that we – that we're now looking at?" to which she responded, "Well from my perspective, I consider taking a drug which can be contradictory to your health something that is dangerous. So I consider that harm to self."

234.   She further testified that although she had known Mr. Pelichet and overseen his treatment for several years, to her knowledge he had never actually physically done harm to himself or others except for "harming himself" by smoking

marijuana. *Ex. U:* Cross-Examination of Defendant Lisa Medoff at May 3, 2017 Hearing.

235.   None of the Plaintiffs have ever "seriously physically injured" himself or anyone else while under the influence of marijuana.

236.   Defendant Lisa Medoff knew or should have known that the risk of self-harm via substance abuse is specifically excluded by statute as a permissible basis for involuntary civil commitment in a psychiatric hospital. M.C.L. § 330.1401(2).

237.   As a consequence of the Defendants' violations of their constitutional rights, the Plaintiffs have suffered damages. Such damages include, but are not limited to, lost wages, reduced future earnings potential, loss of their freedom from physical confinement, suffering and mental anguish during the years they were unnecessarily institutionalized, lost opportunities to spend time with their children and other family members, and loss of enjoyment of life.

238.   Unless Defendants are enjoined, Plaintiffs Bonn Washington, Darius Bickerstaff, and other forensic patients will continue to suffer irreparable injury because of Defendants conduct. Defendants have a practice of automatically filing petitions for continued hospitalization in bad faith, in order to keep persons who have been adjudicated NGRI institutionalized when there is no longer a statutory or constitutional basis to confine them. Because Plaintiff Bonn Washington has been released subject to an ALS contract with Defendants (and Darius Bickerstaff should

be released shortly), Plaintiffs could be returned to Walter P. Reuther Psychiatric Hospital at any time.  Plaintiffs are further required to obtain permission from the NGRI Committee to participate in lawful activities such as seeking employment. The Constitutional rights of Plaintiff Bonn Washington and of other persons who are NGRI patients and constituents and clients of Michigan Protection and Advocacy Service, Inc. remain in jeopardy until Defendants can no longer engage in their unlawful practices.

239.   The public has an interest in ensuring Defendants (government entities and their affiliates) abide by state and federal law, especially where it involves unconstitutional deprivations of liberty.

240.   As a proximate result of the Defendants' violations of Plaintiffs' rights, Plaintiffs have suffered damages. Such damages include, but are not limited to, lost wages, reduced future earnings potential, loss of their freedom from physical confinement, suffering and mental anguish during the years they were unnecessarily institutionalized, lost opportunities to spend time with their children and other family members, and loss of enjoyment of life.

### C. Equal Protection Burdening Fundamental Rights under the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983.

241. The policies, practices, customs, and procedures established, maintained, and carried out by all of the Defendants violate the Equal Protection

clause of the Fourteenth Amendment by intentionally singling out NGRI patients for additional punishment in the form of medically unnecessary confinement and loss of liberty, beyond that imposed on similarly situated individuals who are involuntarily civilly committed for psychiatric treatment and who were not acquitted NGRI.

242.   The policies and procedures established, maintained, and carried out by the Defendants burden the fundamental right to freedom from physical confinement.

243.   The parole-like system that the Defendants established for NGRI patients lacks even the procedural protections, judicial oversight, and statutory maximum sentences afforded to similarly-situated, convicted criminal defendants who are adjudicated "Guilty But Mentally Ill" (GBMI) pursuant to Mich. Comp. Laws § 768.36 (2018).

244.   While persons found GBMI may serve some or all of their sentence in a psychiatric hospital rather than a prison, they are ordinarily entitled to release after serving the statutory maximum sentence for the crime they were convicted of.

245.   When persons found GMBI are released early, they are placed on parole, rather than on "ALS contracts," and provided access to procedural due process protections if they are accused of violating parole.

246.   Persons found GMBI are not placed on 5-year ALS contracts. They are never subject to the oversight of the NGRI Committee Defendants.

247.   If Plaintiff Darryl Pelichet had pled guilty, or "guilty but mentally ill" to the crimes he was acquitted of, he could have been held in custody for a maximum of four years. Instead he and other forensic patients are trapped in an indefinite cycle of hospitalization, strict ALS supervision, and rehospitalization that lasted, or may last, nearly thirteen years and threatened to continue for the remainder of their lives.

248.   Defendants are state actors and as such are obligated to provide Plaintiffs and other forensic patients equal protection under the law.

249.   As a proximate result of the Defendants' violations of Plaintiffs' rights, Plaintiffs have suffered damages. Such damages include, but are not limited to, lost wages, reduced future earnings potential, loss of their freedom from physical confinement, suffering and mental anguish during the years they were unnecessarily institutionalized, lost opportunities to spend time with their children and other family members, and loss of enjoyment of life.

### D. Cruel and Unusual Punishment

250.   The "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'. . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

251.   The Eighth Amendment's guarantees with respect to medical care apply equally to prison inmates and persons who are involuntarily civilly committed for purposes of psychiatric treatment, even though the latter have not been convicted

of a crime. *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 842-43 (6th Cir. 2002).

252. The Eighth Amendment's guarantees with respect to medical care for institutionalized persons includes a right to mental health and psychiatric treatment. *See, generally, Perez v. Oakland County*, 466 F.3d 416 (6th Cir. 2006).

253. Persons responsible for the health and safety of an institutionalized population exhibit "deliberate indifference to serious medical needs" when they provide "grossly inadequate care," which is defined as "treatment so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 844 (6th Cir. 2002) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

254. Michigan's Mental Health Code mandates that a "clinical certificate" accompany a petition for continuing 1-year hospitalization treatment order, and that the psychiatrist or psychologist who submits the clinical certificate must conduct a "personal examination" of the individual named in the petition within 72 hours before the petition is filed. MCL 330.1434(4).

255. Defendant Bavineni, as well as Defendant Stern, conduct brief, ten-to-twenty-minute interviews with NGRI patients held at Walter Reuther in order to

produce the clinical certificates which must accompany petitions for 1-year hospitalization treatment orders.

256. Per MCL § 330.1435(4), "the examining psychiatrist shall either transmit a clinical certificate to the court or report to the court that execution of a clinical certificate is not warranted."

257. On information and belief, Defendant Bavineni has never reported to the probate court "that execution of a clinical certificate" for an NGRI patient was "not warranted."

258. On information and belief, Defendant Stern has never reported to the probate court "that execution of a clinical certificate" for an NGRI patient was "not warranted."

259. Defendant Stern failed to conduct bona-fide psychological evaluations of the NGRI patients at Walter Reuther, including Plaintiff Darryl Pelichet. Defendant Stern's single-session interviews were too brief to conduct meaningful psychological testing, to accurately evaluate a patient's present mental health condition, or to determine the patient's present level of dangerousness to himself or others.

260. Defendant Stern represented to Recipient Rights investigators (and to the Probate Court) that his recommendations regarding Plaintiff Darryl Pelichet were based, in part, on discussions with Mr. Pelichet's treatment team. However, the

treatment team members who were interviewed in the course of the ORR investigation denied that Defendant Stern ever spoke with them about Mr. Pelichet. *Ex. F:* Report of Investigative Findings from Office of Recipient Rights, dated 9/8/17.

261. Rather than conducting a periodic review of each NGRI patient's current mental health condition and ascertaining whether there was a need for continued involuntary confinement, Defendant Stern conducted pro-forma, sham evaluations whose results were predetermined.

262. Defendant Stern provided grossly inadequate treatment when he failed to conduct a bona-fide psychological evaluation of Plaintiff Darryl Pelichet and failed to consult with members of Mr. Pelichet's treatment team about his present mental health condition before reaching a conclusion about Mr. Pelichet's need for continued involuntary hospitalization.

263. Defendant Stern provided grossly inadequate treatment when he summarily concluded, on the basis of little more than a single ten-to-twenty-minute interview, that 1) Mr. Pelichet was presently "mentally ill" as that term is defined in MCL 330.1400(g), 2) that Mr. Pelichet could reasonably be expected, in the near future, to seriously physically injure himself or another person, and 3) that hospitalization, rather than outpatient treatment, was the least restrictive treatment option suitable for Mr. Pelichet's needs.

264. Defendant Stern's sham psychological evaluations are "intolerable to fundamental fairness." They deprive NGRI patients of a meaningful evaluation of their present treatment needs and always result in a recommendation for continuing hospitalization, irrespective of the patient's present mental health condition. *See Ex. D:* Report of Investigative Findings from Office of Recipient Rights, dated 2/8/17; *Ex. E:* Report of Investigative Findings from Office of Recipient Rights, Amended, 6/12/17; *Ex. F:* Report of Investigative Findings from Office of Recipient Rights, dated 9/8/17.

265. Unlike Defendant Stern, Defendant Bavineni regularly treated many of the NGRI patients for whom she produced clinical certificates, including Plaintiffs Darryl Pelichet, Joshua Ragland, and Darius Bickerstsaff.

266. Defendant Bavineni produced clinical certificates whose conclusions about patient dangerousness flatly contradicted her contemporaneous findings in patient risk assessments and other evaluations of NGRI patients completed for Walter Reuther's internal use.

267. Defendant Bavineni's apparent failure to understand that "that facts were required to support the assertion" that Mr. Pelichet required an additional year of involuntary hospitalization demonstrates either gross incompetence, recklessness, or a lack of adequate training and supervision. *See Ex. F:* Report of Investigative Findings from Office of Recipient Rights, dated 9/8/17.

268.   In March of 2017, at the behest of the NGRI Committee Defendants, Defendant Bavineni examined Plaintiff Joshua Ragland and produced a clinical certificate indicating that 1) Mr. Ragland was presently "mentally ill" as that term is defined in MCL 330.1400(g),  2) that Mr. Ragland could reasonably be expected, in the near future, to seriously physically injure himself or another person, and 3) that hospitalization, rather than outpatient treatment, was the least restrictive treatment option suitable for Mr. Ragland's needs.

269.   At the time, Mr. Ragland was caring for his terminally-ill mother while on ALS status in the community. Mr. Ragland's outpatient treatment team, which had contact with him nearly every day, was in unanimous agreement that involuntary civil commitment was not warranted.

270.   Defendant Bavineni's evaluations of NGRI patients prior to their probate court hearings are a sham. Defendant Bavineni mechanically issues recommendations for hospitalization for an additional year, even when she knows that the patient does not meet the Section 401 criteria for involuntary civil commitment. She also recommends "hospitalization" rather than alternative outpatient treatment solely for the purpose of maintaining the patient's NGRI status.

271.   Defendant Bavineni's sham evaluations of NGRI patients constitute "treatment so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."

272.   The NGRI Committee Defendants and the Hospital Management Defendants enforce policies, procedures, and practices with respect to NGRI patients that have subjected Plaintiffs Darryl Pelichet, Joshua Ragland, Bonn Washington, and Darius Bickerstaff to psychiatric treatment so "excessive as to shock the conscience or to be intolerable to fundamental fairness."

273.   The NGRI Committee Defendants and the Hospital Management Defendants imposed a 5-year ALS contract on virtually every NGRI patient that they permitted to leave the hospital on ALS status, regardless of whether five years of strict, parole-like supervision was medically necessary for the individual in question.

274.   The NGRI Committee Defendants, through their contractual agreements with the CMH Contractor and Subcontractor Defendants, directed those entities to ensure that each NGRI patient remained subject to a hospitalization treatment order for the entire five-year ALS contract by filing annual petitions and clinical certificates certifying that the patient satisfies the Section 401 criteria for involuntary civil commitment, even when the patient does not.

275.   When a patient is alleged to have violated their five-year ALS contract and summarily returned to a psychiatric hospital, the NGRI and Hospital Management Defendants' policies mandate that the patient be considered a "new admission." This means that the patient loses all the earned privileges (e.g. greater freedom of movement within the facility) that the patient enjoyed immediately prior

to their release on ALS. The patient must spend at least several months working their way back up to the hospital's least restricted patient classification before the patient can again be considered for release on ALS status. The five-year ALS contract term always starts anew with each subsequent release, so that the cycle of release, contract violation, and readmission can continue indefinitely.

276. Plaintiff Joshua Ragland's experience demonstrates how the Defendants' policies and practices impose grossly excessive treatment on NGRI patients. Henry Ford Kingswood Psychiatric Hospital treated Mr. Ragland in the immediate aftermath of his suicide attempt and considered him ready for discharge after three weeks. He lived at home without incident for seven months following his discharge, before he was admitted to the Center for Forensic Psychiatry solely because he had entered a plea of NGRI to criminal charges relating to the suicide attempt. He was then held at the Center for Forensic Psychiatry for five months, forced to take antipsychotic medication, and permitted to leave only if he agreed to comply with standard ALS contact terms for five years. These terms included a curfew, abstaining from alcohol, not leaving the State of Michigan, and not staying overnight anywhere but his mother's house without the prior permission of the NGRI Committee Defendants. When Mr. Ragland allegedly violated the contract by drinking beer, he was confined in a psychiatric hospital for almost a year.

277.   The boilerplate ALS conditions imposed on Mr. Ragland were not reasonably related to suicide prevention and had a punitive, rather than medical, purpose. The additional eleven months of confinement Mr. Ragland was subjected to without any due process, solely because the NGRI Committee Defendants believed that he drank a beer on occasion or perhaps once smoked marijuana, was grossly excessive, not reasonably related to suicide prevention, and shocks the conscience.

278.   As a proximate result of the Defendants' violations of Plaintiffs' rights, Plaintiffs have suffered damages. Such damages include, but are not limited to, lost wages, reduced future earnings potential, loss of their freedom from physical confinement, suffering and mental anguish during the years they were unnecessarily institutionalized, lost opportunities to spend time with their children and other family members, and loss of enjoyment of life.

## COUNT II:
## DEPRIVATION OF RIGHTS GUARANTEED BY TITLE II OF THE AMERICANS WITH DISABILITIES ACT
### (Defendant MDHHS, MDHHS Contractor and Subcontractor Defendants, and Defendant MDHHS employees (including Nick Lyon) in their official capacities)

279.   Plaintiffs incorporate by reference all allegations contained in Paragraphs 1 through 278.

280.   Defendants are public entities as defined by 42 U.S.C. § 12132.

281. This Count is brought pursuant to Title II of the Americans with Disabilities Act ("ADA"). The ADA prohibits discrimination in all "services, programs, or activities of a public entity." 42 U.S.C. § 12132.

282. The "unjustified isolation" of persons with disabilities in psychiatric facilities by state and local governments constitutes unlawful disability discrimination under Title II. *Olmstead v. L. C. by Zimring*, 527 U.S. 581, 597 (1999).

283. Plaintiffs and all forensic patients are "qualified individuals with a disability" as defined under the ADA. Specifically, Plaintiffs and forensic patients all have a mental illness and impairments that substantially limit one or more major life activity. All Plaintiffs have a record of a mental illness and are regarded by all Defendants as having such impairments.

284. The "integration mandate" of Title II of the ADA, codified in 28 C.F.R. § 35.130(d), requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."

285. Defendants discriminated and continue to discriminate against Plaintiffs and forensic patients who are "qualified individuals with disabilities," in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations, by administering Michigan's mental health system in a manner that has

denied and continues to deny hundreds of persons with mental illness and/or addictive diseases, including the Plaintiffs, the opportunity to receive services in the most integrated setting appropriate to their needs. These individuals are qualified to receive services in a setting that is more integrated than a closed psychiatric hospital, and they do not oppose receiving the services they require, such as substance abuse treatment or home and community based services, on an outpatient basis in the community.

286. Providing treatment to the Plaintiffs on an outpatient basis would not constitute a "fundamental alteration" of the State's behavioral health service system, as that term is defined in *Olmstead*, because the State of Michigan already provides the services that the Plaintiffs require to live in a more integrated setting through its community mental health programs, and providing the necessary treatment in an integrated community setting is significantly less costly on a per-patient basis than institutionalization in a regional psychiatric hospital.

287. Although most of the Plaintiffs' numerous readmissions to Walter P. Reuther Psychiatric Hospital were due primarily to their use of marijuana, and in Joshua Ragland's case, to his alleged occasional use of alcohol, Walter P. Reuther Psychiatric Hospital is not a substance abuse treatment facility and none of the Plaintiffs received meaningful substance abuse treatment during any of their lengthy hospitalizations.

288. Because the Defendants repeatedly subjected the Plaintiffs to long periods of institutionalization, rather than providing treatment to them in the most integrated setting appropriate to their needs, the Plaintiffs have suffered damages. As the United States Supreme Court recognized in *Olmstead*, "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Olmstead*, 527 U.S. at 601.

289. Unless Defendants are enjoined, Plaintiff Bonn Washington, Darius Bickerstaff, and constituents of Plaintiff Michigan Protection and Advocacy Service, Inc. have and will continue to suffer irreparable injury because of Defendants failure to comply with the ADA.

290. As a proximate result of the Defendants' violations of Plaintiffs' rights, Plaintiffs have suffered damages. Such damages include, but are not limited to, lost wages, reduced future earnings potential, loss of their freedom from physical confinement, suffering and mental anguish during the years they were unnecessarily institutionalized, lost opportunities to spend time with their children and other family members, and loss of enjoyment of life.

### COUNT III:
### VIOLATION OF SECTION 504 OF THE REHABILITATION ACT
**(Defendant MDHHS, Defendant MDHHS employees in their official capacities, and CMH Contractor and Subcontractor Defendants)**

291.   Plaintiffs incorporate by reference all allegations contained in Paragraphs 1 through 290.

292.   Section 504 of the Rehabilitation Act of 1973, on which the ADA is modeled, sets forth similar protections against discrimination by recipients of federal funds. 29 U.S.C. §§ 794-794a. These protections include the prohibition against unnecessary segregation. Regulations implementing Section 504 require that a public entity administer its services, programs and activities in "the most integrated setting appropriate" to the needs of qualified individuals with disabilities. 28 C.F.R. § 41.51(d).

293.   Defendant MDHHS, the CMH Contractor Defendants, and the CMH Subcontractor Defendants are all recipients of federal funds for purposes of Section 504 of the Rehabilitation Act.

294.   Mental health inpatient and outpatient services are "programs and activities" for purposes of Section 504 of the Rehabilitation Act.

295.   Plaintiffs Darryl Pelichet, Joshua Ragland, Bonn Washington, Darius Bickerstaff, and the MPAS constituents are "qualified individuals with a disability" for purposes of Section 504 of the Rehabilitation Act. Specifically, Plaintiffs and forensic patients all have a mental illness and impairments that substantially limit one or more major life activity. All Plaintiffs have a record of a mental illness and are regarded by all Defendants as having such impairments.

296.   Defendants' actions imposed and continue to impose unnecessary confinement and segregation upon Plaintiffs and other individuals adjudicated NGRI, including MPAS's constituents, and deny them the most integrated community placements possible, in violation of Section 504's integration mandate.

297.   Defendant's actions violate Section 504 and therefore discriminate against individuals with cognitive and psychiatric disabilities, based on their type of disability and stigma associated with those found NGRI.

298.   As a proximate result of the Defendants' violations of Plaintiffs' rights, Plaintiffs have suffered damages. Such damages include, but are not limited to, lost wages, reduced future earnings potential, loss of their freedom from physical confinement, suffering and mental anguish during the years they were unnecessarily institutionalized, lost opportunities to spend time with their children and other family members, and loss of enjoyment of life.

## REQUEST FOR RELIEF

Accordingly, Plaintiffs respectfully request the following relief from the Court:

1.  Legal Relief

a.   An Order for an award of full compensatory damages for injuries and damages sustained by Plaintiffs (other than Plaintiff MPAS) due to the many years

they were illegally and unconstitutionally confined, against their will, by Defendants;

b.      An Order for actual reasonable attorney fees and litigation expenses.

2.  Equitable Relief

a.      An Order permanently enjoining Defendants, their officers, agents, employees, subordinates, successors in office, and all those acting in concert or participating with them (hereafter "All Defendants") from continuing the acts, omissions, and practices set forth in Counts I-III,

b.      An Order permanently enjoining the NGRI Defendants, Hospital Management Defendants, CMH Contractor Defendants, and MCPN Defendants from entering into any contractual arrangement(s) that place limits or conditions on the recommendations that a psychiatrist, psychologist, or other treatment professional can make to a Probate Court regarding a patient;

c.      An Order permanently enjoining All Defendants from involuntarily returning patients living in community on authorized leave status to custody in a psychiatric hospital without first providing notice and an adversarial hearing, at which the patient is represented by counsel;

d.      An Order permanently enjoining all Defendants from administering behavioral health services in a setting that unnecessarily isolates and segregates individuals with disabilities from the community, and requiring Defendants to

administer behavioral health services in the most integrated setting appropriate to the needs of the individuals with disabilities;

3. An Order for all such other relief as this Court deems reasonable, just, and equitable under the circumstances.

**JURY DEMAND**

Plaintiffs, by and through their attorneys, demands a jury trial in this case.

This the 14th day of September, 2018

/s/ Laurence H. Margolis
Laurence H. Margolis (P69635)
*Margolis Law, PC*
Attorney for Plaintiffs

/s/ James M. Gallagher
James M. Gallagher (P73038)
*James Gallagher PLLC*
Attorney for Plaintiffs

/s/ Andrea L. Rizor
Andrea L. Rizor (P78382)
*Michigan Protection & Advocacy Service, Inc.*
Attorney for Plaintiff MPAS

/s/ Chris E. Davis
Chris E. Davis (P52159)
*Michigan Protection & Advocacy Service, Inc.*
Attorney for Plaintiff MPAS

Table of Contents

Ex. A.: Administrative Directive 10-C-1050-AD

Ex. B: NGRI Committee Procedures Manual.

Ex. C: Form 990 for Carelink.

Ex. D: Report of Investigative Findings from Office of Recipient Rights, dated 2/8/17;

Ex. E: Report of Investigative Findings from Office of Recipient Rights, Amended, 6/12/17;

Ex. F: Report of Investigative Findings from Office of Recipient Rights, dated 9/8/17;

Ex. G: Summary Report of Recipient Rights Complaint Amended Report – 4th revision.

Ex. H: Clinical Certificate Completed by Defendant Bavineni on 10-30-2016.

Ex. I: Six-Month Review Report by Defendant Bavineni, 4/17/17.

Ex. J: Psychiatric Evaluation of Darryl Pelichet by Aruna Bavineni on 05/03/17.

Ex. K: Monroe Community Mental Health Authority Progress Notes for Joshua Ragland.

Ex. L: Letter from Bonn Washington to the NGRI Committee.

Ex. M: SCAO Form PCM 233.

Ex. N: Office of Recipient Rights Investigation Re: Marway Johnson, May 15, 2018.

Ex. O: Appointed Attorney Fee Schedule for Wayne County Probate Court.

Ex. P: Walter P. Reuther Psychiatric Hospital Standard Operating Procedure #254.

Ex. Q: Petition filed by Defendant Hegira Programs, Inc. on October 24, 2017.

Ex. R: Darryl Pelichet and Bonn Washington ALS Contracts.

Ex. S: Pelichet Transcript pg.19-22.

Ex. T: Petition filed by Walter P. Reuther Psychiatric Hospital.

Ex. U: Cross-Examination of Defendant Lisa Medoff at May 3, 2017 Hearing.

# EXHIBIT

# A

**Administrative Directive 10-C-1050-AD**



DIRECTOR'S OFFICE

MAR 2 7 2003

FORENSIC CENTER
XXXXXXXXXXXXX
JAMES XXXXXX
Janet Olszewski
Director



STATE OF MICHIGAN
DEPARTMENT OF COMMUNITY HEALTH
LANSING

XXXXXXXXXXXX
XXXXXXX
Jennifer M. Granholm
Governor

Administrative Directive
10-C-1050/AD

**IMMEDIATE EFFECT**

Replaces <u>Patients Committed</u>
<u>Under The Legal Status of Not</u>
<u>Guilty By Reason of Insanity</u>, 10-
C-1050/AD; rescinded
March 24, 2003

March 19, 2003

TO:       Hospital and Center Directors

FROM:     Janet Olszewski

## SUBJECT:
## PATIENTS COMMITTED UNDER THE LEGAL STATUS OF NOT GUILTY BY REASON OF INSANITY

It is the policy of the Department of Community Health that all patients/residents under the legal status of "not guilty by reason of insanity" who have improved to the point, that release from hospitalization or transfer between facilities is being considered, shall have their treatment plan and recommendations reviewed by the "NGRI" Committee at the Center for Forensic Psychiatry.

All recommendations to the court for release from hospitalization, transfer between facilities, or alternative treatment shall be reviewed by the NGRI Committee prior to filing and/or appearance. The written recommendations of the NGRI Committee shall be entered into the patient record and disclosed during testimony, if requested. Referrals to the NGRI Committee for review shall be made by the hospital/center director/designee. Any delay in referring or filing necessary papers in a timely manner that would result in not renewing the order, will be considered a violation of this policy.

Any person found NGRI for the crime of murder or for a crime that involves sexual conduct, recommended by the NGRI Committee for release, must be reviewed by the Director/designee of the Department of Community Health for final authorization.

# EXHIBIT

# B

**NGRI Committee Procedures Manual**

# State of Michigan
# Bureau of Forensic Mental Health Services

## CENTER FOR FORENSIC PSYCHIATRY
## Not Guilty by Reason of Insanity (NGRI) Committee

# PROCEDURES

Revised
April 2008

# State of Michigan
# Bureau of Forensic Mental Health Services

# CENTER FOR FORENSIC PSYCHIATRY
## Not Guilty by Reason of Insanity (NGRI) Committee

8303 Platt Rd.
Saline, MI  48176
734-429-2531

## TABLE OF CONTENTS

|  |  |
|---|---|
| NGRI Information Flow Chart |  |
| **CENTER FOR FORENSIC PSYCHIATRY NGRI COMMITTEE INFORMATION** |  |
| NGRI Committee Membership |  |
| Michigan Mental Health Code, Chapter 10, SEC. 1050 (5), MCL 330.2050(5) |  |
| Department of Community Health Administrative Rule 10097 |  |
| Department of Mental (Community) Health Policy, Ch.16, SEC. 003, Subj.0001 |  |
| Department of Community Health Directive 10-C-2050-AD |  |
| Appointment of Forensic Liaison |  |
| Forms Used |  |
| **Procedures to be Followed for All Probated NGRI Patients** |  |
| Probated NGRI Orders at 60 days, 90 days, and 1 year (Petitions) |  |
| One-Year Continuing Orders (Six Month Review Reports) |  |
| **Other Issues Involving NGRI Patients** |  |
| Continuing Orders |  |
| Hospital Responsibility for NGRI Patients on Authorized Leave Status (ALS) |  |
| Alternative Treatment Orders & Combined Hospitalization/ATO Orders |  |
| Referrals |  |
| NGRI Patients on Unauthorized Leave Status |  |
| NGRI Patients & Court Orders |  |
| Discharge of NGRI Patients Who Complete an ALS |  |
|  |  |
| **EXHIBITS** |  |
| A.  NGRI Forms and Letters |  |
| B.  Example of a Standard Authorized Leave Status (ALS ) Contract |  |

CFP NGRI Committee Procedures
April 2008
Page 3

# STATE OF MICHIGAN
# BUREAU OF FORENSIC MENTAL HEALTH SERVICES

## CENTER FOR FORENSIC PSYCHIATRY
## NOT GUILTY BY REASON OF INSANITY (NGRI) COMMITTEE

## NGRI INFORMATION FLOW CHART



The DCH Administrative Manual allows the NGRI Committee 15 days to respond to requests received by either concurring or not concurring with the requested actions.

# MENTALLY ILL CATCHMENT AREAS

**CARO CENTER** is the placement facility for the following counties:

| | | | | |
|---|---|---|---|---|
| Alcona | Dickinson | Keweenaw | Montmorency | Sanilac |
| Alger | Genesee | Lapeer | Oakland | Schoolcraft |
| Alpena | Gladwin | Luce | Ogemaw | Shiawassee |
| Arenac | Gogebic | Mackinac | Ontonagon | Tuscola |
| Baraga | Gratiot | Macomb | Osceola | Wexford |
| Bay | Houghton | Marquette | Oscoda | |
| Chippewa | Huron | Mecosta | Presque Isle | |
| Clare | Iosco | Menominee | Roscommon | |
| Crawford | Iron | Midland | Saginaw | |
| Delta | Isabella | Missaukee | St. Clair | |

**KALAMAZOO PSYCHIATRIC HOSPITAL** is the placement facility for the following counties:

| | | | | |
|---|---|---|---|---|
| Allegan | Cass | Hillsdale | Lake | Newaygo |
| Antrim | Charlevoix | Ingham | Leelanau | Oceana |
| Barry | Cheboygan | Ionia | Lenawee | Otsego |
| Benzie | Clinton | Jackson | Manistee | Ottawa |
| Berrien | Eaton | Kalamazoo | Mason | St. Joseph |
| Branch | Emmet | Kalkaska | Montcalm | Van Buren |
| Calhoun | Grand Traverse | Kent | Muskegon | |

**WALTER REUTHER PSYCHIATRIC HOSPITAL** is the placement facility for the following counties:

| |
|---|
| Livingston |
| Monroe |
| Washtenaw |
| Wayne |

**********************************

# DEVELOPMENTALLY DISABLED CATCHMENT AREA

**MT. PLEASANT CENTER is the placement facility for all counties.**

Rev.  9/05

# CENTER FOR FORENSIC PSYCHIATRY NGRI COMMITTEE INFORMATION

## NGRI COMMITTEE MEMBERSHIP

The NGRI Committee of the Center for Forensic Psychiatry (CFP) is a multidisciplinary committee consisting of senior forensic clinical members.  Members of the Committee are appointed by the Director of the Center for Forensic Psychiatry.

## MICHIGAN MENTAL HEALTH CODE, CHAPER 10 SEC. 1050(5), MCL 33.2050(5)

"The release provisions of sections 476 to 479 of this act shall apply to a person found to have committed a crime by a court or jury, but who is acquitted by reason of insanity, except that a person shall not be discharged or placed on leave without first being evaluated and recommended for discharge or leave by the department's program for forensic psychiatry, and authorized leave or absence form the hospital may be extended for a period of 5 years."

## DEPARTMENT OF COMMUNITY HEALTH ADMINISTATIVE RULE R330.10097

"(1) When a person is ordered by the court to be hospitalized, admitted to a facility, or otherwise to receive treatment, the person shall not be discharged or placed on leave without prior consultation with the Center for Forensic Psychiatry.  (2) Consultation shall include exchange of written opinions between the Center and the institution, agency, or professional person providing services and requesting discharge or leave for a person.  (3) An institution, agency, or professional person providing treatment shall file a report with the Center for Forensic Psychiatry proposing plans for discharge or leaves.  (4) Upon receipt of a report proposing a discharge or leave,…the Center shall submit a response to the institution, agency, or person requesting consultation.  The Center's response shall include an evaluation and recommendation based on the report and may include an examination of the person either, at the discretion of the Forensic Center, at the center of the facility or agency providing services… (5) When the Center does not concur with the proposed course of action, the requesting institution, agency or professional person may file additional reports with the center or after any exchange of opinions may ask for a review of the matter by the director of the department…"

## DEPARTMENT OF MENTAL HEALTH POLICY (11/12/73) CH.16, SEC.003, SUBJ.0001

"It is the policy of the Department of Mental Health:…to establish a 'Not Guilty by Reason of Insanity' Committee at the Center for Forensic Psychiatry to review proposed releases of NGRI patients… All patients under the legal status of 'Not Guilty by Reason of Insanity' who have improved to the point of release, shall have their program reviewed by the NGRI Committee at the Center for Forensic Psychiatry and no such release action may be undertaken unless it is recommended by the Committee…"

## DEPARTMENT OF COMMUNTIY HEALTH DIRECTIVE 10-C-1050-AD

On March 19, 2003, Department of Community Health Director Janet Olszewski., issued Administrative Directive 10-C-1050-AD to have immediate effect.  The Directive concerned the subject of Patients Committed Under the Legal Status of Not Guilt by Reason of Insanity.  The Directive stated:

> "It is the policy of the Department of Community Health that all patients/residents under the legal status of  "Not Guilty by Reason of Insanity" who have improved to the point, wherein release form hospitalization or transfer between facilities is being considered, shall have their treatment plan and recommendations reviewed by the "NGRI" Committee at the Center for Forensic Psychiatry.

> All recommendations to the court for release from hospitalization, transfer between facilities, or alternative treatment, shall be reviewed by the NGRI Committee prior to filing and/or appearance.  Petition and/or recommendations shall be accompanied by the written recommendations of the NGRI Committee and disclosed during testimony hospital/center director/designee.  Any delay in referring or filing necessary papers in a timely manner that would result in not renewing the order will be considered a violation of this policy.

> Any person found NGRI for the crime of murder or CSC, recommended by the NGRI Committee for releases must be reviewed by the Director/designee of the Department of Community Health for final authorization."

In compliance with Michigan statute (Mental Health Code, section 1050), MDCH Administrative rule 10097, MDCH policy, and this Directive, the Forensic Center's NGRI Committee has prepared letters, forms, and procedures for processing NGRI patients.  **Note: For every court hearing involving an NGRI patient who has received a civil commitment, the NGRI Committee reviews the situation and provides a recommendation to the Court.**


## APPOINTMENT OF FORENSIC LIAISON

Each state psychiatric hospital and Community Mental Health Services Program shall designate a person as being the Forensic Liaison for that hospital or agency.  The Forensic Liaison or designee will be responsible for ensuring compliance with the NGRI procedures outlined in this document.  Each CMH or hospital will keep the NGRI Committee informed as to the name and telephone contact number of their Forensic Liaison.

The Lead Forensic Liaison at the Forensic Center (734-295-4309), may be contacted for further information regarding NGRI issues.

**FORM USED FOR ALL UPCOMING COURT HEARINGS** (see attached form and letter in Exhibit A)

> **NGRI COURT HEARING FORM** includes:
> *Clinical Assignment Information* (top of the front side of the page)
> *Clinical Assessment* (lower half of front side and top half of back side of the page)
> *NGRI Committee Review* (lower half of back side of the page)

**PROCEDURES TO BE FOLLOWED FOR ALL PROBATED NGRI PATIENTS**

*The instructions, which follow, are in general form to permit hospitals and CMHSP to adapt specific procedures of their own for compliance.*

> **Probated 60 day, 90-day, and one-year NGRI Orders (PETITION/CERTIFICATION)**
>
> After an NGRI patient's 60-day diagnostic hearing, the Probate Court can order that the NGRI patient will be transferred from the Forensic Center to an Area Hospital or elsewhere for further treatment.  Thus, the following instructions apply not only to the Forensic Center, but also to any other treatment hospital or agency where the NGRI patient is receiving treatment.  Note: All forms regarding NGRI patients must be completed thoroughly and accurately, and must be reviewed to ensure compliance with these objectives by the Forensic Liaison or designee of the treating hospital or agency prior to submission to the NGRI Committee.
>
> At least six weeks prior to the expiration of the NGRI patient's 60 day, 90 day or one-year commitment order (or as soon as possible when a court hearing is scheduled for any other reason), the Forensic Liaison or designee will complete the *Clinical Assignment* portion of a new NGRI COURT HEARING FORM and distribute a copy to the assigned clinician(s), Medical Records, and to any other location deemed useful by the treatment hospital or agency.
>
> The Forensic Liaison or designee is responsible for completion and filing with the Court of a Petition and clinical certificate not less than 14 days before the expiration of the order.  THE FORENSIC LIAISON OR DESIGNEE IS ALSO RESPONSIBLE FOR ASSURING THAT CONSULTATION WITH THE NGRI COMMITTEE HAS OCCURRED PRIOR TO THE FILING OF PETITIONS OF CLINCIAL CERTIFICATES NOT RECOMMENDING A HOSPITAL ORDER (EITHER A 90 DAY OR ONE-YEAR CONTINUING HOSPITAL ORDER) OR IF RECOMMENDING A CHANGE IN CURRENT PLACEMENT.
>
> Approximately four weeks prior to the expiration of the 60-day, 90-day, or one-year treatment period, a psychiatrist will complete a Clinical Certificate concerning the NGRI patient and recommend whether the patient is committable or should be discharged.

CFP NGRI Committee Procedures
April 2008
Page 8

The psychiatrist also completes the *Clinical Assessment* portion of the NGRI COURT HEARING FORM (located in the lower section on the front and top section on the back of the form) received from their Forensic Liaison or designee.  If the NGRI patient is committable, the psychiatrist also may recommend what placement the patient should have (e.g., Area Hospital, Forensic Center, or Authorized Leave Status).  The psychiatrist returns the completed NGRI COURT HEARING FORM and Certificate to the Forensic Liaison.  The Form, Certificate, and Petition will be reviewed by the treating hospital or CMHSP Forensic Liaison or designee and hospital/CMHSP administration.  Then, the forensic Liaison or designee will send copies of these documents to the NGRI Committee at the Forensic Center as soon as possible for review and action.

After receipt at the Forensic Center, the NGRI Committee reviews the NGRI COURT HEARING FORM and attached copies of the Petition and Certificate regarding CFP concurrence or non-concurrence of the proposed action.  When the NGRI Committee has met and made its own recommendation concerning the proposed course of action, the NGRI COURT HEARING FORM is forwarded to Medical Records for completion of the NGRI Committee Recommendation Letter to the Court.  A letter is sent to the Court from the NGRI Committee per Section 1050 of the Mental Health Code indicating its direction by the Department of Community Health (DCH) to review recommendations for release from hospitalization (including Authorized Leave Status), transfer between facilities, or placement on Alternative Treatment of all NGRI patients and indicating NGRI Committee recommendation to support or not support the action(s) proposed by the Forensic Center, Area Hospital, or CMHSP.

The Medical Records Department at the Forensic Center will generate two original letters.  One will be forwarded to the testifying psychiatrist, who, in addition to his/her testimony, will deliver it to the Court on the date of the Hearing.  The other letter will be kept in Medial Records.  Medical Records will fax the letter to the Court immediately (along with a copy of the Administrative Directive), which will satisfy the requirement of informing the Court.

**One-year Continuing Orders: (SIX MONTH REVIEW REPORTS)**

Four weeks before the end of the six-month period, the Forensic Liaison or designee will complete the *Clinical Assessment* portion of a new NGRI COURT HEARING FORM and forward it to the treating psychiatrist along with a Six Month Review Report form.  The psychiatrist then completes and returns the Six Month Review Report to the Forensic Liaison.

The Forensic Liaison is responsible for the filing of the Six Month Review Report with the court within 5 days of its completion per Mental Health Code requirements (and he Petition for Discharge as soon as received form the hospitalized individual).  THE FORENSIC LIAISON IS ALSO RESPONSIBLE FOR ASSURING THAT CONSULTATION WITH THE NGRI COMMITTEE HAS OCCURRED PRIOR TO THE FILING OF ANY SIX-MONTH REVIEW REPORT, WHICH DOES NOT RECOMMEND CONTINUATION OF THE CURRENT HOSPITAL ORDER OR CURRENT PLACEMTNT.

A copy of the Six Month Review Report and a blank Petition for Discharge are to be given to the NGRI patient by the Forensic Liaison or designee. The Forensic Liaison or designee documents in the patient's record the date that these items were given to the patient, as the patient has (7) days to file the Petition for Discharge from the time the patient receives it.

**If the NGRI patient DOES NOT file a Petition for Discharge**, no hearing is scheduled, and no action needs to be taken by the NGRI Committee. The partially completed (*Clinical Assignment Information* section by the Forensic Liaison) NGRI COURT HEARING FORM does not require completion by the psychiatrist and is discarded. Any movement of the patient endorsed by the treating hospital or CMHSP should have already been reviewed by the Forensic Liaison or designee at the treating hospital or CMHSP and then forwarded to the NGRI Committee for review at the NGRI Committee's usual weekly meetings where such requests are considered.

**If the NGRI patient DOES file a Petition for Discharge,** the forensic Liaison or designee of the treating hospital or CMHSP will inform the psychiatrist assigned to testify and request his/her completion of the *Psychiatric Assessment* section of the **NGRI COURT HEARING FORM.** The psychiatrist returns the completed **NGRI COURT HEARING FORM** to the Forensic Liaison. The Form and Six Month Review Report will be reviewed by the treating hospital or CMHSP Forensic Liaison or designee and hospital/CMHSP administration. The Forensic Liaison then immediately forwards a copy of the **NGRI COURT HEARING FORM** and Six Month Review Report to the NGRI Committee.

After receipt at the Forensic Center, the NGRI Committee reviews the **NGRI COURT HEARING FORM** and copy of the Six Month Review Report regarding its concurrence or non-concurrence of the proposed action. When the NGRI Committee has met and made its own recommendation concerning the proposed course of action, the **NGRI COURT HEARING FORM** is forwarded to Medical Records for completion of the NGRI Committee Recommendation Letter to the Court. A letter is sent to the Court from the NGRI Committee per section 1050 of the Mental Health Code indicating its direction by the DCH to review recommendations for release from hospitalization (including Authorized Leave Status), transfer between facilities, or placement on Alternative Treatment of all NGRI patients, and indicating is recommendations to support or not support the action(s) proposed by the Forensic Center, Area Hospital, or CMHSP.

The Medial Records Department at the Forensic Center will generate two original letters. One will be forwarded to the testifying psychiatrist who, in addition to his/her testimony, will deliver the letter to the Court on the date of the Hearing. The other letter will be kept in Medical Records. Medical Records will fax the letter to the court immediately (along with a copy of the Administrative Directive), which will satisfy the requirement of informing the Court.

NOTE: Once an NGRI patient is on a one year continuing order, the sequence of future court actions would be:

> In another six months, a Six Month Review Report
> In another six months, a new Petition
> In another six months, a Six Month Review Report
> In another six months, a new Petition
> And so on, until such time as the patient is released, discharged, or removed from NGRI status.

## Other Issues Involving NGRI Patients

### Continuing Orders

The Center for Forensic Psychiatry requires that an NGRI patient be on a one year Continuing Order for Hospitalization prior to considering any request for placement on Authorized Leave Status.

## Hospital Responsibility for NGRI Patients on Authorized Leave Status

The hospital is responsible for ensuring that the supervisor of treatment of the NGRI in the community (e.g., CMH) while on ALS re-petitions on a yearly basis in order to maintain the patient's NGRI commitment status if the hospital believes NGRI status remains appropriate.  The decision to remove a patient from NGRI status during or at the end of an early treatment order must be reviewed by the NGRI Committee prior to any decision to not seek a continuing order of treatment.  The Supervisor of Treatment will send a 90-day report to the NGRI Committee, with a copy to the area hospital, describing the patient's progress in community placement.  (See sample in forms section.)  These will be sent during the quarter when they do not need a Six Month Review Report or Petition.  The sequence of reports from the date of the one year order would be:

> 90-day Report at three months;
> Six Month Review at six months;
> 90-day Report at nine months;
> New Petition and Clinical Certificate at one year.

Prior to placing an NGRI patient on ALS, an ALS Contract must be submitted the NGRI Committee for approval.  If the court requests; the hospital shall forward a copy of the approved ALS Contract to the court holding jurisdiction over the NGRI patient.  For further details, please refer to the sample Authorized Leave Status contract in Exhibit B.

**Alternative Treatment & Combined Hospitalization/Alternative Treatment Orders**

IN ORDER TO MAINTAIN NGRI STATUS, NGRI PATIENTS SHOULD NOT BE PLACED ON ANY TYPE OF ALTERNATIVE TREATMENT ORDER OR COMBINED HOSPITALIZATION/ALTERNATIVE TEATMENT ORDER.  Placement on such orders results in loss of NGRI status, once the patient is discharged from inpatient hospitalization.

NGRI status is retained when community treatment placement occurs on Authorized Leave Status under a continuing hospital treatment order: During the term of a continuing hospital order, the patient may not be discharged without recommendation from the Center for Forensic Psychiatry [per MCL33.2050(5)].

**Referrals**

NGRI patient being considered for any type of less secure environment than the one they currently have (e.g., leave of absence [LOA], transfer to a different hospital, placement on Authorized Leave Status [ALS], placement on Alternative Treatment, Discharge) must first be referred to the NGRI Committee for review.  Adequate referral information must be given concerning the patient's present mental status, type of treatment, and the specific recommendation of the treating staff clearly outlined.  At the discretion of the NGRI Committee, patients may be evaluated by a member of the committee in addition to review of hospital records.  The NGRI Committee members may travel to other hospitals to evaluate such patients, or they may request that the patient be brought to the Center.  Specific forms to facilitate making referrals to the NGRI Committee have been created.

**NGRI Patient on Unauthorized Leave Status**

If an NGRI patient's status changes to that of Unauthorized Leave, the Forensic Services Department at the Forensic Center should be contacted as soon as practicable so that issues such as whether the patient should be transferred back to the Forensic Center can be discussed.

**NGRI Patients and Court Orders**

Any CMHSP, hospital or facility, which receives a court order concerning an NGRI patient shall immediately forward a copy of the court order to the NGRI Committee.

**Discharge of NGRI Patients Who Complete an Authorized Leave Status Contract**

In all cases, when an NGRI patient successfully completes a continuous 5 year ALS contract, NGRI status terminates and the patient must be discharged from the hospital.

CFP NGRI Committee Procedures
April 2008
Page 12

# EXHIBIT A

## Center for Forensic Psychiatry

## NGRI FORMS & LETTERS

Cover Sheet for:

NGRI COURT HEARING FORM

This form is to be used whenever court
testimony is anticipated for an NGRI patient
from area hospitals or CMH agencies.

# NGRI COURT HEARING FORM

## ALL COURT APPEARANCES

NOTE: 1) This is a 2-sided form. 2) This form is not to be used in place of 90-day progress reports.

CLINICAL ASSIGNMENT INFORMATION (to be completed by Forensic Liaison):

Hospital/Agency:________________________ Today's Date:____________

To: ☐ Dr. ______________________

☐ Dr. ______________________

☐ Petitioner ______________________

*Patient Name*: ________________________ DOB:____________Unit______CFP#_____

County of Residence:______________Current Legal Status: ☐ NGRI Diagnostic

☐ 60-day Order

Reason for Report:__________________ ☐ 90-day Order

☐ One-Year Continuing/Hospital

Probate File No:__________ ☐One-Year Continuing/ALS

1. ☐ The above-named patient was found NGRI on _________, and you have been assigned to complete an initial Clinical Certificate on or before ____________________. Order expires____________.
2. ☐ The above-named patient was placed on a __________________ order with an expiration date of __________. Certificate & Petition or ☐6 month review report needed to be completed by________.
3. ☐The above-named patient is scheduled for a probate hearing regarding__________ on__________

---

PSYCHIATRIC ASSESSMENT (to be completed by Testifying and/or Certifying psychiatrist):

Date Evaluated:______________

A. NGRI Offense:______________________________________

B. Diagnosis: ______________________________________

C. Current Medication Regimen: ______________________________

D. Medical Problems: ☐ Yes ______________________

☐ No ______________________

E. History of Substance Abuse. ☐ Yes ______________________

☐ No ______________________

F. Hospital Adjustment

1. Problematic behavior. ☐ Yes ______________________

☐ No ______________________

2. Engagement in treatment. ☐Yes ______________________

☐ No ______________________

3. Compliant with medication ☐ Yes ______________________

☐ No ______________________

G. Self-Awareness

1. Accepts/understands illness. ☐ Yes ______________________

☐ No ______________________

2. Accepts responsibility for offense. ☐ Yes ______________________

☐ No ______________________

3. Able to connect illness with crime ☐ Yes ______________________

☐ No ______________________

CFP NGRI Committee Procedures
April 2008
Page 15

NGRI COURT HEARING FORM                    Page 2                    Patient:_____

H.   Current mental status exam:  (Please attach mental status examination report).

I.   Treatment Expectations
     1. Understands signs of illness.            ☐ Yes _____
                                         ☐ No _____

2.  Recognizes need for ongoing treatment.      ☐ Yes _____
                                                ☐ No _____

3.  Has constructive plans for future.          ☐ Yes _____
                                                ☐ No _____

## Agency Treatment Plan Recommendations

_____
_____
_____

**Agency recommendation in upcoming court action:**
☐ A.  Continuing Hospitalization Order/Hospital_____
☐ B.  Continuing Hospitalization Order/ALS_____
☐ C.  Transfer to _____
☐ D. Discharge from Hospital and Termination of NGRI Status
      ☐ Alternative Treatment or Combined Order _____
      ☐ Discharge _____

_____        _____
Testifying Physician                     Hospital/Agency Administrative Authorization

**Forensic Liaison:**  Review and then send with attached 6 month review report or petition and certificate to:  NGRI Committee, Center for Forensic Psychiatry, Box 2060, Ann Arbor, MI 48106-2060.  Fax: (734) 429-0485.

NGRI COMMITTEE REVIEW:

Patient: _____        Date Reviewed:_____
CFP# _____          Probate File No: _____

Recommendations for:
                                         Concur              Not Concur

A.     Continuing Hospitalization Order/Hospital
B.     Continuing Hospitalization Order/ALS       _____         _____
C.     Transfer to _____           _____         _____
D.     Discharge from Hospital and Termination of
       NGRI Status
            ☐Alternative Treatment or Combined Order  _____     _____
            ☐Discharge                            _____         _____
Comments: _____
_____

_____
NGRI Committee Representative

CFP NGRI Committee Procedures
April 2008
Page 16

Cover Sheet for:

NGRI Committee Court Letter

This form is sent by the NGRI Committee to the Probate Court after review of treating staff recommendations per the NGRI CFP Movement Form or Court Hearing Form from outside agencies.
**Also included is a scan of the Administrative Directive to be included with all NGRI Court Letters to the Probate Courts.

STATE OF MICHIGAN



Jennifer M. Granholm
Governor

DEPARTMENT OF COMMUNITY HEALTH

Janet D. Olszewski, Director

# CENTER FOR FORENSIC PSYCHIATRY

WILLIAM H. MEYER, Center Director
P. O. BOX 2060 □ ANN ARBOR, MICHIGAN 48106
8303 Platt Rd, MICHIGAN 48176
TELEPHONE: (734) 429-2531, TTY (734) 944-7102

Date

**ATTN:  Probate Court Name**

Your Honor:

Pursuant to MCL 330.2050(5), the Center for Forensic Psychiatry has the responsibility to review recommendations for release from hospitalization, transfer between facilities, or placement on Alternative Treatment of all individuals who have been found Not Guilty by Reason of Insanity.  In accordance with this mandate, the NGRI Committee of the Center for Forensic Psychiatry has reviewed the proposed treatment recommendations for the patient, as submitted by treatment staff at the Center for Forensic Psychiatry. The treatment recommendations may include the possibility of either release from hospitalization, Authorized Leave Status, transfer between facilities, or placement on Alternative Treatment.

Patient Name:  _                          CFP #_                        Probate File No: __

Current Status:          [ ] NGRI Diagnostic        [ ] Continuing One Year Order/Hospital
                         [ ] 60-day Order           [ ] Continuing One Year Order/Authorized Leave Status
                         [ ] 90-day Order           [ ] Other_____

### NGRI COMMITTEE RECOMMENDATIONS

[ ]        Continuing Hospitalization Order/Hospital    **hospital name**

[ ]        Continuing Hospitalization Order/Authorized Leave Status

[ ]        Transfer to:      (....or.... area hospital)

[ ]        Discharge from Hospital and Termination of NGRI Status
           [ ]        Alternative Treatment or Combined Order
           [ ]        Discharge

**Reason(s) for NGRI Committee Recommendations:**        ____type in Committee comments____

**NOTE:  *NGRI status is lost when patients are discharged from a hospital treatment order (e.g., frank discharge or placement on an alternative treatment or combined order). Patients who are placed on Authorized Leave Status (ALS) under a continuing treatment order maintain NGRI status; they are considered inpatients that are on leave from the hospital. Therefore, the patient must be kept on a one-year continuing hospitalization order and should not be placed on an alternative treatment or combined order if the court determines it appropriate to maintain the patient's NGRI status and preserve eligibility to continue on five years ALS in accordance with MCL 330.2050(5).***

NGRI Committee
Fax: (734) 429-0487
/dw
Revised 4/2008



STATE OF MICHIGAN
DEPARTMENT OF COMMUNITY HEALTH
LANSING



DIRECTOR'S OFFICE

MAR 2 7 2003

FORENSIC CENTER

XXXXXXXXXXX
XXXXXX
Jennifer M. Granholm
Governor

Janet Olszewski
Director

**Administrative Directive**
**10-C-1050/AD**

**IMMEDIATE EFFECT**

Replaces <u>Patients Committed</u>
<u>Under The Legal Status of Not</u>
<u>Guilty By Reason of Insanity</u>, 10-
C-1050/AD; rescinded
March 24, 2003

March 19, 2003

TO:          Hospital and Center Directors

FROM:     Janet Olszewski

**SUBJECT:**

**PATIENTS COMMITTED UNDER THE LEGAL STATUS OF NOT GUILTY BY**
**REASON OF INSANITY**

It is the policy of the Department of Community Health that all patients/residents under
the legal status of "not guilty by reason of insanity" who have improved to the point, that
release from hospitalization or transfer between facilities is being considered, shall have
their treatment plan and recommendations reviewed by the "NGRI" Committee at the
Center for Forensic Psychiatry.

All recommendations to the court for release from hospitalization, transfer between
facilities, or alternative treatment shall be reviewed by the NGRI Committee prior to
filing and/or appearance.  The written recommendations of the NGRI Committee shall be
entered into the patient record and disclosed during testimony, if requested.  Referrals to
the NGRI Committee for review shall be made by the hospital/center director/designee.
Any delay in referring or filing necessary papers in a timely manner that would result in
not renewing the order, will be considered a violation of this policy.

Any person found NGRI for the crime of murder or for a crime that involves sexual
conduct, recommended by the NGRI Committee for release, must be reviewed by the
Director/designee of the Department of Community Health for final authorization.

LEWIS CASS BUILDING • 320 SOUTH WALNUT STREET • LANSING, MICHIGAN 48913
www.michigan.gov • (517) 373-3500

Cover Sheet for:

FORMAT FOR 90-DAY REPORT

This form is to be used by the Case Manager to report the patient's progress in the community during the quarters when a Six Month Review Report or Petition and Clinical Certificate are not sent.

CFP NGRI Committee Procedures
April 2008
Page 20

## FORMAT FOR 90-DAY REPORT

TO:        NGRI Committee
                Center for Forensic Psychiatry
                8303 Platt Rd.
                Saline, MI  48176

FROM:      Aftercare Agency/Case Manager Name
                Agency Address

DATE:

RE:        Patient's Name & CFP Number

1. The patient was adjudicated NGRI on charges of:

2. Present Mental Status:

3. Medications:

4. Living arrangements and current address:

5. Frequency of appointments:

6. Is patient complying with treatment program; if not, explain:

7. Additional Comments:

_____    _____

Case Manager Signature (also please type or print name)       Date

c:      Copy to supervising area hospital

(Attach additional sheets if necessary)

CFP NGRI Committee Procedures
April 2008
Page 21

# Cover Sheet for:

# REQUESTS FOR LOA
# GROUND PRIVILEGES
# GUIDELINES and FORMAT

These guidelines are used by Area Hospitals/Centers requesting Ground Privileges, LOAs.

An example is also included for LOA Requests for Community Mental Health Agencies

CFP NGRI Committee Procedures
April 2008
Page 22

**Michigan Department of Community Health**
**Bureau of Hospital, Center and Forensic**
**Mental Health Services**

**<u>Guidelines for Unescorted On Grounds</u>**
**<u>Movement for Individuals Adjudicated as NGRI or IST</u>**

The following guidelines apply to patients/residents adjudicated as NGRI or IST at all state-operated inpatient psychiatric hospitals and centers.

1.  Patients/Residents indicated above may be granted Unescorted On Grounds Movement (UOGM), in accordance with this directive.

2.  UOGM is individualized and must include specified periods of time during which the patient/resident, after signing out, is restricted to designated hospital or center area(s), is monitored by hospital or center staff, and is signed in when the UOGM is completed.

3.  UOGM shall not be implemented unless approved by the Center for Forensic Psychiatry's (CFP) Not Guilty by Reason of Insanity (NGRI) Committee.

4.  Referrals for UOGM shall be submitted to the NGRI Committee for review and approval.  The referral shall contain information routinely included for other referrals: identifying data, review of alleged offense(s) or acquittal by reason of insanity, mental status exam, elopement/assault potential, summary of any incidents, current level of privileges, degree of involvement with programming, prior leaves, etc.

5.  Review by the NGRI Committee shall occur not later than seven (7) calendar days after receipt of the request by the Committee.

Dated: January 27, 2006.

**References**
Mental Health Code (330.1744 Freedom of Movement)
Administrative Code (330.10061 Inpatient Rights)

## NGRI Committee Guidelines for LOA/ALS Requests
### (To be used by Regional Hospitals/Center)

1.  Nature of Request:   Specify whether this is an LOA or ALS request; (e.g., eight hour LOA with family)

2.  Referral information including:
    - Charge(s) resulting in NGRI adjudication
    - Current court order
    - Admission date

3.  <u>Brief</u> description of crime

4.  <u>Brief</u> history of:
    - Hospitalization
    - Compliance with treatment/medication
    - Substance Abuse
    - Criminal history

5.  History of and current risk for:
    - Escape
    - Violence

6.  Description of current treatment and patient's compliance and participation
    - Include current medication and cite any recent medication change

7.  History of problematic behavior during last year and rationale why leave request is being considered if there has been a serious incident (e.g., stealing, assault, ULA, drug use, verbal altercations) in the past six months

8.  Current mental status including:
    - Symptoms of psychoses
    - Affective state
    - Degree of insight into mental illness
    - Degree of insight into how mental illness is related to the crime
    - Degree of insight into need for treatment

9.  History of prior leaves and their success

10. Description of proposed leave including:
    - Length (hours, days) and frequency (e.g., four hour leave, once every two weeks for two months, etc.)
    - Individuals involved, their participation in patient's treatment, and their ability to manage patient while on leave
    - Location(s)/proposed activities
    - Therapeutic benefit


**For ALS request**, a more detailed description of the following is indicated:
- Charge(s) resulting in NGRI adjudication
- Patient's understanding of charge(s) and relation to mental illness - **narrative** form
- Patient's preparation for placement
- Degree of supervision at proposed community facility
- Support services that will be provided by CMH


**Note: Leaves are contingent on continued psychiatric and behavioral stability.**

**Community Agency
LOA Request**

**MEMORANDUM**

To:    NGRI Committee
      Center for Forensic Psychiatry
      Box 2060
      Ann Arbor, MI 48106-2060

FROM:   Aftercare Agency Representative Name
      Agency Address

DATE:

RE:    Patient's Name and CFP Number

1. The patient was adjudicated NGRI on charges(s) of:

2. Present mental status:

3. Medication(s):

4. Living arrangements and current address:

5. Frequency of appointments:

6. Is the patient complying with treatment program; if not explain:

7. Specifics of LOA (date, location, degree of supervision, etc.)

Signature: _____  Date: _____

C:  Supervising Hospital

CFP NGRI Committee Procedures
April 2008
Page 25

# EXHIBIT B

# CENTER FOR FORENSIC PSYCHIATRY

## Sample of:

# AUTHORIZED LEAVE STATUS CONTRACT

CFP NGRI Committee Procedures
April 2008
Page 26

HOSPITAL NAME
ADDRESS
CITY, STATE   ZIP

AUTHORIZED LEAVE STATUS CONTRACT

It is hereby agreed that pursuant to MCL 330.2050(5) _____will be placed on Authorized Leave Status (ALS) for a period of _____, beginning on _____.  It is understood that Petitions for Continuing Hospitalization Orders may be filed either by the Hospital or the Supervisor of Treatment; ultimate responsibility for petitioning remains with the Hospital.  Reports pertaining to patient aftercare and compliance will be completed by _____ beginning on _____.   The Patient and Authorized Program Representative agree that noncompliance with the following provisions may, at the discretion of the NGRI Committee, result in revocation of Authorized Leave Status and subsequent re-hospitalization. All violations of the contract must be promptly reported to the CFP NGRI Committee and Hospital.  Patients who are placed on Authorized Leave Status are considered inpatients that are on leave from the Hospital.  Therefore, the patient must be kept on a One-Year Continuing Hospitalization Order and should not be placed on an Alternative Treatment Order if the Court deems it appropriate to maintain the patient's NGRI status and preserve eligibility to continue on five years ALS in accordance with MCL 330.2050(5).

*RESIDENT ADDRESS AND PHONE*

*RESPONSIBLE COMMUNITY REPORTING AGENCY*

I, _____, agree to the following:

## STANDARD REQUIREMENTS

1.  I shall cooperate with all aspects of the _____ treatment program.  This includes taking medications as my doctors prescribe and following the program, which is in my Individual Plan of Service.

2. I shall maintain sobriety by not using alcoholic beverages or illicit drugs or controlled substances not prescribed by my treating physician.

3. I will remain in the State of Michigan.  I will leave Michigan only with the permission of the _____, and the NGRI Committee of the Center for Forensic Psychiatry.

4. Prior to any change of address or placement, I will obtain approval from the _____ and the NGRI Committee.  This information will be forwarded to the _____ no later than the next 90-Day Report.

5. Any overnight leave of absence must be approved in advance by the NGRI Committee.  I will return promptly to my residence at the end of each leave.

6. I understand that I will receive help from a _____ worker, but it is my responsibility to apply for funds/money (when eligible) to pay for the cost of my living arrangement in the community.  I shall pay the amount of room and board, which my placement agency tells me I owe.  Unless otherwise discussed with me, the agency's room and board rate is the current Supplemental Security Income Program Personal Care Rate.

7. Aftercare treatment must be provided by a Community Mental Health Services program, unless prior written permission is given by the _____ and the NGRI Committee of the Center for Forensic Psychiatry.

8. I will not buy, own, or use dangerous weapons such as guns or knives.

9. My conduct will follow established laws and rules.

## INDIVIDUAL REQUIREMENTS

1.

2.

3.

## ADDITIONAL PROVISIONS

Any day pass and/or overnight leave of absence must be approved in advance by the NGRI Committee and Director/designee of the Department of Community Health **for individuals found NGRI for the crime of murder or for a crime that involves sexual conduct.**

I, _____, declare that each of the statements in this ALS Contract has been explained to me by _____.  I have had the chance to ask questions, and I understand the meaning of each statement.


_____          _____
Patient                                                                      Date


_____          _____
Psychiatric Hospital                                                     Date


_____          _____
Authorized Program Representative                            Date


_____          _____
Chairperson, NGRI Committee                                 Date
Center for Forensic Psychiatry

# NGRI REPORTING REQUIREMENTS

## 90-DAY REVIEW

- 90 Days from Date of Order
- To NGRI Committee /w Copy to Regional Hospital/Center

## SIX MONTH REVIEW REPORT

- 180 Days From Date of Order
- To Issuing Probate Court /w Copies to NGRI Committee & Regional Hospital/Center
- Petition For Discharge To Patient

## 90-DAY REVIEW

- 270 Days From Date of Order
- To NGRI Committee /w Copy to Regional Hospital/Center

## Petition For Second or Continuing Treatment Order

- To Issuing Probate Court 14 Days Before End of Order
- MUST BE ACCOMPANIED BY CLINICAL CERTIFICATE
- Copies to Regional Hospital/Center and NGRI Committee

## NGRI COURT HEARING FORM

- >30 Days Prior to Expected Court Hearing
- To NGRI Committee /w Copy to Regional Hospital/Center

# EXHIBIT C

**Form 990 for Carelink**

Form **990**

OMB No 1545-0047

# Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

▶ Do not enter social security numbers on this form as it may be made public

▶ Information about Form 990 and its instructions is at www.IRS.gov/form990

# 2015

**Open to Public Inspection**

Department of the Treasury
Internal Revenue Service

**A** For the 2015 calendar year, or tax year beginning 10-01-2015 , and ending 09-30-2016

| **B** Check if applicable | **C** Name of organization CARELINK NETWORK INC | **D** Employer identification number |
|---|---|---|
| ☐ Address change | | 38-3653299 |
| ☐ Name change | Doing business as | |
| ☐ Initial return | | |
| ☐ Final return/terminated | Number and street (or P O box if mail is not delivered to street address) Room/suite 1333 BREWERY PARK BLVD NO 300 | **E** Telephone number (313) 656-0000 |
| ☐ Amended return | City or town, state or province, country, and ZIP or foreign postal code | |
| ☐ Application pending | DETROIT, MI 482074544 | **G** Gross receipts $ 170,541,077 |

| **F** Name and address of principal officer DAVID E SCHMEHL 1333 BREWERY PARK BLVD STE 300 DETROIT, MI 48207 | **H(a)** Is this a group return for subordinates? ☐ Yes ☑ No |
|---|---|
| | **H(b)** Are all subordinates included? ☐ Yes ☐ No If "No," attach a list (see instructions) |
| **I** Tax-exempt status ☑ 501(c)(3) ☐ 501(c) ( ) ◀ (insert no ) ☐ 4947(a)(1) or ☐ 527 | |
| **J** Website: ▶ WWW CARELINKNETWORK ORG | **H(c)** Group exemption number ▶ |
| **K** Form of organization ☑ Corporation ☐ Trust ☐ Association ☐ Other ▶ | **L** Year of formation 2002 **M** State of legal domicile MI |

## Part I  Summary

| | | |
|---|---|---|
| Activities & Governance | **1** Briefly describe the organization's mission or most significant activities OUR MISSION IS TO SUPPORT, STRENGTHEN AND PROMOTE THE DELIVERY OF BEHAVIORAL HEALTHCARE SERVICES, INCLUDING SERVICES TO NEEDY ADULTS WITH SERIOUS MENTAL ILLNESS AND CHILDREN WITH SERIOUS EMOTIONAL DISORDERS IN WAYNE COUNTY | |
| | **2** Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets | |
| | **3** Number of voting members of the governing body (Part VI, line 1a) . . . . . . . . | **3** | 9 |
| | **4** Number of independent voting members of the governing body (Part VI, line 1b) . . . . . | **4** | 9 |
| | **5** Total number of individuals employed in calendar year 2015 (Part V, line 2a) . . . . . | **5** | 0 |
| | **6** Total number of volunteers (estimate if necessary) . . . . . . . . . . . . . . | **6** | 0 |
| | **7a** Total unrelated business revenue from Part VIII, column (C), line 12 . . . . . . . . | **7a** | 0 |
| | **b** Net unrelated business taxable income from Form 990-T, line 34 . . . . . . . . . | **7b** | 0 |

| | | Prior Year | Current Year |
|---|---|---|---|
| Revenue | **8** Contributions and grants (Part VIII, line 1h) . . . . . . . . | 0 | 0 |
| | **9** Program service revenue (Part VIII, line 2g) . . . . . . . . . | 133,760,686 | 170,527,178 |
| | **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d ) . . . | 11,120 | 13,899 |
| | **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 0 | 0 |
| | **12** Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 133,771,806 | 170,541,077 |
| Expenses | **13** Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) . . . | 0 | 0 |
| | **14** Benefits paid to or for members (Part IX, column (A), line 4) . . . . | 134,533,587 | 0 |
| | **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10 ) | 0 | 0 |
| | **16a** Professional fundraising fees (Part IX, column (A), line 11e) . . . . . | 0 | 0 |
| | **b** Total fundraising expenses (Part IX, column (D), line 25) ▶0 | | |
| | **17** Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) . . . | 6,128,325 | 169,098,816 |
| | **18** Total expenses Add lines 13–17 (must equal Part IX, column (A), line 25) | 140,661,912 | 169,098,816 |
| | **19** Revenue less expenses Subtract line 18 from line 12 . . . . . . . | -6,890,106 | 1,442,261 |

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| Net Assets or Fund Balances | **20** Total assets (Part X, line 16) . . . . . . . . . . . . | 7,793,106 | 12,341,404 |
| | **21** Total liabilities (Part X, line 26) . . . . . . . . . . . | 7,416,054 | 10,522,091 |
| | **22** Net assets or fund balances Subtract line 21 from line 20 . . . . | 377,052 | 1,819,313 |

## Part II  Signature Block

Under penalties of perjury, I declare that I have examined this return, i~~~~ my knowledge and belief, it is true, correct, and complete Declaration o~~~~ preparer has any knowledge

| Sign Here | ****** Signature of officer | |
|---|---|---|
| | DAVID E SCHMEHL CFO Type or print name and title | |

| Paid Preparer Use Only | Print/Type preparer's name PATRICK D FUELLING CPA | Preparer's signature PATRICK D FUELLING | |
|---|---|---|---|
| | Firm's name ▶ DOEREN MAYHEW | | |
| | Firm's address ▶ 305 WEST BIG BEAVER ROAD TROY, MI 48084 | | |

May the IRS discuss this return with the preparer shown above? (see in

**For Paperwork Reduction Act Notice, see the separate instructions.**

**Part III** Statement of Program Service Accomplishments

Check if Schedule O contains a response or note to any line in this Part III . . . . . . . . . . . . . . . . . ☐

**1** Briefly describe the organization's mission

OUR MISSION IS TO SUPPORT, STRENGTHEN AND PROMOTE THE DELIVERY OF BEHAVIORAL HEALTHCARE SERVICES, INCLUDING SERVICES TO NEEDY ADULTS WITH SERIOUS MENTAL ILLNESS AND CHILDREN WITH SERIOUS EMOTIONAL DISORDERS IN WAYNE COUNTY

**2** Did the organization undertake any significant program services during the year which were not listed on
the prior Form 990 or 990-EZ? . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑**No**
If "Yes," describe these new services on Schedule O

**3** Did the organization cease conducting, or make significant changes in how it conducts, any program
services? . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑**No**
If "Yes," describe these changes on Schedule O

**4** Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others, the total expenses, and revenue, if any, for each program service reported

| **4a** | (Code | ) (Expenses $ | 111,901,848 | including grants of $ | | ) (Revenue $ | 117,221,962 ) |
|---|---|---|---|---|---|---|---|

OUTPATIENT SERVICES FOR 266,496 MEMBER MONTHS

| **4b** | (Code | ) (Expenses $ | 24,438,555 | including grants of $ | | ) (Revenue $ | 25,600,429 ) |
|---|---|---|---|---|---|---|---|

INPATIENT SERVICES-STATE HOSPITAL 27,138 INPATIENT DAYS AND COMMUNITY HOSPITAL 46,816 INPATIENT DAYS

| **4c** | (Code | ) (Expenses $ | 26,447,406 | including grants of $ | | ) (Revenue $ | 27,704,787 ) |
|---|---|---|---|---|---|---|---|

RESIDENTIAL TREATMENT-3,173 DAYS

**4d** Other program services (Describe in Schedule O )
(Expenses $ including grants of $ ) (Revenue $ )

**4e** Total program service expenses ▶ 162,787,809

**Part IV** Checklist of Required Schedules

|  |  |  | Yes | No |
|---|---|---|---|---|
| **1** | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? If "Yes," complete Schedule A 🖘 . . . . . . . . . . . . . . . . . . | **1** | Yes | |
| **2** | Is the organization required to complete Schedule B, Schedule of Contributors (see instructions)? . . . | **2** | | No |
| **3** | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? If "Yes," complete Schedule C, Part I . . . . . . . . . . . . | **3** | | No |
| **4** | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? If "Yes," complete Schedule C, Part II . . . . . . . . . . . . . . . . . | **4** | | |
| **5** | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Revenue Procedure 98-19? If "Yes," complete Schedule C, Part III . . . . . . . . . . . . . . . . . | **5** | | |
| **6** | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? If "Yes," complete Schedule D, Part I 🖘 . . . . . . . . . . . . . . . . | **6** | | No |
| **7** | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? If "Yes," complete Schedule D, Part II 🖘 . . . | **7** | | No |
| **8** | Did the organization maintain collections of works of art, historical treasures, or other similar assets? If "Yes," complete Schedule D, Part III 🖘 . . . . . . . . . . . . . . . . | **8** | | No |
| **9** | Did the organization report an amount in Part X, line 21 for escrow or custodial account liability, serve as a custodian for amounts not listed in Part X, or provide credit counseling, debt management, credit repair, or debt negotiation services?If "Yes," complete Schedule D, Part IV 🖘 . . . . . . . . . . . . | **9** | | No |
| **10** | Did the organization, directly or through a related organization, hold assets in temporarily restricted endowments, permanent endowments, or quasi-endowments? If "Yes," complete Schedule D, Part V 🖘 . . . . . . | **10** | | No |
| **11** | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable | | | |
| **a** | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? If "Yes," complete Schedule D, Part VI 🖘 . . . . . . . . . . . . . . . . . | **11a** | | No |
| **b** | Did the organization report an amount for investments—other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? If "Yes," complete Schedule D, Part VII 🖘 . . . . . . . . | **11b** | | No |
| **c** | Did the organization report an amount for investments—program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? If "Yes," complete Schedule D, Part VIII 🖘 . . . . . . . . | **11c** | | No |
| **d** | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? If "Yes," complete Schedule D, Part IX 🖘 . . . . . . . . . . . | **11d** | | No |
| **e** | Did the organization report an amount for other liabilities in Part X, line 25? If "Yes," complete Schedule D, Part X 🖘 | **11e** | Yes | |
| **f** | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? If "Yes," complete Schedule D, Part X 🖘 | **11f** | Yes | |
| **12a** | Did the organization obtain separate, independent audited financial statements for the tax year? If "Yes," complete Schedule D, Parts XI and XII 🖘 . . . . . . . . . . . . . . . . | **12a** | Yes | |
| **b** | Was the organization included in consolidated, independent audited financial statements for the tax year? If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional 🖘 | **12b** | | No |
| **13** | Is the organization a school described in section 170(b)(1)(A)(ii)? If "Yes," complete Schedule E | **13** | | No |
| **14a** | Did the organization maintain an office, employees, or agents outside of the United States? . . . . . | **14a** | | No |
| **b** | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? If "Yes," complete Schedule F, Parts I and IV . . . . . . . . . | **14b** | | No |
| **15** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization? If "Yes," complete Schedule F, Parts II and IV . . . . . . . . | **15** | | No |
| **16** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals? If "Yes," complete Schedule F, Parts III and IV . . . . | **16** | | No |
| **17** | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? If "Yes," complete Schedule G, Part I (see instructions) . . . . | **17** | | No |
| **18** | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? If "Yes," complete Schedule G, Part II . . . . . . . . . . . . . | **18** | | No |
| **19** | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? If "Yes," complete Schedule G, Part III . . . . . . . . . . . . . . . . . . | **19** | | No |
| **20a** | Did the organization operate one or more hospital facilities? If "Yes," complete Schedule H . . . . . | **20a** | | No |
| **b** | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? | **20b** | | |

**Part IV**  **Checklist of Required Schedules** *(continued)*

| | | | | |
|---|---|---|---|---|
| **21** | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or domestic government on Part IX, column (A), line 1? *If "Yes," complete Schedule I, Parts I and II* . | **21** | | No |
| **22** | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* . | **22** | | No |
| **23** | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* . | **23** | Yes | |
| **24a** | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K  If "No," go to line 25a* . | **24a** | | No |
| **b** | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? . . . | **24b** | | |
| **c** | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? . | **24c** | | |
| **d** | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? . . . | **24d** | | |
| **25a** | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L, Part I* . | **25a** | | No |
| **b** | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L, Part I* . | **25b** | | No |
| **26** | Did the organization report any amount on Part X, line 5, 6, or 22 for receivables from or payables to any current or former officers, directors, trustees, key employees, highest compensated employees, or disqualified persons? *If "Yes," complete Schedule L, Part II* . | **26** | | No |
| **27** | Did the organization provide a grant or other assistance to an officer, director, trustee, key employee, substantial contributor or employee thereof, a grant selection committee member, or to a 35% controlled entity or family member of any of these persons? *If "Yes," complete Schedule L, Part III* . | **27** | | No |
| **28** | Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions) | | | |
| **a** | A current or former officer, director, trustee, or key employee? *If "Yes," complete Schedule L, Part IV* . | **28a** | | No |
| **b** | A family member of a current or former officer, director, trustee, or key employee? *If "Yes," complete Schedule L, Part IV* . | **28b** | | No |
| **c** | An entity of which a current or former officer, director, trustee, or key employee (or a family member thereof) was an officer, director, trustee, or direct or indirect owner? *If "Yes," complete Schedule L, Part IV* . | **28c** | | No |
| **29** | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* . | **29** | | |
| **30** | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* . | **30** | | |
| **31** | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* . | **31** | | No |
| **32** | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* . | **32** | | No |
| **33** | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301 7701-2 and 301 7701-3? *If "Yes," complete Schedule R, Part I* . . . . . . . . 🔧 | **33** | | No |
| **34** | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* . . . . . . . . . . . . . . . . . . . . . . . . 🔧 | **34** | Yes | |
| **35a** | Did the organization have a controlled entity within the meaning of section 512(b)(13)? | **35a** | | No |
| **b** | If 'Yes' to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* . . . | **35b** | | |
| **36** | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* . . . . . . . . . . . . . . 🔧 | **36** | | No |
| **37** | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* 🔧 | **37** | | No |
| **38** | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11b and 19? **Note.** All Form 990 filers are required to complete Schedule O . . . . . . . . . . . . . . | **38** | Yes | |

**Part V** **Statements Regarding Other IRS Filings and Tax Compliance**

Check if Schedule O contains a response or note to any line in this Part V . . . . . . . . . . . . ☐

|  |  |  | Yes | No |
|---|---|---|---|---|
| **1a** Enter the number reported in Box 3 of Form 1096 Enter -0- if not applicable . . | **1a** | 150 |  |  |
| **b** Enter the number of Forms W-2G included in line 1a Enter -0- if not applicable . | **1b** | 0 |  |  |
| **c** Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? . . . . . . . . . . . . . . . | | | **1c** | Yes | |
| **2a** Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return . . . . . . . . . . | **2a** | 0 | | | |
| **b** If at least one is reported on line 2a, did the organization file all required federal employment tax returns? **Note.** If the sum of lines 1a and 2a is greater than 250, you may be required to e-file (see instructions) | | | **2b** | | |
| **3a** Did the organization have unrelated business gross income of $1,000 or more during the year? . . . | | | **3a** | | No |
| **b** If "Yes," has it filed a Form 990-T for this year? If "No" to line 3b, provide an explanation in Schedule O . . . | | | **3b** | | |
| **4a** At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? . . | | | **4a** | | No |
| **b** If "Yes," enter the name of the foreign country ▶ _____ See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR) | | | | | |
| **5a** Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? . . | | | **5a** | | No |
| **b** Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | | | **5b** | | No |
| **c** If "Yes," to line 5a or 5b, did the organization file Form 8886-T? . . . . . . . . . . | | | **5c** | | |
| **6a** Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? . . . | | | **6a** | | No |
| **b** If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? . . . . . . . . . . . . . . . . . . . | | | **6b** | | |
| **7** **Organizations that may receive deductible contributions under section 170(c).** | | | | | |
| **a** Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? . . . . . . . . . . . . . . . . . . | | | **7a** | | No |
| **b** If "Yes," did the organization notify the donor of the value of the goods or services provided? . . . . . | | | **7b** | | |
| **c** Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? . . . . . . . . . . . . . . . . . . . . . . | | | **7c** | | No |
| **d** If "Yes," indicate the number of Forms 8282 filed during the year . . . . | **7d** | | | | |
| **e** Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | | | **7e** | | No |
| **f** Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? . . | | | **7f** | | No |
| **g** If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? . . . . . . . . . . . . . . . . . . . . . . | | | **7g** | | |
| **h** If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? . . . . . . . . . . . . . . . . . . . . . | | | **7h** | | |
| **8** **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? . . . . . . . . . . . . . . . . . . . . . . | | | **8** | | |
| **9a** Did the sponsoring organization make any taxable distributions under section 4966? . . . | | | **9a** | | |
| **b** Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? . . . . | | | **9b** | | |
| **10** **Section 501(c)(7) organizations.** Enter | | | | | |
| **a** Initiation fees and capital contributions included on Part VIII, line 12 . . . | **10a** | | | | |
| **b** Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | **10b** | | | | |
| **11** **Section 501(c)(12) organizations.** Enter | | | | | |
| **a** Gross income from members or shareholders . . . . . . . . . | **11a** | | | | |
| **b** Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them ) . . . . . . . . | **11b** | | | | |
| **12a** **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | | | **12a** | | |
| **b** If "Yes," enter the amount of tax-exempt interest received or accrued during the year . . . . . . . . . . . . . . . . . . . | **12b** | | | | |
| **13** **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | | | | |
| **a** Is the organization licensed to issue qualified health plans in more than one state? **Note.** See the instructions for additional information the organization must report on Schedule O | | | **13a** | | |
| **b** Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans . . . | **13b** | | | | |
| **c** Enter the amount of reserves on hand . . . . . . . . . . | **13c** | | | | |
| **14a** Did the organization receive any payments for indoor tanning services during the tax year? . . . . . | | | **14a** | | No |
| **b** If "Yes," has it filed a Form 720 to report these payments? If "No," provide an explanation in Schedule O . . | | | **14b** | | |

Case 2:18-cv-11385-APP   ECF No. 44   PageID.989   Filed 09/14/18   Page 118 of 320

**Part VI** | **Governance, Management, and Disclosure**

For each "Yes" response to lines 2 through 7b below, and for a "No" response to lines 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions.

Check if Schedule O contains a response or note to any line in this Part VI . . . . . . . . . . . . . . . ☑

### Section A. Governing Body and Management

|  |  |  | Yes | No |
|---|---|---|---|---|
| **1a** Enter the number of voting members of the governing body at the end of the tax year | **1a** | 9 |  |  |
| If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O | | | | |
| **b** Enter the number of voting members included in line 1a, above, who are independent | **1b** | 9 |  |  |
| **2** Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? | **2** | | | No |
| **3** Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? . | **3** | | Yes | |
| **4** Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? . . . . . . . . . . . . . . . . . . | **4** | | | No |
| **5** Did the organization become aware during the year of a significant diversion of the organization's assets? . | **5** | | | No |
| **6** Did the organization have members or stockholders? . . . . . . . . . . . . | **6** | | | No |
| **7a** Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? | **7a** | | Yes | |
| **b** Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? . . . . . . . . . . . . | **7b** | | | No |
| **8** Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following | | | | |
| **a** The governing body? . . . . . . . . . . . . . . . . . . . | **8a** | | Yes | |
| **b** Each committee with authority to act on behalf of the governing body? . . . . . . . . | **8b** | | Yes | |
| **9** Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses in Schedule O* . . . . . | **9** | | | No |

### Section B. Policies (This Section B requests information about policies not required by the Internal Revenue Code.)

|  |  | Yes | No |
|---|---|---|---|
| **10a** Did the organization have local chapters, branches, or affiliates? . . . . . . . . . . | **10a** | | No |
| **b** If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | **10b** | | |
| **11a** Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? . . . . . . . . . . . . . . . . . . . | **11a** | Yes | |
| **b** Describe in Schedule O the process, if any, used by the organization to review this Form 990 | | | |
| **12a** Did the organization have a written conflict of interest policy? *If "No," go to line 13* . . . . . | **12a** | Yes | |
| **b** Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? . . . . . . . . . . . . . . . . . . . | **12b** | Yes | |
| **c** Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe in Schedule O how this was done* . . . . . . . . . . . . . . . | **12c** | Yes | |
| **13** Did the organization have a written whistleblower policy? . . . . . . . . . . . | **13** | Yes | |
| **14** Did the organization have a written document retention and destruction policy? . . . . . . . | **14** | Yes | |
| **15** Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| **a** The organization's CEO, Executive Director, or top management official . . . . . . . . | **15a** | | No |
| **b** Other officers or key employees of the organization . . . . . . . . . . . . | **15b** | | No |
| If "Yes" to line 15a or 15b, describe the process in Schedule O (see instructions) | | | |
| **16a** Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? . . . . . . . . . . . . . . . . | **16a** | | No |
| **b** If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? . . . . . . . . . | **16b** | | |

### Section C. Disclosure

**17** List the States with which a copy of this Form 990 is required to be filed▶

**18** Section 6104 requires an organization to make its Form 1023 (or 1024 if applicable), 990, and 990-T (501(c) (3)s only) available for public inspection Indicate how you made these available Check all that apply

☐ Own website  ☐ Another's website  ☑ Upon request  ☐ Other (explain in Schedule O)

**19** Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year

**20** State the name, address, and telephone number of the person who possesses the organization's books and records
▶DAVID E SCHMEHL CFO  1333 BREWERY PARK BLVD STE 300  DETROIT, MI 48207 (313) 656-0000

Case 2:18-cv-11385-APP ECF No. 44, PageID.990 Filed 09/14/18 Page 119 of 320

**Part VII** Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors

Check if Schedule O contains a response or note to any line in this Part VII . . . . . . . . . . . . . . ☐

**Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed  Report compensation for the calendar year ending with or within the organization's tax year

- List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation  Enter -0- in columns (D), (E), and (F) if no compensation was paid

- List all of the organization's **current** key employees, if any  See instructions for definition of "key employee "

- List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations

- List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations

- List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations

List persons in the following order  individual trustees or directors, institutional trustees, officers, key employees, highest compensated employees, and former such persons

☐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee

| (A)<br>Name and Title | (B)<br>Average hours per week (list any hours for related organizations below dotted line) | (C)<br>Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D)<br>Reportable compensation from the organization (W- 2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W- 2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) NICOLE WELLS-STALLWORTH<br>CHAIRPERSON | 2 00 | X | | X | | | | 0 | 0 | 0 |
| (2) VERONICA MADRIGAL<br>TREASURER | 2 00 | X | | X | | | | 0 | 0 | 0 |
| (3) DR SUZANNE KELLER<br>SECRETARY | 2 00 | X | | X | | | | 0 | 0 | 0 |
| (4) CARRIE FLOYD<br>VICE CHAIRPERSON | 2 00 | X | | X | | | | 0 | 0 | 0 |
| (5) SARAH CLARK<br>DIRECTOR | 2 00 | X | | | | | | 0 | 0 | 0 |
| (6) ERIC DE LA ROSA<br>DIRECTOR | 2 00 | X | | | | | | 0 | 0 | 0 |
| (7) BESSIE TYLER<br>DIRECTOR | 2 00 | X | | | | | | 0 | 0 | 0 |
| (8) FR ED ZAORSKI<br>DIRECTOR | 2 00 | X | | | | | | 0 | 0 | 0 |
| (9) DR TIFFANY LAVONNE SANFORD<br>DIRECTOR | 2 00 | X | | | | | | 0 | 0 | 0 |
| (10) TONY ROTHSCHILD<br>DIRECTOR-RESIGNED 1/28/16 | 2 00 | X | | | | | | 0 | 0 | 0 |
| (11) DOREEN NIED<br>EXECUTIVE DIRECTOR | 40 00 | | | X | | | | 0 | 150,434 | 8,882 |
| (12) DAVID SCHMEHL<br>CFO | 26 00<br>14 00 | | | X | | | | 0 | 81,565 | 10,633 |
| | | | | | | | | | | |
| | | | | | | | | | | |

Form 990 (2015)

Case 2:18-cv-11385-APP ECF No. 44 PageID.991 Filed 09/14/18 Page 120 of 320

**Part VII** Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)*

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **1b** Sub-Total . . . . . . . . . . . . . ▶ | | | | | | | | | | |
| **c** Total from continuation sheets to Part VII, Section A . . . . ▶ | | | | | | | | | | |
| **d** Total (add lines 1b and 1c) . . . . . . . . . . ▶ | | | | | | | | 0 | 231,999 | 19,515 |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶ 0

| | | Yes | No |
|---|---|---|---|
| **3** | Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . . **3** | | No |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . . . . . . . . . . . **4** | Yes | |
| **5** | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? *If "Yes," complete Schedule J for such person* . . . . . . . . . **5** | | No |

**Section B. Independent Contractors**

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization Report compensation for the calendar year ending with or within the organization's tax year

| (A) Name and business address | (B) Description of services | (C) Compensation |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶ 0

**Part VIII** Statement of Revenue

Check if Schedule O contains a response or note to any line in this Part VIII . . . . . . . . . . . □

| | | | | (A)<br>Total revenue | (B)<br>Related or exempt function revenue | (C)<br>Unrelated business revenue | (D)<br>Revenue excluded from tax under sections 512-514 |
|---|---|---|---|---|---|---|---|
| **Contributions, Gifts, Grants and Other Similar Amounts** | **1a** | Federated campaigns . . | **1a** | | | | |
| | **b** | Membership dues . . . . | **1b** | | | | |
| | **c** | Fundraising events . . . . | **1c** | | | | |
| | **d** | Related organizations . . . | **1d** | | | | |
| | **e** | Government grants (contributions) | **1e** | | | | |
| | **f** | All other contributions, gifts, grants, and similar amounts not included above | **1f** | | | | |
| | **g** | Noncash contributions included in lines 1a-1f $ | | | | | |
| | **h** | **Total.** Add lines 1a-1f . . . . . . . ▶ | | | | | |
| **Program Service Revenue** | | | Business Code | | | | |
| | **2a** | FEES AND CONTRACTS FROM GOVERNMEN | 624100 | 170,527,178 | 170,527,178 | | |
| | **b** | | | | | | |
| | **c** | | | | | | |
| | **d** | | | | | | |
| | **e** | | | | | | |
| | **f** | All other program service revenue | | | | | |
| | **g** | **Total.** Add lines 2a–2f . . . . . . . ▶ | | 170,527,178 | | | |
| **Other Revenue** | **3** | Investment income (including dividends, interest, and other similar amounts) . . . . . . . . ▶ | | 13,899 | | | 13,899 |
| | **4** | Income from investment of tax-exempt bond proceeds . ▶ | | | | | |
| | **5** | Royalties . . . . . . . . . . . . ▶ | | | | | |
| | | | **(i)** Real | **(ii)** Personal | | | |
| | **6a** | Gross rents | | | | | |
| | **b** | Less rental expenses | | | | | |
| | **c** | Rental income or (loss) | | | | | |
| | **d** | Net rental income or (loss) . . . . . . . ▶ | | | | | |
| | | | **(i)** Securities | **(ii)** Other | | | |
| | **7a** | Gross amount from sales of assets other than inventory | | | | | |
| | **b** | Less cost or other basis and sales expenses | | | | | |
| | **c** | Gain or (loss) | | | | | |
| | **d** | Net gain or (loss) . . . . . . . . . ▶ | | | | | |
| | **8a** | Gross income from fundraising events (not including $ _____ of contributions reported on line 1c) See Part IV, line 18 . . **a** | | | | | |
| | **b** | Less direct expenses . . . **b** | | | | | |
| | **c** | Net income or (loss) from fundraising events . . ▶ | | | | | |
| | **9a** | Gross income from gaming activities See Part IV, line 19 . . . **a** | | | | | |
| | **b** | Less direct expenses . . . **b** | | | | | |
| | **c** | Net income or (loss) from gaming activities . . . ▶ | | | | | |
| | **10a** | Gross sales of inventory, less returns and allowances . **a** | | | | | |
| | **b** | Less cost of goods sold . . **b** | | | | | |
| | **c** | Net income or (loss) from sales of inventory . . ▶ | | | | | |
| | | Miscellaneous Revenue | Business Code | | | | |
| | **11a** | | | | | | |
| | **b** | | | | | | |
| | **c** | | | | | | |
| | **d** | All other revenue . . . . | | | | | |
| | **e** | **Total.** Add lines 11a–11d . . . . . . ▶ | | | | | |
| | **12** | **Total revenue.** See Instructions . . . . . ▶ | | 170,541,077 | 170,527,178 | 0 | 13,899 |

Form 990 (2015)

Page **10**

**Part IX** Statement of Functional Expenses

Section 501(c)(3) and 501(c)(4) organizations must complete all columns  All other organizations must complete column (A)

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . .

| Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII. | **(A)** Total expenses | **(B)** Program service expenses | **(C)** Management and general expenses | **(D)** Fundraising expenses |
|---|---|---|---|---|
| **1** Grants and other assistance to domestic organizations and domestic governments  See Part IV, line 21 . . . . . | | | | |
| **2** Grants and other assistance to domestic individuals  See Part IV, line 22 . . . . | | | | |
| **3** Grants and other assistance to foreign organizations, foreign governments, and foreign individuals  See Part IV, lines 15 and 16 . . . . . . . . . . . | | | | |
| **4** Benefits paid to or for members . . . . | | | | |
| **5** Compensation of current officers, directors, trustees, and key employees . . . . | | | | |
| **6** Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) . . . . . | | | | |
| **7** Other salaries and wages . . . . . | | | | |
| **8** Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) . . . . | | | | |
| **9** Other employee benefits . . . . . . . | | | | |
| **10** Payroll taxes . . . . . . . . . . . | | | | |
| **11** Fees for services (non-employees) | | | | |
| **a** Management . . . . . . . | | | | |
| **b** Legal . . . . . . . . . . | | | | |
| **c** Accounting . . . . . . . . . . . . | | | | |
| **d** Lobbying . . . . . . . . . . . . | | | | |
| **e** Professional fundraising services  See Part IV, line 17 | | | | |
| **f** Investment management fees . . . . . . | | | | |
| **g** Other (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Schedule O ) . . . . | 6,311,007 | | 6,311,007 | |
| **12** Advertising and promotion . . . . . | | | | |
| **13** Office expenses . . . . . . . . | | | | |
| **14** Information technology . . . . . . . | | | | |
| **15** Royalties . . | | | | |
| **16** Occupancy . . . . . . . . . . | | | | |
| **17** Travel . . . . . . . . . . . . | | | | |
| **18** Payments of travel or entertainment expenses for any federal, state, or local public officials . . . . . . . | | | | |
| **19** Conferences, conventions, and meetings . . . . | | | | |
| **20** Interest . . . . . . . . . . . . | | | | |
| **21** Payments to affiliates . . . . . . . | | | | |
| **22** Depreciation, depletion, and amortization . . . . . | | | | |
| **23** Insurance . . . . . . . . . . . | | | | |
| **24** Other expenses  Itemize expenses not covered above (List miscellaneous expenses in line 24e  If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O ) | | | | |
| **a** OUTPATIENT SERVICE EXPE | 111,901,848 | 111,901,848 | | |
| **b** RESIDENTIAL EXPENSE | 26,447,406 | 26,447,406 | | |
| **c** COMMUNITY HOSPITAL INPA | 24,438,555 | 24,438,555 | | |
| **d** | | | | |
| **e** All other expenses | | | | |
| **25** **Total functional expenses.** Add lines 1 through 24e | 169,098,816 | 162,787,809 | 6,311,007 | 0 |
| **26** **Joint costs.** Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation  Check here ▶ ☐ if following SOP 98-2 (ASC 958-720) | | | | |

Form **990** (2015)

| **Part X** | Balance Sheet |

Check if Schedule O contains a response or note to any line in this Part X . . . . . . . . . . . . . . . ☐

| | | | | **(A)** Beginning of year | | **(B)** End of year |
|---|---|---|---|---|---|---|
| **Assets** | **1** | Cash–non-interest-bearing . . . . . . . . | | 2,932,110 | **1** | 2,543,687 |
| | **2** | Savings and temporary cash investments . . . . . . . . . | | 2,500,000 | **2** | 2,500,000 |
| | **3** | Pledges and grants receivable, net . . . . . . . . | | | **3** | |
| | **4** | Accounts receivable, net . . . . . . . . . . . | | 2,360,996 | **4** | 7,297,717 |
| | **5** | Loans and other receivables from current and former officers, directors, trustees, key employees, and highest compensated employees Complete Part II of Schedule L . . . . . . . . . . . . | | | **5** | |
| | **6** | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), persons described in section 4958(c)(3)(B), and contributing employers and sponsoring organizations of section 501(c)(9) voluntary employees' beneficiary organizations (see instructions) Complete Part II of Schedule L | | | **6** | |
| | **7** | Notes and loans receivable, net . . . . . . . . . . . | | | **7** | |
| | **8** | Inventories for sale or use . . . . . . . . . . . | | | **8** | |
| | **9** | Prepaid expenses and deferred charges . . . . . . . | | | **9** | |
| | **10a** | Land, buildings, and equipment cost or other basis Complete Part VI of Schedule D | **10a** | | | |
| | **b** | Less accumulated depreciation . . . . . | **10b** | | **10c** | |
| | **11** | Investments—publicly traded securities . . . . . . . . . | | | **11** | |
| | **12** | Investments—other securities See Part IV, line 11 . . . . . | | | **12** | |
| | **13** | Investments—program-related See Part IV, line 11 . . . . . | | | **13** | |
| | **14** | Intangible assets . . . . . . . . . . . . . | | | **14** | |
| | **15** | Other assets See Part IV, line 11 . . . . . . . . | | | **15** | |
| | **16** | **Total assets.** Add lines 1 through 15 (must equal line 34) . . . . . . | | 7,793,106 | **16** | 12,341,404 |
| **Liabilities** | **17** | Accounts payable and accrued expenses . . . . . . . . | | 7,416,054 | **17** | 9,244,660 |
| | **18** | Grants payable . . . . . . . . . . . . . | | | **18** | |
| | **19** | Deferred revenue . . . . . . . . . . . . | | | **19** | |
| | **20** | Tax-exempt bond liabilities . . . . . . . . . . | | | **20** | |
| | **21** | Escrow or custodial account liability Complete Part IV of Schedule D . . | | | **21** | |
| | **22** | Loans and other payables to current and former officers, directors, trustees, key employees, highest compensated employees, and disqualified persons Complete Part II of Schedule L . . . . . . . . . | | | **22** | |
| | **23** | Secured mortgages and notes payable to unrelated third parties . . | | | **23** | |
| | **24** | Unsecured notes and loans payable to unrelated third parties . . . . | | | **24** | |
| | **25** | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17-24) Complete Part X of Schedule D . . . . . . . . . . . . . . . . | | 0 | **25** | 1,277,431 |
| | **26** | **Total liabilities.** Add lines 17 through 25 . . . . . . . . | | 7,416,054 | **26** | 10,522,091 |
| **Net Assets or Fund Balances** | | **Organizations that follow SFAS 117 (ASC 958), check here ▶ ☑ and complete lines 27 through 29, and lines 33 and 34.** | | | | |
| | **27** | Unrestricted net assets . . . . . . . . . . . . | | 377,052 | **27** | 1,819,313 |
| | **28** | Temporarily restricted net assets . . . . . . . . . | | | **28** | |
| | **29** | Permanently restricted net assets . . . . . . . . . . | | | **29** | |
| | | **Organizations that do not follow SFAS 117 (ASC 958), check here ▶ ☐ and complete lines 30 through 34.** | | | | |
| | **30** | Capital stock or trust principal, or current funds . . . . . . | | | **30** | |
| | **31** | Paid-in or capital surplus, or land, building or equipment fund . . . . . | | | **31** | |
| | **32** | Retained earnings, endowment, accumulated income, or other funds . | | | **32** | |
| | **33** | Total net assets or fund balances . . . . . . . . . | | 377,052 | **33** | 1,819,313 |
| | **34** | Total liabilities and net assets/fund balances . . . . . . . . | | 7,793,106 | **34** | 12,341,404 |

**Part XI** **Reconciliation of Net Assets**

Check if Schedule O contains a response or note to any line in this Part XI . . . . . . . . . . ☐

| | | | |
|---|---|---|---|
| **1** | Total revenue (must equal Part VIII, column (A), line 12) . . . . . . . . . . | **1** | 170,541,077 |
| **2** | Total expenses (must equal Part IX, column (A), line 25) . . . . . . . . . | **2** | 169,098,816 |
| **3** | Revenue less expenses Subtract line 2 from line 1 . . . . . . . . . . . | **3** | 1,442,261 |
| **4** | Net assets or fund balances at beginning of year (must equal Part X, line 33, column (A)) . . | **4** | 377,052 |
| **5** | Net unrealized gains (losses) on investments . . . . . . . . . . . | **5** | |
| **6** | Donated services and use of facilities . . . . . . . . . . . . | **6** | |
| **7** | Investment expenses . . . . . . . . . . . . . . . | **7** | |
| **8** | Prior period adjustments . . . . . . . . . . . . . . | **8** | |
| **9** | Other changes in net assets or fund balances (explain in Schedule O) . . . . . . . | **9** | 0 |
| **10** | Net assets or fund balances at end of year Combine lines 3 through 9 (must equal Part X, line 33, column (B)) | **10** | 1,819,313 |

**Part XII** **Financial Statements and Reporting**

Check if Schedule O contains a response or note to any line in this Part XII . . . . . . . . . . . ☑

| | | | Yes | No |
|---|---|---|---|---|
| **1** | Accounting method used to prepare the Form 990 ☐ Cash ☑ Accrual ☐ Other _____ If the organization changed its method of accounting from a prior year or checked "Other," explain in Schedule O | | | |
| **2a** | Were the organization's financial statements compiled or reviewed by an independent accountant? | **2a** | | No |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both | | | |
| | ☐ Separate basis ☐ Consolidated basis ☐ Both consolidated and separate basis | | | |
| **b** | Were the organization's financial statements audited by an independent accountant? | **2b** | Yes | |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both | | | |
| | ☑ Separate basis ☐ Consolidated basis ☐ Both consolidated and separate basis | | | |
| **c** | If "Yes," to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? | **2c** | Yes | |
| | If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O | | | |
| **3a** | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? | **3a** | | No |
| **b** | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits | **3b** | | |

**SCHEDULE A**
**(Form 990 or 990EZ)**

OMB No 1545-0047

# Public Charity Status and Public Support

Complete if the organization is a section 501(c)(3) organization or a section
4947(a)(1) nonexempt charitable trust.
▶ Attach to Form 990 or Form 990-EZ.
▶ Information about Schedule A (Form 990 or 990-EZ) and its instructions is at
*www.irs.gov/form990*.

**2015**

Open to Public
Inspection

Department of the Treasury
Internal Revenue Service

| Name of the organization | Employer identification number |
|---|---|
| CARELINK NETWORK INC | 38-3653299 |

## Part I · Reason for Public Charity Status (All organizations must complete this part.) See instructions.

The organization is not a private foundation because it is (For lines 1 through 11, check only one box )

1 ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

2 ☐ A school described in **section 170(b)(1)(A)(ii).**(Attach Schedule E (Form 990 or 990-EZ))

3 ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

4 ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the hospital's name, city, and state _____

5 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170(b)(1)(A)(iv).** (Complete Part II )

6 ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

7 ☑ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II )

8 ☐ A community trust described in **section 170(b)(1)(A)(vi)** (Complete Part II )

9 ☐ An organization that normally receives (1) more than 331/3% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions—subject to certain exceptions, and (2) no more than 331/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975 See**section 509(a)(2).** (Complete Part III )

10 ☐ An organization organized and operated exclusively to test for public safety See **section 509(a)(4).**

11 ☐ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in section 509(a)(1) or section 509(a)(2) See **section 509(a)(3).** Check the box in lines 11a through 11d that describes the type of supporting organization and complete lines 11e, 11f, and 11g

a ☐ **Type I.** A supporting organization operated, supervised, or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization **You must complete Part IV, Sections A and B.**

b ☐ **Type II.** A supporting organization supervised or controlled in connection with its supported organization(s), by having control or management of the supporting organization vested in the same persons that control or manage the supported organization(s) **You must complete Part IV, Sections A and C.**

c ☐ **Type III functionally integrated.** A supporting organization operated in connection with, and functionally integrated with, its supported organization(s) (see instructions) **You must complete Part IV, Sections A, D, and E.**

d ☐ **Type III non-functionally integrated.** A supporting organization operated in connection with its supported organization(s) that is not functionally integrated The organization generally must satisfy a distribution requirement and an attentiveness requirement (see instructions) **You must complete Part IV, Sections A and D, and Part V.**

e ☐ Check this box if the organization received a written determination from the IRS that it is a Type I, Type II, Type III functionally integrated, or Type III non-functionally integrated supporting organization

f Enter the number of supported organizations . . . . . . . . . . . . . . . . . . . _____

g Provide the following information about the supported organization(s)

| (i) Name of supported organization | (ii)EIN | (iii) Type of organization (described on lines 1- 9 above (see instructions)) | (iv) Is the organization listed in your governing document? | | (v) Amount of monetary support (see instructions) | (vi) Amount of other support (see instructions) |
|---|---|---|---|---|---|---|
| | | | Yes | No | | |
| | | | | | | |
| | | | | | | |
| **Total** | | | | | | |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.**     Cat No 11285F     **Schedule A (Form 990 or 990-EZ) 2015**

Case 2:18-cv-11385-ABP　ECF No. 44, PageID 997　Filed 09/14/18　Page 126 of 320

**Part II** **Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi)**
(Complete only if you checked the box on line 5, 7, or 8 of Part I or if the organization failed to qualify under
Part III. If the organization fails to qualify under the tests listed below, please complete Part III.)

### Section A. Public Support

| Calendar year<br>(or fiscal year beginning in) ▶ | **(a)**2011 | **(b)**2012 | **(c)**2013 | **(d)**2014 | **(e)**2015 | **(f)**Total |
|---|---|---|---|---|---|---|
| **1** Gifts, grants, contributions, and membership fees received (Do not include any unusual grants ) | 200,785 | | | | | 200,785 |
| **2** Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | |
| **3** The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| **4** **Total.** Add lines 1 through 3 | 200,785 | | | | | 200,785 |
| **5** The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f) | | | | | | |
| **6** **Public support.** Subtract line 5 from line 4 | | | | | | 200,785 |

### Section B. Total Support

| Calendar year<br>(or fiscal year beginning in) ▶ | **(a)**2011 | **(b)**2012 | **(c)**2013 | **(d)**2014 | **(e)**2015 | **(f)**Total |
|---|---|---|---|---|---|---|
| **7** Amounts from line 4 | 200,785 | | | | | 200,785 |
| **8** Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources | 9,343 | 19,349 | 12,098 | 11,120 | 13,899 | 65,809 |
| **9** Net income from unrelated business activities, whether or not the business is regularly carried on | | | | | | |
| **10** Other income Do not include gain or loss from the sale of capital assets (Explain in Part VI ) | | | | | | |
| **11** **Total support.** Add lines 7 through 10 | | | | | | 266,594 |

| **12** | Gross receipts from related activities, etc (see instructions) | | | **12** | 711,959,197 |
|---|---|---|---|---|---|

**13** **First five years.**If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization,
check this box and **stop here** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

### Section C. Computation of Public Support Percentage

| **14** | Public support percentage for 2015 (line 6, column (f) divided by line 11, column (f)) | **14** | 75 310 % |
|---|---|---|---|
| **15** | Public support percentage for 2014 Schedule A, Part II, line 14 | **15** | 99 990 % |

**16a** **33 1/3% support test—2015.**If the organization did not check the box on line 13, and line 14 is 33 1/3% or more, check this box
and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . ▶ ☑

**b** **33 1/3% support test—2014.**If the organization did not check a box on line 13 or 16a, and line 15 is 33 1/3% or more, check this
box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . . . . ▶ ☐

**17a** **10%-facts-and-circumstances test—2015.**If the organization did not check a box on line 13, 16a, or 16b, and line 14
is 10% or more, and if the organization meets the facts-and-circumstances test, check this box and **stop here.** Explain
in Part VI how the organization meets the "facts-and-circumstances" test The organization qualifies as a publicly supported
organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**b** **10%-facts-and-circumstances test—2014.**If the organization did not check a box on line 13, 16a, 16b, or 17a, and line
15 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.**
Explain in Part VI how the organization meets the "facts-and-circumstances" test The organization qualifies as a publicly
supported organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**18** **Private foundation.**If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see
instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**Part III** Case 2:18-cv-04100-APP ECF No. 41 PageID.999 Filed 09/14/18 Page 127 of 320

**Support Schedule for Organizations Described in Section 509(a)(2)**

(Complete only if you checked the box on line 9 of Part I or if the organization failed to qualify under Part II. If the organization fails to qualify under the tests listed below, please complete Part II.)

### Section A. Public Support

| Calendar year (or fiscal year beginning in) ▶ | (a)2011 | (b)2012 | (c)2013 | (d)2014 | (e)2015 | (f)Total |
|---|---|---|---|---|---|---|
| **1** Gifts, grants, contributions, and membership fees received (Do not include any "unusual grants ") | | | | | | |
| **2** Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in any activity that is related to the organization's tax-exempt purpose | | | | | | |
| **3** Gross receipts from activities that are not an unrelated trade or business under section 513 | | | | | | |
| **4** Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | |
| **5** The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| **6** **Total.** Add lines 1 through 5 | | | | | | |
| **7a** Amounts included on lines 1, 2, and 3 received from disqualified persons | | | | | | |
| **b** Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of $5,000 or 1% of the amount on line 13 for the year | | | | | | |
| **c** Add lines 7a and 7b | | | | | | |
| **8** **Public support.** (Subtract line 7c from line 6 ) | | | | | | |

### Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | (a)2011 | (b)2012 | (c)2013 | (d)2014 | (e)2015 | (f)Total |
|---|---|---|---|---|---|---|
| **9** Amounts from line 6 | | | | | | |
| **10a** Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources | | | | | | |
| **b** Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975 | | | | | | |
| **c** Add lines 10a and 10b | | | | | | |
| **11** Net income from unrelated business activities not included in line 10b, whether or not the business is regularly carried on | | | | | | |
| **12** Other income Do not include gain or loss from the sale of capital assets (Explain in Part VI ) | | | | | | |
| **13** **Total support.** (Add lines 9, 10c, 11, and 12 ) | | | | | | |

**14** **First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here**                                             ▶ ☐

### Section C. Computation of Public Support Percentage

| | | |
|---|---|---|
| **15** Public support percentage for 2015 (line 8, column (f) divided by line 13, column (f)) | **15** | |
| **16** Public support percentage from 2014 Schedule A, Part III, line 15 | **16** | |

### Section D. Computation of Investment Income Percentage

| | | |
|---|---|---|
| **17** Investment income percentage for **2015** (line 10c, column (f) divided by line 13, column (f)) | **17** | |
| **18** Investment income percentage from **2014** Schedule A, Part III, line 17 | **18** | |

**19a** **33 1/3% support tests—2015.** If the organization did not check the box on line 14, and line 15 is more than 33 1/3%, and line 17 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization      ▶ ☐

**b** **33 1/3% support tests—2014.** If the organization did not check a box on line 14 or line 19a, and line 16 is more than 33 1/3% and line 18 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization      ▶ ☐

**20** **Private foundation.** If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions      ▶ ☐

Case 2:18-cv-11385-APP ECF No. 44, PageID.999 Filed 09/14/18 Page 128 of 320

| **Part IV** | **Supporting Organizations** |
|---|---|

(Complete only if you checked a box on line 11 of Part I If you checked 11a of Part I, complete Sections A and B If you checked 11b of Part I, complete Sections A and C If you checked 11c of Part I, complete Sections A, D, and E If you checked 11d of Part I, complete Sections A and D, and complete Part V )

## Section A. All Supporting Organizations

| | | | Yes | No |
|---|---|---|---|---|
| **1** | Are all of the organization's supported organizations listed by name in the organization's governing documents? *If "No," describe in **Part VI** how the supported organizations are designated If designated by class or purpose, describe the designation If historic and continuing relationship, explain* | **1** | | |
| **2** | Did the organization have any supported organization that does not have an IRS determination of status under section 509(a)(1) or (2)? *If "Yes," explain in **Part VI** how the organization determined that the supported organization was described in section 509(a)(1) or (2)* | **2** | | |
| **3a** | Did the organization have a supported organization described in section 501(c)(4), (5), or (6)? *If "Yes," answer (b) and (c) below* | **3a** | | |
| **b** | Did the organization confirm that each supported organization qualified under section 501(c)(4), (5), or (6) and satisfied the public support tests under section 509(a)(2)? *If "Yes," describe in **Part VI** when and how the organization made the determination* | **3b** | | |
| **c** | Did the organization ensure that all support to such organizations was used exclusively for section 170(c)(2)(B) purposes? *If "Yes," explain in **Part VI** what controls the organization put in place to ensure such use* | **3c** | | |
| **4a** | Was any supported organization not organized in the United States ("foreign supported organization")? *If "Yes" and if you checked 11a or 11b in Part I, answer (b) and (c) below* | **4a** | | |
| **b** | Did the organization have ultimate control and discretion in deciding whether to make grants to the foreign supported organization? *If "Yes," describe in Part VI how the organization had such control and discretion despite being controlled or supervised by or in connection with its supported organizations* | **4b** | | |
| **c** | Did the organization support any foreign supported organization that does not have an IRS determination under sections 501(c)(3) and 509(a)(1) or (2)? *If "Yes," explain in Part VI what controls the organization used to ensure that all support to the foreign supported organization was used exclusively for section 170(c)(2)(B) purposes* | **4c** | | |
| **5a** | Did the organization add, substitute, or remove any supported organizations during the tax year? *If "Yes," answer (b) and (c) below (if applicable) Also, provide detail in Part VI, including (i) the names and EIN numbers of the supported organizations added, substituted, or removed, (ii) the reasons for each such action, (iii) the authority under the organization's organizing document authorizing such action, and (iv) how the action was accomplished (such as by amendment to the organizing document)* | **5a** | | |
| **b** | **Type I or Type II only.** Was any added or substituted supported organization part of a class already designated in the organization's organizing document? | **5b** | | |
| **c** | **Substitutions only.** Was the substitution the result of an event beyond the organization's control? | **5c** | | |
| **6** | Did the organization provide support (whether in the form of grants or the provision of services or facilities) to anyone other than (a) its supported organizations, (b) individuals that are part of the charitable class benefited by one or more of its supported organizations, or (c) other supporting organizations that also support or benefit one or more of the filing organization's supported organizations? *If "Yes," provide detail in **Part VI.*** | **6** | | |
| **7** | Did the organization provide a grant, loan, compensation, or other similar payment to a substantial contributor (defined in IRC 4958(c)(3)(C)), a family member of a substantial contributor, or a 35-percent controlled entity with regard to a substantial contributor? *If "Yes," complete Part I of Schedule L (Form 990)* | **7** | | |
| **8** | Did the organization make a loan to a disqualified person (as defined in section 4958) not described in line 7? *If "Yes," complete Part II of Schedule L (Form 990)* | **8** | | |
| **9a** | Was the organization controlled directly or indirectly at any time during the tax year by one or more disqualified persons as defined in section 4946 (other than foundation managers and organizations described in section 509 (a)(1) or (2))? *If "Yes," provide detail in **Part VI.*** | **9a** | | |
| **b** | Did one or more disqualified persons (as defined in line 9(a)) hold a controlling interest in any entity in which the supporting organization had an interest? *If "Yes," provide detail in **Part VI.*** | **9b** | | |
| **c** | Did a disqualified person (as defined in line 9(a)) have an ownership interest in, or derive any personal benefit from, assets in which the supporting organization also had an interest? *If "Yes," provide detail in **Part VI.*** | **9c** | | |
| **10a** | Was the organization subject to the excess business holdings rules of IRC 4943 because of IRC 4943(f) (regarding certain Type II supporting organizations, and all Type III non-functionally integrated supporting organizations)? *If "Yes," answer b below* | **10a** | | |
| **b** | Did the organization have any excess business holdings in the tax year? *(Use Schedule C, Form 4720, to determine whether the organization had excess business holdings)* | **10b** | | |
| **11** | Has the organization accepted a gift or contribution from any of the following persons? | | | |
| **a** | A person who directly or indirectly controls, either alone or together with persons described in (b) and (c) below, the governing body of a supported organization? | **11a** | | |
| **b** | A family member of a person described in (a) above? | **11b** | | |
| **c** | A 35% controlled entity of a person described in (a) or (b) above? *If "Yes" to a, b, or c, provide detail in Part VI* | **11c** | | |

**Part IV** Supporting Organizations (continued)

### Section B. Type I Supporting Organizations

| | | Yes | No |
|---|---|---|---|
| **1** | Did the directors, trustees, or membership of one or more supported organizations have the power to regularly appoint or elect at least a majority of the organization's directors or trustees at all times during the tax year? *If "No," describe in Part VI how the supported organization(s) effectively operated, supervised, or controlled the organization's activities If the organization had more than one supported organization, describe how the powers to appoint and/or remove directors or trustees were allocated among the supported organizations and what conditions or restrictions, if any, applied to such powers during the tax year* **1** | | |
| **2** | Did the organization operate for the benefit of any supported organization other than the supported organization(s) that operated, supervised, or controlled the supporting organization? *If "Yes," explain in Part VI how providing such benefit carried out the purposes of the supported organization(s) that operated, supervised or controlled the supporting organization* **2** | | |

### Section C. Type II Supporting Organizations

| | | Yes | No |
|---|---|---|---|
| **1** | Were a majority of the organization's directors or trustees during the tax year also a majority of the directors or trustees of each of the organization's supported organization(s)? *If "No," describe in Part VI how control or management of the supporting organization was vested in the same persons that controlled or managed the supported organization(s)* **1** | | |

### Section D. All Type III Supporting Organizations

| | | Yes | No |
|---|---|---|---|
| **1** | Did the organization provide to each of its supported organizations, by the last day of the fifth month of the organization's tax year, (1) a written notice describing the type and amount of support provided during the prior tax year, (2) a copy of the Form 990 that was most recently filed as of the date of notification, and (3) copies of the organization's governing documents in effect on the date of notification, to the extent not previously provided? **1** | | |
| **2** | Were any of the organization's officers, directors, or trustees either (i) appointed or elected by the supported organization(s) or (ii) serving on the governing body of a supported organization? *If "No," explain in Part VI how the organization maintained a close and continuous working relationship with the supported organization(s)* **2** | | |
| **3** | By reason of the relationship described in (2), did the organization's supported organizations have a significant voice in the organization's investment policies and in directing the use of the organization's income or assets at all times during the tax year? *If "Yes," describe in Part VI the role the organization's supported organizations played in this regard* **3** | | |

### Section E. Type III Functionally-Integrated Supporting Organizations

| **1** | Check the box next to the method that the organization used to satisfy the Integral Part Test during the year **(see instructions)** |
|---|---|
| **a** | ☐ The organization satisfied the Activities Test Complete **line 2** below |
| **b** | ☐ The organization is the parent of each of its supported organizations Complete **line 3** below |
| **c** | ☐ The organization supported a governmental entity Describe in Part VI how you supported a government entity (see instructions) |

| | | | Yes | No |
|---|---|---|---|---|
| **2** | Activities Test **Answer (a) and (b) below.** | | | |
| **a** | Did substantially all of the organization's activities during the tax year directly further the exempt purposes of the supported organization(s) to which the organization was responsive? *If "Yes," then in Part VI identify those supported organizations and explain how these activities directly furthered their exempt purposes, how the organization was responsive to those supported organizations, and how the organization determined that these activities constituted substantially all of its activities* | **2a** | | |
| **b** | Did the activities described in (a) constitute activities that, but for the organization's involvement, one or more of the organization's supported organization(s) would have been engaged in? *If "Yes," explain in Part VI the reasons for the organization's position that its supported organization(s) would have engaged in these activities but for the organization's involvement* | **2b** | | |
| **3** | Parent of Supported Organizations **Answer (a) and (b) below.** | | | |
| **a** | Did the organization have the power to regularly appoint or elect a majority of the officers, directors, or trustees of each of the supported organizations? *Provide details in Part VI* | **3a** | | |
| **b** | Did the organization exercise a substantial degree of direction over the policies, programs and activities of each of its supported organizations? *If "Yes," describe in Part VI the role played by the organization in this regard* | **3b** | | |

**Part V**   Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations

**1**   Check here if the organization satisfied the Integral Part Test as a qualifying trust on Nov 20, 1970 **See instructions.** All other
Type III non-functionally integrated supporting organizations must complete Sections A through E     ☐

| | **Section A - Adjusted Net Income** | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|---|
| **1** | Net short-term capital gain | **1** | | |
| **2** | Recoveries of prior-year distributions | **2** | | |
| **3** | Other gross income (see instructions) | **3** | | |
| **4** | Add lines 1 through 3 | **4** | | |
| **5** | Depreciation and depletion | **5** | | |
| **6** | Portion of operating expenses paid or incurred for production or collection of gross income or for management, conservation, or maintenance of property held for production of income (see instructions) | **6** | | |
| **7** | Other expenses (see instructions) | **7** | | |
| **8** | **Adjusted Net Income** (subtract lines 5, 6 and 7 from line 4) | **8** | | |

| | **Section B - Minimum Asset Amount** | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|---|
| **1** | Aggregate fair market value of all non-exempt-use assets (see instructions for short tax year or assets held for part of year) | **1** | | |
| **a** | Average monthly value of securities | **1a** | | |
| **b** | Average monthly cash balances | **1b** | | |
| **c** | Fair market value of other non-exempt-use assets | **1c** | | |
| **d** | **Total** (add lines 1a, 1b, and 1c) | **1d** | | |
| **e** | **Discount** claimed for blockage or other factors (explain in detail in Part VI) _____ | | | |
| **2** | Acquisition indebtedness applicable to non-exempt use assets | **2** | | |
| **3** | Subtract line 2 from line 1d | **3** | | |
| **4** | Cash deemed held for exempt use Enter 1-1/2% of line 3 (for greater amount, see instructions) | **4** | | |
| **5** | Net value of non-exempt-use assets (subtract line 4 from line 3) | **5** | | |
| **6** | Multiply line 5 by 035 | **6** | | |
| **7** | Recoveries of prior-year distributions | **7** | | |
| **8** | **Minimum Asset Amount** (add line 7 to line 6) | **8** | | |

| | **Section C - Distributable Amount** | | | Current Year |
|---|---|---|---|---|
| **1** | Adjusted net income for prior year (from Section A, line 8, Column A) | **1** | | |
| **2** | Enter 85% of line 1 | **2** | | |
| **3** | Minimum asset amount for prior year (from Section B, line 8, Column A) | **3** | | |
| **4** | Enter greater of line 2 or line 3 | **4** | | |
| **5** | Income tax imposed in prior year | **5** | | |
| **6** | **Distributable Amount.** Subtract line 5 from line 4, unless subject to emergency temporary reduction (see instructions) | **6** | | |

**7**   Check here if the current year is the organization's first as a non-functionally-integrated Type III supporting organization (see
instructions) ☐

**Part V**    Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations *(continued)*

| Section D – Distributions | Current Year |
|---|---|
| **1** Amounts paid to supported organizations to accomplish exempt purposes | |
| **2** Amounts paid to perform activity that directly furthers exempt purposes of supported organizations, in excess of income from activity | |
| **3** Administrative expenses paid to accomplish exempt purposes of supported organizations | |
| **4** Amounts paid to acquire exempt-use assets | |
| **5** Qualified set-aside amounts (prior IRS approval required) | |
| **6** Other distributions (describe in Part VI) See instructions | |
| **7 Total annual distributions.** Add lines 1 through 6 | |
| **8** Distributions to attentive supported organizations to which the organization is responsive (provide details in Part VI) See instructions | |
| **9** Distributable amount for 2015 from Section C, line 6 | |
| **10** Line 8 amount divided by Line 9 amount | |

| Section E – Distribution Allocations (see instructions) | (i) Excess Distributions | (ii) Underdistributions Pre-2015 | (iii) Distributable Amount for 2015 |
|---|---|---|---|
| **1** Distributable amount for 2015 from Section C, line 6 | | | |
| **2** Underdistributions, if any, for years prior to 2015 (reasonable cause required--see instructions) | | | |
| **3** Excess distributions carryover, if any, to 2015 | | | |
| **a** | | | |
| **b** | | | |
| **c** | | | |
| **d** From 2013. . . . . . . _____ | | | |
| **e** From 2014. . . . . . . _____ | | | |
| **f Total** of lines 3a through e | | | |
| **g** Applied to underdistributions of prior years | | | |
| **h** Applied to 2015 distributable amount | | | |
| **i** Carryover from 2010 not applied (see instructions) | | | |
| **j** Remainder Subtract lines 3g, 3h, and 3i from 3f | | | |
| **4** Distributions for 2015 from Section D, line 7 $ _____ | | | |
| **a** Applied to underdistributions of prior years | | | |
| **b** Applied to 2015 distributable amount | | | |
| **c** Remainder Subtract lines 4a and 4b from 4 | | | |
| **5** Remaining underdistributions for years prior to 2015, if any Subtract lines 3g and 4a from line 2 (if amount greater than zero, see instructions) | | | |
| **6** Remaining underdistributions for 2015 Subtract lines 3h and 4b from line 1 (if amount greater than zero, see instructions) | | | |
| **7 Excess distributions carryover to 2016.** Add lines 3j and 4c | | | |
| **8** Breakdown of line 7 | | | |
| **a** | | | |
| **b** | | | |
| **c** Excess from 2013. . . . . . . | | | |
| **d** From 2014. . . . . . . _____ | | | |
| **e** From 2015. . . . . . . _____ | | | |

Case 2:18-cv-11385-APP ECF No. 44, PageID.1003 Filed 09/14/18 Page 132 of 320

| Part VI | Supplemental Information. |
|---|---|

Provide the explanations required by Part II, line 10; Part II, line 17a or 17b; Part III, line 12; Part IV, Section A, lines 1, 2, 3b, 3c, 4b, 4c, 5a, 6, 9a, 9b, 9c, 11a, 11b, and 11c; Part IV, Section B, lines 1 and 2; Part IV, Section C, line 1; Part IV, Section D, lines 2 and 3; Part IV, Section E, lines 1c, 2a, 2b, 3a and 3b; Part V, line 1; Part V, Section B, line 1e; Part V Section D, lines 5, 6, and 8; and Part V, Section E, lines 2, 5, and 6. Also complete this part for any additional information. (See instructions).

| Facts And Circumstances Test |
|---|
|  |

| Return Reference | Explanation |
|---|---|

**SCHEDULE D**
(Form 990)

Department of the Treasury
Internal Revenue Service

## Supplemental Financial Statements

▶ Complete if the organization answered "Yes," on Form 990,
Part IV, line 6, 7, 8, 9, 10, 11a, 11b, 11c, 11d, 11e, 11f, 12a, or 12b.
▶ Attach to Form 990.
Information about Schedule D (Form 990) and its instructions is at *www.irs.gov/form990*.

OMB No 1545-0047

## 2015

Open to Public
Inspection

| Name of the organization | Employer identification number |
|---|---|
| CARELINK NETWORK INC | 38-3653299 |

### Part I — Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts.
Complete if the organization answered "Yes" on Form 990, Part IV, line 6.

| | | (a) Donor advised funds | (b) Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year | | |
| 2 | Aggregate value of contributions to (during year) | | |
| 3 | Aggregate value of grants from (during year) | | |
| 4 | Aggregate value at end of year | | |

5 Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds are the organization's property, subject to the organization's exclusive legal control? ☐ Yes ☐ No

6 Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used only for charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose conferring impermissible private benefit? ☐ Yes ☐ No

### Part II — Conservation Easements. Complete if the organization answered "Yes" on Form 990, Part IV, line 7.

1 Purpose(s) of conservation easements held by the organization (check all that apply)
☐ Preservation of land for public use (e g , recreation or education)
☐ Protection of natural habitat
☐ Preservation of open space
☐ Preservation of an historically important land area
☐ Preservation of a certified historic structure

2 Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last day of the tax year

| | | Held at the End of the Year |
|---|---|---|
| a | Total number of conservation easements | 2a |
| b | Total acreage restricted by conservation easements | 2b |
| c | Number of conservation easements on a certified historic structure included in (a) | 2c |
| d | Number of conservation easements included in (c) acquired after 8/17/06, and not on a historic structure listed in the National Register | 2d |

3 Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the tax year ▶ _____

4 Number of states where property subject to conservation easement is located ▶ _____

5 Does the organization have a written policy regarding the periodic monitoring, inspection, handling of violations, and enforcement of the conservation easements it holds? ☐ Yes ☐ No

6 Staff and volunteer hours devoted to monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
▶ _____

7 Amount of expenses incurred in monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
▶ $ _____

8 Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i) and section 170(h)(4)(B)(ii)? ☐ Yes ☐ No

9 In Part XIII, describe how the organization reports conservation easements in its revenue and expense statement, and balance sheet, and include, if applicable, the text of the footnote to the organization's financial statements that describes the organization's accounting for conservation easements

### Part III — Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets.
Complete if the organization answered "Yes" on Form 990, Part IV, line 8.

1a If the organization elected, as permitted under SFAS 116 (ASC 958), not to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide, in Part XIII, the text of the footnote to its financial statements that describes these items

b If the organization elected, as permitted under SFAS 116 (ASC 958), to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide the following amounts relating to these items

(i) Revenue included on Form 990, Part VIII, line 1 ▶ $ _____

(ii) Assets included in Form 990, Part X ▶ $ _____

2 If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide the following amounts required to be reported under SFAS 116 (ASC 958) relating to these items

a Revenue included on Form 990, Part VIII, line 1 ▶ $ _____

b Assets included in Form 990, Part X ▶ $ _____

| **Part III** | **Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets** *(continued)* |

**3** Using the organization's acquisition, accession, and other records, check any of the following that are a significant use of its collection items (check all that apply)

**a** ☐ Public exhibition

**b** ☐ Scholarly research

**c** ☐ Preservation for future generations

**d** ☐ Loan or exchange programs

**e** ☐ Other

**4** Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIII

**5** During the year, did the organization solicit or receive donations of art, historical treasures or other similar assets to be sold to raise funds rather than to be maintained as part of the organization's collection?  ☐ **Yes**  ☐ **No**

| **Part IV** | **Escrow and Custodial Arrangements.** Complete if the organization answered "Yes" on Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21. |

**1a** Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included on Form 990, Part X?  ☐ **Yes**  ☐ **No**

**b** If "Yes," explain the arrangement in Part XIII and complete the following table

| | | **Amount** |
|---|---|---|
| **c** Beginning balance | **1c** | |
| **d** Additions during the year | **1d** | |
| **e** Distributions during the year | **1e** | |
| **f** Ending balance | **1f** | |

**2a** Did the organization include an amount on Form 990, Part X, line 21, for escrow or custodial account liability?  ☐ **Yes**  ☐ **No**

**b** If "Yes," explain the arrangement in Part XIII  Check here if the explanation has been provided in Part XIII  . . . . . . . . ☐

| **Part V** | **Endowment Funds.** Complete if the organization answered "Yes" to Form 990, Part IV, line 10. |

| | | **(a)**Current year | **(b)**Prior year | **(c)**Two years back | **(d)**Three years back | **(e)**Four years back |
|---|---|---|---|---|---|---|
| **1a** | Beginning of year balance . . . . | | | | | |
| **b** | Contributions . . . . . . . . . | | | | | |
| **c** | Net investment earnings, gains, and losses | | | | | |
| **d** | Grants or scholarships . . . . . | | | | | |
| **e** | Other expenditures for facilities and programs | | | | | |
| **f** | Administrative expenses . . . . | | | | | |
| **g** | End of year balance . . . . . . | | | | | |

**2** Provide the estimated percentage of the current year end balance (line 1g, column (a)) held as

**a** Board designated or quasi-endowment ▶

**b** Permanent endowment ▶

**c** Temporarily restricted endowment ▶

The percentages on lines 2a, 2b, and 2c should equal 100%

**3a** Are there endowment funds not in the possession of the organization that are held and administered for the organization by

| | | **Yes** | **No** |
|---|---|---|---|
| **(i)** unrelated organizations . . . . . . . . . . . . . . . . | **3a(i)** | | |
| **(ii)** related organizations . . . . . . . . . . . . . . . . | **3a(ii)** | | |
| **b** If "Yes" on 3a(ii), are the related organizations listed as required on Schedule R? . . . . . . . . . | **3b** | | |

**4** Describe in Part XIII the intended uses of the organization's endowment funds

| **Part VI** | **Land, Buildings, and Equipment.** Complete if the organization answered 'Yes' to Form 990, Part IV, line 11a. See Form 990, Part X, line 10. |

| Description of property | **(a)** Cost or other basis (investment) | **(b)** Cost or other basis (other) | **(c)** Accumulated depreciation | **(d)** Book value |
|---|---|---|---|---|
| **1a** Land . . . . . . . . . . . . | | | | |
| **b** Buildings . . . . . . . . . . | | | | |
| **c** Leasehold improvements . . . . | | | | |
| **d** Equipment . . . . . . . . . | | | | |
| **e** Other . . . . . . . . . . . | | | | |

**Total.** Add lines 1a through 1e *(Column (d) must equal Form 990, Part X, column (B), line 10(c)* ) . . . . . . . . ▶ | | | | 0 |

**Part VII** **Investments—Other Securities.** Complete if the organization answered 'Yes' on Form 990, Part IV, line 11b. See Form 990, Part X, line 12.

| (a) Description of security or category (including name of security) | (b) Book value | (c) Method of valuation Cost or end-of-year market value |
|---|---|---|
| **(1)** Financial derivatives | | |
| **(2)** Closely-held equity interests | | |
| **(3)** Other | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col (B) line 12)* ▶ | | |

**Part VIII** **Investments—Program Related.** Complete if the organization answered 'Yes' on Form 990, Part IV, line 11c. See Form 990, Part X, line 13.

| (a) Description of investment | (b) Book value | (c) Method of valuation Cost or end-of-year market value |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col (B) line 13)* ▶ | | |

**Part IX** **Other Assets.** Complete if the organization answered 'Yes' on Form 990, Part IV, line 11d See Form 990, Part X, line 15

| (a) Description | (b) Book value |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **Total.** *(Column (b) must equal Form 990, Part X, col (B) line 15)* . . . . . . . . . . . ▶ | |

**Part X** **Other Liabilities.** Complete if the organization answered 'Yes' on Form 990, Part IV, line 11e or 11f. See Form 990, Part X, line 25.

| **1.** (a) Description of liability | (b) Book value |
|---|---|
| Federal income taxes | |
| PAYABLE TO BHPI | 1,277,431 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **Total.** *(Column (b) must equal Form 990, Part X, col (B) line 25)* ▶ | 1,277,431 |

**2.** Liability for uncertain tax positions  In Part XIII, provide the text of the footnote to the organization's financial statements that reports the organization's liability for uncertain tax positions under FIN 48 (ASC 740)  Check here if the text of the footnote has been provided in Part XIII  ☑

| **Part XI** | **Reconciliation of Revenue per Audited Financial Statements With Revenue per Return** | | | |
|---|---|---|---|---|
| | Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a. | | | |
| **1** | Total revenue, gains, and other support per audited financial statements . . . . . . . | | **1** | 170,541,077 |
| **2** | Amounts included on line 1 but not on Form 990, Part VIII, line 12 | | | |
| **a** | Net unrealized gains (losses) on investments . . . . | **2a** | | |
| **b** | Donated services and use of facilities . . . . | **2b** | | |
| **c** | Recoveries of prior year grants . . . . . . | **2c** | | |
| **d** | Other (Describe in Part XIII ) . . . . . . . | **2d** | | |
| **e** | Add lines **2a** through **2d** . . . . . . . . . . . . . . . . | | **2e** | 0 |
| **3** | Subtract line **2e** from line **1** . . . . . . . . . . . . . . | | **3** | 170,541,077 |
| **4** | Amounts included on Form 990, Part VIII, line 12, but not on line **1** | | | |
| **a** | Investment expenses not included on Form 990, Part VIII, line 7b . | **4a** | | |
| **b** | Other (Describe in Part XIII ) . . . . . . . . | **4b** | | |
| **c** | Add lines **4a** and **4b** . . . . . . . . . . . . . . . | | **4c** | 0 |
| **5** | Total revenue Add lines **3** and **4c.**(This must equal Form 990, Part I, line 12 ) . . . . . . | | **5** | 170,541,077 |

| **Part XII** | **Reconciliation of Expenses per Audited Financial Statements With Expenses per Return.** | | | |
|---|---|---|---|---|
| | Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a. | | | |
| **1** | Total expenses and losses per audited financial statements . . . . . . . . . . . | | **1** | 169,098,816 |
| **2** | Amounts included on line 1 but not on Form 990, Part IX, line 25 | | | |
| **a** | Donated services and use of facilities . . . . . . . | **2a** | | |
| **b** | Prior year adjustments . . . . . . . . | **2b** | | |
| **c** | Other losses . . . . . . . . . . | **2c** | | |
| **d** | Other (Describe in Part XIII ) . . . . . . . | **2d** | | |
| **e** | Add lines **2a** through **2d** . . . . . . . . . . . . . . . | | **2e** | 0 |
| **3** | Subtract line **2e** from line **1** . . . . . . . . . . . . . | | **3** | 169,098,816 |
| **4** | Amounts included on Form 990, Part IX, line 25, but not on line **1:** | | | |
| **a** | Investment expenses not included on Form 990, Part VIII, line 7b . | **4a** | | |
| **b** | Other (Describe in Part XIII ) . . . . . . . . . | **4b** | | |
| **c** | Add lines **4a** and **4b** . . . . . . . . . . . . . | | **4c** | 0 |
| **5** | Total expenses Add lines **3** and **4c.** (This must equal Form 990, Part I, line 18 ) . . . . . . | | **5** | 169,098,816 |

### Part XIII   Supplemental Information

Provide the descriptions required for Part II, lines 3, 5, and 9, Part III, lines 1a and 4, Part IV, lines 1b and 2b,
Part V, line 4, Part X, line 2, Part XI, lines 2d and 4b, and Part XII, lines 2d and 4b Also complete this part to provide any additional
information

| Return Reference | Explanation |
|---|---|
| PART X, LINE 2 | UNDER PROVISION OF SECTION 501(C)(3) OF THE INTERNAL REVENUE CODE AND THE APPLICABLE INCOME TAX REGULATIONS OF THE STATE OF MICHIGAN, THE NETWORK IS EXEMPT FROM INCOME TAXES, EXCEPT FOR NET INCOME FROM UNRELATED BUSINESS INCOME, AS A SUBORDINATE UNIT OF BEHAVIORAL HEALTH PROFESSIONAL, INC (BHPI) THE NETWORK IS EXEMPT FROM FEDERAL INCOME TAXES UNDER SECTION 509(A) OF THE INTERNAL REVENUE CODE AS A PUBLIC CHARITY THERE WERE NO UNRELATED BUSINESS ACTIVITIES IN 2016, AND ACCORDINGLY, NO TAX EXPENSE WAS INCURRED DURING THE YEAR ENDED SEPTEMBER 30, 2016 ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN THE UNITED STATES OF AMERICA REQUIRE MANAGEMENT TO EVALUATE TAX POSITIONS TAKEN BY THE NETWORK AND RECOGNIZE A TAX LIABILITY IF THE NETWORK HAS TAKEN AN UNCERTAIN POSITION THAT MORE LIKELY THAN NOT WOULD NOT BE SUSTAINED UPON EXAMINATION BY THE INTERNAL REVENUE SERVICE OR OTHER APPLICABLE TAXING AUTHORITIES MANAGEMENT HAS ANALYZED THE TAX POSITIONS TAKEN BY THE NETWORK AND HAS CONCLUDED THAT AS OF SEPTEMBER 30, 2016, THERE ARE NO UNCERTAIN POSITIONS TAKEN OR EXPECTED TO BE TAKEN THAT WOULD REQUIRE RECOGNITION OF A LIABILITY OR DISCLOSURE IN THE FINANCIAL STATEMENTS THE ORGANIZATION'S INCOME TAX FILINGS ARE SUBJECT TO AUDIT BY VARIOUS TAXING AUTHORITIES THE ORGANIZATION'S OPEN AUDIT PERIODS ARE FOR THE FISCAL YEARS ENDED SEPTEMBER 30, 2013 - 2016 |

| **Part XIII** | **Supplemental Information** *(continued)* |
|---|---|
| Return Reference | Explanation |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

**Schedule J**
**(Form 990)**

**Compensation Information**

OMB No 1545-0047

**For certain Officers, Directors, Trustees, Key Employees, and Highest
Compensated Employees**
▶ **Complete if the organization answered "Yes" on Form 990, Part IV, line 23.**
▶ **Attach to Form 990.**
▶ **Information about Schedule J (Form 990) and its instructions is at** www.irs.gov/form990.

# 2015

**Open to Public
Inspection**

Department of the
Treasury
Internal Revenue Service

| Name of the organization | Employer identification number |
|---|---|
| CARELINK NETWORK INC | 38-3653299 |

---

| **Part I** | **Questions Regarding Compensation** |
|---|---|

|  | | Yes | No |
|---|---|---|---|
| **1a** | Check the appropriate box(es) if the organization provided any of the following to or for a person listed on Form 990, Part VII, Section A, line 1a Complete Part III to provide any relevant information regarding these items | | |

☐ First-class or charter travel  ☐ Housing allowance or residence for personal use
☐ Travel for companions  ☐ Payments for business use of personal residence
☐ Tax idemnification and gross-up payments  ☐ Health or social club dues or initiation fees
☐ Discretionary spending account  ☐ Personal services (e g , maid, chauffeur, chef)

| **b** | If any of the boxes in line 1a are checked, did the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If "No," complete Part III to explain | **1b** | | |
|---|---|---|---|---|
| **2** | Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all directors, trustees, officers, including the CEO/Executive Director, regarding the items checked in line 1a? | **2** | | |
| **3** | Indicate which, if any, of the following the filing organization used to establish the compensation of the organization's CEO/Executive Director Check all that apply Do not check any boxes for methods used by a related organization to establish compensation of the CEO/Executive Director, but explain in Part III | | | |

☐ Compensation committee  ☐ Written employment contract
☐ Independent compensation consultant  ☐ Compensation survey or study
☐ Form 990 of other organizations  ☐ Approval by the board or compensation committee

| **4** | During the year, did any person listed on Form 990, Part VII, Section A, line 1a with respect to the filing organization or a related organization | | | |
|---|---|---|---|---|
| **a** | Receive a severance payment or change-of-control payment? | **4a** | | No |
| **b** | Participate in, or receive payment from, a supplemental nonqualified retirement plan? | **4b** | | No |
| **c** | Participate in, or receive payment from, an equity-based compensation arrangement? | **4c** | | No |
| | If "Yes" to any of lines 4a-c, list the persons and provide the applicable amounts for each item in Part III | | | |
| | **Only 501(c)(3), 501(c)(4), and 501(c)(29) organizations must complete lines 5-9.** | | | |
| **5** | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of | | | |
| **a** | The organization? | **5a** | | No |
| **b** | Any related organization? | **5b** | | No |
| | If "Yes," on line 5a or 5b, describe in Part III | | | |
| **6** | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of | | | |
| **a** | The organization? | **6a** | | No |
| **b** | Any related organization? | **6b** | | No |
| | If "Yes," on line 6a or 6b, describe in Part III | | | |
| **7** | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization provide any non-fixed payments not described in lines 5 and 6? If "Yes," describe in Part III | **7** | | No |
| **8** | Were any amounts reported on Form 990, Part VII, paid or accured pursuant to a contract that was subject to the initial contract exception described in Regulations section 53 4958-4(a)(3)? If "Yes," describe in Part III | **8** | | No |
| **9** | If "Yes" on line 8, did the organization also follow the rebuttable presumption procedure described in Regulations section 53 4958-6(c)? | **9** | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990.    Cat No 50053T    **Schedule J (Form 990) 2015**

**Part II**    **Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees.** Use duplicate copies if additional space is needed.

For each individual whose compensation must be reported on Schedule J, report compensation from the organization on row (i) and from related organizations, described in the instructions, on row (ii)  Do not list any individuals that are not listed on Form 990, Part VII

**Note.** The sum of columns (B)(i)-(iii) for each listed individual must equal the total amount of Form 990, Part VII, Section A, line 1a, applicable column (D) and (E) amounts for that individual

| **(A)** Name and Title | | **(B)** Breakdown of W-2 and/or 1099-MISC compensation | | | **(C)** Retirement and other deferred compensation | **(D)** Nontaxable benefits | **(E)** Total of columns (B)(i)-(D) | **(F)** Compensation in column(B) reported as deferred on prior Form 990 |
|---|---|---|---|---|---|---|---|---|
| | | Base **(i)** compensation | **(ii)** Bonus & incentive compensation | **(iii)** Other reportable compensation | | | | |
| **1** DOREEN NIED EXECUTIVE DIRECTOR | **(i)** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **(ii)** | 150,434 | 0 | 0 | 7,581 | 1,301 | 159,316 | 0 |

**Part III** **Supplemental Information**

Provide the information, explanation, or descriptions required for Part I, lines 1a, 1b, 3, 4a, 4b, 4c, 5a, 5b, 6a, 6b, 7, and 8, and for Part II  Also complete this part for any additional information

| Return Reference | Explanation |
|---|---|
| | |



**SCHEDULE O**
**(Form 990 or 990-EZ)**

Department of the Treasury
Internal Revenue Service

# Supplemental Information to Form 990 or 990-EZ

Complete to provide information for responses to specific questions on
Form 990 or 990-EZ or to provide any additional information.
▶ Attach to Form 990 or 990-EZ.
▶ Information about Schedule O (Form 990 or 990-EZ) and its instructions is at
www.irs.gov/form990.

OMB No 1545-0047

**2015**

**Open to Public Inspection**

| Name of the organization | Employer identification number |
|---|---|
| CARELINK NETWORK INC | 38-3653299 |

## 990 Schedule O, Supplemental Information

| Return Reference | Explanation |
|---|---|
| FORM 990, PART VI, SECTION A, LINE 3 | MANAGEMENT DUTIES ARE ASSUMED BY BEHAVIORAL HEALTH PROFESSIONALS, INC |
| FORM 990, PART VI, SECTION A, LINE 7A | THE BOARD OF DIRECTORS HAVE THE POWER TO APPOINT MEMBERS TO THE BOARD |

| Return Reference | Explanation |
|---|---|
| FORM 990, PART VI, SECTION B, LINE 11 | THE FORM 990 IS EXTENSIVELY REVIEWED BY THE FINANCE DIRECTOR BEFORE FILING IT IS ALSO PROVIDED TO THE BOARD OF DIRECTORS BEFORE FILING |
| FORM 990, PART VI, SECTION B, LINE 12C | DISCLOSURE INFORMATION IS REVIEWED BY CORPORATE COUNSEL AND A DETERMINATION IS MADE TO MANAGE THE CONFLICT |

| Return Reference | Explanation |
|---|---|
| FORM 990, PART VI, SECTION C, LINE 19 | THE GOVERNING DOCUMENTS, CONFLICT OF INTEREST POLICY, AND THE FINANCIAL STATEMENTS ARE MADE AVAILABLE TO THE PUBLIC UPON REQUEST |
| PART XII, LINE 2C | THE ORGANIZATION HAS A COMMITTEE THAT ASSUMES RESPONSIBILITY FOR THE OVERSIGHT OF THE AUDI T AND THE PROCESS FOR THE AUDIT HAS NOT CHANGED FROM THE PRIOR YEAR |

**SCHEDULE R**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

**Related Organizations and Unrelated Partnerships**

▶ Complete if the organization answered "Yes" on Form 990, Part IV, line 33, 34, 35b, 36, or 37.

▶ Attach to Form 990.　　▶ Information about Schedule R (Form 990) and its instructions is at *www.irs.gov/form990*.

OMB No 1545-0047

# 2015

**Open to Public Inspection**

Name of the organization
CARELINK NETWORK INC

Employer identification number
38-3653299

---

**Part I**　**Identification of Disregarded Entities** Complete if the organization answered "Yes" on Form 990, Part IV, line 33.

| (a) Name, address, and EIN (if applicable) of disregarded entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Total income | (e) End-of-year assets | (f) Direct controlling entity |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

---

**Part II**　**Identification of Related Tax-Exempt Organizations** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related tax-exempt organizations during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Exempt Code section | (e) Public charity status (if section 501(c)(3)) | (f) Direct controlling entity | (g) Section 512(b) (13) controlled entity? | |
|---|---|---|---|---|---|---|---|
| | | | | | | Yes | No |
| **(1)**BEHAVIORAL HEALTH PROFESSIONALS INC 1333 BREWERY PARK BLVD STE 300<br><br>DETROIT, MI 48207 38-3615322 | MANAGEMENT | MI | 501(C)(3) | LINE 11C, III-FI | N/A | | No |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

---

For Paperwork Reduction Act Notice, see the Instructions for Form 990.　　　　Cat No 50135Y　　　　Schedule R (Form 990) 2015

**Part III** **Identification of Related Organizations Taxable as a Partnership** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related organizations treated as a partnership during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Predominant income(related, unrelated, excluded from tax under sections 512-514) | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproprtionate allocations? | | (i) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? | | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Yes | No | | Yes | No | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

**Part IV** **Identification of Related Organizations Taxable as a Corporation or Trust** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related organizations treated as a corporation or trust during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Type of entity (C corp, S corp, or trust) | (f) Share of total income | (g) Share of end-of-year assets | (h) Percentage ownership | (i) Section 512 (b)(13) controlled entity? | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Yes | No |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Case 2:18-cv-11385-APP ECF No. 44, PageID.1017 Filed 09/14/18 Page 146 of 320

**Part V** **Transactions With Related Organizations** Complete if the organization answered "Yes" on Form 990, Part IV, line 34, 35b, or 36.

| | | Yes | No |
|---|---|---|---|
| **Note.** Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule | | | |
| **1** During the tax year, did the organization engage in any of the following transactions with one or more related organizations listed in Parts II-IV? | | | |
| **a** Receipt of **(i)** interest, **(ii)** annuities, **(iii)** royalties, or **(iv)** rent from a controlled entity . . . . . . . . . . . | 1a | | No |
| **b** Gift, grant, or capital contribution to related organization(s) . . . . . . . . . . . . . . . . . . | 1b | | No |
| **c** Gift, grant, or capital contribution from related organization(s) . . . . . . . . . . . . . . . . | 1c | | No |
| **d** Loans or loan guarantees to or for related organization(s) . . . . . . . . . . . . . . . . . | 1d | | No |
| **e** Loans or loan guarantees by related organization(s) . . . . . . . . . . . . . . . . . | 1e | | No |
| | | | |
| **f** Dividends from related organization(s) . . . . . . . . . . . . . . . . . . . . . . | 1f | | No |
| **g** Sale of assets to related organization(s) . . . . . . . . . . . . . . . . . . . . | 1g | | No |
| **h** Purchase of assets from related organization(s) . . . . . . . . . . . . . . . . . . | 1h | | No |
| **i** Exchange of assets with related organization(s) . . . . . . . . . . . . . . . . . | 1i | | No |
| **j** Lease of facilities, equipment, or other assets to related organization(s) . . . . . . . . . . . . . . | 1j | | No |
| | | | |
| **k** Lease of facilities, equipment, or other assets from related organization(s) . . . . . . . . . . . . . | 1k | | No |
| **l** Performance of services or membership or fundraising solicitations for related organization(s) . . . . . . . . . . . . . . . . . . . . . . | 1l | | No |
| **m** Performance of services or membership or fundraising solicitations by related organization(s) . . . . . . . . . . | 1m | Yes | |
| **n** Sharing of facilities, equipment, mailing lists, or other assets with related organization(s) . . . . . . . . . | 1n | | No |
| **o** Sharing of paid employees with related organization(s) . . . . . . . . . . . . . . . | 1o | Yes | |
| | | | |
| **p** Reimbursement paid to related organization(s) for expenses . . . . . . . . . . . . . . . | 1p | | No |
| **q** Reimbursement paid by related organization(s) for expenses . . . . . . . . . . . . . . | 1q | | No |
| | | | |
| **r** Other transfer of cash or property to related organization(s) . . . . . . . . . . . . . . . | 1r | | No |
| **s** Other transfer of cash or property from related organization(s) . . . . . . . . . . . . . . | 1s | | No |

**2** If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds

| **(a)**<br>Name of related organization | **(b)**<br>Transaction<br>type (a-s) | **(c)**<br>Amount involved | **(d)**<br>Method of determining amount involved |
|---|---|---|---|
| **(1)** BEHAVIORAL HEALTH PROFESSIONALS INC | O | 251,514 | 100% OF SALARY AND BENEFITS |
| **(2)** BEHAVIORAL HEALTH PROFESSIONALS INC | M | 6,311,007 | ACTUAL COST |
| | | | |
| | | | |
| | | | |
| | | | |

**Part VI**    **Unrelated Organizations Taxable as a Partnership** Complete if the organization answered "Yes" on Form 990, Part IV, line 37.

Provide the following information for each entity taxed as a partnership through which the organization conducted more than five percent of its activities (measured by total assets or gross revenue) that was not a related organization  See instructions regarding exclusion for certain investment partnerships

| (a) Name, address, and EIN of entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Predominant income (related, unrelated, excluded from tax under sections 512-514) | (e) Are all partners section 501(c)(3) organizations? | | (f) Share of total income | (g) Share of end-of-year assets | (h) Dispropritionate allocations? | | (i) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? | | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Yes | No | | | Yes | No | | Yes | No | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Case 2:18-cv-11385-APP   ECF No. 44, PageID.1019   Filed 09/14/18   Page 148 of 320

**Part VII**  **Supplemental Information**

Provide additional information for responses to questions on Schedule R (see instructions)

| Return Reference | Explanation |
| --- | --- |
| | |

# EXHIBIT

# D

**Report of Investigative Findings from Office of Recipient Rights, dated 2/8/17**



RICK SNYDER
GOVERNOR

STATE OF MICHIGAN
DEPARTMENT OF HEALTH AND HUMAN SERVICES
LANSING

NICK LYON
DIRECTOR

## Office of Recipient Rights
## Report of Investigative Findings

| Report Date: February 08, 2017 | Service Request #: 1-97339928 |
| | Allegation Number: 1-98291701 |
| Recipient's Name: DARRYL PELICHET | Unit: R-6 |
| Complainant's Name: DARRYL PELICHET | Relationship: SELF |
| ☑ Substantiated  ☐ Not Substantiated | Category 72223 – Abuse Class II (Emotional Harm) |

### ALLEGATION

On November 10, 2016 ORR received an allegation from patient, Darryl Pelichet stating that on 11/09/2016 psychologist Charles Stern gave incorrect testimony and information regarding Mr. Pelichet's treatment and behavior during a court hearing for continued hospitalization at WRPH. It was further alleged that the incorrect testimony caused Mr. Pelichet to suffer emotional harm.

### CITATIONS

MHC 330.1722 Protection of recipient from abuse or neglect.
Sec. 722. (1) A recipient of mental health services shall not be subjected to abuse or neglect.

R 330.7001 Definitions.
Rule 7001. As used in this part:
(b) "Abuse class II" means any of the following:
(iii) Any action or provocation of another to act by an employee, volunteer, or agent of a provider that causes or contributes to emotional harm to a recipient.
(g) "Emotional harm" means impaired psychological functioning, growth, or development of a significant nature as evidenced by observable physical symptomatology or as determined by a mental health professional.

### ISSUES

1. Did Dr. Stern give incorrect testimony on 11/09/2016 regarding Darryl Pelichet's behavior and treatment as a patient at Walter Reuther Psychiatric Hospital?

2. Did Dr. Stern's failure to give factual information have the potential to have an adverse effect on the court's decision regarding Mr. Pelichet's court order?

3. If yes to both, did Dr. Stern's action's result in Mr. Pelichet experiencing emotional harm?

## INVESTIGATIVE FINDINGS

On November 10, 2016 ORR spoke with patient, Darryl Pelichet at which time Mr. Pelichet informed that he wanted to file a complaint regarding Dr. Stern providing false information during his court hearing yesterday on November 9, 2016. Mr. Pelichet alleged that Dr. Stern testified that Mr. Pelichet displayed negative and aggressive behavior that caused him to have to have his medication increased. Mr. Pelichet further stated that Dr. Stern made statements about his behavior both at Walter Reuther and at his last group home that were false in addition to falsely stating that Mr. Pelichet was noncompliant with treatment and his medication. Mr. Pelichet further stated that he felt "railroaded" and that he was being set up to fail if "nothing, none of the good stuff that he did, mattered". He expressed not understanding why someone who has never worked with him and did not know him or anything about him could be allowed to testify about him when he has a whole treatment team that can testify to his behavior and what kind of patient he is. Mr. Pelichet went on to state that sitting through the court proceedings was extremely stressful for him

On November 16, 2017 ORR reviewed Mr. Pelichet's Progress Notes from 09/01/2016 through 11/09/2016. ORR reviewed the following documents: Psychotherapy Initial, Psychotherapy Progress Notes, Initial Psychotherapy Report, Psychiatric Admission, Psychiatry Aggression Assessment, Psychiatry Incidental, Medication Review, Face to Face Assessment, Violence Risk Assessment, Psychological Assessment, Psychological Behavioral Plan, Psychological Court Service, Psychological Incidental, Psychological Weekly, and Nursing Incidental. Per documentation:

For the month of September there were 17 entries. Thirteen of the entries document that Mr. Pelichet refused medications for either Miralax (for constipation) or ear drops, both of which are optional. Mr. Pelichet was compliant with all other medication. There were no notations of adverse behaviors or refusal to attend PSR groups.

For the month of October there were 18 entries. Of those entries Mr. Pelichet refused Miralax on two occasions and refused to attend PSR on one occasion. Mr. Pelichet was compliant with all other medication. There were no notations of adverse behaviors.

Notes for November were as follows:
**11/01** – Pt. had labs drawn
**11/03** – Pt. seen IPOS done. Met with mother and sister. Patient and family concerned about excess weight gain and depression. Discussed medications with patient and have decided to decrease Invega Sustenna dose to 156mg a month. Also have decided to add Fluoxetine (for depression). Risk/benefit/side effects and alternatives discussed. Pt. agreeable to try it.

**11/08** – Quarterly Fall Risk Assessment. Pt. medication changed in the last 30 days. Low Risk

On December 2, 2017 ORR attempted to contact D. Wash, Certified Court Reporter for the State of Michigan to request her assistance in obtaining a court transcript for the November 9, 2016 hearing that Mr. Pelichet had in Judge Braxton's court.

On December 29, 2017, after not hearing back from Ms. Wash, ORR contacted Mr. Pelichet's treatment team as well as Dr. Stern to inquire about the allegation, what took place in court, statements that were made, as well as if anyone was aware of how ORR could go about receiving a court transcript. ORR did not receive a response back from Dr. Stern on this occasion or several that followed. Of the staff that responded, no one was aware of what took place in court as they stated that they were not present. Dr. Bavenini, Mr. Pelichet's psychiatrist, stated that she was on vacation during the month of November, therefore was unable to speak with Dr. Stern prior to the hearing. Ms. Sandie, Mr. Pelichet's social worker, responded that she had not spoken with Dr. Stern and that Mr. Pelichet had no incidents of aggressive or assaultive behavior during his current admission. In regards to obtaining a court transcript, ORR was further referred to Judge Braxton's courtroom email and phone number. A message was left on the phone and an email was sent on 01/06/2017. No response to either was received.

On January 20, 2017 ORR received a response back from Ms. Wash who agreed to transcribe the court proceedings and would have them submitted to ORR as soon as possible.

On January 30, 2017, after several attempts to make contact, ORR received a response from Dr. Stern who provided answers to a questionnaire that he was also provided in writing. According to Dr. Stern he did not recall any details because Mr. Pelichet's court hearing was a while back and he had testified for 10-15 patients a week since that time. Dr. Stern stated that he had recommended continuing hospitalization based on records, speaking to staff, and interviewing the patient. When asked where he obtained the information that he shared in court, Dr. Stern stated that he got it from medical records and speaking with staff. Dr. Stern stated that he had no interactions with Mr. Pelichet prior to evaluating him for court.

On February 16, 2017 ORR received an email reply from Mr. Pelichet's social worker, C. Sandie who stated: "Mr. Pelichet had presented as upset and expressed frustration regarding the testimony following the court hearing. He also verbalized an increase in depressive symptoms and increased lack of motivation. He had stated at the time that he felt "hopeless." In my opinion this would be considered emotional harm, which led him to file the recipient rights complaint with you."

On February 16, 2017 ORR received the Court Transcript of the proceedings that took place on Wednesday, November 9, 2016. The following is the direct and cross examination of Dr. Stern by Counsel (*the highlighted areas indicate where either incorrect or misleading information was given according to patients records):

**13**



STATE OF MICHIGAN
DEPARTMENT OF HEALTH AND HUMAN SERVICES
LANSING

RICK SNYDER
GOVERNOR

NICK LYON
DIRECTOR

## Office of Recipient Rights
### Report of Investigative Findings * Amended

| | |
|---|---|
| Report Date:  June 12, 2017 | Service Request #: 1-97339928 |
| | Allegation Number: 1-98291701 |
| Recipient's Name: DARRYL PELICHET | Unit: R-6 |
| Complainant's Name: DARRYL PELICHET | Relationship: SELF |
| ☑ Substantiated    ☐ Not Substantiated | Category 7080 – Suitable Services |

### ALLEGATION

On November 10, 2016 ORR received an allegation from patient, Darryl Pelichet stating that on 11/09/2016 psychologist Charles Stern gave incorrect testimony and information regarding Mr. Pelichet's treatment and behavior during a court hearing for continued hospitalization at WRPH.  It was further alleged that the incorrect testimony caused Mr. Pelichet to suffer emotional harm.

On April 28, 2017, 39 days after the original submission of the Report of Investigative Findings (RIF),  ORR received information from Hospital Administration refuting the findings of the original RIF and on May 5, 2017 ORR Director of Hospital and Community Investigations, R. Postema received a Level I Review request from WRPH Director, Mary Clare Solky. ORR reviewed this information, collected further evidence and has amended the report as needed. New evidence has been included in the Addendum section of the report.  During the review of the new evidence, it was determined that  although it is clear that Mr. Pelichet suffered symptoms of impaired psychological functioning based upon the outcome of his 11/09/2016 court hearing, there is not a preponderance of evidence that supports that it was caused solely by the actions of Dr. Stern.  The evidence indicates that incorrect or misleading information may have also been presented to the court by other treating professionals at WRPH in what appears to be an attempt to ensure that Mr. Pelichet remains on a one year continuing treatment order due to his NGRI status.  The record and staff interviews indicated that Mr. Pelichet did not meet the criteria for continued hospitalization as required by section 330.1401 of the Mental Health Code.  Based upon the new information gathered, ORR will be opening a new complaint on behalf of recipient Darryl Pelichet to determine if his rights were violated by the actions of these other treating professionals at WRPH.

There was evidence that Dr. Stern did fail to provide the court with relevant evidence during his court testimony.  Therefore, this investigation has been re-categorized under MHC section, 3301708; Suitable Services.

22

## CITATIONS

Michigan Mental Health Code, Section 330.1708 Suitable services; treatment environment; setting; rights.
Sec. 708. (1) A recipient shall receive mental health services suited to his or her condition.

Michigan Mental Health Code, Section 330.1461 Testimony or deposition of physician or psychologist required; examinations; presence of attorney during deposition; cross-examination of deponent; waiver.
Sec. 461.
(1) Except as otherwise provided in this section, an individual may not be found to require treatment unless at least 1 physician or licensed psychologist who has personally examined that individual testifies in person or by written deposition at the hearing.

Michigan Mental Health Code, Section 330.1459 Documents, witnesses, and cross-examination; rules of evidence.
Sec. 459.
(2) The court shall receive all relevant, competent, and material evidence which may be offered. The rules of evidence in civil actions are applicable, except to the extent that specific exceptions have been provided for in this chapter or elsewhere by statute or court rule.

Michigan Rules of Court, Volume I – State, 2017 – Rules of Evidence:
Rule 401, Definition of "Relevant Evidence":
"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Michigan Mental Health Code, Section 330.1401 "Person requiring treatment" defined; exception.
Sec. 401.
(1) As used in this chapter, "person requiring treatment" means (a), (b), (c), or (d):

(a) An individual who has mental illness, and who as a result of that mental illness can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself, herself, or another individual, and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation.

**(b) An individual who has mental illness, and who as a result of that mental illness is unable to attend to those of his or her basic physical needs such as food, clothing, or shelter that must be attended to in order for the individual to avoid serious harm in the near future, and who has demonstrated that inability by failing to attend to those basic physical needs.**

(c) An individual who has mental illness, whose judgment is so impaired by that mental illness that he or she is unable to understand his or her need for treatment, and whose impaired judgment, on the basis of competent clinical opinion, presents a substantial risk of significant physical or mental

harm to the individual in the near future or presents a substantial risk of physical harm to others in the near future.

(d) An individual who has mental illness, whose understanding of the need for treatment is impaired to the point that he or she is unlikely to voluntarily participate in or adhere to treatment that has been determined necessary to prevent a relapse or harmful deterioration of his or her condition, and whose noncompliance with treatment has been a factor in the individual's placement in a psychiatric hospital, prison, or jail at least 2 times within the last 48 months or whose noncompliance with treatment has been a factor in the individual's committing 1 or more acts, attempts, or threats of serious violent behavior within the last 48 months. An individual under this subdivision is only eligible to receive assisted outpatient treatment.

### ISSUES

1. Did Dr. Stern, a licensed psychologist, after personal examination, give testimony on 11/09/2016 regarding whether recipient Darryl Pelichet is a person requiring treatment at Walter Reuther Psychiatric Hospital (WRPH)?

2. If yes, did Dr. Stern provide the court all relevant evidence as required by law to support that Mr. Pelichet was a person requiring treatment at WRPH?

### INVESTIGATIVE FINDINGS

On November 10, 2016 ORR spoke with patient, Darryl Pelichet at which time Mr. Pelichet informed that he wanted to file a complaint regarding Dr. Stern providing false information during his court hearing yesterday on November 9, 2016. Mr. Pelichet alleged that Dr. Stern testified that Mr. Pelichet displayed negative and aggressive behavior that caused him to have his medication increased. Mr. Pelichet further stated that Dr. Stern made statements about his behavior, both at Walter Reuther and at his last group home, that were false in addition to falsely stating that Mr. Pelichet was noncompliant with treatment and his medication. Mr. Pelichet further stated that he felt "railroaded" and that he was being set up to fail if "nothing, none of the good stuff that he did, mattered". He expressed not understanding why someone who has never worked with him and did not know him or anything about him could be allowed to testify about him when he has a whole treatment team that can testify to his behavior and what kind of patient he is. Mr. Pelichet went on to state that sitting through the court proceedings was extremely stressful for him.

On November 16, 2017 ORR reviewed Mr. Pelichet's Progress Notes from 09/01/2016 through 11/09/2016. ORR reviewed the following documents: Psychotherapy Initial, Psychotherapy Progress Notes, Initial Psychotherapy Report, Psychiatric Admission, Psychiatry Aggression Assessment, Psychiatry Incidental, Medication Review, Face to Face Assessment, Violence Risk Assessment, Psychological Assessment, Psychological Behavioral Plan, Psychological Court Service, Psychological Incidental, Psychological Weekly, and Nursing Incidental. Per documentation:

For the month of September there were 17 entries. Thirteen of the entries document that Mr. Pelichet refused medications for either Miralax (for constipation) or ear drops, both of which are optional. Mr. Pelichet was compliant with all other medication. There were no notations of adverse behaviors or refusal to attend PSR groups.

For the month of October there were 18 entries. Of those entries Mr. Pelichet refused Miralax on two occasions and refused to attend PSR on one occasion. Mr. Pelichet was compliant with all other medication. There were no notations of adverse behaviors.

Notes for November were as follows:
**11/01** – Pt. had labs drawn
**11/03** – Pt. seen IPOS done. Met with mother and sister. Patient and family concerned about excess weight gain and depression. Discussed medications with patient and have decided to decrease Invega Sustenna dose to 156mg a month. Also have decided to add Fluoxetine (for depression). Risk/benefit/side effects and alternatives discussed. Pt. agreeable to try it.
**11/08** – Quarterly Fall Risk Assessment. Pt. medication changed in the last 30 days. Low Risk

On December 2, 2017 ORR attempted to contact D. Wash, Certified Court Reporter for the State of Michigan to request her assistance in obtaining a court transcript for the November 9, 2016 hearing that Mr. Pelichet had in Judge Braxton's court.

On December 29, 2017, after not hearing back from Ms. Wash, ORR contacted Mr. Pelichet's treatment team, as well as Dr. Stern, to inquire about the allegation, what took place in court, statements that were made, as well as if anyone was aware of how ORR could go about receiving a court transcript. ORR did not receive a response back from Dr. Stern on this occasion or several that followed. Of the staff that responded, no one was aware of what took place in court as they stated that they were not present. Dr. Bavenini, Mr. Pelichet's psychiatrist, stated that she was on vacation during the month of November, therefore was unable to speak with Dr. Stern prior to the hearing. Ms. Sandie, Mr. Pelichet's social worker, responded that she had not spoken with Dr. Stern and that Mr. Pelichet had no incidents of aggressive or assaultive behavior during his current admission. In regards to obtaining a court transcript, ORR was further referred to Judge Braxton's courtroom email and phone number. A message was left on the phone and an email was sent on 01/06/2017. No response to either was received.

On January 20, 2017 ORR received a response back from Ms. Wash who agreed to transcribe the court proceedings and would have them submitted to ORR as soon as possible.

On January 30, 2017, after several attempts to make contact with no response, ORR received a response from Dr. Stern who provided answers to a questionnaire that he was

provided in writing. According to Dr. Stern he did not recall any details because Mr. Pelichet's court hearing was a while back and he had testified for 10-15 patients a week since that time. Dr. Stern stated that he had recommended continuing hospitalization based on records, speaking to staff, and interviewing the patient. When asked where he obtained the information that he shared in court, Dr. Stern stated that he got it from medical records and speaking with staff. Dr. Stern stated that he had no interactions with Mr. Pelichet prior to evaluating him for court.

On February 16, 2017 ORR received an email reply from Mr. Pelichet's social worker, C. Sandie who stated: "Mr. Pelichet had presented as upset and expressed frustration regarding the testimony following the court hearing. He also verbalized an increase in depressive symptoms and increased lack of motivation. He had stated at the time that he felt "hopeless." In my opinion this would be considered emotional harm, which led him to file the recipient rights complaint with you."

On February 16, 2017 ORR received the Court Transcript of the proceedings that took place on Wednesday, November 9, 2016. The following is the direct and cross examination of Dr. Stern by Counsel (*the highlighted areas indicate where either incorrect or misleading information was given according to patient's records and staff interviews):


**CHARLES STERN**
**DIRECT EXAMINATION**
**BY MR. COLLINS:**

Q Sir, could you please state your name for the record and your profession?

A Charles Stern, Ph.D. and licensed Psychologist in the State of Michigan for the purposes (Inaudible).

Q Dr. Stern, prior to coming today to testify, did you have the opportunity to meet and interview Mr. Pelichet?

A Yes.

Q And besides meeting and interviewing Mr. Pelichet, did you also have the opportunity to review his medical records?

A Yes.

Q And based on that, did you have the opportunity to review—speak to the staff or speak to any of the other doctors that may have been treating Mr. Pelichet?

A Yes, I spoke with staff.

Q And for the record, can you please indicate do you have a diagnosis based on your interview?

A His diagnosis was Schizophrenia paranoid-type; chronic with Marijuana abuse. It may possibly be a Schizo Effective Disorder.

Q Can you indicate for the record what brought Mr. Pelichet to the hospital?

A Well, he's been adjudicated NGRI since 2005. But he has broken ALS contracts, at AFC facilities a number of times. This one that I just said, also from Marijuana use and other things that had broken the contract. Was in Walter Reuther as a result of these things.

Q Doctor can you please indicate to the Court, what crime brought Mr. Pelichet to (Inaudible)

MR. JEFFERSON: -- Excuse me if you could repeat the question, you were breaking up.

MR. COLLINS: I apologize.

Q Can you please indicate to the Court what crime Mr. Pelichet committed?

A Yes, as I understand it, it's assault of a police officer, resisting and obstructing a police officer.

Q Thank you. And you've also indicated that since 2005 and his hospitalization, he's been given an ALS. Can you just briefly indicate to the Court what an ALS is?

A It's usually a five year contract when a person is discharged, from the hospital but still under their purview, under the NGRI purview. And they usually are sent to a ALS, I mean an AFC program or possibly, a less restrictive hospital, in this case, ALS—AFC program. And there are many rules that they have to follow and if they break those rules, they end up back at the hospital again. In this case, he was discharged back to AFC homes several times and broke the rules and ended up back in the hospital again, under the NGRI umbrella.

Q I believe you also indicated that the reasons within his record as to why he had to be brought to a more restrictive setting in the hospital, is that correct?

A Yes.

Q What were those reasons again? What were the behaviors indicated within his record?

A Well he walked away from the AFC facility without permission, without telling them; (Inaudible) treatment. He has had a number of cases where he was smoking Marijuana

one time and was delivering. So there was a number of incidents that he broke the ALS contract. He's made verbal threats at times, as well. Like I say, a violation—

MR. JEFFERSON: Can you lay a foundation as to when these verbal threats occurred and have Dr. Stern responsive to specific questions, rather than giving this extended narrative.

THE WITNESS: I don't have all the dates of when he was discharged—or was, brought back through the--contract.

Q Let me rephrase the question for you Dr. Stern. Based on your records can you indicate, the last time Mr. Pelichet had been given at ALS?

A Um not sure when it actually started, but he ended up back in the hospital after violating this—on I believe it was May 3rd this year.

Q Thank you and I believe that answers defense Counsel's question in regards to that piece of history. Also, based on the records, have you been able to tell whether Mr. Pelichet has been cooperative in taking his medication?

A He's been more cooperative recently, prior to this hearing, his medications—I spoke with him about the addiction issue. He said, quote: "Addiction has been problematic for me." But he still thinks he can manage on out-patient basis, on his own in the community, according to him. However, he has had difficulty with Marijuana and has violated the contract, the ALS contract several times as a result. He has said, on unit at times, the end of last month, he said I'm not taking medications. He refused to get out of bed to go down to get the medications, getting it last month, he said he refused medication in September several times. He did have an IM injection of Invaga Sustaina (ph.) so that lasted, but he's refused podiatry and ENT appointments, he said that the problem would clear up so he didn't see why he had to go back to the doctor, again. He refused to get up and cooperate with the storm warning, I guess it was a drill, I don't know if it was a drill or a actual storm warning. But any rate, he refused to get out of bed and do that, I asked him about that and he said he had no reason for it, he just didn't do it.

   Again, they've had times when they've had to increase his regular medications, because his behavior—

MR. PELICHET: --That's not true—

A Said, he's passive aggressive and unmotivated through the treatment, so—

Q Dr. Stern you indicated earlier a diagnosis, you saw that Mr. Pelichet had. Can you also indicate to us whether he has any insight into his mental illness, based on your interviewing—

A I believe that his insight is superficial and that's what it also says in the record, superficial cooperation is what they say in the record. And that's what it appears to me as well.

Q You indicated to the Court several behaviors that you either observed or you read within his record and said the issues that staff had to deal with. Based on that information you provided, do you have an opinion as to whether he would be a harm to himself or to others?

A Yes, well obviously he violated the ALS contracts a number of times, not following the rules and so forth and on the unit, he's also not wanted to follow the rules completely and he's passive aggressive about. So I don't see how he's ready to go back out, in to the community at this point, given his history and given what he's been doing in the hospital at times. He's doing more cooperation the last couple of weeks, but coming up to Court so, I think he wants to get out—he still has superficial love (sic).

Q Is it therefore, your professional opinion that this setting is the least restrictive form of treatment for Mr. Pelichet, at this time?

A I, do.

Q And what are you asking the Court to grant you today?

A Well this is a continuing order, so we're asking for the continuing one-year order.

MR. COLLINS: Thank you Your Honor, no other questions at this time.

**CROSS-EXAMINATION**
**BY MR. JEFFERSON:**

Q Doctor, for my benefit, could you describe what you mean when you said, passive aggressive?

A Well for instance, when they wanted him to get up out of bed to go get medicine or wanted to get out of bed to go cooperate with the storm warnings and so forth and he didn't follow through, didn't want to do that. He hadn't been cooperating fully with the treatment, until recently. He doesn't want to fully cooperate.

Q Now doctor you indicated that he had received multiple opportunities to participate in a ALS program and be discharged from the hospital and have the ability to demonstrate any function in the community, is that correct?

A Yes.

Q Okay now, given that, it must have been determined that he was not a risk to others in the community, is that correct?

A Well, if he's not on his medications, he's not cooperating with treatment, he was missing from the AFC facilities so, when he's not on his medications he—in the past he's charged with assault and so forth. So, he could be a danger as a result of that. But they also, according to the NGRI Committee contract, with him and the ALS contract, he's supposed to follow the orders of—

Q In the times he's been placed in the community, he has not committed a crime; he's not had any kind of aggressive behavior, what you're indicating is, he smoked Marijuana and he left a facility, without permission is that what you're telling me?

A He also had one charge of delivering drugs.

Q Okay and his underlying charge, that brought him into the system in 2005, is that correct?

A Yes.

Q And are you aware that Mr. Pelichet has a dual diagnosis? And that he suffers from Multiple Sclerosis?

A Yes, he does.

Q Okay and you understand that he does suffer from pain and other things relating to that Multiple Sclerosis?

A Yes.

Q And you understand that that has been the basis from where he may have smoked Marijuana trying to address his pain, is that correct?

A That may be the case. But his statement to me was, quote: "Addiction has been problematic."

Q Do you know how long he's had his MS diagnosis?

A I don't know when the MS diagnosis began. I believe his Marijuana use began—

Q --Now Dr. Stern, I just asked you a specific question. I didn't ask you to go right field on me. My question was, do you understand the purpose of the Marijuana was dealing with that Multiple Sclerosis?

A He didn't tell me that. But I can understand why he might say that.

Q And you indicate that he's cooperative with his medication?

A He has cooperated with—

Q --And if he was in an ALS program, he would be in an AFC home have his medication on a daily basis and monitor him, is that correct?

A Not if he walks away from the place and they can't give it to him.

Q If he walks away, he ends up back in the hospital?

A If they could find him, when they find him yes.

Q At this point and time he's spent most of the last 11 years in the hospital, for a violation that he committed a crime back in 2005, is that correct?

A Yes.

MR. JEFFERSON: No further, questions.
    (Concluded segment for Dr. Stern at 10:32 a.m.)

  **ORR also had the opportunity to speak with one of the Psychiatrists on staff at WRPH regarding any experience they may have had working with Dr. Stern or his involvement with patients in and out of court proceedings. The psychiatrist did not want to be named in this investigation but shared that they know of more than one occasion in which incorrect information was relayed by Dr. Stern during a court proceeding. The psychiatrist also stated that on at least one occasion in which Dr. Stern was scheduled to give testimony in court for one of the psychiatrist's patients, Dr. Stern not only gave incorrect information, but failed to consult with the psychiatrist prior. One specific detail that this psychiatrist mentioned was the fact that Dr. Stern gave information to the court regarding a patient's initial behavior that resulted in that patient being hospitalized. The psychiatrist stated that Dr. Stern relayed this information as if it were current behavior that the patient was displaying and failed to acknowledge patients actual current status and progress. It was this doctor's opinion that Dr. Stern's involvement with patient's court proceedings have been counterproductive and non-beneficial for patients and other doctors.

After receiving the above information, on 03/07/2017, ORR requested a list of all the patients Dr. Stern has provided testimony for in court. According to the documentation received Dr. Stern has testified in court 45 times from June 2016 to March 2017. On 03/13/2017 ORR also reached out to all of the psychiatrists and social workers at WRPH to inquire about their experiences with Dr. Stern and to try and determine if this was an isolated incident or if there is reason to believe that this is an ongoing pattern of behavior. ORR did not receive many responses. Of the 21 people contacted there were approximately 5 responses, of which only one was aware of any issues involving Dr. Stern. According to this staff person, they were aware of at least 2 incidents where they witnessed Dr. Stern provide incorrect or misleading information to the court regarding a patient. Staff also stated that they have experienced Dr. Stern make false statements regarding consulting with doctors and treatment teams prior to court testimony. Staff also

stated that during one court proceeding that they were witness to, Dr. Stern's lack of factual information and statements that were contrary to what was documented in the patient's records, almost resulted in the cancellation of a planned discharge.

## ADDENDUM

On April 28, 2017 ORR was presented with new information regarding medication that patient, D. Pelichet had missed during the months prior to his court hearing on November 9, 2016. This information was documented in the patients Medimar Report that ORR did not have access to. According to the information presented Mr. Pelichet missed his Wellbutrin XR 300mg medication on 09/19, 09/22, 09/26, 10/27, in the months leading up to his court hearing.

On May 1, 2017, in order to verify this information, ORR contacted the LPN who passes medication on Mr. Pelichet's unit. ORR asked for the Medimar Report to be reviewed from August 1, 2016 through November 9, 2016 for any medication refusals. The LPN stated in response that she has never know Mr. Pelichet to refuse his medication and that it has always been her experience in working with him that he is good about taking his medications. The nurse stated that he receives his psychotropic medication in a once per month administered shot and his antidepressant once per day. She went on to state that if he refuses anything it would be something like a laxative or something of that nature. ORR explained that they were in receipt of documentation that stated that Mr. Pelichet had refused medication on four occasions over that period of time. Upon further review of the Medimar Report the LPN responded that the dates in question were times when Mr. Pelichet missed his medication due to him not getting up to receive the medication at his scheduled 8am time. She went on to further explain that there is only a one hour window of time in which Mr. Pelichet can receive the medication after which time it is documented in the system as omitted/patient refused. With documentation being contrary to staff's statement it is impossible to confirm if Mr. Pelichet specifically refused to take medication or missed medication due to not getting out of the bed to have it administered. It should be noted that as of 11/09/2012, the date of Mr. Pelichet's court hearing, he had taken his Wellbutrin for 13 consecutive days. It was found that Wellbutrin has very long half-life of anywhere between 24 and 40 hours. Given that information 4 missed doses over a course of 101 days, with none of those days being consecutive, would not likely have an adverse effect on a patient's mood.

On May 1, 2017 ORR reviewed Mr. Pelichet's first IPOS from this last admission dated 11/17/2016. There was no mention of him refusing meds nor any goals, objectives, or interventions addressing him refusing or missing medication. ORR also reviewed his IPOS dated 02/15/17. It was similar and did not mention any of the above. The most recent IPOS dated 04/26/17 was not available for review.

On May 16, 2017 ORR requested and received a copy of Dr. Stern's contract with Walter Reuther Psychiatric Hospital. Contract is as follows:

ATTACHMENT A                    **STATEMENT OF WORK**

**CONTRACTOR NAME**:

**CONTRACT TITLE**: Psychologist – Expert Witness, Forensic Court Service

**WORK LOCATION**: Walter P Reuther Psychiatric Hospital

Credentialing Requirements:

- Ph.D. or Psy.D. in Clinical Psychology

**DUTIES TO BE PERFORMED:**

1. Coordinate coverage for weekly Court Docket
2. Interview patients identified as 'going' to Court regarding 401 criteria for Hospitalization (20-45 minutes)
3. Serve as Expert Witness in Court on behalf of Walter Reuther Hospital (2-5 hours Court time)

**DESCRIPTION OF REPORTS OR PRODUCTS TO BE DELIVERED:**

Itemized Billing: for Interview and Court time

Payment Vouchers

**TIMETABLE FOR REPORT OR PRODUCT DELIVERY:**

Upon completion of services

On May 17, 2017, per request, ORR received a copy of Mr. Pelichet's Documentation for both his 11/09/2017 and 05/03/2017 court hearings (Six-Month Review Report, Petition for Discharge from Continuing Mental Health Treatment Form, CFP/NGRI Committee Recommendations Memo to Wayne County Probate Court, Continuing Order for Treatment Form, Continuing Treatment Order, Clinical Certificate, and NGRI Court Hearing Form).

The petition for Continuing Treatment Order was signed on 10/27/2016 by Mr. Pelichet's Social Worker, C. Sandie. In the petition, continuing hospitalization for one year is checked off with the reasoning of; "The basis for this allegation is that I believe the individual has a mental illness and is unable to attend to basic physical needs such as food, clothing, or shelter that must be attended to in order to avoid serious harm." Again, this assertion by the Social Worker is not based on any documented facts or evidence presented. In addition this information contradicts the information provided by the social worker during her interview with ORR regarding the patient's functioning and readiness for discharge. Within the form, the social worker only notes the patients committing offense from 2005 and his poor attendance in PSR groups as a basis for this conclusion. It is also noted in the petition that the treatment has been adequate, there are no needs for modification, and the patient is motivated.

The Clinical Certificate was completed by Mr. Pelichet's treating Psychiatrist, Dr. Bavineni and signed on 10/30/2017. Per the Certificate, the doctor checked off that it was her determination that; "The person is mentally ill (has substantial disorder of thought or mood that significantly impairs judgement, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life)." The psychiatrist goes on to

note that the patient is "superficially cooperative", does not participate in PSR groups, and has limited insight into his illness and poor judgement, as facts to support her determination. However, these are not criteria for hospitalization. The follow up questions on the Certificate specifically address the criteria for hospitalization and ask for the doctor to give further facts that the patient will injure self (she noted he denied), injure others (she noted he denied), will be unable to attend his basic needs (she noted he takes care of his personal hygiene), and is unable to understand need for treatment (she noted he is provided with medication). In addition, aside from the patient's testimony in court acknowledging his mental illness, as well as the need and his ability to independently meet those needs through community services, nursing staff who are responsible for administering medication to Mr. Pelichet state that he regularly and willingly takes his medication.

The Center for Forensic Psychiatry Memo to Wayne County Probate Court dated November 4, 2016 stated the reasons for the NGRI Committee Recommendations for Continuing the One Year Order: "Needs more insight and commitment to treatment".

The Continuing Order for Treatment is dated November 9, 2017 and signed by Judge David Braxton. Within this Order it states that the court finds; "By clear and convincing evidence, the individual continues to be a person requiring treatment because the individual has a mental illness and as a result of that mental illness is unable to attend to those basic physical needs that must be attended to in order to avoid serious harm in the near future, and has demonstrated that inability by failing to attend to those basic physical needs." There was no relevant evidence presented based upon his current documented clinical condition, to support that this statement is factual. Information in Pelichet's record indicates he is high functioning and able to attend to his physical needs.

The Continuing Order for Treatment went on to state that; "There is not an available treatment program that is an alternative to hospitalization or that follows an initial period of hospitalization adequate to meet the individuals treatment needs and is sufficient to prevent harm that the individual may inflict upon self or others within the near future." This statement on the court order is not consistent with the reason for the continued hospitalization cited above and not supported by any alternative plan presented by Detroit-Wayne Community Mental Health Program.

The NGRI Court Hearing Form is not dated (left blank) but was signed by the treating psychiatrist Dr. Bavineni and Hospital Administrator, H. Bandla. Per Form:

> Patient has a history of marijuana abuse.
> Problematic behavior is 'uncooperative'.
>
> Engagement in treatment is 'not motivated for treatment'.
> Compliant with medication is 'yes'.
>
> Self-Aware and understands illness is 'yes'.

Accepts responsibility for offense is 'no'.
Connects illness with crime is 'no'.

Understands signs of illness is 'no'.
Recognizes need for ongoing treatment is 'no'
Has constructive plans for future is 'no'.

Once again, none of these assertions are supported by information or evidence as to how these conclusions were reached.

On Mr. Pelichet's Six-Month Review Report dated 04/17/2017 and signed by the patient's treating psychiatrist, the doctor has checked off the first box which reads; "I believe the individual has a mental illness and as a result of that mental illness, the individual can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in an act or acts or made significant threats that are substantially supportive of this expectation." There is no documentation from Mr. Pelichet's current admission at WRPH to support this assertion and the report also contradicts statements made by Mr. Pelichet's psychiatrist during his court hearing on 05/03/2017.

The Petition for Discharge was signed on 04/18/2017 by Mr. Pelichet requesting to be discharged from WRPH. During his 05/03/2017 hearing Mr. Pelichet outlined plans that he has set in motion once discharged; he has made arrangements to reside with his mother, to become gainfully employed, attends NA on all LOA visits, and will participate in community mental health services that are available to him as he stated that he understand that as a person with a mental illness he will always need treatment. Mr. Pelichet's Petition for Discharge was denied by the court.

On May 17 and 18, 2017 ORR attempted to reach Mr. Pelichet's treating psychiatrist Dr. Bavineni to get her determination regarding emotional harm and how the missing anti-depressants could have affected Mr. Pelichet's emotional state. ORR was unable to reach the doctor but left an email for her on 05/18/2017. ORR left an additional email for Dr. Bavineni on 05/19/2017.

On May 26, 2017 ORR received a questionnaire response from Mr. Pelichet's treating Psychiatrist, Dr. A Bavineni. According to Dr. Bavineni she did not return from vacation until December of 2016, therefore had no contact with the patient for at least a month following his court hearing. According to Mr. Pelichet's treatment plan Dr. Bavineni meets with him once per month. In the questionnaire response Dr. Bavineni stated that as far as she could remember she did not see him depressed or hopeless. When asked about Mr. Pelichet's reported depression being due to his missed doses of Wellbutrin, Dr. Bavineni responded that it is her understanding that Wellbutrin does in fact have a long half-life and that the elimination is slow. She went on to explain that there might be several other reasons for anybody to be emotionally upset.

## CONCLUSION

The decision in this case is based upon a preponderance of evidence, which means a standard of proof which is met when, based upon all available evidence, it is more likely that a right was violated than not, based upon the greater weight of the evidence, not as to quantity, but as to quality.  The facts of this case are as follows:

**1.  Did Dr. Stern, a licensed psychologist, after personal examination, give testimony on 11/09/2016 regarding whether recipient Darryl Pelichet is a person requiring treatment at Walter Reuther Psychiatric Hospital (WRPH)?**

Yes.  Interviews with the recipient and staff, along with the court transcript confirmed that Dr. Stern made statements regarding Mr. Pelichet's treatment, medication and his behavior while at WRPH, as well as during his time in the community.

**2.  If yes, did Dr. Stern provide the court all relevant evidence as required by law to support that Mr. Pelichet was a person requiring treatment at WRPH?**

No.  Dr. Stern is not Mr. Pelichet's treating psychologist and had not worked with him or known him prior to testifying on his behalf on 11/09/2016.  His testimony is that of an expert witness in the eyes of the court and thus taken into great consideration in regards to the court's decision to continue or discontinue treatment/court order at WRPH.  Based upon review of the clinical record and interviews with staff currently providing services to  Mr. Pelichet, it is clear that Dr. Stern provided information that was erroneous, misleading and out of context.  The testimony of Dr. Stern left out relevant evidence that was of consequence to the determination of the action (continued hospitalization) more probable or less probable than it would be without the evidence. Based upon the statements of other WRPH staff, it was indicated this is a pattern for Dr. Stern during court testimony.

Based on these facts, the preponderance of evidence does not support the violation of Abuse Class II – Emotional Harm against Dr. Stern, however, there is a preponderance of evidence that Dr. Stern failed to provide relevant evidence to the court as to Mr. Pelichet's current behavior, compliance with medications and treatment based upon documents in his clinical record and based upon any interviews with staff that provide ongoing treatment to Mr. Pelichet during his latest admission.  **ORR is substantiating a violation by Dr. Stern of recipient Darryl Pelichet's right to be provided with mental health services suited to his condition per MHC section   330.1708(1).**

## RECOMMENDATIONS

ORR recommends that remedial action be taken with Dr. Stern to remedy this violation and prevent recurrence.  ORR also recommends that administration give consideration into discontinuing the use of outside psychologists for matters that involve speaking on the treatment status of patients.  Court testimony given with a lack of research and

personal knowledge regarding a patient can lead to inaccurate information being relayed and potentially affecting discharge. The court relies on "expert testimony" to determine if a person continues to be a person requiring treatment at the hospital or whether appropriate treatment can be provided in a less restrictive setting. This is not a responsibility that should be taken without adequate preparation and has a significant impact on the persons' rights and freedoms.

## PERSONS INTERVIEWED
Darryl Pelichet, Patient
Dr. C. Stern, Psychologist
Christina Sandie, Social Worker
Dr. Bavineni, Psychiatrist
A Copeland, LPN
Anonymous Staff

## DOCUMENTS
Clinical File
Probate Court Transcript
IPOS – 11/2016
IPOS – 02/2017
Court Documentation (Six-Month Review Report, Petition for Discharge, Continuing Order for Treatment, Clinical Certificate, and NGRI Court Hearing Form)
MediMar Report
Statement of Work: Contractual Psychologist

_____

Enid Reed, Rights Advisor                                                    Date
Walter Reuther Psychiatric Hospital
30901 Palmer Rd.
Westland, MI 48186

**CHARLES STERN**
**DIRECT EXAMINATION**
**BY MR. COLLINS:**

Q Sir, could you please state your name for the record and your profession?

A Charles Stern, Ph.D. and licensed Psychologist in the State of Michigan for the purposes (Inaudible).

Q Dr. Stern, prior to coming today to testify, did you have the opportunity to meet and interview Mr. Pelichet?

A Yes.
Q And besides meeting and interviewing Mr. Pelichet, did you also have the opportunity to review his medical records?

A Yes.

Q And based on that, did you have the opportunity to review—speak to the staff or speak to any of the other doctors that may have been treating Mr. Pelichet?

A Yes, I spoke with staff.

Q And for the record, can you please indicate do you have a diagnosis based on your interview?
A His diagnosis was Schizophrenia paranoid-type; chronic with Marijuana abuse. It may possibly be a Schizo Effective Disorder.

Q Can you indicate for the record what brought Mr. Pelichet to the hospital?

A Well, he's been adjudicated NGRI since 2005. But he has broken ALS contracts, at AFC facilities a number of times. This one that I just said, also from Marijuana use and other things that had broken the contract. Was in Walter Reuther as a result of these things.

Q Doctor can you please indicate to the Court, what crime brought Mr. Pelichet to (Inaudible)

MR. JEFFERSON: -- Excuse me if you could repeat the question, you were breaking up.

MR. COLLINS: I apologize.

Q Can you please indicate to the Court what crime Mr. Pelichet committed?

**14**

A Yes, as I understand it, it's assault of a police officer, resisting and obstructing a police officer.

Q Thank you. And you've also indicated that since 2005 and his hospitalization, he's been given an ALS. Can you just briefly indicate to the Court what an ALS is?

A It's usually a five year contract when a person is discharged, from the hospital but still under their purview, under the NGRI purview. And they usually are sent to a ALS, I mean an AFC program or possibly, a less restrictive hospital, in this case, ALS—AFC program. And there are many rules that they have to follow and if they break those rules, they end up back at the hospital again. In this case, he was discharged back to AFC homes several times and broke the rules and ended up back in the hospital again, under the NGRI umbrella.

Q I believe you also indicated that the reasons within his record as to why he had to be brought to a more restrictive setting in the hospital, is that correct?

A Yes.

Q What were those reasons again? What were the behaviors indicated within his record?

A Well he walked away from the AFC facility without permission, without telling them; (Inaudible) treatment. He has had a number of cases where he was smoking Marijuana one time and was delivering. So there was a number of incidents that he broke the ALS contract. He's made verbal threats at times, as well. Like I say, a violation—

MR. JEFFERSON: Can you lay a foundation as to when these verbal threats occurred and have Dr. Stern responsive to specific questions, rather than giving this extended narrative.

THE WITNESS: I don't have all the dates of when he was discharged—or was, brought back through the--contract.

Q Let me rephrase the question for you Dr. Stern. Based on your records can you indicate, the last time Mr. Pelichet had been given at ALS?

A Um not sure when it actually started, but he ended up back in the hospital after violating this—on I believe it was May 3rd this year.

Q Thank you and I believe that answers defense Counsel's question in regards to that piece of history. Also, based on the records, have you been able to tell whether Mr. Pelichet has been cooperative in taking his medication?

A He's been more cooperative recently, prior to this hearing, his medications—I spoke with him about the addiction issue. He said, quote: "Addiction has been problematic for

me." But he still thinks he can manage on out-patient basis, on his own in the community, according to him. However, he has had difficulty with Marijuana and has violated the contract, the ALS contract several times as a result. He has said, on unit at times, the end of last month, he said I'm not taking medications. He refused to get out of bed to go down to get the medications, getting it last month, he said he refused medication in September several times. He did have an IM injection of Invaga Sustaina (ph.) so that lasted, but he's refused podiatry and ENT appointments, he said that the problem would clear up so he didn't see why he had to go back to the doctor, again. He refused to get up and cooperate with the storm warning, I guess it was a drill, I don't know if it was a drill or a actual storm warning. But any rate, he refused to get out of bed and do that, I asked him about that and he said he had no reason for it, he just didn't do it.

Again, they've had times when they've had to increase his regular medications, because his behavior—

MR. PELICHET: --That's not true—

A Said, he's passive aggressive and unmotivated through the treatment, so—

Q Dr. Stern you indicated earlier a diagnosis, you saw that Mr. Pelichet had. Can you also indicate to us whether he has any insight into his mental illness, based on your interviewing—

A I believe that his insight is superficial and that's what it also says in the record, superficial cooperation is what they say in the record. And that's what it appears to me as well.

Q You indicated to the Court several behaviors that you either observed or you read within his record and said the issues that staff had to deal with. Based on that information you provided, do you have an opinion as to whether he would be a harm to himself or to others?

A Yes, well obviously he violated the ALS contracts a number of times, not following the rules and so forth and on the unit, he's also not wanted to follow the rules completely and he's passive aggressive about. So I don't see how he's ready to go back out, in to the community at this point, given his history and given what he's been doing in the hospital at times. He's doing more cooperation the last couple of weeks, but coming up to Court so, I think he wants to get out—he still has superficial love (sic).

Q Is it therefore, your professional opinion that this setting is the least restrictive form of treatment for Mr. Pelichet, at this time?

A I, do.

Q And what are you asking the Court to grant you today?

A Well this is a continuing order, so we're asking for the continuing one-year order.

MR. COLLINS: Thank you Your Honor, no other questions at this time.

**CROSS-EXAMINATION**
**BY MR. JEFFERSON:**

Q Doctor, for my benefit, could you describe what you mean when you said, passive aggressive?

A Well for instance, when they wanted him to get up out of bed to go get medicine or wanted to get out of bed to go cooperate with the storm warnings and so forth and he didn't follow through, didn't want to do that. He hadn't been cooperating fully with the treatment, until recently. He doesn't want to fully cooperate.

Q Now doctor you indicated that he had received multiple opportunities to participate in a ALS program and be discharged from the hospital and have the ability to demonstrate any function in the community, is that correct?

A Yes.

Q Okay now, given that, it must have been determined that he was not a risk to others in the community, is that correct?

A Well, if he's not on his medications, he's not cooperating with treatment, he was missing from the AFC facilities so, when he's not on his medications he—in the past he's charged with assault and so forth. So, he could be a danger as a result of that. But they also, according to the NGRI Committee contract, with him and the ALS contract, he's supposed to follow the orders of—

Q In the times he's been placed in the community, he has not committed a crime; he's not had any kind of aggressive behavior, what you're indicating is, he smoked Marijuana and he left a facility, without permission is that what you're telling me?

A He also had one charge of delivering drugs.

Q Okay and his underlying charge, that brought him into the system in 2005, is that correct?

A Yes.

Q And are you aware that Mr. Pelichet has a dual diagnosis? And that he suffers from Multiple Sclerosis?

A Yes, he does.

Q Okay and you understand that he does suffer from pain and other things relating to that Multiple Sclerosis?

17

A Yes.

Q And you understand that that has been the basis from where he may have smoked Marijuana trying to address his pain, is that correct?

A That may be the case. But his statement to me was, quote: "Addiction has been problematic."

Q Do you know how long he's had his MS diagnosis?

A I don't know when the MS diagnosis began. I believe his Marijuana use began—
Q --Now Dr. Stern, I just asked you a specific question. I didn't ask you to go right field on me. My question was, do you understand the purpose of the Marijuana was dealing with that Multiple Sclerosis?

A He didn't tell me that. But I can understand why he might say that.

Q And you indicate that he's cooperative with his medication?

A He has cooperated with—

Q --And if he was in an ALS program, he would be in an AFC home have his medication on a daily basis and monitor him, is that correct?

A Not if he walks away from the place and they can't give it to him.

Q If he walks away, he ends up back in the hospital?

A If they could find him, when they find him yes.

Q At this point and time he's spent most of the last 11 years in the hospital, for a violation that he committed a crime back in 2005, is that correct?

A Yes.

MR. JEFFERSON: No further, questions.
        (Concluded segment for Dr. Stern at 10:32 a.m.)

   **ORR also had the opportunity to speak with one of the Psychiatrists on staff at WRPH regarding any experience they may have had working with Dr. Stern or his involvement with patients in and out of court proceedings. The psychiatrist did not want to be named in this investigation but shared that they know of more than one occasion in which incorrect information was relayed by Dr. Stern during a court proceeding. The psychiatrist also stated that on at least one occasion in which Dr. Stern was scheduled to give testimony in court for one of the psychiatrist's patients, Dr. Stern not only gave incorrect information,

**18**

but failed to consult with the psychiatrist prior. One specific detail that this psychiatrist mentioned was the fact that Dr. Stern gave information to the court regarding a patient's initial behavior that resulted in that patient being hospitalized. The psychiatrist stated that Dr. Stern relayed this information as if it were current behavior that the patient was displaying and failed to acknowledge patients actual current status and progress. It was this doctor's opinion that Dr. Stern's involvement with patient's court proceedings have been counterproductive and non-beneficial for patients and other doctors.

After receiving the above information, on 03/07/2017, ORR requested a list of all the patients Dr. Stern has provided testimony for in court. According to the documentation received Dr. Stern has testified in court 45 times from June 2016 to March 2017. On 03/13/2017 ORR also reached out to all of the psychiatrists and social workers at WRPH to inquire about their experiences with Dr. Stern and to try and determine if this was an isolated incident or if there is reason to believe that this is an ongoing pattern of behavior. ORR did not receive many responses. Of the 21 people contacted there were approximately 5 responses, of which only one was aware of any issues involving Dr. Stern. According to this staff person, they were aware of at least 2 incidents where they witnessed Dr. Stern provide incorrect or misleading information to the court regarding a patient. Staff also stated that they have experienced both Dr. Stern and Dr. Blake (the other contracted psychiatrist that provides court testimony) make false statements regarding consulting with doctors and treatment teams prior to their testimony and "expert evaluation". Staff also stated that during one court proceeding that they were witness to, Dr. Stern's lack of factual information and statements that were contrary to what was documented in the patient's records, almost resulted in the cancellation of a planned discharge.

## CONCLUSION

The decision in this case is based upon a preponderance of evidence, which means a standard of proof which is met when, based upon all available evidence, it is more likely that a right was violated than not, based upon the greater weight of the evidence, not as to quantity, but as to quality.  The facts of this case are as follows:

1. **Did Dr. Stern give incorrect testimony on 11/09/2016 regarding Darryl Pelichet's behavior and treatment as a patient at Walter Reuther Psychiatric Hospital?**

   Review of the court transcript confirmed that Dr. Stern made statements regarding Mr. Pelichet's treatment, medication and his behavior while at Walter Reuther as well as during his time in the community that were both incorrect and misleading.

2. **Did Dr. Stern's failure to give factual information have the potential to have an adverse effect on the court's decision regarding Mr. Pelichet's court order?**

Although Dr. Stern is not Mr. Pelichet's personal doctor and had not worked with him or known him prior to testifying on his behalf on 11/09/2016, his testimony is that of an expert witness in the eyes of the court and thus taken into great consideration in regards to the court's decision to continue or discontinue treatment/court order.

## 3. If yes to both, did Dr. Stern's action's result in Mr. Pelichet experiencing emotional harm?

Mr. Pelichet expressed that the court proceedings and statements made by Dr. Stern caused him a great deal of stress and "trauma". It was also the opinion of his social worker that the actions of Dr. Stern caused or contributed to Mr. Pelichet experiencing impaired psychological functioning, growth, or development of a significant nature as evidenced by an increase in depressive symptoms and increased lack of motivation. He had also reported that he felt "hopeless."

Based on these facts, the preponderance of evidence does support the violation of Abuse Class II – Emotional Harm.

## RECOMMENDATIONS

Although Mr. Pelichet's court hearing has passed and there is essentially nothing that can remedy the decisions that have already been made, ORR would like to make recommendations going forward that would hopefully prevent matters of this nature from occurring again. ORR recommends that administration give consideration into discontinuing the use of outside psychologists for matters that involve speaking on the treatment status of patients. Court testimony given with a lack of first hand insight regarding a patient can lead to inaccurate information being relayed and potentially affecting discharge. Unfortunately, Dr. Stern is called on to provide "expert testimony" for patients that have a treatment team that works with them daily and consists of many disciplines that are more than capable and qualified to speak on their behalf. With the information that ORR was able to gather, it appears that this issue is not an isolated incident and on at least one reported occasion the other contracted psychiatrist, Dr. Blake, may have also relayed incorrect information to the court. The court relies on "expert testimony" to determine if a person continues to be a person requiring treatment here at the hospital or whether appropriate treatment can be provided in a less restrictive setting. This is not a responsibility that should be taken without adequate preparation and has a significant impact on the persons' rights and freedoms.

ORR also recommends that in May, when Mr. Pelichet's 6 month review comes due before the court, that testimony is provided by staff that work with him on a regular basis and that the court be made aware of the previous court date and the misinformation that the court received. It should be noted that all parties acknowledged that Mr. Pelichet has an issue with Marijuana dependency. It can be argued that this is by far his biggest concern and what continues to set him back when he is in the community. Despite this, he receives no treatment for this at WRPH or in the community. In the past, ORR has asked

that this be taken into consideration as required by the Mental Health Code as it relates to Person-centered Planning and addressed with the NGRI committee. Mr. Pelichet's family has also requested that he be released to a treatment facility as opposed to an AFC home in the past, but this has not been addressed in discharge planning. Contrary to Dr. Stern's testimony, there is no documented evidence that Mr. Pelichet refuses his psychiatric medication or his medication that he takes for his MS diagnosis and Mr. Pelichet shows no signs that he is a danger to himself or others. Based upon the information provided by the clinical record and treating staff, WRPH does not appear to be the least restrictive treatment setting that is either appropriate or available to Mr. Pelichet.

**PERSONS INTERVIEWED**
Darryl Pelichet, Patient
Dr. C. Stern, Psychologist
Christina Sandie, Social Worker
Dr. Bavineni, Psychiatrist
Anonymous Staff

**DOCUMENTS**
Clinical File
Probate Court Transcript

Enid Reed, Rights Advisor                                     Date
Walter Reuther Psychiatric Hospital
30901 Palmer Rd.
Westland, MI 48186

21

# EXHIBIT

# E

**Report of Investigative Findings from Office of Recipient Rights, Amended, 6/12/17**



STATE OF MICHIGAN

RICK SNYDER
GOVERNOR

DEPARTMENT OF HEALTH AND HUMAN SERVICES
LANSING

NICK LYON
DIRECTOR

## Office of Recipient Rights
## Report of Investigative Findings * Amended

Report Date:  June 12, 2017

Service Request #: 1-97339928
Allegation Number: 1-98291701

Recipient's Name: DARRYL PELICHET

Unit: R-6

Complainant's Name: DARRYL PELICHET

Relationship: SELF

☑ Substantiated    ☐ Not Substantiated

Category 7080 – Suitable Services

### ALLEGATION

On November 10, 2016 ORR received an allegation from patient, Darryl Pelichet stating
that on 11/09/2016 psychologist Charles Stern gave incorrect testimony and information
regarding Mr. Pelichet's treatment and behavior during a court hearing for continued
hospitalization at WRPH.  It was further alleged that the incorrect testimony caused Mr.
Pelichet to suffer emotional harm.

On April 28, 2017, 39 days after the original submission of the Report of Investigative
Findings (RIF),  ORR received information from Hospital Administration refuting the findings
of the original RIF and on May 5, 2017 ORR Director of Hospital and Community
Investigations, R. Postema received a Level I Review request from WRPH Director, Mary
Clare Solky. ORR reviewed this information, collected further evidence and has amended
the report as needed. New evidence has been included in the Addendum section of the
report.  During the review of the new evidence, it was determined that  although it is clear
that Mr. Pelichet suffered symptoms of impaired psychological functioning based upon the
outcome of his 11/09/2016 court hearing, there is not a preponderance of evidence that
supports that it was caused solely by the actions of Dr. Stern.  The evidence indicates that
incorrect or misleading information may have also been presented to the court by other
treating professionals at WRPH in what appears to be an attempt to ensure that Mr.
Pelichet remains on a one year continuing treatment order due to his NGRI status.  The
record and staff interviews indicated that Mr. Pelichet did not meet the criteria for continued
hospitalization as required by section 330.1401 of the Mental Health Code.  Based upon
the new information gathered, ORR will be opening a new complaint on behalf of recipient
Darryl Pelichet to determine if his rights were violated by the actions of these other treating
professionals at WRPH.

There was evidence that Dr. Stern did fail to provide the court with relevant evidence during
his court testimony.  Therefore, this investigation has been re-categorized under MHC
section, 3301708; Suitable Services.

## CITATIONS

Michigan Mental Health Code, Section 330.1708 Suitable services; treatment environment; setting; rights.
Sec. 708. (1) A recipient shall receive mental health services suited to his or her condition.

Michigan Mental Health Code, Section 330.1461 Testimony or deposition of physician or psychologist required; examinations; presence of attorney during deposition; cross-examination of deponent; waiver.
Sec. 461.
(1) Except as otherwise provided in this section, an individual may not be found to require treatment unless at least 1 physician or licensed psychologist who has personally examined that individual testifies in person or by written deposition at the hearing.

Michigan Mental Health Code, Section 330.1459 Documents, witnesses, and cross-examination; rules of evidence.
Sec. 459.
(2) The court shall receive all relevant, competent, and material evidence which may be offered. The rules of evidence in civil actions are applicable, except to the extent that specific exceptions have been provided for in this chapter or elsewhere by statute or court rule.

Michigan Rules of Court, Volume I – State, 2017 – Rules of Evidence:
Rule 401, Definition of "Relevant Evidence":
"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Michigan Mental Health Code, Section 330.1401 "Person requiring treatment" defined; exception.
Sec. 401.
(1) As used in this chapter, "person requiring treatment" means (a), (b), (c), or (d):

(a) An individual who has mental illness, and who as a result of that mental illness can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself, herself, or another individual, and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation.

**(b) An individual who has mental illness, and who as a result of that mental illness is unable to attend to those of his or her basic physical needs such as food, clothing, or shelter that must be attended to in order for the individual to avoid serious harm in the near future, and who has demonstrated that inability by failing to attend to those basic physical needs.**

(c) An individual who has mental illness, whose judgment is so impaired by that mental illness that he or she is unable to understand his or her need for treatment, and whose impaired judgment, on the basis of competent clinical opinion, presents a substantial risk of significant physical or mental

harm to the individual in the near future or presents a substantial risk of physical harm to others in the near future.

(d) An individual who has mental illness, whose understanding of the need for treatment is impaired to the point that he or she is unlikely to voluntarily participate in or adhere to treatment that has been determined necessary to prevent a relapse or harmful deterioration of his or her condition, and whose noncompliance with treatment has been a factor in the individual's placement in a psychiatric hospital, prison, or jail at least 2 times within the last 48 months or whose noncompliance with treatment has been a factor in the individual's committing 1 or more acts, attempts, or threats of serious violent behavior within the last 48 months. An individual under this subdivision is only eligible to receive assisted outpatient treatment.

## ISSUES

1. Did Dr. Stern, a licensed psychologist, after personal examination, give testimony on 11/09/2016 regarding whether recipient Darryl Pelichet is a person requiring treatment at Walter Reuther Psychiatric Hospital (WRPH)?

2. If yes, did Dr. Stern provide the court all relevant evidence as required by law to support that Mr. Pelichet was a person requiring treatment at WRPH?

## INVESTIGATIVE FINDINGS

On November 10, 2016 ORR spoke with patient, Darryl Pelichet at which time Mr. Pelichet informed that he wanted to file a complaint regarding Dr. Stern providing false information during his court hearing yesterday on November 9, 2016. Mr. Pelichet alleged that Dr. Stern testified that Mr. Pelichet displayed negative and aggressive behavior that caused him to have his medication increased. Mr. Pelichet further stated that Dr. Stern made statements about his behavior, both at Walter Reuther and at his last group home, that were false in addition to falsely stating that Mr. Pelichet was noncompliant with treatment and his medication. Mr. Pelichet further stated that he felt "railroaded" and that he was being set up to fail if "nothing, none of the good stuff that he did, mattered". He expressed not understanding why someone who has never worked with him and did not know him or anything about him could be allowed to testify about him when he has a whole treatment team that can testify to his behavior and what kind of patient he is. Mr. Pelichet went on to state that sitting through the court proceedings was extremely stressful for him.

On November 16, 2017 ORR reviewed Mr. Pelichet's Progress Notes from 09/01/2016 through 11/09/2016. ORR reviewed the following documents: Psychotherapy Initial, Psychotherapy Progress Notes, Initial Psychotherapy Report, Psychiatric Admission, Psychiatry Aggression Assessment, Psychiatry Incidental, Medication Review, Face to Face Assessment, Violence Risk Assessment, Psychological Assessment, Psychological Behavioral Plan, Psychological Court Service, Psychological Incidental, Psychological Weekly, and Nursing Incidental. Per documentation:

For the month of September there were 17 entries. Thirteen of the entries document that Mr. Pelichet refused medications for either Miralax (for constipation) or ear drops, both of which are optional. Mr. Pelichet was compliant with all other medication. There were no notations of adverse behaviors or refusal to attend PSR groups.

For the month of October there were 18 entries. Of those entries Mr. Pelichet refused Miralax on two occasions and refused to attend PSR on one occasion. Mr. Pelichet was compliant with all other medication. There were no notations of adverse behaviors.

Notes for November were as follows:

**11/01** – Pt. had labs drawn

**11/03** – Pt. seen IPOS done. Met with mother and sister. Patient and family concerned about excess weight gain and depression. Discussed medications with patient and have decided to decrease Invega Sustenna dose to 156mg a month. Also have decided to add Fluoxetine (for depression). Risk/benefit/side effects and alternatives discussed. Pt. agreeable to try it.

**11/08** – Quarterly Fall Risk Assessment. Pt. medication changed in the last 30 days. Low Risk

On December 2, 2017 ORR attempted to contact D. Wash, Certified Court Reporter for the State of Michigan to request her assistance in obtaining a court transcript for the November 9, 2016 hearing that Mr. Pelichet had in Judge Braxton's court.

On December 29, 2017, after not hearing back from Ms. Wash, ORR contacted Mr. Pelichet's treatment team, as well as Dr. Stern, to inquire about the allegation, what took place in court, statements that were made, as well as if anyone was aware of how ORR could go about receiving a court transcript. ORR did not receive a response back from Dr. Stern on this occasion or several that followed. Of the staff that responded, no one was aware of what took place in court as they stated that they were not present. Dr. Bavenini, Mr. Pelichet's psychiatrist, stated that she was on vacation during the month of November, therefore was unable to speak with Dr. Stern prior to the hearing. Ms. Sandie, Mr. Pelichet's social worker, responded that she had not spoken with Dr. Stern and that Mr. Pelichet had no incidents of aggressive or assaultive behavior during his current admission. In regards to obtaining a court transcript, ORR was further referred to Judge Braxton's courtroom email and phone number. A message was left on the phone and an email was sent on 01/06/2017. No response to either was received.

On January 20, 2017 ORR received a response back from Ms. Wash who agreed to transcribe the court proceedings and would have them submitted to ORR as soon as possible.

On January 30, 2017, after several attempts to make contact with no response, ORR received a response from Dr. Stern who provided answers to a questionnaire that he was

provided in writing. According to Dr. Stern he did not recall any details because Mr. Pelichet's court hearing was a while back and he had testified for 10-15 patients a week since that time. Dr. Stern stated that he had recommended continuing hospitalization based on records, speaking to staff, and interviewing the patient. When asked where he obtained the information that he shared in court, Dr. Stern stated that he got it from medical records and speaking with staff. Dr. Stern stated that he had no interactions with Mr. Pelichet prior to evaluating him for court.

On February 16, 2017 ORR received an email reply from Mr. Pelichet's social worker, C. Sandie who stated: "Mr. Pelichet had presented as upset and expressed frustration regarding the testimony following the court hearing. He also verbalized an increase in depressive symptoms and increased lack of motivation. He had stated at the time that he felt "hopeless." In my opinion this would be considered emotional harm, which led him to file the recipient rights complaint with you."

On February 16, 2017 ORR received the Court Transcript of the proceedings that took place on Wednesday, November 9, 2016. The following is the direct and cross examination of Dr. Stern by Counsel (*the highlighted areas indicate where either incorrect or misleading information was given according to patient's records and staff interviews):

**CHARLES STERN**
**DIRECT EXAMINATION**
**BY MR. COLLINS:**

Q Sir, could you please state your name for the record and your profession?

A Charles Stern, Ph.D. and licensed Psychologist in the State of Michigan for the purposes (Inaudible).

Q Dr. Stern, prior to coming today to testify, did you have the opportunity to meet and interview Mr. Pelichet?

A Yes.

Q And besides meeting and interviewing Mr. Pelichet, did you also have the opportunity to review his medical records?

A Yes.

Q And based on that, did you have the opportunity to review—speak to the staff or speak to any of the other doctors that may have been treating Mr. Pelichet?

A Yes, I spoke with staff.

26

Q And for the record, can you please indicate do you have a diagnosis based on your interview?

A His diagnosis was Schizophrenia paranoid-type; chronic with Marijuana abuse. It may possibly be a Schizo Effective Disorder.

Q Can you indicate for the record what brought Mr. Pelichet to the hospital?

A Well, he's been adjudicated NGRI since 2005. But he has broken ALS contracts, at AFC facilities a number of times. This one that I just said, also from Marijuana use and other things that had broken the contract. Was in Walter Reuther as a result of these things.

Q Doctor can you please indicate to the Court, what crime brought Mr. Pelichet to (Inaudible)

MR. JEFFERSON: -- Excuse me if you could repeat the question, you were breaking up.

MR. COLLINS: I apologize.

Q Can you please indicate to the Court what crime Mr. Pelichet committed?

A Yes, as I understand it, it's assault of a police officer, resisting and obstructing a police officer.

Q Thank you. And you've also indicated that since 2005 and his hospitalization, he's been given an ALS. Can you just briefly indicate to the Court what an ALS is?

A It's usually a five year contract when a person is discharged, from the hospital but still under their purview, under the NGRI purview. And they usually are sent to a ALS, I mean an AFC program or possibly, a less restrictive hospital, in this case, ALS—AFC program. And there are many rules that they have to follow and if they break those rules, they end up back at the hospital again. In this case, he was discharged back to AFC homes several times and broke the rules and ended up back in the hospital again, under the NGRI umbrella.

Q I believe you also indicated that the reasons within his record as to why he had to be brought to a more restrictive setting in the hospital, is that correct?

A Yes.

Q What were those reasons again? What were the behaviors indicated within his record?

A Well he walked away from the AFC facility without permission, without telling them; (Inaudible) treatment. He has had a number of cases where he was smoking Marijuana

one time and was delivering. So there was a number of incidents that he broke the ALS contract. He's made verbal threats at times, as well. Like I say, a violation—

MR. JEFFERSON: Can you lay a foundation as to when these verbal threats occurred and have Dr. Stern responsive to specific questions, rather than giving this extended narrative.

THE WITNESS: I don't have all the dates of when he was discharged—or was, brought back through the--contract.

Q Let me rephrase the question for you Dr. Stern. Based on your records can you indicate, the last time Mr. Pelichet had been given at ALS?

A Um not sure when it actually started, but he ended up back in the hospital after violating this—on I believe it was May 3rd this year.

Q Thank you and I believe that answers defense Counsel's question in regards to that piece of history. Also, based on the records, have you been able to tell whether Mr. Pelichet has been cooperative in taking his medication?

A He's been more cooperative recently, prior to this hearing, his medications—I spoke with him about the addiction issue. He said, quote: "Addiction has been problematic for me." But he still thinks he can manage on out-patient basis, on his own in the community, according to him. However, he has had difficulty with Marijuana and has violated the contract, the ALS contract several times as a result. He has said, on unit at times, the end of last month, he said I'm not taking medications. He refused to get out of bed to go down to get the medications, getting it last month, he said he refused medication in September several times. He did have an IM injection of Invaga Sustaina (ph.) so that lasted, but he's refused podiatry and ENT appointments, he said that the problem would clear up so he didn't see why he had to go back to the doctor, again. He refused to get up and cooperate with the storm warning, I guess it was a drill, I don't know if it was a drill or a actual storm warning. But any rate, he refused to get out of bed and do that, I asked him about that and he said he had no reason for it, he just didn't do it.
    Again, they've had times when they've had to increase his regular medications, because his behavior—

MR. PELICHET: --That's not true—

A Said, he's passive aggressive and unmotivated through the treatment, so—

Q Dr. Stern you indicated earlier a diagnosis, you saw that Mr. Pelichet had. Can you also indicate to us whether he has any insight into his mental illness, based on your interviewing—

A I believe that his insight is superficial and that's what it also says in the record, superficial cooperation is what they say in the record. And that's what it appears to me as well.

Q You indicated to the Court several behaviors that you either observed or you read within his record and said the issues that staff had to deal with. Based on that information you provided, do you have an opinion as to whether he would be a harm to himself or to others?

A Yes, well obviously he violated the ALS contracts a number of times, not following the rules and so forth and on the unit, he's also not wanted to follow the rules completely and he's passive aggressive about. So I don't see how he's ready to go back out, in to the community at this point, given his history and given what he's been doing in the hospital at times. He's doing more cooperation the last couple of weeks, but coming up to Court so, I think he wants to get out—he still has superficial love (sic).

Q Is it therefore, your professional opinion that this setting is the least restrictive form of treatment for Mr. Pelichet, at this time?

A I, do.

Q And what are you asking the Court to grant you today?

A Well this is a continuing order, so we're asking for the continuing one-year order.

MR. COLLINS: Thank you Your Honor, no other questions at this time.

## CROSS-EXAMINATION
## BY MR. JEFFERSON:

Q Doctor, for my benefit, could you describe what you mean when you said, passive aggressive?

A Well for instance, when they wanted him to get up out of bed to go get medicine or wanted to get out of bed to go cooperate with the storm warnings and so forth and he didn't follow through, didn't want to do that. He hadn't been cooperating fully with the treatment, until recently. He doesn't want to fully cooperate.

Q Now doctor you indicated that he had received multiple opportunities to participate in a ALS program and be discharged from the hospital and have the ability to demonstrate any function in the community, is that correct?

A Yes.

Q Okay now, given that, it must have been determined that he was not a risk to others in the community, is that correct?

A Well, if he's not on his medications, he's not cooperating with treatment, he was missing from the AFC facilities so, when he's not on his medications he—in the past he's charged with assault and so forth. So, he could be a danger as a result of that. But they also, according to the NGRI Committee contract, with him and the ALS contract, he's supposed to follow the orders of—

Q In the times he's been placed in the community, he has not committed a crime; he's not had any kind of aggressive behavior, what you're indicating is, he smoked Marijuana and he left a facility, without permission is that what you're telling me?

A He also had one charge of delivering drugs.

Q Okay and his underlying charge, that brought him into the system in 2005, is that correct?

A Yes.

Q And are you aware that Mr. Pelichet has a dual diagnosis? And that he suffers from Multiple Sclerosis?

A Yes, he does.

Q Okay and you understand that he does suffer from pain and other things relating to that Multiple Sclerosis?

A Yes.

Q And you understand that that has been the basis from where he may have smoked Marijuana trying to address his pain, is that correct?

A That may be the case. But his statement to me was, quote: "Addiction has been problematic."

Q Do you know how long he's had his MS diagnosis?

A I don't know when the MS diagnosis began. I believe his Marijuana use began—

Q --Now Dr. Stern, I just asked you a specific question. I didn't ask you to go right field on me. My question was, do you understand the purpose of the Marijuana was dealing with that Multiple Sclerosis?

A He didn't tell me that. But I can understand why he might say that.

Q And you indicate that he's cooperative with his medication?

A He has cooperated with—

Q --And if he was in an ALS program, he would be in an AFC home have his medication on a daily basis and monitor him, is that correct?

A Not if he walks away from the place and they can't give it to him.

Q If he walks away, he ends up back in the hospital?

A If they could find him, when they find him yes.

Q At this point and time he's spent most of the last 11 years in the hospital, for a violation that he committed a crime back in 2005, is that correct?

A Yes.

MR. JEFFERSON: No further, questions.
    (Concluded segment for Dr. Stern at 10:32 a.m.)

  \*\*ORR also had the opportunity to speak with one of the Psychiatrists on staff at WRPH regarding any experience they may have had working with Dr. Stern or his involvement with patients in and out of court proceedings. The psychiatrist did not want to be named in this investigation but shared that they know of more than one occasion in which incorrect information was relayed by Dr. Stern during a court proceeding. The psychiatrist also stated that on at least one occasion in which Dr. Stern was scheduled to give testimony in court for one of the psychiatrist's patients, Dr. Stern not only gave incorrect information, but failed to consult with the psychiatrist prior. One specific detail that this psychiatrist mentioned was the fact that Dr. Stern gave information to the court regarding a patient's initial behavior that resulted in that patient being hospitalized. The psychiatrist stated that Dr. Stern relayed this information as if it were current behavior that the patient was displaying and failed to acknowledge patients actual current status and progress. It was this doctor's opinion that Dr. Stern's involvement with patient's court proceedings have been counterproductive and non-beneficial for patients and other doctors.

After receiving the above information, on 03/07/2017, ORR requested a list of all the patients Dr. Stern has provided testimony for in court. According to the documentation received Dr. Stern has testified in court 45 times from June 2016 to March 2017. On 03/13/2017 ORR also reached out to all of the psychiatrists and social workers at WRPH to inquire about their experiences with Dr. Stern and to try and determine if this was an isolated incident or if there is reason to believe that this is an ongoing pattern of behavior. ORR did not receive many responses. Of the 21 people contacted there were approximately 5 responses, of which only one was aware of any issues involving Dr. Stern. According to this staff person, they were aware of at least 2 incidents where they witnessed Dr. Stern provide incorrect or misleading information to the court regarding a patient. Staff also stated that they have experienced Dr. Stern make false statements regarding consulting with doctors and treatment teams prior to court testimony. Staff also

stated that during one court proceeding that they were witness to, Dr. Stern's lack of factual information and statements that were contrary to what was documented in the patient's records, almost resulted in the cancellation of a planned discharge.

## ADDENDUM

On April 28, 2017 ORR was presented with new information regarding medication that patient, D. Pelichet had missed during the months prior to his court hearing on November 9, 2016. This information was documented in the patients Medimar Report that ORR did not have access to. According to the information presented Mr. Pelichet missed his Wellbutrin XR 300mg medication on 09/19, 09/22, 09/26, 10/27, in the months leading up to his court hearing.

On May 1, 2017, in order to verify this information, ORR contacted the LPN who passes medication on Mr. Pelichet's unit. ORR asked for the Medimar Report to be reviewed from August 1, 2016 through November 9, 2016 for any medication refusals. The LPN stated in response that she has never know Mr. Pelichet to refuse his medication and that it has always been her experience in working with him that he is good about taking his medications. The nurse stated that he receives his psychotropic medication in a once per month administered shot and his antidepressant once per day. She went on to state that if he refuses anything it would be something like a laxative or something of that nature. ORR explained that they were in receipt of documentation that stated that Mr. Pelichet had refused medication on four occasions over that period of time. Upon further review of the Medimar Report the LPN responded that the dates in question were times when Mr. Pelichet missed his medication due to him not getting up to receive the medication at his scheduled 8am time. She went on to further explain that there is only a one hour window of time in which Mr. Pelichet can receive the medication after which time it is documented in the system as omitted/patient refused. With documentation being contrary to staff's statement it is impossible to confirm if Mr. Pelichet specifically refused to take medication or missed medication due to not getting out of the bed to have it administered. It should be noted that as of 11/09/2012, the date of Mr. Pelichet's court hearing, he had taken his Wellbutrin for 13 consecutive days. It was found that Wellbutrin has very long half-life of anywhere between 24 and 40 hours. Given that information 4 missed doses over a course of 101 days, with none of those days being consecutive, would not likely have an adverse effect on a patient's mood.

On May 1, 2017 ORR reviewed Mr. Pelichet's first IPOS from this last admission dated 11/17/2016. There was no mention of him refusing meds nor any goals, objectives, or interventions addressing him refusing or missing medication. ORR also reviewed his IPOS dated 02/15/17. It was similar and did not mention any of the above. The most recent IPOS dated 04/26/17 was not available for review.

On May 16, 2017 ORR requested and received a copy of Dr. Stern's contract with Walter Reuther Psychiatric Hospital. Contract is as follows:

ATTACHMENT A                    **STATEMENT OF WORK**

**CONTRACTOR NAME**:

**CONTRACT TITLE**: Psychologist – Expert Witness, Forensic Court Service

**WORK LOCATION**: Walter P Reuther Psychiatric Hospital

Credentialing Requirements:

- Ph.D. or Psy.D. in Clinical Psychology

**DUTIES TO BE PERFORMED:**

1. Coordinate coverage for weekly Court Docket
2. Interview patients identified as 'going' to Court regarding 401 criteria for Hospitalization (20-45 minutes)
3. Serve as Expert Witness in Court on behalf of Walter Reuther Hospital (2-5 hours Court time)

**DESCRIPTION OF REPORTS OR PRODUCTS TO BE DELIVERED:**

Itemized Billing: for Interview and Court time

Payment Vouchers

**TIMETABLE FOR REPORT OR PRODUCT DELIVERY:**

Upon completion of services

On May 17, 2017, per request, ORR received a copy of Mr. Pelichet's Documentation for both his 11/09/2017 and 05/03/2017 court hearings (Six-Month Review Report, Petition for Discharge from Continuing Mental Health Treatment Form, CFP/NGRI Committee Recommendations Memo to Wayne County Probate Court, Continuing Order for Treatment Form, Continuing Treatment Order, Clinical Certificate, and NGRI Court Hearing Form).

The petition for Continuing Treatment Order was signed on 10/27/2016 by Mr. Pelichet's Social Worker, C. Sandie. In the petition, continuing hospitalization for one year is checked off with the reasoning of; "The basis for this allegation is that I believe the individual has a mental illness and is unable to attend to basic physical needs such as food, clothing, or shelter that must be attended to in order to avoid serious harm." Again, this assertion by the Social Worker is not based on any documented facts or evidence presented. In addition this information contradicts the information provided by the social worker during her interview with ORR regarding the patient's functioning and readiness for discharge. Within the form, the social worker only notes the patients committing offense from 2005 and his poor attendance in PSR groups as a basis for this conclusion. It is also noted in the petition that the treatment has been adequate, there are no needs for modification, and the patient is motivated.

The Clinical Certificate was completed by Mr. Pelichet's treating Psychiatrist, Dr. Bavineni and signed on 10/30/2017. Per the Certificate, the doctor checked off that it was her determination that; "The person is mentally ill (has substantial disorder of thought or mood that significantly impairs judgement, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life)." The psychiatrist goes on to

note that the patient is "superficially cooperative", does not participate in PSR groups, and has limited insight into his illness and poor judgement, as facts to support her determination. However, these are not criteria for hospitalization. The follow up questions on the Certificate specifically address the criteria for hospitalization and ask for the doctor to give further facts that the patient will injure self (she noted he denied), injure others (she noted he denied), will be unable to attend his basic needs (she noted he takes care of his personal hygiene), and is unable to understand need for treatment (she noted he is provided with medication). In addition, aside from the patient's testimony in court acknowledging his mental illness, as well as the need and his ability to independently meet those needs through community services, nursing staff who are responsible for administering medication to Mr. Pelichet state that he regularly and willingly takes his medication.

The Center for Forensic Psychiatry Memo to Wayne County Probate Court dated November 4, 2016 stated the reasons for the NGRI Committee Recommendations for Continuing the One Year Order: "Needs more insight and commitment to treatment".

The Continuing Order for Treatment is dated November 9, 2017 and signed by Judge David Braxton. Within this Order it states that the court finds; "By clear and convincing evidence, the individual continues to be a person requiring treatment because the individual has a mental illness and as a result of that mental illness is unable to attend to those basic physical needs that must be attended to in order to avoid serious harm in the near future, and has demonstrated that inability by failing to attend to those basic physical needs." There was no relevant evidence presented based upon his current documented clinical condition, to support that this statement is factual. Information in Pelichet's record indicates he is high functioning and able to attend to his physical needs.

The Continuing Order for Treatment went on to state that; "There is not an available treatment program that is an alternative to hospitalization or that follows an initial period of hospitalization adequate to meet the individuals treatment needs and is sufficient to prevent harm that the individual may inflict upon self or others within the near future." This statement on the court order is not consistent with the reason for the continued hospitalization cited above and not supported by any alternative plan presented by Detroit-Wayne Community Mental Health Program.

The NGRI Court Hearing Form is not dated (left blank) but was signed by the treating psychiatrist Dr. Bavineni and Hospital Administrator, H. Bandla. Per Form:

> Patient has a history of marijuana abuse.
> Problematic behavior is 'uncooperative'.
>
> Engagement in treatment is 'not motivated for treatment'.
> Compliant with medication is 'yes'.
>
> Self-Aware and understands illness is 'yes'.

> Accepts responsibility for offense is 'no'.
> Connects illness with crime is 'no'.
>
> Understands signs of illness is 'no'.
> Recognizes need for ongoing treatment is 'no'
> Has constructive plans for future is 'no'.

Once again, none of these assertions are supported by information or evidence as to how these conclusions were reached.

On Mr. Pelichet's Six-Month Review Report dated 04/17/2017 and signed by the patient's treating psychiatrist, the doctor has checked off the first box which reads; "I believe the individual has a mental illness and as a result of that mental illness, the individual can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in an act or acts or made significant threats that are substantially supportive of this expectation." There is no documentation from Mr. Pelichet's current admission at WRPH to support this assertion and the report also contradicts statements made by Mr. Pelichet's psychiatrist during his court hearing on 05/03/2017.

The Petition for Discharge was signed on 04/18/2017 by Mr. Pelichet requesting to be discharged from WRPH. During his 05/03/2017 hearing Mr. Pelichet outlined plans that he has set in motion once discharged; he has made arrangements to reside with his mother, to become gainfully employed, attends NA on all LOA visits, and will participate in community mental health services that are available to him as he stated that he understand that as a person with a mental illness he will always need treatment. Mr. Pelichet's Petition for Discharge was denied by the court.

On May 17 and 18, 2017 ORR attempted to reach Mr. Pelichet's treating psychiatrist Dr. Bavineni to get her determination regarding emotional harm and how the missing anti-depressants could have affected Mr. Pelichet's emotional state. ORR was unable to reach the doctor but left an email for her on 05/18/2017. ORR left an additional email for Dr. Bavineni on 05/19/2017.

On May 26, 2017 ORR received a questionnaire response from Mr. Pelichet's treating Psychiatrist, Dr. A Bavineni. According to Dr. Bavineni she did not return from vacation until December of 2016, therefore had no contact with the patient for at least a month following his court hearing. According to Mr. Pelichet's treatment plan Dr. Bavineni meets with him once per month. In the questionnaire response Dr. Bavineni stated that as far as she could remember she did not see him depressed or hopeless. When asked about Mr. Pelichet's reported depression being due to his missed doses of Wellbutrin, Dr. Bavineni responded that it is her understanding that Wellbutrin does in fact have a long half-life and that the elimination is slow. She went on to explain that there might be several other reasons for anybody to be emotionally upset.

35

## CONCLUSION

The decision in this case is based upon a preponderance of evidence, which means a standard of proof which is met when, based upon all available evidence, it is more likely that a right was violated than not, based upon the greater weight of the evidence, not as to quantity, but as to quality. The facts of this case are as follows:

**1. Did Dr. Stern, a licensed psychologist, after personal examination, give testimony on 11/09/2016 regarding whether recipient Darryl Pelichet is a person requiring treatment at Walter Reuther Psychiatric Hospital (WRPH)?**

Yes. Interviews with the recipient and staff, along with the court transcript confirmed that Dr. Stern made statements regarding Mr. Pelichet's treatment, medication and his behavior while at WRPH, as well as during his time in the community.

**2. If yes, did Dr. Stern provide the court all relevant evidence as required by law to support that Mr. Pelichet was a person requiring treatment at WRPH?**

No. Dr. Stern is not Mr. Pelichet's treating psychologist and had not worked with him or known him prior to testifying on his behalf on 11/09/2016. His testimony is that of an expert witness in the eyes of the court and thus taken into great consideration in regards to the court's decision to continue or discontinue treatment/court order at WRPH. Based upon review of the clinical record and interviews with staff currently providing services to Mr. Pelichet, it is clear that Dr. Stern provided information that was erroneous, misleading and out of context. The testimony of Dr. Stern left out relevant evidence that was of consequence to the determination of the action (continued hospitalization) more probable or less probable than it would be without the evidence. Based upon the statements of other WRPH staff, it was indicated this is a pattern for Dr. Stern during court testimony.

Based on these facts, the preponderance of evidence does not support the violation of Abuse Class II – Emotional Harm against Dr. Stern, however, there is a preponderance of evidence that Dr. Stern failed to provide relevant evidence to the court as to Mr. Pelichet's current behavior, compliance with medications and treatment based upon documents in his clinical record and based upon any interviews with staff that provide ongoing treatment to Mr. Pelichet during his latest admission. **ORR is substantiating a violation by Dr. Stern of recipient Darryl Pelichet's right to be provided with mental health services suited to his condition per MHC section 330.1708(1).**

## RECOMMENDATIONS

ORR recommends that remedial action be taken with Dr. Stern to remedy this violation and prevent recurrence. ORR also recommends that administration give consideration into discontinuing the use of outside psychologists for matters that involve speaking on the treatment status of patients. Court testimony given with a lack of research and

personal knowledge regarding a patient can lead to inaccurate information being relayed and potentially affecting discharge. The court relies on "expert testimony" to determine if a person continues to be a person requiring treatment at the hospital or whether appropriate treatment can be provided in a less restrictive setting. This is not a responsibility that should be taken without adequate preparation and has a significant impact on the persons' rights and freedoms.

## PERSONS INTERVIEWED
Darryl Pelichet, Patient
Dr. C. Stern, Psychologist
Christina Sandie, Social Worker
Dr. Bavineni, Psychiatrist
A Copeland, LPN
Anonymous Staff

## DOCUMENTS
Clinical File
Probate Court Transcript
IPOS – 11/2016
IPOS – 02/2017
Court Documentation (Six-Month Review Report, Petition for Discharge, Continuing Order for Treatment, Clinical Certificate, and NGRI Court Hearing Form)
MediMar Report
Statement of Work: Contractual Psychologist

---

Enid Reed, Rights Advisor                                                    Date
Walter Reuther Psychiatric Hospital
30901 Palmer Rd.
Westland, MI 48186

# EXHIBIT F

**Report of Investigative Findings from Office of Recipient Rights, dated 9/8/17**



STATE OF MICHIGAN
DEPARTMENT OF HEALTH AND HUMAN SERVICES
LANSING

RICK SNYDER
GOVERNOR

NICK LYON
DIRECTOR

# Office of Recipient Rights
## Report of Investigative Findings

Report Date: September 8, 2017

Recipient's Name: DARRYL PELICHET

Complainant's Name: JAMES KLINGENBERG

✓ Substantiated     Not Substantiated

Service Request #: 1-106920241
Allegation Number: 1-106920247
Unit: R-6
Relationship: ORR
Category: 7086 – LEAST RESTRICTIVE SETTING

## ALLEGATION

ORR opened a complaint on behalf of recipient Darryl Pelichet following an investigation by ORR (Service Request #: 1-97339928, Allegation Number: 1-98291701) regarding testimony given by psychologist Charles Stern about recipient Darryl Pelichet's need for continuing hospitalization. The evidence indicated that incorrect or misleading information may have been presented to the court by other treating professionals at WRPH. The record review and staff interviews indicated that Mr. Pelichet did not meet the criteria for continued hospitalization as required by section 330.1401 of the Mental Health Code, however court papers documented he met 401 criteria in what appears to be an attempt to ensure that Mr. Pelichet remain on a one year continuing treatment order due to his NGRI status.

## CITATIONS

MHC 330.1708 Suitable services; treatment environment; setting; rights.

Sec. 708. (3) Mental health services shall be offered in the least restrictive setting that is appropriate and available.

MHC 330.1401 "Person requiring treatment" defined; exception.
Sec. 401.
(1) As used in this chapter, "person requiring treatment" means (a), (b), (c), or (d):

(a) An individual who has mental illness, and who as a result of that mental illness can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself, herself, or another individual, and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation.

(b) An individual who has mental illness, and who as a result of that mental illness is unable to attend to those of his or her basic physical needs such as food, clothing, or shelter that must be

attended to in order for the individual to avoid serious harm in the near future, and who has demonstrated that inability by failing to attend to those basic physical needs.

(c) An individual who has mental illness, whose judgment is so impaired by that mental illness that he or she is unable to understand his or her need for treatment, and whose impaired judgment, on the basis of competent clinical opinion, presents a substantial risk of significant physical or mental harm to the individual in the near future or presents a substantial risk of physical harm to others in the near future.

(d) An individual who has mental illness, whose understanding of the need for treatment is impaired to the point that he or she is unlikely to voluntarily participate in or adhere to treatment that has been determined necessary to prevent a relapse or harmful deterioration of his or her condition, and whose noncompliance with treatment has been a factor in the individual's placement in a psychiatric hospital, prison, or jail at least 2 times within the last 48 months or whose noncompliance with treatment has been a factor in the individual's committing 1 or more acts, attempts, or threats of serious violent behavior within the last 48 months. An individual under this subdivision is only eligible to receive assisted outpatient treatment.

MHC 330.1461 Testimony or deposition of physician or psychologist required; examinations; presence of attorney during deposition; cross-examination of deponent; waiver.
Sec. 461.
(1) Except as otherwise provided in this section, an individual may not be found to require treatment unless at least 1 physician or licensed psychologist who has personally examined that individual testifies in person or by written deposition at the hearing.

MHC 330.1459 Documents, witnesses, and cross-examination; rules of evidence.
Sec. 459.
(2) The court shall receive all relevant, competent, and material evidence which may be offered. The rules of evidence in civil actions are applicable, except to the extent that specific exceptions have been provided for in this chapter or elsewhere by statute or court rule.

Michigan Rules of Court, Volume I – State, 2017 – Rules of Evidence:
Rule 401, Definition of "Relevant Evidence":
"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

## ISSUES

On 11/9/2016, did psychologist Charles Stern provide testimony in court regarding recipient Darryl Pelichet's need for continuing hospitalization?

If so, was the information in the testimony incorrect and/or misleading?

Was other evidence presented to the court by other treating professionals on 11/19/16 or 4/14/17 that was incorrect or misleading?

If so, did the testimony and evidence influence the court in ordering that Mr. Pelichet remain on a one year continuing order for treatment in a hospital even though he did not meet 401 criteria for continued hospitalization?

## INVESTIGATIVE FINDINGS

A review of Mr. Pelichet's clinical record was completed on 6/26/17.

- A Risk Assessment for Patients on NGRI Status form was completed by Dr. Bavineni, Mr. Pelichet's treating psychiatrist, on 5/18/16, two weeks after his return to WRPH. Mr. Pelichet's risk score was 0 and noted to be a minimum security level required. Mr. Pelichet's psychiatric diagnosis was listed as Schizophrenia, paranoid-type, chronic and Marijuana and drug abuse.
- A letter dated 11/4/16 from the Center for Forensic Psychiatry to the Wayne County Probate Court with the NRGI Committee's recommendation was for a Continuing One Year Order for Hospitalization. The reason for the committee's recommendation was "Needs more insight and commitment to treatment."
- The NGRI Court Hearing Form for the court hearing on 11/9/16 was completed by Dr. Bavineni. The psychiatric assessment listed Mr. Pelichet's NGRI offense as assaulting police and also resisting and obstruction arrest. Mr. Pelichet's diagnosis was chronic paranoid schizophrenia. Medical problems were noted as Multiple Sclerosis, HTN. Dr. Bavineni noted that Mr. Pelichet was uncooperative and not motivated for treatment. She indicated that he was compliant with medication. Dr. Bavineni noted that Mr. Pelichet accepts/understands his illness but does not accept responsibility for his offense, nor was able to connect his illness with his crime. She indicated that he did not understand signs of his illness, did not recognize his need for ongoing treatment and did not have constructive plans for the future. Dr. Bavineni wrote that treatment goals were Mr. Pelichet's "need to understand about the importance of engage in treatment and better coping skills."
- Dr. Bavineni completed a clinical certificate on 10/30/16. The facts serving as the basis for her determination were "Mr. Pelichet is a single, 37 years old, African American male, with a long h/o of mental illness, readmitted to WRPH, due to failed ALS contract. He is superficially co-operative and doesn't participate in treatment recommended groups. He has limited insight in his illness and judgement is poor." Under "likelihood of injury to self", Dr. Bavineni wrote, "He denied." Under "likelihood of injury to others", she wrote, "He denied." Under "inability to attend to basic physical needs", Dr. Bavineni wrote, "He is taking care of his personal hygiene." Under "inability to understand need for treatment", she wrote, "He was provided with IM medication." Dr. Bavineni concluded Mr. Pelichet was an individual requiring treatment and she recommended hospitalization.
- The Petition for Continuing Treatment Order was completed by Christina Sandie, Social Worker. Christina marked that the basis for the allegation that she believed Mr. Pelichet had a mental illness and "is unable to attend to basic physical needs such as food, clothing, or shelter that must be attended to in order to avoid serious harm. Under the conclusion that was based on her personal observation of Mr. Pelichet doing the following acts and saying the following things, she wrote: "Patient is NGRI on charges of assaulting a police officer and resisting and obstructing a police officer." Under "The following conduct and statements seen or heard by others:" she wrote, "The offense occurred on January 18, 2005. Patient had poor attendance in psychosocial rehabilitation groups." Under "The treatment program(s) provided to the individual thus far, and

the results, are" Christina wrote, "1) individual supportive therapy, 2) psychiatric services, 3) pharmacotherapy, 4) psychosocial rehabilitation groups, 5) nursing, 6) activity therapy." She marked that the "treatment is adequate and appropriate for (Mr. Pelichet's) condition" and that he "is motivated to participate in this treatment program."

- The Continuing Order for Treatment dated 11/9/16 noted that the Court finds by clear and convincing evidence, the individual continues to be a person requiring treatment because the individual has a mental illness, and as a result of that mental illness "b. is unable to attend to those basic physical needs that must be attended to in order to avoid serious harm in the near future, and has demonstrated that inability by failing to attend to those basic physical needs." The order also indicated that there is not an available treatment program that is an alternative to hospitalization...

- The Six-Month Review Report dated 4/17/17 for the Continuing Order for Treatment was completed by Dr. Bavineni. For #4 of the form which states, "I believe the individual has mental illness and" Dr. Bavineni marked "a. as a result of that mental illness, the individual can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in an act or acts or made significant threats that are substantially supportive of this expectation." For #6 on the form which states, "This conclusion is based on a. the following facts which I have personal knowledge:" Dr. Bavineni wrote, "Seen and evaluated the patient, reviewed the medical records and discussed with different treatment team members." For #7 on the form which states, "The _ alternative treatment program _ assisted outpatient treatment program (neither one was marked) provided to the individual since the order, and the results are:" Dr. Bavineni wrote, "Patient failed his 5 year ALS contract, while he was receiving outpatient treatment. Since patient admitted to WRPH he did develop some insight in his mental illness, but he had difficulty adjusting in the community." For #8 on the form which states," This treatment is adequate and appropriate to the indivual's condition. The estimated time required for further treatment is 6 months. The following modifications in treatment are currently planned during the next six-month period, or proposed as _ alternative treatment, _ assisted outpatient treatment, (again neither was marked) and will be adequate and appropriate to the individual's condition:" Dr. Bavineni wrote, "Patient need to continue in structured therapeutic setting and learn about the adverse affects of marijuana abuse on general health and also while taking psychotropic medication which will aggravate the psychotic behavior. Understand about the 5 year ALS contract and follow the NGRI recommendations." Dr. Bavineni also marked that Mr. Pelichet continues to be a person requiring treatment.

On 7/14/17 Mr. Pelichet was released on Alternative Leave Status (ALS) from WRPH. A discharge summary was completed by Dr. Bavineni on 7/24/17. Mr. Pelichet's admission diagnosis was noted as 1. Schizophrenia, chronic, paranoid type, 2. Marijuana abuse. Other pertinent information was that his reason for hospitalization was due to failed ALS contract, specifically that "he was relapsed on marijuana and also he was not following the rules and did violate his five year ALS contract." Under the section "Mental Status on Admission" it was noted that Mr. Pelichet was cooperative, awake, alert and oriented. His personal hygiene had been adequate and he was dressed appropriately. Mr. Pelichet did not exhibit any thought disorder at that time. He denied any thoughts of violence or thoughts of hurting himself. Dr. Bavineni noted under the "Course During Hospitalization" that Mr. Pelichet was showing cooperation for taking his medication. Under the "Mental Status on Discharge" Dr. Bavineni again noted that Mr. Pelichet was dressed appropriately, that his personal hygiene was adequate and that he was cooperative. She wrote that his thought process was organized and that he again denied any thoughts of violence or thoughts of hurting himself. Dr. Bavineni wrote under the

41

"Final Disposition" that Mr. Pelichet's stay in the hospital was "uneventful." His discharge diagnosis was listed as 1. Chronic paranoid schizophrenia, stable, 2. Marijuana abuse in remission.

An interview was conducted with Lisa Medoff, PhD/Director of Psychology, on 8/9/17. Dr. Medoff explained that she had selected Dr. Stern for his position personally as an expert witness for purposes of court testimony to determine criteria for continued treatment. She indicated that she supervises the psychologists at WRPH including Dr. Stern who is contracted with WRPH for his services as an expert witness. Dr. Medoff stated that Dr. Stern has many years of experience in providing court testimony. She explained that she had read Dr. Stern's court testimony from 11/9/16 regarding Mr. Pelichet and she stated that the information Dr. Stern provided was all factual. Dr. Medoff stated that Dr. Stern talks to the patients for 20-45 minutes and also reviews their clinical records prior to the court hearing. When asked about the requirement for a one year continuing order for treatment for NGRI patients, Dr. Medoff indicated that it was the NGRI Committee who determines the length of the order needed "as far as I know." When asked about having to be on a five year ALS contract, Dr. Medoff stated that a patient on ALS can be released by the NGRI Committee or the court prior to the completion of five years. Dr. Medoff then stated that she didn't think that ORR can make clinical judgements about patients and that ORR always believes the patients when they file complaints. She indicated that the court makes determinations based on the facts presented to them.

An interview was conducted with Christina Sandie, Social Worker, on 8/9/17. Christina confirmed that she was the social worker assigned to Mr. Pelichet. She indicated that Mr. Pelichet had had poor attendance at treatment groups early in his most recent admission to WRPH. Christina stated that Mr. Pelichet seemed depressed around the time of his court hearing on 11/9/16 and she thought that it might have been a seasonal depression. She indicated that Dr. Stern did not talk to her about Mr. Pelichet prior to the 11/9/16 court hearing. Christina stated that when Mr. Pelichet came to her upset after the hearing, she encouraged him to file a Recipient Rights Complaint. When asked about the testimony that Dr. Stern had given about Mr. Pelichet, she indicated that there was no documentation that Mr. Pelichet had verbally threatened anyone either at WRPH or at this placement prior to returning from ALS. Christina explained that Mr. Pelichet had been the victim of an assault by another patient during this most recent admission but that he did not retaliate or fight back. She also indicated that Mr. Pelichet had helped a nurse when another patient attacked the nurse. Christina stated that Mr. Pelichet had good insight into his need for medication and that he had not "refused" his medication. She explained that there were a few times when he didn't get up on time to receive medication and it is then marked "refused." Christina stated that Mr. Pelichet was very good about getting him IM injection and had reminded the staff about it when it was missed due to an LOA. She indicated that Mr. Pelichet did not receive an increase in medication due to behaviors as Dr. Stern testified to. Christina stated that Mr. Pelichet has quite a bit of insight into his mental illness and need for treatment. She indicated that Mr. Pelichet had no rule violations. Christina stated that Mr. Pelichet missed some groups and his lack of participation in groups was probably the reason for the one year continuing order that he received on 11/9/17. She indicated that Mr. Pelichet does not trust the system and exhibited signs of depression as a result of the 11/9/16 hearing. Christina stated that Mr. Pelichet was motivated after the court hearing to move forward with treatment and early in 2017 he started attending groups regularly, went on LOA's regularly, and was more positive about his treatment. She indicated that she testified at Mr. Pelichet's six-month review as well as Dr. Medoff. Christina stated that Dr. Stern did not testify at the six-month review. She indicated that Mr. Pelichet was released to his mother's home in July and that the AFC setting was not always a good fit for Mr.

Pelichet. When asked why on the petition filed by her on 10/27/16 she had marked "#7" ("The basis of this allegation is that I believe the individual has a mental illness and is unable to attend to basic physical needs such as food, clothing, or shelter that must be attended to in order to avoid serious harm") but on the six-month review dated 4/17/17, Dr. Bavineni had marked "4a" ("I believe the individual has a mental illness and as a result of that mental illness, the individual can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in in an act or made significant threats that are substantially supportive of this expectation"), Christina stated, "It depends on who fills out the paperwork." When asked to clarify why she had marked "unable to attend to those basic physical needs...," Christina stated, "We do that for him so that is why I marked it."

An interview was conducted with Norine Bourgeois, Social Worker, on 8/9/17. Norine indicated that she was not currently Mr. Pelichet's social worker but had been during previous admissions. She explained that Mr. Pelichet had broken his ALS contract multiple times and was returned to WRPH each time. Norine stated that Mr. Pelichet didn't always handle his personal responsibilities such as paying bills and rent. She indicated that he was NGRI for assaulting a police officer but she was not aware of any assaults while in the community on ALS or at WRPH.

An interview was conducted with Aruna Bavineni, M.D./Psychiatrist, on 8/9/17. Dr. Bavineni confirmed that she was Mr. Pelichet's treating psychiatrist during his recent admission. She indicated that she did not know the details of his crime for which he was found NGRI but just that he was charged with assaulting a police officer and resisting and obstructing a police officer. When asked about her comment that Mr. Pelichet was not motivated for treatment on the NGRI Court Hearing Form for the hearing on 11/9/16, Dr. Bavineni stated that during the first half of his admission, Mr. Pelichet was not motivated for treatment and did not participate in groups. She indicated that in the second half of the admission after the first of the year he did participate in the assigned groups. Dr. Bavineni stated that Mr. Pelichet's family was also more involved during the second half of the admission and that seemed to motivate Mr. Pelichet. She explained that Mr. Pelichet was being passive/aggressive in that he would not come out of his room for groups but would participate in playing cards on the unit with other patients and staff. When asked about why Mr. Pelichet was returned to the hospital from his ALS contract, Dr. Bavineni stated that he had left AMA from the group home and smoked marijuana. When asked if his smoking marijuana was a problem related to his mental illness, Dr. Bavineni said that he could commit other crimes and is "still considered guilty" (of the NGRI charges). She indicated that it is up to the NGRI Committee to determine if he is to return to the hospital for violating the contract. Dr. Bavineni stated that Mr. Pelichet says that group homes are difficult because they have too many rules. She indicated that she was on vacation at the time of Mr. Pelichet's court hearing on 11/9/16. Dr. Bavineni stated that Dr. Stern did not talk to her about Mr. Pelichet prior to the court hearing and that she did not know who he talked to. She indicated that Mr. Pelichet's medications were lowered while she was on vacation and she found out about it when she returned from her vacation. Dr. Bavineni stated that the NGRI Committee decides if a one year court order is needed. She indicated that Mr. Pelichet has insight into his medications not into his mental illness. When asked about why she marked on the six-month review dated 4/17/17 that "I believe the individual has a mental illness and as a result of that mental illness, the individual can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in in an act or made significant threats that are substantially supportive of this expectation", Dr. Bavineni stated that she was unsure where Mr. Pelichet was in his treatment. On the six-month review, question #6 states, "This conclusion is based

on the following facts which I have personal knowledge." Dr. Bavineni wrote, "Seen and evaluated the patient, reviewed the medical records and discussed with different treatment team members." When it was pointed out to her that there were just sources but no facts as to why Mr. Pelichet was a danger to himself or others, Dr. Bavineni could not provide any facts and appeared to not understand the question.

An interview was conducted with Hanumaiah Bandla, M.D./Director of Psychiatry, on 8/9/17. Dr. Bandla explained that he provides administrative supervision to the other psychiatrists and also supervises Dr. Medoff. He indicated that he meets with the doctors monthly but the doctors can bring questions to him as needed between the monthly meetings. Dr. Bandla stated that he had reviewed the court testimony of Dr. Stern from 11/9/16 and he noted no problems with it. He indicated that community hospitals use independent PhD level psychologists to give court testimony and so WRPH also uses this practice. Dr. Bandla stated that patients often don't like the testimony from their own doctors so and outside doctor is used. He indicated that all NGRI patients are under the supervision of the NGRI Committee and they also send a report to the court in addition to what WRPH provides to the court. Dr. Bandla stated that patients who are NGRI need to have an order for hospitalization to maintain their NGRI status but he could not provide the basis for this requirement other than the NGRI Committee.

An interview was conducted with Charles Stern, PhD/Contract Psychologist, on 8/9/17. Dr. Stern stated that he had been on a contract with WRPH for a couple years. He indicated that he had many years of court testimony and that he is in court almost every day. When asked what he does to prepare to testify in court, Dr. Stern stated that he reviews the psychiatric evaluation of the treating psychiatrist and also reads progress notes. When asked if he talks to the treating psychiatrist also, he indicated that he talks to staff but it depends on who is available when he comes in, which he said is usually at night or on the weekends. Dr. Stern stated that he also reviewed the settled record for Mr. Pelichet's NRGI charges. (These records are not at WRPH and it is unlikely that Dr. Stern reviewed them.) When questioned about his court testimony, Dr. Stern became quite hostile and demanded to know what this writer was trying to prove and why his testimony was being questioned. He also wanted to know this writer's credentials. Dr. Stern was asked if it was possible to present factual information in a way that is misleading or misinterpreted. He would not answer the question but continued to appear upset and said, "You know that answer" but would not reply "yes" or "no." Dr. Stern was unable to answer any questions about the details of his testimony other than to say that what he said was accurate. He could not recall any details about Mr. Pelichet regarding medication refusal, medication increases or decreases, behaviors on the unit, or alleged threats other than to say that it was in the record. Dr. Stern stated that this court hearing was so long ago and that he does hundreds of court hearings each year. He eventually calmed down when the direction of the questioning changed. On more than on occasion he referred to recipients as "these people" and talked about how they are manipulative. Dr. Stern ended the interview by stating that he really cares about "these people" as well as the safety of the hospital staff and the community at large.

A review of ORR Report of Investigative Findings dated 6/12/17 (Service Request #1-97339928, Allegation #1-98291701) substantiated that Dr. Stern did not provide all relevant evidence when he gave testimony at Mr. Pelichet's court hearing on 11/9/16. It was determined that Dr. Stern provided information that was erroneous, misleading and out of context.

A review of the court testimony by Dr. Stern was completed and the following was noted:

- Dr. Stern testified that he "spoke to staff" as part of his preparation for court. (However, he did not identify who the staff were when questioned.)
- When asked if he had a diagnosis based on his interview of Mr. Pelichet, Dr. Stern stated, "His diagnosis **was** Schizophrenia paranoid-type; chronic with marijuana abuse. It **may** possibly be Schizoaffective Disorder." (emphasis added)
- When asked what brought Mr. Pelichet to the hospital, Dr. Stern stated, "He's been adjudicated NGRI since 2005. But he has broken ALS contracts, at AFC's a number of times. This one that I just said, also for marijuana use and other things that broke the contract." (The history of when Mr. Pelichet was originally adjudicated NGRI and earlier broken contracts are not relevant to his most recent return to the hospital. Dr. Stern did not provide any details as to the "other things" that broke the contract.)
- When asked to describe what ALS (Alternative Leave Status) is, Dr. Stern stated, "They are usually sent to a ALS, I mean an AFC program or possibly a less restrictive hospital…" (Dr. Stern's understanding of the ALS contract is in question in that he states that a less restrictive hospital could be a placement for ALS. If a recipient is in a hospital, he/she is not on ALS.)
- Again Dr. Stern was asked what behaviors Mr. Pelichet had that were then reasons for his return to the hospital, he stated, "He has had a number of cases where he was smoking marijuana one time and was delivering so there was a number of incidents that broke his contract. He's made verbal threats at times as well." When the defense attorney questioned when the verbal threats occurred, Dr. Stern could not provide any dates or specific details as to these alleged incidents. Dr. Stern also did not know the dated when Mr. Pelichet was last placed on ALS or the date of his return to WRPH. (The number of cases where Mr. Pelichet broke his contract were spread out over multiple placements, not just his most recent.)
- Dr. Stern testified, "He has said on the unit at times, the end of last month, he said, 'I'm not taking medications.' He refused to get out of bed to go down to get medication, getting it last month, he said he refused medications in September several times." (There is no evidence that Mr. Pelichet said he was not taking medications. Mr. Pelichet missed medication four times over the course of 100 days and none were consecutive.)
- Dr. Stern stated in his testimony, "Again, they've had times when they've had to increase his regular medications, because of his behavior." (There is no evidence of medication increase due to Mr. Pelichet's behavior. In fact, Mr. Pelichet's medication dosage was decreased prior to the court hearing.)
- When asked if he had an opinion as to whether Mr. Pelichet would be a harm to himself or to others. Dr. Stern stated, "Yes, well obviously he violated the ALS contracts a number of times, not following the rules and so forth and on the unit, he's also not wanted to follow the rules completely and he's passive-aggressive about. So I don't see how he's ready to go back out in the community at this point, given his history and given what he's been doing in the hospital **at times**." (Emphasis added. The only relevant fact is that in his history Mr. Pelichet was charged with assault in 2005 but none of the other information Dr. Stern provides shows that Mr. Pelichet is a danger to himself or others.)
- When asked if, in his professional opinion, this was the least restrictive form of treatment for Mr. Pelichet at this time, Dr. Stern said, "I do."
- During cross examination, when it was pointed out that Mr. Pelichet had been released on ALS in the past and must not have been a risk to others in the community, Dr. Stern stated, "Well, if he's not on his medications, he's not cooperating with treatment, he was missing from the AFC

facilities so, when he's not on his medications he – in the past he's charged with assault **and so forth**." (emphasis added)

• When asked if he was aware of Mr. Pelichet's diagnosis of Multiple Sclerosis, Dr. Stern indicated that he was but he did not know how long he had had that diagnosis. When the attorney asked if he understood that the purpose of the marijuana use was for the MS, Dr. Stern replied, "He didn't tell me that but I understand **why he might say that**." (emphasis added)

An interview was conducted with recipient Darryl Pelichet on 8/17/17 via telephone. Mr. Pelichet had been released on Alternative Leave Status (ALS) from Walter Reuther Psychiatric Hospital on 7/14/17. He was asked to describe the court hearing on 11/9/16. Mr. Pelichet stated that he was upset after the hearing and felt that Dr. Stern wasn't telling the truth about him. He said, "It weighed heavy on me." Mr. Pelichet explained that his family has always been supportive of him but that he had distanced himself from them for a while when he was returned to WRPH from the ALS contract. When asked if Dr. Stern had talked to him prior to the court hearing, he indicated that Dr. Stern came into WRPH on Saturday after 6:00pm when there were no professional staff persons present. Mr. Pelichet stated that he wasn't expecting Dr. Stern to show up at that time but he talked to Dr. Stern for 10-15 minutes. He indicated that he was allowed to make a statement in court during the hearing but they (the court) sided with Dr. Stern based on the doctor's opinion. Mr. Pelichet denied making any verbal threats as Dr. Stern had testified to. He admitted being arrested in 2009 for delivery of marijuana but was only convicted of possession. Mr. Pelichet stated that he was sentenced to time served and turned over to the NGRI Committee to deal with his treatment.

## CONCLUSION

***On 11/9/2016, did psychologist Charles Stern provide testimony in court regarding recipient Darryl Pelichet's need for continuing hospitalization?*** Yes. A review of the court transcript as well as interviews with Dr. Stern and other staff from WRPH confirmed that he gave testimony as an expert witness regarding Mr. Pelichet's continuing order for treatment.

***If so, was the information in the testimony incorrect and/or misleading?*** Yes. As noted in Service Request #: 1-97339928, Allegation Number: 1-98291701 regarding testimony given by psychologist Charles Stern about recipient Darryl Pelichet's need for continuing hospitalization, the information provided by Dr. Stern was erroneous, misleading and out of context. When interviewed by this writer, Dr. Stern was unable to provide any details about the testimony, stating that it was so long ago and that he does hundreds of court hearings each year. Dr. Stern testified in court and also told this writer that he spoke with staff in preparation for the court hearing but he was unable to identify who the staff person(s) was/were. Dr. Bavineni, Mr. Pelichet's treating pshyciatrist, and Christina Sandie, Mr. Pelichet's social worker, each indicated that Dr. Stern did not talk to them prior to the court hearing. Dr. Stern indicated that he talks to whomever is present when he comes in to review the clinical record but that is usually at night or on the weekend so there are likely no treatment team members available to consult with regarding the recipient and his/her treatment. Dr. Stern throughout his testimony made vague statements using words like "and other things" or "and so forth" without providing details but said in a way that would suggest that there was more evidence than was provided. Dr. Stern testified that Mr. Pelichet said that he was "not taking medication" but there is no evidence to support this assertion. He also testified that Mr. Pelichet's medication was increased due to behaviors on the unit when in fact Mr. Pelichet's medications were decreased prior to the court hearing and there is no evidence of any increases in medication due to behaviors. When

asked if Mr. Pelichet would be a harm to himself or others, Dr. Stern testified that Mr. Pelichet had violated his ALS contract several times but gave no evidence as to how he would be a harm to himself or others.

***Was other evidence presented to the court by other treating professionals on 11/19/16 or 4/14/17 that was incorrect or misleading?*** Yes. Dr. Bavineni completed an NGRI Court Hearing Form and the Clinical Certificate for the court hearing. Social Worker Christina Sandie completed the Petition for Continuing Treatment Order. On the NGRI Court Hearing Form, Dr. Bavineni indicated that Mr. Pelichet was uncooperative and not motivated for treatment. This was contradicted by the Petition where Christina indicated that Mr. Pelichet was motivated to participate in the treatment program. Dr. Bavineni also contradicted herself on the NGRI Court Hearing Form in that she marked on the front that Mr. Pelichet accepts/understands his illness and on the back marked that he does not understand the signs of his illness. On the Clinical Certificate Dr. Bavineni noted that Mr. Pelichet denied likelihood of injury to himself or others and indicated that he is taking care of this personal hygiene. However, on the Petition Christina marked as the basis for his need for continuing treatment that Mr. Pelichet is unable to attend to his basic physical needs such as food, clothing or shelter. When questioned as to why she marked this box on the Petition, Christina stated that the WRPH provides those things for him so that is why she selected that option. When it was pointed out that Dr. Bavineni marked a different basis on the six-month review form, Christina stated, "it depends on who fills out the form" suggesting that it is not based on clinical data but on the person completing the paperwork. Also on the Petition where Christina was to describe her personal observation of Mr. Pelichet that was the basis of the need for treatment, she wrote that he is NGRI on charges of assaulting a police officer and resisting and obstructing a police officer and that the offense occurred on January 18, 2005. There was no information on the Petition that supported the assertion that Mr. Pelichet is a person requiring treatment. On the Six-Month Review Report Dr. Bavineni indicated that the basis for Mr. Pelichet's need for continuing treatment was that he could "reasonably be expected within the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in an act or acts or made significant threats that are substantially supportive of this expectation." However, there was no information contained in the report that supported this assertion. When interviewed, Dr. Bavineni did not understand that facts were required to support the assertion rather than simply stating that she had seen and evaluated the patient, reviewed his medical record and discussed with different treatment team members.

***If so, did the testimony and evidence influence the court in ordering that Mr. Pelichet remain on a one year continuing order for treatment in a hospital even though he did not meet 401 criteria for continued hospitalization?*** Yes. It was noted that the documentation that was provided to the court at both the court hearing for continued hospitalization on 11/9/16 and again at the six-month review were items marked that are considered criteria for hospitalization under Chapter 4 of the Michigan Mental Health Code. The court order followed the documentation provided to the court. However, the information provided during interviews did not support the assertions made in the documentation. This can be seen when reviewing the discharge summary completed by Dr. Bavineni when Mr. Pelichet was again placed on ALS on 7/14/17. Dr. Bavineni noted that Mr. Pelichet's return to the hospital were due to a failed ALS contract, specifically that he was relapsed on marijuana and was not following the rules. Her description of Mr. Pelichet at the time of admission was very close to that of her description of him at discharge and none of the things stated were criteria for hospitalization. Dr. Bavineni noted that Mr. Pelichet was cooperative with taking medication and his stay in the hospital was "uneventful."

The findings of the case are based upon the standard of preponderance of evidence which means a standard of proof which is met when, based upon all the available evidence, it is more likely that a right was violated than not; greater weight of evidence, not as to quantity (number of witnesses), but as to quality (believability and greater weight of important facts provided). Based on the preponderance of evidence presented by the investigative findings, a violation of Mr. Pelichet's right to receive mental health services in the least restrictive setting that is appropriate and available is substantiated.

## RECOMMENDATIONS

ORR recommends that the NGRI process for evaluating the need for continued hospitalization be reviewed with all treating professionals and contract psychologists at WRPH to ensure that only clinically factual information be presented to the courts and recommendations to the court are based upon the criteria established in Section 401 of the Mental Health Code.

During the course of this investigation, ORR determined that the process of using court orders for continued hospitalization to maintain NGRI Committee oversight has become standard practice that is placing the due process rights of individuals who have been found NGRI and placed in the care of the Michigan Department of Health and Human Services (MDHHS) in jeopardy. ORR recommends that this process be reviewed and evaluated by the Bureau of Hospitals and Administrative Operations and Legal Affairs Administration and administrative action be taken to prevent such violations in the future at all MDHHS operated hospitals and centers.

## PERSONS INTERVIEWED

Lisa Medoff, PhD/Director of Psychology for WRPH - 8/9/17
Christina Sandie, Social Worker - 8/9/17
Norine Bourgeois, Social Worker - 8/9/17
Aruna Bavineni, M.D./Psychiatrist - 8/9/17
Hanumaiah Bandla, M.D./Director of Psychiatry - 8/9/17
Charles Stern, PhD/Contract Psychologist - 8/9/17
Darryl Pelichet, recipient - 8/17/17

## DOCUMENTS EXAMINED

Report of Investigative Findings for Service Request #: 1-97339928, Allegation #: 1-98291701 –
6/12/17
Letter dated 11/4/16 from Center for Forensic Psychiatry to Wayne County Probate Court – 6/12/17
NGRI Court Hearing Form – 6/12/17
Clinical Certificate dated 10/30/16 by Dr. Bavineni – 6/12/17
Petition for Continuing Treatment Order dated 10/27/16 by Christina Sandie – 6/12/17
Continuing Order for Treatment dated 11/9/16 for Darryl Pelichet – 6/12/17
Six-Month Review Report dated 4/17/17 by Dr. Bavineni – 6/12/17
Court transcript dated 11/9/16 of Dr. Stern – 6/12/17
Email dated 6/8/17 from Deborah Brock – 6/12/17

IPOS's dated 8/16/16, 11/10/16, 2/8/17 and 5/3/17 for Darryl Pelichet – 6/12/17
Risk Assessment dated 5/18/16 by Dr. Bavineni – 6/12/17
Psychiatric Evaluations dated 5/4/16 and 5/3/17 by Dr. Bavineni – 6/12/17
Social Work Assessments dated 5/6/16 and 5/4/17 by Christina Sandie – 6/12/17
Medical History and Psychical Exam dated 5/2/17 by Shireen Brohi – 6/12/17
Nursing Assessments dated 8/6/16, 11/8/16 and 5/13/17 by Dominique Sullano – 6/12/17
Rehab Services Assessment dated 5/6/16 and 5/2/17 by Scott Price – 6/12/17
Suicide Risk Assessment dated 5/4/16 and 12/15/16 by Dr. Bavineni – 6/12/17
Email dated 6/20/17 from Kimberly Meyer – 6/20/17
Police Report dated 3/11/05 and Narrative Report – 6/20/17
Alternative Leave Status contracts dated 12/15/06, 10/23/08, 8/18/10, 6/29/12, 12/15/14, 12/15/15, and 1/14/16 for Darryl Pelichet – 6/15/17
Discharge Summary dated 7/14/17 for Darryl Pelichet – 8/7/17


Jim Klingenberg, Rights Specialist
CARO CENTER
2000 CHAMBERS RD
CARO, MI, 48723
844-987-2276

49

# EXHIBIT G

**Summary Report of Recipient Rights Complaint Amended Report – 4th revision**



STATE OF MICHIGAN
DEPARTMENT OF HEALTH AND HUMAN SERVICES
WALTER P. REUTHER PSYCHIATRIC HOSPITAL

RICK SNYDER
GOVERNOR

NICK LYON
DIRECTOR

## SUMMARY REPORT OF RECIPIENT RIGHTS COMPLAINT
### AMENDED REPORT – 4th REVISION

| | |
|---|---|
| Date of Complaint Report: | September 8, 2017 |
| Date Filed with ORR: | June 12, 2017 |
| Date of Facility Response: | October 10, 2017 |
| ORR Complaint No.: | 1-106920241 & 1-106920247 |
| Recipient Name/Case#: | Darryl Pelichet (Discharged) |

Complainant:   James Klingenberg, Recipient Rights Advisor
c/o Caro Center
2000 Chambers Road
Caro, Michigan 48723

Dear Mr. Klingenberg:

The Director's Office has reviewed the findings of your complaint and offers the following response:

**Allegations:**
ORR opened a complaint on behalf of recipient Darryl Pelichet following an investigation by ORR (Service Request #: 1-97339928, Allegation Number: 1-98291701) regarding testimony given by psychologist Charles Stern about recipient Darryl Pelichet's need for continuing hospitalization. The evidence indicated that incorrect or misleading information may have been presented to the court by other treating professionals at WRPH. The record review and staff interviews indicated that Mr. Pelichet did not meet the criteria for continued hospitalization as required by section 330.1401 of the Mental Health Code, however court papers documented he met 401 criteria in what appears to be an attempt to ensure that Mr. Pelichet remain on a one year continuing treatment order due to his NGRI status.

**Legal Basis:**
MHC 330.1708 Suitable services; treatment environment; setting; rights.

Sec. 708. (3) Mental health services shall be offered in the least restrictive setting that is appropriate and available.

MHC 330.1401 "Person requiring treatment" defined; exception.
Sec. 401.(1) As used in this chapter, "person requiring treatment" means (a), (b), (c), or (d):

(a) An individual who has mental illness, and who as a result of that mental illness can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself, herself, or another individual, and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation.

(b) An individual who has mental illness, and who as a result of that mental illness is unable to attend to those of his or her basic physical needs such as food, clothing, or shelter that must be attended to in order for the individual to avoid serious harm in the near future, and who has demonstrated that inability by failing to attend to those basic physical needs.

(c) An individual who has mental illness, whose judgment is so impaired by that mental illness that he or she is unable to understand his or her need for treatment, and whose impaired judgment, on the basis of competent clinical opinion, presents a substantial risk of significant physical or mental harm to the individual in the near future or presents a substantial risk of physical harm to others in the near future.

30901 PALMER ROAD • WESTLAND, MICHIGAN 48186-5389
www.michigan.gov • 734-367-8400 • TDD 734-367-8616

(d) An individual who has mental illness, whose understanding of the need for treatment is impaired to the point that he or she is unlikely to voluntarily participate in or adhere to treatment that has been determined necessary to prevent a relapse or harmful deterioration of his or her condition, and whose noncompliance with treatment has been a factor in the individual's placement in a psychiatric hospital, prison, or jail at least 2 times within the last 48 months or whose noncompliance with treatment has been a factor in the individual's committing 1 or more acts, attempts, or threats of serious violent behavior within the last 48 months. An individual under this subdivision is only eligible to receive assisted outpatient treatment.

MHC 330.1461 Testimony or deposition of physician or psychologist required; examinations; presence of attorney during deposition; cross-examination of deponent; waiver.
Sec. 461. (1) Except as otherwise provided in this section, an individual may not be found to require treatment unless at least 1 physician or licensed psychologist who has personally examined that individual testifies in person or by written deposition at the hearing.

MHC 330.1459 Documents, witnesses, and cross-examination; rules of evidence.
Sec. 459. (2) The court shall receive all relevant, competent, and material evidence which may be offered. The rules of evidence in civil actions are applicable, except to the extent that specific exceptions have been provided for in this chapter or elsewhere by statute or court rule.

Michigan Rules of Court, Volume I – State, 2017 – Rules of Evidence:
Rule 401, Definition of "Relevant Evidence." "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

**Issues:**

1. On 11/9/2016, did psychologist Charles Stern provide testimony in court regarding recipient Darryl Pelichet's need for continuing hospitalization?

2. If so, was the information in the testimony incorrect and/or misleading?

3. Was other evidence presented to the court by other treating professionals on 11/19/16 or 4/14/17 that was incorrect or misleading?

4. If so, did the testimony and evidence influence the court in ordering that Mr. Pelichet remain on a one year continuing order for treatment in a hospital even though he did not meet 401 criteria for continued hospitalization?

**Persons Interviewed:**
Lisa Medoff, PhD/Director of Psychology for WRPH - 8/9/17
Christina Sandie, Social Worker - 8/9/17
Norine Bourgeois, Social Worker - 8/9/17
Aruna Bavineni, M.D./Psychiatrist - 8/9/17
Hanumaiah Bandla, M.D./Director of Psychiatry - 8/9/17
Charles Stern, PhD/Contract Psychologist - 8/9/17
Darryl Pelichet, recipient - 8/17/17

**Documents Reviewed:**
Report of Investigative Findings for Service Request #: 1-97339928, Allegation #: 1-98291701 – 6/12/17
Letter dated 11/4/16 from Center for Forensic Psychiatry to Wayne County Probate Court – 6/12/17
NGRI Court Hearing Form – 6/12/17
Clinical Certificate dated 10/30/16 by Dr. Bavineni – 6/12/17
Petition for Continuing Treatment Order dated 10/27/16 by Christina Sandie – 6/12/17
Continuing Order for Treatment dated 11/9/16 for Darryl Pelichet – 6/12/17

Six-Month Review Report dated 4/17/17 by Dr. Bavineni – 6/12/17
Court transcript dated 11/9/16 of Dr. Stern – 6/12/17
Email dated 6/8/17 from Deborah Brock – 6/12/17
IPOS's dated 8/16/16, 11/10/16, 2/8/17 and 5/3/17 for Darryl Pelichet – 6/12/17
Risk Assessment dated 5/18/16 by Dr. Bavineni – 6/12/17
Psychiatric Evaluations dated 5/4/16 and 5/3/17 by Dr. Bavineni – 6/12/17
Social Work Assessments dated 5/6/16 and 5/4/17 by Christina Sandie – 6/12/17
Medical History and Psychical Exam dated 5/2/17 by Shireen Brohi – 6/12/17
Nursing Assessments dated 8/6/16, 11/8/16 and 5/13/17 by Dominique Sullano – 6/12/17
Rehab Services Assessment dated 5/6/16 and 5/2/17 by Scott Price – 6/12/17
Suicide Risk Assessment dated 5/4/16 and 12/15/16 by Dr. Bavineni – 6/12/17
Email dated 6/20/17 from Kimberly Meyer – 6/20/17
Police Report dated 3/11/05 and Narrative Report – 6/20/17
Alternative Leave Status contracts dated 12/15/06, 10/23/08, 8/18/10, 6/29/12, 12/15/14, 12/15/15, and 1/14/16
    for Darryl Pelichet – 6/15/17
Discharge Summary dated 7/14/17 for Darryl Pelichet – 8/7/17

<u>Summary of Findings:</u>

1. *On 11/9/2016, did psychologist Charles Stern provide testimony in court regarding recipient Darryl Pelichet's need for continuing hospitalization?*

   Yes.  A review of the court transcript as well as interviews with Dr. Stern and other staff from WRPH confirmed that he gave testimony as an expert witness regarding Mr. Pelichet's continuing order for treatment.

2. *If so, was the information in the testimony incorrect and/or misleading?*

   Yes. As noted in Service Request #: 1-97339928, Allegation Number: 1-98291701 regarding testimony given by psychologist Charles Stern about recipient Darryl Pelichet's need for continuing hospitalization, the information provided by Dr. Stern was erroneous, misleading and out of context.  When interviewed by this writer, Dr. Stern was unable to provide any details about the testimony, stating that it was so long ago and that he does hundreds of court hearings each year.  Dr. Stern testified in court and also told this writer that he spoke with staff in preparation for the court hearing but he was unable to identify who the staff person(s) was/were.  Dr. Bavineni, Mr. Pelichet's treating psychiatrist, and Christina Sandie, Mr. Pelichet's social worker, each indicated that Dr. Stern did not talk to them prior to the court hearing.  Dr. Stern indicated that he talks to whomever is present when he comes in to review the clinical record but that is usually at night or on the weekend so there are likely no treatment team members available to consult with regarding the recipient and his/her treatment.  Dr. Stern throughout his testimony made vague statements using words like "and other things" or "and so forth" without providing details but said in a way that would suggest that there was more evidence than was provided.  Dr. Stern testified that Mr. Pelichet said that he was "not taking medication" but there is no evidence to support this assertion.  He also testified that Mr. Pelichet's medication was increased due to behaviors on the unit when in fact Mr. Pelichet's medications were decreased prior to the court hearing and there is no evidence of any increases in medication due to behaviors.  When asked if Mr. Pelichet would be a harm to himself or others, Dr. Stern testified that Mr. Pelichet had violated his ALS contract several times but gave no evidence as to how he would be a harm to himself or others.

3. *Was other evidence presented to the court by other treating professionals on 11/19/16 or 4/14/17 that was incorrect or misleading?*

   Yes. Dr. Bavineni completed an NGRI Court Hearing Form and the Clinical Certificate for the court hearing. Social Worker Christina Sandie completed the Petition for Continuing Treatment Order.  On the NGRI Court Hearing Form, Dr. Bavineni indicated that Mr. Pelichet was uncooperative and not motivated for treatment.  This was contradicted by the Petition where Christina indicated that Mr. Pelichet was

motivated to participate in the treatment program. Dr. Bavineni also contradicted herself on the NGRI Court Hearing Form in that she marked on the front that Mr. Pelichet accepts/understands his illness and on the back marked that he does not understand the signs of his illness. On the Clinical Certificate Dr. Bavineni noted that Mr. Pelichet denied likelihood of injury to himself or others and indicated that he is taking care of this personal hygiene. However, on the Petition Christina marked as the basis for his need for continuing treatment that Mr. Pelichet is unable to attend to his basic physical needs such as food, clothing or shelter. When questioned as to why she marked this box on the Petition, Christina stated that the WRPH provides those things for him so that is why she selected that option. When it was pointed out that Dr. Bavineni marked a different basis on the six-month review form, Christina stated, "it depends on who fills out the form" suggesting that it is not based on clinical data but on the person completing the paperwork. Also on the Petition where Christina was to describe her personal observation of Mr. Pelichet that was the basis of the need for treatment, she wrote that he is NGRI on charges of assaulting a police officer and resisting and obstructing a police officer and that the offense occurred on January 18, 2005. There was no information on the Petition that supported the assertion that Mr. Pelichet is a person requiring treatment. On the Six-Month Review Report Dr. Bavineni indicated that the basis for Mr. Pelichet's need for continuing treatment was that he could "reasonably be expected within the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in an act or acts or made significant threats that are substantially supportive of this expectation." However, there was no information contained in the report that supported this assertion. When interviewed, Dr. Bavineni did not understand that facts were required to support the assertion rather than simply stating that she had seen and evaluated the patient, reviewed his medical record and discussed with different treatment team members.

4. *If so, did the testimony and evidence influence the court in ordering that Mr. Pelichet remain on a one year continuing order for treatment in a hospital even though he did not meet 401 criteria for continued hospitalization?*

Yes. It was noted that the documentation that was provided to the court at both the court hearing for continued hospitalization on 11/9/16 and again at the six-month review were items marked that are considered criteria for hospitalization under Chapter 4 of the Michigan Mental Health Code. The court order followed the documentation provided to the court. However, the information provided during interviews did not support the assertions made in the documentation. This can be seen when reviewing the discharge summary completed by Dr. Bavineni when Mr. Pelichet was again placed on ALS on 7/14/17. Dr. Bavineni noted that Mr. Pelichet's return to the hospital were due to a failed ALS contract, specifically that he was relapsed on marijuana and was not following the rules. Her description of Mr. Pelichet at the time of admission was very close to that of her description of him at discharge and none of the things stated were criteria for hospitalization. Dr. Bavineni noted that Mr. Pelichet was cooperative with taking medication and his stay in the hospital was "uneventful."

**Conclusion:**
Based on the preponderance of evidence presented by the investigative findings, a violation of Mr. Pelichet's right to receive mental health services in the least restrictive setting that is appropriate and available is substantiated.

**Recommendation:**
ORR recommends that the NGRI process for evaluating the need for continued hospitalization be reviewed with all treating professionals at WRPH to ensure that only clinically factual information be presented to the courts and recommendations to the court are based upon the criteria established in Section 401 of the Mental Health Code.

During the course of this investigation, ORR determined that the process of using court orders for continued hospitalization to maintain NGRI Committee oversight has become standard practice that is placing the due process rights of individuals who have been found NGRI and placed in the care of the Michigan Department of Health and Human Services (MDHHS) in jeopardy. ORR recommends that this process be reviewed and evaluated by the Bureau of Hospitals and Administrative Operations and Legal Affairs Administration and administrative action be taken to prevent such violations in the future at all MDHHS operated hospitals and centers.

Page 5

**Hospital and Bureau of Hospitals and Administrative Operations Response:**
The hospital will review the NGRI process in conjunction with Section 401 of the Mental Health Code with all treating professionals involved in the process with emphasis on the accuracy of information presented to the courts.

The Department of Health and Human Services (DHHS) will attempt to ensure only clinically factual information will be presented to the courts and that clinical recommendations will be based on the criteria for a person requiring treatment. DHHS will review and evaluate the process for continuous hospitalization for NGRI patients.

Sincerely,

Mary Clare Solky, MA, LPC, LLP
Hospital Director

Cynthia Kelly, Director
Bureau of Hospitals & Administrative Operations

c:      Darryl Pelichet (Discharged)
        Enid Reed, Recipient Rights Advisor

Copy of report e-mailed to:        Mona Thomas, Human Resources Director
                                    Hanumaiah Bandla, M.D., Chief of Clinical Affairs

---

You also have the right to appeal the decision. The grounds for appeal are: (1) The investigative findings of the office are not consistent with the facts or with the law, rules, policies or guidelines; (2) The action taken or plan of action proposed by the facility director does not provide an adequate remedy; (3) An investigation was not initiated or completed on a timely basis.

In the event you desire to file a written appeal and require assistance contact the MDHHS-Office of Recipient Rights. The address for appeals/mediation is:
MDHHS – Office of Recipient Rights
Attn:   Appeals Coordinator
        Lewis Cass Building
        320 S. Walnut Street, Garden Level
        Lansing, MI 48933

You may also receive assistance from the following organizations:
NAMI-Michigan                                   Michigan Protection and Advocacy Services, Inc.
401 S. Washington Square, Suite 104             4095 Legacy Parkway, Suite 500
Lansing, MI 48933                               Lansing, MI 48911
(800)331-4264                                   (800)288-5923

# EXHIBIT

# H

**Clinical Certificate Completed by Defendant Bavineni on 10-30-2016**

11/01/2016  11.52   7347228056                    WRPH PT AFFAIRS                    PAGE  04/05

## This is a NGRI patient

Approved, SCAO                                                                JIS CODE  CCT

| STATE OF MICHIGAN<br>PROBATE COURT<br>WAYNE          COUNTY<br>CIRCUIT COURT - FAMILY DIVISION | CLINICAL CERTIFICATE | FILE NO.<br>2008-728311-MI |
|---|---|---|

In the matter of _____ PELICHET, DARRYL

1. TO THE EXAMINER. The following is a statement that must be read to the individual before proceeding with any questions

I am authorized by law to examine you for the purpose of advising the court if you have a mental condition which needs treatment and whether such treatment should take place in a hospital or in some other place. I am also here to determine if you should be hospitalized or remain hospitalized before a court hearing is held. I may be required to tell the court what I observe and what you tell me.

I certify that on this date I read the above statement to the individual before asking any questions or conducting any examination

2. I further certify that I, __ARUNA BAVINENI, M.D.___, personally examined _Darryl Pelichet_
   Name of examiner (type or print)                                              Patient
   at _WALTER REUTHER PSYCHIATRIC HOSPITAL 30901 PALMER RD. WESTLAND, MI. 48186_
   Name of place where examined and its address
   on _10 30 - 2016_ starting at _7:30 AM_ and continuing for _~30~_ minutes.
   Date                                Time

INSTRUCTIONS: Describe in detail the specific actions, statements, demeanor, and appearance of the individual, together with other information which underlie your conclusion. Indicate the source of any information not personally known or observed. If this certificate is to accompany a petition for discharge, state why the individual continues to be or is no longer a person requiring treatment or in need of hospitalization.

3 My determination is that the person is
   ☑ mentally ill (has a substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life).
   ☐ not mentally ill

☐ 4. (If applicable) The person has
   ☐ convulsive disorder,          ☐ alcoholism.          ☐ other drug dependence.
   ☐ mental processes weakened by reason of advanced years
   ☐ other (specify):
   ☐ been hospitalized involuntarily two or more times within the two-year period immediately preceding the filing of the petition and has rejected aftercare programs and treatment.

5. My diagnosis is _Schizophrenia Chronic Paranoid type_

6 Facts serving as the basis for my determination are _Mr. Pelichet is a single, 37 years old, African American male, with long hx of mental illness, he admitted to WRPH, due to failed_

(PLEASE SEE OTHER SIDE)

Do not write below this line ~ For court use only

2016 NOV - 1  P 4:24
FILED
PROBATE COURT
WAYNE COUNTY MI

PCM 206  (9/07)  CLINICAL CERTIFICATE                      MCL 330.1425, MCL 330.1435

52

11/01/2016 11:52 7347228055      WRPH PT AFFAIRS      PAGE 05/05

6 (continued) _ALS Contract He is Superficially co-operative_
_and does not participate in Treatment Groups and_
_Groups. He has limited insight in his illness and_
_judgement is Poor;_

7. Explain in the space below the facts which lead you to believe that future conduct may result in (check applicable box)

☐ a. likelihood of injury to self Facts:

_He denied_

Therefore, I believe that the examined person, as a result of mental illness, can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure self.

☐ b. likelihood of injury to others. Facts:

_He denied_

Therefore, I believe that the examined person, as a result of mental illness, can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure others.

☐ c. inability to attend to basic physical needs. Facts:

_He is taking care of his Personal hygiene._

Therefore, I believe that the examined person, as a result of mental illness, is unable to attend to those basic physical needs (such as food, clothing or shelter) that must be attended to in order to avoid serious harm in the near future.

☐ d. inability to understand need for treatment. Facts:

_He was provided with my medications_

Therefore, I believe that the examined person, as a result of mental illness, is unable to understand the need for treatment and continued behavior can reasonably be expected to result in significant physical harm to self or others.

8. I conclude the individual   ☑ is   ☐ is not   a person requiring treatment.     **To maintain NGRI Status**

9. (optional) I recommend   ☑ hospitalization   ☐ alternative treatment

as follows. _____

I certify that I am a person authorized by law to certify as to the individual's mental condition. I am not related by blood or marriage either to the person about whom this certificate is concerned or to any person who has filed, or whom I know to be planning to file, a petition in this proceeding. I declare under the penalties of perjury that this certificate has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

10-30-2016    8: w am

Date

PSYCHIATRIST

Title (physician, psychiatrist, etc.)

FILED

PROBATE COURT

WAYNE COUNTY

Signature: _A. Bavineni md_

ARUNA BAVINENI, M.D.     (734) 367-8600

Print or type name and business telephone no.

# EXHIBIT

# I

## Six-Month Review Report by

## Defendant Bavineni, 4/17/17

This is a NGRI patient Rↄ

Approved, SCAO

STATE OF MICHIGAN
PROBATE COURT
COUNTY OF WAYNE

SIX-MONTH REVIEW REPORT

PCS CODE: SRR
TCS CODE: SMPR

FILE NO.
2008-728311-MI

In the matter of _____ DARRYL PELICHET _____
First, middle, and last name

1 The individual presently resides at
☐ own home or with relatives
☐ a center
☑ a hospital
☐ a private facility
☐ _____

and the address is WALTER REUTHER PSYCHIATRIC HOSPITAL 30901 PALMER RD WESTLAND, MI 48186

☐ 2. The individual was placed on authorized leave on _____ and continues on leave status.

3. By order of this court dated 11/9/2016 _____ the individual was placed in a
☐ a. one-year alternative treatment program.
☐ b. one-year assisted outpatient treatment program.
☐ c. one-year combined treatment program.
☑ d. one-year continuing hospitalization program.
☐ e. center or private facility as a judicial admission.

4 I believe the individual has mental illness and
☑ a. as a result of that mental illness, the individual can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in an act or acts or made significant threats that are substantially supportive of this expectation.
☐ b. as a result of that mental illness, the individual is unable to attend to those basic physical needs that must be attended to in order to avoid serious harm in the near future, and has demonstrated that inability by failing to attend to those basic physical needs.
☐ c. the individual's judgment is so impaired by that mental illness that s/he is unable to understand his/her need for treatment, and whose impaired judgment, on the basis of competent clinical opinion, presents a substantial risk of significant physical or mental harm to the individual or presents a substantial risk of physical harm to others in the near future.
☐ d. the individual's understanding of the need for treatment is impaired to the point that s/he is unlikely to voluntarily participate in or to adhere to treatment that has been determined necessary to prevent a relapse or harmful deterioration of his/her condition. The individual's noncompliance with treatment has been a factor in the individual's
☐ i. placement in ☐ a psychiatric hospital ☐ jail ☐ prison at least two times within the last 48 months.
(Specify the name[s] and location[s] of the hospital, jail, or prison and the date[s] of hospitalization or incarceration.)
_____
_____

AND/OR
☐ ii. committing one or more acts, attempts, or threats of serious violent behavior within the last 48 months.
(Specify the acts, attempts, or threats of serious violent behavior.)
_____
_____

☐ 5 I believe the individual has an intellectual disability and can be reasonably expected in the near future to intentionally or unintentionally seriously physically injure self or another person and has overtly acted in a manner substantially supportive of that expectation.

(SEE SECOND PAGE)

Do not write below this line – For court use only

PCM 226 (9/15) SIX-MONTH REVIEW REPORT

MCL 330.1482, MCL 330.1483, MCL 330.1515, MCL 330.1531

54

Six-month Review Report  (9/16)

File No. 2008-728311-MI

6. This conclusion is based on
   a  the following facts of which I have personal knowledge:

   Seen And Evaluated The Patient, Reviewed The medical
   Records And discussed with different Treatment Team
   members

   b. the following facts, which are based on reports by others whose names and addresses, if known, are.

   _____

   _____

7. The ☐ alternative treatment program   ☐ assisted outpatient treatment program   provided to the individual since
   the order, and the results are

   Patient Landed his 5 years ALS Contract, while he was
   receiving out Patient Treatment, Since Patient admitted
   to WRPH he did developed Some insight in his mental
   illness, but he had difficulty adjusting in the Community

8. This treatment ☑ is   ☐ is not   adequate and appropriate to the individual's condition. The estimated time required
   for further treatment is  6  _____ ☐ days. ☑ months. The following modifications in treatment are currently planned
   during the next six-month period, or proposed as   ☐ alternative treatment,   ☐ assisted outpatient treatment,
   and will be adequate and appropriate to the individual's condition. (Write "none" if no modifications are expected.)

   Patient need To Continue in Structured Therapeutic Society
   And learn about the adverse affects of marijuana abuse
   on general health And also while taking Psychotropic medication
   which will aggravate the Psychotic behavior. Understand about
   his 5 year ALS Contract, And to know the NGRI his and action.

9. The individual   ☐ should be discharged from the treatment program.
                     ☑ continues to be a person requiring treatment.        **To maintain NGRI Status**
                     ☐ continues to be a person meeting the criteria for judicial admission.

I declare under the penalties of perjury that this report has been examined by me and that its contents are true to the best of
my information, knowledge, and belief.

4-17-2017
Date

A. Bavineni
Signature of physician or licensed psychologist

ARUNA BAVINENI, M.D.
Name (type or print)

PSYCHIATRIST
Title

734-367-5600
Telephone no.

# EXHIBIT J

**Psychiatric Evaluation of Darryl Pelichet
by Aruna Bavineni on 05/03/17**

Date Created: 05/03/2017 at 04:07 PM
Form Name: Psychiatric Evaluation
Client's Name: PELICHET,DARRYL (000915349)
Client's DOB: 03/04/1979

Walter P. Reuther Psychiatric Hospital
30901 Palmer Rd
Westland, MI 48186

## General Data
Date Assessment Started: 05/03/2017

Individual's Name: PELICHET,DARRYL

Address: 35810 Bibbins

City: Romulus

State: MI

Admission Date: 05/04/2016

Unit: R6

Date of Birth: 03/04/1979

Race: Black/African-American

Marital Status: Single / Never Married

Education Level: 12 Years

Legal Status: NGRI - Probate Order

## Psychiatric Evaluation
Type of Assessment: Annual

Give a verbatim statement from individual:
This is the 5th admission at WRPH, for Mr. Pelichet, 38 years old,(
03-04-1979),Single, African American Male was brought in to WRPH on
05-04-2016, due to failed ALS contract. He is NGRI, for the charges of
Assaulting Police and also Resisting and obstructing arrest. He said he did
violated his ALS contract by un authorized leave, and said he left the roup
home, with out informing the group home staff. He was released from WRPH on
01-14-2016, to Bibins AFC Home, located at 35810, Bibbins, Romulus, MI-48174,
and the Tel# 734-941-6506, and his follow up care was scheduled with Adult Out
patient services, Hegira Programs Inc, 8623, N.WAyne Road, Suite 323,,
Westland, MI-48185

1

Date Created: 05/03/2017 at 04:07 PM
Form Name: Psychiatric Evaluation
Client's Name: PELICHET,DARRYL (000915349)
Client's DOB: 03/04/1979

Walter P. Reuther Psychiatric Hospital
30901 Palmer Rd
Westland, MI 48186

Statement from Other Source (family):
Mr. Pelichet has no legal guardian. He said he has been taking his recommended
medications, and he has been attending his recommended PSR groups, since last
5-6 months, in WRPH.

Onset of Illness:
It was reported that he did sought treatment while he was in High school. In
1996 he was seen by psychiatrist, how ever he was never prescribed
medications. When he turned 19 he was incarcerated for three years, and he did
not received Mental Health treatments while he was in the prison. Patient's
brother died in 2003 of congestive hear failure at the age of 35, and it was
reported that patient did had a nervous breakdown during that period. He was
admitted at Providence Hospital, and also Havenwyck hospital in 2004. In 2005
he did received criminal charges for assault, resisting and also obstructing,
of the police officer. He was found NGRI and was transferred to CFP.Later he
was transferred to KRPH in Sept of 2007, and later he was released to
independent placement in the community.He failed his 5 years ALS contract by
smoking Marijuna, and he was brought back to WRPH on 11/7/2007. Again in 2009
April he was sent to WCJ for two weeks because he was charged with Delivering
Marijuana, and he was brought back to WRPH. The third admission to WRPH was in
11/2/2011, due to verbal threats, while he was in the community. He was also
hospitalized at WRPH from May 2014 until December 2014. This admission was
because he failed his ALS contract was because he was relapsed on Marijuana abuse.

Reason for Admission:
It was reported that Mr. Pelichet did violated his ALS contract by not
following with his 5 years ALS contract, by not reporting his where about, and
also violation of his curfew timings.

Circumstances leading to admission and other details relevant to evolution of
individual's present condition:
This is the 5th admission at WRPH, for Mr. Pelichet, 38 years old, (
03-04-1979),Single, African American Male was brought in today 05-04-2016, due
to failed ALS contract. He is NGRI, for the charges of Assaulting Police and
also Resisting and obstructing arrest. He said he did violated his ALS
contract by un authorized leave, and said he left the roup home, with out
informing the group home staff. He was released from WRPH on 01-14-2016, to
Bibins AFC Home, located at 35810, Bibins, Romulus, MI-48174, and the Tel#
734-941-6506, and his follow up care was scheduled with Adult Out patient
services, Hegira Programs Inc, 8623, N.WAyne Road, Suite 323,, Westland, MI-48185

2

Date Created: 05/03/2017 at 04:07 PM
Form Name: Psychiatric Evaluation
Client's Name: PELICHET,DARRYL (000915349)
Client's DOB: 03/04/1979

Walter P. Reuther Psychiatric Hospital
30901 Palmer Rd
Westland, MI 48186

*VERBATIM FROM 5/4/16*

Pertinent positives and pertinent negatives to support diagnoses and rule out
other diagnoses:
  Mr. PelichetDenied of hearing voices at this time. He did reported that he was
  paranoid at the time he was involved in the crime was that he thought that
  "people were going to kill me, and my family, and I thought that Government
  was reading my mind. I heard voices , and also I got messages from the bill
  boards, radio, and also TV". He also said at that time he was also gambling,
  and was also abusing Marijuana. He did say that he does have difficulty with
  interpersonal relationships.

Be as specific as possible with examples from the individual (e.g. delusional
content, hallucination content, suicidal thinking):
  Mr. PelichetDenied of hearing voices at this time. He did reported that he was
  paranoid at the time he was involved in the crime was that he thought that
  "people were going to kill me, and my family, and I thought that Government
  was reading my mind. I heard voices , and also I got messages from the bill
  boards, radio, and also TV". He also said at that time he was also gambling,
  and was also abusing Marijuana. He did say that he does have difficulty with
  interpersonal relationships.

Previous Diagnoses, Hospitalizations, Outpatient Treatment:
  It was reported that he was involved with different out patient Mental health
  treatments, including Hegira CMH in Westland, and also Guidence center in
  South Gate, Michigan. Since he has been relesed from WRPH in January of 2016,
  he has been following up with Hegira, and his treating psychiatrist is Dr. Kang.

Previous Psychiatric Medication Trials and Responses:
  He said he was tried with Risperdal, Seroquel, and also abilify.He said he was
  still hearing voices at that time. He was also DX with Psychotic Disorder NOS.

Substance Abuse History:
  Michigan Alcoholism Screening Test (MAST)


  1. Do you feel you are a normal drinker? (By normal, we mean you drink less
  than or as much as other people.) (Y/N) Score--Yes- (2)

  2. Have you ever awakened the morning after some drinking the night before and
  found you could not remember a part of the evening? (Y/N) Score---No--

  3. Does your wife, husband, a parent, or other near relative ever worry or

3

Date Created: 05/03/2017 at 04:07 PM
Form Name: Psychiatric Evaluation
Client's Name: PELICHET,DARRYL (000915349)
Client's DOB: 03/04/1979

Walter P. Reuther Psychiatric Hospital
30901 Palmer Rd
Westland, MI 48186

complain about your drinking? (Y/N) Score--No--

4. Can you stop drinking without a struggle after one or two drinks? (Y/N)
Score---Yes---(2).

5. Do you ever feel guilty about your drinking? (Y/N) Score--No--

6. Do friends or relatives think you are a normal drinker? (Y/N) Score---Yes---(2).

7. Are you able to stop drinking when you want to? (Y/N) Score---Yes---(2).

8. Have you ever attended a meeting of Alcoholics Anonymous (AA)? (Y/N) Score--No--

9. Have you gotten into physical fights when drinking? (Y/N) Score--No--

10. Has your drinking ever created problems between you and your wife,
husband, a parent, or other relatives? (Y/N) Score--No--

11. Has your wife, husband (or other family members) ever gone to anyone for
help about your drinking? (Y/N) Score--No--

12. Have you ever lost friends because of drinking? (Y/N) Score--No--

13. Have you ever gotten into trouble at work or school because of drinking?
(Y/N) Score--No--

14. Have you ever lost a job because of drinking? (Y/N) Score--No--

15. Have you ever neglected your obligations, your family, or your work for
two or more days in a row because you were drinking? (Y/N) Score--No--

16. Do you drink before noon fairly often? (Y/N) Score--No--

17. Have you ever been told you have liver trouble? Cirrhosis? (Y/N) Score--No--

18. After heavy drinking, have you ever had Delirium Tremens (D.T.s), or
severe shaking, or heard voices, or seen things that really were not there?
(Y/N) Score--No--

19. Have you ever gone to anyone for help about your drinking? (Y/N) Score--No--

20. Have you ever been in a hospital for your drinking? (Y/N) Score--No--

4

Date Created: 05/03/2017 at 04:07 PM
Form Name: Psychiatric Evaluation
Client's Name: PELICHET,DARRYL (000915349)
Client's DOB: 03/04/1979

Walter P. Reuther Psychiatric Hospital
30901 Palmer Rd
Westland, MI 48186

21. Have you ever been a patient in a psychiatric hospital or on a psychiatric
ward in a general hospital where drinking was a part of the problem that
resulted in hospitalization? (Y/N) Score--No--

22. Have you ever been seen at a psychiatric or mental health clinic, or gone
to any doctor, social worker, or clergyman for help with an emotional problem,
where drinking was part of the problem? (Y/N) Score--No--

23. Have you ever been arrested for drunk driving, driving while intoxicated,
or driving under the influence of alcoholic beverages? (Y/N, if yes how many
times __) Score--No--

24. Have you ever been arrested, or taken into custody even for a few hours,
because of other drunken behavior? (Y/N, if yes how many times __) Score--No--

Total Score is --8--


Substance Abuse Over the Last 12 Months: Negative-No Abuse Within Last 12 Months

Current Medical Conditions:
  He has been DX with Morbid Obesity, HTN, High cholesterol, and also MS. It was
  reported that he was treated for Bells palsy, once while he was at WRPH.

Allergies and Adverse Drug Reactions:
  He said he is allergic to Abilify, and couldn't come with allergic reaction,
  and may be he has side effects with Abilify.

All Current Medications:        *LOWERED from 5/4/16*
  He does take Invega sustena 157 Mg every 4 weeks,
  He does take wellbutrin XL 300 mg every day, by mouth. He has been tolerating
  the medications well.        *LOWERED from 5/4/16*

Social History:
  Mr. Pelichet was born in Michigan, and he was raised by both parents. Parents
  were married until father died. Mother worked in Detroit Diesel, as blue print
  technician. Father worked at General mortars, and died at the age of 75, years
  of age, about 20 years ago.He has two half siblings. He does consider he has
  good relationship with his family. No History of Mental illness in the
  family.He does consider he has good support from his family. He said he failed
  to complete High school, and dropped out in 12th grade, because of increased

5

Date Created: 05/03/2017 at 04:07 PM
Form Name: Psychiatric Evaluation
Client's Name: PELICHET,DARRYL (000915349)
Client's DOB: 03/04/1979

Walter P. Reuther Psychiatric Hospital
30901 Palmer Rd
Westland, MI 48186


Marijuana abuse. He said he did completed GED later. He said he had limited
job skills, and said he did worked as shoffer briefly. He said he did attended
Davenport college, and he dropped out immediately. He said he was never
married, and he said he does have a daughter, about 6 years old, and said the
daughter lives in a different state.


Psychological Trauma History:
  He denied of any trauma while growing.

Psychological Trauma History Identified: No

Legal History:
  He is NGRI

History of any of the following?: Other Psychiatric History

Family History (include response to specific medications):
  No H/O of Mental illness in the family

Alertness: Alert

Appearance: Clean, Neat

Looks: stated age

Describe Behavior:
  Co-operative

Mood: Hostile

Describe Mood:
  'I am angry because I was denied of my discharge today".

Affect: Broad

Affect Appropriate to Thought Content: Yes

Rate: Normal

Tone: Normal

Date Created: 05/03/2017 at 04:07 PM
Form Name: Psychiatric Evaluation
Client's Name: PELICHET,DARRYL (000915349)
Client's DOB: 03/04/1979

Walter P. Reuther Psychiatric Hospital
30901 Palmer Rd
Westland, MI 48186


Volume: Normal

Perceptual Disturbances Reported/Suspected: No

Individual's thoughts are: Logical

Recall number of weeks in a year?: No

Recall number of months in a year?: Yes

Knows how many nickels in $1.15: No

Can perform simple multiplication?: Yes

Can perform simple division?: Yes

Appears to possess intelligence that is: Average

Appears to show: Denial

Assessment of insight is based on: He was angry because his discharge has been
denied by the court, and he doesn't     ?

Appears to possess judgement that is: Average

Appears to have impulse control that is: Average

Oriented To: Time, Place

Immediate Memory Intact: Yes

Recent Memory Intact: Yes

Remote Memory Intact: Yes

Risk of Violence to Self Over Past 6 Months?: No

Any Current or Past Suicide/Risk of Violence to Self:
   None     5/4/16 LISTS one SUICIDE ATTEMPT
Risk of Violence to Others Over Past 6 Months: No

7

Date Created: 05/03/2017 at 04:07 PM
Form Name: Psychiatric Evaluation
Client's Name: PELICHET,DARRYL (000915349)
Client's DOB: 03/04/1979

Walter P. Reuther Psychiatric Hospital
30901 Palmer Rd
Westland, MI 48186

Any Current or Past Risk of Violence to Others:
   None

Risk of Fire Setting Present?: No

Risk of Elopement Present?: No

Are there specific contraindications or risks to seclusion and restraint for
this patient?: No

Strengths for NRI: Interpersonal relationships and supports, Other

Specify Other: Family support

Discussion of diagnostic formulation and differential diagnosis:
   Mr. Pelichet has long H/O of MI, and also he was abusing Marijuana, while he
   is on 5 years ALS contract. He does exhibit poor impulse control, and he has
   no insight, and poor judgement.

Primary Purpose of Hospitalization:
   This is the 5th admission at WRPH, for Mr. Pelichet, 37 years old, (
   03-04-1979),Single, African American Male was brought in today 05-04-2016, due
   to failed ALS contract. He is NGRI, for the charges of Assaulting Police and
   also Resisting and obstructing arrest. He said he did violated his ALS
   contract by un authorized leave, and said he left the roup home, with out
   informing the group home staff. He was released from WRPH on 01-14-2016, to
   Bibins AFC Home, located at 35810, Bibins, Romulus, MI-48174, and the Tel#
   734-941-6506, and his follow up care was scheduled with Adult Out patient
   services, Hegira Programs Inc, 8623, N.WAyne Road, Suite 323,, Westland, MI-48185

Preliminary IPOS:
   P-1 NGRI and failed ALS contract,
   P-2 Delusional behavior-Stable with medications
   P-3 as Marijuna abuse/ use.

Recommendations for IPOS:
   Mr. Pelichet will be seen and evaluated by the treatment team, and formulate
   the treatment plan. He will be explained about the treatment goals, and also
   the discharge criteria. He will be encouraged to attend the PSR groups, to
   learn about the importance of taking medications, and also learn the warning
   signs of his mental illness, and how he was involved in the crime, due to lack

8

Date Created: 05/03/2017 at 04:07 PM
Form Name: Psychiatric Evaluation
Client's Name: PELICHET,DARRYL (000915349)
Client's DOB: 03/04/1979

<div align="center">

Walter P. Reuther Psychiatric Hospital
30901 Palmer Rd
Westland, MI 48186

</div>

of insight. He will be also encouraged to learn more about the substance
abuse, and the adverse affects of abusing drugs while taking psychotropic
medications. Mr. Pelichet will also be seen by the medical doctor and his
medical needs will be addressed.


Medication Plan and Rationale:
1). Psycho pharmacotherapy,
2). Group Therapy with Nursing and social work weekly,
3). Individual Psychotherapy and medication Review at least once per week by
the psychiatrist,
4). Weekly supportive casework counseling, individual supportive Psychotherapy
by MSW,
5). Medical services as needed,
6). Daily around clock Nursing care and supervision, and group and individual
therapy,
7). Activity Therapy daily in groups and individually, on and off ward,
8). Dietary services, regular diet,
9). Milieu Therapy,
10). Consultations as needed by the out side specialist, and also opthalmology
consult if needed

Consultations for Medical Conditions:
Mr. Pelichet has multiple medical problems, and he will be seen and evaluated
by the medical doctor, and his medical needs will be addressed.

Diagnostic Testing:
Routein Labs, EKG. H&P, Urine Drug screen, upon return from LOA, Chest X-ray

Draft / Pending Approval / Final: Final

---

Signed: ARUNA BAVINENI MD on 05/03/2017 at 04:07 PM Author

# EXHIBIT

# K

## Monroe Community Mental Health Authority Progress Notes for Joshua Ragland

# Monroe Community Mental Health Authority
## Progress Note

### IDENTIFYING INFORMATION

| DATE | TIME | STAFF | |
|---|---|---|---|
| 12/28/2015 | 11:30 a.m. - 12:30 p.m. | Linda Monroe | |
| **NAME** | | **CASE NUMBER** | **DOB** |
| JOSHUA RAGLAND | | 0001151139 | 06/14/1990 |

### GENERAL INFORMATION

| CONTACT TYPE | LOCATION OF SERVICE |
|---|---|
| Face to Face | Home |

### PRIMARY CARE INFORMATION

| PRIMARY CARE CLINIC | PRIMARY CARE PHYSICIAN |
|---|---|
| | |

### NARRATIVE

S: "So if the court discharges me from the ALS contract, will I still receive services from ACT?"

O: Met Josh for a contact at his home. His brother was watching tv in the living room while we met for a contact. His mother arrived home and joined us for the contact. Writer told Josh I want to review his ALS contract with him. Writer pointed out the sentence in the contract about Josh not drinking or using drugs not prescribed by his doctor while he is on the ALS contract. Writer reminded him that he agreed to comply with the contract but that he has stated recently that he occasionally has a beer. He denied using street drugs but said he has consumed beer now and then. Writer told him that he could be violated for not complying with the contract. He said he would comply and not drink beer or use street drugs. His mood and affect were bright. Hygiene and grooming fair. Dressed for the weather. Writer explained that next time he sees Dr. Horn she will complete a six month review and if he wants to he can petition to be discharged from the 1 yr continuing hospitalization order. He said he wants to do that. Writer recommended that he not get his hopes up too much that he will be discharged because he is not always compliant with treatment. Writer told him however if he is discharged that he will still continue treatment with ACT. He was glad to hear that. We followed up with BC Network but they were unable to clarify why they had called saying he was at risk for losing his coverage.

A: MI & SA-precontemplation soc

P: Monitor for health and safety at home and in the community. Writer told Josh that I will email DHS liaison and ask her if Josh is still receiving Molina Health insurance and let him know what she says.

### OUTCOMES

| DATE | TYPE |
|---|---|
| 03/30/2015 | General |

**OUTCOME**
"I will comply with the ALS contract." To that effect, Josh will comply with the contract through 1/26/2016.

### ATO INFORMATION

| COMPLIANT WITH ATO | NON-COMPLIANCE WITH ATO |
|---|---|
| ☐ Consumer is compliant with the ATO | ☐ Refused medications or injection |
| | ☐ Not at designated site to receive medication |
| | ☐ Refused to come to or not at designated site for ride to Injection and/or MD appointment |
| | ☐ Refused to come to or not at designated site for ride to ATO Review appointment |
| | ☐ Refused to come to or not at designated site for ride to Court Pick Up Order |
| | ☐ Not complying with other aspects of treatment plan (therapy groups, etc) |

☐ Consumer made statements showing lack of insight or had behaviors showing continued need for ATO (you must document the statements or behaviors in the narrative)

☐ Consumer given notice of required ATO Review appointment

☐ Consumer given notice of required appointment with treating psychiatrist

☐ Consumer given notice of required appointment to come for injection

### SUD INFORMATION

# Monroe Community Mental Health Authority
## Progress Note

| IDENTIFYING INFORMATION | | |
|---|---|---|
| DATE<br>01/20/2016 | TIME<br>11:15 a.m. - 12:00 p.m. | STAFF<br>Linda Monroe |
| NAME<br>JOSHUA RAGLAND | CASE NUMBER<br>0001151139 | DOB<br>06/14/1990 |

| GENERAL INFORMATION | |
|---|---|
| CONTACT TYPE<br>Not Face to Face | LOCATION OF SERVICE<br>Other |

| PRIMARY CARE INFORMATION | |
|---|---|
| PRIMARY CARE CLINIC | PRIMARY CARE PHYSICIAN |

### NARRATIVE

Writer joined the treatment team meeting for Josh at Walter Reuther Psychiatric Hospital via speaker phone . Josh is residing in area R6 at the hospital. His doctor, nurse, dietician, OT, and clinical social worker were present along with Josh. At the doctor's request, Josh described his original charge for which he received a NGRI designation. After listening to Josh, the doctor prescribed Abilify 10mg, 1xday for psychosis and the anti depressant brintellex. Josh was resistant to taking Abilify, telling the doctor that he never hears voices, which is one of the reasons for taking Abilify. We discussed Josh's violation of his contract and he defended himself, saying he only drank alcohol once and that was in April 2015 and he stated that  he never smoked marijuana. He said he has been complying with treatment through MCMHA. The team wanted to know why Josh was violated. Writer informed team that based on writer's 90 day report, the NGRI committee including Evette Adams, had writer request a pick up order and have him brought in based on the fact that he drank alcohol occasionally and stated that he smoked marijuana once and that he was resistant to taking anti-psychotics. The doctor has requested that writer inform the team of the date when Josh reported smoking marijuana. Subsequently, writer left a voice mail for Rhonda Hemingway, Josh's clinical social worker, that I would provide her with that information next week. The team developed goals with Josh for his stay at WRPH. When asked, Josh was informed that he would have a minimal stay of six months at WRPH.

| ATO INFORMATION | |
|---|---|
| COMPLIANT WITH ATO | NON-COMPLIANCE WITH ATO |
| ☐ Consumer is compliant with the ATO | ☐ Refused medications or injection |
| | ☐ Not at designated site to receive medication |
| | ☐ Refused to come to or not at designated site for ride to Injection and/or MD appointment |
| | ☐ Refused to come to or not at designated site for ride to ATO Review appointment |
| | ☐ Refused to come to or not at designated site for ride to Court Pick Up Order |
| | ☐ Not complying with other aspects of treatment plan (therapy groups, etc) |

☐ Consumer made statements showing lack of insight or had behaviors showing continued need for ATO (you must document the statements or behaviors in the narrative)
☐ Consumer given notice of required ATO Review appointment
☐ Consumer given notice of required appointment with treating psychiatrist
☐ Consumer given notice of required appointment to come for injection

### SUD INFORMATION

## Monroe Community Mental Health Authority
## Progress Note

### IDENTIFYING INFORMATION

| DATE 02/12/2016 | TIME 12:10 p.m. - 1:15 p.m. | STAFF Jimmie Woodward | |
|---|---|---|---|
| NAME JOSHUA RAGLAND | | CASE NUMBER 0001151139 | DOB 06/14/1990 |

### GENERAL INFORMATION

| CONTACT TYPE Face to Face | LOCATION OF SERVICE Hospital |
|---|---|

### PRIMARY CARE INFORMATION

| PRIMARY CARE CLINIC | PRIMARY CARE PHYSICIAN |
|---|---|

### NARRATIVE

This writer met with Josh who presented with a friendly demeanor and was very welcoming. Josh continues to maintain that his return to the hospital was due to miscommunication on the part of the treatment team. He denies that he reported drinking beer and using marijuana as he originally reported stating that these were past behaviors but did not occur during his assignment to the treatment team. He then asked about drug testing and why this wasn't done when he reported use originally. Explained that he was taken at his word about using but going forward this will change. Verification will be done through regular drug screens which Josh agreed with including those conducted randomly. He discussed his desire to limit his contact with the team through only having to see on clinician. Explained that the ACT model does not support his request and that he would continue to interact with all team members should he be re-released to the treatment team.

Josh denied any animosity toward the team and asked that his assigned case manger call him on the patient phone. 1-734-367-8580. The caller would also need to enter or select the designation that resolves to his treatment floor (R6).

### ATO INFORMATION

| COMPLIANT WITH ATO | NON-COMPLIANCE WITH ATO |
|---|---|
| ☐ Consumer is compliant with the ATO | ☐ Refused medications or injection |
| | ☐ Not at designated site to receive medication |
| | ☐ Refused to come to or not at designated site for ride to Injection and/or MD appointment |
| | ☐ Refused to come to or not at designated site for ride to ATO Review appointment |
| | ☐ Refused to come to or not at designated site for ride to Court Pick Up Order |
| | ☐ Not complying with other aspects of treatment plan (therapy groups, etc) |

☐ Consumer made statements showing lack of insight or had behaviors showing continued need for ATO (you must document the statements or behaviors in the narrative)

☐ Consumer given notice of required ATO Review appointment

☐ Consumer given notice of required appointment with treating psychiatrist

☐ Consumer given notice of required appointment to come for injection

### SUD INFORMATION

# Monroe Community Mental Health Authority
## Progress Note

| IDENTIFYING INFORMATION | | | |
|---|---|---|---|
| DATE 06/23/2016 | TIME 2:15 p.m. - 3:00 p.m. | STAFF Joel McCrea | |
| NAME JOSHUA RAGLAND | | CASE NUMBER 0001151139 | DOB 06/14/1990 |

| GENERAL INFORMATION | |
|---|---|
| CONTACT TYPE Face to Face | LOCATION OF SERVICE Inpatient Psych Facility |

| PRIMARY CARE INFORMATION | |
|---|---|
| PRIMARY CARE CLINIC | PRIMARY CARE PHYSICIAN |

### NARRATIVE

S-"No I don't plan on returning. I've done a stint at forensics and now here and it's enough." Josh and writer spoke of ways to stay out of Walter Reuther Psychiatric Hospital (WRPH).

O-Josh appears to be alert, oriented x3, well groomed and appropriately dressed for the weather. Josh exhibits a euthymic mood, appropriate affect, cooperative behavior and unremarkable speech. Josh did not report experiencing any SI/HI, perceptual disturbances or any side effects from his medications during the contact. Writer observes Josh advocating for his leaves of absence (LOA) for the upcoming weekend with his group therapist, Emily. Writer spoke to Josh's psychiatrist to verify his discharge plan. The psychiatrist stated that Josh needed to have two 8 hour LOA's, two 12 hour LOA's and then two 24 hour LOA's without incident prior to the discharge planning process to proceed.

A-MI-Maintenance SA-contemplation

P-Josh continues to show that he is ready to be discharged at WRPH by his medication compliance, completing work tasks, getting along with staff and peers and participating in what he is asked to do with no complaints. Staff reported that Josh is the model patient, actively participating in groups and working on becoming discharged. Josh has an upcoming IPOS meeting on 7/20 but no one knew the time. Additionally Josh has a court date on 8/18 for his social security. Josh did not remember the time for that either.

| ATO INFORMATION | |
|---|---|
| **COMPLIANT WITH ATO** | **NON-COMPLIANCE WITH ATO** |
| ☐ Consumer is compliant with the ATO | ☐ Refused medications or injection |
| | ☐ Not at designated site to receive medication |
| | ☐ Refused to come to or not at designated site for ride to Injection and/or MD appointment |
| | ☐ Refused to come to or not at designated site for ride to ATO Review appointment |
| | ☐ Refused to come to or not at designated site for ride to Court Pick Up Order |
| | ☐ Not complying with other aspects of treatment plan (therapy groups, etc) |

☐ Consumer made statements showing lack of insight or had behaviors showing continued need for ATO (you must document the statements or behaviors in the narrative)
☐ Consumer given notice of required ATO Review appointment
☐ Consumer given notice of required appointment with treating psychiatrist
☐ Consumer given notice of required appointment to come for injection

### SUD INFORMATION

## Monroe Community Mental Health Authority
## Progress Note

| IDENTIFYING INFORMATION | | | |
|---|---|---|---|
| DATE<br>02/29/2016 | TIME<br>9:00 a.m. - 10:00 a.m. | STAFF<br>Linda Monroe | |
| NAME<br>JOSHUA RAGLAND | | CASE NUMBER<br>0001151139 | DOB<br>06/14/1990 |

| GENERAL INFORMATION | |
|---|---|
| CONTACT TYPE<br>Face to Face | LOCATION OF SERVICE<br>Inpatient Psych Facility |

| PRIMARY CARE INFORMATION | |
|---|---|
| PRIMARY CARE CLINIC | PRIMARY CARE PHYSICIAN |

### NARRATIVE

Writer met with Josh and his treatment team this morning at Walter Reuther Psychiatric Hospital . Josh's mood and affect were bright. Hygiene and grooming good. The team informed Josh that his social worker (Rhonda Hemmingway who was not present today) was going to submit a request for respite, which, if approved would mean the 10 months he spent in the community would be credited towards his five year NGRI contract. The social worker present at the meeting stated that if respite is granted his release from WRPH would quickly follow. When asked Josh told the team that he was taking his meds as prescribed, that is Brintellex and Abilify. Josh reports that the stay in the hospital has been positive for him; that he is learning new coping skill; that he is more open to talking after having a lot of time alone to think. The team asked him about his goals for upon discharge and he said he is interested in taking more welding classes and helping his mom, who is ill. Josh has undergone treatment and an operation for kidney stones while residing at WRPH. After the treatment meeting, writer met with Josh to review his interim IPOS paperwork, which he signed. He was friendly and forthcoming. Writer explained that we would continue to see him once a month while he resides in the hospital .

| ATO INFORMATION | |
|---|---|
| COMPLIANT WITH ATO | NON-COMPLIANCE WITH ATO |
| ☐ Consumer is compliant with the ATO | ☐ Refused medications or injection |
| | ☐ Not at designated site to receive medication |
| | ☐ Refused to come to or not at designated site for ride to Injection and/or MD appointment |
| | ☐ Refused to come to or not at designated site for ride to ATO Review appointment |
| | ☐ Refused to come to or not at designated site for ride to Court Pick Up Order |
| | ☐ Not complying with other aspects of treatment plan (therapy groups, etc) |

☐ Consumer made statements showing lack of insight or had behaviors showing continued need for ATO (you must document the statements or behaviors in the narrative)

☐ Consumer given notice of required ATO Review appointment

☐ Consumer given notice of required appointment with treating psychiatrist

☐ Consumer given notice of required appointment to come for injection

| SUD INFORMATION |
|---|

# EXHIBIT L

**Letter from Bonn Washington to the NGRI Committee**

To: NGRI Committee                                           1-23-18
From: NGRI ALS Recipient - Bonn G. Washington (905259)
Re: Request for part-time employment

    I am Bonn G. Washington and I am requesting that I be allowed to get a part-time job outside of S.T.E.P as a dishwasher at a restaurant or as a stock clerk at CVS, Walgreens or even at Southland Mall which is not too far from this group home where I live. I have monthly and daily expenses such as a monthly cell phone bill which is $50.00 monthly and everyday expenses such as cigarettes bus fare and whatever other miscellaneous expenses which will come to light in my everyday living. My monthly allowance is $44.00 and this alone is not enough to even cover my cell phone bill of $50.00 monthly.

    I am 100% financially self supporting with no financial support from anyone outside of myself and I am capable and mindfully mature enough to budget and take financial responsibilities and I need another source of income to be self reliant financially and I have no intentions to borrow money from anyone. To work at S.T.E. is not enough money to fully support myself for the majority of work at S.T.E.P is piece work which is pennies per work singular in which at the end of the shift I could make only 8 to 10 or $12.00

    I am sincere in this request to abide by any guidelines or restrictions that you all of the Committee give me limitations or should I be allowed to work part-time 20 hours a week or less should I be allowed to work outside of S.T.E.P which will max and match my high functioning potential which I am truly capable of

Sincerely Written
Bonn G. Washington  1-23-18

# EXHIBIT M

**SCAO Form PCM 233**

Approved, SCAO                                                                                    JIS CODE:  NRA

| STATE OF MICHIGAN<br>PROBATE COURT<br>COUNTY<br>CIRCUIT COURT - FAMILY DIVISION | NOTICE OF RIGHT TO APPEAL RETURN<br>AND APPEAL OF RETURN<br>FROM AUTHORIZED LEAVE | FILE NO. |
|---|---|---|

In the matter of _____

The above individual has been on authorized leave from a hospital or center for more than 10 days.  The individual was then returned to the hospital or center involuntarily, as follows.

| Date of last order | Date of return | Time of return | Age of individual | Name of hospital/center |
|---|---|---|---|---|
| | | | | |

## NOTICE OF RIGHT TO APPEAL

You have a right to appeal your return to the hospital or center and to have a hearing to determine the outcome of appeal.  If you wish  to appeal, notify the _____ Court within 7 days after receipt of this notice.

Complete the petition below and mail a copy to the court.  In the case of a child who is less than 13 years of age, the appeal must be made by the parent or guardian.

## PROOF OF SERVICE

I certify that this notice was personally served on the above individual on _____ at _____ ,
                                                          Date                        Time
and a copy was mailed to _____ Court on _____ .
                                                                               Date

_____
Signature

NOTE TO COURT:  MCR 5.743 and MCR 5.743b require form PCM 227 to be sent to the individual's attorney.

## PETITION APPEALING RETURN TO HOSPITAL

I appeal my return to the hospital/center and demand a hearing.

☐ I request court-appointed legal counsel.

I declare under the penalties of perjury that this petition for appeal has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

                                                                                                    ☐ individual
              ☐ parent
☐ guardian

_____                    _____
Date                                         Signature

Do not write below this line - For court use only

MCL 330.1408(3), MCL 330.1537(3), MCR 5.743, MCR 5.743a, MCR 5.743b

**PCM 233**  (9/08)  **NOTICE OF RIGHT TO APPEAL RETURN AND APPEAL OF RETURN FROM AUTHORIZED LEAVE**

# EXHIBIT

# N

**Office of Recipient Rights Investigation**
**Re: Marway Johnson, May 15, 2018**



STATE OF MICHIGAN

RICK SNYDER
GOVERNOR

DEPARTMENT OF HEALTH AND HUMAN SERVICES
LANSING

NICK LYON
DIRECTOR

## Office of Recipient Rights
### Report of Investigative Findings

| | |
|---|---|
| Report Date:  May 15, 2018 | Service Request #: 1-117678436<br>Allegation Number: 1-117678440 |
| Recipient's Name: ███████████ | Unit: R-4 |
| Complainant's Name: ANONYMOUS | Relationship: WRPH STAFF |
| ☑ Substantiated  ☐  Not Substantiated | Category 7223 ABUSE CLASS III |

**ALLEGATION**

On February 26, 2018 ORR received an email alleging that on 02/22/2018 during PSR group, Social Worker, Marway Johnson, made disparaging comments to the group (and to ████████ specifically) regarding the patient treatment process and how it related to court and the reporting of patient progress specifically; stating, "I will always say something bad about you when I go to court because its my job to keep you here."  Ms. Johnson also expressed her disregard for Mr. ██████ and other patients and the ability for any of them to succeed in the community; stating "you will never do any good in the community when you get out of here."  The allegation has been reviewed by this office.


**CITATIONS**

MHC 330.1722 Protection of recipient from abuse or neglect. Sec. 722. (1) A recipient of mental health services shall not be subjected to abuse or neglect.

DCH Administrative Rule 330.7001
(c) "Abuse class III" means the use of language or other means of communication by an employee, volunteer, or agent of a provider to degrade, threaten, or sexually harass a recipient.

APF 132 Definitions:
Degrade means:
    (a) To treat humiliatingly: to cause somebody humiliating loss of status or reputation or cause somebody a humiliatingly loss of self-esteem, make worthless; to cause a person to feel that they or other people are worthless and do not have the respect or good opinion of others. Synonyms: degrade, debase, demean, humble, humiliate. These verbs mean to deprive of self-esteem or self-worth; to shame or disgrace.

(b) Degrading behavior shall be further defined as any language or epithets that insult the person's heritage, mental status, race, sexual orientation, gender, intelligence, etc…

## ISSUES

1. On 02/22/2018 did social worker, Marway Johnson state during PSR group that she will always say something bad about patients because it was her job to keep them here (hospitalized)?

2. On 02/22/2018 did Ms. Johnson state during PSR group that the patients will never do anything good in the community once they get out?

3. If yes to either question above, did Ms. Johnson use language as a means to degrade patients?

## INVESTIGATIVE FINDINGS

On February 23, 2018 ORR received an email from Nurse Manager, S. George regarding a complaint he received from a staff person. ORR spoke with staff and they stated that while they are comfortable with cooperating fully with the investigation they would feel more comfortable if they could remain anonymous. Per the email:

> "On 2/22/18 during 3:00 P.M. PSR group, social worker Marway Johnson stated to the patients in group that her job is to keep the patients admitted to the facility. Patient ▓▓▓▓▓▓▓▓ confronted Ms. Johnson and stated "This isn't the first time you've said this. You told us in the other dining room in another group that your job is to not say anything good about us and when you go to court it is only to get our order to stay renewed." Ms. Johnson stated "You are right. I did say that, and I will never have a good thing to say about you or anyone here to anyone and I will always say something bad about you when I go to court because my job is to keep you here. It doesn't matter how good you are doing I will always say something bad because you will never do any good in the community when you get out of here." ▓▓▓▓▓▓▓ became agitated by what Ms. Johnson said but was able to control his agitation. This writer talked to the patient after group and reported to her supervisors what transpired in PSR group."

On February 27, 2018 ORR spoke with the complainant regarding the allegation made. According to staff, "▓▓▓▓▓▓ was there. He tried really hard not to get upset. She started the conversation off toward the group based on what another person had said. When she agreed with the statement that was said about not saying anything good about patients in court, ▓▓▓▓ commented to her that she had made the comment before in her other group and he turned and pointed to the third dining room. We were currently in the first dining room. She agreed with him and went on to continue to say it again. It was really upsetting him and the other patients too. I noticed that ▓▓▓▓ began to start talking to himself like he does. He didn't

get loud. He didn't raise his voice or argue with her or anything. She called his name and he stopped the talking. Shortly after that she made another statement about the patients in the community never doing anything good and I nearly fell out of my chair. I couldn't believe it. Everything she was saying to them was so wrong to say. It's wrong that they actually do it (misrepresent the patients in court) but why say that to a patient. You (M. Johnson/social workers) should be encouraging them. ███████ asked if I could open the restroom for him and I said of course and when we left the room I told him that he didn't have to listen to her negativity."

On February 27, 2018 ORR hand delivered a Notice of Appointment for Interview for Social Worker, Marway Johnson. ORR gave Ms. Johnson the letter indicating that a tentative appointment was scheduled for the following day. ORR asked Ms. Johnson if she would like to have Union representation or if she would like to speak today. Ms. Johnson declined representation and stated that she could speak now as long as it was brief as she had a PSR group to conduct at 3pm. ORR asked which groups Ms. Johnson was responsible for and she stated, Substance Abuse Group: Putting it Into Practice and Good Mental Health. ORR then informed Ms. Johnson of the allegation and asked if she could comment on what took place during the group. According to Ms. Johnson; "I never said that. Another patient told me that their Social Worker had told him that it was their job to say whatever in court to keep them here. The patients all began to talk around the room stating what social workers, doctors, and psychiatrists have said and done in court. I have never been to court, so I can't say that that is what I did, but I did say to them that we go to court, so we can renew your treatment order even if you are stable. That is our job to say what is needed for them to stay." ORR asked Ms. Johnson about the alleged statement relating to how patients would fail in the community (the exact statement from the complaint was read to her). Ms. Johnson stated; "I never said that. It was a group conversation, but I did agree that we go to court to get them recertified." ORR asked Ms. Johnson if she really believed it was her "job" to keep patients here hospitalized and she responded; "Yes. That is my job. I was told, that is my job. Is it not my job?" To which ORR responded; "No, it is not. Your job is to provide therapeutic services to assist with their overall treatment and care in order to move them towards stability so that they can return to the community."

On March 1, 2018 ORR attempted to speak with ███████████ regarding the allegation. Mr. ██████ stated, "I am not down with the recipient rights thing. That's snitching, that's not what I do. I don't know how you found out about what she said, but I don't want to talk about it."

On March 16, 2018 ORR spoke with Mr. ██████ again and asked if he could speak briefly about what was said during the PSR group where he became upset. Mr. ██████ was hesitant to participate but eventually stated, "I don't write recipient rights complaints and I don't snitch. I don't want to get her or nobody else in trouble." ORR explained that he wasn't the one that complained and that he was just needed to talk about what if anything was said. Mr. ██████ continued stating.; "Okay look this is what she said, she said it was her job to say whatever she needed to say to keep us here for another year. She said she would never say anything good about us because that's not her job."  When asked about the statement made regarding patients in the community Mr. ██████ stated, "No, it wasn't what you said. I don't remember exactly how she put it but she said something about how we wouldn't do good if we left anyway."

On May 14, 2018 ORR reviewed the position description for the MDHHS-Walter P. Reuther Psychiatric Hospital Clinical Social Worker. The general summary of function/purpose of the position states; "The incumbent provides a variety of professional clinical social work services involving case management, <u>therapeutic interventions</u> and <u>discharge planning</u> for patients at the Walter P. Reuther Psychiatric Hospital.

**CONCLUSION**

The decision in this case is based upon a preponderance of evidence, which means a standard of proof which is met when, based upon all available evidence, it is more likely that a right was violated than not, based upon the greater weight of the evidence, not as to quantity, but as to quality.  The facts of this case are as follows:

1. **On 02/22/2018 did social worker, Marway Johnson state during PSR group that she will always say something bad about patients because it was her job to keep them here (hospitalized)?**

   According to both the complainant and the patient named in this complaint, Ms. Johnson did state to the PSR group that it was her job to say something bad about patients in order to keep them here in the hospital. Even more important, although Ms. Johnson denied using those exact words she did acknowledge that she expressed to the group that she (as the social worker) goes to court in order to renew their treatment order, even if they are stable. She also confirmed with the patients that the purpose of court is so that they can be recertified. Ms. Johnson further stated to ORR during the interview that it was her understanding that it is her job to say whatever needs to be said, regardless of how a patient is progressing, in order for that patient to remain hospitalized and on a continuing order.

2. **On 02/22/2018 did Ms. Johnson state during PSR group that the patients will never do anything good in the community once they get out?**

   Although Ms. Johnson denied making this statement, based on statements from the patient and the staff witness it is more likely than not that Ms. Johnson stated something of this nature to the patients in her PSR group.

3. **If yes to either question above, did Ms. Johnson use language as a means to degrade patients?**

   Yes. The language that Ms. Johnson used to speak to patients was not only patronizing and condescending, it was degrading and showed a lack of respect and consideration for any of the patients' feelings. Ms. Johnson's words had the potential to cause harm and negatively affect the patients' sense of self-esteem and self-worth as evidenced by Mr. ███████ becoming upset. Such words and attitudes displayed by staff can also have a negative effect on patient treatment prognosis which is counterproductive to the goal and purpose of treatment and a therapeutic environment. In a role that requires unconditional positive regard towards the people she is required to provide therapeutic services for, Ms. Johnson not only failed to extend that to the group but her response to her actions

showed indifference, as she felt that she was speaking the truth to the patients and would merely be "doing her job" when her time in court came.

Based on these facts, the preponderance of evidence supports the violation of Abuse Class III.


**RECOMMENDATIONS**

ORR recommends WRPH Administration ensures that Ms. Johnson receive appropriate disciplinary action for substantiated Abuse III allegation in accordance with the MDHHS Disciplinary Guidelines. ORR further recommends that remedial action specifically includes Dignity and Respect training.

ORR also recommends that the Bureau of Hospitals and Forensic Services addresses what appears to be a message that is disseminated to staff by their superiors regarding their responsibilities toward patients in respect to "saying whatever needs to be said to keep patients here (on an order for involuntary hospitalization)" regardless of a patient's progress with treatment and readiness for discharge.  Based upon past substantiated rights violations, this messaging is not isolated to the Social Work Department at WRPH and needs to be addressed across all clinical departments at all facilities.


**PERSONS INTERVIEWED**

Anonymous, WRPH Staff
█████████, Patient
Marway Johnson, Social Worker


_____

Enid Reed, Rights Advisor                             Date
Walter Reuther Psychiatric Hospital
30901 Palmer Rd.
Westland, MI 48186

# EXHIBIT

# O

**Appointed Attorney Fee Schedule for Wayne County Probate Court**

# WAYNE COUNTY PROBATE COURT
## Court Appointed Attorney Fee Schedule

| Assignment Type | Petition Type | Description | Fee |
|---|---|---|---|
| ATTORNEY | Mental Health | One time payment to represent respondent at **all required mental health hearings** for each petition assigned.  <u>Attorney must attend deferral conference at the hospital to be eligible for payment</u>. | $130 per Assignment |
| ATTORNEY | Developmentally Disabled | <u>No Personal Visit Required by Court</u><br>One time payment to represent proposed ward at **all required hearings** for each petition assigned.<br><br><u>Personal Visit Required by Court</u><br>One time payment to: 1) represent proposed ward at **all required hearings** for each petition assigned, and 2) personally visit proposed ward (if required by the Court) prior to initial hearing. | $60 per Assignment<br><br>$75 per Assignment |
| ATTORNEY | Guardianship Review | One time payment to represent ward **at all required hearings** when the court determines a hearing is required as a result of a guardianship review. | $175 per Assignment |
| ATTORNEY | LIP | One time payment to represent ward **at all required hearings** when the court determines an attorney is required. | $175 per Assignment |
| ATTORNEY | All Other | One time payment to represent party **at all required hearings** for each petition assigned. | $175 per Assignment |
| ADULT GUARDIANSHIP REVIEW | N/A | One time payment for each guardianship review completed.  <u>No payment will be issued if it is determined that the ward is deceased</u>. | $60 per Assignment |
| GUARDIAN AD LITEM | All | One time payment for each Guardian ad Litem assignment.  Payment includes compensation for the preparation/filing of GAL report and attendance **at all required hearings**. | $175 per Assignment |

**NOTE: Wayne County Probate Court will authorize payments included in this schedule only when the Court determines the party represented has liquid assets less than $5,000.**

**Rev. Oct/2014**

# EXHIBIT P

**Walter P. Reuther Psychiatric Hospital
Standard Operating Procedure #254**



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**WALTER P. REUTHER PSYCHIATRIC HOSPITAL**
**STANDARD OPERATING PROCEDURE**

| SOP NUMBER: 254 | ISSUE DATE: 04/04/98 | REVIEW DATE: | 05/30/17 |
|---|---|---|---|
| SUBJECT: NGRI (Not Guilty by Reason of Insanity) | | REVISION DATE: | 05/30/17 |
| PRIMARY AUTHOR: Director of Social Work | | EFFECTIVE DATE: | 07/08/17 |
| EXECUTIVE STAFF APPROVAL: | HOSPITAL DIRECTOR APPROVAL: APPROVAL DATE: 06/07/17 | | |

**POLICY/STANDARD/RULE/REGULATION/LAW:**

In accordance with the Michigan Mental Health Code, MDHHS Policy, and Administrative Rules, WRPH shall provide persons found Not Guilty by Reason of Insanity, treatment services based on their individual needs according to the requirements of the Center for Forensic Psychiatry (CFP)/NGRI Committee.

**APPLICATIONS:** Clinical Staff, Medical Records, Patient Affairs, and Safety Department

**REFERENCES:**

- Michigan Mental Health Code, Chapter 4: 330.1482, 330.1483, 330.1484, 330.1485, 330.1479, and 330.1480
- Michigan Mental Health Code, Chapter 10;330.2050(5)
- MDHHS Administrative Rule, Chapter 4
- MDHHS APF 164, :Freedom of Movement"
- Center for Forensic Psychiatry NGRI Committee Procedures 4/2008
- WRPH SOP 222, Admission to the Hospital
- WRPH SOP 247, Unauthorized Leave of Absence (ULA)
- WRPH SOP 248, Leave of Absence (LOA)
- WRPH SOP 251, Periodic Reviews
- WRPH SOP 252, Petition & Certification for Initial and Continued Involuntary Hospitalizations
- WRPH SOP 258, Patient Transfers Between State Facilities
- WRPH SOP 285, Patient Community Outings

**DEFINITIONS/ABBREVIATIONS:**

*AUTHORIZED LEAVE STATUS (ALS):* A person found to have committed a crime by a court or jury, but who was acquitted by reason of insanity, except that a person shall not be discharged or placed on leave without first being evaluated and recommended for discharge or leave by the department's program for forensic psychiatry and authorized leave of absence from the hospital may be extended for a period of five (5) years.

*COMMUNITY MENTAL HEALTH SERVICES PROGRAM/MANAGER OF COMPREHENSIVE PROVIDER NETWORK (CMHSP/MCPN):* Agency representative who serves as a liaison.

*FORENSIC LIAISON:* WRPH staff person designated by the Director of Social Work who is responsible for ensuring compliance with NGRI procedures established by the Center for Psychiatry.

*FORENSIC CASE NUMBER:* A six (6) digit number assigned to patients by the Center for Forensic Psychiatry with a Forensic history.

*LEAVE OF ABSENCE (LOA):* Indicates an approved leave from the hospital grounds, either alone or accompanied by family or friends. A scheduled out-trip accompanied by hospital personnel shall not be interpreted as an LOA.

*NGRI COMMITTEE:* A multidisciplinary committee consisting of senior forensic, clinical members. Members of the committee are appointed by the Director of the Center for Forensic Psychiatry.

*NOT GUILTY BY REASON OF INSANITY (NGRI):* A patient who has been adjudicated NGRI in a District or Circuit Court. These patients have been to trial and a judge or a jury has determined that they were not legally responsible for their actions due to their mental or emotional state at the time of the crime.

*PATIENTS ON NGRI STATUS:* A patient who was adjudicated NGRI and is not yet released from treatment oversight by the Center for Forensic Psychiatry NGRI Committee.

*PERIODIC REVIEW/SIX-MONTH REVIEW:* Determination by a psychiatrist whether the patient continues to be a person in need of mental health treatment made six (6) months from the date of a continuing order.

*SUPERVISED GROUND ACCESS:* Patients may only go off the unit up to four (4) times per day with staff supervision.

*UNSUPERVISED GROUND ACCESS:* Patients may go off the unit up to three (3) times per day independently of staff supervision during posted hours.

## STANDARDS:

A. Individuals adjudicated NGRI shall be admitted to the hospital upon a Probate Court Order by a Probate Court or upon transfer from the Center of Forensic Psychiatry.

B. The original correspondence and reports from the Center for Forensic Psychiatry shall be maintained in the patient's medical record and copies shall be filed in the Patient Affairs Office.

C. An alert shall be entered on the Client Alerts screen in the EMR indicating the patient's NGRI status.

D. Patients on NGRI status are to be evaluated for risk of escape or aggressive behavior within five (5) working days of admission utilizing the Risk Assessment Form (WRPH-233B).

E. The Risk Assessment is to be repeated whenever the patient is eligible for a change of movement, if the last Risk Assessment was not within 30 days of the request.

F. Patients on NGRI status who have a Risk Assessment that indicates a score of 10 or less on the Aggressive Profile and 30 or less on the Escape Profile may be granted Supervised Ground Access. Patients scoring more on either of the scales shall be considered maximum risk and shall be on one-to-one supervision, when taken off the unit.

G. All requests for Unsupervised Ground Access, participation in community outing, Leave of Absence, or release on Authorized Leave Status shall be submitted to the NGRI Committee for approval within ten (10) business days of the Treatment Team's determination.

H. Patients who have returned from Authorized Leave Status must submit a narrative to accompany the request for Unsupervised Ground Access.

I. Review by the NGRI Committee shall occur no later than fifteen (15) calendar days after receipt of the request by the committee.

J. A patient adjudicated NGRI for the offense of murder or criminal sexual conduct must be approved by the NGRI Committee and also the Director of Community Health/Department Designee before being granted Unsupervised Ground Access, Community Outings, Leave of Absence, or Release on ALS Status.

K. Participation in any off hospital grounds activity, including community outings, criminal court hearings or court hearings for legal matters not associated with his/her NGRI offense, requires NGRI Committee approval. Patients must have Unsupervised Ground Access before participation in community outings, unless otherwise, approved by the NGRI Committee.

L. If a patient's Unsupervised Ground Access is revoked, a new request must be made to the NGRI Committee for reinstatement of Unsupervised Ground Access.

M. The request for LOA should be submitted when the following criteria have been met:
   1. The patient's mental illness, which led to the adjudication as NGRI, is in adequate remission/control.
   2. The patient is not considered presently dangerous to self or others.
   3. The patient is not considered an escape risk; and
   4. The patient's LOA is considered to have therapeutic value.

N. The request for ALS should be submitted when the following criteria have been met:
   1. The patient is on a Continuing Order for Treatment.
   2. The patient's mental illness, especially the mental illness that led to the patient's adjudication as NGRI, is in adequate remission or control.
   3. The patient should have adequate insight regarding the nature of his or her mental condition, treatment needs, and how his/her mental illness contributed to his/her offense.
   4. The patient is not considered an escape risk.
   5. Within the bounds of reasonable clinical certainty, the patient is not likely to repeat the type of behavior which led to the adjudication as NGRI or to commit other dangerous acts.
   6. The patient has written a narrative to the NGRI Committee to reflect insight regarding the nature of his or her mental condition, treatment needs, and how his/her mental illness contributed to his/her offense.

O. Before releasing the patient to the community on ALS, the hospital shall assure the patient is on a current treatment order and that the order does not expire within the next 30 days of the ALS release date.

P. Patients on NGRI status shall not be discharged from hospitalization without prior approval from the NGRI Committee.

Q. A patient shall not be discharged from Authorized Leave of Absence (ALS) without first being evaluated and recommended for discharge from WRPH by the NGRI Committee.  The following criteria must be met:
1. The patient no longer meets the statutory criteria for civil commitment.   A psychiatrist shall do a thorough evaluation to document this.
2. The patient has demonstrated that the mental illness leading to the adjudication, as NGRI, is controlled or in adequate remission for a significant period of time.

R. Whenever a patient on NGRI status is placed on Unauthorized Leave of Absence (ULA), the Michigan State Police, The Center for Forensic Psychiatry, and the Hospital Director shall be, immediately, notified.  If the patient has not returned after 72 hours, the patient shall be, administratively, transferred to the Center for Forensic Psychiatry via an official DCH Order to Transfer (Patient Transfers Between State Facilities – SOP 258).

S. The NGRI Committee must be notified of all transfers, including administrative transfers, between state facilities, via e-mail.

T. A patient on NGRI status may petition the court for discharge, if the patient is in disagreement with the outcome of a Periodic Review/Six-Month Review, or if, otherwise, wishing to be discharged.  (SOP 251, "Periodic Review").

U. Prior to expiration of a Court Order or whenever the patient completes a Petition for Discharge, WRPH-281, "NGRI Court Hearing Form" is completed and submitted to NGRI Committee for review.

V. Recommendations to the Court for release from hospitalization or alternative treatment shall be forwarded to the NGRI Committee for review and approval before filing and/or court appearance.   The written recommendations of the NGRI Committee shall be entered into the patient's medical record and disclosed during testimony, if requested.

W. The NGRI Committee shall be notified of the outcome of court hearings of all patients on NGRI status and, immediately, notified of all NGRI/ALS patients that are dismissed by court or of any court orders that may affect the patient's NGRI status.

X. ALS patients returning to the hospital will be treated as a new admission and all admission procedures will be followed.

Y. Staff supervision shall be provided to all NGRI patients receiving treatment in community hospitals or medical facilities, unless otherwise, indicated by the NGRI Committee. (See Procedure C).

## PROCEDURES:

## A. ADMISSION PROCEDURES FOR NOT GUILTY BY REASON OF INSANITY (NGRI):

| WHO | | DOES WHAT |
|---|---|---|
| Patient Affairs Designee | 1. | Completes the admission process for NGRI patients in accordance with Order of Treatment. (See Admission to the Hospital – SOP 222, Section D). |
| | 2. | Enters a Client Alert in the Patient's EMR indicating the patient's NGRI status. |
| | 3. | Maintains a file of all documents relating to the NGRI status of the patient. |
| Treatment Team | 4. | Completes the Risk Assessment within five (5) working days after admission. Tabulates and reviews scores regarding the granting of Supervised Ground Access (See Standard D). |
| Unit Clerk | 5. | Scans completed copies of the Risk Assessment (WRPH-233B) into the "NGRI Committee Documents" folder and forwards the original to Medical Records. |

## B. INPATIENT TREATMENT PROCEDURES:

| WHO | | DOES WHAT |
|---|---|---|
| Treatment Team | 1. | Repeats the Risk Assessment whenever the patient is eligible for a change of movement level (Unsupervised Ground Access, Community Outings with Staff, LOAs, and/or ALS Planning), if the last Risk Assessment was not within 30 days of the request. |
| Unit Clerk | 2. | Scans completed copies of the Risk Assessment (WRPH-233B) into the "NGRI Committee Documents" folder and forwards the original to Medical Records. |

| WHO | | DOES WHAT |
|---|---|---|
| Psychiatrist / Social Worker | 3. | Prepares the NGRI Request Letter (WRPH-279) for any change of movement level (Unsupervised Ground Access, Community Outings with staff, LOAs, and/or ALS Planning [psychiatrist provides the mental status exam]. This must be completed within ten (10) business days of the treatment team's determination. **NOTE:** *Regarding "NGRI Emergency LOA Request" refer to Exhibit E-180 for required documentation.* |
| Social Work Secretary / Designee | 4. | Formats NGRI Request Letter and forwards to Forensic Liaison/Social Work Department Designee for review. |
| Forensic Liaison / Social Work Designee | 5. | Reviews and approves NGRI Request Letter and patient's narrative, if applicable. |
| Psychiatrist, Social Worker, and Forensic Liaison/Social Work Designee | 6. | Signs the NGRI Request Letter. |
| Social Work Secretary / Designee | 7. | Faxes NGRI Request Letter and patient's narrative (when indicated) to NGRI Committee and forwards original documents to the Unit Clerk. |
| Unit Clerk | 8. | Scans original NGRI Request Letter and patient's narrative (when indicated) into the patient's EMR in the "NGRI Committee Documents" folder and forwards the original to Medical Records. |
| Forensic Liaison / Social Work Designee | 9. | a. Receives a response from the NGRI Committee, via email, regarding the NGRI Request Letter. b. Forwards the NGRI Committee's email response to the appropriate Psychiatrist, Social Worker, Director of Social Work, and Social Work Department/Secretary/Designee. |
| Social Worker | 10. | Communicates the response from the NGRI Committee to the Treatment Team and makes appropriate arrangements, if the NGRI Committee approves the request. |
| Social Work Secretary/Designee | 11. | Forwards the NGRI Committee's response to the Unit Clerk to be scanned. |
| Unit Clerk | 12. | Scans the NGRI Committee's response into the patient's EMR in the "NGRI Committee Documents" folder and forwards the original to Medical Records. |

## C. SUPERVISION OF NGRI PATIENTS AT COMMUNITY HOSPITALS/MEDICAL FACILITIES:

| WHO | | DOES WHAT |
|---|---|---|
| Central Nursing Office Designee | 1. | Assigns WRPH nursing staff to escort and supervise all NGRI patients receiving treatment in community hospitals or medical facilities unless, otherwise, indicated by the NGRI Committee. |
| Social Worker | 2. | a. Emails the Forensic Liaison/Department Designee, Director of Social Work, and CMHSP/MCPN Liaison, immediately, indicating: 1) That an NGRI patient was hospitalized 2) Reason for hospitalization 3) Facility name 4) Date of admission to facility 5) Date of return to WRPH b. Notifies the legal guardian and/or family member/identified support person of patient's hospitalization. |
| Forensic Liaison/Social Work Designee | 3. | Emails the NGRI Committee notifying them of an NGRI patient's recent community hospitalization including reason for hospitalization, facility name, date of admission and date of return to WRPH. |
| | 4. | Receives recommendations or requirements from the NGRI Committee regarding supervision of NGRI patient while receiving treatment in a community hospital or medical facility. |
| | 5. | Forwards response from the NGRI Committee indicating required supervision of NGRI patient while receiving treatment in a community hospital or medical facility to the Central Nursing Office, Treatment Team, Director of Social Work, and Director of Psychiatry. |

**D. AUTHORIZED LEAVE STATUS (ALS) PLANNING:**

| WHO | | DOES WHAT |
|---|---|---|
| Treatment Team | 1. | Determines patient has met criteria for release on ALS (See Standard N). |
| Psychiatrist/Social Worker | 2. | Prepares NGRI Request Letter (WRPH-279) for ALS planning [psychiatrist provides the mental status exam].  This must be completed within ten (10) business days of the Treatment Team's determination. |
| Social Work Secretary/ Designee | 3. | Formats NGRI Request Letter and forwards to Forensic Liaison/Social Work Department Designee for review. |
| Forensic Liaison/Social Work Dept.  Designee | 4. | Reviews and approves NGRI Request Letter and patient's narrative. |
| Psychiatrist, Social Worker, and Forensic Liaison/Social Work Designee | 5. | Signs NGRI Request Letter. |
| Social Work Secretary/Designee | 6. | Faxes NGRI Request Letter and patient's narrative to NGRI Committee and forwards original documents to the Unit Clerk. |
| Unit Clerk | 7. | Scans original NGRI Request Letter and patient's narrative into the patient's EMR in the "NGRI Committee Documents" folder and forwards the original to Medical Records. |
| Forensic Liaison/Social Work Designee | 8. | a.   Receives a response from the NGRI Committee, via email, regarding NGRI Request Letter.<br>b.   Forwards the NGRI Committee's email response to the appropriate Psychiatrist, Social Worker, Director of Social Work, and Social Work Department Secretary/Designee. |
| Social Work Secretary/Designee | 9. | Forwards the NGRI Committee's response to the Unit Clerk to be filed scanned. |
| Unit Clerk | 10. | Scans the NGRI Committee's response into the patient's EMR in the "NGRI Committee Documents" folder and forwards the original to Medical Records. |
| Social Worker | 11. | Communicates the response from the NGRI Committee to the Treatment Team and makes appropriate arrangements, if the NGRI Committee approves the request. |
| | 12. | Completes Comprehensive Pre-Release and Discharge Plan (WRPH-251) within five (5) business days of the NGRI Committee's approval for ALS planning and provides a copy to the CMHSP/MCPN Liaison. |
| Forensic Liaison/Social Work Designee | 13. | Contacts Director of Community Health/Designee to schedule an interview of only those NGRI patients acquitted of murder or criminal sexual conduct.  Determines whether or not the NGRI patient may be released on ALS status.  Evaluates the patient for approval to proceed with ALS planning. |
| Social Worker | 14. | Requests Placement Description from CMHSP/MCPN Liaison only for those NGRI patients acquitted of murder or criminal sexual conduct and forwards to the Forensic Liaison/Social Work Designee. |
| Forensic Liaison/Social Work Designee | 15. | Reviews and forwards Placement Description for those NGRI patients acquitted of murder or criminal sexual conduct to NGRI Committee for approval. |
| Social Worker | 16. | Develops the ALS Contract upon placement approval from the NGRI Committee and Director of Community Health/Designee.  Arranges a date and time for meeting to sign the ALS Contract.  Secures all necessary signatures from the involved parties. |
| Social Work Dept. Secretary/Designee | 17. | Faxes the signed ALS Contract to the NGRI Committee. |
| | 18. | Receives the faxed signature page from the NGRI Committee, as approval. |
| Social Worker | 19. | Provides copies of the ALS Contract for distribution.  Sends the original ALS Contract to Medical Records. |
| | 20. | Coordinates and facilitates the ALS Release Meeting and provides a copy of the ALS Contract to all parties involved. |
| Social Work Secretary/Designee | 21. | Sends email notification to the NGRI Committee of the patient's official ALS release date. |

| WHO | | DOES WHAT |
|---|---|---|
| Medical Records | 22. | Scans the ALS Contract into the patient's EMR in the "NGRI Committee Documents" folder and forwards the original to Medical Records. |

### E.   PERIODIC REVIEW/SIX MONTH REVIEW REPORT:

| WHO | | DOES WHAT |
|---|---|---|
| Patient Affairs Designee | 1. | Notifies the psychiatrist, via monthly "Expiration of Court Orders" list, that the Six Month Review Report, (PCM 226) is due. |
| | 2. | Forwards a Six Month Review Report to the psychiatrist before the due date for completion. |
| Psychiatrist | 3. | Completes the Six Month Review Report and forwards the completed form to Patient Affairs by the due date. |
| Patient Affairs Designee | 4. | Files the Six Month Review Report with the court within five (5) days of receipt. |
| | 5. | Provides patient a copy of the Six Month Review Report and a Petition for Discharge from Continuing Treatment (PCM 220), if the patient objects to the report within five (5) days of receipt of the Six Month Review Report. |
| | 6. | Files the form Petition for Discharge from Continuing Treatment with the court within 7 days of receipt (excluding Sunday and holidays), only if the patient disagrees with the Six Month Review Report. |
| | 7. | a.  Receives notification of the hearing date from the Probate Court of record and serves the patient the Notice of Hearing (PCM 212) and Order of Appointing Attorney (PC 628);<br>b.  Mails copies to the guardian; and<br>c.  Forwards to the testifying doctor. |
| | 8. | Serves the patient the Notice of Hearing and Order of Appointing Attorney. |
| | 9. | Enters hearing date into the "Court Orders" screen in the "Docket" section and documents date and time patient was served in the "Notes" field. |
| Psychiatrist | 10. | Completes NGRI Court Hearing Form (WRPH-281) within two (2) business days of the Petition for Discharge being filed and returns it to the Patient Affairs Office. |
| Patient Affairs Designee | 11. | Faxes the NGRI Court Hearing Form to the NGRI Committee and sends the original to Medical Records and a copy to the testifying psychologist. |
| | 12. | Receives the NGRI Committee Court Letter with their recommendations and provides a copy to Medical Records and the testifying psychologist. |
| Medical Records | 13. | Scans completed forms into the patient's EMR in the "NGRI Committee Documents" folder and forwards the original to Medical Records. |
| Testifying Psychologist | 14. | a. Provides clinical observations and recommendations of the NGRI Committee indicated in the NGRI Court Letter to the Probate Court as an *"expert witness"*.<br>b. Immediately notifies Patient Affairs of the results of the court hearing.<br>c. Notifies the Treatment Team of any court orders that affect the patient's NGRI status. |
| Patient Affairs Designee | 15. | Notifies the Director of Psychiatry and the Forensic Liaison/Social Work Designee of the results of the court hearing, if the patient has been discharged from treatment, or if the court order will affect the patient's NGRI status. |
| Forensic Liaison/Social Work Designee | 16. | Notifies the NGRI Committee and assures that follow-up aftercare is provided. |

### F.   EXPIRATION OF TREATMENT ORDERS:

| WHO | | DOES WHAT |
|---|---|---|
| Patient Affairs Designee | 1. | Notifies the psychiatrist that the court order is expiring, via monthly "Expiration of Court Orders" list. |
| Psychiatrist | 2. | Provides NGRI Court Hearing Form (WRPH-281) to the treating psychiatrist thirty (30) days prior to the expiration date of the Treatment Order. |
| | 3. | Completes NGRI Court Hearing Form and returns it to Patient Affairs. |
| Patient Affairs Designee | 4. | Distributes Petition for Continuing Treatment **(**PCM 218) to the Social Worker and Clinical Certificate (PCM 208) to the treating Psychiatrist. |

| WHO | | DOES WHAT |
|---|---|---|
| | 5. | Faxes WRPH-281, "NGRI Court Hearing Form" to the NGRI Committee and sends the original to Medical Records and a copy to the testifying psychologist. |
| | 6. | Receives the NGRI Committee Court Letter with their recommendations and provides a copy to Medical Records and the testifying psychologist. |
| Social Worker | 7. | Completes Petition for Continuing Treatment and submits to Patient Affairs Office at least 24 hours before date due for submission in court. |
| Psychiatrist | 8. | Completes the Clinical Certificate and submits to Patient Affairs Office no earlier than 24 hours before date due for submission in court. |
| Patient Affairs Designee | 9. | Files the completed Petition for Continuing Treatment (PCM 218) and the Clinical Certificate (PCM 208) in the Probate Court of record. |
| | 10. | Receives notification of the hearing date from the Probate Court of Jurisdiction and serves the Hearing Notice, a copy of the Petition and Certificate to the patient. |
| | 11. | Enters hearing date into the "Court Orders" screen in the "Docket" section and documents date and time patient was served in the "Notes" field. |
| Testifying Psychologist | 12. | a. Provides clinical observations and recommendations of the NGRI Committee identified in the NGRI Court Letter to the Probate Court as an "*expert witness*". <br> b. Immediately, notifies Patient Affairs of the results of the court hearing. <br> c. Notifies the Treatment Team of any court orders that affect the patient's NGRI status. |
| Patient Affairs Designee | 13. | Notifies the Director of Psychiatry and the Forensic Liaison /Social Work Designee of the results of the court hearing, if the patient has been discharged from treatment, or if the court order will affect the patient's NGRI status. |
| Forensic Liaison/Social Work Designee | 14. | Notifies the NGRI Committee and assures that follow-up aftercare is provided. |

## G. UNAUTHORIZED LEAVE (ULA) PROCEDURES FOR NGRI PATIENTS (INPATIENT):

| WHO | | DOES WHAT |
|---|---|---|
| Social Worker | 1. | Notifies the Forensic Liaison/Social Work Designee and CMHSP/MCPN Liaison, immediately, that the patient is ULA. |
| Safety Department | 2. | Notifies, immediately, the State Police that an NGRI patient was placed on ULA status. |
| Patient Affairs Designee | 3. | Notifies the Probate Court of Jurisdiction that the patient is ULA. Emails Safety Dept. and the Forensic Liaison/Social Work Designee that notification has been completed. |
| Forensic Liaison/Social Work Designee | 4. | Contacts the Center for Forensic Psychiatry after patient has been ULA for 72 hours to request authorization for administrative transfer. (Per Patient Transfers Between State Facilities (SOP-258). |
| | 5. | Receives authorization from the Center for Forensic Psychiatry to proceed with administrative transfer. |
| | 6. | Notifies the Treatment Team and Patient Affairs to proceed with administrative transfer. |

## H. AUTHORIZED LEAVE STATUS/PATIENT FOLLOW-UP:

| WHO | | DOES WHAT |
|---|---|---|
| Forensic Liaison/Social Work Designee | 1. | Maintains and reviews the documentation of patients on ALS and a file of Periodic Review/Six Month Review Reports (PCM 226), 90 Day Reports, Continuing Order for Treatment (PCM 219), and correspondence. |
| | 2. | Monitors the facilitation of Periodic Review/Six Month Review Reports, 90-Day Reports and Continuing Order for Treatment. |
| | 3. | Coordinates the completion of the Periodic Review/Six Month Review Report and the Continuing Order for Treatment by WRPH staff, when the CMHSP agency is unable to do so, while on ALS. |

| WHO | | DOES WHAT |
|---|---|---|
| | 4. | Maintains responsibility for monitoring and keeping a record of the 90-Day Reports, Periodic Reviews/Six Month Reviews, and Court Orders, as long as the patient is on ALS. |

### I. NGRI /ALS RE-HOSPITALIZATION PROCEDURES:
(REFER TO SOP 222 - ADMISSION TO THE HOSPITAL FOR ADDITIONAL INFORMATION)

| WHO | | DOES WHAT |
|---|---|---|
| Forensic Liaison/Social Work Designee | 1. | Receives email notification from the NGRI Committee that NGRI/ALS patient requires an evaluation due to violating their ALS Contract and/or has exhibited behaviors/symptoms that indicate a need for re-hospitalization. <br> a.  Schedules and coordinates an evaluation of NGRI/ALS patient at WRPH by assigned treatment team. <br> b.  Sends email to NGRI Committee stating the results of the evaluation and the recommendations, i.e., re-hospitalization, change in level of care, etc. <br> OR <br> Receives email notification from the NGRI Committee that NGRI/ALS patient requires re-hospitalization, without an evaluation, due to violating their ALS Contract and/or has exhibited behaviors/symptoms that indicate a need for re-hospitalization. <br> a.  Requests from the CMHSP/MCPN Liaison the Re-hospitalization Form and Clinical Packet: Progress Notes for last 90 days, Medication Sheet, which includes medications for medical conditions, Police Reports, IPOS, any significant medical info, Urine Drug Screen (UDS), Incident Reports, current court order, Group Home Notes, and ALS Contract. <br> b.  Coordinates the patient's re-admission with the CMHSP/MCPN Liaison. |
| | 2. | Sends email notification of patient's re-hospitalization to assigned unit and appropriate departments. |
| | 3. | Forwards Re-hospitalization Form and Clinical Packet to Patient Affairs Designee. |
| Patient Affairs Designee | 4. | Distributes Admission Packet via email. |

### J. UNAUTHORIZED LEAVE (ULA) PROCEDURES FOR NGRI/ ALS PATIENTS:

| WHO | | DOES WHAT |
|---|---|---|
| Forensic Liaison/Social Work Designee | 1. | Receives notification from the CMHSP/MCPN Liaison or CMHSP that the patient is ULA from placement. |
| | 2. | Obtains information from the CMHSP/MCPN Liaison or CMHSP, placement provider, and/or family regarding the patient's last known whereabouts, verify current address, obtain a description of the patient, current risk of harm to self or others. |
| | 3. | Receives notifications from the NGRI Committee that the patient should be placed on ULA status by the hospital. |
| | 4. | Notifies the Social Work Department Director, Director of Psychiatry, Hospital Director/Designee, Bureau Director/Designee, Chief of Clinical Affairs, Safety Director, Patient Affairs, and Data Processing. |
| | 5. | Provides Safety with information required to complete Section A of WRPH-306, *including whether the patient is a danger to self or others*. |
| Forensic Liaison/Social Work Designee | 6. | Completes "Leaves" screen in EMR to place patient on Unauthorized Leave status. |
| Safety Department | 7. | Receives notification from the Forensic Liaison/Social Work Dept. Designee that a NGRI/ALS patient is ULA. Notifies, immediately, the State Police of an NGRI/ALS patient ULA and requests that patient is placed in LEIN system. |
| Patient Affairs Designee | 8. | Notifies the appropriate Probate Court of Jurisdiction that the patient is ULA. Emails Safety Dept. and the Forensic Liaison/Social Work Dept. Designee that notification has been made. |

| WHO | | DOES WHAT |
|---|---|---|
| Forensic Liaison/Social Work Designee | 9. | Contacts CFP after patient has been ULA for 72 hours to request approval for administrative transfer to CFP. |
| Patient Affairs Designee | 10. | Contacts designated CMHSP authority for approval of transfer. The approvals must be: a. On the CMHSP letterhead. b. Must indicate that the CMHSP approves the transfer of the patient from Point A (sending hospital) to Point B (receiving hospital). c. Must contain the signature of a CMHSP designee that is approving the transfer. |
| | 11. | Forwards the Re-hospitalization Form and clinical packet to CFP at the time the patient is administratively transferred to CFP. |
| | 12. | Forwards the CMHSP approval and the Order of Transfer to the Bureau of Hospital, Center & Forensic Mental Health Services for authorization. |
| | 13. | Contacts CFP, upon receipt of the Order of Transfer, and schedules a date for the administrative transfer. |
| | 14. | Scans Order of Transfer (DCH-1890) into the patient's EMR in the "Discharge Summary" folder, sends original to Medical Records. |
| Forensic Liaison/Social Work Designee | 15. | Completes and sends out Discharge/Release Notice (WRPH-245). |
| Psychiatrist | 16. | Enters discharge order in the EMR in the "Patient Profile/Physicians Orders" screen using Order Type "LOA/Transfer/Discharge". |

**K.  ADMINISTRATIVE TRANSFERS FOR NGRI/ALS PATIENTS:**

| WHO | | DOES WHAT |
|---|---|---|
| Forensic Liaison/Social Work Designee | 1. | Completes and forwards Transfer Copy Request (WRPH-330) to Data Processing Supervisor. |
| Data Processing Supervisor / Designee | 2. | Copies the identified documents from Transfer Copy Request and when completed, forwards to Patient Affairs Designee. |
| Forensic Liaison/Social Work Designee | 3. | Contacts designated CMHSP authority for approval of transfer. The approvals must be: a. On the CMHSP letterhead. b. Must indicate that the CMHSP approves the transfer of the patient from Point A (sending hospital) to Point B (receiving hospital). c. Must contain the signature of a CMHSP designee that is approving the transfer. |
| | 4. | Contacts the receiving hospital requesting transfer, once CMHSP approval is obtained. |
| | 5. | Sends receiving hospital the transfer information packet for their review. |
| | 6. | Forwards the CMHSP approval and the Order of Transfer to the Bureau of Hospital, Center & Forensic Mental Health Services for authorization. |
| | 7. | Contacts the receiving hospital upon receipt of the Order of Transfer, and schedules a date for the administrative transfer. |
| | 8. | Forwards Order of Transfer (DCH-1890) to Medical Records to be scanned into the patient's EMR in the "Discharge Summary" folder. |
| Psychiatrist | 9. | Enters discharge order in the EMR in the "Patient Profile/Physicians Orders" screen using Order Type "LOA/Transfer/Discharge". |
| Forensic Liaison/Social Work Designee | 10. | Completes and sends out Discharge/Release Notice (WRPH-245). |
| Medical Records | 11. | Prepares medical record for transfer upon notification by Transfer Coordinator except transfer to the Forensic Center. |
| Patient Affairs Designee | 12. | Notifies the Court of Jurisdiction of the patient's administrative transfer. When the patient's court order does not cover the receiving hospital, WRPH shall request the Court of Jurisdiction to amend the court order to include the receiving hospital prior to the patient's transfer. |

| WHO | | DOES WHAT |
|---|---|---|
| Forensic Liaison/Social Work Designee | 13. | Sends email to NGRI Committee stating the date of administrative transfer and reason for transfer and copy the receiving hospital. |
| | 14. | Scans a new ALS Contract signature page signed and dated by the patient, receiving hospital, and CMHSP. |
| | 15. | Forwards signature page to the NGRI Committee to be filed in the patient's CFP chart. |
| | 16. | Forwards the signature page to Medical Records. |
| Medical Records | 17. | Scans the signature page into the "NGRI Committee Documents" folder and forwards the original to Medical Records. |

## L. NGRI CONTRACT COMPLETION & DISCHARGE PROCEDURES:

| WHO | | DOES WHAT |
|---|---|---|
| Forensic Liaison/Social Work Designee | 1. | Reviews the patient's file approximately 30-45 days prior to the patient completing his/her ALS contract. |
| | 2. | Sends an email to the CMHSP/MCPN Liaison 4 weeks prior to ALS Contract completion date to: <br> a. Verifies the patient's address, phone number, and contact information for the CMHSP provider and case manager. <br> b. Asks if the Responsible Reporting Agency/CMHSP/Contractual Agency has assessed the patient to determine if an Alternative Treatment Order (ATO) is appropriate. |
| | 3. | Sends an email to the NGRI Committee, prior to ALS Contract completion date, stating the patient's expected ALS Contract completion date/discharge date from WRPH, current address, phone number, CMHSP information, and a statement regarding if the Responsible Reporting Agency/CMHSP/Contractual Agency will petition for an Alternative Treatment Order (ATO) or Assisted Outpatient Treatment Order (ATO). |
| | 4. | Receives a confirmation of receipt of email from NGRI Committee regarding confirmation of review and recommendations. |
| Patient Affairs Designee | 5. | Notifies the Court of Jurisdiction of the patient's discharge from WRPH and completion of their ALS Contract. |
| Forensic Liaison/Social Work Designee | 6. | Notifies the Director of Psychiatry and assigned psychiatrist of ALS Contract completion/discharge date. |
| Psychiatrist | 7. | Enters discharge order in the EMR in the "Patient Profile/Physicians Orders" screen using Order Type "LOA/Transfer/Discharge". |
| Forensic Liaison /Social Work Designee | 8. | Completes and sends out Discharge/Release Notice (WRPH-245). |
| Social Work Secretary/Designee | 9. | Receives ALS Completion Letter and provides a copy to Patient Affairs and the Forensic Liaison/Social Work Dept. Designee.   Forwards original to Medical Records. |
| Medical Records | 10. | Receives the ALS Completion Letter and scans into the patient's EMR in the "NGRI Committee Documents" folder and forwards the original to Medical Records. |

## EXHIBITS:

   I.     NGRI Emergency LOA Request (E-180)

## FORMS:

    I.  Risk Assessment for Patients on NGRI Status (WRPH-233B)
   II.  NGRI Request Letter  (WRPH-279)
  III.  NGRI Court Hearing Form  (WRPH-281)
  IV.  ALS Contract-Wayne County (WRPH-280A)
  V.  ALS Contract-Out County  (WRPH-280B)
  VI.  Comprehensive Pre-Release and Discharge Plan (WRPH-251)
 VII.  Petition and Order to Change Venue (PC 608)

VIII.   Notice of Hearing on Petition for Hospitalization/Assisted Outpatient Treatment/
            Judicial Admission (PCM 212)
IX.     Order of Appointing Attorney (PC 628)
X.      Notice of Hearing /Proof of Service (WCPC 601)
XI.     Petition/Application for Hospitalization (PCM 201)
XII.    Petition for Second or Continuing Treatment (PCM 218)
XIII.   Continuing Order for Treatment (PCM 219)
XIV.    Clinical Certificate (PCM 208)
XV.     Demand for Hearing (PCM 236)
XVI.    Six-Month Review Report (PCM-226)
XVII.   Petition for Discharge From Continuing Treatment or Judicial Admission (PCM-220)
XVIII.  Order of Transfer (DCH-1890)
XIX.    Transfer Copy Request (WRPH-330)
XX.     Discharge/Release Notice (WRPH-245)
XXI.    Unauthorized Leave of Absence Report (WRPH-306)

# EXHIBIT

# Q

**Petition filed by Defendant Hegira Programs, Inc. on October 24, 2017**

NGRI On Authorized Leave From Walter P. Reuther Psychiatric Hospital

Approved, SCAO

PCS CODE: PCT/PCO
TCS CODE: PSO/PCO

| STATE OF MICHIGAN | PETITION FOR | FILE NO. |
|---|---|---|
| PROBATE COURT   Wayne | ☐ SECOND  ☒ CONTINUING | 2008-728311-MI |
| COUNTY OF | MENTAL HEALTH TREATMENT ORDER | |

In the matter of ___Darryl Pelichet_____ DOB: ___3/04/1979___

First, middle, and last name

1. I, __Mary Scott_____, state that I am

Name (type or print)

☒ the authorized representative of the agency or mental health professional supervising the individual's alternative or assisted outpatient treatment program.

☐ _____ of _____.
Director or authorized representative            Name of hospital

2. The individual is currently  ☒ residing  ☐ hospitalized  at __7710 N. Merriman, Apt 101, Westland, MI__
                                                                         Address and telephone no.
   48185                    (313) ~~525-1139~~  492-8104

3. The  ☐ initial  ☐ second  ☒ continuing  order entered by this court for the individual expires on __11/09/2017__.
                                                                                                        Date

4. The individual continues to be a person requiring treatment and is in need of
   ☐ hospitalization for not more than 90 days.     ☒ continuing hospitalization for a period of one year.
   ☐ combined hospitalization and alternative/assisted outpatient treatment for not more than one year.
   ☐ alternative/assisted outpatient treatment for not more than one year.
5. The individual is likely to refuse treatment on a voluntary basis when the order expires.

INSTRUCTIONS: In answering items 6 and 7, include a description of the observed or reported behavior of the individual including, but not limited to, how behavior and conditions have changed since the last order and whether any stabilization or remission is contingent on continued medication or other treatment. Avoid medical terms and conclusions other than diagnosis.

6. The basis for this allegation is that I believe the individual has a mental illness and: (Check all that apply.)
   ☒ a. as a result of that mental illness, the individual can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in an act or acts or made significant threats that are substantially supportive of this expectation.
   ☐ b. as a result of that mental illness, the individual is unable to attend to those basic physical needs that must be attended to in order to avoid serious harm in the near future, and has demonstrated that inability by failing to attend to those basic physical needs.
   ☐ c. the individual's judgment is so impaired by that mental illness that s/he is unable to understand his/her need for treatment, and whose impaired judgment, on the basis of competent clinical opinion, presents a substantial risk of significant physical or mental harm to the individual or presents a substantial risk of physical harm to others in the near future.
   ☐ d. the individual's understanding of the need for treatment is impaired to the point that s/he is unlikely to voluntarily participate in or adhere to treatment that has been determined necessary to prevent a relapse or harmful deterioration of his/her condition. The individual's noncompliance with treatment has been a factor in the individual's
      ☐ i. placement in  ☐ a psychiatric hospital  ☐ jail  ☐ prison  at least two times within the last 48 months.
      (Specify the name[s] and location[s] of the hospital, jail, or prison and the date[s] of hospitalization or incarceration.)
      _____
      _____

   AND/OR
   ☐ ii. committing one or more acts, attempts, or threats of serious violent behavior within the last 48 months.
      (Specify the acts, attempts, or threats of serious violent behavior.)
      _____

(SEE SECOND PAGE)

33392

HEARING ORDERED

USE NOTE: If this form is being filed in the circuit court family division, place the court name and county in the upper left-hand corner of the form.

Do not write below this line - For court use only

**FILED**

OCT 2 4 2017

WAYNE COUNTY PROBATE COURT
DEPUTY PROBATE REGISTER #90

NOV - 1 2017

JUDGE:

JUDGE LAWRENCE J. PAOLUCCI

MCL 699.1472a(5).

Petition for Second or Continuing Mental Health Treatment Order   (9/16)          File No. __2008-728311-MI__

7. This conclusion is based upon
   a. my personal observation of the person doing the following acts and saying the following things:

   Patient is aware of the nature of his offense and is aware of his
   role in outcome of the Acts that resulted in this contact

   b. the following conduct and statements that others have seen or heard and have told me about:

   by: _____
   Witness name                    Complete address                              Telephone no.

8. The diagnoses of physical and mental conditions are ___Schizoaffective Disorder; Cannabis Dependence;___
   Multiple Sclerosis; Hypertension; High Cholesterol; GERD

9. The treatment program(s) provided to the individual thus far, and the results, are ___Assertive Community Treatment;___
   IDDT services; Random urine drug screens; individual therapy; Gambler's Anonymous

   meetings.

10. The present treatment  ☒ is  ☐ is not  adequate and appropriate to the individual's condition.
    The individual  ☒ is  ☐ is not  motivated to participate in this treatment program. The estimate of further time necessary

    to provide the required treatment is _____.
    The following modifications are currently planned for the next period of treatment: (Write "none" if no modifications are expected.)

11. The interested parties, their addresses, and their representatives are identical to those appearing on the initial petition except as follows:

12. Attached is a clinical certificate executed by a psychiatrist.

13. I REQUEST the court to order the individual to receive
    ☐ hospitalization for not more than 90 days.
    ☒ continuing hospitalization for not more than one year.          To Maintain NGRI Status
    ☐ combined hospitalization and alternative/assisted outpatient treatment for not more than one year.
    ☐ alternative/assisted outpatient treatment for not more than one year.

I declare under the penalties of perjury that this petition has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

__10/23/2017__
Date

Signature of petitioner
6623 N. Wayne Rd
Address
Westland, Mich 48185     (734) 427-1144
City, state, zip                    Telephone no.

# EXHIBIT R

**Darryl Pelichet and**

**Bonn Washington ALS Contracts**

WRPH-280A
(Rev 05/15)

(254)

## WALTER P. REUTHER PSYCHIATRIC HOSPITAL
## 30901 PALMER ROAD
## WESTLAND, MICHIGAN 48186

RE: Darryl Pelichet
CFP#: 915349
Date of Birth: 03/04/1979
Date of Admission to Walter P. Reuther Psychiatric Hospital: 05/04/16

## AUTHORIZED LEAVE STATUS (ALS) CONTRACT

It is hereby agreed that pursuant to MCL 330.2050(5) Darryl Pelichet, hereafter referred to in this contract as "the patient," will be placed on Authorized Leave Status (ALS) which may be extended for a period of five years beginning on or after 7/14/17. It is understood that either the Hospital or the Supervisor of Treatment may file Petitions for Continuing Hospitalization Orders; however, ultimate responsibility for petitioning remains with the Hospital. Reports pertaining to patient aftercare and compliance will be completed by the Hegira Programs, Inc./ CareLink at the times designated in this contract. The next report due will be a 90 Day Report due on or before 8/09/17. The patient and Hegira Programs, Inc./ CareLink agrees that noncompliance with the following provisions may result in revocation of Authorized Leave Status and subsequent re-hospitalization. Patients who are placed on Authorized Leave Status are considered inpatients on leave from the hospital. Therefore, the patient must be kept on a Hospitalization Treatment Order and should not be placed on an Alternative Treatment Order if the Court deems it appropriate to maintain the patient's NGRI status and preserve ALS eligibility that may be extended for a period of five years in accordance with MCL 330.2050(5).

### RESIDENT ADDRESS AND TELEPHONE
Mattielene Pelichet
7710 N. Merriman Apt. 101
Westland, MI 48185
P: (313) 525-1139

### RESPONSIBLE COMMUNITY MENTAL HEALTH SERVICE PROVIDER (CMHSP)
Detroit-Wayne Mental Health Authority
707 Milwaukee
Detroit, MI 48202
P: (313) 344-9099 ext. 3025
F: (313) 833-3670

NGRI Committee: ALS Contract
RE: Darryl Pelichet
Date: July 05, 2017

2

## RESPONSIBLE COMMUNITY MENTAL HEALTH CONTRACTUAL AGENCY (if applicable)

Hegira Programs, Inc.
8623 N. Wayne Rd. #220
Westland, MI 48185
P: (734) 742-0605
F: (734) 742-0608

## COMMUNITY MENTAL HEALTH SERVICE PROVIDER RESPONSIBILITIES

1. The CMHSP/Contractual Agency is responsible for providing and supervising the treatment of the patient while on Authorized Leave Status in accordance with this individual's clinical needs. This includes, but is not limited to, developing and monitoring an individualized treatment plan, medication management, providing day or residential programs, counseling, psychotherapy, and other treatment deemed necessary by the individual's treatment team.

2. The CMHSP/Contractual Agency, by signing this contract, is stating that they have an appropriate treatment program and an appropriately structured living environment with adequate staff to meet the needs of the patient while on Authorized Leave Status.

3. The following reporting requirements are based on the date that the judge signs the continuing treatment order. As this individual may enter the community on Authorized Leave Status at any point during the continuing treatment order, it is critical to determine the next reporting requirement based on the date the judge signed the current court order.

   a.) At least 14 days prior to the expiration of the current court order, the NGRI Court Hearing Form is to be completed and sent by FAX to the NGRI Committee of the Center for Forensic Psychiatry. A copy of this completed form is also to be sent by FAX to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

   At least 14 days prior to the expiration of the current court order, a Petition for Second or Continuing Treatment Order and a Clinical Certificate are to be filed with the Probate Court. These should reflect a request for a 90 day or one-year hospitalization with Walter P. Reuther Psychiatric Hospital named as the hospital. Copies of the Petition and the Clinical Certificate are to be sent by FAX to the NGRI Committee of the Center for Forensic Psychiatry and to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

   Once secured, copies of the resulting 90 day or one-year continuing treatment order are to be sent by FAX to both the NGRI Committee of the Center for Forensic Psychiatry and to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

NGRI Committee: ALS Contract
RE: Darryl Pelichet
Date: July 05, 2017

3

b.)   Ninety-Day Reports are to be completed at 90 days and 270 days after the date the current court order was signed by the judge. The original is to be sent to the NGRI Committee of the Center for Forensic Psychiatry with a copy sent by FAX to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

c.)   A Six Month Review Report is to be filed with the Wayne County Probate Court 180 days after the date that the current court order was signed by the judge.

The patient is to be provided a copy of the Six Month Review Report and informed at the time of the right to file a Petition for Discharge from treatment. Documentation attesting to the fact that the patient was informed of this right should be filed in the patient's medical record.

Copies of the Six Month Review Report are to be sent by FAX both to the NGRI Committee at the Center for Forensic Psychiatry and to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

Should the patient elect to file a Petition for Discharge at the time, an NGRI Court Hearing Form is to be completed immediately. Copies of the Petition for Discharge and the NGRI Court Hearing Form are to be sent by FAX to the NGRI Committee at the Center for Forensic Psychiatry and a copy sent by FAX to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

4. For patients that are released to the community directly from the Center for Forensic Psychiatry, the CMHSP/Contractual Agency will complete three (3), Thirty-Day Reports from the day of release. The original is to be sent to the NGRI Committee of the Center for Forensic Psychiatry with a copy sent by FAX to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

5. The CMHSP/Contractual Agency is to obtain authorization from the NGRI Committee at the Center for Forensic Psychiatry, prior to any of the following:

   • significant changes in treatment provision;
   • overnight leaves of absence from the designated independent or dependent living setting;
   • movement between dependent living settings;
   • movement into an independent living setting;
   • any changes from one independent living setting to another; and
   • any change in the patient's permanent living address.

6. The NGRI Committee at the Center for Forensic Psychiatry and the Walter P. Reuther Psychiatric Hospital Forensic Liaison are to be notified immediately if any of the following occurs.

NGRI Committee: ALS Contract      4
RE: Darryl Pelichet
Date: July 05, 2017

- If the patient experiences any significant changes in their behavior, medical or psychiatric condition.
- If the patient demonstrates any significant incidents of noncompliance; or
- If the whereabouts of the patient is unknown for more than one hour.

7. Walter P. Reuther Psychiatric Hospital Forensic Liaison is to be notified in writing by the CMHSP/Contractual Agency if any of the following occur:

- Any change in case managers or case management providers/Contractual Agencies ("Supervisor of Treatment");
- Any intent to make a change in the patient's address; or
- If the NGRI Committee of the Center for Forensic Psychiatry grants the patient permission to leave the State of Michigan.

8. *(if appropriate)* The CMHSP/Contractual Agency will provide the patient the opportunity to participate in Special Education and/or Adult Education programs.

9. In the event of a change in Contractual Agencies, the responsible CMHSP will provide the new Contractual Agency with a copy of the ALS Contract and the direction that the provisions in the ALS Contract remain in full force and effect.

10. Six months prior to the expiration of the ALS contract, the CMHSP will consult with the NGRI Committee regarding the patient's treatment needs once the ALS contract expires.

11. (If applicable) For management of crime victim notification requirements, see attached addendum.


## STANDARD REQUIREMENTS

I, Darryl Pelichet, agree to the following:

1. I shall cooperate with all aspects of the CMHSP/Contractual Agency treatment program. This includes taking my medications as my doctors prescribe and following the program that is in my Individual Plan of Service.

2. I shall maintain sobriety by not using alcoholic beverages or illicit drugs or other controlled substances not prescribed by my treating physician while under the supervision of the CMHSP/Contractual Agency. Drug and/or alcohol screening may be ordered as deemed necessary by the CMHSP/Contractual Agency.

NGRI Committee: ALS Contract                                                                    5
RE: Darryl Pelichet
Date: July 05, 2017

    a. It is noted that patients who have obtained a medical marijuana card will nonetheless be in violation of the contract if they smoke marijuana

3. I will remain in the State of Michigan. I will leave Michigan only with the permission of the CMHSP/Contractual Agency and the NGRI Committee at the Center for Forensic Psychiatry.

4. Prior to any change of address or placement, I will obtain approval from the CMHSP/Contractual Agency and the NGRI Committee at the Center for Forensic Psychiatry.

5. Any overnight leaves of absence must be approved in advance by the NGRI Committee at the Center for Forensic Psychiatry. I will report promptly to the residence at the end of each leave.

6. I understand that I will receive help from a CMHSP/Contractual Agency worker, but it is my responsibility to apply for funds/money (when eligible) to pay for the cost of my living arrangement in the community. I shall pay the amount of room and board that is determined by my placement agency. Unless otherwise discussed with me, the agency's room and board rate is the current Supplemental Security income (SSI) Program Personal Care Rate.

7. Aftercare treatment must be provided by a Community Mental Health Services Provider unless written permission is given by the NGRI Committee at the Center for Forensic Psychiatry and Walter P. Reuther Psychiatric Hospital.

8. I will not buy, own, or possess dangerous weapons or any other dangerous objects.

9. My conduct will follow established laws and rules.

## INDIVIDUAL REQUIREMENTS

1. I, Darryl Pelichet understand and agree to participate in Alcoholic Anonymous (AA) and/or Narcotics Anonymous (NA) meetings minimally three times per week.

2. I will attend and participate in weekly substance abuse groups as indicated in my individual plan of service.

3. I, Darryl Pelichet understand and agree to cooperate with random urine drug screens at least twice per month or as requested by Hegira Programs, Inc/CareLink.

4. I will take medications as prescribed and meet as scheduled with my assigned case manager to discuss medication monitoring and compliance.

WRPH-280A
(Rev 05/15)

(254)

## WALTER P. REUTHER PSYCHIATRIC HOSPITAL
## 30901 PALMER ROAD
## WESTLAND, MICHIGAN  48186

RE: Darryl Pelichet
CFP#: 915349
Date of Birth: 03/04/1979
Date of Admission to Walter P. Reuther Psychiatric Hospital: 05/04/16

## AUTHORIZED LEAVE STATUS (ALS) CONTRACT

It is hereby agreed that pursuant to MCL 330.2050(5) Darryl Pelichet, hereafter referred to in this contract as "the patient," will be placed on Authorized Leave Status (ALS) which may be extended for a period of five years beginning on or after 7/14/17. It is understood that either the Hospital or the Supervisor of Treatment may file Petitions for Continuing Hospitalization Orders; however, ultimate responsibility for petitioning remains with the Hospital. Reports pertaining to patient aftercare and compliance will be completed by the Hegira Programs, Inc./ CareLink at the times designated in this contract. The next report due will be a 90 Day Report due on or before 8/09/17. The patient and Hegira Programs, Inc./ CareLink agrees that noncompliance with the following provisions may result in revocation of Authorized Leave Status and subsequent re-hospitalization. Patients who are placed on Authorized Leave Status are considered inpatients on leave from the hospital. Therefore, the patient must be kept on a Hospitalization Treatment Order and should not be placed on an Alternative Treatment Order if the Court deems it appropriate to maintain the patient's NGRI status and preserve ALS eligibility that may be extended for a period of five years in accordance with MCL 330.2050(5).

## RESIDENT ADDRESS AND TELEPHONE

Mattielene Pelichet
7710 N. Merriman Apt. 101
Westland, MI 48185
P: (313) 525-1139

## RESPONSIBLE COMMUNITY MENTAL HEALTH SERVICE PROVIDER (CMHSP)

Detroit-Wayne Mental Health Authority
707 Milwaukee
Detroit, MI 48202
P: (313) 344-9099 ext. 3025
F: (313) 833-3670

NGRI Committee: ALS Contract
RE: Darryl Pelichet
Date: July 05, 2017

2

## RESPONSIBLE COMMUNITY MENTAL HEALTH CONTRACTUAL AGENCY (if applicable)

Hegira Programs, Inc.
8623 N. Wayne Rd. #220
Westland, MI 48185
P: (734) 742-0605
F: (734) 742-0608

## COMMUNITY MENTAL HEALTH SERVICE PROVIDER RESPONSIBILITIES

1. The CMHSP/Contractual Agency is responsible for providing and supervising the treatment of the patient while on Authorized Leave Status in accordance with this individual's clinical needs. This includes, but is not limited to, developing and monitoring an individualized treatment plan, medication management, providing day or residential programs, counseling, psychotherapy, and other treatment deemed necessary by the individual's treatment team.

2. The CMHSP/Contractual Agency, by signing this contract, is stating that they have an appropriate treatment program and an appropriately structured living environment with adequate staff to meet the needs of the patient while on Authorized Leave Status.

3. The following reporting requirements are based on the date that the judge signs the continuing treatment order. As this individual may enter the community on Authorized Leave Status at any point during the continuing treatment order, it is critical to determine the next reporting requirement based on the date the judge signed the current court order.

    a.) At least 14 days prior to the expiration of the current court order, the NGRI Court Hearing Form is to be completed and sent by FAX to the NGRI Committee of the Center for Forensic Psychiatry. A copy of this completed form is also to be sent by FAX to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

    At least 14 days prior to the expiration of the current court order, a Petition for Second or Continuing Treatment Order and a Clinical Certificate are to be filed with the Probate Court. These should reflect a request for a 90 day or one-year hospitalization with Walter P. Reuther Psychiatric Hospital named as the hospital. Copies of the Petition and the Clinical Certificate are to be sent by FAX to the NGRI Committee of the Center for Forensic Psychiatry and to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

    Once secured, copies of the resulting 90 day or one-year continuing treatment order are to be sent by FAX to both the NGRI Committee of the Center for Forensic Psychiatry and to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

NGRI Committee: ALS Contract                                                                 3
RE: Darryl Pelichet
Date: July 05, 2017

        b.)     Ninety-Day Reports are to be completed at 90 days and 270 days after the date the current court order was signed by the judge. The original is to be sent to the NGRI Committee of the Center for Forensic Psychiatry with a copy sent by FAX to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

        c.)     A Six Month Review Report is to be filed with the Wayne County Probate Court 180 days after the date that the current court order was signed by the judge.

                The patient is to be provided a copy of the Six Month Review Report and informed at the time of the right to file a Petition for Discharge from treatment. Documentation attesting to the fact that the patient was informed of this right should be filed in the patient's medical record.

                Copies of the Six Month Review Report are to be sent by FAX both to the NGRI Committee at the Center for Forensic Psychiatry and to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

                Should the patient elect to file a Petition for Discharge at the time, an NGRI Court Hearing Form is to be completed immediately. Copies of the Petition for Discharge and the NGRI Court Hearing Form are to be sent by FAX to the NGRI Committee at the Center for Forensic Psychiatry and a copy sent by FAX to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

4.    For patients that are released to the community directly from the Center for Forensic Psychiatry, the CMHSP/Contractual Agency will complete three (3), Thirty-Day Reports from the day of release. The original is to be sent to the NGRI Committee of the Center for Forensic Psychiatry with a copy sent by FAX to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

5.    The CMHSP/Contractual Agency is to obtain authorization from the NGRI Committee at the Center for Forensic Psychiatry, prior to any of the following:

       •   significant changes in treatment provision;
       •   overnight leaves of absence from the designated independent or dependent living setting;
       •   movement between dependent living settings;
       •   movement into an independent living setting;
       •   any changes from one independent living setting to another; and
       •   any change in the patient's permanent living address.

6.    The NGRI Committee at the Center for Forensic Psychiatry and the Walter P. Reuther Psychiatric Hospital Forensic Liaison are to be notified immediately if any of the following occurs.

NGRI Committee: ALS Contract
RE: Darryl Pelichet
Date: July 05, 2017

4

- If the patient experiences any significant changes in their behavior, medical or psychiatric condition.
- If the patient demonstrates any significant incidents of noncompliance; or
- If the whereabouts of the patient is unknown for more than one hour.

7. Walter P. Reuther Psychiatric Hospital Forensic Liaison is to be notified in writing by the CMHSP/Contractual Agency if any of the following occur:

- Any change in case managers or case management providers/Contractual Agencies ("Supervisor of Treatment");
- Any intent to make a change in the patient's address; or
- If the NGRI Committee of the Center for Forensic Psychiatry grants the patient permission to leave the State of Michigan.

8. *(if appropriate)* The CMHSP/Contractual Agency will provide the patient the opportunity to participate in Special Education and/or Adult Education programs.

9. In the event of a change in Contractual Agencies, the responsible CMHSP will provide the new Contractual Agency with a copy of the ALS Contract and the direction that the provisions in the ALS Contract remain in full force and effect.

10. Six months prior to the expiration of the ALS contract, the CMHSP will consult with the NGRI Committee regarding the patient's treatment needs once the ALS contract expires.

11. (If applicable) For management of crime victim notification requirements, see attached addendum.

## STANDARD REQUIREMENTS

I, Darryl Pelichet, agree to the following:

1. I shall cooperate with all aspects of the CMHSP/Contractual Agency treatment program. This includes taking my medications as my doctors prescribe and following the program that is in my Individual Plan of Service.

2. I shall maintain sobriety by not using alcoholic beverages or illicit drugs or other controlled substances not prescribed by my treating physician while under the supervision of the CMHSP/Contractual Agency. Drug and/or alcohol screening may be ordered as deemed necessary by the CMHSP/Contractual Agency.

NGRI Committee: ALS Contract                                                                                   5
RE: Darryl Pelichet
Date: July 05, 2017

      a. It is noted that patients who have obtained a medical marijuana card will nonetheless be in violation of the contract if they smoke marijuana

3. I will remain in the State of Michigan. I will leave Michigan only with the permission of the CMHSP/Contractual Agency and the NGRI Committee at the Center for Forensic Psychiatry.

4. Prior to any change of address or placement, I will obtain approval from the CMHSP/Contractual Agency and the NGRI Committee at the Center for Forensic Psychiatry.

5. Any overnight leaves of absence must be approved in advance by the NGRI Committee at the Center for Forensic Psychiatry. I will report promptly to the residence at the end of each leave.

6. I understand that I will receive help from a CMHSP/Contractual Agency worker, but it is my responsibility to apply for funds/money (when eligible) to pay for the cost of my living arrangement in the community. I shall pay the amount of room and board that is determined by my placement agency. Unless otherwise discussed with me, the agency's room and board rate is the current Supplemental Security Income (SSI) Program Personal Care Rate.

7. Aftercare treatment must be provided by a Community Mental Health Services Provider unless written permission is given by the NGRI Committee at the Center for Forensic Psychiatry and Walter P. Reuther Psychiatric Hospital.

8. I will not buy, own, or possess dangerous weapons or any other dangerous objects.

9. My conduct will follow established laws and rules.

## INDIVIDUAL REQUIREMENTS

1. I, Darryl Pelichet understand and agree to participate in Alcoholic Anonymous (AA) and/or Narcotics Anonymous (NA) meetings minimally three times per week.

2. I will attend and participate in weekly substance abuse groups as indicated in my individual plan of service.

3. I, Darryl Pelichet understand and agree to cooperate with random urine drug screens at least twice per month or as requested by Hegira Programs, Inc/CareLink.

4. I will take medications as prescribed and meet as scheduled with my assigned case manager to discuss medication monitoring and compliance.

NGRI Committee: ALS Contract                                                                                        6
RE: Darryl Pelichet
Date: July 05, 2017

5. I will comply with my individual plan of services as developed with Hegira Programs, Inc./CareLink. This includes medication and treatment review, monitoring and management for compliance, individual and group therapy, substance abuse, case management and psychiatric services.

6. I agree to meet with the assigned Hegira Programs, Inc. staff three times a week for face to face contact, as arranged by treatment team to include two of the weekly meetings taking place in the home.

7. I will not own, hide, seek, sell, or buy illegal drugs or alcohol and I will focus on maintaining sobriety.

8. I will not use any herbal supplements, vitamins or other non-prescribed substances or medications without consulting with professional providers assigned to my case, i.e. at Hegira Programs, Inc.

9. I will participate, as scheduled in individual therapy/counseling to address potential and existing problems and issues at least once per week, including assessments of any alcohol or drug issues.

10. I understand and agree to participate in Gambler's Anonymous meetings monthly as indicated in my individual plan of service.

11. I will not participate in any gambling activity behaviors, i.e. shooting dice, card games.

12. I will not go to or visit any casino for any reason.

13. I will not operate any motor vehicle without prior permission from the NGRI Committee and for a period of no less than 30 days from date of release.

14. I understand that I must obtain permission from the NGRI Committee, CareLink and Hegira Programs, Inc. prior to obtaining employment or educational opportunities. I agree to coordinate all education and employment opportunities with my Hegira Programs, Inc. case manager.

15. I agree to comply with all house rules, expectations, and curfew of 11:00 PM. I will discuss concerns appropriately with Mattielene Pelichet and agree to comply with her decisions.

## ADDITIONAL PROVISIONS

For individuals found NGRI for the crime of Murder or for a crime that involves sexual conduct, any day pass or overnight leave of absence must be approved, in advance, by the NGRI Committee and Director/Designee of the Department of Health and Human Services.

NGRI Committee: ALS Contract                                                        7
RE: Darryl Pelichet
Date: July 05, 2017

I, Darryl Pelichet, declare that each of the statements in the Contract has been explained to me by Christina
Sandie, LMSW, assigned Hospital Social Worker. I have had the opportunity to ask questions, and I understand
the meaning of each statement.

_____                    _____
Patient                                              Date

_____                    _____
Guardian (if applicable)                             Date

_____                    7-5-2017
WRPH Chief of Clinical Affairs/Designee              Date

_____  m.a, LPC           7/5/17
Detroit-Wayne Mental Health Authority                Date
CMHSP Representative Name and credentials

_____                     7/5/2017
CareLink (MCPN)                                       Date
Representative Name and credentials

_____  MSW, LMSW           7-5-17
Hegira Programs, Inc. (CMH)                          Date
Representative Name and credentials

_____
Mattielene Pelichet                                  Date
Representative Name

_____                     7/12/17
Chairperson, NGRI Committee                          Date
Center for Forensic Psychiatry
P.O. Box 2060
Ann Arbor, MI 48106
(734) 429-2531

cc:    Regional Hospital Forensic Liaison

NGRI Committee: ALS Contract                                                              8
RE: Darryl Pelichet
Date: July 05, 2017


cc:     Regional Hospital Forensic Liaison
        Wayne Community Mental Health Service Provider (CMHSP)
        Regional Hospital Medical Record



## Walter P. Reuther Psychiatric Hospital
## NGRI YEARLY REPORTING REQUIREMENTS

### 30 Day Review-Direct Community Placement Program Patients Only

- Three (3) 30 Day Reports are to be completed every 30 Days from Date of ALS Release

- To NGRI Committee with copy to Walter P. Reuther Psychiatric Hospital & the Detroit Wayne County Mental Health Authority NGRI Coordinator

### 90 Day Review

- 90 Days from Date of current Court Order

- To NGRI Committee with copy to Walter P. Reuther Psychiatric Hospital & the Detroit Wayne County Mental Health Authority NGRI Coordinator

### SIX MONTH REVIEW REPORT

- 180 Days from Date of Order

- To issuing Court with copies to NGRI Committee, Walter P. Reuther Psychiatric Hospital & Detroit Wayne County Mental Health Authority NGRI Coordinator

- Petition for Discharge to Patient

- No 90 Day Report due

### 90 DAY REVIEW

- 270 Days from Date of Order

- To NGRI Committee with copy to Walter P. Reuther Psychiatric Hospital & Detroit Wayne County Mental Health Authority NGRI Coordinator

### PETITION FOR SECOND OR CONTINUING TREATMENT ORDER

- To issuing Probate Court 14 Days before end of Order

- Must be accompanied by Clinical Certificate

NGRI Committee: ALS Contract                                                                                   10
RE: Darryl Pelichet
Date: July 05, 2017

- Copies to NGRI Committee, Walter P. Reuther Psychiatric Hospital & Detroit Wayne County Mental Health Authority NGRI Coordinator

- No 90 Day Report Due

### NGRI COURT HEARING FORM

- To Court 30 days prior to expected Court Hearing

- To NGRI Committee with copy to Walter P. Reuther Psychiatric Hospital

### CMH AGENCY/NGRI COORDINATOR

Detroit/Wayne-Yolanda Baker, Phone # 313-833-2338
**WRPH Forensic Liaison:** Evette Carroll, LMSW, Phone: 734-367-8600, Fax: 734-367-8618, E-Mail: **CarrollE2@michigan.gov. Court Issues:** WRPH Patient Affairs, Phone: 734-367-8510 or 734-367-8511 or the Forensic Liaison. Fax# for Court Paperwork (734) 722-8056.



WRPH-280A
(Rev 05/15)

(254)

### WALTER P. REUTHER PSYCHIATRIC HOSPITAL
### 30901 PALMER ROAD
### WESTLAND, MICHIGAN  48186

RE: Bonn Washington
CFP#: 905259
Date of Birth: 03/30/1975
Date of Admission to Walter P. Reuther Psychiatric Hospital: 05/01/2017

## AUTHORIZED LEAVE STATUS (ALS) CONTRACT

It is hereby agreed that pursuant to MCL 330.2050(5) Bonn Washington, hereafter referred to in this contract as "the patient," will be placed on Authorized Leave Status (ALS) which may be extended for a period of five years beginning on or after 1/8/2018 . It is understood that either the Hospital or the Supervisor of Treatment may file Petitions for Continuing Hospitalization Orders; however, ultimate responsibility for petitioning remains with the Hospital.  Reports pertaining to patient aftercare and compliance will be completed by the New Center Community Services/CareLink at the times designated in this contract.  The next report due will be a 90 day review due on or before 4/9/2018 . The patient and New Center Community Services/CareLink agrees that noncompliance with the following provisions may result in revocation of Authorized Leave Status and subsequent re-hospitalization.  Patients who are placed on Authorized Leave Status are considered inpatients on leave from the hospital.  Therefore, the patient must be kept on a Hospitalization Treatment Order and should not be placed on an Alternative Treatment Order if the Court deems it appropriate to maintain the patient's NGRI status and preserve ALS eligibility that may be extended for a period of five years in accordance with MCL 330.2050(5).

### RESIDENT ADDRESS AND TELEPHONE
Yarbrough AFC
Virgil Yarbrough
15226 Beech Daly
Taylor, MI 48180
P: 734-941-7355

### RESPONSIBLE COMMUNITY MENTAL HEALTH SERVICE PROVIDER (CMHSP)
Detroit-Wayne Mental Health Authority
707 Milwaukee
Detroit, MI 48202
P: (313) 344-9099 ext. 3025
F: (313) 833-3670

NGRI Committee: ALS Contract
RE: Bonn Washington
Date: December 8, 2017

**RESPONSIBLE COMMUNITY MENTAL HEALTH CONTRACTUAL AGENCY (if applicable)**
New Center Community Services/Carelink
2051 W. Grand Blvd.
Detroit, MI 48208
P: 313-961-3400
F: 313-961-3255

**COMMUNITY MENTAL HEALTH SERVICE PROVIDER RESPONSIBILITIES**

1. The CMHSP/Contractual Agency is responsible for providing and supervising the treatment of the patient while on Authorized Leave Status in accordance with this individual's clinical needs. This includes, but is not limited to, developing and monitoring an individualized treatment plan, medication management, providing day or residential programs, counseling, psychotherapy, and other treatment deemed necessary by the individual's treatment team.

2. The CMHSP/Contractual Agency, by signing this contract, is stating that they have an appropriate treatment program and an appropriately structured living environment with adequate staff to meet the needs of the patient while on Authorized Leave Status.

3. The following reporting requirements are based on the date that the judge signs the continuing treatment order. As this individual may enter the community on Authorized Leave Status at any point during the continuing treatment order, it is critical to determine the next reporting requirement based on the date the judge signed the current court order.

   a.) At least 14 days prior to the expiration of the current court order, the NGRI Court Hearing Form is to be completed and sent by FAX to the NGRI Committee of the Center for Forensic Psychiatry. A copy of this completed form is also to be sent by FAX to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

   At least 14 days prior to the expiration of the current court order, a Petition for Second or Continuing Treatment Order and a Clinical Certificate are to be filed with the Probate Court. These should reflect a request for a 90 day or one-year hospitalization with Walter P. Reuther Psychiatric Hospital named as the hospital. Copies of the Petition and the Clinical Certificate are to be sent by FAX to the NGRI Committee of the Center for Forensic Psychiatry and to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

   Once secured, copies of the resulting 90 day or one-year continuing treatment order are to be sent by FAX to both the NGRI Committee of the Center for Forensic Psychiatry and to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

NGRI Committee:  ALS Contract                                                                                          3
RE: Bonn Washington
Date: December 8, 2017

b.)   Ninety-Day Reports are to be completed at 90 days and 270 days after the date the current court order was signed by the judge.  The original is to be sent to the NGRI Committee of the Center for Forensic Psychiatry with a copy sent by FAX to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

c.)   A Six Month Review Report is to be filed with the <u>Wayne</u> County Probate Court 180 days after the date that the current court order was signed by the judge.

The patient is to be provided a copy of the Six Month Review Report and informed at the time of the right to file a Petition for Discharge from treatment.  Documentation attesting to the fact that the patient was informed of this right should be filed in the patient's medical record.

Copies of the Six Month Review Report are to be sent by FAX both to the NGRI Committee at the Center for Forensic Psychiatry and to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

Should the patient elect to file a Petition for Discharge at the time, an NGRI Court Hearing Form is to be completed immediately.  Copies of the Petition for Discharge and the NGRI Court Hearing Form are to be sent by FAX to the NGRI Committee at the Center for Forensic Psychiatry and a copy sent by FAX to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

4.  For patients that are released to the community directly from the Center for Forensic Psychiatry, the CMHSP/Contractual Agency will complete three (3), Thirty-Day Reports from the day of release. The original is to be sent to the NGRI Committee of the Center for Forensic Psychiatry with a copy sent by FAX to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

5.  The CMHSP/Contractual Agency is to obtain authorization from the NGRI Committee at the Center for Forensic Psychiatry, prior to any of the following:

- significant changes in treatment provision;
- overnight leaves of absence from the designated independent  or dependent living setting;
- movement between dependent living settings;
- movement into an independent living setting;
- any changes from one independent living setting to another; and
- any change in the patient's permanent living address.

6.  The NGRI Committee at the Center for Forensic Psychiatry and the Walter P. Reuther Psychiatric Hospital Forensic Liaison are to be notified immediately if any of the following occurs.

NGRI Committee:  ALS Contract                                                                                    4
RE: Bonn Washington
Date: December 8, 2017

- If the patient experiences any significant changes in their behavior, medical or psychiatric condition.
- If the patient demonstrates any significant incidents of noncompliance; or
- If the whereabouts of the patient is unknown for more than one hour.

7. Walter P. Reuther Psychiatric Hospital Forensic Liaison is to be notified in writing by the CMHSP/Contractual Agency if any of the following occur:

- Any change in case managers or case management providers/Contractual Agencies ("Supervisor of Treatment");
- Any intent to make a change in the patient's address; or
- If the NGRI Committee of the Center for Forensic Psychiatry grants the patient permission to leave the State of Michigan.

8. *(if appropriate)* The CMHSP/Contractual Agency will provide the patient the opportunity to participate in Special Education and/or Adult Education programs.

9. In the event of a change in Contractual Agencies, the responsible CMHSP will provide the new Contractual Agency with a copy of the ALS Contract and the direction that the provisions in the ALS Contract remain in full force and effect.

10. Six months prior to the expiration of the ALS contract, the CMHSP will consult with the NGRI Committee regarding the patient's treatment needs once the ALS contract expires.

11. (If applicable) For management of crime victim notification requirements, see attached addendum.


**STANDARD REQUIREMENTS**

I, Bonn Washington, agree to the following:

1. I shall cooperate with all aspects of the CMHSP/Contractual Agency treatment program.  This includes taking my medications as my doctors prescribe and following the program that is in my Individual Plan of Service.

2. I shall maintain sobriety by not using alcoholic beverages or illicit drugs or other controlled substances not prescribed by my treating physician while under the supervision of the CMHSP/Contractual Agency.   Drug and/or alcohol screening may be ordered as deemed necessary by the CMHSP/Contractual Agency.

NGRI Committee: ALS Contract
RE: Bonn Washington
Date: December 8, 2017

5

      a.  It is noted that patients who have obtained a medical marijuana card will nonetheless be in violation of the contract if they smoke marijuana

3. I will remain in the State of Michigan. I will leave Michigan only with the permission of the CMHSP/Contractual Agency and the NGRI Committee at the Center for Forensic Psychiatry.

4. Prior to any change of address or placement, I will obtain approval from the CMHSP/Contractual Agency and the NGRI Committee at the Center for Forensic Psychiatry.

5. Any overnight leaves of absence must be approved in advance by the NGRI Committee at the Center for Forensic Psychiatry. I will report promptly to the residence at the end of each leave.

6. I understand that I will receive help from a CMHSP/Contractual Agency worker, but it is my responsibility to apply for funds/money (when eligible) to pay for the cost of my living arrangement in the community. I shall pay the amount of room and board that is determined by my placement agency. Unless otherwise discussed with me, the agency's room and board rate is the current Supplemental Security Income (SSI) Program Personal Care Rate.

7. Aftercare treatment must be provided by a Community Mental Health Services Provider unless written permission is given by the NGRI Committee at the Center for Forensic Psychiatry and Walter P. Reuther Psychiatric Hospital.

8. I will not buy, own, or possess dangerous weapons or any other dangerous objects.

9. My conduct will follow established laws and rules.

## INDIVIDUAL REQUIREMENTS

1. I understand and agree to participate in Alcoholic Anonymous (AA) and/or Narcotics Anonymous (NA) meetings minimally three times per week.

2. I understand and agree to cooperate with random urine drug screens at least three times per month or as requested by New Center Community Services/CareLink.

3. I will participate in the intensive outpatient substance abuse program at New Center Community Services, to address substance abuse issues two times per week.

4. I will participate, as scheduled, in all therapy and counseling to address potential and existing problems and issues at least once per week, including assessments of any alcohol or drug issues.

NGRI Committee:  ALS Contract                                                                                    6
RE: Bonn Washington
Date: December 8, 2017

5.  I will continue with my medications and meet with my New Center Community Services/CareLink case manager a minimum of once a week for the first 60 days and thereafter as indicated in my IPOS.

6.  I will immediately notify my New Center Community Services/CareLink case manager of any problems or issues with my medication or treatment.

7.  I agree to be involved in the work program twice a week or as scheduled by the New Center Community Services/CareLink case manager. The work program may begin within 2 weeks of my release.

8.  I will not use or purchase any over the counter medications, alcohol, energy drinks, herbal supplements, synthetic marijuana and/or inhalants or other drugs without permission from my psychiatrist or medical physician.

9.  All prescribed medications, over the counter medications, herbal supplements, vitamins, and non-prescribed substances approved by my psychiatrist at New Center Community Services will be dispensed by Yarbrough AFC home staff.

10.  I agree to only leave Yarbrough AFC with staff supervision for the first 30 days. And based on my readjustment to the community, I will be granted unsupervised community time as identified in my IPOS.

11.  I agree to comply with all rules and regulations of Yarbrough AFC home and discuss any concerns immediately with my treatment team. I will allow the home staff to transport me and I will not utilize my own transportation for aftercare appointments.

12.  I will not own, hide, seek, or buy marijuana or any illegal drugs/alcohol. I will not be in the company or involved with any individuals consuming drugs, legally or illegally. Nor will I be with anyone consuming marijuana, no matter what their legal status is regarding their use.

13.  I will not purchase or operate any motor vehicle without prior authorization from the NGRI Committee.

## ADDITIONAL PROVISIONS

**For individuals found NGRI for the crime of Murder or for a crime that involves sexual conduct, any day pass or overnight leave of absence must be approved, in advance, by the NGRI Committee and Director/Designee of the Department of Health and Human Services.**

7

NGRI Committee: ALS Contract
RE: Bonn Washington
Date: December 8, 2017

I, Bonn Washington, declare that each of the statements in the Contract has been explained to me by Rebecca Liston, LMSW CAADC, assigned Hospital Social Worker. I have had the opportunity to ask questions, and I understand the meaning of each statement.

_____   12-13-17
Patient                                        Date

_____   Date
Guardian (if applicable)

_____   12/13/17
WRPH Chief of Clinical Affairs/Designee   Psychiatrist  Date

_____   12/13/17
Detroit-Wayne Mental Health Authority          Date
CMHSP Representative Name and credentials

_____   12/13/17
CareLink (MCPN)                                Date
Representative Name and credentials

_____   12/13/17
New Center Community Services (CMH)            Date
Representative Name and credentials

_____   12-13-17
Virgil Yarbrough                               Date
Representative Name

_____   1-3-18
Chairperson, NGRI Committee                    Date
Center for Forensic Psychiatry
P.O. Box 2060
Ann Arbor, MI 48106
(734) 429-2531

NGRI Committee:  ALS Contract                                                                            8
RE: Bonn Washington
Date: December 8, 2017

cc:     Regional Hospital Forensic Liaison
        Wayne Community Mental Health Service Provider (CMHSP)
        Regional Hospital Medical Record



NGRI Committee: ALS Contract                                                                          9
RE: Bonn Washington
Date: December 8, 2017

## Walter P. Reuther Psychiatric Hospital
## NGRI YEARLY REPORTING REQUIREMENTS

### 30 Day Review-Direct Community Placement Program Patients Only

- Three (3) 30 Day Reports are to be completed every 30 Days from Date of ALS Release

- To NGRI Committee with copy to Walter P. Reuther Psychiatric Hospital & the Detroit Wayne County Mental Health Authority NGRI Coordinator

### 90 Day Review

- 90 Days from Date of current Court Order

- To NGRI Committee with copy to Walter P. Reuther Psychiatric Hospital & the Detroit Wayne County Mental Health Authority NGRI Coordinator

### SIX MONTH REVIEW REPORT

- 180 Days from Date of Order

- To issuing Court with copies to NGRI Committee, Walter P. Reuther Psychiatric Hospital & Detroit Wayne County Mental Health Authority NGRI Coordinator

- Petition for Discharge to Patient

- No 90 Day Report due

### 90 DAY REVIEW

- 270 Days from Date of Order

- To NGRI Committee with copy to Walter P. Reuther Psychiatric Hospital & Detroit Wayne County Mental Health Authority NGRI Coordinator

### PETITION FOR SECOND OR CONTINUING TREATMENT ORDER

- To issuing Probate Court 14 Days before end of Order

- Must be accompanied by Clinical Certificate

NGRI Committee: ALS Contract
RE: Bonn Washington
Date: December 8, 2017

10 

- Copies to NGRI Committee, Walter P. Reuther Psychiatric Hospital & Detroit Wayne County Mental Health Authority NGRI Coordinator

- No 90 Day Report Due

## NGRI COURT HEARING FORM

- To Court 30 days prior to expected Court Hearing

- To NGRI Committee with copy to Walter P. Reuther Psychiatric Hospital

## CMH AGENCY/NGRI COORDINATOR

Detroit/Wayne-Yolanda Baker, Phone # 313-833-2338
**WRPH Forensic Liaison:** Evette Carroll, LMSW, Phone: 734-367-8600, Fax: 734-367-8618, E-Mail: **CarrollE2@michigan.gov**. **Court Issues:** WRPH Patient Affairs, Phone: 734-367-8510 or 734-367-8511 or the Forensic Liaison. Fax# for Court Paperwork (734) 722-8056.

NGRI Committee: ALS Contract                                                                    6
RE: Darryl Pelichet
Date: July 05, 2017

5. I will comply with my individual plan of services as developed with Hegira Programs, Inc./CareLink. This includes medication and treatment review, monitoring and management for compliance, individual and group therapy, substance abuse, case management and psychiatric services.

6. I agree to meet with the assigned Hegira Programs, Inc. staff three times a week for face to face contact, as arranged by treatment team to include two of the weekly meetings taking place in the home.

7. I will not own, hide, seek, sell, or buy illegal drugs or alcohol and I will focus on maintaining sobriety.

8. I will not use any herbal supplements, vitamins or other non-prescribed substances or medications without consulting with professional providers assigned to my case, i.e. at Hegira Programs, Inc.

9. I will participate, as scheduled in individual therapy/counseling to address potential and existing problems and issues at least once per week, including assessments of any alcohol or drug issues.

10. I understand and agree to participate in Gambler's Anonymous meetings monthly as indicated in my individual plan of service.

11. I will not participate in any gambling activity behaviors, i.e. shooting dice, card games.

12. I will not go to or visit any casino for any reason.

13. I will not operate any motor vehicle without prior permission from the NGRI Committee and for a period of no less than 30 days from date of release.

14. I understand that I must obtain permission from the NGRI Committee, CareLink and Hegira Programs, Inc. prior to obtaining employment or educational opportunities. I agree to coordinate all education and employment opportunities with my Hegira Programs, Inc. case manager.

15. I agree to comply with all house rules, expectations, and curfew of 11:00 PM. I will discuss concerns appropriately with Mattielene Pelichet and agree to comply with her decisions.

## ADDITIONAL PROVISIONS

For individuals found NGRI for the crime of Murder or for a crime that involves sexual conduct, any day pass or overnight leave of absence must be approved, in advance, by the NGRI Committee and Director/Designee of the Department of Health and Human Services.

NGRI Committee: ALS Contract                                                    7
RE: Darryl Pelichet
Date: July 05, 2017

I, Darryl Pelichet, declare that each of the statements in the Contract has been explained to me by Christina
Sandie, LMSW, assigned Hospital Social Worker. I have had the opportunity to ask questions, and I understand
the meaning of each statement.

_____          7/9/2017
Patient                                     Date

_____          _____
Guardian (if applicable)                    Date

_____          7-5-2017
WRPH Chief of Clinical Affairs/Designee     Date

_____          7/5/17
Detroit-Wayne Mental Health Authority       Date
CMHSP Representative Name and credentials

_____          7/5/2017
CareLink (MCPN)                             Date
Representative Name and credentials

_____          7-5-17
Hegira Programs, Inc. (CMH)                 Date
Representative Name and credentials

_____          _____
Mattielene Pelichet                         Date
Representative Name

_____          7/12/17
Chairperson, NGRI Committee                 Date
Center for Forensic Psychiatry
P.O. Box 2060
Ann Arbor, MI 48106
(734) 429-2531

cc:    Regional Hospital Forensic Liaison

NGRI Committee: ALS Contract                                                        8
RE: Darryl Pelichet
Date: July 05, 2017


cc:     Regional Hospital Forensic Liaison
        Wayne Community Mental Health Service Provider (CMHSP)
        Regional Hospital Medical Record



NGRI Committee: ALS Contract                                                9
RE: Darryl Pelichet
Date: July 05, 2017

## Walter P. Reuther Psychiatric Hospital
## NGRI YEARLY REPORTING REQUIREMENTS

### 30 Day Review-Direct Community Placement Program Patients Only

- Three (3) 30 Day Reports are to be completed every 30 Days from Date of ALS Release

- To NGRI Committee with copy to Walter P. Reuther Psychiatric Hospital & the Detroit Wayne County Mental Health Authority NGRI Coordinator

### 90 Day Review

- 90 Days from Date of current Court Order

- To NGRI Committee with copy to Walter P. Reuther Psychiatric Hospital & the Detroit Wayne County Mental Health Authority NGRI Coordinator

### SIX MONTH REVIEW REPORT

- 180 Days from Date of Order

- To issuing Court with copies to NGRI Committee, Walter P. Reuther Psychiatric Hospital & Detroit Wayne County Mental Health Authority NGRI Coordinator

- Petition for Discharge to Patient

- No 90 Day Report due

### 90 DAY REVIEW

- 270 Days from Date of Order

- To NGRI Committee with copy to Walter P. Reuther Psychiatric Hospital & Detroit Wayne County Mental Health Authority NGRI Coordinator

### PETITION FOR SECOND OR CONTINUING TREATMENT ORDER

- To issuing Probate Court 14 Days before end of Order

- Must be accompanied by Clinical Certificate

NGRI Committee: ALS Contract
RE: Darryl Pelichet
Date: July 05, 2017

10

- Copies to NGRI Committee, Walter P. Reuther Psychiatric Hospital & Detroit Wayne County Mental Health Authority NGRI Coordinator

- No 90 Day Report Due

### NGRI COURT HEARING FORM

- To Court 30 days prior to expected Court Hearing

- To NGRI Committee with copy to Walter P. Reuther Psychiatric Hospital

### CMH AGENCY/NGRI COORDINATOR

Detroit/Wayne-Yolanda Baker, Phone # 313-833-2338
**WRPH Forensic Liaison:** Evette Carroll, LMSW, Phone: 734-367-8600, Fax: 734-367-8618, E-Mail: **CarrollE2@michigan.gov**. **Court Issues:** WRPH Patient Affairs, Phone: 734-367-8510 or 734-367-8511 or the Forensic Liaison. Fax# for Court Paperwork (734) 722-8056.



WRPH-280A
(Rev 05/15)

(254)

## WALTER P. REUTHER PSYCHIATRIC HOSPITAL
### 30901 PALMER ROAD
### WESTLAND, MICHIGAN 48186

RE: Bonn Washington
CFP#: 905259
Date of Birth: 03/30/1975
Date of Admission to Walter P. Reuther Psychiatric Hospital: 05/01/2017

## AUTHORIZED LEAVE STATUS (ALS) CONTRACT

It is hereby agreed that pursuant to MCL 330.2050(5) Bonn Washington, hereafter referred to in this contract as "the patient," will be placed on Authorized Leave Status (ALS) which may be extended for a period of five years beginning on or after 1/8/2018 . It is understood that either the Hospital or the Supervisor of Treatment may file Petitions for Continuing Hospitalization Orders; however, ultimate responsibility for petitioning remains with the Hospital.  Reports pertaining to patient aftercare and compliance will be completed by the New Center Community Services/CareLink at the times designated in this contract.  The next report due will be a 90 day review due on or before 4/9/2018 .The patient and New Center Community Services/CareLink agrees that noncompliance with the following provisions may result in revocation of Authorized Leave Status and subsequent re-hospitalization.  Patients who are placed on Authorized Leave Status are considered inpatients on leave from the hospital.  Therefore, the patient must be kept on a Hospitalization Treatment Order and should not be placed on an Alternative Treatment Order if the Court deems it appropriate to maintain the patient's NGRI status and preserve ALS eligibility that may be extended for a period of five years in accordance with MCL 330.2050(5).

### RESIDENT ADDRESS AND TELEPHONE
Yarbrough AFC
Virgil Yarbrough
15226 Beech Daly
Taylor, MI 48180
P: 734-941-7355

### RESPONSIBLE COMMUNITY MENTAL HEALTH SERVICE PROVIDER (CMHSP)
Detroit-Wayne Mental Health Authority
707 Milwaukee
Detroit, MI 48202
P: (313) 344-9099 ext. 3025
F: (313) 833-3670

NGRI Committee:  ALS Contract                                                                                    2
RE: Bonn Washington
Date: December 8, 2017

**RESPONSIBLE COMMUNITY MENTAL HEALTH CONTRACTUAL AGENCY (if applicable)**
New Center Community Services/Carelink
2051 W. Grand Blvd.
Detroit, MI 48208
P: 313-961-3400
F: 313-961-3255

**COMMUNITY MENTAL HEALTH SERVICE PROVIDER RESPONSIBILITIES**

1. The CMHSP/Contractual Agency is responsible for providing and supervising the treatment of the patient while on Authorized Leave Status in accordance with this individual's clinical needs.  This includes, but is not limited to, developing and monitoring an individualized treatment plan, medication management, providing day or residential programs, counseling, psychotherapy, and other treatment deemed necessary by the individual's treatment team.

2. The CMHSP/Contractual Agency, by signing this contract, is stating that they have an appropriate treatment program and an appropriately structured living environment with adequate staff to meet the needs of the patient while on Authorized Leave Status.

3. The following reporting requirements are based on the date that the judge signs the continuing treatment order.  As this individual may enter the community on Authorized Leave Status at any point during the continuing treatment order, it is critical to determine the next reporting requirement based on the date the judge signed the current court order.

   a.)   At least 14 days prior to the expiration of the current court order, the NGRI Court Hearing Form is to be completed and sent by FAX to the NGRI Committee of the Center for Forensic Psychiatry  A copy of this completed form is also to be sent by FAX to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

   At least 14 days prior to the expiration of the current court order, a Petition for Second or Continuing Treatment Order and a Clinical Certificate are to be filed with the Probate Court. These should reflect a request for a 90 day or one-year hospitalization with Walter P. Reuther Psychiatric Hospital named as the hospital.  Copies of the Petition and the Clinical Certificate are to be sent by FAX to the NGRI Committee of the Center for Forensic Psychiatry and to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

   Once secured, copies of the resulting 90 day or one-year continuing treatment order are to be sent by FAX to both the NGRI Committee of the Center for Forensic Psychiatry and to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

NGRI Committee:  ALS Contract                                                                                        3
RE: Bonn Washington
Date: December 8, 2017

b.)    Ninety-Day Reports are to be completed at 90 days and 270 days after the date the current court order was signed by the judge.  The original is to be sent to the NGRI Committee of the Center for Forensic Psychiatry with a copy sent by FAX to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

c.)    A Six Month Review Report is to be filed with the <u>Wayne</u> County Probate Court 180 days after the date that the current court order was signed by the judge.

The patient is to be provided a copy of the Six Month Review Report and informed at the time of the right to file a Petition for Discharge from treatment.  Documentation attesting to the fact that the patient was informed of this right should be filed in the patient's medical record.

Copies of the Six Month Review Report are to be sent by FAX both to the NGRI Committee at the Center for Forensic Psychiatry and to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

Should the patient elect to file a Petition for Discharge at the time, an NGRI Court Hearing Form is to be completed immediately.  Copies of the Petition for Discharge and the NGRI Court Hearing Form are to be sent by FAX to the NGRI Committee at the Center for Forensic Psychiatry and a copy sent by FAX to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

4.  For patients that are released to the community directly from the Center for Forensic Psychiatry, the CMHSP/Contractual Agency will complete three (3), Thirty-Day Reports from the day of release. The original is to be sent to the NGRI Committee of the Center for Forensic Psychiatry with a copy sent by FAX to the Walter P. Reuther Psychiatric Hospital Forensic Liaison.

5.  The CMHSP/Contractual Agency is to obtain authorization from the NGRI Committee at the Center for Forensic Psychiatry, prior to any of the following:

- significant changes in treatment provision;
- overnight leaves of absence from the designated independent  or dependent living setting;
- movement between dependent living settings;
- movement into an independent living setting;
- any changes from one independent living setting to another; and
- any change in the patient's permanent living address.

6.  The NGRI Committee at the Center for Forensic Psychiatry and the Walter P. Reuther Psychiatric Hospital Forensic Liaison are to be notified immediately if any of the following occurs.

NGRI Committee: ALS Contract                                                                                              4
RE: Bonn Washington
Date: December 8, 2017

- If the patient experiences any significant changes in their behavior, medical or psychiatric condition.
- If the patient demonstrates any significant incidents of noncompliance; or
- If the whereabouts of the patient is unknown for more than one hour.

7. Walter P. Reuther Psychiatric Hospital Forensic Liaison is to be notified in writing by the CMHSP/Contractual Agency if any of the following occur:

- Any change in case managers or case management providers/Contractual Agencies ("Supervisor of Treatment");
- Any intent to make a change in the patient's address; or
- If the NGRI Committee of the Center for Forensic Psychiatry grants the patient permission to leave the State of Michigan.

8. *(if appropriate)* The CMHSP/Contractual Agency will provide the patient the opportunity to participate in Special Education and/or Adult Education programs.

9. In the event of a change in Contractual Agencies, the responsible CMHSP will provide the new Contractual Agency with a copy of the ALS Contract and the direction that the provisions in the ALS Contract remain in full force and effect.

10. Six months prior to the expiration of the ALS contract, the CMHSP will consult with the NGRI Committee regarding the patient's treatment needs once the ALS contract expires.

11. (If applicable) For management of crime victim notification requirements, see attached addendum.


**STANDARD REQUIREMENTS**

I, Bonn Washington, agree to the following:

1. I shall cooperate with all aspects of the CMHSP/Contractual Agency treatment program. This includes taking my medications as my doctors prescribe and following the program that is in my Individual Plan of Service.

2. I shall maintain sobriety by not using alcoholic beverages or illicit drugs or other controlled substances not prescribed by my treating physician while under the supervision of the CMHSP/Contractual Agency. Drug and/or alcohol screening may be ordered as deemed necessary by the CMHSP/Contractual Agency.

NGRI Committee: ALS Contract                                                                 5
RE: Bonn Washington
Date: December 8, 2017

      a.  It is noted that patients who have obtained a medical marijuana card will nonetheless be in violation of the contract if they smoke marijuana

3.  I will remain in the State of Michigan. I will leave Michigan only with the permission of the CMHSP/Contractual Agency and the NGRI Committee at the Center for Forensic Psychiatry.

4.  Prior to any change of address or placement, I will obtain approval from the CMHSP/Contractual Agency and the NGRI Committee at the Center for Forensic Psychiatry.

5.  Any overnight leaves of absence must be approved in advance by the NGRI Committee at the Center for Forensic Psychiatry. I will report promptly to the residence at the end of each leave.

6.  I understand that I will receive help from a CMHSP/Contractual Agency worker, but it is my responsibility to apply for funds/money (when eligible) to pay for the cost of my living arrangement in the community. I shall pay the amount of room and board that is determined by my placement agency. Unless otherwise discussed with me, the agency's room and board rate is the current Supplemental Security Income (SSI) Program Personal Care Rate.

7.  Aftercare treatment must be provided by a Community Mental Health Services Provider unless written permission is given by the NGRI Committee at the Center for Forensic Psychiatry and Walter P. Reuther Psychiatric Hospital.

8.  I will not buy, own, or possess dangerous weapons or any other dangerous objects.

9.  My conduct will follow established laws and rules.

## INDIVIDUAL REQUIREMENTS

1.  I understand and agree to participate in Alcoholic Anonymous (AA) and/or Narcotics Anonymous (NA) meetings minimally three times per week.

2.  I understand and agree to cooperate with random urine drug screens at least three times per month or as requested by New Center Community Services/CareLink.

3.  I will participate in the intensive outpatient substance abuse program at New Center Community Services, to address substance abuse issues two times per week.

4.  I will participate, as scheduled, in all therapy and counseling to address potential and existing problems and issues at least once per week, including assessments of any alcohol or drug issues.

NGRI Committee:  ALS Contract                                                    6
RE: Bonn Washington
Date: December 8, 2017

5.  I will continue with my medications and meet with my New Center Community Services/CareLink case manager a minimum of once a week for the first 60 days and thereafter as indicated in my IPOS.

6.  I will immediately notify my New Center Community Services/CareLink case manager of any problems or issues with my medication or treatment.

7.  I agree to be involved in the work program twice a week or as scheduled by the New Center Community Services/CareLink case manager. The work program may begin within 2 weeks of my release.

8.  I will not use or purchase any over the counter medications, alcohol, energy drinks, herbal supplements, synthetic marijuana and/or inhalants or other drugs without permission from my psychiatrist or medical physician.

9.  All prescribed medications, over the counter medications, herbal supplements, vitamins, and non-prescribed substances approved by my psychiatrist at New Center Community Services will be dispensed by Yarbrough AFC home staff.

10.  I agree to only leave Yarbrough AFC with staff supervision for the first 30 days. And based on my readjustment to the community, I will be granted unsupervised community time as identified in my IPOS.

11.  I agree to comply with all rules and regulations of Yarbrough AFC home and discuss any concerns immediately with my treatment team. I will allow the home staff to transport me and I will not utilize my own transportation for aftercare appointments.

12.  I will not own, hide, seek, or buy marijuana or any illegal drugs/alcohol. I will not be in the company or involved with any individuals consuming drugs, legally or illegally. Nor will I be with anyone consuming marijuana, no matter what their legal status is regarding their use.

13.  I will not purchase or operate any motor vehicle without prior authorization from the NGRI Committee.

## ADDITIONAL PROVISIONS

**For individuals found NGRI for the crime of Murder or for a crime that involves sexual conduct, any day pass or overnight leave of absence must be approved, in advance, by the NGRI Committee and Director/Designee of the Department of Health and Human Services.**

7

NGRI Committee: ALS Contract
RE: Bonn Washington
Date: December 8, 2017

I, Bonn Washington, declare that each of the statements in the Contract has been explained to me by Rebecca Uston, LMSW CAADC, assigned Hospital Social Worker. I have had the opportunity to ask questions, and I understand the meaning of each statement.

Bonn Reson Washington                    12-13-17
Patient                                  Date

Guardian (if applicable)                 Date

                          M.B.           12/13/17
         Rocha Guslau M.D.
WRPH Chief of Clinical Affairs/Designee  psychiatry  Date

         M.A., LPC                       12/13/17
Detroit-Wayne Mental Health Authority    Date
CMHSP Representative Name and credentials

         MA LPC                          12/13/17
CareLink (MCPN)                          Date
Representative Name and credentials

                                         12/13/17
New Center Community Services (CMH)       Date
Representative Name and credentials

                                         12-13-17
Virgil Yarbrough                         Date
Representative Name

                                         1-3-18
Chairperson, NGRI Committee              Date
Center for Forensic Psychiatry
P.O. Box 2060
Ann Arbor, MI 48106
(734) 429-2531

COPY

NGRI Committee:  ALS Contract                                                                                      8
RE: Bonn Washington
Date: December 8, 2017

cc:     Regional Hospital Forensic Liaison
        Wayne Community Mental Health Service Provider (CMHSP)
        Regional Hospital Medical Record



NGRI Committee: ALS Contract                                               9
RE: Bonn Washington
Date: December 8, 2017

## Walter P. Reuther Psychiatric Hospital
### NGRI YEARLY REPORTING REQUIREMENTS

### 30 Day Review-Direct Community Placement Program Patients Only

- Three (3) 30 Day Reports are to be completed every 30 Days from Date of ALS Release

- To NGRI Committee with copy to Walter P. Reuther Psychiatric Hospital & the Detroit Wayne County Mental Health Authority NGRI Coordinator

### 90 Day Review

- 90 Days from Date of current Court Order

- To NGRI Committee with copy to Walter P. Reuther Psychiatric Hospital & the Detroit Wayne County Mental Health Authority NGRI Coordinator

### SIX MONTH REVIEW REPORT

- 180 Days from Date of Order

- To issuing Court with copies to NGRI Committee, Walter P. Reuther Psychiatric Hospital & Detroit Wayne County Mental Health Authority NGRI Coordinator

- Petition for Discharge to Patient

- No 90 Day Report due

### 90 DAY REVIEW

- 270 Days from Date of Order

- To NGRI Committee with copy to Walter P. Reuther Psychiatric Hospital & Detroit Wayne County Mental Health Authority NGRI Coordinator

### PETITION FOR SECOND OR CONTINUING TREATMENT ORDER

- To issuing Probate Court 14 Days before end of Order

- Must be accompanied by Clinical Certificate

NGRI Committee: ALS Contract
RE: Bonn Washington
Date: December 8, 2017



- Copies to NGRI Committee, Walter P. Reuther Psychiatric Hospital & Detroit Wayne County Mental Health Authority NGRI Coordinator

- No 90 Day Report Due

## NGRI COURT HEARING FORM

- To Court 30 days prior to expected Court Hearing

- To NGRI Committee with copy to Walter P. Reuther Psychiatric Hospital

## CMH AGENCY/NGRI COORDINATOR

Detroit/Wayne-Yolanda Baker, Phone # 313-833-2338
**WRPH Forensic Liaison:** Evette Carroll, LMSW, Phone: 734-367-8600, Fax: 734-367-8618, E-Mail: **CarrollE2@michigan.gov**. **Court Issues:** WRPH Patient Affairs, Phone: 734-367-8510 or 734-367-8511 or the Forensic Liaison. Fax# for Court Paperwork (734) 722-8056.

# EXHIBIT S

**Pelichet Transcript pg.19-22**

 1      status."

 2                      Is that something that's automatically

 3      on the form or --

 4   A.   It's automatically on the form.

 5   Q.   I can show you if it helps.

 6   A.   No, I don't need it.

 7   Q.   But it goes to my point that if you don't file

 8      this petition, NGRI status is no longer

 9      continued, is that right?

10                      You have to file this petition in order

11      to continue that status, right?

12   A.   Yes.

13                      MR. GALLAGHER:  That's all I've got

14      here, Judge.  Just one moment, Judge.

15   BY MR. GALLAGHER:

16   Q.   Is alternative treatment, is that something that

17      might be available to Darryl?

18   A.   Alternative to Hegira?

19   Q.   To hospitalization, other forms of treatment for

20      Darryl?

21   A.   I wouldn't know other than what he receives from

22      us.

23   Q.   When you -- let me ask it another way.

24                      When you complete this form, do you

25      always check off "continuing hospitalization"?

```
 1  A.   That's the only one I've ever completed.

 2            MR. GALLAGHER:  No further questions,

 3       Judge.

 4            MR. SUROWIEC:  No questions.

 5            *      *      *

 6            THE COURT:  Mr. Surowiec, call your

 7       next witness.

 8            MR. SUROWIEC:  Dr. Vijayakumaran,

 9       please.

10            P.G. VIJAYAKUMARAN, M.D.,

11       having first been duly sworn, was examined and

12       testified on his oath as follows:

13                    DIRECT EXAMINATION

14  BY MR. SUROWIEC:

15  Q.   Good afternoon.

16  A.   Good afternoon.

17  Q.   Please state your name?

18  A.   My name is Dr. Vijayakumaran, M.D. with the

19       initials P and G.

20  Q.   What was the last part?

21  A.   Initials P and G.

22  Q.   Doctor, you are a psychiatrist, correct?

23  A.   That's correct.

24  Q.   What is the difference between a psychiatrist and

25       a psychologist?
```

```
 1   A.   Psychiatrist goes through medical school, then
 2        residency program and that qualifies to make him
 3        a psychiatrist.
 4                  In addition, they can take the Board of
 5        American Psychiatry and Neurology as an added
 6        consideration.
 7   Q.   Now, I'm going to ask you to speak up and raise
 8        your voice -- yell at me.
 9   A.   All right.
10   Q.   So you're a medical doctor, you're an M.D?
11   A.   Yes.
12   Q.   Where did you get your M.D?
13   A.   In India.
14   Q.   And then you came here to the states and are you
15        board certified?
16   A.   Yes.
17   Q.   You're board certified in psychiatry?
18   A.   Psychiatry.
19   Q.   You can prescribe medication?
20   A.   Yes.
21   Q.   And you have a patient population that you see on
22        a regular basis?
23   A.   Yes.
24                  MR. SUROWIEC:  Your Honor, I did
25        discuss with counsel and we have agreed to move
```

```
 1        things along that we would stipulate to the

 2        expert requirements of each of our experts, so I

 3        would move to have Dr. Vijayakumaran certified as

 4        an expert by the Court.

 5               THE COURT:  So ordered.

 6               MR. GALLAGHER:  So stipulated, thank

 7        you, Judge.

 8   BY MR. SUROWIEC:

 9   Q.   Dr. Vijayakumaran, did you have the opportunity

10        to evaluate and see Mr. Pelichet?

11   A.   Yes.

12   Q.   When?

13   A.   In October 23 last year.

14   Q.   And do you -- did you see him for purposes of

15        today's hearing?  Did you evaluate him for

16        purposes of today's hearing?

17   A.   No.

18   Q.   When did you -- you saw him in October of last

19        year and what was your purpose in October of last

20        year?

21   A.   To create documents substantiating his

22        continuation of the ALS status.

23   Q.   That's my point.  What I'm asking you is, when

24        you met with him was your purpose in meeting with

25        him to meet a determination as to whether or not
```

# EXHIBIT T

**Petition filed by Walter P. Reuther Psychiatric Hospital**

11/01/2016  11:52  7347228056                    WRPH PT AFFAIRS                    PAGE  02/05

## This is a NGRI patient

Approved, SCAO                                                                    JIS CODE: PCT, PCO

| STATE OF MICHIGAN PROBATE COURT COUNTY OF WAYNE | PETITION FOR ☐ SECOND ☑ CONTINUING TREATMENT ORDER | FILE NO. 2008-728311-MI |

In the matter of _____ PELICHET, DARRYL , _____ DOB: 03/04/1979

1. I, CHRISTINA SANDIE, LMSW _____ , state that I am
   Name (type or print)

   ☐ the authorized representative of the agency or mental health professional supervising the individual's alternative treatment program.

   ☑ SOCIAL WORKER                              of  WALTER REUTHER PSYCHIATRIC HOSPITAL
   Director or authorized representative of director              Name of hospital

2. The individual is currently residing/hospitalized at  30901 PALMER RD, WESTLAND, MI, 48186
                                                          Address

3. The initial order for mental health treatment was made pursuant to a petition filed under MCL 330.1434.
   ☐ initial
4. The ☐ second      order entered by this court for the individual expires on  11/22/2016
      ☑ continuing                                                              Date

5. The individual continues to be a person requiring treatment and is in need of
   ☐ hospitalization for not more than 90 days.
   ☑ continuing hospitalization for a period of one year.
   ☐ combined hospitalization and alternative/assisted outpatient treatment for not more than one year.
   ☐ alternative/assisted outpatient treatment for not more than one year.

6. The individual is likely to refuse treatment on a voluntary basis when the order expires.

INSTRUCTIONS. In answering items 7 and 8, include a description of the observed or reported behavior of the individual including, but not limited to, how behavior and conditions have changed since the last order and whether any stabilization or remission is contingent on continued medication or other treatment. Avoid medical terms and conclusions other than diagnosis.

7. The basis for this allegation is that I believe the individual has a mental illness and  (Check as many as are applicable.)
   ☐ as a result, can reasonably be expected in the near future to intentionally or unintentionally seriously physically injure another person or can reasonably be expected in the near future to intentionally or unintentionally seriously physically injure him/herself
   ☑ is unable to attend to basic physical needs such as food, clothing, or shelter that must be attended to in order to avoid serious harm.
   ☐ is unable to understand the need for treatment because of impaired judgment, and continued behavior can reasonably be expected, on the basis of competent clinical opinion, to result in significant physical harm to self or others.

8. This conclusion is based upon
   a. my personal observation of the person doing the following acts and saying the following things:

   Patient is NGRI on charges of Assaulting a Police Officer
   and Resisting and Obstructing a police officer.

                                (SEE SECOND PAGE)

USE NOTE:  If this form is being filed in the circuit court family division, please enter the court name and county in the upper left-hand corner of the form.

Do not write below this line – For court use only                                29647

2016 NOV 1 P 2:14                          OCT 3 1 2016              HEARING ORDERED
FILED                                                               NOV 0 9 2016
PROBATE COURT                                                       JUDGE:
WAYNE COUNTY                                                        MCL330-1472a, MCL 330-1475
PCM 215 (9/13) PETITION FOR SECOND OR CONTINUING TREATMENT ORDER
                                    DEPUTY PROBATE REGISTER

                                                                    JUDGE DAVID BRAXTON

50

11/01/2016  11:52   7347228056                    WRPH PT AFFAIRS                    PAGE  03/05

b  the following conduct and statements seen or heard by others:

The offense occurred on January 18, 2005. Patient has poor attendance in psychosocial rehabilitation groups.

by _____          _____          _____
   Name of witness               Complete address            Telephone no

by _____          _____          _____
   Name of witness               Complete address            Telephone no

9  The diagnoses of physical and mental conditions are Axis I: Schizophrenia, paranoid, chronic type. Marijuana, drug abuse.

10. The treatment program(s) provided to the individual thus far, and the results, are 1) individual supportive therapy 2) Psychiatric services 3) Pharmacotherapy 4) Psychosocial rehabilitation groups 5) nursing 6) Activity therapy

11  The present treatment   ☑ is  ☐ is not  adequate and appropriate to the individual's condition. The individual ☑ is ☐ is not

motivated to participate in this treatment program. The estimate of further time necessary to provide the required treatment is
ONE YEAR
_____. The following modifications are currently planned for
the next period of treatment. (Write "none" if continuation of previous treatment program(s) is/are the only course of treatment.)

None.

12. The interested parties, their addresses, and their representatives are identical to those appearing on the initial petition except as follows

**To maintain NGRI Status**

13. Attached is a clinical certificate executed by a psychiatrist.

14. I REQUEST the court to order the individual to receive
☐ hospitalization for not more than 90 days.
☑ continuing hospitalization for not more than one year.
☐ combined hospitalization and alternative/assisted outpatient treatment for not more than one year.
☐ alternative/assisted outpatient treatment for not more than one year.

I declare under the penalties of perjury that this petition has been examined by me and that its contents are true to the best of my information, knowledge and belief.

10-27-15 _____          _____ LMSW
Date                              Signature of petitioner
                                  WRPH, 30901 PALMER RD.
2015 NOV 1 - P 4:24              Address
FILED                            WESTLAND, MI. 48186          (734) 367-8600
PROBATE COURT                    City, state, zip            Telephone no.
WAYNE COUNTY

51

11/01/2016  11.52    7347228056              WRPH PT AFFAIRS              PAGE  04/05

## This is a NGRI patient

Approved, SCAO                                                          JIS CODE  CCT

| STATE OF MICHIGAN PROBATE COURT WAYNE COUNTY CIRCUIT COURT - FAMILY DIVISION | CLINICAL CERTIFICATE | FILE NO. 2008-728311-MI |
|---|---|---|

In the matter of _____ PELICHET, DARRYL

1. TO THE EXAMINER.  The following is a statement that must be read to the individual before proceeding with any questions

I am authorized by law to examine you for the purpose of advising the court if you have a mental condition which needs treatment and whether such treatment should take place in a hospital or in some other place.  I am also here to determine if you should be hospitalized or remain hospitalized before a court hearing is held.  I may be required to tell the court what I observe and what you tell me.

I certify that on this date I read the above statement to the individual before asking any questions or conducting any examination

2. I further certify that I, __ARUNA BAVINENI, M.D.__, personally examined __Darryl Pelichet__
   Name of examiner (type or print)                                      Patient
   at __WALTER REUTHER PSYCHIATRIC HOSPITAL 30901 PALMER RD. WESTLAND, MI. 48186__
   Name of place where examined and its address
   on __10 30 - 2016__ starting at __7:30 AM__ And continuing for __-30-__ minutes.
   Date                          Time

INSTRUCTIONS: Describe in detail the specific actions, statements, demeanor, and appearance of the individual, together with other information which underlie your conclusion. Indicate the source of any information not personally known or observed. If this certificate is to accompany a petition for discharge, state why the individual continues to be or is no longer a person requiring treatment or in need of hospitalization.

3. My determination is that the person is
   ☑ mentally ill (has a substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life).
   ☐ not mentally ill

☐ 4. (If applicable)  The person has
   ☐ convulsive disorder.          ☐ alcoholism.          ☐ other drug dependence.
   ☐ mental processes weakened by reason of advanced years
   ☐ other (specify):
   ☐ been hospitalized involuntarily two or more times within the two-year period immediately preceding the filing of the petition and has rejected aftercare programs and treatment.

5. My diagnosis is __Schizophrenia Chronic Paranoid type__

6. Facts serving as the basis for my determination are __Mr. Pelichet is a single, 37 years old, African American male, with long H/o of mental illness, Re admitted to WRPH, due to failed__
   (PLEASE SEE OTHER SIDE)

Do not write below this line ~ For court use only

2016 NOV  - 1  P 4:24

FILED
PROBATE COURT
WAYNE COUNTY, MICHIGAN

PCM 205  (9/07)  CLINICAL CERTIFICATE                                    MCL 330.1425, MCL 330.1435

52

11/01/2016  11:52    7047228055                     WRPH PT AFFAIRS                          PAGE  05/05

6 (continued) ALS Contract He is Superficially co-operative
And does not participate in treatment programs and
Groups. He has limited insight in his illness and
judgement is Poor;

7. Explain in the space below the facts which lead you to believe that future conduct may result in (check applicable box)

☐ a  likelihood of injury to self  Facts:

He denied

Therefore, I believe that the examined person, as a result of mental illness, can reasonably be expected within the near
future to intentionally or unintentionally
seriously physically injure self.

☐ b.  likelihood of injury to others.  Facts:

He denied

Therefore, I believe that the examined person, as a result of mental illness, can reasonably be expected within the near
future to intentionally or unintentionally
seriously physically injure others.

☐ c.  inability to attend to basic physical needs.  Facts:

He is taking care of his Personal hygiene.

Therefore, I believe that the examined person, as a result of mental illness, is unable to attend to those basic physical
needs (such as food, clothing or shelter) that must be attended to in order to avoid serious harm in the near future.

☐ d.  inability to understand need for treatment.  Facts:

He was Provided with my medications

Therefore, I believe that the examined person, as a result of mental illness, is unable to understand the need for treatment
and continued behavior can reasonably be expected to result in significant physical harm to self or others.

8.  I conclude the individual     ☑ is     ☐ is not    a person requiring treatment.          To maintain NGRI Status

9.  (optional)  I recommend     ☑ hospitalization     ☐ alternative treatment

as follows._____

I certify that I am a person authorized by law to certify as to the individual's mental condition. I am not related by blood or marriage
either to the person about whom this certificate is concerned or to any person who has filed, or whom I know to be planning to file,
a petition in this proceeding. I declare under the penalties of perjury that this certificate has been examined by me and that its
contents are true to the best of my information, knowledge, and belief.

10-30-2016                8: W Am                    A. Bavineni md
Date                                                Signature
PSYCHIATRIST                                        ARUNA BAVINENI, M.D.
Title (physician, psychiatrist, etc.)                Print or type name and business telephone no.      (734) 367-8600

FILED
PROBATE COURT
WAYNE COUNTY

*This is a NGRI patient* RV

Approved, SCAO

PCS CODE: SRR
TCS CODE: SMPR

STATE OF MICHIGAN
PROBATE COURT
COUNTY OF WAYNE

SIX-MONTH REVIEW REPORT

FILE NO.
2008-728311-MI

In the matter of ___DARRYL PELICHET___
First, middle, and last name

1  The individual presently resides at
  ☐ own home or with relatives
  ☐ a center
  ☑ a hospital
  ☐ a private facility
  ☐ _____

  and the address is __WALTER REUTHER PSYCHIATRIC HOSPITAL 30901 PALMER RD  WESTLAND, MI  48186__

☐ 2. The individual was placed on authorized leave on _____ and continues on leave status.

3. By order of this court dated _11/9/2016_ _____ the individual was placed in a
  ☐ a. one-year alternative treatment program.
  ☐ b. one-year assisted outpatient treatment program.
  ☐ c. one-year combined treatment program.
  ☑ d. one-year continuing hospitalization program.
  ☐ e. center or private facility as a judicial admission.

4  I believe the individual has mental illness and
  ☑ a. as a result of that mental illness, the individual can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in an act or acts or made significant threats that are substantially supportive of this expectation.
  ☐ b. as a result of that mental illness, the individual is unable to attend to those basic physical needs that must be attended to in order to avoid serious harm in the near future, and has demonstrated that inability by failing to attend to those basic physical needs.
  ☐ c. the individual's judgment is so impaired by that mental illness that s/he is unable to understand his/her need for treatment, and whose impaired judgment, on the basis of competent clinical opinion, presents a substantial risk of significant physical or mental harm to the individual or presents a substantial risk of physical harm to others in the near future.
  ☐ d. the individual's understanding of the need for treatment is impaired to the point that s/he is unlikely to voluntarily participate in or to adhere to treatment that has been determined necessary to prevent a relapse or harmful deterioration of his/her condition  The individual's noncompliance with treatment has been a factor in the individual's
    ☐ i.  placement in  ☐ a psychiatric hospital  ☐ jail  ☐ prison  at least two times within the last 48 months.
        (Specify the name[s] and location[s] of the hospital, jail, or prison and the date[s] of hospitalization or incarceration.)

    _____

    _____

    AND/OR
    ☐ ii.  committing one or more acts, attempts, or threats of serious violent behavior within the last 48 months.
        (Specify the acts, attempts, or threats of serious violent behavior.)

    _____

    _____

☐ 5  I believe the individual has an intellectual disability and can be reasonably expected in the near future to intentionally or unintentionally seriously physically injure self or another person and has overtly acted in a manner substantially supportive of that expectation.

(SEE SECOND PAGE)
Do not write below this line - For court use only

PCM 226  (9/15)  SIX-MONTH REVIEW REPORT

MCL 330.1462, MCL 330.1483, MCL 330.1515, MCL 330.1531

54

Six-month Review Report  (9/16)

File No. 2008-728311-MI

6. This conclusion is based on
   a the following facts of which I have personal knowledge:

   _Seen And Evaluated The Patient, Reviewed The medical_
   _records And discussed with different Treatment Team_
   _members_

   b. the following facts, which are based on reports by others whose names and addresses, if known, are.

   _____

   _____

7. The  ☐ alternative treatment program   ☐ assisted outpatient treatment program   provided to the individual since
   the order, and the results are

   _Patient Landed his 5 years ALS Contract, while he was_
   _receiving out Patient Treatment, Since Patient admitted_
   _to WRPH, he did developed Some insight in his mental_
   _illness, but he had difficulty adjusting in the Community_

8. This treatment ☑ is  ☐ is not  adequate and appropriate to the individual's condition. The estimated time required
   for further treatment is _6_____  ☐ days. ☑ months. The following modifications in treatment are currently planned
   during the next six-month period, or proposed as  ☐ alternative treatment,  ☐ assisted outpatient treatment,
   and will be adequate and appropriate to the individual's condition. (Write "none" if no modifications are expected.)

   _Patient need To Continue in Structured Therapeutic Setting_
   _And learn about the adverse affect of mari Juana abuse_
   _on general health And also while taking Psychotropic medication_
   _which will aggravate the Psychotic behavior. Understand about_
   _his 5 year ALS Contract, And follow the NGRI laws and acts._

9. The individual   ☐ should be discharged from the treatment program.     **To maintain NGRI Status**
                     ☑ continues to be a person requiring treatment.
                     ☐ continues to be a person meeting the criteria for judicial admission.

I declare under the penalties of perjury that this report has been examined by me and that its contents are true to the best of
my information, knowledge, and belief.

_4-17-2017_
Date

Signature of physician or licensed psychologist

ARUNA BAVINENI, M.D.
Name (type or print)

PSYCHIATRIST
Title

734-367-5600
Telephone no.

# EXHIBIT U

**Cross-Examination of Defendant**

**Lisa Medoff at May 3, 2017 Hearing**

1          MS. HAMMOUD:  Okay.  Thank you, Dr. Medoff.

2          I don't have anything further.

3          THE COURT:  Any cross?

4          MR. MENKEN:  Yes.

5                    CROSS-EXAMINATION

6   BY MR. MENKEN:

7   Q    You indicated that you've been working with (inaudible)

8        for the last couple of weeks?

9   A    He's been in my group over the last several weeks, yes.

10  Q    Okay.  And you indicated, though, you weren't aware of

11       what brought him in here in the first place?

12  A    Well, my understanding is that it was a leave from his

13       ALS status from the home that he was in.

14  Q    Okay.  But what I'm saying is, you were aware that in

15       2005 -- do you know why he was -- what charge he had that

16       he was found not guilty by reason of insanity?

17  A    I did not read the settled record.

18  Q    Okay.  If I told you, basically, that the Order says that

19       he -- it was for assaulting and resisting a police

20       officer, would that refresh your memory?  That that was

21       in his records?

22  A    It would refresh my memory somewhat.

23  Q    Okay.  And when you looked at his records, did you

24       ever -- was there ever a point in time that he has ever

25       injured himself or others during this entire period from

TRANSCRIPTION OF DVD – MAY 3, 2017                18

1        2005 to now that he –– that we're now looking at?

2   A    Well, from my perspective, I consider taking a drug which

3        can be contradictory to your health something that is

4        dangerous.  So I consider that harm to self.

5   Q    To self.  Okay.

6             But far as harm to others, he's never actually

7        physically either done harm to other people or, other

8        than using the marijuana, harmed himself in another way?

9   A    Not to my knowledge.

10  Q    Okay.  Now –– so, he's been in this program and he's been

11       released and then he comes back.  So the basis of the

12       reason that he violated his contract was that he uses

13       marijuana; correct?  That was one of them?

14  A    One of them.  I thought that he walked away from the

15       home.

16  Q    Yes.  And the other one he walked once from the home;

17       correct?  Is that a "Yes" or "No"?

18  A    Yes.

19  Q    Okay.  So, you indicated, though, that during the entire

20       time, other than –– there were some occasions where he

21       didn't take his medication, but he was pretty much taking

22       his medication the entire time.  Is that a fair statement

23       other than ––

24  A    On this admission, yes.

25  Q    Okay.  And that –– and his main choice as far as the

1      medication he was given, is that Wellbutrin?

2   A  No.  I only refer to Wellbutrin as a drug that was given

3      to him for depression that he refused.  He has other meds

4      you can talk to his psychiatrist about.

5   Q  So you couldn't make -- you couldn't -- you know he's

6      been taking his medications, but you can't discuss the

7      drugs he's on?

8   A  I am not a medical doctor or a psychiatrist.

9   Q  Okay.  Fair enough.

10              Now -- so, in terms of his stay at the

11     hospital, you're saying that he couldn't be released

12     today?

13  A  I do not think so.

14  Q  Okay.  Are you aware -- have you talked to his team?

15     That they were -- that they had a different opinion and

16     were in the process of figuring out how he can be

17     released?

18  A  I said that his team is in the process of talking about

19     his release, but that is a different statement than he

20     should be released to the street.

21  Q  So when you say "being released" as opposed to "released

22     to the street," you're saying that he -- he may be ready

23     to be released but under a program, not just sort of

24     dismissed?  Is that --

25  A  I -- I believe that his team was in the process of

1      talking to him about stepping down to the next step,

2      again, through the ALS contract.

3   Q  And that's to go into the community?

4   A  Yes.

5   Q  Okay.  And you indicated that since the fall in the

6      hospital here you've been involved with him with this one

7      group that you're in charge of?

8   A  Yes.

9   Q  Okay.  Are you involved with anything else as far as

10     either his day-to-day activities or (inaudible) --

11  A  I am the supervisor of his individual therapist.  I am

12     aware of what he had been discussing in individual

13     therapy to a certain extent.

14  Q  Okay.  And, now, were you aware that the last time there

15     was a petition they checked different boxes?  Like, the

16     last time they had he couldn't take care of his basic

17     needs, and they didn't have anything about that he could

18     intentionally or unintentionally injure himself.  Did you

19     take a look at that list?

20  A  Yes.

21  Q  Okay.  Is there a reason that you think that he's not

22     able to take care of his basic needs?

23  A  Well, let me clarify.  That -- a lot of times when that

24     box is checked it refers to a couple of things, and one

25     is the ability to understand the need for treatment and

1     also what happens when somebody decompensates; that they

2     can't meet their basic needs.  So in the sense that

3     marijuana is still his drug of choice, the basic needs of

4     stopping the substance abuse, as far as I'm concerned,

5     are still not met.  And the understanding of the severity

6     of the paranoia and so forth when he is decompensating is

7     not met.  So I still would put him under Area C(?).

8   Q  Okay.  So, in terms of the categories that require, like,

9     an involuntary commitment, you're saying that the use of

10    marijuana places him, as far as all these categories,

11    because he was using marijuana?

12  A  Yes.  In addition to the judgment when he left home or so

13    forth.  He knows what the rules of his contract are.

14              MR. MENKEN:  I have no further questions.

15              THE COURT:  All right.  Thank you.

16          Any other witnesses, Mr. Hammoud?

17          MS. HAMMOUD:  No, your Honor.

18          THE COURT:  All right.  Very well.

19          Do you rest at this time?

20          MS. HAMMOUD:  Yes, I would, your Honor.

21          THE COURT:  All right.

22              Mr. Menken, do you have any witnesses you wish

23    to offer at this time?

24              MR. MENKEN:  Yes, your Honor.  The first

25    witness I'm going to call is his doctor.