## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**DARRYL PELICHET, BONN WASHINGTON, JOSHUA RAGLAND, DARIUS BICKERSTAFF**, through his Guardian **MARY BICKERSTAFF**, and **MICHIGAN PROTECTION AND ADVOCACY SERVICES, INC. (MPAS)**,

Case No. 18-cv-11385

Paul D. Borman
United States District Judge

Plaintiffs,

Anthony P. Patti
United States Magistrate Judge

v.

**ROBERT GORDON,**[1] in his official capacity, **LISA MEDOFF**, individually and in her official capacity, **MARY CLAIRE SOLKY**, individually and in her official capacity, **LAURIE ALBERT**, individually and in her official capacity, **HANUMAIAH BANDLA**, individually and in his official capacity, **CHARLES STERN**, individually, **ARUNA BAVINENI**, individually and in her official capacity, **SHARON DODD-KIMMEY**, individually and in her official capacity, **CRAIG LEMMEN**, individually and in his official capacity, **KIMBERLY KULP-OSTERLAND**, individually and in her official capacity, **LISA MARQUIS**, individually and in her official capacity, **MARTHA SMITH**, individually and in her official capacity, **DAVE BARRY**, individually and in his official capacity,

---

[1] Robert Gordon became Director of MDHHS in January 2019 and is automatically substituted as Defendant for former Director and Defendant Nick Lyon. Nick Lyon is the former Director of MDHHS and was Director of the Michigan Department of Community Health from September 2014 until April 2015, when that agency merged into MDHHS.

1

**KELLI SCHAEFER**, individually and in her official capacity, **JOE CORSO**, individually and in his official capacity, **DIANE HEISEL**, individually and in her official capacity, **HEGIRA PROGRAMS, INC., NEW CENTER COMMUNITY SERVICES, INC., CARELINK NETWORK, INC., BEHAVIORAL HEALTH PROFESSIONALS, INC.,** and **MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES (MDHHS),**

                    Defendants.

_____/

## OPINION AND ORDER RULING ON MOTIONS TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6): (1) DENYING DEFENDANT ROBERT GORDON, IN HIS OFFICIAL CAPACITY, MOTION TO DISMISS (2) GRANTING MDHHS MANAGEMENT EMPLOYEE DEFENDANTS' SOLKY, ALBERT, BANDLA, MEDOFF MOTION TO DISMISS IN THEIR OFFICIAL AND INDIVIDUAL CAPACITY (3) DENYING NGRI COMMITTEE MEMBERS' MOTION TO DISMISS IN THEIR OFFICIAL AND INDIVIDUAL CAPACITY: DODD-KIMMEY, LEMMEN, KULP-OLSTERLAND, MARQUIS, BARRY, SCHAEFFER, CORSO, HEISEL (4) DENYING DEFENDANT CHARLES STERN, Ph.D.'s MOTION TO DISMISS IN HIS INDIVIDUAL CAPACITY, EXCEPT FOR THE EIGHTH AMENDMENT CLAIM WHICH IS DISMISSED; and (5) GRANTING DEFENDANT LISA MEDOFF, Ph.D.'s MOTION TO DISMISS IN HER OFFICIAL AND INDIVIDUAL CAPACITY (6) GRANTING MDHHS MOTION TO DISMISS DEFENDANT DR. ARUNA BAVINENI IN HER OFFICIAL AND INDIVIDUAL CAPACITY

## I.      INTRODUCTION

On September 14, 2018, the Plaintiffs filed a 76-page unpaginated First Amended Complaint ("FAC"), and attached 20 exhibits comprising an additional 240 pages. (ECF #44, PgID 872, *et seq.*)

The three count FAC alleges (1) 42 U.S.C. § 1983 violations of the four individual Plaintiffs' "civil rights secured by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, (2) violations of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and (3) violations of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*" (ECF #44, PgID 875.)

The FAC's principal claim of "unconstitutional and discriminatory policies and practices designed to segregate those with disabilities from the rest of society," (*id.* at PgID 876) is based upon the fact that in 2003, Janet Olszewski, former director of the Michigan Department of Community Health, n/k/a the Michigan Department of Health and Human Services ("MDHHS"), issued Administrative Directive 10-C-1050-AD (hereinafter "Olszewski Directive") mandating "that all recommendations to the probate court for release from hospitalization . . . under the legal status of 'not guilty by reason of insanity' ["NGRI"] be reviewed by the NGRI Committee prior to filing or court appearance," and that "any delay in referring or filing necessary papers in a timely manner that would result in not receiving the order, will be considered a violation of this policy." (ECF #44, PgID 876, ¶5.)

Plaintiffs interpret the Olszewski Directive to state that because "a civil commitment order will not be renewed if a petition is not filed to renew it, a treatment provider that determines that a person adjudged NGRI does not currently satisfy the statutory or constitutional requirements for involuntary civil commitment, would violate the Policy by declining to petition the Probate Court for an additional year of involuntary hospitalization." (*Id.* at ¶6.) Plaintiffs' FAC Complaint, (¶7) asserts that the Olszewski Directive "effectively ordered that all patients at Michigan's regional psychiatric hospitals and community mental health service providers to automatically file a petition in Probate Court for one year of involuntary hospitalization for every 'Not Guilty by Reason of Insanity' ('NGRI') patient, every year, regardless of whether the patient's treating physicians believed that the patient continued to satisfy statutory or constitutional requirements for involuntary civil commitment." (*Id.* at PgID 876-77, ¶7.) Plaintiffs' FAC ¶8 states that the Olszewski Policy is still in effect today.

Plaintiffs Darryl Pelichet, Bonn Washington, Joshua Ragland, and Darius Bickerstaff had all been charged with assaultive criminal offenses,[2] adjudicated

---

[2] <u>Darryl Pelichet:</u>   Schizophrenia disorder; assaulting a police officer; tested positive for marijuana. (FAC, ECF #44, PgID 890-92.)

<u>Joshua Ragland:</u>   Suicidal, sitting on an overpass bridge guardrail; resisted/obstructed rescuing police officer, feloniously assaulted officer. (*Id.* at PgID 901.) Occasional beer, once smoked marijuana. (*Id.*)

4

NGRI in Michigan state courts, and then civilly committed to the Walter P. Reuther Psychiatric Hospital ("WPRH"). They have all, at various times, been released from confinement to live in the community subject to hospital oversight as inpatients under Authorized Leave Status ("ALS") contracts, wherein they agreed to terms such as drug testing and curfews. The duration of their civil commitment had been extended one or more times pursuant to petitions to Probate Courts by MDHHS hospitals seeking continuing Hospitalization Treatment Orders ("HTOs"), which were usually granted, after hearings, at which Plaintiffs were represented by counsel. The present-day status of their specific cases otherwise differ. Pelichet, Ragland, and Washington are no longer committed within the MDHHS structure. Bickerstaff remains an NGRI inpatient, but was on ALS status as of March 20, 2019.[3]

---

Bonn Washington:    Schizophrenia disorder; assaulted Sheriff, 2005. (*Id.* at PgID 905.) Positive for marijuana after every release. (*Id.* 907.)

Darius Bickerstaff:    Schizophrenia bipolar disorder; 2014 felonious assault against grandmother's boyfriend. (*Id.* at PgID 907-09.)

Marijuana is a federal statutorily designated Schedule I controlled substance. 21 U.S.C. § 812.

[3] Since Plaintiffs filed the First Amended Complaint, Plaintiff Bonn Washington's status with the state psychiatric treatment system has changed. Washington is currently receiving treatment under an Alternative Treatment Order (ATO), meaning he no longer is subject to a Hospitalization Treatment Order, and does not have NGRI or Walter P. Reuther Psychiatric Hospital ("WPRH") inpatient status. (Hr'g Tr., Mar. 20, 2019, Defs. Stern and Medoff Mots. to Dismiss, ECF #83, PgID 2286, 30:17-19.)

Plaintiffs contend that their rights were violated by Defendants' policy/practice of seeking to renew Plaintiffs' commitment as NGRI patients by filing annual petitions with state Probate Courts for continuing one-year Hospital Treatment Orders as a matter of course, which, after hearings were most times granted by those courts.

Plaintiffs acknowledge that they were represented by court-appointed counsel at those court hearings. Further, those hearings did not always result in court orders for continuing hospitalization. Some resulted in a verdict denying continuing hospitalization and therefore release from civil confinement.

Specifically, Plaintiffs allege that the MDHHS petitions for continuing one-year Hospital Treatment Orders were filed by Defendants regardless of whether Plaintiffs continued to meet the definition of a "person requiring treatment" under M.C.L. § 330.1401 ("Section 401"), the criteria for continuing hospitalization. M.C.L. § 330.1476(2). Plaintiffs were aware of their right to contest these HTO petitions in Probate Court.

A separate complaint allegation relates to Alternative Leave Status (ALS) -- NGRI Committee conditional releases from hospital confinement to community programs. (FAC ECF #44, ¶183-86, PgID 915-16.) Plaintiffs aver that they were denied procedural due process each time their ALS authorized leave had been

revoked for alleged contract violations by the patients because they had not been provided with a Michigan statutorily mandated notice form that requires MDHHS to provide them, post revocation of ALS status, of their right to contest, by appeal, the grounds for re-hospitalization. FAC ¶165.[4] Defendants concede that persons returned to hospitalization after authorized leave in excess of 10 days, never received notice or forms informing them of their right to appeal their return.

## II. PROCEDURAL HISTORY

On May 2, 2018, Plaintiffs filed their Complaint. (ECF #1.) On June 20, 2018, Dr. Stern filed his Answer and Affirmative Defenses. (ECF #20.) On June 29, 2018, Dr. Medoff filed her Answer and Affirmative Defenses. (ECF #22.) The Michigan Department of Health and Human Services ("MDHHS") Defendants filed a Motion to Dismiss on June 29, 2018. (ECF #29.) On July 9, 2018, Dr. Charles Stern filed his First Amended Affirmative Defenses. (ECF #26.) On July 11, 2018, Dr. Lisa Medoff filed Amended and/or Special Affirmative Defenses. (ECF #28.) On August

---

[4] M.C.L. § 330.1408(3), a section in Michigan's Mental Health Code, states: "An opportunity for appeal, and notice of that opportunity, shall be provided to an individual who objects to being returned from any authorized leave in excess of 10 days." Further, M.C.L. § 330.1537(3) provides that: "An opportunity for appeal shall be provided to any individual returned over his or her objection from any authorized leave in excess of 10 days, and the individual shall be notified of his or her right to appeal." State Court Administrative Office ("SCAO") Form PCM 233, "Notice of Right to Appeal Return and Appeal of Return from Authorized Leave," references these two sections of the Mental Health Code (as well as M.C.R. 5.743, M.C.R. 5.743a, and M.C.R. 5.743b, which all address appeal rights post-readmission) and requires compliance with the statutes.

3, 2018, Plaintiffs filed a Motion for Leave to File the First Amended Complaint

(ECF #31) to add parties, which was granted on September 13, 2018. Plaintiffs filed

the First Amended Complaint on September 14, 2018. (ECF #44.)

The three-count First Amended Complaint alleges:

Count I       Deprivation of Rights Guaranteed by the Constitutions and Laws of the United States and the State of Michigan – Procedural Due Process Violations under the Fourteenth Amendment, Substantive Due Process under the Fourteenth Amendment, Equal Protection Burdening Fundamental Rights under the Fourteenth Amendment, and Cruel and Unusual Punishment (All Defendants)

Count II      Deprivation of Rights Guaranteed by Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*, (Defendant MDHHS, MDHHS Contractor and Sub-Contractor Defendants, and Defendant MDHHS Employees (including Robert Gordon) in their Official Capacities)

Count III     Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, (Defendant MDHHS, CMH Contractor and Sub-Contractor Defendants, and Defendant MDHHS Employees in their Official Capacities)

Plaintiff Bickerstaff also seeks injunctive relief.[5]

Defendants[6] have filed three separate Motions to Dismiss pursuant to Federal

Rule of Civil Procedure 12(b)(6).

---

[5] The Court assumes that due to Plaintiff Washington's recent release from involuntary civil commitment, Plaintiff Bickerstaff, alone, can seek injunctive relief.

[6] Several additional named Defendants, which are allegedly MDHHS independent contractors and sub-contractors that provide community housing and/or adult foster care for WPRH NGRI patients released on ALS contracts: Hegira Programs, Inc.

