## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**DARRYL PELICHET**, et al.
  Plaintiffs,

v.

**ROBERT GORDON**, et al,
Defendants.

Case No.: 2:18-cv-11385

HON. PAUL D. BORMAN

MAG. ANTHONY P. PATTI

### PLAINTIFFS' RESPONSE TO NGRI COMMITTEE DEFENANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Laurence H. Margolis (P69635)
James M. Gallagher (P73038)
Ian T. Cross (P83367)
Attorneys for Plaintiffs
214 S. Main St., Suite 202
Ann Arbor, MI 48104
Phone: (734) 994-9590
larry@lawinannarbor.com
jim@lawinannarbor.com
ian@lawinannarbor.com

Katherine J. Bennett (P75913)
Darrin F. Fowler (P53464)
*Michigan Dep't of Attorney General*
Attorneys for MDHHS Defendants
P.O. Box 30755
Lansing, MI 48909
Phone: (517) 373-1160
Email: Bennettk1@michigan.gov

Loren D. Blum (P38557)
Law Offices of Christine Greig
Attorney for Defendant Hegira Program
28411 Northwestern Hwy., Suite 640
Southfield, MI 48034
(248) 223-0120
loren.blum@libertymutual.com

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES…………………………………………….………….iii

INDEX OF EXHIBITS………………....……………………………………….v

CONSISE STATEMENT OF ISSUES PRESENTED………………….………………..vi

CONTROLLING OR MOST APPROPRIATE AUTHORITY………….……………vi

ARGUMENT…….…………………………………………………………….1

    I.     INTRODUCTION TO THE NGRI COMMITTEE…..…………………1

    II.    THE NGRI COMMITTEE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' PROCEDURAL DUE PROCESS CLAIMS………………………………….………………….5

    III.   THE NGRI COMMITTEE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' SUBSTANTIVE DUE PROCESS CLAIMS………………………………………………….15


CONCLUSION……………………………………………….…..………...25

ii

<u>TABLE OF AUTHORITIES</u>

# Cases

*Addington* v. *Texas*, 441 U.S. 418 (1979)

*Bills v. Henderson,* 631 F.2d 1287, 1291 (6th Cir. 1980).

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)

*Cleavinger v. Saxner*, 474 U.S. 193 (1985)

*Combs v. Wilkinson*, 315 F.3d 548 (6th Cir. 2002)

*Cummings v. City of Akron*, 418 F.3d 676 (6th Cir. 2005)

*Daniels v. Williams*, 474 U.S. 327 (1986)

*Doe v. Claiborne Cnty.*, 103 F.3d 495 (6th Cir. 1996),

*Foucha v. Louisiana*, 504 U.S. 71 (1992).

*Flying Dog Brewery, LLLP v. Mich. Liquor Control Comm'n*, 597 Fed.Appx. 342 (6th Cir. 2015)

*Gagnon v. Scarpelli*, 411 U.S. 778 (1973).

*Goldberg v. Kelly*, 397 U.S. 254 (1970)

*Goss v. Lopez*, 419 U.S. 565 (1975)

*Howard v. Grinage*, 82 F.3d 1343 (6th Cir. 1996)

*Jackson v. Indiana*, 406 U.S. 715 (1974)

*Johnson v. City of Cincinnati*, 310 F.3d 484 (6th Cir. 2002)

*Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978)

*Moore v. City of East Cleveland*, 431 U.S. 494 (1977)

*Morrissey v. Brewer*, 408 U.S. 471 (1972)

*Parham v. J.R.,* 442 U.S. 584 (1979)

*Peatross v. City of Memphis*, 818 F.3d 233 (6th Cir. 2016).

*People v. McQuillan*, 392 Mich. 511 (1974)

*People v. Portus (In re Portus)*, 325 Mich. App. 374 (2018)

*Robinson v. Bibb*, 840 F.2d 349 (6th Cir. 1988).

*Sallier v. Makowski*, U.S. Dist. LEXIS 23562 at *8 (E.D. Mich. 2002)

*Silberstein v. City of Dayton*, 440 F.3d 306 (6th Cir. 2006)

*Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834 (6th Cir. 2002)

*Truax v. Raich*, 239 U.S. 33 (1915)

*United States v. Lanier*, 520 U.S. 259 (1997)

*Vitek v. Jones,* 445 U.S. 480 (1980)

*Willecke v. Toth*, 2009 U.S. Dist. LEXIS 90318 (E.D. Mich 2009)

*Williams v. Port Huron Sch. Dist.*, 455 Fed. Appx. 612 (6th Cir. 2012)

*Witzke v. Pullins-Govantes*, 397 F. Supp. 3d 975 (E.D. Mich. 2019)

*Witzke v. Marlan*, 2018 U.S. Dist. LEXIS 220221

*Wolff v. McDonnell*, 418 U.S. 539 (1974)

*Wood v. Strickland*, 420 U.S. 308 (1975)

*Young v. Harper*, 520 U.S. 143 (1997)
*Zinermon v. Burch*, 494 U.S. 113 (1990)

## Statutes

Mich. Comp. Laws 330.2050(5)
Mich. Comp. Laws 330.1476
Mich. Comp. Laws 330.1479
Mich. Comp. Laws 330.1482
Mich. Comp. Laws 330.1483

