**Puthenparampil Vijayakumaran**
**05/26/2021**

1          UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF MICHIGAN

3              SOUTHERN DIVISION

4

5   DARRYL PELICHET, et al,

6              Plaintiffs,

7        vs.                    Case No. 2:18-cv-11385

8                               Hon. Anthony P. Patti

9   ROBERT GORDON, et al,

10              Defendants.

11   _____

12

13

14      The Deposition of PUTHENPARAMPIL VIJAYAKUMARAN, M.D.,

15      Taken via Hanson remote,

16      Commencing at 10:28 a.m.,

17      Wednesday, May 26, 2021,

18      Before Dora L. Quinn, CSR-6110.

19

20   Court reporter, attorney(s) and witness appearing remotely.

21

22

23

24

25



```
 1    APPEARANCES:

 2

 3    IAN CROSS

 4    LAURENCE H. MARGOLIS

 5    Margolis, Gallagher & Cross

 6    214 South Main Street

 7    Suite 200

 8    Ann Arbor, Michigan   48104

 9    (734) 994-9590

10    ian@lawinannarbor.com

11    larry@lawina2.com

12         Appearing on behalf of the Plaintiffs.

13

14    THOMAS G. CARDELLI

15    Cardelli Lanfear

16    322 West Lincoln

17    Royal Oak, Michigan   48067

18    (248) 544-1100

19    tcardelli@cardellilaw.com

20         Appearing on behalf of the Defendant Hegira.

21

22

23

24

25
```



```
 1    KATHERINE J. BENNETT

 2    ASHLEE LYNN

 3    Department of Attorney General

 4    525 West Ottawa Street

 5    Floor 6

 6    Lansing, Michigan  48933

 7    (517) 335-7632

 8    bennettk1@michigan.gov

 9    lynna@michigan.gov

10         Appearing on behalf of the Defendants MDHHS.

11

12    ALSO PRESENT:

13    Emily Bengel

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  TABLE OF CONTENTS

 2

 3   Witness                              Page

 4   PUTHENPARAMPIL VIJAYAKUMARAN, M.D.

 5

 6   EXAMINATION

 7   BY MR. CROSS:                        5

 8   EXAMINATION

 9   BY MS. BENNETT:                      45

10

11                       EXHIBITS

12

13   Exhibit                              Page

14   (Exhibits attached to transcript.)

15

16   DEPOSITION EXHIBIT A                 12

17   DEPOSITION EXHIBIT B                 16

18   DEPOSITION EXHIBIT C                 26

19   DEPOSITION EXHIBIT D                 29

20   DEPOSITION EXHIBIT E                 35

21   DEPOSITION EXHIBIT F                 37

22   DEPOSITION EXHIBIT G                 42

23   DEPOSITION EXHIBIT H                 43

24   DEPOSITION EXHIBIT I                 43

25
```



 1  Wednesday, May 26, 2021

 2  10:28 a.m.

 3

 4              COURT REPORTER:  My name is Dora Quinn, a

 5      Michigan notary public and certified shorthand

 6      reporter, and this deposition is being held via

 7      videoconferencing equipment.  The witness and reporter

 8      are not in the same room.  The witness will be sworn

 9      in remotely pursuant to agreement of all parties.  The

10      parties stipulate that the testimony is being given as

11      if the witness was sworn in person.

12              PUTHENPARAMPIL VIJAYAKUMARAN, M.D.,

13      was thereupon called as a witness herein, and after

14      having first been duly sworn to testify to the truth,

15      the whole truth and nothing but the truth, was

16      examined and testified as follows:

17                          EXAMINATION

18  BY MR. CROSS:

19  Q.  Good morning, Dr. Vijayakumaran.

20  **A.  Good morning.**

21  Q.  Have you ever had your deposition taken before?

22  **A.  Yes.**

23  Q.  About how many times?

24  **A.  Probably two times as well as I can remember, yeah.**

25  Q.  Well, in case that was a long time ago, I'm just going



Puthenparampil Vijayakumaran
05/26/2021                                              Page 6

1        to go over some ground rules before we start.

2                First of all, this isn't an endurance

3        contest.  If you need a break to go to the bathroom or

4        for any reason, you just let me know, but I have one

5        rule.  I ask that if there's a question that I've

6        posed, you answer the last question before the break;

7        okay?

8    A.  Okay.

9    Q.  If you don't understand any of my questions, I don't

10       want you to guess.  I want you to ask me to clarify;

11       all right?

12   A.  All right.

13   Q.  And, finally, in this deposition the names of -- or we

14       may end up talking about patients who are not a party

15       to the case, and for their privacy I'm going to refer

16       to them by just their initials.  And I ask that you do

17       the same if that comes up at all; okay?

18   A.  All right.

19   Q.  All right.  So, Dr. Kumaran, what do you do for a

20       living?

21   A.  I'm a psychiatrist and I practice in Livonia and in

22       Westland.  I work for a corporation known as Hegira

23       Health, Incorporated.

24   Q.  Okay.  Do you work anywhere else besides Hegira

25       Health, Incorporated?



Puthenparampil Vijayakumaran
05/26/2021                                          Page 7

1   A.   No.

2   Q.   Okay.  How many years have you been working for

3        Hegira?

4   A.   Since 1982.

5   Q.   What is your job title?

6   A.   I'm the medical director for the corporation and --

7   Q.   Okay.

8   A.   All right.

9   Q.   I'm sorry.  Continue.

10  A.   No.  I do have some administrative duty, but mostly I

11       see patients.

12  Q.   Can you tell me all of your job duties?

13  A.   Seeing patients, evaluating patients and prescribe the

14       needed treatment and work with a treatment team.

15  Q.   Okay.  What is the difference between a psychiatrist

16       and a psychologist?

17  A.   Well, a psychiatrist is a medically trained doctor,

18       professional, more focus on the biological aspects of

19       treatment, mainly medication management.  And a

20       psychologist is not medically trained, but they have

21       more training in the psychology aspects of a human

22       being, and they devise their own forms of treatment.

23  Q.   So when you provide treatment to a patient, you're

24       providing medical treatment; correct?

25  A.   Mainly medical treatment.



 1   Q.   Do you know whether patients generally have a right to

 2        refuse medical treatment?

 3   **A.   Correct.**

 4   Q.   Are there circumstances though where you would provide

 5        treatment to a patient against the patient's will?

 6   **A.   Only in rare circumstances.**

 7   Q.   And what are those circumstances?

 8   **A.   When a person's life is in danger or refusing**

 9        **treatment can cause imminent danger to one's self and**

10        **others and they're not able to take care of themselves**

11        **to the detriment of their life.**

12   Q.   Do you have to do anything before you can subject a

13        person to involuntary psychiatric treatment?

14   **A.   It depends on the context.  If I am seeing the patient**

15        **on an emergency basis and the patient is acutely**

16        **suicidal or acutely homicidal, I am allowed to use the**

17        **necessary treatment.**

18   Q.   What was that?  I'm sorry.  I didn't hear the last

19        part.

20   **A.   I'm allowed to use the treatment -- the treatment**

21        **modality if the patient is in imminent danger of**

22        **hurting himself or others.**

23   Q.   Okay.  And you're allowed to make that determination

24        unilaterally or, in other words, just by yourself?

25   **A.   Mostly by myself, but also I do work with a team and I**



 1          do consult with the team, and sometimes, when

 2          available, I consult with the family.

 3     Q.   So what about outside of an acute situation?

 4     A.   Well, it depends on the situation.  If the patient is

 5          not in imminent danger of hurting himself or others or

 6          the patient can take care of themselves pretty well,

 7          that patient has the right to refuse treatment.

 8     Q.   Do you ever have to seek permission from a court to

 9          provide involuntary treatment to a patient?

10     A.   Sometimes.  In my work, I work in two areas; one is

11          outpatient treatment and the other is crisis

12          intervention.  I don't usually go to court seeking

13          treatment.  That is not usually part of my sphere of

14          work.

15                    Having said that, except, you know, in

16          emergency situations we may approach people, and if

17          there is an ongoing treatment program formally ordered

18          by the court, then I continue treatment, of course

19          depending on the right of the patient.

20     Q.   So if there's an ongoing treatment program ordered by

21          the court, does that process ever end?

22     A.   I cannot answer that.

23     Q.   Well, can it ever end?

24     A.   It can end, depending on the condition of the patient.

25     Q.   So how does it end?  Can you just work me through the



1        administrative mechanism by which it ends?

2   A.   Well, if there's a court order and the patient is

3        compliant with the court order and if the patient

4        remains stable for a reasonable time, then I can

5        present to the court that the patient is doing well,

6        compliant with all the requirements ordered by the

7        court, and the patient is not in imminent danger of

8        hurting himself or others.  And the understanding that

9        patient will continue to be in a stable state, I will

10       appeal to the court not to terminate the treatment.

11              Again, treatment depends on the condition

12       you are treating and the patient's history.  So I may

13       appeal to the court that patient can -- patient does

14       not need to be under a court order, that the patient

15       can, on his own or their own volition, continue the

16       treatment.

17  Q.   Okay.  Do the court orders -- when a patient is under

18       a court order like you just described, does the court

19       order have any expiration date of time limit?

20  A.   It depends.  Some court orders do specify that a

21       patient needs to be in treatment for, say, five years,

22       four years, three years, depending on the severity of

23       the case.  I don't determine that support decision to

24       do that.

25  Q.   So if the court orders the patient to receive



1      treatment for five years, you have no input into that

2      decision?

3  A.  As I mentioned earlier, if the patient has been

4      complying with the treatment and patient is not

5      causing any danger to himself or others and patient is

6      abiding by all the court stipulations, then taking

7      into consideration the history of the patient, the

8      context in which the patient has been ordered to

9      undergo treatment, considering all these factors, I

10     may appeal to the court, again, depending on the

11     diagnosis, depending on the clinical situation,

12     whether to terminate the treatment or that the patient

13     can continue treatment on his own volition.

14 Q.  In your opinion when does a patient need to be

15     involuntarily hospitalized?

