IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**DARRYL PELICHET**, et. al.

Plaintiffs,

v.

Case No.: 2:18-cv-11385
MAG.: ANTHONY P. PATTI

**ELIZABETH HURTEL**, Director of the Michigan Department of Health and Human Services, in her official capacity, et. al

Defendants.

## DECLARATION OF SHIELA HATTON

Declarant, Sheila Hatton, states as follows based on her personal knowledge:

1. My name is Sheila Hatton and I am over 18 years of age.

2. I have decades of experience working with seriously-mentally-ill, institutionalized adults.

3. I worked at the Huron Valley Center, 400-bed, MDOC-operated psychiatric hospital that housed convicted felons with serious mental illness, from 1994 until 2004.

4. In 2004, I was transferred to the Center for Forensic Psychiatry, a facility housing individuals adjudicated Not Guilty by Reason of Insanity, Incompetent to Stand Trial, or awaiting competency evaluations.

5. In December of 2014, after I obtained my Bachelor's of Science in Nursing, I began working in Walter P. Reuther Psychiatric Hospital as an RN. I continued to work full-time at Walter P. Reuther Psychiatric Hospital until October of 2016.

6. Since I left Walter P. Reuther Psychiatric Hospital in October of 2016, I have worked as an RN at the Acute Inpatient Mental Health Unit at the Veterans Administration Hospital in Ann Arbor.

7. In June 2020, I became a licensed Psychiatric Mental Health Nurse Practitioner and began practicing at Team Mental Health Services in Southgate.

8. In my current role as a Psychiatric Mental Health Nurse Practitioner, I conduct psychiatric evaluations and prescribe psychiatric medications on a daily basis.

9. When I worked at Walter P. Reuther Psychiatric Hospital, patients were assigned to a locked Unit housing up to thirty patients. Patients spent the vast majority of their time on their Unit.

10. Staff at Walter P. Reuther Psychiatric Hospital were also assigned to specific Units.

11. I was assigned to the same Unit as Joshua Ragland, Darryl Pelichet, and Bonn Washington.

12. My shifts were typically eight hours, if I was not working overtime, for five days a week.

13. I had extensive, daily contract with Joshua Ragland, Darryl Pelichet, and Bonn Washington while those individuals were housed in Walter P. Reuther Psychiatric Hospital.

14. Many of the patients at Walter P. Reuther Psychiatric Hospital were actively psychotic and violent.

15. Patient-on-patient and patient-on-staff assaults occurred on my unit on a weekly basis. I have been assaulted by patients at Walter Reuther on at least five occasions in less than two years of working at the facility.

16. Each Unit at Walter Reuther is equipped with a seclusion/restraint room for isolating and/or physically restraining violent patients.

17. Darryl Pelichet, Joshua Ragland, and Bonn Washington never required seclusion or restraint in the time they were on my Unit at Walter Reuther.

18. In the time they were on my Unit at Walter Reuther, Darryl Pelichet, Joshua Ragland, and Bonn Washington did not, to my knowledge, engage in any assaultive or violent behavior.

19. I provided medical attention to Joshua Ragland on one occasion after he was attacked by another patient. He did not retaliate.

20. I interacted with Joshua Ragland approximately five days a week from January to October of 2016. Throughout his stay at Walter Reuther, he behaved appropriately, was not psychotic or delusional, did not engage in self-injurous behavior, and exhibited no observable symptoms of mental illness.

21. Joshua Ragland's personal hygiene was appropriate throughout the nine months he spent on my Unit. He appeared capable of attending to his basic physical needs for food, clothing, and shelter without assistance.

22. If a veteran with a mental state and history equivalent to Joshua Ragland's presented at the Acute Inpatient Mental Health Unit at the V.A. Hospital in Ann Arbor, we would not admit that veteran as an inpatient.

23. When a veteran presents at the Acute Inpatient Mental Health Unit at the V.A. Hospital in Ann Arbor who is actively suicidal or presents immediately following a serious suicide attempt, the veteran is typically treated as an inpatient for a period of a few days or a few weeks at most.

