IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**DARRYL PELICHET**, et. al.

Plaintiffs,

v.

**ELIZABETH HURTEL**, Director of the Michigan Department of Health and Human Services, in her official capacity, et. al

Defendants.

Case No.: 2:18-cv-11385
MAG.: ANTHONY P. PATTI

### DECLARATION OF DR. BRANDON MOORE, M.D.

Declarant, Dr. Brandon Moore, states as follows based on his personal knowledge:

1. My name is Dr. Brandon Moore and I am over 18 years of age.

2. I am a board-certified forensic psychiatrist. I am also board-certified in general psychiatry.

3. During my residency, I completed a forensic psychiatry rotation at the Center for Forensic Psychiatry in Ypsilanti, Michigan. Immediately following my residency, I also completed a fellowship in forensic psychiatry at the University of Rochester in Rochester, New York.

4. I am employed at St. Joe's Medical Group/St. Mary's Mercy Livonia as an Attending Psychiatrist and as Director of Forensic Education.

5. I have also worked as a psychiatrist at various correctional facilities, where I managed suicidal and self-injurious inmates.

6. In my current role at St. Marys Mercy Livonia Hospital, I treat patients with schizophrenia, violent patients, patients with substance use disorders, and patients with suicidal tendencies on a daily basis.

7. Staff at adult foster care homes regularly transport mentally-ill residents to the Emergency Room at St. Mary's Mercy Livonia, often because the resident is acting out or is not following house rules. Family members and police officers also regularly transport mentally-ill individuals to the Emergency Room at St. Mary's Mercy Livonia.

8. My job duties include examining these patients and determining whether each patient should be admitted to a psychiatric ward.

9. My job duties also include monitoring patients who have been admitted for inpatient psychiatric treatment, prescribing treatment, and determining when the patients are ready for discharge.

10. I have reviewed hundreds of pages of medical records and psychiatric assessments for Darryl Pelichet and Joshua Ragland from their hospitalizations at Walter P. Reuther Psychiatric Hospital and their outpatient treatment in the community. I also conducted a clinical interview with Darryl Pelichet via Zoom.

11. On the basis of my training, education, and experience, it is my opinion that Joshua Ragland has not required any inpatient psychiatric treatment, other than a brief hospitalization following a suicide attempt in February of 2014.

12. Acute psychiatric hospitalization following a serious suicide attempt typically lasts for a few days or a few weeks at most. If further treatment is required, it is done on an outpatient basis.

13. There was no medical necessity for the five-month inpatient hospitalization of Mr. Ragland at the Center for Forensic Psychiatry, beginning in October of 2014. This hospitalization commenced because of a legal event, Mr. Ragland's acceptance of an NGRI plea, and not because of any apparent change in Mr. Ragland's symptoms that would warrant hospitalization.

14. Although Mr. Ragland was diagnosed with bipolar disorder at the Center for Forensic Psychiatry, I do not believe that he meets the diagnostic criteria for bipolar disorder. He has exhibited major depression. But I saw no evidence of any manic or hypomanic episodes. I also did not see any evidence of psychosis. I agree with Monroe Community Mental Health's diagnosis of major depressive disorder.

15. Mr. Ragland could have been easily treated on an outpatient basis in late 2014 and early 2015. He was not actively suicidal or homicidal and was not displaying symptoms of serious mental illness at that time.

16. Mr. Ragland did not need to be hospitalized from January of 2016 to December of 2016. It is my opinion that this hospitalization was not only medically-unnecessary, but was manifestly unreasonable and outside the bounds of acceptable medical practice.

17. In 2016, Mr. Ragland was largely treatment-compliant and symptom-free. His medication regimen was not indicative of someone with severe mental illness. There was no legitimate medical reason to admit him as an inpatient and no legitimate medical reason to hold him for almost a year.

18. A typical inpatient stay for psychiatric treatment is five to seven days. Reasons that would justify a longer stay include a need to titrate medication or a plan to transition a patient from an oral antipsychotic to a long-acting injectable. Even with these types of medication adjustments, inpatient stays rarely need to exceed 30 days. An inpatient stay can last slightly longer, up to approximately 45 days, if the patient is floridly psychotic and the symptoms are initially unresponsive to medication. But psychiatric hospitalizations over 30 days are unusual in the contemporary practice of medicine.

19. On rare occasions, I have referred patients to Walter P. Reuther Psychiatric Hospital for longer-term hospitalization.

20. The patients that my colleagues and I refer to Walter P. Reuther Psychiatric Hospital are those that are too persistently symptomatic and too violent to be safely managed on a civil inpatient unit. These patients are highly treatment-resistant, continuously experiencing severe symptoms of mental illness that are not relieved by medication, and require routine use of physical and/or chemical restraints to prevent them from destroying hospital property and attacking other patients or staff. These patients also have histories of persistent violent behavior in AFC homes that have not been successfully interrupted by various medication adjustments. I do not refer patients to WPRPH if they require seclusion and restraint on only a few occasions. My colleagues and I only refer patients to WPRPH as a last resort, when various treatment adjustments have failed to arrest a longstanding pattern of frequent assaultive behavior.

21. From my review of their records, I found no indication that Joshua Ragland or Darryl Pelichet ever required application of seclusion or restraint during their stays at WPRPH. These patients were not engaging in violent behavior, they appeared to be generally treatment-compliant and their symptoms were

adequately controlled with medication. Joshua Ragland and Darryl Pelichet did not come close to requiring long-term hospitalization.

22. On the basis of my training, education, and experience, my examination of Darryl Pelichet, and my review of the treatment records for Darryl Pelichet, it is my opinion that for the vast majority of the time Darryl Pelichet has been hospitalized since 2005, inpatient psychiatric treatment was not medically necessary.

