UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARRYL PELICHET,
BONN WASHINGTON,
JOSHUA RAGLAND,                        Case No. 2:18-cv-11385
DARIUS BICKERSTAFF,                    Honorable Anthony P. Patti
through his guardian
FRANK BICKERSTAFF, and
MICHIGAN PROTECTION
AND ADVOCACY SERVICE,
INC.,

        Plaintiffs,

v.

ELIZABETH HERTEL, *et al*.,

        Defendants.
_____/

**OPINION AND ORDER GRANTING IN PART and DENYING IN PART
DEFENDANT HEGIRA'S MOTION FOR SUMMARY JUDGMENT (ECF
No. 172)**

**I.      OPINION**

**A.      Introduction**

Four persons—individuals who have been found not guilty of certain crimes

by reason of insanity (NGRI)—and Michigan Protection and Advocacy Service,

Inc. (MPAS)—"a nonprofit organization designated by the governor as the

protection and advocacy organization for individuals who have physical, mental,

and developmental disabilities in the state of Michigan"—initiated this lawsuit

against a multitude of Defendants.  (ECF No. 44, ¶¶ 11-170.)  Hegira—which

treated Plaintiffs Pelichet and Washington—is the only remaining Defendant.

Thus, this opinion concerns Pelichet and Washington's claims against Hegira.

At the center of this lawsuit are provisions of Michigan's Mental Health

Code and the policies and directives of Michigan's Department of Health and

Human Services (MDHHS).

### 1.      The release and discharge of individuals found not guilty by reason of insanity

When an individual is acquitted by reason of insanity, his or her disposition

is governed by Mich. Comp. Laws § 330.2050, Subsection (5) of which provides

as follows:

> The release provisions of [Mich. Comp. Laws §§ 330.1476 to
> 330.1479] shall apply to a person found to have committed a crime by
> a court or jury, but who is acquitted by reason of insanity, except that
> a person shall not be discharged or placed on leave without first being
> evaluated and recommended for discharge or leave by the
> department's program for forensic psychiatry, and authorized leave or
> absence from the hospital may be extended for a period of 5 years.

Mich. Comp. Laws § 330.2050(5) (internal and external footnotes omitted).  *See*

*also* Mich. Admin. Code Rules 330.10085-330.10097.

Section 330.2050(5) provides the framework for Michigan's Center for

Forensic Psychiatry (CFP) NGRI Committee's recommendations to probate courts

(*see* ECF No. 44, PageID.970) and its execution of Authorized Leave Status (ALS)

Contracts (*see Id.*, PageID.979), and is also referred to in the MDHHS Walter P.

Reuther Psychiatric Hospital's (WRPH's) Standard Operating Procedure (ECF No.

44, PageID.1119).

### 2.     A person requiring treatment

Michigan's Mental Health Code defines a "person requiring treatment" as

follows:

> (a)     An individual who has mental illness, and who as a result of that mental illness can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself, herself, or another individual, and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation.
>
> (b)     An individual who has mental illness, and who as a result of that mental illness is unable to attend to those of his or her basic physical needs such as food, clothing, or shelter that must be attended to in order for the individual to avoid serious harm in the near future, and who has demonstrated that inability by failing to attend to those basic physical needs.
>
> (c)     An individual who has mental illness, whose judgment is so impaired by that mental illness, and whose lack of understanding of the need for treatment has caused him or her to demonstrate an unwillingness to voluntarily participate in or adhere to treatment that is necessary, on the basis of competent clinical opinion, to prevent a relapse or harmful deterioration of his or her condition, and presents a substantial risk of significant physical or mental harm to the individual or others.

Mich. Comp. Laws Ann. § 330.1401(1).

Citing Section 330.1401 and United States Supreme Court case law,

Plaintiffs allege that "[b]oth Michigan law and the United States Constitution

prohibit the involuntary civil commitment in a psychiatric hospital of a person who is not both mentally ill *and* dangerous." (ECF No. 44, ¶ 79 (emphasis in original).)

### 3. MDHHS Policies and Directives

In addition to Michigan's Mental Health Code, the NGRI Committee also appears to have been guided by a Department of Mental Health Policy dated November 12, 1973 (ECF No. 44, PageID.958) and Department of Community Health Directive 10-C-1050-AD issued on March 19, 2003 (*Id.*, PageID.952, 959, 971), the latter of which has been at issue in this lawsuit. (*Id.*, ¶¶ 5, 25.) Administrative Directive 10-C-1050 from the Michigan Department of Community Health (MDCH) – now known as the Michigan Department of Health and Human Services (MDHHS) – concerns patients committed under the legal status of NGRI. (*Id.*, PageID.952.)

According to Plaintiffs, Administrative Directive 10-C-1050 requires that the NGRI Committee review certain items "prior to filing or court appearance." (ECF No. 44, ¶ 5; *see also id.*, PageID.958-959, 963.) As Plaintiffs allege, "[t]he MDHHS policy . . . caused and continues to cause an unknown number of Michigan residents, including the Plaintiffs, to spend years of their lives unnecessarily and unconstitutionally confined in state-operated psychiatric hospitals." (*Id.*, ¶ 8.)

### B. Hegira (a Community Mental Health Subcontractor) is the only remaining Defendant.

4

The individual Plaintiffs—Pelichet, Ragland, Washington, and Bickerstaff—allege that they "have been adjudicated 'not guilty by reason of insanity' ('NGRI') and subjected to repeated unlawful involuntary civil commitment . . . ."  (ECF No. 44, PageID.874.)  Plaintiffs named twenty-one Defendants, but, through various Court orders, twenty Defendants have been terminated.  (ECF Nos. 68, 87, 108, 134 & 200.)  Therefore, only one Defendant remains active—Hegira Programs, Inc.

Plaintiffs explain that Defendant Hegira and (former) Defendant New Center Community Services, Inc., *i.e.*, "Community Mental Health Contractual Agencies" or "CMH Subcontractor Defendants," are "Michigan nonprofit corporations that contract with Defendant CareLink Network, Inc. and with the Michigan Department of Health and Human Services to provide mental health and substance abuse treatment programs to Michigan residents."  (*Id.*, ¶ 28.)  Plaintiffs describe the CMH Subcontractors' involvement as follows:

> 29.    The CMH Subcontractor Defendants, in their contractual agreements with Defendant CareLink Network and the NGRI Committee Defendants, agreed to petition the Probate Court for a one-year continuing Hospitalization Treatment Order for every NGRI patient placed in their care, every year for five years, and to never make a recommendation to the Probate Court for discharge or for alternative/assisted outpatient treatment, regardless of the opinions of their own treating professionals about the patient's present condition and treatment needs.

30.     All NGRI patients that are in the care of the CMH Subcontractor Defendants are living in community settings, such as adult foster care homes, with family, or independently, and receiving outpatient treatment. Paradoxically, the CMH Subcontractor Defendants do not recommend alternative/assisted outpatient treatment to the Probate Court, even though this is precisely what their patients are receiving and will continue to receive.

31.     The CMH Subcontractor Defendants do not recommend alternative/assisted outpatient treatment because a patient on an "Alternative Treatment Order" ceases to be "inpatient" at a regional psychiatric hospital under Michigan law.  When a patient is not an "inpatient," the NGRI Committee Defendants lose their ability to summarily compel the patient to return to the psychiatric hospital without filing a new petition for involuntary civil commitment.  The CMH Subcontractor Defendants, at the behest of the NGRI Committee Defendants, therefore[,] routinely seek a court order for one year of hospitalization, and the patient is considered an inpatient on an authorized leave of absence from the hospital for the entire year. This process is repeated annually for a five-year period.