Defendant Michigan Department of Health and Human Services ("MDHHS") and several of its employees, named in their individual and official capacities, filed a Motion to Dismiss on October 12, 2018 (ECF #56) ("MDHHS Motion"). The Parties to the MDHHS Motion are: Defendant Robert Gordon (official capacity only); the following in both their official and individual capacities: Mary Solky (Hospital Director at Walter P. Reuther Psychiatric Hospital ("WPRH")); Dr. Laurie Albert (Director of Social Work at WPRH); Dr. Hanumaiah Bandla (Chief of Clinical Affairs at WPRH); Dr. Aruna Bavineni (WPRH psychiatrist); Sharon Dodd-Kimmey; Craig Lemmen; Kimberly Kulp-Olsterland; Lisa Marquis; Martha Smith; Dave Barry; Kelli Schaefer; Diane Heisel; and Joe Corso (collectively, "MDHHS Defendants," and referred to as a subset of Defendants herein as "MDHHS Employee Defendants" or "MDHHS Defendants"). Dodd-Kimmey, Lemmen, Kulp-Olsterland, Marquis, Smith, Barry, Schaefer, Heisel, and Corso are members of the

_____

("Hegira"); Carelink Network, Inc. ("Carelink"); Behavioral Health Professionals, Inc. ("Behavioral Health"); and New Center Community Services, Inc. ("New Center"), are not parties to these motions. For clarity, these Defendants are herein referred to as "Community Caretakers." Plaintiffs allege that MDHHS policy required Plaintiffs' community housing and/or adult foster care providers to file petitions for Hospitalization Treatment Orders.

Defendants Carelink and Behavioral Health were dismissed by stipulation of the Parties on November 14, 2018. (ECF #68.) Defendant Hegira answered the original Complaint (ECF #17, 18, June 6, 2018) but has not filed a responsive pleading to the FAC. Defendant New Center was not served with a summons.

NGRI Committee at the Center for Forensic Psychiatry ("CFP") (referred to as a subset of MDHHS Defendants herein as "NGRI Committee Defendants"). (FAC, ECF #31-1, ¶¶11-15, 17-20, 22, 24, PgID 496-98.) Plaintiffs filed a Response on November 16, 2018 (ECF #69), and the MDHHS Defendants filed their Reply on December 14, 2018 (ECF #75). The Court held a hearing on the MDHHS Defendants' Motion to Dismiss on March 1, 2019.

Defendant Lisa Medoff, Ph.D., WPRH Director of Psychology, a WPRH employee represented by separate counsel,[7] filed her Motion to Dismiss on October 19, 2018. (ECF #63.) (In this Opinion, Dr. Medoff is included among the "MDHHS Employee Defendants.") Plaintiffs filed a Response on November 26, 2018 (ECF #71), and Dr. Medoff filed her Reply on December 31, 2018 (ECF #76).

Defendant Charles Stern, Ph.D., a psychologist who was hired by WPRH as an independent contractor to conduct a psychological evaluation of Plaintiff Darryl Pelichet, filed his Rule 12(b)(6) Motion on September 25, 2018. (ECF #49.) Plaintiff Pelichet filed a Response on October 16, 2018 (ECF #60), and Dr. Stern filed his Reply on October 29, 2018 (ECF #65). Plaintiff Pelichet's Response states that Pelichet alone brings a single cause of action against Dr. Stern under Title 42 U.S.C.

---

[7] Defendants Solky, Albert, Bandla and Medoff are referred to collectively in the FAC and herein as "Hospital Management Defendants."

§ 1983 for deprivation of federal constitutional rights (Count I). (Pls.' Resp., ECF #60, PgID 1354.)

Defendants Drs. Stern and Medoff join and concur in the MDHHS Motion to Dismiss (ECF #56) and Reply (ECF #75), and join and concur in each other's respective Motions to Dismiss and Replies. The MDHHS Motion Defendants have not joined Dr. Stern or Dr. Medoff's Motions. The Court held a hearing on Defendants Stern and Medoff's Motions on March 20, 2019.

## III. RELEVANT LEGAL OPINIONS REGARDING PLEADING CIVIL RIGHTS CLAIMS

The well-plead non-conclusory allegations in the FAC are construed in the light most favorable to the plaintiffs, and the court also draws all reasonable inferences in favor of the plaintiff. *Cahoo v. SAS Analytics*, 912 F.3d 887, 897 (6th Cir. 2019)

To state a civil rights claim under 42 U.S.C. §1983 "a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States, (2) caused by a person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 28 (1988); *Dominguez v. Corr. Med. Services*, 555 F.3d 543, 549 (6th Cir. 2009) (citation omitted).

"[D]amage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right."

11

*Cahoo* at 899 (citations omitted). *Accord, Ashcroft v. Iqbal*, 556 U.S. at 662, 676 (2009).

In *Bishop v. Gosiger*, 692 F.Supp.2d 762, 774, the District Court cited Sixth Circuit precedent in pointing out:

> "'It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to put flesh on its bones.'" *Bishop v. Gosiger, Inc.*, 692 F. Supp. 2d 762, 774 (E.D. Mich. 2010)(quoting *Meridia Prods. Liab. Lit. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006)). "'[I]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'"

*Bishop*, (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)).

## IV. ALLEGATIONS

### A. MDHHS Policies

#### 1. Annual Petitions for Continued Treatment Orders (CTOs)

Plaintiffs allege that the HTO process violations alleged are attributable to the Olszewski Directive (FAC, ECF #44, PgID 876; Ex. A, PgID 952), which mandates that all NGRI patients "who have improved to the point, that release from hospitalization or transfer between facilities is being considered, shall have their treatment plan and recommendations reviewed by" the NGRI Committee.[8] Thus, the Olszewski Directive provision is the keystone for many of Plaintiffs' claims.

---

[8] Plaintiffs attached a copy of the "Center for Forensic Psychiatry Not Guilty by Reason of Insanity (NGRI) Committee Procedures," which quotes a 1973 Department of Mental Health Policy:

The Court finds that the language of the provision requiring the timely filing of a renewed civil commitment petition, or if not, then a timely referral to the NGRI committee, does not create a policy requiring the filing of such a renewal petition in every case. The Court rejects Plaintiffs' claim that the 2003 Olszewski Directive (discussed *infra*, at Pages 39-45), requires treatment providers to file petitions for continuing HTOs, regardless of their opinion of the patient's status under the M.C.L. § 330.1401[9] (often referred to as "Section 401" of Michigan's Mental Health Code) criteria as a "person requiring treatment."

---

"It is the policy of the Department of Mental Health:…to establish a 'Not Guilty by Reason of Insanity' Committee at the Center for Forensic Psychiatry to review proposed releases of NGRI patients… All patients under the legal status of 'Not Guilty by Reason of Insanity' who have improved to the point of release, shall have their program reviewed by the NGRI Committee at the Center for Forensic Psychiatry and no such release action may be undertaken unless it is recommended by the Committee…"

(ECF #44, FAC, Ex. B, NGRI Procedures, PgID 958.)

Clearly, the NGRI Committee's role in the release of NGRI patients was not created by the 2003 Olszewski Directive, as implied by the FAC.

[9] M.C.L. § 330.1401 states:

(1) As used in this chapter, "person requiring treatment" means (a), (b), (c), or (d):

(a) An individual who has mental illness, and who as a result of that mental illness can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself, herself, or another individual, and who has engaged in an act or acts or

13

made significant threats that are substantially supportive of the expectation.

(b) An individual who has mental illness, and who as a result of that mental illness is unable to attend to those of his or her basic physical needs such as food, clothing, or shelter that must be attended to in order for the individual to avoid serious harm in the near future, and who has demonstrated that inability by failing to attend to those basic physical needs.

(c) An individual who has mental illness, whose judgment is so impaired by that mental illness that he or she is unable to understand his or her need for treatment, and whose impaired judgment, on the basis of competent clinical opinion, presents a substantial risk of significant physical or mental harm to the individual in the near future or presents a substantial risk of physical harm to others in the near future.

(d) An individual who has mental illness, whose understanding of the need for treatment is impaired to the point that he or she is unlikely to voluntarily participate in or adhere to treatment that has been determined necessary to prevent a relapse or harmful deterioration of his or her condition, and whose noncompliance with treatment has been a factor in the individual's placement in a psychiatric hospital, prison, or jail at least 2 times within the last 48 months or whose noncompliance with treatment has been a factor in the individual's committing 1 or more acts, attempts, or threats of serious violent behavior within the last 48 months. An individual under this subdivision is only eligible to receive assisted outpatient treatment.

(2) An individual whose mental processes have been weakened or impaired by a dementia, an individual with a primary diagnosis of epilepsy, or an individual with alcoholism or other drug dependence is not a person requiring treatment under this chapter unless the individual also meets the criteria specified in subsection (1). An individual described in this subsection may be hospitalized under the informal or formal voluntary hospitalization provisions of this chapter if he or she is considered clinically suitable for hospitalization by the hospital director.

The 2003 Olszewski Directive to "Hospital and Center Directors" states:

**SUBJECT:**
**PATIENTS COMMITTED UNDER THE LEGAL STATUS**
**OF NOT GUILTY BY REASON OF INSANITY**

It is the policy of the Department of Community Health that all patients/residents under the legal status of "not guilty by reason of insanity" who have improved to the point, that release from hospitalization or transfer between facilities is being considered, shall have their treatment plan and recommendations reviewed by the "NGRI" Committee at the Center for Forensic Psychiatry.

All recommendations to the court for release from hospitalization, transfer between facilities, or alternative treatment shall be reviewed by the NGRI Committee prior to filing and/or appearance. The written recommendations of the NGRI Committee shall be entered into the patient record and disclosed during testimony, if requested. Referrals to the NGRI Committee for review shall be by the hospital/center director/designee. Any delay in referring or filing necessary papers in a timely manner that would result in not renewing the order, will be considered a violation of this policy.

Any person found NGRI for the crime of murder or for a crime that involves sexual conduct, recommended by the NGRI Committee for release, must be reviewed by the Director/designee of the Department of Community Health for final authorization.

(ECF #44, FAC, Plaintiffs' Exh. A, PgID 952.) Thus, as noted *supra*, the Directive requires all recommendations for release from hospitalization be timely reviewed by the NGRI Committee. Nothing in the Directive says (1) a release can never be recommended or (2) that the NGRI Committee must always file a petition for continued commitment.

Plaintiffs also cite to a section of the "Center for Forensic Psychiatry (CFP) Not Guilty by Reason of Insanity (NGRI) Committee Procedures" ("NGRI Procedures"), titled "Alternative Treatment and Combined Hospitalization/ Alternative Treatment Orders:"

> IN ORDER TO MAINTAIN NGRI STATUS, NGRI PATIENTS SHOULD NOT BE PLACED ON ANY TYPE OF ALTERNATIVE TREATMENT ORDER OR COMBINED HOSPITALIZATION/ALTERNATIVE TREATMENT ORDER. Placement on such orders results in loss of NGRI status, once the patient is discharged from inpatient hospitalization.[10]

(NGRI Committee Procedures Manual, Plaintiffs' Exh. B, PgID 964.) (Capitalization in original.) This clarifies the process for continued NGRI status, and explains the impact of a Plaintiff's loss of NGRI status: when an NGRI patient no longer has inpatient status, the NGRI Committee loses oversight of that individual and can no longer compel the patient to return to the hospital as under the terms of an ALS contract, without seeking a new petition for involuntary commitment.

With regard to NGRI Committee agreements with community housing contractors and subcontractors, Plaintiffs allege, conclusionally, without any factual basis, that the contractors and subcontractors (some of whom are also Defendants to this suit, but not parties to the instant Motion) agreed at the request of the NGRI

---

[10] During the pendency of this case, Plaintiff Washington has been placed on an Alternative Treatment Order ("ATO") status. (ECF #83, Hr'g Tr., Mar. 20, 2019, Defs. Stern and Medoff Mots. to Dismiss, PgID 2286, 30:17-19.)

16

Committee to routinely file petitions seeking continuing one-year HTOs, so that the NGRI patients retain "inpatient" status. (FAC at ¶¶30-31, PgID 500-01.)

## 2. Alternative Leave Status (ALS)

When hospitalized Plaintiffs are "released" into the community as inpatients on ALS leave from the hospital, the ALS contracts include conditions of release, and span a period of five years. (*Id.* at ¶72.) Plaintiffs allege that the NGRI Committee's policy states that patients are not eligible for alternative leave unless the hospital team determines "within the bounds of reasonable clinical certainty," that they are not likely to repeat the type of behavior that led to the adjudication of NGRI or to commit other dangerous acts. (*Id.* at ¶152.) The Court concludes that this is not supportive of any claim of a violation of a patient's constitutional rights.