# INDEX OF EXHIBITS

Ex. A- Affidavit of Darryl Pelichet
Ex. B- WRPH Standard Operating Procedure 254
Ex. C- Marway Johnson Deposition
Ex. D- Trial Testimony of Christina Sandie
Ex. E- NGRI Committee Procedures
Ex. F- Progress Notes Re: Revocation ALS Contract for Bonn Washington
Ex. G- Trial Testimony of Mary Scott
Ex. H- Selected NGRI Committee Meeting Minutes -ALS Restrictions
Ex. I- Selected Progress Notes for Plaintiffs
Ex. J- Bavineni Deposition, 9/4/20 (*Video available on request, transcript is not yet available*)
Ex. K- Emails Re: Ragland ALS Revocation
Ex. L- Ragland CMH Progress Notes Re- ALS Revocation
Ex. M- Affidavit of Joshua Ragland
Ex. N- Defendants' Responses to Plaintiffs' First Requests to Admit
Ex. O- Defendants' Responses to Plaintiffs' Third Interrogatories and Second Requests to Admit
Ex. P- Ragland Substitute 6-Month Review Report, 1/28/16
Ex. Q- Selected NGRI Committee Meeting Minutes -ALS Revocation Hearings
Ex. R- Committee Member Emails Re: ALS Return Hearing Outcome
Ex. S- ORR Report Regarding Pattern of Falsified Clinical Certificates
Ex. T- Quality and Compliance Investigation Report
Ex. U- ORR Report Regarding James Blake Allegation
Ex. V- Affidavit of Latasha Stallworth
Ex. W- Affidavit of Mark Alvarez
Ex. X- Affidavit of Dale Crowe
Ex. Y- Affidavit of Darrell Veres
Ex. Z- Affidavit of James Blake
Ex. AA- Handwritten Note from Pelichet Investigative File
Ex. AB- April 2017 Emails Re. Ragland

## CONSISE STATEMENT OF ISSUES PRESENTED

1. Can Board Members be sued under 42 U.S.C. 1983 for their unconstitutional collective actions?

   Plaintiffs answer: Yes.
   Defendants answer: No.

2. Viewing the facts and any inferences reasonably drawn from them in the light most favorable to the Plaintiffs, did the NGRI Committee Defendants, could a reasonable juror find that the NGRI Committee Defendants caused the Plaintiffs to be subjected to a violation of a clearly-established procedural due process right?

   Plaintiffs answer: Yes.
   Defendants answer: No.

3. Viewing the facts and any inferences reasonably drawn from them in the light most favorable to the Plaintiffs, did the NGRI Committee Defendants, could a reasonable juror find that the NGRI Committee Defendants caused the Plaintiffs to be subjected to a violation of a clearly-established substantive due process right?

   Plaintiffs answer: Yes.
   Defendants answer: No.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*Foucha v. Louisiana*, 504 U.S. 71 (1992)
*Zinermon v. Burch*, 494 U.S. 113 (1990)
*Silberstein v. City of Dayton*, 440 F.3d 306 (6th Cir. 2006)
*Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834 (6th Cir. 2002)

## I.   INTRODUCTION TO THE NGRI COMMITTEE

MCL 330.2050(5) is the only statutory grant of authority to the NGRI Committee. That

statute reads, in its entirety:

> **The release provisions of sections 476 to 479 of this act shall apply** to a person
> found to have committed a crime by a court or jury, but who is acquitted by reason
> of insanity, **except that** a person shall not be discharged or placed on leave without
> first being evaluated and recommended for discharge or leave by the department's
> program for forensic psychiatry, and authorized leave or absence from the hospital
> may be extended for a period of 5 years.

MCL 330.2050(5) (emphasis added).

By its very terms, MCL 330.2050(5) qualifies "the release provisions of sections 476 to

479," which are not the sole means by which persons civilly-committed for mental illness

can be released. *See People v. Portus (In re Portus)*, 325 Mich. App. 374, 400-01 (2018).

In relevant part, Sections 476 to 479 grant the Directors of Michigan's three regional

psychiatric hospitals discretionary authority to discharge any civilly-committed patient

during the term of a treatment order "whom the hospital director considers clinically

suitable for discharge," MCL 330.1476(1), and mandate discharge of any patient who "no

longer meets the criteria of a person requiring treatment." MCL 330.1476(2). Section 479

permits hospital directors to place patients on leave from a hospital, while mandating

discharge of any patient "who has been on an authorized leave or absence from the hospital

for a continuous period of 1 year." MCL 330.1479. Together, Sections 476-479 provide

procedural mechanisms for discharging a patient while a treatment order is in effect

1

"without requiring a court order sanctioning the discharge." *In re Portus*, 325 Mich. App. at 401.

When read in conjunction with sections 476 to 479, it becomes apparent that MCL 330.2050(5) has two functions. First, it modifies the time limit imposed by MCL 330.1479 for mandatory discharge of a person on continuous leave from a hospital if that person is an NGRI patient. Second, it gives the NGRI Committee veto power over any decision by a hospital director to unilaterally place on leave or discharge an NGRI patient during a term of court-ordered hospitalization. This is the only power granted to the NGRI Committee by the statute. The broader reading of the second clause of MCL 330.2050(5), prohibiting *any* discharge or leave for an NGRI patient without a "recommend[ation] for discharge" from the NGRI Committee, would be unconstitutional. *See People v. McQuillan*, 392 Mich. 511, 539 (1974) (applying equal protection analysis of *Jackson v. Indiana*, 406 U.S. 715 (1974) to Michigan's NGRI program).