16 A.  If the patient is in imminent danger of hurting

17     himself or others and the patient is not taking care

18     of himself or herself to the detriment of their

19     physical well-being, those are the essential criteria

20     that we use in civil commitment.

21 Q.  Do you have any involvement in the civil commitment

22     process?

23 A.  In terms of my work, I do admit patients involuntarily

24     to hospitals, but it depends on the hospital whether

25     proceed with the further court commitment or not.



Puthenparampil Vijayakumaran
05/26/2021                                    Page 12

1   Q.   So you say you admit them to the hospital, and then

2        the hospital makes the decision whether to proceed

3        with continued commitment or not?

4   **A.   That's correct.**

5   Q.   Okay.  I'm going to show you a document.

6                   MARKED BY THE REPORTER:

7                   DEPOSITION EXHIBIT A

8                   10:41 a.m.

9   BY MR. CROSS:

10  Q.   Do you recognize this document, sir?

11  **A.   It's a blank document as far as I can see.**

12  Q.   Okay.  I know it's blank, but is this a form or a

13       document that you've seen before?

14  **A.   Yes.**

15  Q.   What is it?

16  **A.   It's a Clinical Certificate.**

17  Q.   What's the purpose of a Clinical Certificate?

18  **A.   To enumerate or specify who the patient is, who the**

19       **examiner is, and where the examination took place, the**

20       **time, the time spent, and the reasons for commitment**

21       **based on the diagnosis, but, more importantly, based**

22       **on the current clinical presentation.**

23  Q.   Is this a form that is submitted to the court?

24  **A.   Yes.**

25  Q.   Have you ever completed one of these forms in your



1       time at Hegira?

**2    A.    Yes.**

3    Q.    About how many times have you completed this form in

4          your time at Hegira?

**5    A.    That I cannot tell you.  I cannot recall.**

6    Q.    Do you know if it would be, you know, ten or a hundred

7          or a thousand?

**8    A.    I just --**

9    Q.    Can you give me a ballpark?

**10   A.    I cannot give you a ballpark.  I have been in practice**

**11         since '82.**

12   Q.    So would it be fair to say -- well, do you have an

13         idea of about how many you complete in a year?

**14   A.    I do not have an idea.**

15   Q.    Okay.  Is it possible it's, since '82, more than ten?

16                 MR. CARDELLI:  I'm going to object to the

17         form of the question.  It calls for a speculative

18         response from the witness.  The witness should not

19         speculate.  Anything is possible.  We'll stipulate to

20         that.

21   BY MR. CROSS:

22   Q.    You can answer.

**23   A.    I do not know.**

24   Q.    Okay.  I'm going to direct your attention down to No.

25         9 on this form.



```
 1                    MR. CARDELLI:  Are you able to explode that

 2        a little bit, Ian?

 3                    MR. CROSS:  Sure.

 4                    MR. CARDELLI:  I'm probably the only one

 5        that has poor eyesight, but --

 6   BY MR. CROSS:

 7   Q.   Can you see that Dr. Kumaran?

 8                    MR. CARDELLI:  That's much better.  Thank

 9        you.

10                    THE WITNESS:  I conclude that this is or is

11        not a person requiring treatment.

12   BY MR. CROSS:

13   Q.   So when you complete this form, do you check one of

14        those boxes in No. 9?

15   A.   Yes.

16   Q.   How do you decide which box to check?

17   A.   Well, it depends on your assessment of a patient,

18        whether that patient needs treatment or not.

19   Q.   Okay.  So if you were to say that -- or conclude in

20        No. 9 that the individual is a person requiring

21        treatment, would you need to check one of these four

22        boxes in No. 8?

23   A.   Yes.  I need to specify why I am asking that a patient

24        needs to be hospitalized.

25   Q.   So, for example, if you checked B, likelihood of
```



```
 1          injury to others, you would also need to specify some

 2          facts as to why you believed the individual posed a

 3          likelihood of injury to others?

 4     A.   Yes.

 5     Q.   Okay.  Now, No. 10, do you check a box in No. 10 when

 6          you complete this form?

 7     A.   I do.

 8     Q.   How do you decide which box to check in No. 10?

 9     A.   It depends on the intensity of what we are dealing

10          with.

11     Q.   So when would you recommend hospitalization only?

12     A.   Well, if the patient is in imminent danger of hurting

13          himself or others, if the patient is not taking care

14          of himself or herself or based on the other treatment

15          regimen, again, if there's a court order that

16          patients -- patient need to be hospitalized if they

17          deviate from the treatment regimen stipulated by the

18          court.

19               My -- it is not just -- most of the time it

20          is suffice to say that whether the patient is in

21          danger of hurting himself or others or not taking care

22          of himself or herself, that's what I do in my every

23          day practice.  That is how I determine what course of

24          treatment I need to pursue.

25     Q.   All right.  So under what circumstances would you
```



  1        recommend assisted outpatient treatment without

  2        hospitalization?

  3    A.  I -- I haven't done that.  I haven't approached the

  4        court with the combination treatment or the assisted

  5        outpatient treatment without hospitalization.

  6    Q.  You've never done that?

  7    A.  I have never done that.

  8                    MARKED BY THE REPORTER:

  9                    DEPOSITION EXHIBIT B

 10                    10:48 a.m.

 11    BY MR. CROSS:

 12    Q.  Okay.  I'm going to show you another document.  Do you

 13        recognize this document, sir?

 14    A.  Yes.

 15    Q.  What is it?

 16    A.  It's a six-month review treatment.  As far as I know

 17        we use this document for NGRI patients as far as my

 18        practice goes.

 19    Q.  Okay.  What's the purpose of this form?

 20    A.  It's a review about progress of treatment.

 21    Q.  Have you ever completed one of these in your time at

 22        Hegira?

 23    A.  I have completed and -- yes.

 24    Q.  Do you know how many times you've completed it?

 25    A.  Let me check my phone here.



1    Q.   I'm sorry.  Are you looking at some documents, sir?

2    **A.   Yes.**

3    Q.   What are you looking at?

4    **A.   I have this protocol that we follow -- the protocol**

5    **that we follow for NGRI patients.**

6    Q.   Oh, interesting.  There is a protocol that you follow

7         for NGRI patients?

8    **A.   It's not I who follow it.  It is what is stipulated by**

9    **the court.**

10   Q.   All right.

11   **A.   And I need to follow certain things based on what the**

12   **court tells me.**

13   Q.   Do you file this form with the court?

14   **A.   I have filed this form, but I don't have that form.**

15   **If you can show me the whole form, I can have a better**

16   **understanding.**

17   Q.   Sure.

18              MR. CARDELLI:  By the way, Ian, at some

19        stage could you identify these as exhibits just so we

20        know what we're talking about here.

21              MR. CROSS:  I'm sorry.  We'll call this

22        Exhibit B and the previous form Exhibit A.

23              MR. CARDELLI:  That would be great.  Yeah.

24        Just so when we're reading the transcript we know

25        what --



```
 1                    MR. CROSS:  Okay.
 2                    THE WITNESS:  Can you please show me the
 3          last page?
 4     BY MR. CROSS:
 5     Q.   Sure.  So when you are completing this form at Hegira,
 6          sir, do you check a box in No. 9?
 7     A.   Yes.
 8     Q.   How do you decide what to choose for No. 9?
 9     A.   It depends.  Again, I -- I have to specify something,
10          that I have not used in -- this form in civil
11          commitments or civil proceedings.  It is pertinent to
12          my practice only for NGRI clients.
13     Q.   Okay.
14     A.   How I determine what box to click depends on patient's
15          clinical status, patient's compliance with the
16          treatment, and in terms of compliance and terms of not
17          only taking medication but what the court stipulated
18          that the patient needs to follow.
19     Q.   Okay.  Do you indicate the estimated -- see in No. 8
20          where it says the estimated time required for further
21          treatment is blank, check box days, check box months,
22          do you indicate an estimated time required for further
23          treatment in No. 8 when you complete these?
24     A.   I suppose I do.  I --
25     Q.   How do you decide how much additional time is required
```



```
 1        for treatment?
 2   A.   Well, it depends on the -- again, there are many
 3        factors to go through here.  As I mentioned many
 4        times, it depends on the compliance in all forms,
 5        whether the patient is doing a follow-up, whether
 6        patient is taking drugs, whether, you know, patient is
 7        deviating from the -- you know, with the orders
 8        stipulated by the court.  It all depends on those
 9        things.  Sometimes 60-days extension.  Sometimes 90
10        days.
11   Q.   Okay.
12   A.   But it's hard to say what exactly -- the number that I
13        am putting.  It's -- it's variable.  Depends on
14        different factors.
15   Q.   So I noticed you said the term NGRI.  Can you explain
16        what that is?
17   A.   It's the -- is not guilty by reason of insanity.  It
18        is a person who commits a crime, and at the time of
19        commitment of the crime, patient is in a mental state
20        where he or she is not able to distinguish between
21        right and wrong based on an altered mental status.  It
22        can be medical.  It can be psychiatric, so on and so
23        forth.
24   Q.   If I say the term ALS contract, do you know what that
25        is?
```



1   A.   My understanding is alternate leave status.  That's my

2        understanding.

3   Q.   What is an ALS contract?

4   A.   ALS contract is a contract ordered by a court stating

5        that the patient needs to comply with certain

6        narratives during the course of that contract.

7   Q.   Have you ever had patients that you treated at Hegira

8        that were NGRI patients on ALS contracts?

9   A.   Yes.

10  Q.   Those two forms we looked at before, Exhibits A and B,

11       has anyone ever provided you any training about how to

12       complete those forms for NGRI patients on ALS

13       contracts?

14  A.   I have not had any formal training.  The forms you

15       showed me, the clinical cert, which we have been doing

16       for years, it is part of the residency program that --

17       you know, that the doctors or psychiatrists or

18       licensed psychologists should be familiar with.

19            And the second form is -- again, I did not

20       have any formal training, but what I have come across

21       is that that form is filled based on the input from

22       the various members of the, what we call, NGRI team.

23       The team is responsible for providing and managing a

24       client -- providing treatment and managing the client.

25  Q.   Do you complete either of those forms differently when



1       a patient is an NGRI patient on an ALS contract versus

2       for a patient who is not an NGRI client?