24. If an individual with an equivalent history and mental state to Joshua Ragland presented at Team Mental Health Services, I would treat that individual as an outpatient.

25. Joshua Ragland was not actively suicidal or homicidal when he was admitted to Walter Reuther in January of 2016.

4

26. Joshua Ragland's mental state remained essentially the same from January of 2016 until I quit in October of 2016.

27. In my opinion, based on my training, experience, and daily personal observation of Joshua Ragland, I believe that Joshua Ragland's psychiatric hospitalization at Walter Reuther in 2016 was medically unnecessary.

28. In my opinion, based on my training, experience, and daily personal observation of Joshua Ragland, the question of whether long-term inpatient psychiatric hospitalization of Joshua Ragland was medically necessary was not a "close call." It was obvious that long-term inpatient psychiatric treatment for Mr. Ragland was not medically necessary.

29. I had daily contact with Darryl Pelichet during two of his hospitalizations at Walter Reuther, from February of 2015 until January of 2016, and from May of 2016 until October of 2016.

30. Darryl Pelichet's mental state remained essentially the same throughout these hospitalizations.

31. Darryl Pelichet was not actively psychotic, delusional, suicidal, or homicidal at the time of his February 2015 and May 2016 admissions to Walter Reuther.

32. Darryl Pelichet's personal hygiene was appropriate throughout his stays and he appeared to be able to attend to his basic physical needs for food, clothing, and shelter without assistance.

33. Darryl Pelichet's thought processes were normal, his behavior was appropriate, and his thinking was reality-based throughout his stays on my Unit.

34. If a veteran with Darryl Pelichet's history and symptoms presented at the Acute Inpatient Mental Health Unit at the V.A. Hospital in Ann Arbor, we would not admit that veteran as an inpatient.

35. In my current job at Team Mental Health Services, I regularly treat individuals on an outpatient basis whose mental illness is more severe than Darryl Pelichet's was during his 2015 and 2016 hospitalizations.

36. In my opinion, based on my training, experience, and daily personal observation of Darryl Pelichet, I believe that Darryl Pelichet's 2015 and 2016 hospitalizations at Walter Reuther were medically-unnecessary.

37. In my opinion, based on my training, experience, and daily personal observation of Darryl Pelichet, the question of whether long-term inpatient psychiatric hospitalization of Darryl Pelichet in 2015 and 2016 was medically necessary was not a "close call." It was obvious that long-term inpatient psychiatric treatment for Mr. Pelichet was not medically necessary.

6

38. Other staff members on my Unit who had daily contact with Mr. Pelichet agreed with me that Mr. Pelichet did not need to be hospitalized.

39. Walter P. Reuther Psychiatric Hospital has only minimal services geared toward treatment of substance use disorders. It is not a substance abuse treatment facility.

40. In my job at the V.A. Hospital in Ann Arbor, I have tried to secure admission to Walter Reuther for veterans whose mental illness was too severe for community placement and who required an institutional level of care.

41. On every occasion that I have attempted to place a veteran at Walter P. Reuther Psychiatric Hospital, I have been unable to do so because no beds were available.

42. In my experience, beds at Walter P. Reuther Psychiatric Hospital were not allocated to the patients with the most severe mental illnesses and the greatest need for inpatient psychiatric treatment. Scarce public adult psychiatric beds at Walter Reuther were being occupied by individuals who presented no immediate danger to themselves or others and did not require an inpatient level of care. The unnecessary confinement of persons capable of living in the community not only harms those individuals, but also prevents other actively-psychotic, unstable patients from accessing the long-term inpatient psychiatric treatment that they need.

43. I have not been paid or compensated in any way for my participation in this case.

44. I declare under penalty of perjury that the foregoing is true and correct.

Date: 07/30/21

By: /Sheila Hatton PMHNPBC
Sheila Hatton, MSN, PMHNP