23. Darryl Pelichet has schizophrenia. He has a relatively mild case for someone with his disease.

24. About 80% of people with schizophrenia have a course characterized by an acute onset of the disease, intermittent symptoms, and later exhibit no symptoms or only mild symptoms. Only about 20% of patients with schizophrenia present with the stereotypical course of insidious onset, continuous symptoms, and poor outcome.

25. Long-term outcomes in patients with schizophrenia are also strongly correlated with the presence and severity of deficit symptoms. Deficit symptoms represent the absence or diminution of processes that occur in normal individuals. In contrast, positive symptoms are exaggerations of normal processes, or phenomena that do not occur in normal individuals. Deficit symptoms include decreased expressiveness, persistent apathy, and

flat affect. Patients with persistent deficit symptoms are the least likely to show improvement and recovery over the course of the illness.

26. Darryl Pelichet had acute onset and intermittent, relatively mild symptoms. He does not exhibit clinically-significant deficit symptoms. He has been medication compliant. His symptoms appear to have been in continuous remission since 2011.

27. Darryl Pelichet is and was able to complete ADLs ("activities of daily living") without assistance and demonstrated consistent voluntary compliance with antipsychotic medication. In my opinion, he did not require a dependent community placement such as an AFC home. Patients with mild schizophrenia who are independent in ADLs and can self-administer their antipsychotics (or willingly attend appointments for long-acting injectables) are generally able to live independently.

28. Like most patients with schizophrenia, Darryl Pelichet may have occasionally required short-term hospitalization when experiencing active symptoms of psychosis.

29. I treat patients with similar psychiatric symptoms and histories to Darryl Pelichet on a frequent, regular basis. When patients similar to Darryl Pelichet need to be admitted for inpatient treatment, a typical stay is five to seven days.

30. I might hold someone like Darryl Pelichet slightly longer, up to about three weeks, if I had decided to transition the patient from an oral antipsychotic to a long-acting injectable such as Invega Sustenna.

31. I would never refer a patient with symptomology similar to Darryl Pelichet for longer-term hospitalization.

32. The medically-appropriate course of treatment for a patient like Darryl Pelichet does not change because he is a "forensic" patient. I have treated numerous forensic and non-forensic patients, as well as schizophrenic patients confined in prisons and jails. Darryl Pelichet has one documented incident of assaultive behavior during a psychotic episode in 2005. The non-forensic patients that I treat frequently have similar or more severe histories of assaultive behavior during acute episodes of psychosis. Darryl Pelichet is not categorically more dangerous or clinically distinct from the patient population I interact with on a daily basis due to his NGRI adjudication.

33. I have managed thousands of psychiatric admissions for patients similar to Darryl Pelichet over my career, and in the vast majority of cases, the patient can be stabilized and ready for discharge in less than 30 days. Most such patients are ready for discharge after about a week.

34. From my review of the records, it appears that from 2006 to 2018, Darryl Pelichet experienced active symptoms of psychosis once, in October of 2011.

An inpatient stay for less than 30 days would have been appropriate at that time.

35. None of the other readmissions of Darryl Pelichet since 2006 were medically necessary.

36. Darryl Pelichet was hospitalized when his symptoms were in remission, apparently because he tested positive for marijuana or because he broke rules.

37. I would never admit a patient whose symptoms were in remission to a psychiatric ward merely because the patient had failed a drug test.

38. To warrant admission, a schizophrenic patient should be currently experiencing symptoms of psychosis and should be presently dangerous to themselves or others.

39. While use of marijuana can increase paranoia and is not recommended for patients with schizophrenia, the effects of marijuana vary from patient to patient. Use of marijuana does not always cause decompensation and returning symptoms of psychosis in a patient with schizophrenia.

40. Medical professionals sometimes disagree about the best course of treatment for a given patient, but the range of arguably appropriate treatment plans is not unlimited. Ordering long-term hospitalization to prevent an asymptomatic patient from using marijuana is outside the scope of modern professional medical practice.

41. To warrant hospitalization, the patient's use of marijuana must have actually caused the patient to experience a relapse of psychosis and have caused the patient to become acutely dangerous.

42. Unfortunately, the use of marijuana is common among patients with schizophrenia. A patient with schizophrenia using marijuana is not a medical or psychiatric emergency.

43. There are a range of appropriate community-based treatment options for patients with schizophrenia and substance use disorders. At the lowest intensity are AA/NA groups, then Assertive Community Treatment (ACT-Team) services, then Intensive Dual-Disorder Treatment (IDDT), and finally, inpatient substance use treatment programs. These services represent potentially appropriate treatment options for Darryl Pelichet.

44. Psychiatric hospitalization was not an appropriate treatment for Darryl Pelichet's substance use.

45. Darryl Pelichet appears to have been hospitalized in May of 2016 while he was not even currently using marijuana, was medication-compliant, and was completely asymptomatic. He was hospitalized for a curfew violation.

46. Ordering admission to a psychiatric ward because an asymptomatic patient has violated a rule is not medical treatment.

47. I evaluate patients who have violated rules or acted disruptively in AFC homes on a daily basis. I do not admit these patients to the psychiatric ward unless there is a medical reason to admit them.

48. There does not appear to have been any legitimate medical reason to hospitalize Darryl Pelichet in May of 2016.

49. I declare under penalty of perjury that the foregoing is true and correct, and my opinions are stated within a reasonable degree of medical certainty.

Date: 8/10/21

By: *[signature]*

Dr. Brandon Moore, M.D.