32.     The CMH Subcontractor Defendants made facially invalid petitions for one-year Hospitalization Treatment Orders for Plaintiffs Darryl Pelichet, Bonn Washington, Darius Bickerstaff, and other forensic patients and so caused them to be subject to restrictions on their liberty which were not based on meaningful, individualized assessments of their present treatment needs.

33.     The CMH Subcontractor Defendants filed petitions for one-year Hospitalization Treatment Orders and/or failed to recommend NGRI patients for discharge when their own assessments of the patients' condition indicated that *the patients did not meet the statutory or constitutional requirements for subjecting a person to involuntary civil commitment*.

(ECF No. 44, ¶¶ 29-33 (emphasis added).)

Plaintiffs seek legal and equitable relief.  (ECF No. 44, PageID.947-49.)

## C.     Hegira's Pending Dispositive Motion

The parties have consented to my jurisdiction. (ECF No. 115.) In the currently pending motion for summary judgment, Defendant Hegira argues that it is entitled to summary judgment as to Plaintiffs' constitutional claims (Count I), Plaintiffs' ADA claim (Count II), and Plaintiffs' Rehabilitation Act claim (Count III). (ECF No. 172, PageID.4134-35.) Plaintiffs have filed a response (ECF No. 176), and Defendant has filed a reply (ECF No. 178).

Having reviewed the motion papers and having conducted a video motion hearing on September 15, 2021, at which counsel for the individual Plaintiffs (Ian T. Cross and Laurence H. Margolis), counsel for the MDHHS Defendants (Katherine J. Bennett and Ashlee Lynn), and counsel for Hegira (Thomas G. Cardelli) advocated, and having taken this matter under advisement, this matter is now ready for decision.

### D. Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts

7

in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (internal citations omitted).

"The moving party has the initial burden of proving that no genuine issue of material fact exists . . . ." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56 (e)(2) (providing that if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for the purposes of the motion."). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citations omitted).

Summary judgment is appropriate if the evidence favoring the nonmoving party is merely colorable or is not significantly probative. *City Management Corp. v. United States Chem. Co.*, 43 F.3d 244, 254 (6th Cir. 1994). In other words, summary judgment is appropriate when "a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case. . . ." *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

### E.   Discussion

#### 1.   Hegira treated Plaintiffs Pelichet and Washington.

Notably, Plaintiffs explain that the CMH Subcontractor Defendants (in this lawsuit, presently only Hegira) contract with or are hired by the CMH *Contractor* Defendants. (*Id.*, ¶¶ 39, 41.) Pursuant to a subcontract agreement with CareLink Network, Inc., Hegira "was to provide community-based healthcare services to NGRI patients." (ECF No. 172, PageID.4143, ECF No. 172-1, PageID.4168-212 [Ex. A].) Hegira treated Plaintiffs Pelichet and Washington. (ECF No. 172, PageID.4133 n.3; ECF No. 176, PageID.4587, 4598, 4601.)

#### a.   Pelichet

Within the allegations specific to Plaintiff Pelichet (ECF No. 44, ¶¶ 63-111), Plaintiffs allege that Pelichet "was released pursuant to ALS contracts on seven occasions between 2005 and 2017." (*Id.*, ¶ 74.) Plaintiffs contend that Pelichet

was "returned to custody [at WRPH] in January of 2008," because he "tested positive for marijuana on a random drug screen[,]" but, "[u]nlike a probationer or parolee charged with a violation," Mr. Pelichet had "no opportunity to contest his return to custody in court and no access to court-appointed legal counsel." (ECF No. 44, ¶ 73; *see also id.*, ¶ 125 (Ragland).)  In sum, Plaintiffs contend that Pelichet "was forced to return to confinement on six occasions since 2005, most recently on May 4, 2016." (ECF No. 44, ¶ 185; *see also* ECF No. 176-30, PageID.5239.)

Plaintiffs allege that, "[t]o secure court orders for continuing hospitalization when Mr. Pelichet's condition failed to satisfy the statutory or constitutional requirements for involuntary civil commitment, MDHHS employees, contractors, and subcontractors filed petitions for continuing treatment orders that were facially invalid and presented false or misleading testimony to the Probate Court." (*Id.*, ¶ 82.)  Petitions for second or continuing treatment orders (SCAO Form PCM 218) are to be accompanied by a clinical certificate (SCAO Form PCM 208). (ECF No. 44, PageID.982; *see also id.*, ¶ 81.)  To support their claims as to Pelichet, including that he did not meet Section 330.1401's definition of a person requiring treatment, Plaintiffs point to:

- an October 27, 2016 Petition for Continuing Treatment Order (SCAO Form PCM 218), which was signed by a social worker at the WRPH and requested the Court order Pelichet to receive "continuing hospitalization for not more than one year[,]" and

was stamped "to maintain NGRI status[,]" (*Id.*, PageID.1180-81 [Ex. T]);

- an October 30, 2016 clinical certificate (SCAO Form PCM 208) on which Aruna Bavineni, M.D. concluded Pelichet was a person requiring treatment, and she recommended hospitalization (*Id.*, PageID.1085-86 [Ex. H], 1182-83 [Ex. T]);

- the February 8, 2017 Office of Recipient Rights (ORR) Report of Investigative Findings, which concerned the November 9, 2016 testimony of psychologist Charles Stern (*Id.*, PageID.1021-23 [Ex. D]);

- Dr. Bavineni's April 17, 2017 six-month review report (SCAO Form PCM 226), wherein she opines that Pelichet "continues to be a person requiring treatment[,]" (*Id.*, PageID.1088-89 [Ex. I], 1184-85 [Ex. T]);

- Dr. Bavineni's May 3, 2017 psychiatric evaluation (*Id.*, PageID.1091-99 [Ex. J]);

- a June 12, 2017 amended report of investigative findings from the ORR, which concerned the November 9, 2016 testimony of psychologist Charles Stern (*Id.*, PageID.1024-39 [Ex. D], 1049-64 [Ex. E]);[1]

- Pelichet's July 5, 2017 ALS contract, which was signed, *inter alia*, by a representative of Hegira Programs, Inc. (*Id.*, PageID.1133-48, 1159-63 [Ex. R]);

- a September 8, 2017 ORR report from a second investigation, which concerned, *inter alia*, whether "other evidence presented to the court by other treating professionals" on November 19, 2016 and April 14, 2017 "was incorrect or misleading[,]" (*Id.*, PageID.1066-77 [Ex. F]); and,

---

[1] It seems there may have been another ORR report; however, its date is unclear. (*See Id.*, PageID.1040-47.)

- an MDHHS WRPH Summary Report of Recipient Rights Complaint (Amended Report – 4th Revision), which is seemingly dated October 10, 2017 (*Id.*, PageID.1079-83 [Ex. G]).

(*Id.*, ¶¶ 85, 93, 95, 97, 99, 100, 101, 102, 105, 106, 218, 228.)