An NGRI Patient may be discharged from commitment/confinement status after successful completion of a five-year ALS contract, or if the Probate Court Judge (1) rejects an annual MDHHS petition for a continuing HTO, (2) grants an MDHHS petition for release from confinement, or (3) grants a patient's petition for release.

In order to secure a new HTO for the coming year, the Defendant MDHHS petition must demonstrate to the Probate Court Judge that the patient is both: (1) mentally ill; and (2) dangerous, as defined by Section 401 of the Mental Health Code. (ECF #44, FAC, ¶¶79-80, PgID 893.) The petition must be accompanied by a

Clinical Certificate executed by a psychiatrist or psychologist who has personally examined the patient, certifying that the patient continues to meet the statutory criteria for involuntary hospitalization. (*Id.* at ¶81.)

The FAC alleges that in order to secure a court order for continued hospitalization when Pelichet's condition failed to satisfy the statutory or constitutional requirements for involuntary civil commitment, "MDHHS employees" filed petitions for continuing treatment orders that were facially invalid and presented false or misleading testimony to the Probate Court Judge. (FAC at ¶82.)

Plaintiffs' claims rely in a large part on a report authored by the MDHHS Office of Recipient Rights ("ORR"), a patient advocacy office, whose report is referred to extensively in the FAC.[11] The ORR had received and reviewed a

---

[11] The Office of Recipient Rights is a patient advocacy entity, located within the MDHHS, that receives complaints from persons confined within MDHHS facilities, investigates them on behalf on the Complainant, including interviews, and issues a "Report of Investigation." (FAC #93-97, PgID 896-897) The ORR Reports contain hearsay, Fed. R. Evid. 801, 802, and hearsay within hearsay, Fed. R. Evid. 805, and in large part conclusory opinions.

The Supreme Court noted in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009):

> [T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Although for the purposes of a motion to dismiss we must take all of the factual allegations as true, we are not bound to accept as true a legal conclusion couched as a factual allegation.

complaint from Plaintiff Pelichet, regarding, in particular, HTO hearing in-court testimony given by psychologist Dr. Charles Stern on November 19, 2016, regarding Pelichet's "need for continuing hospitalization." (Exh. F, ECF #44, PgID 1066). The ORR investigated Pelichet's claim, and concluded that Dr. Stern's testimony was incorrect and/or misleading. The ORR Report then expanded its discussion beyond Pelichet, to provide its conclusion with regard the entire NGRI process, allegedly validating Pelichet's complaint, and then proffered its conclusion that WPRH was "using court orders for continued hospitalization to maintain NGRI Committee oversight [which] has become standard practice" and that this "practice" was "placing the due process rights of individuals who have been found NGRI and placed in the care of [MDHHS] in jeopardy." (*Id.* at Ex. G, Summary Report of Recipient Rights Compl. – Am. Report, 4th Version, PgID 1082.)

An additional FAC allegation of an MDHHS violation of a confined patient's rights is based upon M.C.L. § 330.1408(3) which states that if a patient released from hospital confinement on an ALS contract, is ordered returned to the hospital by the NGRI Committee: "An opportunity for appeal, and notice of that opportunity, shall be provided to an individual who objects to being returned from any authorized

_____

(Internal citations and quotations omitted.)

19

leave in excess of 10 days."[12] (FAC, ¶183 at Pg. 915.) Plaintiffs allege that, pursuant

to that statute, they were entitled to appeal from the revocation of their leave, and

that to facilitate an appeal, be provided with State Court Administrative Office

("SCAO") Form PCM 233, "Notice of Right to Appeal Return and Appeal of Return

from Authorized Leave," intended to facilitate compliance with M.C.L. §

330.1408(3). (*Id.* at ¶186.) Plaintiffs allege that "None of the [return]

Plaintiffs…were ever served with SCAO Form PCM 233 or otherwise notified that

they had a right to contest their involuntary return to the hospital." In particular FAC

¶165 alleges a violation of this requirement with regard to Plaintiff Bickerstaff. At

the Court's hearing on the MDHHS Motion to Dismiss, Counsel for Defendant

MDHHS did not dispute Plaintiff's allegation that this form was never provided.

> The Sixth Circuit recently reiterated that:

> The Fourteenth Amendment provides that no state shall "deprive
> any person of life, liberty, or property, without due process of
> law." U.S. Const. Am. XIV, § 1. "[T]he Due Process Clause
> provides that certain substantive rights – life, liberty, and
> property – cannot be deprived except pursuant to constitutionally
> adequate procedures."

*Cahoo v. SAS Analytics*, 912 F.3d 887-899 (6th Cir. 2019).

---

[12] If a patient is deemed by the NGRI Committee to have violated a term of the ALS contract, the patient is returned to the hospital, and if again granted ALS leave, the five year "clock" is restarted with no credit given for the prior leave. (*Id.* at ¶¶72, 188, 191.)

The Court finds that Plaintiff Bickerstaff's unchallenged allegation of a violation of §330.1408(3), that Plaintiffs were deprived of their State statutory right to receive notice of their right to appeal from revocation of their ALS status, supports Plaintiffs' claim against Defendant MDHHS for a violation of the Michigan Statute.

## B. Individual Plaintiffs

### 1. Darryl Pelichet

Twenty years ago, Pelichet had been incarcerated for three years. (ECF #44, FAC, Ex. J, May 3, 2017 Internal Psychiatric Evaluation – Pelichet, PgID 1092.) Thereafter, in 2005, at the age of 24, Pelichet was charged with assaulting a police officer. (*Id.* at ¶64, PgID 890.) He was found NGRI and civilly committed to the Center for Forensic Psychiatry ("CFP"), where, for the first time, he was treated for a schizoaffective disorder. (*Id.* at ¶¶66-68.) His symptoms allegedly went into remission. (*Id.*)

As an MDHHS in-patient, Pelichet had been released on seven ALS contracts between 2005 and 2017, but was returned to WPRH for various serious contract violations, including marijuana use, making verbal threats, distributing marijuana, and violating curfew. (*Id.* at Ex. J, PgID 1092.) In 2017, he exercised his right to trial in Probate Court to challenge an MDHHS Petition for continued hospitalization, and he prevailed. (*Id.* at ¶¶74, 110, PgID 892, 900.) He was discharged from hospitalization on January 30, 2018. (*Id.*)

Pelichet is the sole Plaintiff bringing a claim against Dr. Charles Stern, Ph.D.[13] (Pls.' Resp., ECF #60, PgID 1354.) Dr. Stern, an independent contractor, conducts psychological evaluations of NGRI patients at WPRH prior to their Probate Court hearings. (ECF #44, FAC, ¶23, PgID 880.) Independent evaluations are required in Probate Court proceedings. (*Id.* at ¶254; M.C.L. § 330.1343.) Dr. Stern was hired by WPRH to conduct a psychological evaluation of Pelichet in the fall of 2016 prior to the hearing on a petition for a continuing Hospitalization Treatment Order. (*Id.* at ¶¶82-85, PgID 893-94.) The purpose of the required in-person evaluation and to then testify to his findings. (*Id.* at ¶84.) was to determine if Pelichet's mental condition continued to meet the standard thresholds for subjecting him to continued involuntary psychiatric hospitalization.

The FAC alleges that Dr. Stern failed to conduct a "bona-fide" psychological evaluation of Pelichet. (*Id.* at ¶259, PgID 936.) Plaintiff contends that Dr. Stern conducted a "sham" evaluation, the results and consequences of which, an order subjecting him to an additional year of involuntary hospitalization, were "predetermined." (*Id.* at ¶261, PgID 937.) Pelichet alleges that after meeting Dr. Stern on one occasion for less than twenty minutes, his court testimony recommended an additional year of involuntary hospitalization. Plaintiff contends

---

[13] Plaintiffs' Response states that Pelichet alone brings a single cause of action against Dr. Stern under Section 1983 for deprivation of federal constitutional rights (Count I). (Pls.' Resp., ECF #60, PgID 1354.)

that this evaluation was "too brief to conduct meaningful psychological testing, to accurately evaluate a patient's present mental health condition, or to determine the patient's present level of dangerousness to himself or others." (*Id.* at ¶259, PgID 936.) Plaintiff further contends that prior to his testimony, Dr. Stern did not discuss Pelichet's present mental health condition with members of Pelichet's treatment team. (*Id.* at ¶260, PgID 936-37.) Plaintiff concludes that Dr. Stern's testimony about his compliance with treatment was false, misleading, or both. (*Id.* at ¶93, PgID 896.)

In addition, Plaintiff alleges that in an ORR investigation interview Dr. Stern attempted to mislead ORR investigators, and became "hostile" when questioned about whether his recommendations were based on discussions with Pelichet's treatment team. (*Id.* at Ex. F, Sep. 8, 2017 Report of Investigative Findings, PgID 1072.) The ORR Report alleged that while Dr. Stern both testified in the court and stated to an ORR investigator that he had spoken to Pelichet's treaters, his treaters had denied this. (*Id.*) Plaintiff further alleges that the ORR report stated that while Dr. Stern testified in court that he had reviewed the file as to Pelichet's original charges (a.k.a., the "settled record"), this was not possible because that file was not kept onsite at the hospital. (*Id.* at PgID 1068.)

The FAC alleges that Defendant WPRH employee Dr. Aruna Bavineni, who was not named in Pelichet's complaint to the ORR, had provided false or misleading documents and testimony regarding Pelichet to the Probate Court in order to obtain

a continuing HTO. Plaintiff alleges that on October 30, 2016, Dr. Bavineni completed a Clinical Certificate indicating that Pelichet was a "person requiring treatment," but did not provide reasons why he met the criteria for any of the four categories. (*Id.* at ¶99, PgID 897.) Plaintiffs allege that when Pelichet filed a Petition for Discharge six months later, Dr. Bavineni was required to file a Six-Month Review, as to whether she believed Pelichet "can reasonably be expected in the near future to intentionally or unintentionally seriously physically injure self or others...." (*Id.* at ¶¶101-02, PgID 898.) At the May 3, 2017 hearing on Pelichet's Petition for Discharge, she testified to the contents of her Six-Month Review and recommended a continuing HTO. (ECF #44, FAC, ¶104, PgID 899.) According to Pelichet's ORR Report, Dr. Bavineni stated to them that she "did not understand that facts were required to support the assertion" that Pelichet posed a risk of danger to himself or others. (*Id.* at ¶106; Ex. J, PgID 1091.)

Plaintiff further alleges that later on May 3, 2017, the day of her Probate Court testimony, Dr. Bavineni had completed a Report of Pelichet for *internal* WPRH purposes, that found Pelichet posed no recent risk of violence to himself and no current or past risk of violence to others. (*Id.* at ¶105; Ex. J, May 3, 2017 Internal Psychiatric Evaluation – Pelichet, PgID 1097-98.)

Defendant Dr. Lisa Medoff, who also testified at Pelichet's May 3, 2017 Probate Court hearing, was not mentioned in Pelichet's complaint to the ORR. (*Id.*

at ¶105, PgID 899.) Pelichet had previously had his ALS contracts revoked on multiple occasions for failing marijuana drug screens. (*Id.* at ¶75.) The FAC alleges that Counsel for Pelichet had asked Dr. Medoff on cross-examination if "there was ever a point in time that [Pelichet] has ever injured himself or others during this entire period from 2005 to now, that we – that we're now looking at?" and she responded, "Well from my perspective, I consider taking a drug which can be contradictory to your health something that is dangerous. So I consider that harm to self." (FAC at ¶233.) She further testified that, to her knowledge, he had never actually physically harmed himself or others since 2005 except for "harming himself" by smoking marijuana. (*Id.* at ¶233-34; Ex. U, Tr. of May 3, 2017 Probate Court Hr'g, PgID 1187.) The Court notes that marijuana is a federal Schedule One controlled substance, subject to a Federal Criminal Prosecution. 21 U.S.C. § 812(c)(10). The Court also notes that Pelichet suffers from a schizophrenic disorder. *Supra*, Pg. 4, n.2.