Yet, the NGRI Committee does not limit its oversight activities to reviewing requests from hospital directors to discharge NGRI patients in the absence of probate court involvement. Regional-hospital staff require NGRI Committee approval for any significant change in the restrictiveness of the patient's treatment setting, including allowing the patient greater freedom of movement *within* Walter P. Reuther Psychiatric Hospital ("WRPH"). (Ex. A- Affidavit of Darryl Pelichet; Ex. B- WRPH SOP 254, pg. 2, Standard L). The NGRI Committee sets and approves the conditions of Authorized Leave Status ("ALS"), (Ex. C- Johnson Deposition, pg. 38-41; Ex. D- Trial Testimony of

2

Christina Sandie, pgs. 76, 80-81[1]), determines if a patient on ALS violated the conditions, and decides if the alleged violation warrants revocation of ALS and return to hospitalization. (Ex. E- NGRI Committee Procedures, Pg. 26; Ex. F- Progress Notes Re: Revocation ALS Contract for Bonn Washington; Ex. B- WRPH SOP 254, pg. 8). The NGRI Committee exercises a high level of control over NGRI patients on ALS. The Committee determines where ALS patients can live, whether they are allowed to leave their home, and whether they can drive a car, go to school, or get a job. (See Ex. G- Trial Testimony of Mary Scott, pgs. 6-7, 12-13; Ex. H- Selected NGRI Committee Meeting Minutes[2]; Ex. I- Selected Progress Notes for Plaintiffs).

The NGRI Committee also exercises control over the treatment recommendations made to the probate court by psychiatrists at regional psychiatric hospitals. WRPH's official NGRI Standard Operating Procedure requires that "[r]ecommendations to the Court for release from hospitalization or alternative treatment shall be forwarded to the NGRI Committee for review **and approval before filing and/or court appearance.**" (Ex. B- WRPH SOP 254, pg. 3, Standard W) (emphasis added); *See also* Deposition of Dr. Aruna Bavineni at 18:10-20:11).[3] Finally, the NGRI Committee and its liaisons attempt

---

[1] Sworn testimony from another case can be used in the same manner as an affidavit to oppose a motion for summary judgment, regardless of whether the transcript would be admissible at trial. *See Willecke v. Toth*, 2009 U.S. Dist. LEXIS 90318 at *5-6 (E.D. Mich. 2009).

[2] The NGRI Committee Defendants have not yet produced meeting minutes for any meetings that took place later than 2014.

[3] Plaintiffs took Dr. Bavineni's deposition on 9/4/2020 and possess a video recording, but the transcript is not yet available. Plaintiffs will cite to the video which they can produce upon request. Alternatively, the transcript can be filed in ECF when it is received.

to screen the information that psychiatrists and social workers can share with the probate court. (Ex. E- NGRI Committee Procedures Pg. 7; Ex. K- Emails Re: Ragland ALS Revocation).

NGRI Committee Defendants filed a Motion to Dismiss on Oct. 12, 2018, in which they asserted that they were entitled to qualified immunity because the relevant constitutional rights were not clearly-established. (ECF No. 56, page.ID 1303-1306). That motion was granted in part and denied in part. It was denied with respect to the individual-capacity substantive and procedural due process claims against the NGRI Committee Defendants. (ECF No. 87, Page.ID 2415). The core allegation relevant to the substantive due process claim against the NGRI Committee Defendants is that:

> [Plaintiffs] were detained as NGRI patients subject to continuing HTOs routinely, year after year, regardless of whether they met the two requirements for involuntary civil commitment according to both state law, and federal and state constitutional rights, i.e., failure to establish that they were 1) mentally-ill; and 2) a danger to themselves or others.

Opinion and Order, ECF No. 87, Page.ID 2389.

The allegation relevant to the procedural due process claims is that the NGRI Committee revoked Plaintiffs' Authorized Leave Status ("ALS") without providing procedural due process protections. (ECF No. 87, Page.ID 2391). Specifically, the Court found that "[t]here are plausible allegations that the members of the NGRI Committee authorized, approved, or knowingly acquiesced in conduct in violation of the Constitution, the ADA, and the Rehabilitation Act." (ECF No. 87, Page.ID 2390). The NGRI Committee

4

Defendants now move for partial summary judgment on the individual-capacity claims for substantive and procedural due process violations on the basis of qualified immunity.

## II.     PROCEDURAL DUE PROCESS

Defendants raise several qualified-immunity arguments relating to Plaintiffs' procedural due process claims. First, citing *Williams v. Port Huron Sch. Dist.*, 455 Fed. Appx. 612 (6th Cir. 2012) and *Doe v. Claiborne Cnty.*, 103 F.3d 495 (6th Cir. 1996), The NGRI Committee Defendants argue that they cannot be held liable in their individual capacities for actions they took collectively as a group. This is not the law.  Members of government boards and committees are routinely held individually liable under Section 1983 for actions they take collectively that violate the rights of others. *See, e.g. Silberstein v. City of Dayton*, 440 F.3d 306 (6th Cir. 2006) (denying qualified immunity to civil service board members for terminating plaintiff without pre-deprivation hearing); *Flying Dog Brewery, LLLP v. Mich. Liquor Control Comm'n*, 597 Fed.Appx. 342 (6th Cir. 2015) (reversing grant of qualified immunity in First Amendment damages claims against members of Liquor Control Commission for denying approval of "Raging Bitch" beer label); *Cleavinger v. Saxner*, 474 U.S. 193 (1985) (individual liability imposed on members of prison disciplinary board for due process violation); *Wood v. Strickland*, 420 U.S. 308 (1975) (school board members can be held individually liable under 1983 for collectively violating students' due process rights).