3   A.  **No.**

4   Q.  Has anyone ever told you what recommendations to make

5       to the court on either of those forms we just talked

6       about for NGRI patients?

7   A.  **As I told you that, I do get input -- input from the**

8       **doctor who is treating the patient, the case manager,**

9       **the -- the psychologist or the social worker who is**

10      **doing counseling and so on and so forth.**

11  Q.  So you get input, but is the decision theirs or is it

12      yours?

13  A.  **It's my decision.**

14  Q.  Okay.  And it's based on your clinical judgment?

15  A.  **Yes.**

16  Q.  Do you know what the NGRI Committee is?

17  A.  **I do not know much about the NGRI Committee, but I was**

18      **told that any decision in recommendation that we make**

19      **or I make, say patient can go on leave to be with his**

20      **or her family for the weekend or the patient can go**

21      **and stay in a semi-independent situation, I have to**

22      **make that proposal, and the NGRI Committee has to**

23      **agree upon that.  So my understanding is that they are**

24      **a decision-making committee based on, you know, their**

25      **discussions, and I don't know -- I have no idea what**



1          their workings are, what they think or what they do.

2   Q.     So if you and the NGRI Committee disagree about

3          something for a particular patient, whose decision

4          takes precedence?

5   **A.     My understanding is that it is the NGRI committee's**

6   **        decision.**

7   Q.     Do you ever talk to the NGRI Committee?

8   **A.     No.**

9   Q.     Does the NGRI Committee exercise any control over the

10         findings and recommendations in your clinical

11         certificates or six-month reviews for NGRI patients?

12  **A.     I have never received any input from them personally.**

13  **        I don't know whether any other treatment -- treatment**

14  **        team members have received any such contributions from**

15  **        them.**

16  Q.     Okay.  Does anyone exercise control over the findings

17         and recommendations in your clinical certificates or

18         six-month reviews for NGRI patients?

19  **A.     I do not know the understanding of whom -- who has the**

20  **        authority to overrule me or make a decision based on**

21  **        my recommendation.  Is that --**

22  Q.     So I'm not asking about making decisions based on your

23         recommendation.  I'm asking about deciding what your

24         recommendation is.  Does anyone else decide for you

25         what your recommendation is for a particular patient?



Puthenparampil Vijayakumaran
05/26/2021                                                  Page 23

1   A.   Nobody is making a decision for me, but I do get input

2        from my treatment team.

3   Q.   Okay.  When you're making these decisions about what

4        to recommend to the court for an individual patient,

5        do you interview the patient?

6   A.   Yes.

7   Q.   What else do you base your decision on besides the

8        interview?

9   A.   We -- during the team meeting, the various disciplines

10       are the social workers, the case managers.  They

11       present a variety of the course of patient's

12       treatment, what the patient has been doing, whether

13       the patient is working, things like that, and also I

14       discuss with the treating psychiatrist, also I review

15       the documents before I attend the meeting, so I try to

16       be informed about what's going on with their client.

17  Q.   So fair to say that you get information from the

18       treatment team?

19  A.   That's correct.

20  Q.   But the ultimate decision is yours?

21  A.   Yes.

22  Q.   Okay.  Are patients who are NGRI sometimes sent back

23       to the hospital during their ALS contract?

24  A.   Yes.

25  Q.   What is your involvement, if any, in that process?



Puthenparampil Vijayakumaran
05/26/2021                                          Page 24

1    A.    Nothing much.  I -- I've -- have not been involved in

2          making a decision to -- whether to hospitalize the

3          patient or not.  I may add that once the patient

4          violates contract stipulations, patient is taken to

5          the psychiatric hospital, and they make the

6          determination as to admit the patient or not.

7    Q.    Who determines whether the patient has violated the

8          contract stipulations?

9    A.    The case manager, the social worker, the doctor who is

10         treating the patient.

11   Q.    Are those the people who make the decision whether to

12         send the patient back to the hospital?

13   A.    I don't know whether they have any particular input or

14         a particular hand in doing that.  My understanding of

15         the law is that if the patient deviate from the

16         directives of the court, he or she usually goes back

17         to the hospital.  Now, the intensity of the violation

18         may vary, but usually my -- my position in my dealing

19         with the patient, I hear the news after the fact.

20   Q.    Okay.  And you believe that the ALS contract is a

21         directive from the court?

22   A.    I do believe, yes.

23   Q.    Okay.  Do you know what a respite is?

24   A.    It is a system we use.  We don't call it respite

25         anymore, only in certain, you know, circles.  We --



1    the -- we -- the same thing we call crisis residential

2    program, where you have patient in -- not in acute

3    crisis, you know, where their life is in danger or the

4    patient is all emaciated because of dehydration, but

5    in some situations we do send patients to a program

6    where they are cared for, a treatment program, to

7    manage that subacute breakthrough of symptoms.

8  Q.  And then when they come out of that program, are they

9      back on the same ALS contracts they were on before?

10 A.  I'm not talking about the ALS status.  I'm talking

11     about the usual -- you asked about respite.

12 Q.  Yes.

13 A.  It doesn't -- it's -- I don't know whether it's

14     particularly a place in -- in NGRI clients.  I don't

15     know.  No idea.  I'm talking in general about respite.

16 Q.  Okay.  Okay.  So I want to go back to Exhibit A.  Here

17     at No. 9, have you ever submitted a Clinical

18     Certificate for an NGRI patient where you've checked

19     the is not box?

20 A.  No.

21 Q.  And you already testified that in No. 10 you have

22     never checked a combination of hospitalization and

23     assisted outpatient treatment; is that correct?

24 A.  That is correct.

25 Q.  And you have never checked the assisted outpatient



 1          treatment without hospitalization; is that correct?

 2     A.   That's correct.

 3                    MS. BENNETT:  Objection.  Asked and

 4          answered.

 5     BY MR. CROSS:

 6     Q.   Okay.  Now we're going to go to Exhibit B.  For No. 9

 7          on Exhibit B, have you ever checked the box should be

 8          discharge from the treatment program?

 9     A.   For the ALS clients I -- I don't recall doing that.

10     Q.   Okay.  I'm going to show you another document.  We'll

11          call this Exhibit C.

12                    MARKED BY THE REPORTER:

13                    DEPOSITION EXHIBIT C

14                    11:07 a.m.

15     BY MR. CROSS:

16     Q.   Is that your signature there, sir?

17     A.   That's correct.

18     Q.   And you indicated in No. 9 that the individual

19          continues to be a person requiring treatment?

20     A.   Yes.

21     Q.   And you indicated in No. 8 that the estimated time

22          required for further treatment is six months?

23     A.   That's correct.

24                    MR. CARDELLI:  Ian, is there more than one

25          page to this document?



1            MR. CROSS:  There is.

2            MR. CARDELLI:  Okay.

3            MR. CROSS:  I'm going to go up and talk

4    about the other page.

5            MR. CARDELLI:  Do you know how many pages?

6    Is it just a two-page document?

7            MR. CROSS:  It's a two-page document.

8            MS. BENNETT:  Ian, I've got to object.

9    This -- I think right now you're making a

10   non-plaintiff patient's identity an exhibit in this

11   deposition.  This should be redacted.  I want to

12   object to making this part of the record.  It's, to

13   me, a serious HIPAA concern and mental health code

14   concern.

15           MR. CROSS:  Well, I'll say for the record

16   this is a public document filed in the Wayne County

17   Probate Court and available on the internet.  And I'm

18   not going to say the patient's name, and I ask the

19   witness not say the patient's name either.  I just

20   want to ask the witness about how he filled it out.

21           MS. BENNETT:  Okay.  But it's still now a

22   record in the deposition.  I think that it's going to

23   need to be sealed, but I guess we can -- I just want

24   to state that for the record and make a record of my

25   concern.  Thank you.



```
 1   BY MR. CROSS:

 2   Q.   So for No. 4 you indicated that you believe that the

 3        individual has a mental illness, and as a result of

 4        the mental illness the individual can reasonably be

 5        expected within the near future to intentionally or

 6        unintentionally, seriously, physically injure himself

 7        or others and has engaged in an act or acts or made

 8        significant threats that are substantially supportive

 9        of this expectation; correct?

10   A.   That's correct.

11   Q.   And here in No. 6 your conclusion was based on what

12        exactly?

13   A.   It's based on the patient's history, the seriousness

14        and intensity of the crime or behavior that person

15        exhibited and that led to being an NGRI client, and

16        the need to see that the patient continues to be

17        compliant with the treatment and be stabilized.  These

18        are the factors --

19   Q.   So --

20   A.   -- that I took -- take into --

21   Q.   Why didn't you write --

22                   (Reporter interrupted the record at

23                   11:10 a.m.)

24   BY MR. CROSS:

25   Q.   Why didn't you write any of those facts in No. 6?
```



Puthenparampil Vijayakumaran
05/26/2021                                    Page 29

1   A.   Well, it is -- it is part of the discussion.  I do

2        that in the Clinical Certificate in my own

3        handwriting.

4   Q.   Okay.

5   A.   I may add -- before you ask the question -- in

6        psychiatry the course determines the outcome.  You

7        need to be sure that the patient remains compliant and

8        stable over a length of time to predict or try to

9        predict what the outcome of that patient is going to

10       be; in other words, what that prognosis is going to

11       be.  Thank you.

12                  MARKED BY THE REPORTER:

13                  DEPOSITION EXHIBIT D

14                  11:11 a.m.

15  BY MR. CROSS:

16  Q.   Okay.  I'm going to show you another document.  Is

17       that your signature down there again?

18  A.   Yes.

19  Q.   And you indicated that the individual --

20                  MS. BENNETT:  Ian, can we please see the --

21       like, the first page of the document --

22                  MR. CROSS:  Sure.

23                  MS. BENNETT:  -- before you go to the

24       bottom so we know what we're looking at before you ask

25       questions?  Thank you.