Plaintiffs claim that the clinical certificate for the most recent Petition for a Continuing Treatment Order for Pelichet was completed by P. G. Vijayakumaran, M.D., who allegedly recommended hospitalization, as opposed to alternative treatment, to "maintain NGRI status." (*Id.*, ¶ 223.) According to Plaintiffs, Defendants filed another petition for a one-year hospitalization treatment order on October 25, 2017, presumably Hegira's October 24, 2017 Petition for Second or Continuing Mental Health Treatment Order for Pelichet (SCAO Form PCM 218), which was signed by M. L. Scott and requested that the Wayne County Probate Court order Pelichet to receive "continuing hospitalization for not more than one year" to "maintain NGRI status[.]" (*Id.*, ¶¶ 108, 214, 228; *Id.*, PageID.1131-32.) However, apparently in January 2018, Pelichet exercised his right to a jury trial (allegedly for "the first time since 2005") and was represented by counsel. (ECF No. 44, ¶ 109, 224, 227.) Plaintiffs note that, at Pelichet's January 2018 jury trial, Dr. Vijayakumaran testified about his October 23, 2017 evaluation of Mr. Pelichet, the purpose of which was "[t]o create documents substantiating his continuation of the ALS status." (*Id.*, PageID.1178; *see also id.*, ¶ 224.) According to Plaintiffs, "[t]he jury took less than 30 minutes to return a verdict in Mr. Pelichet's favor."

12

(*Id.*, ¶¶ 109-110; *see also Id.*, ¶¶ 224, 227.)  In other words, as Plaintiffs phrase it, "Defendant's [p]etition for involuntary hospitalization was denied."  (*Id.*, ¶ 110.)

### b.    Washington

Within the allegations specific to Plaintiff Washington (*Id.*, ¶¶ 134-45), Plaintiffs allege that Washington "has been released pursuant to ALS contracts on five occasions between 2005 and 2018."  (*Id.*, ¶ 140.)  They also allege Washington was "forced to return to confinement on four occasions since 2005." (*Id.*, ¶ 185.)

Washington's December 2017 ALS contract is signed by multiple people, including representatives of CareLink (MCPN) and New Center Community Services (CMH).  (ECF No. 44, PageID.1149-58, 1164-73.)  Plaintiffs claim Washington's "most recent release was in January of 2018[,]" and, citing Washington's January 23, 2018 letter to the NGRI Committee—wherein Washington requests permission "to get a part-time job outside of S.T.E.P.[,]" (*Id.*, PageID.1106-07)—claim he "has not yet been granted permission to seek private-sector employment."  (*Id.*, ¶¶ 141-42.)  Also, Plaintiffs allege that, "[e]very time [Washington] was released prior to his current stint in the community, [he] was returned to the hospital for violating the ALS contract by testing positive for marijuana[,]" "[e]ach subsequent release was pursuant to a new ALS contract that required a renewed five-year, violation-free period before [he] could be

discharged[,]" "[a]fter each positive drug test, [he] was confined in the [WRPH] under restrictive conditions for approximately one year[,]" and "[he] received little-to-no substance abuse treatment during his periods of confinement [there]." (*Id.*, ¶¶ 143-45.)

### 2. Constitutional claims (Count I)

#### a. State actor

Defendant Hegira argues that it is not a state actor subject to 42 U.S.C. § 1983 claims.  (ECF No. 172, PageID.4151-56.)  "The Supreme Court has developed three tests for determining the existence of state action in a particular case:  (1) the public function test, (2) the state compulsion test, and (3) the symbiotic relationship or nexus test."  *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003) (en banc).  In sum, Defendant Hegira contends that its conduct does not satisfy any of these tests.  (ECF No. 172, PageID.4156.)

The Court disagrees, because it is convinced that Hegira is a state actor for purposes of this lawsuit under the public function test, the nexus test, or both. Although Defendants correctly note that "providing mental health services has not been a power which has traditionally been exclusively reserved to the state[,]" *Wolotsky v. Huhn*, 960 F.2d 1331, 1334-35 (6th Cir. 1992) (affirming the district court's grant of partial summary judgment where Defendant Portage Path Community Mental Health Center "did not act under color of state law in

14

terminating plaintiff.") (ECF No. 172, PageID.4153), Plaintiffs convincingly argue

that, in this case, "the State . . . exercised total control over whether, when, and

from whom the Plaintiffs would receive treatment[,]" by likening their cases to

those in which treatment was provided to incarcerated individuals.  (ECF No. 176,

PageID.4580-81.)  *See West v. Atkins*, 487 U.S. 42, 54 (1988) (where petitioner

was incarcerated at a state prison, "[r]espondent, as a physician employed by North

Carolina to provide medical services to state prison inmates, acted under color of

state law for purposes of § 1983 when undertaking his duties in treating petitioner's

injury.  Such conduct is fairly attributable to the State."); *Carl v. Muskegon Cty.*,

763 F.3d 592, 594-95 (6th Cir. 2014) (where Plaintiff was "a pretrial detainee with

a history of mental illness," Dr. Jawor, an independent contractor for CMH, which

contracted to provide mental health services at the county jail, was "a state actor

under the pubic-function test . . . ." ); *Probst v. Cent. Ohio Youth Ctr.*, 511 F. Supp.

2d 862, 865 (S.D. Ohio 2007) (where Plaintiff's decedent was incarcerated at a

juvenile detention facility, "the provision of mental-healthcare services to

incarcerated persons in a juvenile facility is a public function, and as a result, CCI

and Plumley are state actors.").  Hegira's attempt to distinguish these cases is

unavailing.  Even if Plaintiffs were not limited to "a setting that would prohibit

them from obtaining alternative care[,]" such as "second opinions," or even if

"each Plaintiff's progress was also monitored by a judge[,]" (ECF No. 178,

PageID.5649-51), it remains that Hegira's treatment of Pelichet and Washington was attributable to their NGRI status.  And, when asked at oral argument whether treatment of NGRI patients has traditionally been a state function (as opposed to just general mental health treatment), Hegira's attorney admitted that "likely it is" the way it has traditionally been considered.

Moreover, as Hegira notes with respect to the symbiotic relationships test, "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974) (citing *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 176 (1972)). Put another way, "it must be demonstrated that the State is intimately involved in the challenged private conduct in order for that conduct to become attributable to the state for purposes of a § 1983 action." *Bier v. Fleming*, 717 F.2d 308, 311 (6th Cir. 1983) (ECF No. 172, PageID.4155.)  Here, as Plaintiffs note, Hegira "plays a minor, but essential, role," along with others, "in a comprehensive government framework for the management of involuntarily-committed NGRI patients[,]" as set forth in Hegira's ALS contracts with the State of Michigan.  (ECF No. 176, PageID.4585-86; ECF No. 176-7 (*see* CMH Service Provider Responsibilities).) *See Gokor v. Schlievert*, 335 F. Supp. 3d 972, 983 (N.D. Ohio 2018) ("Schlievert's examinations occur, then, not because he in his capacity as a physician sees a

16

medical need for them, but, rather, because a State-created and State-controlled framework mandates that he do so.").

Having reached the conclusion that Hegira is a state actor under the public function and nexus tests, the Court need not address the parties' arguments as to the compulsion test, which concerns interpretation of the NGRI Committee Procedures and the ALS contracts. (ECF No. 172, PageID.4153-55; ECF No. 176, PageID.4582-85.) Thus, the Court will turn to the merits of Plaintiffs' claims against Hegira.

### b. Procedural due process (Count I(a))

Plaintiffs allege that Defendants have violated their Fourteenth Amendment rights to procedural due process. (ECF No. 44, ¶¶ 171-93.) They claim to have "experienced a deprivation of liberty each and every time they were returned to confinement at [WRPH] as punishment for allegedly violating . . . the rules of their ALS contracts," which were signed "under duress[.]" (*Id.*, ¶¶ 175-76.)