### 2. Plaintiff Joshua Ragland

Ragland has "struggled with depression," and on February 8, 2014, was pulled off the edge of a bridge by police officers as he was "contemplating suicide." (FAC at ¶¶112-13.) When he resisted, the officers had to tackle and restrain him. (*Id.* at ¶114.) Ragland was initially transported to a hospital emergency room, and then to the Henry Ford Kingswood Psychiatric Hospital for treatment for his suicide

attempt. He was treated as an inpatient for three weeks, and then discharged. (*Id.* at ¶¶115-16.) In June of 2014, four months after his suicide attempt, Ragland was arrested and charged with resisting/obstructing an officer and felonious assault, for resisting and assaulting the officers who had pulled him off the bridge. (*Id.* at ¶117.) In October 2014, he resolved the State criminal charges with a plea of NGRI, and he was confined at the CFP for five months. (*Id.* at ¶¶118-19.)

Plaintiff Ragland has had a 2015 ALS contract revoked on one occasion. (*Id.* at ¶185.) On January 14, 2016, police officers were called to Ragland's mother's home and returned him to WPRH, where his leave was revoked. (*Id.* at ¶¶121-22.) Plaintiffs allege that Ragland's ALS was revoked because the NGRI Committee believed, on the basis of a report from Ragland's treatment team, that he had admitted to "occasionally" having a beer and smoking marijuana "once," in violation of his ALS contract terms. (*Id.* at ¶122.) Plaintiffs allege that there was a mistake/misinterpretation by the NGRI, and that Ragland had in fact been talking about past substance use, rather than admitting substance use while he was under the ALS contract. (*Id.* at ¶123.)

Ragland was re-admitted to WPRH from January 14, 2016 until December 16, 2016, when he was given leave on another ALS contract. (*Id.* at ¶¶126-27.) While on this ALS leave, Ragland's outpatient treatment provider allegedly refused to file a petition for a continuing Hospitalization Treatment Order, and it was decided after

members of Ragland's treatment team met with an NGRI Committee representative, that WPRH would file the petition for continued confinement because the ALS contract stated that "ultimate responsibility for petitioning remains with the hospital." (*Id.* at ¶¶129-30, PgID 904.) On April 21, 2017, at a Probate Court hearing on WPRH's petition for a continuing HTO, the Judge denied the MDHHS petition and released Ragland from confinement. (*Id.* at ¶132.)

### 3. Plaintiff Bonn Washington

Washington, 43 years-old, suffers from a schizoaffective disorder. (*Id.* at ¶134.) In 2005, after Washington assaulted a Washtenaw County Sheriff's Deputy during a psychotic episode, he was charged with assault and found NGRI. (*Id.* at ¶¶135-36.) Washington alleges that he has not experienced an acute psychotic episode since 2005. (*Id.* at ¶139.) Washington had been released on ALS contracts five times between 2005 and 2018; his stretches of leave time ranged from one month to approximately two years. (*Id.* at ¶140.) Washington was on ALS as of January 2018. (*Id.* at ¶141.) He is now on an Alternative Treatment Order, no longer under commitment, and is not under inpatient status. (Defs. Stern and Medoff Mots. to Dismiss Hr'g Tr., Mar. 20, 2019, ECF #83, PgID 2286, 30:17-19.)

### 4. Plaintiff Darius Bickerstaff

Bickerstaff was diagnosed with schizoaffective bipolar disorder. (*Id.* at ¶147.) He stopped taking his medication in March 2014, when he was 26 years old, and had

a psychotic episode that resulted in a physical altercation in his grandmother's home. (*Id.* at ¶148.) He was charged with felonious assault with intent to do great bodily harm against his grandmother's elderly boyfriend. (*Id.*) He was adjudged NGRI, confined to the CFP, and then transferred to WPRH in March 2016. (*Id.* at ¶149.)

The FAC avers that the Petitions for Bickerstaff's continuing HTOs that were granted indicate that he may be a danger to himself or others, while he has allegedly been compliant on ALS. (*Id.* at ¶155.) Bickerstaff also alleges that his ALS was revoked on one occasion, solely because of a MDHHS community contractor's failure to timely find replacement housing for him after WPRH staff had concluded that his current housing situation was treating him poorly. (*Id.* at ¶¶161-62.) Bickerstaff was approved for ALS in April 2018, and another petition for a continuing HTO was filed by WPRH in May 2018. (*Id.* at ¶¶169-70.) Bickerstaff has filed a Petition for Discharge. He has been granted ALS with travel rights during the pendency of this suit. (Hr'g Tr., Mar. 20, 2019, Defs. Stern and Medoff Mots. to Dismiss, ECF #83, PgID 30:17-19.)

### 5. Michigan Protection and Advocacy Service (MPAS)

Plaintiff MPAS, a nonprofit organization incorporated in Michigan, alleges that it "brings this action on its own behalf and on behalf of its constituents who have been directly affected by Defendants' unlawful policies and practices." (FAC, ECF #44, PgID 885.) MPAS alleges that it has been "designated by the governor as the

protection and advocacy organization for individuals who have physical, mental, and developmental disabilities in the State of Michigan." (FAC, ECF #44, PgID 886, ¶44.) MPAS alleges that "under the Federal Developmental Disabilities Assistance and Bill of Rights Act of 1975 (DD Act), each state is required to have a statewide Protection and Advocacy network in place. . . ." (*Id.* PgID 886, ¶46.)

MPAS further alleges that under the Protection and Advocacy for Individuals with Mental Illness Act (PAIMI), MPAS has a "federal mandate to pursue . . . legal . . . remedies to ensure the protection of individuals with mental illness, 42 U.S.C. §10805(a)(1)." (FAC at PgID 887, ¶49.)

MPAS alleges that its "constituents include the named individual plaintiffs, as well as all other forensic patients. (FAC at PgID 888, ¶56.)

MPAS states that is seeks "Only declaratory and injunctive relief . . . as it pertains to the state's policies, practices, supervision, training and customs as a whole and does not require the participation of individual members to resolve." (FAC at PgID 889, ¶60.)

Finally MPAS alleges that it has been "investigating a number of complaints from NGRI patients regarding their confinement . . . (including Plaintiff Darius Bickerstaff)." (FAC at ¶62, PgIDs, 889-890.)

## V. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows for the dismissal of a case

where the complaint fails to state a claim upon which relief can be granted. As noted *supra*, when reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012).

To state a claim, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]he complaint 'does not need detailed factual allegations' but should identify 'more than labels and conclusions.'" *Casias v. Wal–Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The court "need not accept as true a legal conclusion couched as a factual allegation, or an unwarranted factual inference." *Handy-Clay*, 695 F.3d at 539 (internal citations and quotation marks omitted).

In other words, a plaintiff must provide more than "formulaic recitation of the elements of a cause of action" and his or her "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56. The Sixth Circuit has reiterated that "[t]o survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016)

(citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## VI. ANALYSIS[14]

### A. Subject Matter Jurisdiction

#### 1. Plaintiffs Pelichet, Ragland, and Washington's Damages Claims are Not Moot

Defendants argue that because Pelichet, Ragland, and Washington are no longer under the control of the state mental health system, their claims are moot. (Defs.' Mot., ECF #56, PgID 1283.) A federal court's jurisdiction is limited to live, ongoing cases or controversies, and moot claims must be dismissed for lack of jurisdiction. *Pettrey v. Enterprise Title Agency*, 584 F.3d 701, 703 (6th Cir. 2009). This is because a moot claim is no longer a "case" or "controversy" under Article III of the United States Constitution. *Mokdad v. Sessions*, 876 F.3d 167, 169 (6th Cir. 2017). "A case becomes moot 'when the issues presented are no longer live or parties lack a legally cognizable interest in the outcome.'" *United States v. City of Detroit*, 401 F.3d 448, 450 (6th Cir. 2005).

Plaintiffs counter that because Pelichet, Ragland, and Washington maintain a live claim for damages, their claims are not moot. Pelichet and Ragland do not seek injunctive relief in the FAC, and concede that they do not have such a claim (and

---

[14] The Court will now address Washington's claims (and the Parties' arguments regarding those claims) from the same position as Pelichet and Ragland's claims, as Washington, Pelichet, and Ragland are no longer under civil commitment orders.

31

neither would Washington). "The existence of a damages claim ensures that this dispute is a live one and one over which Article III gives [courts] continuing authority." *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 387 (6th Cir. 2005). Plaintiffs point out that for purposes of Article III standing, it does not matter whether Plaintiffs would still have been returned to the hospital if they had been provided the State-required form to appeal revocation of their ALS status. *See Wright v. O'Day*, 706 F.3d 769, 771-72 (6th Cir. 2013).

The denial of procedural due process rights is itself actionable for nominal damages without proof of an actual injury. *Carey v. Piphus*, 435 U.S. 247, 266 (1978). Once a plaintiff has shown that his procedural due process rights were violated, the burden shifts to the defendant to prove that the plaintiff would not have achieved a better outcome even if due process had been afforded. *Franklin v. Aycock*, 795 F.2d 1253, 1264 (6th Cir. 1986). Even if the defendant subsequently succeeds in disproving causation, plaintiff is entitled to nominal damages. *Id.*

Because Pelichet, Ragland, and Washington have live claims for nominal damages, it does not matter that they are now outside of the control of the NGRI system. Therefore, their claims are not moot. *Ermold v. Davis*, 855 F.3d 715, 719 (6th Cir. 2017) ("Claims for damages are largely able to avoid mootness challenges.").

### 2. Bickerstaff's Claims are Cognizable under 42 U.S.C. § 1983

Defendants contend that Plaintiffs' claims are not cognizable under Section 1983 because they were not properly brought as state petitions for a writ of habeas corpus. (ECF #56, MDHHS Mot., PgID 1283.) The Court rejects Defendants' attempt at "misdirection." As the United States Supreme Court noted in *Kansas v. Hendricks*, 521 U.S. 346, 363 (1997): "The Court has, in fact, cited the confinement of 'mentally unstable individuals who present a danger to the public' as one classic example of non-punitive detention. . . . Far from any punitive objective, the confinement's duration is instead linked to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others." Plaintiffs were subject to civil confinement, and thus could not seek relief under State habeas corpus.

The Michigan Court of Appeals decision *People v. Williams*, 228 Mich. App. 546 (1998), noted that the Michigan Legislature has ordered:

> Civilly committed persons and those acquitted on the basis of insanity may be discharged whenever the *court determines* that the committed person qualifies as 'no longer . . . requiring treatment,' M.C.L. § 330.1476(2). A 'person requiring treatment' is, in essence a person with a mental illness who, as a result of this illness, poses a serious danger to himself or others. M.C.L. § 330.1401. Thus, the civilly committed person must be released when he either has recovered from his mental illness or no longer poses a danger to himself or others.

*Williams* at 556-57. Because Bickerstaff is under civil commitment and not State criminal confinement, he can seek relief under 42 U.S.C. §1983.

### 3. Defendants' Additional Jurisdictional Arguments

The MDHHS argues that the *Rooker-Feldman* doctrine bars Plaintiff Washington's claims, and that Plaintiff Bickerstaff's claims are unripe. (ECF #56, PgID 1285-88.) MDHHS argues alternatively, that this Court should not consider Plaintiff Bickerstaff's claims pursuant to the doctrine of abstention. (*Id.* at PgID 1288-91.) Dr. Stern also contends that Plaintiff Pelichet's claims should not be considered under the doctrines *Rooker-Feldman* and abstention. (ECF #49, PgID 1223.) Dr. Medoff argues that Bickerstaff's claims are unripe, and that *Rooker-Feldman* bars all of the claims against her in the FAC. (ECF #63, PgID 1669-72, 1674.)

### a. The *Rooker-Feldman* Doctrine

The *Rooker–Feldman* doctrine bars federal-court review of "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). "If the source of the injury is the state court decision, then the Rooker–Feldman doctrine would prevent the district court from asserting jurisdiction. If there is some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim." *McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir. 2006). Because "the doctrine [had] sometimes been construed to

extend far beyond the contours of the *Rooker* and *Feldman* cases," *Exxon*, 544 U.S. at 283, the Supreme Court and this court have emphasized its "limited application," *Coles v. Granville*, 448 F.3d 853, 857 (6th Cir. 2006).

Plaintiffs do not make allegations against the Probate Court Judges. *See McCormick*, 451 F.3d at 392. Plaintiffs make due process claims with regard to MDHHS policies – specifically the Olszewski Directive, and the WPRH Employee Defendants as they relate to annual filing for continuing HTOs, and the failure to provide Plaintiffs with a legislatively mandated State form informing them of their right to appeal the revocation of their ALS leave.