*Williams*, and the case it cites on this point, *Doe v. Claiborne Cnty.*, 103 F.3d 495 (6ᵗʰ Cir. 1996), involved failure-to-protect claims against school board members. *Williams* concerned student-on-student racial harassment, while *Claiborne* concerned teacher-on-student sexual abuse. The *Claiborne* board members could not have actively participated by "encourage[ing] . . . authoriz[ing], approv[ing], or knowingly acquiesc[ing]" in the unconstitutional conduct, because they "had no knowledge, constructive or otherwise," of the sexual abuse. *Id*. at 513. The reason that school board members in these cases could not be held individually liable for failing to act is because "a 'duty' under 'color of law' must be a distinct element of a section 1983 case alleging a 'failure to act.'" *Claiborne*, 103 F.3d at 512. "In the absence of a duty there is no section 1983 liability because the failure to act cannot be said to have occurred under color of state law." *Id*. (emphasis added).

Here, the NGRI Committee members clearly acted under color of state law when they revoked Plaintiffs' ALS contracts and ordered them confined in a state hospital. An email chain concerning Plaintiff Ragland (Exhibit K) illustrates the revocation process. In January of 2016, Mr. Ragland was living with his mother on ALS and receiving outpatient services from Monroe County Community Mental Health ("Monroe CMH"). On January 13, 2016 at 10:59 AM, forensic liaison Evette Carroll sent a lengthy email to Defendant Dr. Craig Lemmen, the Chairman of the NGRI Committee at the time. Ms. Carroll reported that she had contacted Monroe CMH on 1/11/16 to request that Mr. Ragland be

transported to WRPH for admission, based on information contained in a 90-day report prepared by the CMH. She also wrote:

> "I asked that the Six Month Review be brought with the patient to WRPH **and not filed in court** due to an issue with a recent WRPH NGRI/ALS patient who was discharged from treatment as a result of information contained in that patient's six month review." (Emphasis added).

The filing of Six-Month Review Reports with the probate court is required by state law. MCL 330.1483. The purpose of the Six-Month Review report is to determine whether a person subject to a one-year involuntary treatment order continues to meet the statutory criteria for involuntary mental health treatment after six months. MCL 330.1482. Later in the same email, Ms. Carroll reports with alarm that on 1/12/16, "I received the Six Month Review stating, **'the individual should be discharged from the treatment program.'**" (emphasis in original). She then requests the "immediate assistance" of Defendant Dr. Lemmen to facilitate Mr. Ragland's return to WRPH.

Dr. Lemmen responds, at 11:28 AM, "how can I be of help?"

Ms. Carroll replies, at 11:37 AM, "I would like the committee to put something in writing stating that due to ALS violations he needs to be admitted to WRPH."

To which Dr. Lemmen responds at 11:42 AM, "Please make it so."

Dr. Lemmen copied the NGRI Committee's administrative assistant, Deborah Brock, on his "Please make it so" email. Ms. Brock then produced documentation indicating that the NGRI Committee recommended that Mr. Ragland be returned to WRPH. Mr. Ragland was arrested at his home the following day and transported to WRPH, where he remained confined for eleven months. (Ex. L- Ragland CMH Progress Notes Re- ALS Revocation; Ex. M- Affidavit of Joshua Ragland). Defendants admit that Mr. Ragland did not receive notice or a hearing at which he could contest the revocation of ALS. (Ex. N- Defendants' Responses to Plaintiffs' First Requests to Admit, #1, #2; Ex. O- Defendants' Responses to Plaintiffs' Third Interrogatories and Second Requests to Admit). Shortly after Mr. Ragland's admission to WRPH, the hospital prepared its own 6-Month Review Report, which it filed in probate court. The hospital's report predictably found that Mr. Ragland was committable under every available statutory basis. (Ex. P- Ragland Substitute 6-Month Review Report, 1/28/16).

The NGRI Committee Defendants had actual or constructive knowledge that patients returned to WRPH did not receive the opportunity to contest revocation of ALS. Kalamazoo Psychiatric Hospital ("KPH"), which performs the same function as WRPH on the west side of the State, does afford its ALS returnees access to court hearings. Each time a KPH returnee contested their ALS revocation, the NGRI Committee was notified of the hearing, they sent a letter containing their recommendations in regards to the patient to the presiding probate court judge, and they were notified afterwards of the outcome. (Ex. Q- Selected NGRI Committee Meeting Minutes, Items 13, 33; Ex. R- Committee

8

Member Emails Re: ALS Return Hearing Outcome). From January 2015 to April 2018, the Committee remanded 46 NGRI patients on ALS to KPH and 30 of those patients exercised their right to a hearing. The Committee remanded 65 NGRI patients on ALS to WRPH in the same time period, but none of those patients received a hearing. (Ex. O-Defendants' Responses to Plaintiffs' Third Interrogatories and Second Requests to Admit). Since hearings were held for the approximately two-thirds of KPH returnees that requested them, but were never held for WRPH returnees for at least several years, an inference can be drawn that the Committee members were aware that hearings were not being afforded to the individuals that they remanded to WRPH.

The NGRI Committee Defendants' second argument[4] with respect to the procedural due process claims is that they are not responsible for depriving the Plaintiffs of their liberty interests without notice and a hearing, since a Michigan court rule requires the hospital director (a dismissed defendant), not the NGRI Committee, to provide ALS returnees with the paperwork necessary to contest their return. However, the "relevant action" in a procedural due process claim is the defendants' "deliberate decision to deprive the [plaintiff] of [a protected liberty interest], not their hypothetically negligent failure to

---

[4] The NGRI Committee Defendants also argue that each Defendant can only be held liable for the Committee Members' collective actions during the time period when that Defendant served on the Committee. Plaintiffs are in agreement on this point, but it is of little practical significance. Every named NGRI Committee Defendant was on the Committee during at least one of the ALS revocations at issue. Since the State typically insures its employees for liability with respect to acts and omissions in the course of their employment, it matters little to each Plaintiff which individual Committee Defendants participated in each decision to return him to confinement.