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

```
 1                  MR. CARDELLI:  Is this going to be -- is

 2        this D?

 3                  MR. CROSS:  This is Exhibit D.

 4                  MR. CARDELLI:  Thank you.

 5                  MS. BENNETT:  And I'm going to have the

 6        same objection or, I guess, just note on this exhibit

 7        regarding patient confidentiality.  Thank you.

 8    BY MR. CROSS:

 9    Q.   Okay.  See above --

10                  MR. CARDELLI:  Wouldn't we be able to just

11        stipulate that we can black out those --

12                  MR. CROSS:  I have no problem blacking out

13        the name, and I think we can stipulate to that.

14                  MR. CARDELLI:  We would stipulate to that.

15                  MS. BENNETT:  Yeah.  I would stipulate to

16        that also.

17    BY MR. CROSS:

18    Q.   Okay.  See right here above your signature you wrote

19         to maintain NGRI status?

20    A.   Yes.

21    Q.   That's correct?

22    A.   That's correct.

23    Q.   Why did you write that?

24    A.   Again, we need to have a frame of time to observe and

25         follow up with patient to ensure that the patient
```



Puthenparampil Vijayakumaran
05/26/2021                                    Page 31

1      be -- will be compliant and will continue the

2      stability.  Again, we need to do ongoing follow-up to

3      make sure that the status of the patient continues in

4      a reasonable, stable manner.

5   Q.  All right.  Let me -- so this to maintain NGRI status,

6      is that your handwriting, sir?

7   A.  No.

8   Q.  Do you know whose handwriting that is?

9   A.  It looks like it's the handwriting of one of the --

10      the gentleman who -- who is in charge of the -- he's

11      an assistant clinical director of the program.

12   Q.  Is his name Bill Hartley?

13   A.  That's correct.

14   Q.  Okay.  See where it says here recommended that patient

15      receive grief counseling?

16   A.  Yes.

17   Q.  Is that also Bill Hartley's handwriting?

18   A.  That is correct.

19   Q.  And see up here my conclusion is based on the

20      following facts of which I have personal knowledge, is

21      this Bill Hartley's handwriting?

22   A.  That's correct.

23   Q.  Is everything on this form Bill Hartley's handwriting?

24   A.  That's correct.

25   Q.  Except for your signature; right?



 1   A.   That's correct.

 2   Q.   Now, the date here next to your signature, is that

 3        your handwriting?

 4   A.   I cannot tell you that.

 5   Q.   All right.  Let's zoom in on the date here, and I

 6        think it says error and there's some initials.  Are

 7        those your initials?

 8   A.   No.

 9   Q.   Do you know whose initials those might be?

10   A.   Mr. Bill Hartley.

11   Q.   Okay.  So would it be fair to say that the only thing

12        you wrote on this form is your signature and

13        everything else on the form was written by Bill

14        Hartley?

15   A.   That's not a fair statement.  If you can -- if you

16        consider the intent and purpose.

17   Q.   Okay.  Explain to me.

18   A.   Because this -- this -- documents are written in front

19        of me.

20   Q.   This document was wrote in front of you?

21   A.   Yeah.  He used a pen and he wrote based on our

22        discussion, and I approved that.  It's not kind of a

23        blind document he gives me to sign and he goes out

24        and --

25   Q.   All right.



 1  A.   **You have to consider the intent, what is intent of**

 2       **this document.**

 3  Q.   So I want to understand.  Your testimony is that you

 4       were with Bill Hartley.  He filled all this stuff out

 5       for you?

 6  A.   **That's correct.**

 7  Q.   That's correct?

 8  A.   **That's correct?**

 9  Q.   Okay.  And then you signed it?

10  A.   **Yes.**

11  Q.   After he filled it out?

12  A.   **Yes.**

13  Q.   On this date?

14  A.   **I -- yes.  I think it's the 8th of February.**

15  Q.   Okay.  I'm going to show you --

16            MR. CROSS:  So I'm sorry.  Did I freeze for

17       a second?

18            MR. CARDELLI:  Yeah.  We thought you were

19       just joking with us.

20            (Mr. Cross exited Zoom room at 11:17 a.m.)

21            (Recess taken at 11:17 a.m.)

22            (Back on the record at 11:26 a.m.)

23            (Requested portion of the record read at

24            11:27 a.m.)

25            "Q.  After he filled it out?



1                   A.   Yes.

2                   Q.   On this date?

3                   A.   I -- yes.  I think it's the 8th of

4        February.

5                   Q.   Okay.  I'm going to show you -- "

6    BY MR. CROSS:

7    Q.   So, Dr. Kumaran, I apologize for the pause there.

8              You testified that -- did you testify that

9        you were with Bill Hartley when he filled out that

10       form?

11   A.   Uh-huh.

12   Q.   Why did he need to write it instead of you?

13   A.   Well, I -- I do not understand the question.  Some --

14       sometimes we type.  Sometimes we write.

15   Q.   Okay.

16   A.   Sometimes, you know, somebody else writes for you.

17       Sometimes we have a scriber.  It all depends on the

18       circumstances.

19   Q.   But you saying those are your recommendations and you

20       told him to write that?

21   A.   Yes.

22   Q.   Okay.  I'm going to show you -- so this is the

23       document we were just talking about, and I'm going to

24       show you what's been marked Plaintiffs' Exhibit E.

25                   MARKED BY THE REPORTER:



```
 1              DEPOSITION EXHIBIT E

 2              11:28 a.m.

 3   BY MR. CROSS:

 4   Q.   This is also a two-page form.  Is that your signature,

 5        sir?

 6   A.   That's right.

 7   Q.   And is that your handwriting to maintain NGRI status?

 8   A.   No.

 9   Q.   Is that your handwriting on the date?

10   A.   Yes.

11   Q.   That is?

12   A.   Yeah.

13   Q.   Okay.

14   A.   VK, these are my initials.

15   Q.   Those are your -- VK is your initials?

16   A.   That's correct.

17   Q.   What about that bubble thing right there?

18   A.   It's PG.

19   Q.   That's PG?

20   A.   Yeah.  Somebody apparently signed for me and then I

21        signed my initials here.

22   Q.   Okay.  So someone initialled it and then you

23        initialled it?

24   A.   Yes.

25   Q.   Okay.  So if we go to the top of this form -- we don't
```



 1      need to say the patient's name on the record, but you

 2      see the name of the patient here?

 3   A. Uh-huh.  Yes.

 4   Q. And the one we just talked about, do you see the name

 5      of the patient here?

 6   A. That's correct.

 7   Q. And these are the same patient; correct?

 8   A. These are the same patient.  Same name.

 9   Q. All right.  And this form actually has three pages.

10      The last page is a proof of service.  Is this Bill

11      Hartley's handwriting on the proof of service?

12   A. It looks like Bill Hartley's handwriting, and he has

13      signed it.

14   Q. He has signed it.  And what time does he say he served

15      this form personally on the patient?

16   A. I do not know.  I cannot answer that question.

17   Q. Well, what does it say in No. 3 with the checkmark?

18   A. According to court rule, I served my person service

19      the papers described above on --

20   Q. You don't need to say the patient's name.  This

21      address, do you recognize this address?

22   A. That's the clinic address, outpatient clinic.

23   Q. Okay.  Do you work at that location?

24   A. That's correct.

25   Q. Do you work there every day of the week?



 1   A.   No.

 2   Q.   Which days do you work there?

 3   **A.   Now I work there on Thursdays.  I used to work there**

 4        **on Saturdays too.**

 5   Q.   All right.  You worked there on Thursdays and

 6        Saturdays.  Did you work there any other days of the

 7        week?

 8   **A.   Sometimes I go there to attend meetings and take care**

 9        **of paperwork or other necessary things.**

10   Q.   All right.  And what's the date and time here over in

11        this column?  Can you read that for the record?

12   **A.   I don't know whether it's the 6th or the 8th.  I**

13        **cannot make that out.**

14   Q.   Okay.  Can you see it better now?

15   **A.   I don't think I can see it now.**

16   Q.   Well --

17   **A.   I cannot see it now.**

18   Q.   It's either the 6th or the 8th of 2016 at 3:30 p.m.?

19   **A.   It might be.  I'm not really sure about that.**

20   Q.   Okay.  So I'm going to show you another document.

21        Call this Exhibit F.

22                    MARKED BY THE REPORTER:

23                    DEPOSITION EXHIBIT F

24                    11:33 a.m.

25   BY MR. CROSS:



 1   Q.   This is another proof of service, and would you agree

 2        that the handwriting here is not the same as the

 3        handwriting on the one we just looked at in Exhibit D?

 4   A.   **It's different, yes.**

 5   Q.   Okay.  Do you know a person by the name of Roxanne

 6        Green?

 7   A.   **I don't recall that name now.  No, I cannot recall**

 8        **that name.**

 9   Q.   Okay.  And what is the date and time of service on

10        this proof of service?

11   A.   **2-8-16, 3:30 p.m.**

12   Q.   And is the patient the same as the last proof of

13        service we looked at?

14   A.   **Yes.**

15   Q.   And is the location the same as the last proof of

16        service we looked at?

17   A.   **Yes.**

18   Q.   And what is being served here, Line 1?

19   A.   **It's a six-month review report.**

20   Q.   Okay.  And here Bill Hartley was also serving a

21        six-month review report; correct?

22   A.   **Correct.**

23   Q.   Now, this six-month review report, that's for the same

24        patient.  See where it says to maintain NGRI status?

25   A.   **Yes.**



```
 1   Q.   Does that look like the same handwriting that's on

 2        this proof of service?

 3   A.   I cannot make that determination.

 4   Q.   All right.  But this person's name is Roxanne Green;

 5        right --

 6   A.   It looks like that.

 7   Q.   -- who filed this proof of service?

 8                   Now, if we zoom in here on the date, are

 9        you sure that's not an RG?

10   A.   As far as I can see, Counselor, it is PG.  It may be

11        RG.  I do not know.  I cannot make an opinion on that.

12   Q.   Is that how you write your initials?

13   A.   No.

14   Q.   And do you believe the 2-16-16 is your handwriting?

15   A.   It may be my handwriting.  I just cannot -- I cannot

16        hundred percent tell you that.  This is my initials.

17        That much I can tell you.  That's my initial, VK.

18   Q.   VK is your initial?

19   A.   That's correct.

20   Q.   And PG, you don't know if that's PG or RG, but you

21        know that you didn't write that?

22   A.   I have -- I cannot -- I did not write that.  That's

23        not the way I write; okay?

24   Q.   Okay.  So are these 2 six-month review reports for the

25        same patient at the same time --
```



Puthenparampil Vijayakumaran
05/26/2021                                      Page 40

1   A.   I don't recall this.

2   Q.   -- Exhibit D and Exhibit E?

3   A.   I do not recall that, the same date or a different

4        date.