The Supreme Court has "recognized that for the ordinary citizen, commitment to a mental hospital produces a massive curtailment of liberty, and in consequence requires due process protection." *Vitek v. Jones*, 445 U.S. 480, 491-492 (1980) (citations and quotations omitted). In the operative pleading,

citing Mich. Comp. Laws § 330.1408(3) ("Individuals returnable to hospitals"),[2]

the due process clause of the Michigan Constitution, and the "Notice of Right to

Appeal Return and Appeal of Return from Authorized Leave" (SCAO Form PCM

233) (ECF No. 44, PageID.1109), Plaintiffs contend that "Mr. Pelichet was forced

to return to confinement on six occasions since 2005, most recently on May 4,

2016[,]" and "Mr. Washington was similarly forced to return to confinement on

four occasions since 2005."  (*Id.*, ¶¶ 183-85; *see also* ECF No. 176-30,

PageID.5239.)  Plaintiffs allege they were not served with the appeal form "or

otherwise notified that they had a right to contest their involuntary return to the

hospital[,]" they did not have "an opportunity to contest any of the forced returns

to the hospital before a neutral decisionmaker [*sic*][,]" and they each have had their

ALS status "summarily revoked . . . with no procedural due process protections at

all."  (*Id.*, ¶¶ 186-88.)  Specifically, with respect to the subcontractor Defendants,

Plaintiffs claim:

> The NGRI Committee Defendants, Hospital Management Defendants,
> and CMH Contractor and Subcontractor Defendants have a practice of
> failing to provide NGRI patients with the notifications and

---

[2] *Compare* Mich. Comp. Laws Ann. § 330.1408(3) ("An opportunity for appeal, and notice of that opportunity, *shall* be provided to an individual who objects to being returned from any authorized leave in excess of 10 days.") (emphasis added), *with* MI LEGIS 146 (2022), 2022 Mich. Legis. Serv. P.A. 146 (S.B. 101) ("An opportunity for appeal, and notice of that opportunity, *must* be provided to an individual who objects to being returned from any authorized leave in excess of 10 days.") (emphasis added).

opportunities to be heard required by Michigan law and by the
Michigan and United States Constitutions.

(*Id.*, ¶ 192.)

Although Hegira argues there is no record evidence that it "infringed upon

Plaintiff's [*sic*] federally protected due process rights[,]" (ECF No. 172,

PageID.4156-59), this argument does not address notice and the opportunity to be

heard.  Its reply is equally unenlightening, even though Hegira claims Plaintiffs

"violated their respective contracts by consuming marijuana, despite knowing that

the same would lead to their return to confinement."  (ECF No. 178, PageID.5649

n.1; *id.*, PageID.5652-53.)  To the extent Defendant Hegira seeks entry of summary

judgment as to Plaintiffs' procedural due process claims, the Court expected

evidence of notice and an opportunity to be heard, such as copies of the

aforementioned "Notice of Right to Appeal Return and Appeal of Return from

Authorized Leave" (PCM 233) or a similar document.  (ECF No. 44, ¶¶ 184, 186;

*id.*, PageID.1109).  *See also* SCAO PCM 212 ("Notice of Hearing and Advice of

Rights") (*https://www.courts.michigan.gov/SCAO-forms/*), or the Wayne County

Probate Court (WCPC) 601 ("Notice of Hearing/Proof of Service")

(*http://www.wcpc.us/probate-court-forms.html*.)

In their response, as for Hegira's "decisions whether to rehospitalize patients

on ALS[,]" Plaintiffs note that:  (i) in response to a discovery request, the MDHHS

and Gordon admitted that "between January 1, 2015 and April 30, 2018, no

probate court hearings were held concerning an appeal of a return to [WRPH] by

an NGRI patient who had been on [ALS] for an excess of ten days[,]" (ECF No.

176-19, PageID.4868); (ii) at his April 27, 2021 deposition, Craig Lemmen,

M.D.—a former CFP employee and the former NGRI Committee chairman—

testified that "the treatment team [at the CMH] has the final authority to bring the

person back to the hospital[,]" (ECF No. 176-8, PageID.4758, 4742-43); (iii) at her

February 5, 2021 deposition, WRPH employee Evette Carroll testified that "most

patients return to the hospital at their recommendation or request of the CMH

provider and/or the psychiatrist or treatment provider in the community at that time

. . . [,]" (ECF No. 176-20, PageID.4966-69); and, (iv) at his May 2021 deposition,

Dr. Vijayakumaran testified that he does not have much involvement in the process

of NGRI patients being sent back to the hospital during their ALS contract, and he

"hear[s] the news after the fact[,]" (ECF No. 176-10, PageID.4801-02).  (ECF No.

176, PageID.4592-93.)  Plaintiffs contend that "[i]f a jury were to believe Dr.

Lemmen's testimony that Hegira had the final authority to revoke ALS, Hegira

would be liable for procedural due process violations."  (*Id.*, PageID.4593.)

In sum, neither Hegira nor the individual Plaintiffs adequately address the

central elements of notice and an opportunity to be heard.  Still, Defendant Hegira

has not shown its entitlement to summary judgment on Plaintiffs' procedural due

process claim.  Moreover, while probate court hearings provide an opportunity to

be heard, the process of *getting there* and the seemingly automatic

recommendations, which no doubt carry huge weight with the probate court, create

at least some questions of fact that need to be fleshed out through a more complete

record at trial.

### c.    Substantive due process (Count I(b))

Plaintiffs also allege Defendants have violated their Fourteenth Amendment

right to substantive due process, generally contending that involuntary civil

commitment of persons adjudicated NGRI continued "unless and until the patient

complete[d] a five-year period in the community without violating a set of strict

conditions of release."  (ECF No. 44, ¶ 196; *see also id.*, ¶¶ 194-240.)

### i.    Petitions for Second or Continuing Mental Health Treatment Orders (PCM 218)

According to Plaintiffs, the CMH Subcontractor Defendants, *e.g.* Defendant

Hegira (or former Defendant New Center Community Services), "filed Petitions

for Continuing Treatment Orders alleging that Plaintiffs . . . could reasonably be

expected 'in the near future' to 'seriously physically injure' themselves or others . .

. [,]" even though they were "living in the community, complying with their

treatment, and passing their random drug screens."  (*Id.*, ¶ 215.)  Also, Plaintiffs

allege that the Subcontractor Defendants agree, in their "standard NGRI outpatient

treatment contracts . . . [,]" to "petition for a one-year continuing Hospitalization

Treatment Order for the relevant patient every year for five years, and never to

make a recommendation to the Probate Court for alternative/assisted outpatient treatment." (ECF No. 44, ¶ 218; *see also id.*, ¶¶ 219-221.) Significantly, Plaintiffs contend that "[t]he contract does not allow for the possibility that the examining psychiatrist for the relevant CMH Defendant could conclude that outpatient treatment is sufficient for the patient's needs or that the patient no longer meets the M.C.L. § 330.1401 criteria for continuing involuntary hospitalization." (*Id.*, ¶ 222.)

The *Petition for Second or Continuing Mental Health Treatment Order* (SCAO Form PCM 218) provides the following choices for an individual who continues to be "a person requiring treatment":

- hospitalization for not more than 90 days.

- continuing hospitalization for a period of one year.

- combined hospitalization and alternative/assisted outpatient treatment for not more than one year.

- alternative/assisted outpatient treatment for not more than one year.