With regard to the continuing HTOs, "[t]hat some of [Plaintiffs'] claims were based on the defendants' actions during the state-court case, e.g., that they made fraudulent misrepresentations to the state court, this does not necessarily mean that *Rooker–Feldman* applies to bar his complaint." *Barnaby v. Witkowski*, No. 16-1207, 2017 WL 3701727, at *2 (6th Cir. Feb. 17, 2017) (citing *McCormick*, 451 F.3d at 392 (holding that the plaintiff's claims that the defendants committed fraud and misrepresentation in state probate proceedings did not allege an injury caused by the state-court judgment itself, and thus the *Rooker–Feldman* doctrine was inapplicable)). The *Rooker-Feldman* doctrine does not bar Plaintiffs' claims.

**b. Abstention**

Defendants argue that both the *Colorado River* and *Younger* doctrines bar Washington and Bickerstaff's claims. In *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), the Supreme Court held that "considerations of judicial economy and federal-state comity may justify abstention [by the federal court] in situations involving the contemporaneous exercise of jurisdiction by state and federal courts." *Romine v. Compuserve Corp.*, 160 F.3d 337, 339 (6th Cir. 1998) (citing *Colo. River,* 424 U.S. at 817). "Before the *Colorado River* doctrine can be applied, the district court must first determine that the concurrent state and federal actions are actually parallel." *Id.*

The state Probate Court proceedings for Washington and Bickerstaff are not parallel to this action. Plaintiffs raise procedural and substantive due process claims against the MDHHS and WPRH employees which may be pursued in a § 1983 civil rights action in this Court. These proceedings will not interfere with any pending proceedings before the Probate Court. *See O'Neill v. Coughlan*, 511 F.3d 638, 641 (6th Cir. 2008) ("Under *Younger* abstention, absent unusual circumstances not asserted here, a federal court must decline to interfere with pending state civil or criminal proceedings when important state interests are involved.") (citing *Younger v. Harris*, 401 U.S. 37, 41 (1971)). Therefore, the doctrine of abstention does not bar Washington and/or Bickerstaff's claims.

### c. Ripeness

Defendants contend that Bickerstaff's claims are not yet ripe for adjudication because he is "subject to an on-going state mental health treatment order." (ECF #56, MDHHS Mot., PgID 1286; ECF #63, Medoff Mot., PgID 1674.) Ripeness is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way[.]" *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003). The claims alleged by Bickerstaff are ripe regardless of the fact that he is subject to a continuing Hospitalization Treatment Order. The alleged violations in the FAC may be pursued prior to his release from civil commitment.

## B. Claims Against Defendants MDHHS and the MDHHS Employees Acting in Their Official Capacity and in Their Individual Capacity

Plaintiffs fail to address the MDHHS Defendants' arguments regarding MDHHS's and the MDHHS Employee Defendants' entitlement to Eleventh Amendment immunity for actions in their official capacity.

The Eleventh Amendment bars claims against a state and its agencies, except where the state consents to a federal court's jurisdiction or where Congress expressly waives immunity. *Harrison v. Michigan*, 722 F.3d 768, 771 (6th Cir. 2013). This immunity applies to state agencies whatever the nature of the relief that is requested, including injunctive relief. *Freeman v. Michigan Dep't of State*, 808 F.2d 1174, 1179

(6th Cir. 1987); *McLittle v. O'Brien*, 974 F. Supp 635, 637 (E.D. Mich. 1997). The MDHHS has not consented to this Court's jurisdiction, nor has Congress expressly abrogated state immunity under § 1983. *Coleman*, 664 F. Supp. at 1085. Because a suit against MDHHS, an agency of the State of Michigan, is a suit against the State of Michigan, and Michigan has not waived its Eleventh Amendment immunity, *Jamison v. Child Protective Servs.*, No. 1:17-CV-559, 2017 WL 4510629, at *2 (W.D. Mich. Oct. 10, 2017), Plaintiffs' § 1983 damages claims against MDHHS are dismissed. Nor can Plaintiffs raise Due Process claims against individual Defendants in their official capacity if the deprivation resulted from conduct pursuant to an established state procedure.

However, the Eleventh Amendment does not provide immunity to individuals sued in their official capacities, seeking injunctive relief. Thus, claims seeking injunctive relief against MDHHS employee defendants in their official capacities are not barred. *Freeman*, 808 F.2d at 1179 ("As the Supreme Court made clear in *Edelman v. Jordan*, the 'fiction' embodied in *Ex parte Young*, 209 U.S. 123…(1908), permits an injunction against a state official who has acted unconstitutionally, because an official so acting no longer represents the state. *Edelman*, 415 U.S. [651], 664…(1974).").

Damages claims against government officials in their individual capacity arising from alleged violations of constitutional rights must allege with particularity,

facts that demonstrate what *each* defendant did to violate the asserted constitutional right. Plaintiffs have not done that here with regard to the hospital management Defendants: Solky, Albert, Bandla and Medoff.

## C. Failure to State a Claim

### 1. Complaint Exhibits – The Clear Language of Official Documents, *inter alia*, the Olszewski Directive -- Trump the FAC's Allegations that the Olszewski Directive Violates Plaintiffs' Rights

Defendants argue that "[W]hen a [official] written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *Creelgroup, Inc. v. NGS Am., Inc.*, 518 F. App'x 343, 347 (6th Cir. 2013). The Court concludes that this applies regardless of whether the official document is attached to the Plaintiff's pleadings. Although the Sixth Circuit has cautioned against elevating contradictory statements from an exhibit to a motion to dismiss over allegations that are stated in a complaint where the document is not the basis for the allegations in the complaint, *Jones v. City of Cincinnati*, 521 F.3d 555, 561 (6th Cir. 2008), in this case the Olszewski Directive, in particular, and the NGRI Procedures, and WPRH Standards, form the keystone of the Plaintiffs' principal FAC allegations. These exhibits -- official documents -- clearly undermine the interpretation in Plaintiffs' FAC with regard to an alleged State policy requiring MDHHS petitioners to always seek continuing confinement.

A review of the CFP NGRI Committee Procedures ("NGRI Procedures") cited by Plaintiffs to support their allegation that the policy compels Plaintiffs' Community Caretakers to petition for continuing hospitalization, cherry-picks a provision that, when placed in proper context of other official documents, clearly does not evidence a policy of mandating confinement petitions from Community Caretakers.

Plaintiffs allege that the following provision under the section "Alternative Treatment & Combined Hospitalization/Alternative Treatment Orders" instructs NGRI patients' Community Caretakers not to place patients on anything other than a Hospitalization Treatment Order:

> IN ORDER TO MAINTAIN NGRI STATUS, NGRI PATIENTS SHOULD NOT BE PLACED ON ANY TYPE OF ALTERNATIVE TREATMENT ORDER OR COMBINED HOSPITALIZATION/ALTERNATIVE TREATMENT ORDER. Placement on such orders results in loss of NGRI status, once the patient is discharged from inpatient hospitalization.[15]

(*Id.* at Ex. B, ECF #44, PgID 964.) (Capitalization in original.) This is only one paragraph from the section, and it explains the impact on an NGRI patient's status when placing that patient on treatment orders other than HTOs, such as Alternative

---

[15] During the pendency of this case, Plaintiff Washington has been placed on an Alternative Treatment Order ("ATO"). (Hr'g Tr., Mar. 20, 2019, Defs. Stern and Medoff Mots. to Dismiss, ECF #83, PgID 2286, 30:17-19.)

Treatment Orders ("ATOs"). It states simply that placement on ATOs will result in the loss of NGRI status. The remainder of the of the section states:

> NGRI status is retained when community treatment placement occurs on Authorized Leave Status under a continuing hospital treatment order: During the term of a continuing hospital treatment order, the patient may not be discharged without recommendation from the Center for Forensic Psychiatry [per M.C.L. 33.2050(5)].

(*Id.*) (Alteration in original.) This section states, correctly, the legal parameters applicable to NGRI patients; it is not an order to Community Caretakers that they must not ever place an NGRI patient on an ATO.

Further, the NGRI Procedures discuss the steps to be taken when an NGRI patient is entitled to petition for discharge – beginning with a six month review after an HTO petition has been granted:

### One-year Continuing Orders: (SIX MONTH REVIEW REPORTS)

> Four weeks before the end of the six-month period, the Forensic Liaison or designee[16] will complete the Clinical Assessment portion of a new NGRI COURT HEARING FORM and forward it to the treating psychiatrist along with a Six Month Review Report form. The psychiatrist then completes and returns the Six Month Review Report to the Forensic Liaison.

---

[16] Each Michigan psychiatric hospital and Community Mental Health Services Program designates an individual as its Forensic Liaison to the Forensic Center. (*Id.* at PgID 959.) "The Forensic Liaison or designee is responsible for ensuring compliance with the [NGRI Procedures]." (*Id.*)

The Forensic Liaison is responsible for the filing of the Six Month Review Report with the court within 5 days of its completion per Mental Health Code requirements (**and the Petition for Discharge as soon as received [from] the hospitalized individual**). THE FORENSIC LIAISON IS ALSO RESPONSIBLE FOR ASSURING THAT CONSULTATION WITH THE NGRI COMMITTEE HAS OCCURRED PRIOR TO THE FILING OF ANY SIX-MONTH REVIEW REPORT, **WHICH DOES NOT RECOMMEND CONTINUATION OF THE CURRENT HOSPITAL ORDER OR CURRENT PLACE[MENT]**.

A copy of the Six Month Review Report **and a blank Petition for Discharge are to be given to the NGRI patient** by the Forensic Liaison or designee.

(FAC, Plaintiffs' Exh. B, NGRI Committee Procedures Manual at PgID 961-62.) (Capitalization in original; emphasis in bold added.)

This procedure instructs the Community Caretaker that any petition for discharge in a Six Month Review Report which does not recommend continuation of the current Hospital Treatment Order or current Placement, be provided to the Forensic Liaison for consultation with the NGRI Committee prior to the filing of that Report. This undercuts Plaintiffs' allegation that this orders Community Caretakers to always recommend a continued HTO. Yes, it does funnel the confinement issue to the NGRI Committee for review and action, but this is not unconstitutional or surprising given the reality that this issue involves patients confined after being found NGRI for assaultive crimes because of serious mental health issues. But yes, as Congress has recognized in the American With Disabilities

Act and the Rehabilitation Act, the patient who improves sufficiently to be released from confinement, should be released.

Finally, the last paragraph in the "One-Year Continuing Orders," states that the rules applicable to the annual court hearing on the issue of continuing confinement or discharge, require that a blank petition for discharge be provided in advance to the NGRI patient along with his Six Month Review Report. Thus, the patient is provided with a blank petition to seek their discharge, which if filed, will be ruled upon at the hearing at which the patient will have assistance of counsel.

Plaintiffs allege that the "NGRI Committee's policy" states that patients are "not eligible for alternative leave unless the hospital team determines 'within the bounds of reasonable clinical certainty,' that [they are] not likely to repeat the type of behavior [that] led to the adjudication of NGRI or to commit other dangerous acts." (FAC at ¶152.) Plaintiffs allege that this contradicts the Section 401 criteria for "Persons Requiring Treatment," a finding that such individuals are both mentally ill and pose a danger to themselves or others. However, the language found in the policies attached again as exhibits, trump the FAC's allegations. The language Plaintiffs cite is found instead in the WPRH Standard Operating Procedure #254, Standard N: "The request for ALS should be submitted when the following criteria have been met:…Within the bounds of reasonable clinical certainty, the patient is not likely to repeat the type of behavior which led to the adjudication as NGRI or to

commit other dangerous acts." (FAC, ECF #44, Ex. P, WPRH Standard Operating Procedure #254, PgID 1120.) Standard N discusses "other dangerous acts," and there is no reference to the statutory criteria of Section 401. Moreover, Standards Q and V address discharge and/or change from NGRI status and state:

> Q. A patient shall not be discharged from [ALS] without first being evaluated and recommended for discharge from WRPH by the NGRI Committee. The following criteria must be met:
>
>> 1. The patient no longer meets the statutory criteria for civil commitment. A psychiatrist shall do a thorough evaluation to document this.
>>
>> 2. The patient has demonstrated that the mental illness leading to adjudication, as NGRI, is controlled or in adequate remission for a significant period of time.
>
> ***
>
> V. Recommendations to the Court for release from hospitalization or alternate treatment shall be forwarded to the NGRI Committee for review and approval before filing and/or court appearance. The written recommendations of the NGRI Committee shall be entered into the patient's medical records and disclosed during testimony, if requested.

(*Id.* at PgID 1121.)