9

accord him the procedural protections of the Due Process Clause." *Daniels v. Williams*, 474 U.S. 327, 334 (1986). If the deprivation of liberty was intentional, it does not matter if the failure to provide process was negligent, or even blameless. *See Howard v. Grinage*, 82 F.3d 1343, 1351 (6th Cir. 1996) ("We know of no authority for the proposition that an intentional deprivation of life, liberty or property does not give rise to a due process violation because the failure to provide due process [may have been] without fault.") *See also, Witzke v. Marlan*, 2018 U.S. Dist. LEXIS 220221 at *18 (Patti, J.) (recommending partial summary judgment for *pro se* parolee plaintiff against defendant "Parole Violation Specialist," when defendant ordered him confined in the Detroit Reentry Center for drug treatment for 139 days due to an alleged parole violation, plaintiff did not receive a parole violation hearing, and MDOC Policy Directives cited by defendant assigned responsibility for scheduling parole violation hearings to a different official).

Finally, the NGRI Committee Defendants argue that Plaintiffs' rights to notice and a hearing when their ALS status was revoked was not clearly-established under federal law.[5] "In order for a constitutional right to be clearly established, there need not be a case with the exact same fact pattern, or even "fundamentally similar" or "materially similar" facts, rather, the question is whether the Defendants had "fair warning" that their actions were unconstitutional." *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005). "General statements of the law are not inherently incapable of giving fair and clear

---

[5] This issue was extensively briefed by the parties two years ago. See ECF No. 69, Page.ID 2039-2043.

warning . . . a general constitutional rule identified in the decisional law may apply with obvious clarity to the conduct in question, even though the very action in question has not previously been held unlawful." *United States v. Lanier*, 520 U.S. 259, 271 (1997). Fair warning can be provided by a United States Supreme Court case, a case decided in a United States Court of Appeals, or a case in the highest state court in the state where the case against the defendant asserting qualified immunity arose. *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988).

Returning the Plaintiffs to long-term confinement in a psychiatric hospital on the basis of alleged violations of their ALS Contracts, without providing any sort of procedural due process at all, is clearly unconstitutional. The Constitution typically "requires *some* kind of a hearing before the state deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). *See also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("[T]he root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing *before* he is deprived of any significant [protected] interest.") (emphasis in original) (citations and internal quotations admitted); *Parham v. J.R.,* 442 U.S. 584, 606-07 (1979) (holding that a neutral physician must determine that statutory admission standard is met before confinement of child in mental hospital); *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 18 (1978) (holding that a hearing is required before cutting off utility service); *Goss v. Lopez*, 419 U.S. 565, 579 (1975) (requiring informal hearing before suspending students from school and concluding that, at minimum, due process requires "*some* kind of notice and . . . *some*

kind of hearing" (emphasis in original)); *Wolff v. McDonnell*, 418 U.S. 539, 557-58 (1974) (requiring hearing before forfeiture of prisoner's good-time credits); *Fuentes v. Shevin,* 407 U.S. 67, 80-84 (1972) (requiring hearing before issuance of writ allowing repossession of property); *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970) (requiring hearing before termination of welfare benefits).

After establishing that the Due Process Clause requires *some* kind of notice and *some* kind of hearing either before or shortly after the state deprives a person of any substantial liberty or property interest, the *Zinermon* Court made clear that: "there is a substantial liberty interest in avoiding confinement in a mental hospital." 494 U.S. at 131. *See also Vitek v. Jones*, 445 U.S. 480, 491-492 (1980) (finding that commitment to a mental hospital entails "'a massive curtailment of liberty'" and requires due process protection); *Parham*, 442 U.S., at 600 (finding a "substantial liberty interest in not being confined unnecessarily for medical treatment"); *Addington v. Texas*, 441 U.S. 418, 425 (1979) ("Civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection"); *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) (due process requires at least that the nature and duration of commitment to a mental hospital "bear some reasonable relation to the purpose" of the commitment).

Per *Zinermon,* it is clearly established that 1) some kind of notice and some kind of hearing are required before or shortly after the state deprives a person of any substantial liberty interest and 2) an individual's interest in avoiding 149 days of involuntary confinement in a mental hospital is a substantial liberty interest. Thus, involuntarily

confining a person in a mental hospital for months without providing an opportunity for *some* kind of notice and *some* kind of hearing is clearly a procedural due process violation.

Defendants argue that the right to notice and a hearing is not "clearly established" in the context of revocations of 'Authorized Leave Status' for Michigan NGRI patients. But Plaintiffs are not required to show prior caselaw holding that the Due Process Clause applies to the specific state-created conditional liberty interest at issue in this case. Whenever a state creates a meaningful liberty interest, "the due process clause acts to ensure that the state-created right is not arbitrarily abrogated." *Bills v. Henderson,* 631 F.2d 1287, 1291 (6th Cir. 1980). The Supreme Court held in *Morrissey v. Brewer*, 408 U.S. 471 (1972) that the Due Process Clause protects even conditional liberty interests that a state body has broad discretion to grant or deny, such as parole. A parolee facing revocation of his conditional liberty interest must receive, at a minimum,

> "(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole."

*Morrissey*, 408 U.S. at 489 (1972).