5   Q.   Well, let's look at the date that they were filed in

6        probate court.  This one was filed February 16th,

7        2016.  You would agree with that; right?

8   A.   That is correct.

9   Q.   And the other one was filed February 10th, 2016?

10  A.   That's correct.

11  Q.   And the case number is 796760?

12  A.   Okay.

13  Q.   The case number on this one, is that the same case

14       number?

15  A.   Looks like that.

16  Q.   So do you do six-month review reports every week, or

17       do you do them every six months?

18  A.   Every six months.

19  Q.   So why are there 2 six-month review reports filed in

20       the same case for the same patient both bearing your

21       signature filled out by different people filed a week

22       apart?

23  A.   I do not know.  I cannot answer that question.  I pay

24       attention to the substance contained in the document.

25  Q.   And, I mean, if we look at the proofs of service, they


HANSON RENAISSANCE
COURT REPORTERS & VIDEO    hansonreporting.com
313.567.8100

Puthenparampil Vijayakumaran
05/26/2021                                    Page 41

 1      were supposedly served on the patient at the same

 2      time.  Do you remember that?

 3  A.  **I -- I don't know what the question means.  The**

 4      **service -- my signature shows the time when I was**

 5      **involved in the case, discussion with the patient.**

 6  Q.  Okay.  So your signature, for example, on this one,

 7      it's typed.  Do you know if you typed it or someone

 8      else typed it?

 9  A.  **Someone else typed it.**

10  Q.  Someone else typed it.  Did you tell that person what

11      to type?

12  A.  **No.**

13  Q.  So you didn't tell that person to type that the

14      estimated time required for treatment is six months?

15  A.  **I said that, of course.  That's the six-month meeting**

16      **that we are having.**

17  Q.  And you signed this on 2-16-16?

18  A.  **That's correct.**

19  Q.  Well, how could you have signed it on 2-16-16 if it

20      was filed on 2-10-16?

21  A.  **I have no idea.**

22  Q.  Is it possible that you signed a bunch of these blank

23      forms and put them somewhere in the office in Hegira

24      for other Hegira employees to fill out and file with

25      the probate court?



1   A.   Not at all.

2   Q.   There's no way that could have happened?

3   A.   No.

4   Q.   So how did this happen where two different people

5        filed forms two weeks apart?

6   A.   I have no idea.

7                MR. CARDELLI:  Yeah.  I'm going to object,

8        Ian.  It's been asked and answered.  It becomes

9        argumentative once you ask it the third time.

10               MARKED BY THE REPORTER:

11               DEPOSITION EXHIBIT G

12               11:40 a.m.

13  BY MR. CROSS:

14  Q.   All right.  Let's look at another one.  Is that your

15       signature?

16  A.   That's correct.

17  Q.   Did you write that date?

18  A.   No.

19  Q.   Did you write I interviewed patient face to face and

20       home staff?

21  A.   I did not write that.  That's not my handwriting, but

22       I do interview home staff when they come for the

23       meeting.

24  Q.   So I'm sorry.  This one is -- we need to turn it

25       around to see the top page.



 1                       But is there anything on this form that's

 2          in your handwriting?

 3     A.   No.  That's not my handwriting.

 4                       MARKED BY THE REPORTER:

 5                       DEPOSITION EXHIBIT H

 6                       11:41 a.m.

 7     BY MR. CROSS:

 8     Q.   Would you agree the handwriting on this form, Exhibit

 9          G, matches the handwriting on this proof of service

10          which we'll call Exhibit H?

11     A.   Yeah.  Some of -- some -- yeah.  One -- one sentence

12          there and the -- the bottom -- the name of the client

13          and the address.

14     Q.   Do you know a person by the name of Marie Dalton?

15     A.   I don't recall that person at this point.  I don't

16          know.  It was -- it appears she's a BSW, a social

17          worker.

18     Q.   All right.  Let's look at another one.  I'll call this

19          Exhibit I.

20                       MARKED BY THE REPORTER:

21                       DEPOSITION EXHIBIT I

22                       11:42 a.m.

23     BY MR. CROSS:

24     Q.   Any of the handwriting on this form your handwriting?

25     A.   No.



1   Q.   Is that date your handwriting?

2   **A.   I just cannot determine that.**

3   Q.   You can't determine that?

4   **A.   I can't say yes or no.**

5   Q.   Well, were you able to determine it for this one,

6       Exhibit G?

7   **A.   It doesn't look like my handwriting.**

8   Q.   This date on Exhibit G doesn't look like your

9       handwriting?

10  **A.   That is correct.**

11  Q.   Do you normally write the date next to your signature

12      when you sign a form that has a space for the date?

13  **A.   I usually do that, but unless, you know, somebody else**

14      **filled it during the meeting.**

15  Q.   So how do these get filled out?

16  **A.   What do you mean?  Explain.  Can you elaborate on**

17      **that?**

18  Q.   Sure.  You said if somebody else filled it during the

19      meeting.  So there's a meeting and it's filled out

20      during the meeting; is that your testimony?

21  **A.   That's correct.**

22  Q.   And somebody fills out every part of the form

23      including the date except for your signature?

24  **A.   No.  I personally fill the clinical cert.  Nobody else**

25      **can fill that, but these documents are the -- the**



Puthenparampil Vijayakumaran
05/26/2021                                    Page 45

1        contents are based on the discussion with the patient,

2        the treatment team, the whole staff, all family

3        members.

4    Q.   So you don't necessarily -- you say you personally

5        fill the clinical certs, but you don't necessarily

6        personally fill the six-month reviews?

7    A.   That's correct.

8    Q.   So maybe somebody else is doing the six-month review?

9    A.   No.

10   Q.   So when someone fills out the six-month review, do

11       they do it in your presence?

12   A.   Yes.

13   Q.   Every time?

14   A.   As far as I can recall.

15   Q.   So then --

16               MR. CROSS:  Well, all right.  I don't have

17       any further questions.  Thank you for your time,

18       Doctor.

19               MR. CARDELLI:  Katherine, do you have any

20       questions?  I do not.

21               MS. BENNETT:  I do have some questions.

22                        EXAMINATION

23   BY MS. BENNETT:

24   Q.   Hi, Doctor.  My name is Katherine Bennett.  I'm with

25       the Department of Attorney General.  I represent the



1      state defendants in this case, and I just have a few

2      questions for you today.  I just want to clarify.  You

3      were asked some questions and I just want to get some

4      clarification on a few things.

5                   Is it fair to say that the NGRI Committee

6      has never required you to fill out a Clinical

7      Certificate a certain way?

8   A.  **They never told me what to do.**

9   Q.  And say -- go ahead.  You can finish your answer.

10  A.  **No.  I do it based on my observation.**

11  Q.  And so is that the same for the six-month review

12     report form, the NGRI Committee has never told you how

13     to fill out that form?  You do it based on your own

14     observations and clinical judgment?

15  A.  **That's correct.**

16  Q.  And you said that some things you would run by the

17     NGRI Committee, such as whether an NGRI patient can

18     take leave with family; is that right?

19  A.  **I don't personally do that.  We make a determination**

20     **and one of the team members contact NGRI Committee**

21     **about what we discussed.**

22  Q.  Okay.  But that has nothing to do with your judgment

23     in filling out a clinical cert or a six-month review

24     report; right?

25  A.  **No.**


HANSON RENAISSANCE
COURT REPORTERS & VIDEO    hansonreporting.com
313.567.8100

Puthenparampil Vijayakumaran
05/26/2021                                        Page 47

1   Q.   Do you oftentimes have your support staff fill out

2        forms for you for your review and approval?

3   A.   **Not all the time, but sometimes in -- in -- especially**

4        **during team meetings.  Not on an individual basis.**

5        **When other people are present.**

6   Q.   Okay.  You never signed your name to a clinical cert

7        or a six-month review report if you disagreed with the

8        contents of it; right?

9   A.   **That's correct.**

10  Q.   Are you familiar with a patient by the name of Darryl

11       Pelichet?

12  A.   **Yes.**

13  Q.   And how are you familiar with Mr. Pelichet?

14  A.   **Me being with the NGRI team, I review the cases and**

15       **attend necessary clinical meetings.  I discuss issues**

16       **with the treating doctor.  I review the documents and**

17       **make the documents necessary for the care of the**

18       **patient and as stipulated by the court.**

19  Q.   So you've provided treatment to Mr. Pelichet?

20  A.   **I did not provide treatment to Mr. Pelichet.**

21  Q.   Did you complete a clinical cert form for

22       Mr. Pelichet?

23  A.   **Yes.**

24  Q.   And anything that was in that clinical cert form, was

25       that your own decision to include that?



1   A.   That's correct.

2   Q.   And that would go the same for any clinical cert form

3        you filled out for Mr. Pelichet?

4   A.   Absolutely.

5   Q.   And how about have you filled out six-month review

6        reports for Mr. Pelichet?

7   A.   I don't recall that.

8   Q.   But fair to say that your general practice would be,

9        true, if you had filled out a six-month report for

10       Mr. Pelichet that it would be based on your clinical

11       judgment?

12  A.   That's correct.

13  Q.   And that you wouldn't fill it out a certain way

14       because somebody mandated you to do it a different

15       way?

16  A.   No.  No.

17  Q.   Aside from filling out a clinical cert for

18       Mr. Pelichet, did you have any other role in his

19       treatment whatsoever?

20  A.   Yes.  I -- when I talked to Mr. Pelichet during these

21       meetings, I go through the -- I went through the --

22       you know, his treatment, the medication, side effects,

23       what has been happening.  You know, overall the

24       psychosocial issues, medication issues, medical

25       issues, you know, things like that.  And if I need to



1    talk to the -- convey anything specifically to the

2    treating doctor, I would do that, and it's an overall

3    assessment of his status.