(ECF No. 44, PageID.1180-81.) Plaintiffs claim "the CMH Subcontractor Defendants' employees are advised to always check the second box, 'continuing hospitalization for not more than one year,' for every NGRI patient[,] because the CMH Contractor and Subcontractor Defendants' ALS contracts with the NGRI Committee Defendants p[ur]port to preclude them from making any other

22

recommendation to the Court." (*Id.*, ¶¶ 225-26.)  Alleging that WRPH rubber-stamps "to maintain NGRI status" on the petitions to amend the choice of "continuing hospitalization," Plaintiffs claim that WRPH regularly recommends "one-year Hospitalization Treatment Orders for NGRI patients . . . *for the sole purpose of maintaining the patient's NGRI status*." (*Id.*, ¶¶ 229-30 (emphasis in original).)  According to Plaintiffs, "Defendants have a practice of automatically filing petitions for continued hospitalization in bad faith, in order to keep persons who have been adjudicated NGRI institutionalized when there is no longer a statutory or constitutional basis to confine them." (*Id.*, ¶ 238.)

## ii.  Hegira's arguments

Defendant Hegira argues there is no record evidence that it "infringed upon Plaintiff's [*sic*] federally protected due process rights." (ECF No. 172, PageID.4156.)  First, Hegira points to this Court's September 20, 2019 criticism of Plaintiffs' reliance on the following provision of the NGRI Procedures:

> IN ORDER TO MAINTAIN NGRI STATUS, NGRI PATIENTS SHOULD NOT BE PLACED ON ANY TYPE OF ALTERNATIVE TREATMENT ORDER OR COMBINED HOSPITALIZATION / ALTERNATIVE TEATMENT [*sic*] ORDER.  Placement on such orders results in loss of NGRI status, once the patient is discharged from inpatient hospitalization.

(*See* ECF No. 44, PageID.964.)  Judge Borman stated that, "when placed in proper context of other official documents," the provision "clearly does not evidence a

policy of mandating confinement petitions from Community Caretakers[,]" (ECF No. 87, PageID.2382).  (ECF No. 172, PageID.4157.)

Second, as to Mary Scott's January 2018 probate court testimony that, when she completes the form, she has only checked off "continuing hospitalization," (ECF No. 44, PageID.1175-76), Hegira summarizes that "the decision to continue Plaintiffs Pelichet and Washington on their respective treatment on NGRI status, however frequent, was made only after careful assessment by licensed professionals."  (ECF No. 172, PageID.4158.)  In particular, Hegira notes:

- Hegira employee Mary Scott's May 26, 2021 deposition testimony that she exercised her "own clinical judgment in completing Mr. Pelichet's 90-day report[,]" and her "own clinical judgment in determining how to complete the petition for a continuing treatment order for Mr. Pelichet[,]" (ECF No. 172-1, PageID.4478-79);

- Hegira employee Puthenparampil Vijayakumaran, M.D.'s May 26, 2021 deposition testimony that, while he does get input, the decision put forth on a clinical certificate or a six-month review form is "based on [his] clinical judgment[,]" (*Id.*, PageID.4506, 4510, 4515; *see also id.*, PageID.4540); and,

- WRPH employee Evette Carroll's February 5, 2021 testimony that she was concerned Mr. Pelichet did not understand his need for treatment, because there were "many times he pretty much minimized his symptoms . . . [,]" there were times he resisted, there were times he decompensated even further, and there was a time where he "walked into the hospital and sa[id] he needed to be hospitalized[.]"  (*Id.*, ECF No. 172-1, PageID.4386.)

(ECF No. 172, PageID.4147-50, 4157-58.)

Third, Hegira contends that its employees "underwent training organized and directed by CareLink[,]" and that "[n]othing in the[] training materials directs Hegira employees to automatically file petitions without regard for treatment needs." (ECF No. 172, PageID.4158; ECF No. 172-1, PageID.4258-72 (CareLink NGRI Training Materials); ECF No. 172-1, PageID.4558 ¶ 7 (Affidavit of Carol Zuniga).)

Finally, Hegira contends that the ALS contracts of Plaintiffs Pelichet and Washington, (*see* ECF No. 44, PageID.1134-73), "do not support Plaintiffs' assertion of due process violations." (ECF No. 172, PageID.4159.) According to Hegira, "[t]hese contracts were subject to extension up to a period of period of five (5) years in accordance with MCL 330.2050(5)[,]" (ECF No. 172, PageID.4144 n.4), and "the ALS contracts both reference and mirror MCL 330.2050(5)," (ECF No. 172, PageID.4159).

### iii.   Plaintiffs' response (circumstantial & statistical evidence)

Plaintiffs contend that they have "put forth evidence that Hegira participated in violations of the substantive . . . due process rights of NGRI patients[.]" (ECF No. 176, PageID.4586-93.) They counter what they label Defendant Hegira's "self-serving denial" by referring to "circumstantial evidence that Hegira's staff did not exercise professional judgment in their treatment decisions for NGRI patients." (ECF No. 176, PageID.4587-88.)

For example, a clinical certificate (SCAO Form PCM 208) presents several questions, the last two of which ask the clinician to conclude whether the individual "is" or "is not" a "person requiring treatment," and to recommend "hospitalization" or "alternative treatment," although there is also a line on which to elaborate. (*Id.*, PageID.1085-86, 1182-83.) At his May 2021 deposition, Dr. Vijayakumaran was asked, "have you ever submitted a Clinical Certificate for an NGRI patient where you've checked the 'is not' box?" He answered, "No." (ECF No. 176-10, PageID.4803.) Dr. Vijayakumaran was also asked with respect to a different form, presumably a Six-Month Review Report (PCM 226), "And you have never checked the 'assisted outpatient treatment' without hospitalization; is that correct?" He answered, "That's correct." (*Id.*, PageID.4803-04; *see also id.*, PageID.4793-94.) In Plaintiffs' words, "a reasonable jury could conclude[,] based on its ALS Contracts[,] that Hegira agreed to petition the Wayne County Probate Court for a one-year continuing hospitalization order every year for five years, every time it assumed responsibility for an NGRI patient on ALS." (ECF No. 176, PageID.4588.) (*See also* ECF No. 44, ¶ 29.)

In another example, Dr. Vijayakumaran was asked about the handwriting on several six-month review reports for non-parties (SCAO Form PCM 226). (ECF No. 176, PageID.4588-90; ECF No. 176-10, PageID.4807-22; ECF Nos. 176-11, 176-12, 176-13, 176-14.) In some cases Vijayakumaran admitted that the

handwriting on a certain form was not his and belonged to Bill (William J.) Hartley or perhaps even Roxanne Green or Marie (Murray) Dalton. (ECF No. 176-10, PageID.4809-14, 4816-17, 4821.) Although Vijayakumaran testified that he was "with Bill Hartley when he filled out that form[,]" (ECF No. 176-10, PageID.4812), and agreed that "when someone fills out the six-month review," they "do it in [his] presence[,]" (*Id.*, PageID.4823). As Plaintiffs put it,

> A reasonable jury could infer from this evidence that Dr. Vijayakumaran pre-signed the forms, Mr. Hartley and Ms. Green each independently completed and filed a report bearing Dr. Vijayakumaran's signature and recommending continued involuntary treatment for this patient without realizing that the other had also done so, and that one or both of them falsely claimed to have personally served the NGRI patient with their report on February 8, 2016, at 3:30pm at Hegira's Westland office.

(ECF No. 176, PageID.4590.)

Additionally, Plaintiffs rely upon statistical information regarding "every petition, clinical certificate, and six-month review report filed for an NGRI patient" from 2005 through 2018, *e.g.*: (a) of 337 petitions for continuing treatment, none of the 335 legible petitions recommended discharge; (b) none of the 337 clinical certificates indicated that the person no longer meets Mich. Comp. Laws § 330.1401 criteria; and, (c) 292 of 296 six-month review reports "recommended continuation of the current treatment regimen for an additional six months (or, on occasion, an additional 23 months)," and relevant data on the remaining four reports was not legible. (ECF No. 176, PageID.4590-92 (citing ECF No. 176-15

27

[Six-Month Reviews Spreadsheet]; ECF No. 176-16 [Clinical Certificates and Petitions Spreadsheet]; ECF No. 176-17 [Minnis Affid.]; and, ECF No. 176-18 [Chakrabarty Affid.]).)  Plaintiffs claim "[a] large set of patients all receiving identical or nearly identical treatment recommendations typically supports an inference that *each* treatment recommendation was not based on bona-fide professional judgment."  (*Id.*, PageID.4592 (emphasis in original).)