Thus, the specific written policies defeat the Plaintiffs' allegation that there is an express official policy or directive that requires WPRH or Plaintiffs' Community Caretakers to annually file petitions for continuing HTOs of NGRI patients.

The Court concludes that there is no official MDHHS policy responsible for the violation of any of Plaintiffs' constitutional rights, (Count I) or right to treatment

in the most integrated setting under the ADA (Count II) and the Rehabilitation Act (Count III). (FAC, ECF #44, PgID 877, ¶¶ 8-10.)

## 2. The Individual Capacity § 1983 Claims Against Defendants Solky, Albert, Bandla, Medoff, Bavineni, Stern, and the NGRI Committee Defendants

Count I of the FAC contains claims for various constitutional violations (deprivation of procedural and substantive due process, violation of equal protection, and cruel and unusual punishment) against "[a]ll MDHHS Defendants," named in both their individual and official capacities, with the exception of MDHHS Director Robert Gordon (who has Eleventh Amendment immunity, from any surviving claims because he is only sued in his official capacity).

Plaintiffs argue that they adequately allege that Defendants Solky, Albert, Bandla, Medoff, and the NGRI Committee Members individually violated their constitutional rights by implicitly authorizing, approving or knowingly acquiescing in their subordinates' violations. (Pls.' Resp to MDHHS Mot., ECF #69, PgID 2030.)

Alternatively, Plaintiffs contend that MDHHS practices and/or customs infringed on Plaintiff's federally protected rights. This contention improperly conflates *Monell* municipal liability[17] with Section 1983 individual liability of

---

[17] "Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials . . . . Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).

supervisors. *See Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) ("Heyerman's attempt to hold Mladenoff liable in her individual capacity for her alleged failure to adequately supervise assistant county prosecutors or for her adherence to or continuation of a policy that, in Heyerman's words, "abdicated" her responsibility "to act on remand orders", "improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability.") (quoting *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 543 (6th Cir. 2008)). Any allegations that the customs and/or practices of individual Defendants amounted to the force of law are more appropriate to state a claim against a municipal entity regarding its liability for a policy. Plaintiffs' argument that "[r]espondeat superior liability does not encompass situations in which the employer's [referring to Defendants Medoff, Solky, Bandla and Albert's] own wrongful conduct caused or contributed to the tort, for example by promulgating a policy or custom likely to cause deprivations of constitutional rights, failing to train or supervise employees," Plaintiffs' response to MDHHS Motion to Dismiss, ECF ¶69, PgID 2030), that refers to the Olszewski Directive, is without merit for the reasons stated *supra*. At the same time, the Court recognizes this holding in *Monell*:

> "Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials . . . . Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or

usage' with the force of law." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).

### a. Claims against the NGRI Committee Defendants

The two principal confinement matters at issue in the FAC are (1) NGRI petitions to the Probate Court for the continuation of confinement HTOs, and (2) NGRI revocation of Plaintiffs' ALS status, and thereafter not providing Plaintiffs with appeal forms as required by a Michigan statute.

Plaintiffs allege that they were detained as NGRI patients subject to continuing HTOs routinely, year after year, regardless of whether they met the two requirements for involuntary civil confinement according to both state law, and Federal and State constitutional rights, *i.e.*, failure to establish that they were: (1) mentally ill; and (2) a danger to themselves and/or others. Plaintiffs contend that these two issues form the basis of constitutional violations under the Fourteenth Amendment (deprivation of Substantive and Procedural Due Process, and Equal Protection of the laws), and the Eighth Amendment (Cruel and Unusual Punishment).

The Sixth Circuit has held that liability cannot be imposed on a supervisor under Section 1983 based on the theory of *respondeat superior. Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied,* 469 U.S. 845 (1984). Liability may exist where "execution of the supervisors' job function result[s] in [the p]laintiff's injury." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006). There must be a

showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. *Taylor v. Michigan Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) (citing *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied*, 469 U.S. 845 (1984)). At a minimum, a Section 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate. *Id.* Persons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior. *See Heyerman*, 680 F.3d at 647 (citing *Murphy v. Grenier,* 406 F. App'x 972, 974 (6th Cir. 2011) ("Personal involvement is necessary to establish section 1983 liability"); *see also Gibson v. Matthews,* 926 F.2d 532, 535 (6th Cir. 1991) (noting that personal liability "must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others, either defendants or non-defendants")).

There are plausible allegations that the members of the NGRI Committee authorized, approved or knowingly acquiesced in conduct in violation of the Constitution, the ADA and the Rehabilitation Act. Although Plaintiffs consistently lump together Defendants Dodd-Kimmey, Lemmen, Kulp-Olsterland, Marquis, Smith, Barry, Schaefer, Heisel, and Corso, without specifying how each, or any, participated in the alleged constitutional violations, the actions of their Committee are specifically addressed by Plaintiffs throughout the entirety of the FAC.

In an allegation specific to the NGRI Committee Defendants, Plaintiffs allege that the NGRI Committee Defendants "regularly exercise their seemingly absolute discretion" to deprive NGRI patients whose leave is revoked without any adversarial hearing of judicial oversight, of their right to procedural due process. (*Id.* at PgID 917.)

These due process issues relate both to NGRI HTO petitions for continuation of confinement, and to revocation of ALS status without providing notice of right to appeal from a revocation.

### b. Procedural Due Process Claim

#### 1. Claim for Monetary Damages against Hospital Management Defendants in their Individual Capacities

To establish a procedural due process violation under Section 1983, Plaintiffs are required to demonstrate three elements: (1) that they had a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) that they were deprived of that protected interest within the meaning of the due process clause; and (3) that the state did not afford them adequate procedural rights before depriving them of the protected interest. *Wedgewood Ltd. P'ship I v. Twp. Of Liberty, Ohio*, 610 F.3d 340, 349 (6th Cir. 2010).

Plaintiffs allege that they were legally entitled to challenge any re-hospitalization following a period longer than ten days, yet they were never made aware of this procedure, in particular, and were not provided with the State-legislated

49

form. (ECF #44, FAC, ¶¶183-84, PgID 915-16.) Although Defendants argue that state law provided process under M.C.L. § 330.1408(3) and therefore there was no deprivation, Plaintiffs correctly state that their rights were violated because they were never made aware or timely made aware of the right to immediately appeal the revocation of their ALS leave.

Plaintiffs allege that Pelichet's leave was revoked six times between 2005 and 2016, Washington's leave was revoked four times "since 2005," Ragland had his leave revoked once in January 2016, and Bickerstaff's leave was revoked once in August 2017. The allegations refer to "Defendants'" failure to provide Plaintiffs with notice and opportunity to appeal the revocation, in particular failure to provide SCAO Form 233. There is no allegation that Defendants Medoff, Albert, Bandla, Solky, Bavineni, or Stern, as individuals, had the obligation to provide the SCOA Form 233 and did not do so. There are no allegations that Medoff, Albert, Bandla, Solky, Bavineni, or Stern implicitly authorized, approved or knowingly acquiesced in a failure to provide SCAO Form 233 on any of the multiple instances where Pelichet, Washington, or Ragland's leave had been revoked. The doctrine of respondent superior does not apply.

## 2. Defendant Bickerstaff's Claim for Prospective Injunctive Relief

As the Court has noted *supra*, Sixth Circuit recently stated in *Cahoo v. SAS Analytics*, 912 F.3d 887, 902 (6th Cir. 2019), that "the [Supreme] Court has usually

held that the Constitution requires some kind of a hearing before the State deprives a person of liberty or property." (Citations omitted.)

Construing Plaintiffs' FAC liberally and accepting Plaintiffs' more specific factual allegations of violations of their right to due process, as this Court must do at this stage, the Court finds that Plaintiffs have sufficiently alleged, and Defendants have not denied, that the NGRI Committee members failed to provide state-required appeal notice after it revoked ALS privileges, reinstating confinement in hospitals. *See* M.C.L. § 330.1408(3). Plaintiff Bickerstaff can seek prospective injunctive relief against the NGRI Committee Defendants in their official capacity for violating the Michigan statue requiring provision of a Notice for Appeal.

### c. Substantive Due Process – Defendants Bandla, Solky, Albert, Medoff, Bavineni, and Stern

In order to determine whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance the liberty of the individual and the demands of an organized society. *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 849 (6th Cir. 2002) (citations omitted). In *Terrance*, the court stated:

> In order to ascertain whether a state has adequately protected the rights of an involuntarily committed mental patient, the Constitution only requires that courts make certain that professional judgment in fact was exercised. In making such determinations, decisions made by the appropriate professional are entitled to a presumption of correctness unless it is established that the person responsible did not base the decision on accepted professional judgment. Throughout this analysis, courts must acknowledge that a

> heightened degree of protection must be afforded to the involuntarily committed.

*Id.* (internal quotations and citations omitted.)

Substantive due process claims are "loosely divided into two categories: (1) deprivations of a particular constitutional guarantee; and (2) actions that shock the conscience." *Doe v. Miami Univ.*, 882 F.3d 579, 597 (6th Cir. 2018) (citing *Valot v. Southeast Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997)).

The FAC alleges, "All Defendants acted in concert to establish, maintain, and enforce a policy of continuing the involuntary civil commitment of all persons adjudicated NGRI, including Plaintiffs and other forensic patients, unless and until the patient completes a five-year period in the community without violating a set of strict conditions of release." (ECF #44, FAC, PgID 919, ¶196.)

To the extent Plaintiffs attempt to allege a conspiracy to violate their rights, the FAC falls short. "[I]t is well-settled that conspiracy claims must be pled with some degree of specificity; vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983." *Bickerstaff v. Lucarelli*, 830 F.3d 388, 400 (6th Cir. 2016). Plaintiffs' claims of Eighth and Fourteenth Amendment violations, requiring the conclusion that multiple MDHHS Employee Defendants as well as independent contractor Defendant Stern, in their individual capacities, acted in contravention of express policies, the Federal Constitution, and the Michigan Constitution and state legislation, to propagate the

52

scheme that Plaintiffs suggest, does not fare better. Blanket allegations pertaining to "Defendants," or lumping together individual Defendants, in an attempt to plead a constitutional violation by an individual are insufficient. *See Boxill v. O'Grady*, -- F.3d--, 2019 WL 3849559, at *3 (6th Cir. 2019) ("Summary reference to a single, five-headed "Defendants" does not support a reasonable inference that *each* Defendant is liable for retaliation.") (citing *Heyne v. Metro Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011) ("This Court has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right.")).

### 1. Solky, Dr. Bandla, Dr. Albert, and Dr. Medoff – the "Hospital Management Defendants"

Plaintiffs allege that Defendants Solky, Dr. Bandla, Dr. Albert, and Dr. Medoff acted in concert to keep Plaintiffs on HTOs indefinitely: "the Hospital Management Defendants [Solky, and Drs. Bandla, Albert, and Medoff] directed both independent-contractor psychologists, such as Defendant Stern, and hospital employees, such as Marway Johnson,…and Defendant Bavineni" to produce documents and testify in court in a manner that "exaggerated each NGRI patient's present level of dangerousness in order to increase the probability that each NGRI patient's hospitalization treatment order would be renewed." (FAC, ECF #44, PgID 922.)

As to the requirement of specification, Plaintiffs cite an ORR report in which a WPRH social worker, Marway Johnson is alleged to have stated to another individual (not the ORR investigation), that social workers attend court hearings in order to "recertify" the patients. (FAC, ECF #44, Ex. N, Report of ORR Investigative Findings, PgID 1113.) Johnson told the ORR investigator that she, personally, had never testified before the Probate Court (*id.* at PgID 1113), and did not identify anyone who did. Further, there are no allegations in the ORR report that Johnson participated in renewing any of the Plaintiffs' HTOs. The ORR Report alleging this conduct does not even an allege time and place. This is not sufficient under *Ashcroft*.

The FAC fails to go beyond conclusory allegations alluding to a conspiracy among the individual Defendants working at WPRH to maintain the NGRI status of as many patients as possible and for as long as possible. Again, there are no allegations that a specific Hospital Management Defendant committed a violation of a Plaintiffs rights. Thus, Plaintiffs allegations generally and conclusionally that all of the "Hospital Management Defendants" "directed" independent contractor psychologists and "hospital employees" to create false records and perjure themselves in court to secure such court orders are not sufficient.