The specific procedural due process protections mandated in *Morrissey* apply to the revocation of other conditional liberty interests besides parole, such as probation. *See Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973). These *specific* protections, not merely *some* kind of notice and *some* kind of hearing, are also applicable to programs that

13

resemble parole, regardless of how the state classifies the program. It does not matter if the state claims that the program is not parole, or if the state classifies the program participants as technically "in custody" or "on leave" from the institution where they are confined. *See Young v. Harper*, 520 U.S. 143 (1997); *see also, Sallier v. Makowski*, U.S. Dist. LEXIS 23562 at *8 (E.D. Mich. 2002) (holding that the applicability of *Morrissey* is determined "not by the label the state places on a particular release program, but rather whether the status of participating offenders is *functionally* similar to parole.")

*Young v. Harper* is applicable to "parole-like" programs in general, not merely to the specific Oklahoma program at issue in that case. Defendants argument that the Plaintiffs' procedural due process rights are not established in a sufficiently "particularized" sense, since the Sixth Circuit has not specifically held that Michigan NGRI patients on 5-year ALS Contracts have a due process right to notice and a hearing when they are returned to confinement for allegedly violating their contracts, would render *Young* essentially meaningless. What matters for the purpose of a due process analysis is not how the State labels or administratively classifies its procedure, but rather whether the State has abrogated a conditional liberty interest which, "although indeterminate, includes many of the core values of unqualified liberty," such that its termination "inflicts a grievous loss on the [plaintiff] and often on others." *Witzke v. Pullins-Govantes*, 397 F. Supp. 3d 975, 980 (E.D. Mich. 2019).

Indeed, confinement in a psychiatric hospital is such an extreme deprivation of liberty that procedural due process protections are required *even when a person is already in*

14

*custody.* The Supreme Court has held that a mentally ill convicted felon, who was first transferred from a Nebraska prison to a state psychiatric hospital, and later from the state psychiatric hospital to the "psychiatric ward of the penal complex," had a protected liberty interest in not being returned from the penal complex to the state psychiatric hospital without notice and a hearing. *See Vitek v. Jones*, 445 U.S. at 492-93 (1980). If a convicted felon serving his sentence has a substantial liberty interest in not being returned to a psychiatric hospital from prison, no reasonable person could believe that the Plaintiffs do not have a substantial liberty interest in not being returned to a psychiatric hospital from their own homes after years of living in the community.

## III.   SUBSTANTIVE DUE PROCESS

The Due Process Clause contains a substantive component that "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Zinermon v. Burch,* 494 U.S. 113, 125 (1990). Among those arbitrary, wrongful actions is the continued involuntary confinement of a non-dangerous mentally-ill person. *Foucha v. Louisiana*, 504 U.S. 71, 77 (1992). In other words, an insanity "acquittee may be held as long as he is both mentally-ill and dangerous, but no longer." *Id*. The unconstitutionality of involuntarily confining non-dangerous mentally-ill persons, regardless of procedural fairness, was clearly established law at all times relevant to this action and Defendants have offered no serious argument to the contrary.

15

It was further clearly-established at all relevant times that treatment decisions for involuntarily-committed mental patients must be based on the actual exercise of "accepted professional judgment" by the relevant treating professional. *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 849 (6th Cir. 2002) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)). Plaintiffs alleged that they were subjected to petitions for one-year Hospitalization Treatment Orders, "routinely, year after year, regardless of whether they met the two requirements for involuntary civil commitment according to both state law, and federal and state constitutional rights." (ECF No. 87, Pg.ID 2389). Essentially, Plaintiffs alleged that the State's treating professionals repeatedly railroaded them through the civil commitment process without making any effort to determine whether they were actually mentally ill and dangerous. This conduct violates both their rights to treatment decisions based on professional judgment, and their right to not to be civilly-committed if they do not meet the constitutional requirements for involuntary civil commitment. The Court has already found that this conduct, if proven, would violate the Plaintiffs' clearly-established substantive due process rights. (ECF No. 87, Page.ID 2391).

The NGRI Committee Defendants argue that the conditions they placed on NGRI patients who were on ALS contracts in the community did not violate clearly-established constitutional rights. These conditions went far beyond requiring the Plaintiffs to take psychotropic medication and participate in mental health treatment, and some conditions did in fact infringe upon clearly-established substantive due process rights. *See, e.g. Moore v. City of East Cleveland*, 431 U.S. 494, 499 (1977) (substantive due process right

16

to reside with family members); *Truax v. Raich*, 239 U.S. 33 (1915) (substantive due process right to "work for a living in the common occupations of the community,"); *Johnson v. City of Cincinnati*, 310 F.3d 484, 496 (6th Cir. 2002) (substantive due process rights to intrastate and interstate travel). But at its core, this is a straw-man argument. It sidesteps the primary allegations of substantive due process violations in this case: that an "automatic-HTO-petition" custom or practice exists for NGRI patients, that professional judgment is not exercised when the recommendations for continuing hospitalization are made, and the NGRI Committee Defendants were the enforcers of these unconstitutional practices, or at the very least encouraged, implicitly authorized, approved, or knowingly acquiesced in the relevant conduct.

Although the discovery process has barely begun, substantial admissible evidence has already emerged to indicate that an "automatic-HTO-petition" custom or practice exists for NGRI patients, that professional judgment is not exercised when treatment recommendations are made, and that the NGRI Committee Defendants were the driving force behind a pattern of constitutional violations. Defendants have admitted that for a 3-year and four-month period immediately preceding the commencement of this action, no NGRI patient housed at, or on ALS from, WRPH ever received a probate court recommendation from the NGRI Committee for anything other than a one-year hospitalization order. (See Ex. N, Requests to Admit 24-29). They admitted that every clinical certificate that the Department filed for an NGRI patient housed at WRPH recommended either continuation of an existing one-year hospitalization treatment order

or a new hospitalization treatment order. (Ex. N, Request to Admit 23). There is a considerable body of evidence from which a jury could conclude that many of the annual psychiatric evaluations of NGRI patients, which are ostensibly done to determine 1) if the patient is still both mentally-ill and dangerous, and 2) if so, whether the patient could be treated on an outpatient basis, were not actually conducted. (Exhibits S, T, U, V, W, X, Y, Z).