4  Q.  Okay.  How about a patient by the name of Bonn

5     Washington, do you know a patient by that name?

6  A.  No.

7  Q.  How about Darius Bickerstaff, do you know a patient by

8     that name?

9  A.  No.

10  Q.  How about Joshua Ragland, do you know a patient by

11     that name?

12  A.  No.

13          MS. BENNETT:  Okay.  I don't have any

14     further questions.  Thank you.

15          MR. CARDELLI:  No questions.

16          Ian, anymore?

17          MR. CROSS:  I'm done.

18          (Discussion off the record at 11:51 a.m.)

19          (Back on the record at 11:52 a.m.)

20          MR. CARDELLI:  Yeah.  I just wanted to make

21     sure that the notice was to all the parties in the

22     case, and if you could just verify that at some stage,

23     Ian, that would be appreciated.

24          MR. CROSS:  I don't know if we provided it

25     to all parties.  I would have to check with my



1    assistant.

2                    MR. CARDELLI:   Okay.   All right.   Very

3    good.   Thank you, Doctor.

4                    (The deposition was concluded at 11:52 a.m.

5            Signature of the witness was not requested by

6            counsel for the respective parties hereto.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    CERTIFICATE OF NOTARY

 2    STATE OF MICHIGAN  )

 3                       ) SS

 4    COUNTY OF JACKSON  )

 5

 6                 I, DORA L. BENSON, certify that this

 7         deposition was taken before me on the date

 8         hereinbefore set forth; that the foregoing questions

 9         and answers were recorded by me stenographically and

10         reduced to computer transcription; that this is a

11         true, full and correct transcript of my stenographic

12         notes so taken; and that I am not related to, nor of

13         counsel to, either party nor interested in the event

14         of this cause.