### iv.  Summation

Plaintiffs' offerings of circumstantial and statistical evidence show a "genuine dispute" as to the "material fact" of whether Hegira employees exercised independent professional judgment.  Hegira claims that "[t]he parties obtained testimony from numerous Hegira employees that leaves no doubt that Hegira always exercised independent professional judgment in reviewing cases."  (ECF No. 178, PageID.5652.)  Yet, even considering state Defendant Lemmen's agreement at his April 2021 deposition that "two professionals who are acting in the best interest of a patient can have different opinions . . . [,]" (ECF No. 172-1, PageID.4444-45), in addition to Scott and Vijayakumaran's May 2021 deposition testimony that they exercised their own clinical judgment (ECF No. 172-1, PageID.4478-79, 4515-16), the Court cannot overlook either Scott's January 2018 probate court testimony that she has only checked off "continuing hospitalization,"

(ECF No. 44, PageID.1175-76), or Vijayakumaran's May 2021 testimony about completing clinical certificates (ECF No. 176-10, PageID.4803-04, 4807-22).

Moreover, at the summary judgment stage, the Court may consider Plaintiffs' statistical information. Hegira contends that, "[a]lthough Plaintiffs' attorneys vaguely claim to have reviewed pages of 'records,' Plaintiffs' attorneys are not witnesses in this case and their conclusions are not admissible." (ECF No. 178, PageID.5653.) Still, to the extent Defendant Hegira notes that Fed. R. Civ. P. 56(c)(2) "requires that a claim that a fact is disputed must be supported by admissible evidence[,]" (ECF No. 178, PageID.5653), "[t]he majority of circuits interpret *Celotex* to permit consideration of evidence submitted at summary judgment in non-admissible form when the evidence 'will be reduced to admissible form at trial.'" *DeBiasi v. Charter Cty. of Wayne*, 537 F. Supp. 2d 903, 911 (E.D. Mich. 2008) (quoting *McMillian v. Johnson,* 88 F.3d 1573, 1584 (11th Cir. 1996)).

### d. Equal Protection (Count I(c)) and Eighth Amendment (Counts I(d))

Defendant Hegira argues that summary judgment should be granted as to Plaintiffs' equal protection and Eighth Amendment claims. (ECF No. 172, PageID.4160-63.) These claims are no longer at issue. In September 2019, this Court interpreted Plaintiffs' equal protection and Eighth Amendment claims as brought against non-Hegira Defendants, dismissed Plaintiffs' equal protection claim, dismissed the Eighth Amendment claim against Stern, and granted the

motion to dismiss Bavineni.  (ECF No. 87, PageID.2404-08, 2415-16; ECF No. 44,

¶¶ 241-78.)  Additionally, the individual Plaintiffs do not address the equal

protection and Eighth Amendment claims in their response.  (ECF No. 176.)

Moreover, the MDHHS Defendants—in their own motion for summary

judgment—interpreted this Court's September 20, 2019 order as dismissing these

claims (ECF No. 177, PageID.5468 (citing ECF No. 87, PageID.2404-08)), an

interpretation to which Plaintiffs made no response (ECF No. 182).  Thus, these

claims need not be addressed further.

### 3.    ADA (Count II) and Rehabilitation Act (Count III)

Plaintiffs bring their ADA and Rehabilitation Act claims against Defendant

Hegira, alleging that it is a private party engaged in state action, a recipient of

federal funds, or both.  (ECF No. 44, ¶¶ 279-90, 291-98; *see also Id.*, ¶ 173.)

Defendant Hegira argues it "did not engage in any conduct that ran afoul of the

ADA or Rehabilitation Act with respect to Plaintiff[s] Pelichet or Washington[.]"

(ECF No. 172, PageID.4163-66.)

### a.    Most integrated setting

Title II of the Americans with Disabilities Act (ADA) and Section 504 of the

Rehabilitation Act each contain an "integration mandate."  *See* 42 U.S.C. § 12132

(codified in 28 C.F.R. § 35.130(d)), 29 U.S.C. §§ 794-794a.  (ECF No. 44, ¶¶ 284,

292, 296.)  In short, "[a] public entity shall administer services, programs, and

activities in the most integrated setting appropriate to the needs of qualified

individuals with disabilities."  28 C.F.R. § 35.130(d); *see also* 28 C.F.R. § 41.51(d)

("Recipients shall administer programs and activities in the most integrated setting

appropriate to the needs of qualified handicapped persons.").

Plaintiffs generally allege that "[i]ndividuals deemed NGRI are not being

served in the most integrated setting or receiving individualized therapeutic

treatment to give them a realistic chance to be successful in the community.

Instead[,] they are merely warehoused in state hospitals, their rights and freedoms

forfeited in the name of public safety."  (ECF No. 44, ¶ 9.)  More specifically,

Plaintiffs' ADA and Rehabilitation Act claims allege that:

- Defendants discriminated and continue to discriminate against
  Plaintiffs and forensic patients who are "qualified individuals
  with disabilities," in violation of Title II of the ADA, 42 U.S.C.
  § 12132, and its implementing regulations, by administering
  Michigan's mental health system in a manner that has denied
  and continues to deny hundreds of persons with mental illness
  and/or addictive diseases, including the Plaintiffs, the
  opportunity to receive services in the most integrated setting
  appropriate to their needs.  These individuals are qualified to
  receive services in a setting that is more integrated than a closed
  psychiatric hospital, and they do not oppose receiving the
  services they require, such as substance abuse treatment or
  home and community[-]based services, on an outpatient basis in
  the community.

- Defendants' actions imposed and continue to impose
  unnecessary confinement and segregation upon Plaintiffs and
  other individuals adjudicated NGRI, including MPAS's
  constituents, and deny them the most integrated community

placements possible, in violation of Section 504's integration mandate.

(ECF No. 44, ¶¶ 285, 296.)[3]

### b. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999)

Throughout their ADA claim, Plaintiffs refer to *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), wherein the Supreme Court held that "the proscription of discrimination . . . require[s] placement of persons with mental disabilities in community settings rather than in institutions" when (1) "the State's treatment professionals have determined that community placement is appropriate," (2) "the transfer from institutional care to a less restrictive setting is not opposed by the affected individual," and (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Olmstead*, 527 U.S. at 587.

"Recognition that unjustified institutional isolation of persons with disabilities is a form of discrimination reflects two evident judgments." *Olmstead*, 527 U.S. at 600. "First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons

---

[3] Although Plaintiffs' ADA (42 U.S.C. § 12132) and Section 504 (29 U.S.C. §§ 794-794(a)) claims are discussed in the same vein due to their similarities, the Sixth Circuit has noted two differences: (1) Section 504 reaches only federally funded entities; and, (2) Section 504 is limited to denials of benefits "solely by reason of her or his disability[.]" *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 452-53 (6th Cir. 2008).

so isolated are incapable or unworthy of participating in community life." *Id*.