The ORR Report states that:

> ORR recommends that the NGRI process for evaluating the need for continued hospitalization be reviewed with all treating professionals at WRPH to ensure that only clinically factual information be presented to the courts and recommendations to

> the courts are based upon the criteria established in Section 401 of the Mental Health Code.
>
> During the course of this investigation, ORR determined that the process of using court orders for continued hospitalization to maintain NGRI Committee oversight has become standard practice that is placing the due process rights of individuals who have been found NGRI and placed in the care of [MDHHS] in jeopardy.

(*Id.* at PgID 1082.) Thus, the ORR Report criticized the NGRI process, and alleged, conclusorily, that NGRI Committee oversight has become a "Standard Practice," jeopardizing NGRI confinees' due process rights.

Mary Solky, WPRH Hospital Director, signed the WPRH's October 10, 2017 Response to the ORR's Summary Report of Pelichet's Recipient Rights Complaint. That Complaint had alleged that incorrect or misleading evidence was provided to the Probate Court by treating professionals. (*Id.* at Ex. G, PgID 1083.) In WPRH's October 10, 2017 response to that ORR report, Defendant Solky, in her official capacity as the WPRH Hospital Director, stated:

> The Hospital will review the NGRI process in conjunction with Section 401…with all treating professionals with emphasis on the accuracy of information presented to the courts. The [MDHHS] will attempt to ensure only clinically factual information will be presented to the courts and that clinical recommendations will be based on the criteria for a person requiring treatment. [MDHHS] will review and evaluate the process for continuous hospitalization for NGRI patients.

(*Id.* at 1083.) While this evidences a constructive response to ORR's recommendations, it does not concede that the NGRI Committee (or MDHHS)

concurs in ORR's determinations or its conclusion. Plaintiffs' allegation with regard to the NGRI process is sufficient to deny Defendant's Motion to Dismiss the NGRI Defendants.

With regard to Dr. Stern's conduct, there are no allegations that Defendant Dr. Medoff directed Dr. Stern to conclude that Pelichet, the only Plaintiff whom Dr. Stern evaluated, was a person requiring treatment, or to conduct a "sham evaluation." The conclusory allegation that "[o]n information and belief, it was intended by Defendant Lisa Medoff, and as a result, every clinical examination of an NGRI patient commissioned by Walter P. Reuther Psychiatric Hospital for the purpose of completing a Petition for a Continuing Treatment Order in the past five years has resulted in the" finding that the individual was a "person requiring treatment" under Section 401, is not sufficient. (ECF #44, FAC, PgID 920, ¶199.)[18] Further, there are no allegations that Dr. Medoff discussed Dr. Stern's evaluation of Pelichet with Stern either before or after the hearing. Dr. Medoff is immune for liability for her in-court testimony.

Dr. Bandla, WPRH Chief of Clinical Affairs, who supervises Dr. Medoff and the other WPRH psychiatrists, was copied on Solky's October 10, 2017 response to the ORR Report (FAC, Ex. F, Sep. 8, 2017 Report of Investigative Findings, PgID 1072). The ORR report attached to the FAC had stated that Dr. Bandla told an ORR

investigator that he had reviewed Dr. Stern's testimony from Pelichet's hearing after-the-fact and "noted no problems with it." There are no allegations that Dr. Bandla instructed Dr. Medoff to act in any manner that would violate the Plaintiffs' constitutional or statutory rights or that he had spoken to Dr. Stern before or after Stern's testimony. Dr. Bandla's opinion expressed in that post hoc interview about Dr. Stern's testimony is just that, his opinion _after_ reading Stern's testimony, and that fact does not survive Defendant's Motion to Dismiss Plaintiffs' allegation that Dr. Bandla participated in a deprivation of Due Process.

The FAC further contains general and conclusory allegations that "[i]ndigent and mentally-ill persons institutionalized at [WPRH] are poorly equipped to detect and credibly respond to false or misleading testimony proffered by their treatment professionals." Significantly, Plaintiffs were represented by counsel at each Probate Court hearing. The presiding Probate Court judge determined whether to authorize a continuing HTO or to grant Plaintiffs' petitions for discharge from confinement.

Plaintiffs allege, conclusionally, that "NGRI patients report that their court-appointed attorneys consistently pressure them to waive their rights to trial and stipulate to an additional 1-year hospitalization treatment order," and that Pelichet and Washington's attorneys were paid $130 "to handle their entire civil commitment cases...." (ECF #44, FAC, PgID 922, ¶¶205-06.) That low pay scale does not impel the conclusion that the patient's attorney was guilty of ineffective assistance of

counsel. Further, Plaintiffs' conclusory allegations about patient counsel pressure, is belied by "official" court transcripts evidencing effective cross-examination of Defendant-petitioners by counsel for Plaintiffs. The specific transcript of Pelichet's court hearing, attached to the FAC, indicates that court-appointed counsel vigorously cross-examined Dr. Stern at Pelichet's November 9, 2016 hearing. The fact that the Probate Judge granted WPRH's petition for a continuing HTO does not establish ineffective assistance of counsel. (ECF #44, FAC, Ex. E, PgID 1056-58.) Finally, in 2017, Probate Judges ruled against WPRH petitions for HTOs as to both Pelichet and Ragland, both of whom were then discharged.

## 2. Dr. Charles Stern

Darryl Pelichet is the only Plaintiff bringing claims against Dr. Stern. Because Dr. Stern has testimonial immunity for his statements at the November 9, 2016 hearing on Pelichet's Petition for Discharge, his November 8, 2016 evaluation is the conduct at issue.

Plaintiffs' Complaint against Dr. Stern goes far beyond Pelichet's claim, and sets forth global conclusory allegations that Dr. Stern performed "sham" evaluations on hundreds on patients and concluded that they all required continuing hospitalization. Non-specific, conclusory allegations without names or dates, that Dr. Stern allegedly perjured himself in other patients' cases, do not pass even the low evidentiary standard required on a Defendant's Motion to Dismiss.

The FAC alleges that Dr. Stern's 10 to 20-minute examination of Pelichet, prior to Dr. Stern's hearing testimony, deprived Pelichet of due process and also violated his Eighth Amendment claim of evidencing Dr. Stern's indifference to his medical situation.

That 10-20 minute time factor, in and of itself, does not support the conclusion that Dr. Stern's evaluation was not "bona fide." Further, Plaintiffs have not provided evidence of express, or beyond conclusory claims of a policy requiring Dr. Stern to come to particular conclusion. The ORR investigation report, which included an interview with Dr. Stern, goes well beyond responding to Mr. Pelichet's complaint to provide many conclusory allegations.

Nevertheless, at this stage of the proceedings, considering Plaintiff's allegations and relevant portions of the ORR Reports, the Court will not dismiss Plaintiff Pelichet's claim against Dr. Stern.

### 3. Dr. Aruna Bavineni

Plaintiffs allege that the Dr. Bavineni completed an October 30, 2016 Clinical Certificate that was submitted to the Probate Court stating that Pelichet was a "person requiring treatment," without providing any bases for why he met the criteria, and that she did this per the express or implied instruction of the "Hospital Management Defendants." That is a totally conclusory allegation. Further, that Clinical Certificate does discuss grounds for her conclusions: Pelichet's failure to

comply with his ALS contract terms, superficial cooperation in his treatment, and limited insight into his illness. (ECF #44, FAC, Ex. H, Oct. 30, 2016 Clinical Certificate – Pelichet, PgID 1085-86.) The Probate Court Judge granted WPRH's petition for a continuing HTO after a November 9, 2016 hearing.

Plaintiffs further allege that on April 17, 2017, Dr. Bavineni completed a Six-Month Review Report in connection with Pelichet's Petition for Discharge, which Plaintiffs aver was not supported by facts evidencing that Pelichet posed a threat to himself, but stated instead that Dr. Bavineni had "[s]een and evaluated the patient. Reviewed the medical records and discussed with different treatment team members." (ECF #44, FAC, Ex. I, Apr. 17, 2017 Six-Month Review Report – Pelichet, PgID 1088-89.) The Bavineni Report notes that Pelichet violated his ALS contract and had developed some insight into his mental illness since re-admission to WPRH, but had difficulty "adjusting in the community." Dr. Bavineni also noted that Pelichet "needed to continue in a structured therapeutic setting and learn about the adverse [e]ffects of marijuana abuse on general health and also while taking psychotropic medications which will aggravate the psychotic behavior." (*Id.*)

Plaintiffs further allege that later on May 3, 2017, the day that Dr. Bavineni had testified in Probate Court on Pelichet's petition for discharge, that Pelichet posed an imminent risk of harm to himself and/or others, she completed an internal hospital psychiatric evaluation where she indicated that Pelichet presented "no risk of

violence to himself over the past six months, no risk of violence to others over the past six months, no current or past risk of suicide/violence to self, and no current or past risk of violence to others." (ECF #44, FAC, ¶105, PgID 899; *id.* at Ex. J, May 3, 2017 Internal Psychiatric Evaluation – Pelichet, PgID 1091.) A handwritten note on the cited exhibit that states "5/4/16 Lists one suicide attempt." (*Id.* at Ex. J, PgID 1097.) (It is unclear who wrote that note.) At the same time, that May 3, 2017 internal evaluation also discussed in detail Pelichet's breach of his ALS terms, which included Pelichet's acknowledgment that he left his group home without reporting his destination and failed to obey curfew terms. (*Id.* at Ex. J, PgID 1091.) This information is relevant to her internal evaluation, which also detailed Pelichet's initial NGRI offense (assault) as well as a 2011 ALS violation for threatening individuals verbally.

There are no allegations that anyone directed Dr. Bavineni to draw any conclusion that either Pelichet or Ragland were mentally ill and dangerous, according to the criteria of Section 401.

The FAC allegations against treater Bavineni do not provide allegations sufficient to support a claim that Dr. Bavineni did not exercise accepted professional judgment. Therefore, the Court concludes, taking the facts in the light most favorable to Plaintiffs, the non-moving parties, that the FAC fails to state a claim that

Defendant Dr. Bavineni violated Plaintiff Pelichet's right to Substantive Due Process.

The same is true for Dr. Bavineni's evaluation of Plaintiff Ragland in the Spring of 2017, whose 2016 ALS had been revoked for drinking alcohol and smoking marijuana. Plaintiffs allege that Dr. Bavineni produced a Clinical Certificate stating that Ragland met the definition of a "person requiring treatment." (ECF #44, FAC, PgID 904.) Ragland requested a trial on the petition for an HTO, the Probate Court Judge rejected the hospital's petition, and released Ragland. Again, the FAC contains no factual allegation in Ragland's case that Dr. Bavineni was required to find that Ragland was a "person requiring treatment," nor allegations that Dr. Bavineni, of her own accord, had acted outside the realm of accepted professional conduct. Therefore, while Plaintiffs disagree with Dr. Bavineni's conclusion, they have failed to state a claim that Dr. Bavineni in her individual capacity violated Ragland's Substantive Due Process rights.

### d. Equal Protection Claim - Defendants Bandla, Solky, Albert, Medoff, Bavineni, and Stern

To allege an equal protection claim, Plaintiffs must demonstrate "intentional and arbitrary discrimination" by the state; that is, they must demonstrate that they have "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000).

Plaintiffs allege discrimination based on their NGRI status, but they have not plead that they were treated differently than other NGRI patients or non-NGRI patients. Plaintiffs have not alleged that other similarly situated patients were treated differently by the individual Defendants.

As the Sixth Circuit recently held in *Cahoo v. SAS Analytics, et al.*, 912 F.3d 887, 905 (6th Cir. 2019):

> Plaintiffs failed to state a plausible equal protection claim because Plaintiffs failed to allege that the Individual Agency Defendants intentionally singled them out for discriminatory treatment....

Accordingly, Plaintiffs' equal protection claim is dismissed.

### e. Deliberate Indifference to Medical Needs – Eighth Amendment

Plaintiffs defer to the argument in their Response to Dr. Stern's Motion to Dismiss their Eighth Amendment claims. Plaintiff's Response to Dr. Stern's Motion to Dismiss addresses only Dr. Stern's conduct and the subjective component as to Dr. Stern. An Eighth Amendment claim has two components, one objective and one subjective. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). To satisfy the objective component, the plaintiff must allege that the medical need at issue is "sufficiently serious." *Comstock* at 702-03. To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the plaintiff, that he/she did in fact draw

the inference, and that he/she then disregarded that risk. *Id.* at 703. A plaintiff must allege that officials had "a sufficiently culpable state of mind." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000).