Dr. Aruna Bavineni, the psychiatrist who performed (or claims to have performed) these evaluations for several of the Plaintiffs, testified that she did not determine what treatment recommendations were submitted to the probate court. (Bavineni Dep. at 17:50-20:00). She testified that she could not report to the probate court that in her opinion, an NGRI patient did not meet civil commitment criteria without the approval of management, and that the "NGRI Board" has final authority to determine what treatment the NGRI patients require. (Bavineni Dep. at 19:20) ("Patients are NGRI, NGRI Board has final authority.") Dr. Bavineni testified that the Clinical Certificate SCAO forms that she uses to report the results of her evaluations to the probate court are placed in her mailbox at WRPH with her purported "findings" that the patient is mentally-ill and requires continuing hospitalization **already filled in by someone else.** (Bavineni Dep. at 32:45-34:47). She merely completes the sections listing the reasons for those findings. Dr. Bavineni submitted these forms to the probate court to certify that in her professional opinion, the patient is mentally-ill, reasonably likely to seriously physically injure someone in the near future, and cannot be treated in a less restrictive setting than a

psychiatric hospital. A reasonable jury could conclude from Dr. Bavineni's testimony that her role in the process was to find a reason to justify each NGRI patient's continued hospitalization, not to determine whether continued hospitalization was warranted.

Marway Johnson, a social worker at WRPH, made statements in the presence of Residential Care Aide Brianne Timosevic, WRPH patient M.O., and Recipient Rights investigator Enid Reed indicating that she "had been told, that is my job" to write whatever was necessary in the petition for a hospitalization order, and if called to testify, to say whatever was necessary in court to keep NGRI patients in the hospital. She reportedly said to a group of patients, "I will always say something bad about you when I go to court **because my job is to keep you here.** It doesn't matter how good you are doing, I will always say something bad because you will never do any good in the community." (ECF No. 44, Page.ID 1112) (emphasis added). Ms. Johnson testified that her supervisor is Evette Carroll (Ex. C- Johnson Deposition, pg. 39), who is the NGRI Committee Liaison for WRPH. Although Ms. Johnson denied or claimed not to remember making these statements, (Ex. C- Johnson Deposition, pg. 35-38), Ms. Reed, Ms. Timosevic, and patient M.O. all reported hearing Ms. Johnson make the statements. (ECF No. 44, Page.ID 1111-1113)[6]. Ms. Johnson testified that she completes petitions for hospitalization even for NGRI patients who meet WRPH's internal discharge criteria. (Ex. C- Johnson Deposition, pg. 24). She testified that she has recommended alternatives to hospitalization, such as

---

[6] Plaintiffs took Ms. Reed's deposition on 8/28/2020. The transcript is not yet available. Ms. Reed testified at her deposition that the quotations in this report are accurate and that the anonymous staff member she quoted was Brianne Timosevic.

19

Assisted Outpatient Treatment Orders, in petitions to the probate court for some of her patients, but not for her NGRI patients. (Ex. C- Johnson Deposition, pg. 22-23). She testified that she has only recommended one-year hospitalization orders for NGRI patients. (Ex. C- Johnson Deposition, pg. 24).

Enid Reed is an Office of Recipient Rights ("ORR") investigator who has worked in WRPH since 2013. She testified at her deposition that the hospital has a custom or practice of automatically petitioning for one year of additional hospitalization for every NGRI patient, every year, regardless of whether the patient meets civil commitment criteria. Ms. Reed testified that she had a meeting with the Hospital Director and the Director of Psychiatry on April 28, 2017. In that meeting, both executives confirmed that "the petition [for a one-year hospitalization order] is purposely misleading in regards to some patients to prevent discharge from hospital after court." (Ex. AA- Reed Handwritten Note from Pelichet Investigative File).[7] She testified that other hospital staff had told her the same thing, and that the Director of Psychology further reported that the probate court civil commitment process for NGRIs is "just a formality."

ORR conducted multiple investigations into whether perjury occurred in Plaintiff Darryl Pelichet's probate court hearings and whether his treatment professionals falsely documented that Mr. Pelichet the met civil commitment criteria "in an attempt to ensure that Mr. Pelichet remain on a one year continuing treatment order due to his NGRI status." (ECF No. 44, Page.ID 1066). ORR's investigative reports are admissible under FRE

---

[7] Ms. Reed testified that the note was in her handwriting and that its contents were true.

803(8). *See Combs v. Wilkinson*, 315 F.3d 548, 555-56 (6th Cir. 2002). Numerous WRPH staff members interviewed over the course of the August-September 2017 investigation indicated that the NGRI Committee requires the hospital to petition for one-year continuing hospitalization treatment orders for all NGRI patients. Dr. Hanumaiah Bandla, the Director of Psychiatry, reported that "patients who are NGRI need to have an order for hospitalization to maintain their NGRI status but he could not provide the basis for this requirement other than the NGRI Committee." (ECF No. 44, Page.ID 1072). Dr. Lisa Medoff, the Director of Psychology, reported that "it was the NGRI Committee who determines the length of the [treatment] order needed 'as far as I know.'" (ECF No. 44, Page.ID 1070). Dr. Aruna Bavineni, consistent with her recent deposition testimony, "stated that the NGRI Committee decides if a one year court order is needed." (ECF No. 44, Page.ID 1071). The report concludes that "the process of using court orders for continuing hospitalization to maintain NGRI Committee oversight has become standard practice that is placing the due process rights of individuals who have been found NGRI . . . in jeopardy." ECF No. 44, Page.ID 1076).