15

16

17

18

19

20

21         _____

22         DORA L. QUINN, CSR-6110

23         Notary Public,

24         Jackson County, Michigan

25         My commission expires:  9-12-23
```



Puthenparampil Vijayakumaran
05/26/2021                                                      1

**1**

**1**  38:18
**10**  15:5,8 25:21
**10:28**  5:2
**10:41**  12:8
**10:48**  16:10
**10th**  40:9
**11:07**  26:14
**11:10**  28:23
**11:11**  29:14
**11:17**  33:20,21
**11:26**  33:22
**11:27**  33:24
**11:28**  35:2
**11:33**  37:24
**11:40**  42:12
**11:41**  43:6
**11:42**  43:22
**11:51**  49:18
**11:52**  49:19 50:4
**16th**  40:6
**1982**  7:4

**2**

**2**  39:24 40:19
**2-10-16**  41:20
**2-16-16**  39:14 41:17,19
**2-8-16**  38:11
**2016**  37:18 40:7,9
**2021**  5:1
**26**  5:1

**3**

**3**  36:17
**3:30**  37:18 38:11

**4**

**4**  28:2

**6**

**6**  28:11,25
**60-days**  19:9
**6th**  37:12,18

**7**

**796760**  40:11

**8**

**8**  14:22 18:19,23 26:21
**82**  13:11,15
**8th**  33:14 34:3 37:12,18

**9**

**9**  13:25 14:14,20 18:6,8 25:17
  26:6,18
**90**  19:9

**A**

**a.m.**  5:2 12:8 16:10 26:14
  28:23 29:14 33:20,21,22,24
  35:2 37:24 42:12 43:6,22
  49:18,19 50:4
**abiding**  11:6
**Absolutely**  48:4
**act**  28:7
**acts**  28:7

**acute**  9:3 25:2
**acutely**  8:15,16
**add**  24:3 29:5
**additional**  18:25
**address**  36:21,22 43:13
**administrative**  7:10 10:1
**admit**  11:23 12:1 24:6
**agree**  21:23 38:1 40:7 43:8
**agreement**  5:9
**ahead**  46:9
**allowed**  8:16,20,23
**ALS**  19:24 20:3,4,8,12 21:1
  23:23 24:20 25:9,10 26:9
**altered**  19:21
**alternate**  20:1
**anymore**  24:25 49:16
**apologize**  34:7
**apparently**  35:20
**appeal**  10:10,13 11:10
**appears**  43:16
**appreciated**  49:23
**approach**  9:16
**approached**  16:3
**approval**  47:2
**approved**  32:22
**areas**  9:10
**argumentative**  42:9
**aspects**  7:18,21
**assessment**  14:17 49:3
**assistant**  31:11 50:1
**assisted**  16:1,4 25:23,25
**attend**  23:15 37:8 47:15
**attention**  13:24 40:24
**Attorney**  45:25



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
*hansonreporting.com*
313.567.8100

authority 22:20

---

**B**

back 23:22 24:12,16 25:9,16
33:22 49:19

ballpark 13:9,10

base 23:7

based 12:21 15:14 17:11
19:21 20:21 21:14,24 22:20,
22 28:11,13 31:19 32:21 45:1
46:10,13 48:10

basis 8:15 47:4

bathroom 6:3

bearing 40:20

behavior 28:14

believed 15:2

Bennett 26:3 27:8,21 29:20,23
30:5,15 45:21,23,24 49:13

Bickerstaff 49:7

Bill 31:12,17,21,23 32:10,13
33:4 34:9 36:10,12 38:20

biological 7:18

bit 14:2

black 30:11

blacking 30:12

blank 12:11,12 18:21 41:22

blind 32:23

Bonn 49:4

bottom 29:24 43:12

box 14:16 15:5,8 18:6,14,21
25:19 26:7

boxes 14:14,22

break 6:3,6

breakthrough 25:7

BSW 43:16

bubble 35:17

---

**C**

call 17:21 20:22 24:24 25:1
26:11 37:21 43:10,18

called 5:13

calls 13:17

CARDELLI 13:16 14:1,4,8
17:18,23 26:24 27:2,5 30:1,4,
10,14 33:18 42:7 45:19 49:15,
20 50:2

care 8:10 9:6 11:17 15:13,21
37:8 47:17

cared 25:6

case 5:25 6:15 10:23 21:8
23:10 24:9 40:11,13,20 41:5
46:1 49:22

cases 47:14

causing 11:5

cert 20:15 44:24 46:23 47:6,
21,24 48:2,17

Certificate 12:16,17 25:18
29:2 46:7

certificates 22:11,17

certified 5:5

certs 45:5

charge 31:10

check 14:13,16,21 15:5,8
16:25 18:6,21 49:25

checked 14:25 25:18,22,25
26:7

checkmark 36:17

choose 18:8

circles 24:25

circumstances 8:4,6,7 15:25
34:18

civil 11:20,21 18:10,11

clarification 46:4

bunch 41:22

---

clarify 6:10 46:2

click 18:14

client 20:24 21:2 23:16 28:15
43:12

clients 18:12 25:14 26:9

clinic 36:22

clinical 11:11 12:16,17,22
18:15 20:15 21:14 22:10,17
25:17 29:2 31:11 44:24 45:5
46:6,14,23 47:6,15,21,24
48:2,10,17

code 27:13

column 37:11

combination 16:4 25:22

commitment 11:20,21,25
12:3,20 19:19

commitments 18:11

commits 19:18

committee 21:16,17,22,24
22:2,7,9 46:5,12,17,20

committee's 22:5

complete 13:13 14:13 15:6
18:23 20:12,25 47:21

completed 12:25 13:3 16:21,
23,24

completing 18:5

compliance 18:15,16 19:4

compliant 10:3,6 28:17 29:7
31:1

comply 20:5

complying 11:4

concern 27:13,14,25

conclude 14:10,19

concluded 50:4

conclusion 28:11 31:19

condition 9:24 10:11

confidentiality 30:7



HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100

consideration 11:7

consult 9:1,2

contact 46:20

contained 40:24

contents 45:1 47:8

contest 6:3

context 8:14 11:8

continue 7:9 9:18 10:9,15
  11:13 31:1

continued 12:3

continues 26:19 28:16 31:3

contract 19:24 20:3,4,6 21:1
  23:23 24:4,8,20

contracts 20:8,13 25:9

contributions 22:14

control 22:9,16

convey 49:1

corporation 6:22 7:6

correct 7:24 8:3 12:4 23:19
  25:23,24 26:1,2,17,23 28:9,10
  30:21,22 31:13,18,22,24 32:1
  33:6,7,8 35:16 36:6,7,24
  38:21,22 39:19 40:8,10 41:18
  42:16 44:10,21 45:7 46:15
  47:9 48:1,12

counsel 50:6

counseling 21:10 31:15

Counselor 39:10

County 27:16

court 5:4 9:8,12,18,21 10:2,3,
  5,7,10,13,14,17,18,20,25
  11:6,10,25 12:23 15:15,18
  16:4 17:9,12,13 18:17 19:8
  20:4 21:5 23:4 24:16,21 27:17
  36:18 40:6 41:25 47:18

crime 19:18,19 28:14

crisis 9:11 25:1,3

criteria 11:19

Cross 5:18 12:9 13:21 14:3,6,
  12 16:11 17:21 18:1,4 26:5,15
  27:1,3,7,15 28:1,24 29:15,22
  30:3,8,12,17 33:16,20 34:6
  35:3 37:25 42:13 43:7,23
  45:16 49:17,24

current 12:22

---

**D**

Dalton 43:14

danger 8:8,9,21 9:5 10:7 11:5,
  16 15:12,21 25:3

Darius 49:7

Darryl 47:10

date 10:19 32:2,5 33:13 34:2
  35:9 37:10 38:9 39:8 40:3,4,5
  42:17 44:1,8,11,12,23

day 15:23 36:25

days 18:21 19:10 37:2,6

dealing 15:9 24:18

decide 14:16 15:8 18:8,25
  22:24

deciding 22:23

decision 10:23 11:2 12:2
  21:11,13,18 22:3,6,20 23:1,7,
  20 24:2,11 47:25

decision-making 21:24

decisions 22:22 23:3

defendants 46:1

dehydration 25:4

Department 45:25

depending 9:19,24 10:22
  11:10,11

depends 8:14 9:4 10:11,20
  11:24 14:17 15:9 18:9,14
  19:2,4,8,13 34:17

deposition 5:6,21 6:13 12:7
  16:9 26:13 27:11,22 29:13
  35:1 37:23 42:11 43:5,21 50:4

determination 8:23 24:6 39:3
  46:19

determine 10:23 15:23 18:14
  44:2,3,5

determines 24:7 29:6

detriment 8:11 11:18

deviate 15:17 24:15

deviating 19:7

devise 7:22

diagnosis 11:11 12:21

difference 7:15

differently 20:25

direct 13:24

directive 24:21

directives 24:16

director 7:6 31:11

disagree 22:2

disagreed 47:7

discharge 26:8

disciplines 23:9

discuss 23:14 47:15

discussed 46:21

discussion 29:1 32:22 41:5
  45:1 49:18

discussions 21:25

distinguish 19:20

doctor 7:17 21:8 24:9 45:18,
  24 47:16 49:2 50:3

doctors 20:17

document 12:5,10,11,13
  16:12,13,17 26:10,25 27:6,7,
  16 29:16,21 32:20,23 33:2
  34:23 37:20 40:24

documents 17:1 23:15 32:18
  44:25 47:16,17

Dora 5:4

**drugs** 19:6

**duly** 5:14

**duties** 7:12

**duty** 7:10

---

**E**

**earlier** 11:3

**effects** 48:22

**elaborate** 44:16

**emaciated** 25:4

**emergency** 8:15 9:16

**employees** 41:24

**end** 6:14 9:21,23,24,25

**ends** 10:1

**endurance** 6:2

**engaged** 28:7

**ensure** 30:25

**enumerate** 12:18

**equipment** 5:7

**error** 32:6

**essential** 11:19

**estimated** 18:19,20,22 26:21
  41:14

**evaluating** 7:13

**examination** 5:17 12:19 45:22

**examined** 5:16

**examiner** 12:19

**exercise** 22:9,16

**exhibit** 12:7 16:9 17:22 25:16
  26:6,7,11,13 27:10 29:13
  30:3,6 34:24 35:1 37:21,23
  38:3 40:2 42:11 43:5,8,10,19,
  21 44:6,8

**exhibited** 28:15

**exhibits** 17:19 20:10

**exited** 33:20

**expectation** 28:9

**expected** 28:5

**expiration** 10:19

**explain** 19:15 32:17 44:16

**explode** 14:1

**extension** 19:9

**eyesight** 14:5

---

**F**

**face** 42:19

**fact** 24:19

**factors** 11:9 19:3,14 28:18

**facts** 15:2 28:25 31:20

**fair** 13:12 23:17 32:11,15 46:5
  48:8

**familiar** 20:18 47:10,13

**family** 9:2 21:20 45:2 46:18

**February** 33:14 34:4 40:6,9

**file** 17:13 41:24

**filed** 17:14 27:16 39:7 40:5,6,
  9,19,21 41:20 42:5

**fill** 41:24 44:24,25 45:5,6 46:6,
  13 47:1 48:13

**filled** 20:21 27:20 33:4,11,25
  34:9 40:21 44:14,15,18,19
  48:3,5,9

**filling** 46:23 48:17

**fills** 44:22 45:10

**finally** 6:13

**findings** 22:10,16

**finish** 46:9

**focus** 7:18

**follow** 17:4,5,6,8,11 18:18
  30:25

**follow-up** 19:5 31:2

**form** 12:12,23 13:3,17,25

14:13 15:6 16:19 17:13,14,15,
22 18:5,10 20:19,21 31:23
32:12,13 34:10 35:4,25 36:9,
15 43:1,8,24 44:12,22 46:12,
13 47:21,24 48:2

**formal** 20:14,20

**formally** 9:17

**forms** 7:22 12:25 19:4 20:10,
  12,14,25 21:5 41:23 42:5 47:2

**frame** 30:24

**freeze** 33:16

**front** 32:18,20

**future** 28:5

---

**G**

**general** 25:15 45:25 48:8

**generally** 8:1

**gentleman** 31:10

**give** 13:9,10

**good** 5:19,20 50:3

**great** 17:23

**Green** 38:6 39:4

**grief** 31:15

**ground** 6:1

**guess** 6:10 27:23 30:6

**guilty** 19:17

---

**H**

**hand** 24:14

**handwriting** 29:3 31:6,8,9,17,
  21,23 32:3 35:7,9 36:11,12
  38:2,3 39:1,14,15 42:21 43:2,
  3,8,9,24 44:1,7,9

**happen** 42:4

**happened** 42:2

**happening** 48:23



hard 19:12

Hartley 31:12 32:10,14 33:4 34:9 38:20

Hartley's 31:17,21,23 36:11, 12

health 6:23,25 27:13

hear 8:18 24:19

Hegira 6:22,24 7:3 13:1,4 16:22 18:5 20:7 41:23,24

held 5:6

hereto 50:6

HIPAA 27:13

history 10:12 11:7 28:13

home 42:20,22

homicidal 8:16

hospital 11:24 12:1,2 23:23 24:5,12,17

hospitalization 15:11 16:2,5 25:22 26:1

hospitalize 24:2

hospitalized 11:15 14:24 15:16

hospitals 11:24

human 7:21

hundred 13:6 39:16

hurting 8:22 9:5 10:8 11:16 15:12,21

**I**

Ian 14:2 17:18 26:24 27:8 29:20 42:8 49:16,23

idea 13:13,14 21:25 25:15 41:21 42:6

identify 17:19

identity 27:10

illness 28:3,4

imminent 8:9,21 9:5 10:7

11:16 15:12

importantly 12:21

include 47:25

including 44:23

Incorporated 6:23,25

individual 14:20 15:2 23:4 26:18 28:3,4 29:19 47:4

information 23:17

informed 23:16

initial 39:17,18

initialled 35:22,23

initials 6:16 32:6,7,9 35:14,15, 21 39:12,16

injure 28:6

injury 15:1,3

input 11:1 20:21 21:7,11 22:12 23:1 24:13

insanity 19:17