"Second, confinement in an institution severely diminishes the everyday life

activities of individuals, including family relations, social contacts, work options,

economic independence, educational advancement, and cultural enrichment." *Id.*,

527 U.S. at 601. (*See also* ECF No. 44, ¶¶ 282, 286, 288.)

### c. Need not show facial discrimination

Hegira does not rely upon *Olmstead*. Instead, Hegira relies upon *Anderson*

*v. City of Blue Ash*, 798 F.3d 338 (6th Cir. 2015), in which the Sixth Circuit

explained:

> To establish a prima facie case of intentional discrimination under
> Title II of the ADA, a plaintiff must show that: (1) she has a
> disability; (2) she is otherwise qualified; and (3) she was being
> excluded from participation in, denied the benefits of, or subjected to
> discrimination under the program because of her disability.

*Anderson*, 798 F.3d at 357 (internal footnote omitted) (citing *Tucker v. Tennessee*,

539 F.3d 526, 532 (6th Cir. 2008)). *See also Burns v. City of Columbus, Dep't of*

*Pub. Safety, Div. of Police*, 91 F.3d 836, 841 (6th Cir. 1996) ("To prevail in a

Rehabilitation Act case, the plaintiff ultimately must prove (1) that he or she is a

'handicapped person' under the Act; (2) that he or she is 'otherwise qualified'; (3)

that he or she is being excluded from participation in, being denied the benefits of,

or being subjected to discrimination under the program solely because of his or her

handicap; and (4) that the program or activity receives federal funds.") (internal

footnote omitted) (citing *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 573 (6th Cir. 1988)).

Hegira claims "[t]here is absolutely no evidence that Hegira treated Plaintiffs differently from any of its other patients who are not under NGRI status[,]" in support of which Hegira cites (i) the affidavit of Deborah Olexa (ECF No. 172-1, PageID.4563 ¶ 8 [Ex. J]); and, (ii) the testimony of Hegira witnesses. (ECF No. 172, PageID.4164-65.)  Hegira also notes Plaintiffs' acknowledgement that "most of . . . Plaintiffs' numerous readmissions to [WRPH] were due primarily to their use of marijuana, and in Joshua Ragland's case, to his alleged occasional use of alcohol," (ECF No. 44, ¶ 287).  (ECF No. 172, PageID.4165.)  Furthermore, Hegira contends that "the ultimate decision about whether . . . Pelichet or Washington would be returned to W[RP]H rested with the probate court, not Hegira[,]" in support of which Hegira cites the Carroll Deposition Transcript (ECF No. 172-1, PageID.4382 [Ex. E]).  (ECF No. 172, PageID.4165-66.)  Finally, in its reply, Hegira claims that Plaintiffs "expressly agreed to the terms of the ALS contracts," and it questions how "voluntary acquiescence to various terms and conditions is discriminatory."  (ECF No. 178, PageID.5653-54.)  Hegira contends that *Olmstead* did not involve "medical professionals simply exercis[ing] their medical judgments as to whether a hospital setting or community facility is

required[,]" or "Plaintiffs agree[ing] to contractual terms" with placement "dictated by their present condition and the terms of those contracts." (*Id.*, PageID.5654.)

For purposes of summary judgment, enough of an issue of voluntariness has been raised for that question to be decided at trial, particularly in the context of a psychiatric patient having to "choose" between signing a document that allows him to be in the community verses not signing and being confined to a mental institution as an inpatient. It is not hard to see how that would be coercive. More to the point, with respect to the *Olmstead* claims, Plaintiffs correctly note that they "are not required to assert that Defendants discriminated against them based on their disability." *K.B. by Next Friend T.B. v. Michigan Dep't of Health & Hum. Servs.*, 367 F. Supp. 3d 647, 661 (E.D. Mich. 2019). (ECF No. 176, PageID.4595.) Plaintiffs also note the following observation from the Sixth Circuit:

> State Defendants contend that their conduct did not violate § 504 because discrimination was not the sole motivation for their actions, because they had no discriminatory animus, and because Plaintiffs did not allege that they were denied services based on a distinction between them and other similarly situated individuals. But such showings are not required to state a claim for violation of the integration mandate, and so we are not persuaded by this argument.

*Waskul v. Washtenaw Cty. Cmty. Mental Health*, 979 F.3d 426, 460 n.13 (6th Cir. 2020). (ECF No. 176, PagID.4595-96.) Moreover, the Department of Justice's statement regarding "*Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and* Olmstead v. L.C." (ECF No. 176-21 [Ex. U])

provides guidance.  (ECF No. 176, PageID.4596-98.)  When the DOJ considered

whether "a violation of the ADA's integration mandate require[s] a showing of

facial discrimination[,]" it opined:

> No, in the *Olmstead* context, an individual is not required to prove
> facial  discrimination.  In *Olmstead*, the court held that the plaintiffs
> could make out a case under the integration mandate even if they
> could not prove "but for" their disability, they would have received
> the community-based services they sought.  It was enough that the
> state currently provided them services in an institutional setting that
> was not the most integrated setting appropriate.  Additionally, an
> *Olmstead* claim is distinct from a claim of disparate treatment or
> disparate impact and accordingly does not require proof of those
> forms of discrimination.

(ECF No. 176-21, PageID.5017 ¶ 3A.)

### d.    Evidence regarding most integrated setting

After citing the DOJ's guidance regarding the type of evidence upon which

an individual may rely "to establish that an integrated setting is appropriate[,]"

(ECF No. 176-21, PageID.5017-18), Plaintiffs contend "there is ample evidence

that Hegira participated in denying Plaintiffs Pelichet and Washington access to

care in the most integrated settings appropriate to their needs."  (ECF No. 176,

PageID.4597-98.)  Upon consideration, Plaintiffs' ADA and Rehabilitation Act

claims survive summary judgment.

First, citing several "individual requirements" from Pelichet's July 5, 2017

ALS Contract (*see* ECF No. 176-7, PageID.4731-32), Plaintiffs contend the

restrictions "go far beyond requiring sobriety and compliance with mental health

treatment[,]" but, instead, "impose the precise harms of institutionalization identified in *Olmstead*." 527 U.S. at 601.  (ECF No. 176, PageID.4598.)  Plaintiffs contend that many of the restrictions, "including those on driving, access to education, and access to employment," were not "tailored to Plaintiff's [sic] individual needs;" rather, as Christina Sandie testified at her February 2021 deposition, the restrictions on operating a motor vehicle or obtaining employment or educational opportunities were "standard individual requirements."  (ECF No. 176, PageID.4598-99; ECF No. 176-22, PageID.5040-41.)

Second, Plaintiffs contend that, "[w]hen [they] allegedly violated these restrictive conditions, Hegira revoked their ALS contracts and placed them in a closed psychiatric hospital[,]" in support of which Plaintiffs note that, before Pelichet's most recent rehospitalization, he was residing at the Bibbins Adult Foster Care (AFC) Home.  (ECF No. 176, PageID.4599.)  They also point to:

- Pelichet's April 15, 2016 negative urine toxicology (ECF No. 176-26)

- An April 22, 2016 incident report, which reflects that Pelichet was not in his bedroom at 7:30 a.m., although he was reached on his phone and reported "he stayed out all night long and [was] on his way back home."  (ECF No. 176-24)

- An April 22, 2016 Hegira progress note, which reflects that Pelichet "returned to the AFC around [9:00] a.m." and said he "had to sneak out the backdoor to spend time with his Girlfriend."  (ECF No. 176-23)

- Pelichet's April 29, 2016 negative urine toxicology (ECF No. 176-25)

(ECF No. 176, PageID.4599.)  According to a January 2018 United Psychological Services (UPS) Psychological Evaluation and Treatment Plan signed by Carl E. Alsterberg, Ph.D., Pelichet was hospitalized on May 4, 2016.  (ECF No. 176-30, PageID.5236-48.)  Thus, "[a] jury could conclude that the event that triggered Mr. Pelichet's most recent fourteen-month hospitalization was not a positive drug test, violent behavior, medication non-compliance, or returning symptoms of psychosis, but rather Mr. Pelichet's attempt to covertly spend the night with his girlfriend." (ECF No. 176, PageID.4599.)