Persons responsible for the health and safety of an institutionalized population exhibit "deliberate indifference to serious medical needs" when they provide "grossly inadequate care," which is defined as "treatment so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 844 (6th Cir. 2002). The Sixth Circuit "has consistently held that damage claims against governmental officials alleged to arise from violations of constitutional rights cannot be founded upon conclusory, vague or general allegations, but must instead, allege facts that show the existence of the asserted constitutional rights violation recited in the complaint and what *each* defendant did to violate the asserted right." *Id.* at 842 (emphasis added).

The Eighth Amendment claim allegations (purportedly brought against "All Defendants") discuss only Drs. Stern and Bavineni *supra* with regards to Plaintiffs' Substantive Due Process claim. Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Here, however, the crux of Plaintiffs' claim is their contention

that they no longer required mental health treatment. *See, e.g., McQuilkin v. Cent. New York Psychiatric Ctr.*, No. 9:08-CV-00975, 2010 WL 3765847, at *17 (N.D.N.Y. Aug. 27, 2010), *report and recommendation adopted*, No. 9:08-CV-00975, 2010 WL 3765715 (N.D.N.Y. Sept. 20, 2010). While it is well established, that charges that amount only to allegations of medical malpractice, and disagreements with respect to medical care do not state an Eighth Amendment claim. *Wright v. Sapp*, 59 F. App'x 799, 801 (6th Cir. 2003). On the other hand the Court concludes that receiving continued hospitalization when an individual is not ill, can amount to deliberate indifference. However, Pelichet's allegations regarding Dr. Bavineni's 2016 Clinical Certificate and 2017 Six-Month Review Report are insufficient to allege deliberate indifference. Dr. Bavineni may not have filled out the April 17, 2017 Six-Month Report and the May 3, 2017 internal psychiatric evaluation with facially consistent conclusions, but it is not contested that they were prepared for different purposes: (1) court: continued hospitalization or not; (2) internal: subsequent treatment modalities if the judge imposed a continuing HTO.

The same is true for her evaluation of Plaintiff Ragland in March or April 2017, whose 2016 ALS had been revoked for drinking alcohol and smoking marijuana. Dr. Bavineni produced a Clinical Certificate allegedly stating that Ragland met the definition of a "person requiring treatment." (ECF #44, FAC, PgID 904.) Ragland requested a bench trial on the petition for an HTO, and the Probate

Court denied the NGRI Committee's petition for continued hospitalization. That legal decision does not impel the conclusion that Dr. Bavineni recklessly disregarded Ragland or Pelichet's serious medical needs.

As for Dr. Stern, Pelichet's allegation that he conducted a single 10-20 minute evaluation, where he concluded that Pelichet met the definition of a "person requiring treatment," does not meet the pleading standard for deliberate indifference even at the Motion to Dismiss stage, nor does it establish that Dr. Stern was of a culpable state of mind in order to satisfy the subjective component of deliberate indifference.

## D. Drs. Bavineni, Medoff and Stern are Entitled to Absolute Witness Immunity for In-Court Testimony

Absolute immunity applies to the performance of certain functions that are integral to the functioning of the judicial system. *See Briscoe v. LaHue*, 460 U.S. 325, 345 (1983). Absolute immunity protects an official from liability even when the official acted with knowledge of a constitutional violation. *Id.* "Testimony at adversarial judicial proceedings is the most historically grounded of these functions which merit absolute immunity." *Gregory v. City of Louisville*, 444 F.3d 725, 738 (6th Cir. 2006) (citing *Briscoe* at 345).

### 1. Dr. Aruna Bavineni

As discussed above, Plaintiffs allege, conclusionally, that Dr. Bavineni falsified records used to support the petitions for HTOs. Testimony as to the content

66

of these records would not shield Dr. Bavineni from liability for a sufficiently alleged constitutional violation. The Sixth Circuit decision in *Gregory v. City of Louisville*, 444 F.3d, at 738, (6th Cir. 2006) rejects the conclusion that Defendants suggest in this case: a defendant would be able to falsify evidence (here, grounds for involuntary civil commitment), and later be immunized from liability for that action by providing testimony as to the falsified evidence. Plaintiffs' allegation that her judgment was wrong, from their point of view does not come close to alleging a deliberate indifference claim under the Eighth and Fourteenth Amendments. Dr. Bavineni would, of course remain entitled to immunity for her in court testimony.

**2. Dr. Lisa Medoff**

Plaintiffs allege that Dr. Medoff hired independent contractor psychologists, and then directed them to complete the Clinical Certificates, Six-Month Review Reports, and testify in court recommending continuing hospitalization orders, "exaggerat[ing] each NGRI patient's present level of dangerousness in order to increase the probability that each NGRI patient's hospitalization treatment order would be renewed." (ECF #44, FAC at ¶¶199, 204.) Yes, Dr. Medoff did hire independent contractor psychologists and psychiatrists. But there is no evidence of her directing them to reach certain results. Plaintiffs further allege with regard to Dr. Medoff's testimony at Pelichet's hearing that Pelichet met Section 401 criteria, that she knew or should have known that, under the statute, self-harm via substance abuse

cannot serve as the basis for meeting the criteria. M.C.L. § 330.1401(2). This claim that substance abuse is not relevant to an assessment of NGRI mental health patients, is absurd. Further, Dr. Medoff has immunity for any such testimony. Plaintiffs have not alleged that Dr. Medoff produced any documents that could establish liability for her out-of-court conduct.

### 3. Dr. Charles Stern

The specific out-of-court non-conclusory allegation against Dr. Stern is the alleged 10-20 minute evaluation prior to his testimony that Pelichet required another year of hospitalization and that ORR wrote that he had examined Pelichet's records, when ORR alleged he did not. Dr. Stern has testimonial immunity, and there are no allegations that he introduced into evidence a Clinical Certificate or produced any other documents in court related to his evaluation of Plaintiff Pelichet.

### E. Title II of the Americans with Disabilities Act (Count II) and § 504 of the Rehabilitation Act (Count III)

Court II of the FAC alleges "Deprivation of Rights Guaranteed by Title II of the Americans With Disabilities Act" against Defendant MDHHS, MDHHS Contractor and Subcontractor Defendants, and Defendant MDHHS Employees (including Nick Lyon n/k/a Robert Gordon) in their official capacities.

The FAC contends that Plaintiffs, all of whom have a mental illness and impairments, and qualify as individuals with a disability under the ADA, have been denied the opportunity "to receive services in the most integrated setting appropriate

68

to their needs . . . more integrated than a closed psychiatric hospital . . . such as substance abuse treatment or home and community based services, an outpatient basis in the community." (ECF #44, FAC, ¶285, PgID 944.) This tracks the language of the ADA statute.

Plaintiffs' request for equitable relief seeks, *inter alia*:

> An Order permanently enjoining all Defendants from administering behavioral health services in a setting that unnecessarily isolates and segregates individuals with disabilities from the community and requiring Defendants to administer behavioral health services in the most integrated setting appropriate to the needs of the individuals with disabilities.

(ECF #44, FAC, ¶2(d), PgID 948-49.)

Given this Court's ruling to continue Plaintiffs' allegations regarding the conduct of NGRI defendants with regard to unnecessary continued confinement, the Court will not dismiss Plaintiffs' ADA claims against the NGRI Defendants.

Court III of the FAC alleges "Violation of Section 504 of the Rehabilitation Act" against Defendant MDHHS, Defendant MDHHS Employees in their official capacities, and CMH Contractor and Subcontractor Defendants. Plaintiff allege that Section 504 of the Rehabilitation Act of 1973, on which the ADA is modeled, sets forth similar protections against discrimination including "protections against unnecessary segregation." (ECF #44, FAC, ¶292, PgID 946.)

As the Supreme Court noted in *Olmstead v. Zimring*, 527 U.S. 581, 590 (1998), "Title II, the public services portion of the ADA, states that 'public entity' includes 'any State or local government' and 'any department, agency, [or] special purpose district' §§12131(1)(A)(B). . . . On redress for violations of §12132's discrimination prohibition, Congress referred to remedies available under §505 of the "Rehabilitation Act." The Supreme Court also noted in *Olmstead* at Page 591 that Congress instructed the Attorney General to issue "regulations . . . applicable to recipients of financial assistance under §504," that includes the requirement that they "administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." *Id.* at 591-92. Thus, the ADA and the Rehabilitation Act could apply to the Plaintiffs in this case.

At the same time, this Court notes the Supreme Court in *Olmstead* concluded:

> "Consistent with these provisions, the State generally may rely on the reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility requirements' for habitation in a community-based program. . . ." Courts normally should defer to the reasonable medical judgments of public health officials."

*Olmstead* at 602.

The Defendant MDHHS's Motion to Dismiss states that Plaintiffs fail to state a claim under the ADA and §504. (ECF #56, PgID 1301.) Defendants cite to *Olmstead* at 607 (1999) which concluded:

> [U]nder Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities

70

> when the State's treatment professionals determine that such placement is appropriate, the affected (sic) persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

Thus, the determination of the State's treatment professionals that such placement is appropriate is the first required consideration, but that, of course does not provide them with a free pass to violate patients' constitutional and statutory rights.

In the instant case, Plaintiffs admit that "medical professionals evaluated and determined that each individual Plaintiff required mental health treatment." (ECF #56, MDHHS Mot., PgID 1302.) But, they allege that "Defendants' design of the NGRI program [The Olszewski Directive] is not reasonable or appropriate. Psychiatric staff believe their role is to keep NGRI patients institutionalized," by engaging "in a pattern and practice of perjury to the probate court to keep NGRI patients hospitalized or under the control of the NGRI Committee." This is highly conclusory, and this Court has concluded that the design of the program contained in the Olszewski Directive is reasonable.

Yes, all NGRI cases seeking continued hospitalization must proceed through the NGRI Committee on their way to Probate Court hearings. But that procedure, on its face, does not violate Plaintiffs' constitutional rights, or the ADA or the Rehabilitation Act. Indeed, there is a compelling justification for the State to funnel final state decision-making on retain/release recommendations to Probate Courts

regarding NGRI committed persons who had been charged with serious assaultive crimes, and then found by NGRI after evidence of serious mental health issues. At the same time, that does not provide immunity to NGRI Committee members, in the face of Plaintiff's allegations and its exhibits in Pelichet's case.

At this Court's March 1, 2019 hearing on the MDHHS Motion to Dismiss, Plaintiff Michigan Protection Advocacy Service ("MPAS") adopted the FAC attack on the "policy":

> We're seeking to have the policy declared invalid…Policy that they must continually seek a hospitalization order regardless of their actual medical need for hospitalization.

(ECF #82, Tr. of Hr'g on MDHHS Mot., PgID 2245.) In response to the Court's question "Does this [policy] go back to the Olszewski order?" MPAS Counsel answered, "Yes, your Honor." *Id.* In response to the Court's follow-up question:

> Court:    You're saying that that [the 2003 Olszewski Directive] created a policy that they must follow?
>
> MPAS:    Yes . . . .

*Id.*

Thereafter, the March 20, 2019 hearing on Defendants Stern and Medoff's Motions to Dismiss, Plaintiffs' Counsel stated that they are seeking injunctive relief "as a whole in this case . . . we want them to rewrite the policy." (ECF #83, Tr. of Hr'g on Stern and Medoff Mots., PgID 2305).

As the Court has previously noted, time and again, the language of the 2003 Olszewski Directive does not create such a policy violating Plaintiffs' rights, so there is nothing to rewrite.

Because Counts II and III seek to enforce the ADA and Rehabilitation Act requirements with regard to the duty of mental health providers to utilize the least restrictive confinement, the Court will permit those allegations in Counts II and III against Robert Gordon, in his official capacity, and the NGRI Defendants to proceed, and DENY the Defendants' Motion to Dismiss these claims.

## VII. CONCLUSION

(1) Defendant Robert Gordon's Motion to Dismiss the Counts I, II, III claims in his official capacity, is DENIED

(2) The MDHHS Hospital Management Defendants Motion to Dismiss Counts I, II, III claims in their official and individual capacities is GRANTED,

(3) The NGRI Committee Defendants' Motion to Dismiss Counts I, II, III in their individual capacity is DENIED,

(4) Defendant Dr. Lisa Medoff's Separate Motion to Dismiss her individual and official capacity claims is also GRANTED,

(5) Defendant Dr. Charles Stern's Separate Motion to Dismiss his individual and official capacity claims is DENIED, except for the Eight Amendment claim, which is DISMISSED.

(6) MDHHS Motion to Dismiss R. Aruna Bavineni in her official and individual

capacity is GRANTED.

IT IS SO ORDERED.

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

DATED: SEP 20 2019