The emails produced concerning Plaintiff Ragland provide further evidence of the NGRI Committee's role in the petitioning process. A jury could reasonably infer from the January 2016 emails exchanged between Ms. Carroll and Defendant Lemmen (Ex. K) that they sought Mr. Ragland's immediate rehospitalization not because he allegedly drank beer or smoked marijuana on one occasion, but rather to prevent Monroe CMH from reporting to the probate court that Mr. Ragland did not meet the statutory criteria for

21

involuntary treatment. Ms. Carroll and Defendant Lemmen appeared to be rehospitalizing Mr. Ragland not out of concern for his safety, but rather to prevent his impending discharge.

This inference is strengthened by considering the emails exchanged after the probate court denied a petition for continuing involuntary treatment for Mr. Ragland in April 2017. (Ex. AA- April 2017 Emails Re. Ragland). After the hearing, Ms. Carroll emailed various parties at CFP, including Dr. Lemmen, to inform them of the denial of the petition. One minute after receiving the news, Defendant and NGRI Committee member Kelli Shaefer lamented,

"Another Monroe County NGRI lost to the court…"

On April 24, Ms. Carroll explained to the group why they "lost" Mr. Ragland. According to her, Monroe CMH refused to petition for a continuing hospitalization order for Mr. Ragland because "they had no reason to state in court that he should remain on a hospitalization order." Ms. Carroll submitted a petition for continuing hospitalization herself after Mr. Ragland's treatment providers refused to do so, enlisting Dr. Bavineni to complete a clinical certificate. Mr. Ragland's treatment providers attended the probate court hearing and testified that he did not meet involuntary treatment criteria. This "contributed to the judge's decision to deny the petition." The next day, Defendant Lemmen replied to Ms. Carroll, writing, "Should we notify Cindy Kelly of this perpetual

problem?" To which Ms. Carroll responded, "I think that would be a great idea." Defendant Lemmen replied, "Then would you do it?"

Cynthia Kelly was, at the time, the Director of the Bureau of Hospitals and Administrative Operations for MDHHS. Plaintiffs have requested production of Ms. Carroll's correspondence with Ms. Kelly relating to this incident, but have not yet received it. Based on these emails, a reasonable jury could conclude that the NGRI Committee Defendants attempted to exercise control over the recommendations that psychiatrists at regional hospitals and CMH providers proffered to probate courts, in an effort to prevent NGRI patients from being "lost to the court."

The NGRI Committee Defendants claim that they cannot be held liable for the "automatic petition" custom or practice because they do not "personally file petitions for involuntary treatment with the probate court—they just make recommendations to the probate court." (ECF 128, Page.ID 2926). However, Section 1983 states that every person acting under color of law who "subjects, or causes [a person] to be subjected" to deprivation of constitutional rights "shall be liable to the party injured[.]" *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016). The defendant need not personally commit the wrongful act; encouragement, authorization, approval, and knowing acquiescence are all sufficient to confer liability. *Id.* There is a genuine issue of material fact regarding whether the NGRI Committee Defendants encouraged, authorized, approved, or knowingly acquiesced in a custom or practice of automatically petitioning for hospitalization for every NGRI patient, every year. A reasonable jury could even conclude

23

that the NGRI Committee were the primary enforcers of an "automatic petition" practice, which is more than sufficient to confer liability.

The NGRI Committee Defendants further argue that they could not have violated the Plaintiffs' rights because "ultimately a state probate court, not the NGRI Committee Defendants, decides whether to continue Plaintiffs' hospitalization orders." (ECF 128, Page.ID 2927). This is not new information uncovered in discovery. It is the same argument these Defendants made before Judge Borman eighteen months ago. (ECF No. 82, Page.ID 2213-2214, 2240-2241). The Court was well aware at the time it denied Defendants' Motion to Dismiss that state probate courts rule on the petitions for continuing hospitalization orders. The Court correctly noted, citing *McCormick v. Braverman*, 451 F.3d 382, 392 (6th Cir. 2006), that when a Plaintiff alleges that a defendant committed or encouraged fraud and misrepresentation in state probate court proceedings, he brings a claim for an injury caused by the defendant, not by the probate court. (ECF No. 87, Page.ID 2377). The fact that the NGRI Committee Defendants were not uniformly successful at keeping every NGRI patient on a continuing hospitalization order regardless of whether that patient was mentally-ill and dangerous does not mean that they could not have caused a constitutional injury on the many, many occasions when they did succeed.

CONCLUSION AND RELIEF REQUESTED

For all the foregoing reasons, Plaintiffs request that the Court deny the NGRI Committee

Defendants' Motion for Partial Summary Judgment. In the alternative, if the Court finds

that Plaintiffs have failed to present sufficient admissible evidence to establish a genuine

issue of material fact on either claim, Plaintiffs request that the Court hold this motion in

abeyance pending additional discovery.

/s/ Laurence H. Margolis (P69635)
Laurence H. Margolis (P69635)
James M. Gallagher (P73038)
Ian T. Cross (P83367)
Attorneys for Plaintiffs
214 S. Main St., Suite 202
Ann Arbor, MI 48104
Phone: (734) 994-9590
larry@lawinannarbor.com
jim@lawinannarbor.com
ian@lawinannarbor.com

25