intensity 15:9 24:17 28:14

intent 32:16 33:1

intentionally 28:5

interesting 17:6

internet 27:17

interrupted 28:22

intervention 9:12

interview 23:5,8 42:22

interviewed 42:19

involuntarily 11:15,23

involuntary 8:13 9:9

involved 24:1 41:5

involvement 11:21 23:25

issues 47:15 48:24,25

**J**

job 7:5,12

joking 33:19

Joshua 49:10

judgment 21:14 46:14,22 48:11

**K**

Katherine 45:19,24

kind 32:22

knowledge 31:20

Kumaran 6:19 14:7 34:7

**L**

law 24:15

leave 20:1 21:19 46:18

led 28:15

length 29:8

licensed 20:18

life 8:8,11 25:3

likelihood 14:25 15:3

limit 10:19

living 6:20

Livonia 6:21

location 36:23 38:15

long 5:25

looked 20:10 38:3,13,16

**M**

M.D. 5:12

made 28:7

maintain 30:19 31:5 35:7 38:24

make 8:23 21:4,18,19,22 22:20 24:5,11 27:24 31:3 37:13 39:3,11 46:19 47:17 49:20

makes 12:2



**making** 22:22 23:1,3 24:2 27:9,12

**manage** 25:7

**management** 7:19

**manager** 21:8 24:9

**managers** 23:10

**managing** 20:23,24

**mandated** 48:14

**manner** 31:4

**Marie** 43:14

**marked** 12:6 16:8 26:12 29:12 34:24,25 37:22 42:10 43:4,20

**matches** 43:9

**means** 41:3

**mechanism** 10:1

**medical** 7:6,24,25 8:2 19:22 48:24

**medically** 7:17,20

**medication** 7:19 18:17 48:22,24

**meeting** 23:9,15 41:15 42:23 44:14,19,20

**meetings** 37:8 47:4,15 48:21

**members** 20:22 22:14 45:3 46:20

**mental** 19:19,21 27:13 28:3,4

**mentioned** 11:3 19:3

**Michigan** 5:5

**modality** 8:21

**months** 18:21 26:22 40:17,18 41:14

**morning** 5:19,20

**N**

**names** 6:13

**narratives** 20:6

**necessarily** 45:4,5

**needed** 7:14

**news** 24:19

**NGRI** 16:17 17:5,7 18:12 19:15 20:8,12,22 21:1,2,6,16, 17,22 22:2,5,7,9,11,18 23:22 25:14,18 28:15 30:19 31:5 35:7 38:24 46:5,12,17,20 47:14

**non-plaintiff** 27:10

**notary** 5:5

**note** 30:6

**notice** 49:21

**noticed** 19:15

**number** 19:12 40:11,13,14

**O**

**object** 13:16 27:8,12 42:7

**objection** 26:3 30:6

**observation** 46:10

**observations** 46:14

**observe** 30:24

**office** 41:23

**oftentimes** 47:1

**one's** 8:9

**ongoing** 9:17,20 31:2

**opinion** 11:14 39:11

**order** 10:2,3,14,18,19 15:15

**ordered** 9:17,20 10:6 11:8 20:4

**orders** 10:17,20,25 19:7

**outcome** 29:6,9

**outpatient** 9:11 16:1,5 25:23, 25 36:22

**overrule** 22:20

**P**

**p.m.** 37:18 38:11

**pages** 27:5 36:9

**papers** 36:19

**paperwork** 37:9

**part** 8:19 9:13 20:16 27:12 29:1 44:22

**parties** 5:9,10 49:21,25 50:6

**party** 6:14

**patient** 7:23 8:5,14,15,21 9:4, 6,7,9,19,24 10:2,3,5,7,9,13, 14,17,21,25 11:3,4,5,7,8,12, 14,16,17 12:18 14:17,18,23 15:12,13,16,20 18:18 19:5,6, 19 20:5 21:1,2,8,19,20 22:3, 25 23:4,5,12,13 24:3,4,6,7,10, 12,15,19 25:2,4,18 28:16 29:7,9 30:7,25 31:3,14 36:2,5, 7,8,15 38:12,24 39:25 40:20 41:1,5 42:19 45:1 46:17 47:10,18 49:4,5,7,10

**patient's** 8:5 10:12 18:14,15 23:11 27:10,18,19 28:13 36:1, 20

**patients** 6:14 7:11,13 8:1 11:23 15:16 16:17 17:5,7 20:7,8,12 21:6 22:11,18 23:22 25:5

**pause** 34:7

**pay** 40:23

**Pelichet** 47:11,13,19,20,22 48:3,6,10,18,20

**pen** 32:21

**people** 9:16 24:11 40:21 42:4 47:5

**percent** 39:16

**permission** 9:8

**person** 5:11 8:13 14:11,20 19:18 26:19 28:14 36:18 38:5 41:10,13 43:14,15

person's 8:8 39:4

personal 31:20

personally 22:12 36:15 44:24
45:4,6 46:19

pertinent 18:11

PG 35:18,19 39:10,20

phone 16:25

physical 11:19

physically 28:6

place 12:19 25:14

Plaintiffs' 34:24

point 43:15

poor 14:5

portion 33:23

posed 6:6 15:2

position 24:18

practice 6:21 13:10 15:23
16:18 18:12 48:8

precedence 22:4

predict 29:8,9

prescribe 7:13

presence 45:11

present 10:5 23:11 47:5

presentation 12:22

pretty 9:6

previous 17:22

privacy 6:15

probate 27:17 40:6 41:25

problem 30:12

proceed 11:25 12:2

proceedings 18:11

process 9:21 11:22 23:25

professional 7:18

prognosis 29:10

program 9:17,20 20:16 25:2,5,

6,8 26:8 31:11

progress 16:20

proof 36:10,11 38:1,10,12,15
39:2,7 43:9

proofs 40:25

proposal 21:22

protocol 17:4,6

provide 7:23 8:4 9:9 47:20

provided 20:11 47:19 49:24

providing 7:24 20:23,24

psychiatric 8:13 19:22 24:5

psychiatrist 6:21 7:15,17
23:14

psychiatrists 20:17

psychiatry 29:6

psychologist 7:16,20 21:9

psychologists 20:18

psychology 7:21

psychosocial 48:24

public 5:5 27:16

purpose 12:17 16:19 32:16

pursuant 5:9

pursue 15:24

put 41:23

PUTHENPARAMPIL 5:12

putting 19:13

## Q

question 6:5,6 13:17 29:5
34:13 36:16 40:23 41:3

questions 6:9 29:25 45:17,20,
21 46:2,3 49:14,15

Quinn 5:4

## R

Ragland 49:10

rare 8:6

read 33:23 37:11

reading 17:24

reason 6:4 19:17

reasonable 10:4 31:4

reasons 12:20

recall 13:5 26:9 38:7 40:1,3
43:15 45:14 48:7

receive 10:25 31:15

received 22:12,14

recess 33:21

recognize 12:10 16:13 36:21

recommend 15:11 16:1 23:4

recommendation 21:18
22:21,23,24,25

recommendations 21:4
22:10,17 34:19

recommended 31:14

record 27:12,15,22,24 28:22
33:22,23 36:1 37:11 49:18,19

redacted 27:11

refer 6:15

refuse 8:2 9:7

refusing 8:8

regimen 15:15,17

remains 10:4 29:7

remember 5:24 41:2

remotely 5:9

report 38:19,21,23 46:12,24
47:7 48:9

reporter 5:4,6,7 12:6 16:8
26:12 28:22 29:12 34:25
37:22 42:10 43:4,20


hansonreporting.com
313.567.8100

**reports** 39:24 40:16,19 48:6

**represent** 45:25

**requested** 33:23 50:5

**required** 18:20,22,25 26:22
   41:14 46:6

**requirements** 10:6

**requiring** 14:11,20 26:19

**residency** 20:16

**residential** 25:1

**respective** 50:6

**respite** 24:23,24 25:11,15

**response** 13:18

**responsible** 20:23

**result** 28:3

**review** 16:16,20 23:14 38:19,
   21,23 39:24 40:16,19 45:8,10
   46:11,23 47:2,7,14,16 48:5

**reviews** 22:11,18 45:6

**RG** 39:9,11,20

**role** 48:18

**room** 5:8 33:20

**Roxanne** 38:5 39:4

**rule** 6:5 36:18

**rules** 6:1

**run** 46:16


─────────── S ───────────


**Saturdays** 37:4,6

**scriber** 34:17

**sealed** 27:23

**seek** 9:8

**seeking** 9:12

**semi-independent** 21:21

**send** 24:12 25:5

**sentence** 43:11

**seriousness** 28:13

**served** 36:14,18 38:18 41:1

**service** 36:10,11,18 38:1,9,10,
   13,16 39:2,7 40:25 41:4 43:9

**serving** 38:20

**severity** 10:22

**shorthand** 5:5

**show** 12:5 16:12 17:15 18:2
   26:10 29:16 33:15 34:5,22,24
   37:20

**showed** 20:15

**shows** 41:4

**side** 48:22

**sign** 32:23 44:12

**signature** 26:16 29:17 30:18
   31:25 32:2,12 35:4 40:21
   41:4,6 42:15 44:11,23 50:5

**signed** 33:9 35:20,21 36:13,14
   41:17,19,22 47:6

**significant** 28:8

**sir** 12:10 16:13 17:1 18:6
   26:16 31:6 35:5

**situation** 9:3,4 11:11 21:21

**situations** 9:16 25:5

**six-month** 16:16 22:11,18
   38:19,21,23 39:24 40:16,19
   41:15 45:6,8,10 46:11,23 47:7
   48:5,9

**social** 21:9 23:10 24:9 43:16

**space** 44:12

**specifically** 49:1

**speculate** 13:19

**speculative** 13:17

**spent** 12:20

**sphere** 9:13

**stability** 31:2

**stabilized** 28:17

**stable** 10:4,9 29:8 31:4

**staff** 42:20,22 45:2 47:1

**stage** 17:19 49:22

**start** 6:1

**state** 10:9 19:19 27:24 46:1

**statement** 32:15

**stating** 20:4

**status** 18:15 19:21 20:1 25:10
   30:19 31:3,5 35:7 38:24 49:3

**stay** 21:21

**stipulate** 5:10 13:19 30:11,13,
   14,15

**stipulated** 15:17 17:8 18:17
   19:8 47:18

**stipulations** 11:6 24:4,8

**stuff** 33:4

**subacute** 25:7

**subject** 8:12

**submitted** 12:23 25:17

**substance** 40:24

**substantially** 28:8

**suffice** 15:20

**suicidal** 8:16

**support** 10:23 47:1

**supportive** 28:8

**suppose** 18:24

**supposedly** 41:1

**sworn** 5:8,11,14

**symptoms** 25:7

**system** 24:24


─────────── T ───────────


**takes** 22:4

**taking** 11:6,17 15:13,21 18:17
   19:6


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

talk 22:7 27:3 49:1

talked 21:5 36:4 48:20

talking 6:14 17:20 25:10,15 34:23

team 7:14 8:25 9:1 20:22,23 22:14 23:2,9,18 45:2 46:20 47:4,14

tells 17:12

ten 13:6,15

term 19:15,24

terminate 10:10 11:12

terms 11:23 18:16

testified 5:16 25:21 34:8

testify 5:14 34:8

testimony 5:10 33:3 44:20

thing 25:1 32:11 35:17

things 17:11 19:9 23:13 37:9 46:4,16 48:25

thought 33:18

thousand 13:7

threats 28:8

Thursdays 37:3,5

time 5:25 10:4,19 12:20 13:1,4 15:19 16:21 18:20,22,25 19:18 26:21 29:8 30:24 36:14 37:10 38:9 39:25 41:2,4,14 42:9 45:13,17 47:3

times 5:23,24 13:3 16:24 19:4

title 7:5

today 46:2

told 21:4,7,18 34:20 46:8,12

top 35:25 42:25

trained 7:17,20

training 7:21 20:11,14,20

transcript 17:24

treated 20:7

treating 10:12 21:8 23:14 24:10 47:16 49:2

treatment 7:14,19,22,23,24,25 8:2,5,9,13,17,20 9:7,9,11,13, 17,18,20 10:10,11,16,21 11:1, 4,9,12,13 14:11,18,21 15:14, 17,24 16:1,4,5,16,20 18:16, 21,23 19:1 20:24 22:13 23:2, 12,18 25:6,23 26:1,8,19,22 28:17 41:14 45:2 47:19,20 48:19,22

true 48:9

truth 5:14,15

turn 42:24

two-page 27:6,7 35:4

type 34:14 41:11,13

typed 41:7,8,9,10

─────────────

## U

Uh-huh 34:11 36:3

ultimate 23:20

undergo 11:9

understand 6:9 33:3 34:13

understanding 10:8 17:16 20:1,2 21:23 22:5,19 24:14

unilaterally 8:24

unintentionally 28:6

usual 25:11

─────────────

## V

variable 19:13

variety 23:11

vary 24:18

verify 49:22

versus 21:1

videoconferencing 5:7

Vijayakumaran 5:12,19

violated 24:7

violates 24:4

violation 24:17

VK 35:14,15 39:17,18

volition 10:15 11:13

─────────────

## W

wanted 49:20

Washington 49:5

Wayne 27:16

Wednesday 5:1

week 36:25 37:7 40:16,21

weekend 21:20

weeks 42:5

well-being 11:19

Westland 6:22

whatsoever 48:19

words 8:24 29:10

work 6:22,24 7:14 8:25 9:10, 14,25 11:23 36:23,25 37:2,3,6

worked 37:5

worker 21:9 24:9 43:17

workers 23:10

working 7:2 23:13

workings 22:1

write 28:21,25 30:23 34:12,14, 20 39:12,21,22,23 42:17,19, 21 44:11

writes 34:16

written 32:13,18

wrong 19:21

wrote 30:18 32:12,20,21

─────────────

## Y

year 13:13

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Puthenparampil Vijayakumaran
05/26/2021                                              10

**years** 7:2 10:21,22 11:1 20:16

---

**Z**

---

**zoom** 32:5 33:20 39:8