Third, Plaintiffs refer to multiple pieces of diverging opinion evidence.  For example, at her April 2021 deposition, Sheila Hatton opined that WRPH was not the least-restrictive setting appropriate for Pelichet's needs (ECF No. 176-27, 5138-39), she testified about her "disagreement with the treatment team regarding the rehospitalization of Mr. Pelichet[,]" (*Id.*, PageID.5169), and she explained that, when she was working at WRPH and Pelichet was a patient, she spent 40 hours with him in a typical week (*Id.*, PageID.5181).  Additionally, Plaintiffs note WRPH risk assessments—one dated June 4, 2014, which scored Pelichet's "aggressive behavior profile" risk score as "00," (ECF No. 176-28, PageID.5223) and another based on Christina Sandie's trial testimony that Pelichet was "low risk" during his 2016-2017 admission to WRPH (ECF No. 176-36, PageID.5410-

38

12).  Furthermore, the September 8, 2017 MDHHS ORR Report states:  "[b]ased on the preponderance of evidence presented by the investigative findings, a violation of Mr. Pelichet's right to receive mental health services in the least restrictive setting that is appropriate and available is substantiated."  (ECF No. 176-29, PageID.5234.)[4]  Also, the January 2018 UPS Psychological Evaluation and Treatment Plan documents Pelichet's report that "he is able to perform activities of daily living . . . without issues[,]" as well as Dr. Alsterberg's conclusions that "[t]here was not any evidence of frank psychosis seen in this evaluation[,]" and "he seems to have the behavioral capacity to recognize reality, and the ability to cope with ordinary demands of life."  (ECF No. 176-30, PageID.5237, 5245, 5247.)  Moreover, Dr. Alsterberg testified that he did not think Pelichet "require[d] treatment unless ordered by a court o[r] a committee[,]" Pelichet's "symptoms are in remission[,]" and Pelichet "would have been compliant long before this[,]" (ECF No. 176-31, PageID.5253-54, 5262).  (*See* ECF No. 176, PageID.4600-01.)

_____

[4] In the amended complaint, Plaintiffs also note that the ORR "determined that the process of using court orders for continued hospitalization to maintain NGRI Committee oversight has become standard practice that is placing the due process rights of individuals who have been found NGRI and placed in the care of the Michigan Department of Health and Human Services (MDHHS) in jeopardy." (ECF No. 44, ¶ 231; *id.*, PageID.1076, 1082.)

Fourth, as for the instances when Pelichet and Washington used marijuana while under Hegira's supervision, Plaintiffs contend that groups homes or WRPH are not necessarily the least restrictive settings capable of meeting their treatment needs—a claim they support with references to Integrated Dual Disorder Treatment (IDDT), which Hegira describes as "an intensive program that focuses on substance use and mental health disorders[,]" and "a time-unlimited program[,]" (ECF No. 176-32, PageID.5274).  (ECF No. 176, PageID.4601.)  By comparison, Plaintiffs contend that WRPH had "only minimal substance use treatment . . . [,]" such as Enid Ali Reed's April 2017 email that Pelichet's needs "are greater than what the hospital has to offer in regards to his substance use . . . [,]" (ECF No. 176-33, PageID.5275), or Reed's August 2020 deposition testimony about "substance abuse therapy[,]" (ECF No. 176-34, PageID.5370-72), or Hatton's April 2021 deposition testimony that "individuals from Alcoholics Anonymous from the outside were allowed to come in and have groups[,]" (ECF No. 176-27, PageID.5143).  (ECF No. 176, PageID.4602.)  At oral argument, defense counsel repeatedly stated that the contract simply says Hegira has to "treat, support, and advocate for the patient."  While there is no breach of contract claim in this lawsuit, the testimony here about substance abuse treatment suggests that Hegira's role – which is intricately tied up in due process – may not have been fulfilled at all.  More to the point, in the context of the ADA and Rehabilitation Act claims,

Hegira's actions may be demonstrative of a violation of the integration mandate (*e.g.*, is it reasonable and consistent with the contractual obligations to put Pelichet in a psychiatric hospital for marijuana use when Hegira has a program for drug treatment, even if Pelichet did breach the contract?).

Finally, in further support of their claim that Hegira's treatment, placement, and petitioning decisions for NGRI patients were determined "not by its professionals' determinations of the individualized treatment needs of each patient, but rather *by the requirements of the ALS Contract*[,]" Plaintiffs point to:

- Hegira's April 7, 2011 client treatment plan report for Washington, which reflects that he "will be eligible for discharge when he has completed his NGRI ALS contract." (ECF No. 176-35.)

- Mary Scott January 2018 probate court testimony that Pelichet needs permission to work and/or go to school. (ECF No. 176-1, PageID.4608-10, 4615-16.)

- Christina Sandie's trial testimony, when she was asked about Pelichet and agreed that "*similar* conditions and terms applied with other patients[.]" (ECF. No. 176-36, PageID.5419 (emphasis added).)

- Christina Sandie's February 2, 2021 deposition testimony about "standard individual requirements." (ECF No. 176-22, PageID.5040-41; *see also id.*, PageID.5039, 5073-75, 5077.)

- Washington's December 8, 2017 ALS contract, which lists thirteen individual requirements. (ECF No. 176-38, PageID.5451-52.) Washington signed the contract himself without a guardian. (*Id.*, PageID.5453.)

- Bickerstaff's February 1, 2017 ALS contract, which lists fifteen individual requirements. (ECF No. 176-37, PageID.5429-30.)

(ECF No. 176, PageID.4602-03 (emphasis in original).) The Court also notes: (i) Pelichet's July 5, 2017 ALS contract, which lists fifteen individual requirements (ECF No. 176-7, PageID.4731-32), and which Pelichet signed himself without a guardian (*Id.*, PageID.4733); (ii) Carroll's February 5, 2021 deposition testimony that there may be "different individual requirements[,]" (ECF No. 176-20, PageID.4960). Although these "standard individual requirements" on a given ALJ contract may differ in number, as Plaintiffs see it, "a reasonable juror could conclude that the ALS contracts are not tailored to afford each patient treatment in the most integrated 'setting' appropriate to their needs, because the requirements imposed on each NGRI patient through their ALS Contract were largely the same." (ECF No. 176, PageID.4602.)

In sum, Plaintiffs have shown a genuine dispute as to the material fact of whether Plaintiffs were placed in the most integrated setting. 28 C.F.R. § 35.130(d); 28 C.F.R. § 41.51(d).

## II. ORDER

For the reasons stated above, Defendant Hegira's June 16, 2021 motion for summary judgment (ECF No. 172) is **GRANTED IN PART** and **DENIED IN PART**. Accordingly, as Plaintiffs' claims relate to Defendant Hegira: **(1)** the procedural and substantive due process claims (Counts I(a),(b)) survive summary

judgment; **(2)** the equal protection and Eighth Amendment claims (Counts I(c),

(d)) are **DISMISSED**; and, **(3)** the ADA and Rehabilitation Act claims (Counts II

and III) survive summary judgment.

Date:  July 26, 2022                              s/*Anthony P. Patti*
                                                 Anthony P. Patti
                                                 United States Magistrate Judge